No. 16-1981

# United States Court of Appeals
# for the Federal Circuit

PETRO-HUNT, L.L.C.

*Plaintiff-Appellant*

v.

UNITED STATES,

*Defendant-Appellee.*

_____

**On Appeal From The United States Court of Federal Claims
Case Nos. 00-512L, 11-775L, Judge Marian Blank Horn**

_____

**BRIEF FOR PLAINTIFF-APPELLANT**

_____

Edmund M. Amorosi
SMITH PACHTER MCWHORTER PLC
8000 Towers Crescent Drive
Suite 900
Tysons Corner, Virginia 22182
703-847-6300
eamorosi@smithpachter.com

D. Joe Smith
JENNER & BLOCK LLP
1099 New York Avenue, NW
Suite 900
Washington, DC 20001
202-639-6000 (phone)
jsmith@jenner.com

J. Ralph White
Sharon L. Andrews
B. Alan Baker
WHITE ANDREWS &
SHACKELFORD, LLC
650 Poydras Street, Suite 2319
New Orleans, Louisiana 70130
(504) 799-2585
ralph@whiteandrews.com

*Counsel for Petro-Hunt, L.L.C.*

## <u>CERTIFICATE OF INTEREST</u>

Counsel for Plaintiff-Appellant, Petro-Hunt, L.L.C., certifies the following:

1. The full name of every party or amicus represented by one or more of the undersigned counsel is: Petro-Hunt, L.L.C.

2. The name of the real party in interest (if the party in the caption is not the real party in interest) represented: The captioned party is the real party in interest.

3. All parent corporations or publicly held companies that own 10% or more of the stock in the party represented, both of which are privately held, are:

>  (a) Petro-Hunt Holding, LLC

>  (b) William Herbert Hunt Trust Estate.

4. The following law firms and partners or associates that appeared for the party in the lower tribunal or that are expected to appear for the party in this court (and who are not already listed on the docket for the current case are):

>  MONTGOMERY, BARNETT, BROWN, READ, HAMMOND & MINTZ, L.L.P.

>  WHITE LAW FIRM (Stella C.C. Shackelford)

>  WILMER CUTLER PICKERING HALE AND DOOR, LLP

July 5, 2016                          /s/ J. Ralph White
                                      J. Ralph White
                                      WHITE ANDREWS &
                                      SHACKELFORD, LLC
                                      650 Poydras Street, Suite 2319
                                      New Orleans, Louisiana 70130
                                      (504) 799-2585 (phone)
                                      (504) 799-2586 (fax)
                                      ralph@whiteandrews.com

                                      *Counsel for Petro-Hunt, L.L.C.*

# TABLE OF CONTENTS

**Page**

CERTIFICATE OF INTEREST ..................................................... i

TABLE OF AUTHORITIES ......................................................... v

STATEMENT OF RELATED CASES ......................................... xi

JURISDICTIONAL STATEMENT ............................................... 1

STATEMENT OF THE ISSUES .................................................. 2

STATEMENT OF THE CASE .................................................... 3

SUMMARY OF THE ARGUMENT ........................................... 15

STANDARD OF REVIEW ........................................................ 18

ARGUMENT ............................................................................... 19

I.    Petro-Hunt's Permanent Takings Claim and Contract Claims Were Not
      Time-Barred Because They Did Not Accrue Until the Quiet Title Action
      Concluded ............................................................................ 19

      A.  The Fifth Circuit's 2007 Decision in the Quiet Title Action Was a
          Necessary Element to Petro-Hunt's Court of Federal Claims Suit . 21

      B.  Under the Court of Federal Claims' Reasoning, Petro-Hunt Would
          Have Had to Make an Election of Remedies to Secure Any Judicial
          Relief .......................................................................... 26

II.   Petro-Hunt's Temporary Takings Claims Were Not Time-Barred
      Because They Did Not Accrue Until Each Mineral Lease Effecting the
      Taking Ended ......................................................................... 27

III.  Section 1500 Did Not Apply to Petro-Hunt's Temporary   Takings
      Claims .................................................................................. 32

      A.  Petro-Hunt's Alternative Request for Just Compensation in the Quiet
          Title Action Was Not a "Claim" .......................................... 33

      B.  Petro-Hunt's Alternative Request for Compensation in the Quiet
          Title Action Was Not "Pending" ......................................... 35

C.  Petro-Hunt's Temporary Takings Claims in the Court of Federal Claims Were Not "Based on Substantially the Same Operative Facts" as the Claims in the Quiet Title Action ................................ 41

    1. Operative Facts in Petro-Hunt's Quiet Title Action .................... 43

    2. Operative Facts in Petro-Hunt's Court of Federal Claims Action43

D.  Section 1500 Cannot Bar Petro-Hunt's Constitutional Right to Just Compensation Under the Fifth Amendment .................................... 44

IV.  The Court of Federal Claims Had Exclusive Jurisdiction over Petro-Hunt's Judicial Takings Claim ............................................................. 47

CONCLUSION ............................................................................ 56

ADDENDUM

CERTIFICATE OF SERVICE

CERTIFICATE OF COMPLIANCE

# TABLE OF AUTHORITIES

CASES                                                                    Page(s)

*A & D Auto Sales, Inc. v. United States*,
   748 F.3d 1142 (Fed. Cir. 2014) ................................................................. 53

*Alley's of Kingsport v. United States*
   103 Fed. Cl. 449 (2013) ................................................................... 53, 54

*Allustiarte v. United States*,
   256 F.3d 1349 (Fed. Cir. 2001) .......................................................... 52, 53

*Anadarko Prod. Co. v. Caddo Parish Sch. Bd.*,
   455 So. 2d 699 (La. App. 2 Cir. 1984) ..................................................... 25

*Bass Enters. Prod. Co. v. United States*,
   133 F.3d 893 (Fed. Cir. 1998), ................................................................. 27

*Blanchette v. Conn. Gen. Ins. Corps.*,
   419 U.S. 102 (1974) ................................................................................. 44

*Block v. North Dakota ex rel. Bd. of University and Sch. Lands*,
   461 U.S. 273 (1983) ................................................................................. 21

*Boise Cascade Corp. v. United States*,
   296 F.3d 1339 (Fed. Cir. 2002) .......................................................... 50, 51

*Brandt v. United States*,
   710 F.3d 1369 (Fed. Cir. 2013) .......................................................... 35, 37

*Central Pines Land Co. v. United States*,
   274 F.3d 881 (5th Cir. 2001) ................................................................... 24

*Central Pines Land Co. v. United States*,
   697 F.3d 1360 (Fed. Cir. 2008) ............................................................... 41

*Chauvin v. Kirchoff*,
   194 So. 2d 805 (La. App. 1967) ............................................................. 30

*Christopher Vill., L.P. v. United States,*
  360 F.3d 1319 (Fed. Cir. 2004)......................................................... 37, 38

*Cohens v. Virginia,*
  19 U.S. (6 Wheat.) 264 (1821) ................................................................ 49

*Coll v. First Am. Title Ins. Co.,*
  642 F.3d 876 (10th Cir. 2011)................................................................. 33

*Colo. River Water Conservation Dist. v. United States,*
  424 U.S. 800 (1976) ................................................................................ 49

*Colonial Chevrolet v. United States*
  103 Fed. Cl. 570 (2013)...................................................................... 53, 54

*Creppel v. United States,*
  41 F.3d 627 (Fed. Cir. 1994).................................................................. 28

*Durfee v. Duke,*
  375 U.S. 106 (1963) ................................................................................ 38

*Dwen v. United States,*
  62 Fed. Cl. 76 (2004)............................................................................... 22

*E. Enters. v. Apfel,*
  524 U.S. 498 (1998) ................................................................................ 48

*Edward J. DeBartolo Corp. v. Fl. Gulf Coast Bldg. & Constr. Trades
  Council,*
  485 U.S. 568 (1988) ................................................................................ 39

*Fidelity and Guar. Ins. Underwriters, Inc. v. United States,*
  805 F.3d 1082 (Fed. Cir. 2015).............................................................. 18

*Fort Mojave Indian Tribe v. United States,*
  23 Cl. Ct. 417 (1991)............................................................................... 19

*Foster v. United States,*
  607 F.2d 943 (Ct. Cl. 1979)..................................................................... 29

*Franconia Associates v. United States,*
    536 U.S. 129 (2002) ................................................................. 31

*Hopland Band of Pomo Indians v. United States,*
    855 F.2d 1573 (Fed. Cir. 1988) ................................................ 19

*Jacobs v. United States,*
    290 U.S. 13 (1933) .................................................................... 45

*Keene Corp. v. United States,*
    508 U.S. 200 (1993). ................................................................ 32

*Koontz v. St. John's River Water Mgmt. Dist.,*
    133 S. Ct. 2586 (2013) ............................................................. 26

*Laird v. Integrated Res., Inc.,*
    897 F.2d 826 (5th Cir. 1990) .................................................... 33

*Ministerio Roca Solida v. United States,*
    778 F.3d 1351 (Fed. Cir. 2015) ................................... 36, 39, 44

*Oak Forest v. United States,*
    23 Cl. Ct. 90 (1991) ................................................................. 21

*Petro-Hunt, L.L.C. v. United States* (*Petro-Hunt I*),
    179 F. Supp. 2d 669 (W.D. La. 2001) ...................................... 11

*Petro-Hunt, L.L.C. v. United States* (*Petro-Hunt II*),
    365 F.3d 385 (5th Cir. 2004) ......................................... 11, 12, 43

*Petro-Hunt, L.L.C. v. United States* (*Petro-Hunt III*),
    2007 WL 715270 (5th Cir. Mar. 6, 2007). ............................... 12

*Petro-Hunt, L.L.C. v. United States* (*Petro-Hunt IV*),
    90 Fed. Cl. 51 (2009) ............................................................... 13

*Petro-Hunt, L.L.C. v. United States* (*Petro-Hunt V*),
    105 Fed. Cl. 37 (2012) ............................................................. 14

*Petro-Hunt, L.L.C. v. United States* (*Petro-Hunt VI*),
  105 Fed. Cl. 132 (2012).............................................................. 15

*Petro-Hunt, L.L.C. v. United States* (*Petro-Hunt VII*),
  126 Fed. Cl. 367 (2016).............................................................. 15

*Samish Indian Nation v. United States*,
  419 F.3d 1355 (Fed. Cir. 2005)..................................... 19, 22, 23

*San Carlos Apache Tribe v. United States*,
  639 F.3d 1346 (Fed. Cir. 2011)......................................... 23, 24

*Smith v. Orr*,
  855 F.2d 1544 (Fed. Cir. 1988)................................................ 37

*Smith v. United States*,
  709 F.3d 1114 (Fed. Cir. 2013)................................................ 48

*Solid Waste Agency of N. Cook Cnty v. U.S. Army Corps of Eng'rs*,
  531 U.S. 159 (2001) ................................................................. 39

*Stop the Beach Renourishment, Inc. v. Fla. Dept. of Env. Res.*,
  560 U.S. 702 (2010) ................................................................. 47

*Trusted Integration, Inc. v. United States*,
  659 F.3d 1159 (2011) ............................................................... 35

*United States v. Cnty. of Cook*,
  157 F.3d 381 (7th Cir. 1999)................................................... 38

*United States v. Little Lake Misere Land Company, Inc.*,
  412 U.S. 580 (1973) ................................................. 8, 9, 20, 24

*United States v. Nebo Oil Company, Inc.*,
  90 F. Supp. 73 (W.D. La. 1950) ........................................... 6, 7

*United States v. Nebo Oil Company, Inc.*,
  190 F. 2d 1003 (5th Cir. 1951) ....................................... *passim*

*United States v. Tohono O'Odham Nation*,
   563 U.S. 307 (2011) ..........................................................................*passim*

*United States v. U.S. Fid. & Guar. Co.*,
   309 U.S. 506 (1940). ................................................................. 37

*Yuba Natural Resources, Inc. v. United States*,
   821 F.2d 638 (Fed. Cir. 1987). ................................................. 27

CONSTITUTIONAL PROVISIONS

U.S. Const. amend. V .............................................................. 1, 45

STATUTES

28 U.S.C § 1346............................................................. 13, 34, 37

28 U.S.C § 1500.................................................................... 13

28 U.S.C. § 1295..................................................................... 1

28 U.S.C. § 1491.................................................................. 1, 12

28 U.S.C. § 1500.................................................................. 1, 14

28 U.S.C. § 2201.................................................................... 34

28 U.S.C. § 2501............................................................. 1, 13, 19

28 U.S.C. § 2522..................................................................... 1

31 U.S.C. § 226..................................................................... 28

Weeks Act, 36 Stat. 961 (Mar. 1, 1911), codified as amended in scattered
   sections of Title 16 of the U.S. Code ........................................ 5

La. Rev. Stat. Ann. § 31:21................................................... 3, 29

La. Rev. Stat. Ann. § 31:27....................................................... 3

La. Rev. Stat. Ann. § 31:29 ............................................................. 4

La. Rev. Stat. Ann. § 31:44, *et seq.* ............................................ 30

La. Rev. Stat. Ann. § 31:64 ............................................................. 5

La. Rev. Stat. Ann. § 31:115–117 ............................................... 28

La. Rev. Stat. Ann. § 31:149 ......................................................... 4

1940 La. Acts No. 315 ........................................................... *passim*

**FEDERAL RULES**

Federal Rule of Civil Procedure 8(a) ................................... 33, 34

**OTHER AUTHORITIES**

5 Charles Alan Wright & Arthur B. Miller, FEDERAL PRACTICE AND PROCEDURE § 1282 (3d ed. 1998) ............................................. 40

Craig A. Schwartz, "Footloose: How to Tame the Tucker Act Shuffle After *United States v. Tohono O'Oodham Nation*," 59 UCLA L. Rev. Discourse 2 (2011) ...................................................................... 40

Emily S. Bremer and Jonathan R. Siegel, *Clearing the Path to Justice: The Need to Reform 28 U.S.C. §1500*, 65 ALA. L. REV. 1 (2013) .................. 32

## <u>STATEMENT OF RELATED CASES</u>

In accordance with Federal Circuit Rule 47.5, counsel for Plaintiff-Appellant provides as follows:

a)  There have been no previous appeals in this case.

b)  They are aware of no other case that will be directly affected by the Court's decision in this case.

## JURISDICTIONAL STATEMENT

Petro-Hunt, L.L.C. ("Petro-Hunt") asserted claims against the United States for the taking of private property without compensation in violation of Amendment V of the U.S. Constitution and, alternatively, for breach of contract and reformation. Jurisdiction existed in the United States Court of Federal Claims ("CFC") under 28 U.S.C. § 1491(a).

The CFC's November 6, 2009 Order dismissed Petro-Hunt's permanent takings claim, temporary takings claims, in part, breach of contract claims, and claim for reformation as time-barred under the six-year limitations period in 28 U.S.C. § 2501. Appx0028–0029.

The CFC's May 2, 2012 Order dismissed Petro-Hunt's remaining temporary takings claims under 28 U.S.C. § 1500. Appx0043.

The CFC's February 29, 2016 Order dismissed Petro-Hunt's judicial takings claim for lack of subject matter jurisdiction. Appx0068.

On February 29, 2016, the CFC entered final judgment regarding the claims disposed of by its prior Orders. Appx0001, 0002. On April 25, 2016, Petro-Hunt timely appealed from that judgment in accordance with 28 U.S.C. § 2522. Dkt. 227. Under 28 U.S.C. § 1295(a)(3), this Court has jurisdiction over a final judgment of the CFC.

# STATEMENT OF THE ISSUES

1. Petro-Hunt's permanent takings claim, breach of contract claims, and claim for reformation were timely when filed within six years of the U.S. Court of Appeals for the Fifth Circuit's 2007 decision abrogating its 1951 decision, which held that Petro-Hunt's predecessor in title owned Louisiana mineral property in perpetuity in the Kisatchie National Forest, as the Fifth Circuit's 2007 decision was a necessary element to Petro-Hunt's claims.

2. Petro-Hunt's temporary takings claims, which were based on a series of 10-year intrusive mineral leases that the United States issued on Petro-Hunt's mineral property, accrued when each mineral lease ended and were timely when filed within six years of the end of the lease that effected the taking.

3. Section 1500 of Title 28 of the United States Code does not bar Petro-Hunt's temporary takings claims because (a) they were never "pending" in the district court, which lacked jurisdiction over them in any event; (b) they were not based on substantially the same operative facts as the district court action; and (c) Section 1500 cannot be construed to bar constitutional takings claims without prompting serious constitutional concerns.

4. The CFC had exclusive jurisdiction over Petro-Hunt's judicial

takings claim under the Tucker Act because the court must determine only whether Petro-Hunt's established property right was eliminated and the amount of just compensation due for the taking, and it is not required to scrutinize the merits of another court's decision.

## STATEMENT OF THE CASE

The history of this case spans over 80 years and involves protracted litigation, statutory turmoil, and judicial inconsistency, all of which have led to the inequitable result that the United States has acquired thousands of acres of valuable Louisiana mineral property without paying for it, and Petro-Hunt has been left without a forum in which to vindicate its constitutional and contractual rights.

### Origin of the Dispute Over Petro-Hunt's Louisiana Mineral Property

Unlike every other state, Louisiana does not recognize separate surface and mineral estates. Reserved mineral rights take the form of a mineral servitude, which entitles the holder to explore for and produce minerals on another's land and reduce those minerals to possession and ownership. La. Rev. Stat. Ann. § 31:21. Louisiana mineral servitudes are extinguished, among other ways, if after 10 years from the date of sale, no exploration or production has occurred, which is called prescription for nonuse. *Id.* § 31: 27(1). Generally, good faith operations to discover and

produce minerals will interrupt the running of prescription. *Id.* § 31:29.

Certain exceptions to the law of prescription, such as those detailed below,

create imprescriptible mineral rights, which do not require a holder to

conduct any operations to maintain its mineral servitude. *See* La. Rev. Stat.

Ann. § 31:149.

As part of the United States' efforts to create the Kisatchie National

Forest ("Kisatchie") in the 1930s, the Government promised Louisiana

landowners that if they sold their land to the United States, the landowners'

reserved mineral rights would never prescribe under Louisiana's law of

prescription. Appx0141–0142. Louisiana landowners, including Bodcaw

Lumber Company of Louisiana ("Bodcaw") and Grant Timber &

Manufacturing Company of Louisiana, Inc. ("Grant"), Petro-Hunt's

predecessors in title, had been reluctant to sell their property to the United

States because they feared they would lose their mineral rights. *Id.*

In an effort to persuade them to sell the surface land, representatives

of the Forest Service of the U.S. Department of Agriculture ("USDA")

provided Bodcaw and Grant with a legal opinion from the USDA Assistant

Solicitor, which affirmed that the law of prescription would not apply to

lands purchased by the United States under the Weeks Act.[1] Appx0142.

Relying on the United States' assurances, between 1934 and 1937, Bodcaw

and Grant sold over 180,000 acres of surface land in Grant, Winn, and

Natchitoches Parishes, but not the mineral rights, to the United States.[2] *Id.*

Before selling the land to the United States, Bodcaw and Grant had

executed six virtually identical mineral conveyances to Good Pine Oil

Company ("Good Pine Oil") between 1932 and 1934. Appx0139–0140.

These conveyances of the mineral rights in perpetuity created 96 mineral

servitudes on the 180,000 acres later sold to the United States.[3] *Id.* Bodcaw

and Grant expressly excluded these mineral rights from their sales to the

Government. Appx0143.

Less than 10 years after the mineral conveyances and the United

States' land purchases, the Louisiana Legislature passed Act No. 315 of

1940 to encourage further land sales to the United States. 1940 La. Acts No.

---

[1] Weeks Act, 36 Stat. 961 (Mar. 1, 1911), codified as amended in scattered
sections of Title 16 of the U.S. Code (authorizing purchase of lands for
inclusion in national forests). The Weeks Act allowed owners selling land to
the United States to reserve their rights to minerals. 36 Stat. 962.

[2] This acreage represents approximately 30% of the Kisatchie's total acreage
today.

[3] Noncontiguous tracts create "as many mineral servitudes as there are
tracts" unless the act creating the mineral servitudes provides otherwise. La.
Rev. Stat. Ann. § 31:64.

315, now codified in present form at La. Rev. Stat. Ann. § 31:149. Act 315 created an exception to Louisiana's law of prescription for 10 years nonuse and retroactively confirmed that all outstanding but unprescribed mineral rights reserved in land sold to the United States, such as the mineral rights here, were now imprescriptible, so long as the United States remained the landowner. *Id.* Act 315 thus codified the United States' prior representations to Bodcaw and Grant.

In 1941, Good Pine Oil conveyed all of its mineral rights to the land in the Kistatchie to William C. Brown. Appx0144. In 1942, Mr. Brown conveyed the perpetual mineral rights to Nebo Oil Company, Inc. ("Nebo Oil"). *Id.* Although Nebo Oil believed that it had acquired imprescriptible mineral servitudes based on the prior agreements between the parties, the United States' assurances, and Act 315, the Government reneged on the representations it made to induce the sale of the surface lands by asserting ownership of the mineral rights through prescription. Appx0145.

### Federal Courts Deny the United States' Claims to Ownership of the Imprescriptible Mineral Property

In 1948, the United States filed suit for a declaratory judgment against Nebo Oil, claiming that Nebo Oil's mineral rights to an 800-acre tract of land in the Kisatchie had prescribed to the United States. *United States v. Nebo Oil Company, Inc.*, 90 F. Supp. 73 (W.D. La. 1950); Appx0144–0145.

The 800-acre tract was a part of a larger 24,943-acre conveyance of the surface from Bodcaw. Appx0006. The 800 acres were also part of an 1120-acre servitude that was created by a 37,532-acre mineral conveyance from Bodcaw to Good Pine Oil. *Nebo Oil*, 90 F. Supp. at 77. After a trial on the merits, the U.S. District Court for the Western District of Louisiana ruled that Nebo Oil owned the mineral property in perpetuity. *Id.* at 107.

On appeal, after reviewing Act 315 of 1940, Louisiana decisional law, and the agreements between Nebo Oil's predecessors and the United States, the U.S. Court of Appeals for the Fifth Circuit held that Act 315 applied retroactively, without violating the Constitution, and that Nebo Oil's mineral rights were imprescriptible. *United States v. Nebo Oil Company, Inc.*, 190 F.2d 1003 (5th Cir. 1951). The Fifth Circuit held that the "hope" of the Government, as landowner, for a return of the minerals, based solely on the Louisiana law of prescription, was not a contract right impaired by the passage of Act 315. *Id.* at 1009. The Fifth Circuit affirmed the district court's detailed findings of fact, including the finding that the United States did not buy, did not intend to buy, and did not pay for the mineral rights. *Id.* at 1009-10.

**Impact of *Nebo Oil***

For more than 50 years, Petro-Hunt and its predecessors were actual and record owners of the 96 mineral servitudes in the Kisatchie. Nebo Oil recorded the judgment in its favor along with affidavits of ownership in the parishes' land records, providing notice that it owned title to all 180,000 acres of imprescriptible mineral servitudes. Appx0145. The United States did not contravene these affidavits, and its own public land records after *Nebo Oil* reflected that private parties owned these mineral rights in perpetuity. Appx0146.

During that time, the United States sought to acquire other Louisiana mineral property through litigation. After again losing a quiet title action in the district court and the Fifth Circuit, the United States took its quest to the Supreme Court in *United States v. Little Lake Misere Land Company, Inc.*, 412 U.S. 580 (1973). In *Little Lake Misere*, the Supreme Court held that Act 315 of 1940 could not be applied retroactively to outstanding mineral interests in lands acquired by the United States under the Migratory Bird Conservation Act, a statutory scheme entirely different from the Weeks Act involved in *Nebo Oil*. *Little Lake Misere* turned on a choice of law analysis and held that federal rather than state law applied. *Id.* The Supreme Court found that Act 315 deprived the United States of its "bargained-for contractual interests" in that case. *Id.* at 597.

The *Little Lake Misere* Court did not overrule *Nebo Oil* and distinguished it in a footnote based on the fact-driven nature of that case.[4] The Supreme Court observed that in circumstances where the contract between the parties did not indicate how the United States would obtain the mineral rights, "it might be said that the Government acknowledged and intended to be bound by unforeseeable changes in state law." *Id.* at 602-03. While *Nebo Oil* involved acquisitions of lands already burdened by mineral servitudes outstanding in third parties, *Little Lake Misere* involved an acquisition that subsequently created a mineral servitude. *Id.* at 582.

The United States left the mineral property in the Kisatchie undisturbed for decades after *Nebo Oil*. Beginning in the late 1980s, however, the Government disregarded *Nebo Oil* and the terms of the conveyances and started sporadically issuing mineral leases on Petro-Hunt's

---

[4] The Supreme Court stated:

> The [Fifth Circuit] Court of Appeals [in *Nebo Oil*] also emphasized that officials of the Department of Agriculture had represented to the Government's vendor that 'the prescriptive provisions of the Louisiana Civil Code would not apply to lands sold to the United States for national forest purposes.' 190 F.2d 1003, 1005. The Court of Appeals noted that the price paid by the Government did not reflect the value of any mineral rights and that the vendor would not have agreed to the land sale absent the Government's representation that Louisiana prescriptive law would not apply. *Id.* at 1006.

*Little Lake Misere*, 412 U.S. at 586 n.4.

mineral property.[5] Appx0146; Appx1063–1078. In the 1990s, the mineral
servitude owners disputed the issuance of the leases on their mineral
property and pursued administrative relief before the U.S. Department of the
Interior to no avail. Appx0146. The intrusive leases concerned only small
portions of the mineral property until the United States leased approximately
13,000 acres to a single lessee in 1997. Appx1071–1078.

**Petro-Hunt's Quiet Title Action**

In response to the United States' increased leasing activities, on
February 18, 2000, Petro-Hunt and the co-owners of the mineral servitudes,
Hunt Petroleum Corporation and Kingfisher Resources, Inc., filed a
declaratory judgment action under 28 U.S.C. § 2409a to quiet title to the
mineral property. Appx1126. In the complaint, the mineral servitude owners
alternatively requested just compensation, but only in the event that the
district court did not award title to the plaintiffs. Appx1140. The
Government responded that the district court lacked jurisdiction to declare
an unconstitutional taking and award compensation. Appx0033.

In 2001, the U.S. District Court for the Western District of Louisiana
granted summary judgment in Petro-Hunt's favor and ruled that under the

---

[5] The United States even issued a lease on the 800 acres at issue in *Nebo Oil*,
which Petro-Hunt owns in perpetuity today. Appx 1077.

Fifth Circuit's decision in *Nebo Oil*, *res judicata* precluded the United States from relitigating title to the 96 mineral servitudes, which the district court held Petro-Hunt owned in perpetuity. *Petro-Hunt, L.L.C. v. United States* (*Petro-Hunt I*), 179 F. Supp. 2d 669 (W.D. La. 2001). The district court made undisputed findings of fact that all 96 mineral servitudes were created by six virtually identical conveyances and were "similarly situated" to the 800-acre tract at issue in *Nebo Oil*, and thus equally susceptible to the application of Act 315. *Id.* at 682. The district court also held that the United States had been afforded a "full and fair opportunity" in *Nebo Oil* to litigate Act 315's constitutionality and application to the mineral property. *Id.* ("The government should not be allowed to litigate now that which it could have litigated 50 years ago."). Like it had 50 years before, the district court found that the United States did not own these mineral rights.

But in 2004, the Fifth Circuit unexpectedly reversed the district court and held that *res judicata* applied only to the mineral rights in the 800-acre parcel described in the United States' *Nebo Oil* complaint, which remained imprescriptible. *Petro-Hunt, L.L.C. v. United States* (*Petro-Hunt II*), 365 F.3d 385, 397 (5th Cir. 2004), *cert. denied*, 543 U.S. 1034 (2004). Departing from long-standing precedent, the Fifth Circuit held that Petro-Hunt's remaining mineral property was now subject to the law of prescription. *Id.*

The Fifth Circuit remanded the case for the district court to determine whether any of the servitudes had in fact prescribed. *Id.*

On remand, the district court denied Petro-Hunt's motion for a trial on whether Act 315 was hostile to the United States' interests under the facts of the case. Appx1402. On December 7, 2005, the district court issued a judgment that Petro-Hunt remained the owner of five servitudes, now subject to the law of prescription, and the owner of 800 acres of the 1120-acre *Nebo Oil* servitude, which remained imprescriptible. Appx0247–0280. The district court further ruled that 90 servitudes and the remaining 320 acres of the *Nebo Oil* servitude had prescribed to the United States. *Id.*

On March 6, 2007, the Fifth Circuit affirmed the district court's order denying Petro-Hunt's motion for a trial and the district court's final judgment on ownership. *Petro-Hunt, L.L.C. v. United States* (*Petro-Hunt III*), No. 06-30095, 2007 WL 715270 (5th Cir. Mar. 6, 2007) (per curiam), *cert. denied*, 552 U.S. 1242 (2008); Appx2080–2082.

**Petro-Hunt's Court of Federal Claims Action**

On August 24, 2000, Petro-Hunt filed suit in the CFC, *Petro-Hunt, L.L.C. v. United States*, No. 00-512, asserting Fifth Amendment takings claims and requesting monetary relief, which only the CFC can grant for takings claims over $10,000. Appx0090; 28 U.S.C. § 1491(a)(1); *cf.* 28

U.S.C. § 1346(a)(2). A few months later, the CFC granted the parties' joint motion to stay the case pending the resolution of the Quiet Title Action in the district court. Appx0009.

After the Quiet Title Action concluded, the stay was lifted, and Petro-Hunt filed its First Amended Complaint in the CFC on June 25, 2008, adding alternative claims for breach of contract and reformation. Appx0118–0121. In November of 2009, the CFC ruled that Petro-Hunt's permanent takings claim and contract claims accrued between 1991 and 1993, based on letters to the mineral servitude owners regarding the United States' claims of mineral ownership of specific parcels in the Kisatchie. *Petro-Hunt, L.L.C. v. United States* (*Petro-Hunt IV*), 90 Fed. Cl. 51, 63-64 (2009); Appx0017–0018. The CFC dismissed the claims as untimely under 28 U.S.C. § 2501. *Id.* at 72; Appx0026. The CFC also dismissed as time-barred Petro-Hunt's temporary takings claims founded on the Government's intrusive 10-year mineral leases that were issued more than six years before Petro-Hunt filed suit on August 24, 2000. *Id.* at 65-67, 72; Appx0028–29. The CFC denied Petro-Hunt's motion for reconsideration. Appx0030–31. In 2010, Petro-Hunt filed a Restated Second Amended Complaint, which added a judicial takings claim founded on the result of the Quiet Title Action. Appx0147–0149, Appx0150–0151.

After having joined in a stay request in 2000 pending the resolution of

the Quiet Title Action, as well as having failed to raise the issue in its prior

motion to dismiss, the Government belatedly filed another motion to dismiss

under 28 U.S.C. § 1500 in late May of 2011, after the Supreme Court

handed down the decision interpreting Section 1500 in *United States v.*

*Tohono O'Odham Nation*, 563 U.S. 307 (2011). Dkt. 108.

While the United States' motion to dismiss under Section 1500 was

pending, on November 17, 2011, Petro-Hunt filed a new suit in the CFC,

*Petro-Hunt, L.L.C. v. United States*, Case No. 11-775, which reasserted

claims from Petro-Hunt's pending suit, Case No. 00-512, to avoid the

possible punitive effect of Section 1500's potential application. Appx0194.

The CFC issued an order staying Case No. 11-775 in December of 2011. No.

11-775, Dkt. 11. In 2015, the CFC consolidated Petro-Hunt's two actions.

No. 11-775, Dkt. 22.

In May of 2012, the CFC concluded that Petro-Hunt's alternative

compensation request in its district court complaint was "pending" when

Petro-Hunt filed its temporary takings claims in the CFC and that the two

suits were based on the same operative facts. *Petro-Hunt, L.L.C. v. United*

*States* (*Petro-Hunt V*), 105 Fed. Cl. 37, 44 (2012); Appx0037–0038. The

CFC dismissed Petro-Hunt's remaining temporary takings claims under

Section 1500, but denied the Government's motion as to Petro-Hunt's judicial takings claim. *Id.* at 48; Appx0038; Appx0040. The Court denied Petro-Hunt's motion for reconsideration. *Petro-Hunt, L.L.C. v. United States (Petro-Hunt VI)*, 105 Fed. Cl. 132 (2012); Appx0044–46.

After two and a half years of expending extensive time and resources conducting discovery, on February 29, 2016, the CFC ruled that it could not determine whether the Fifth Circuit took Petro-Hunt's mineral property without "scrutinizing" the Fifth Circuit's decision. *Petro-Hunt, L.L.C. v. United States* (*Petro-Hunt VII*), 126 Fed. Cl. 367, 385 (2016); Appx0067–0068. The CFC dismissed Petro-Hunt's judicial takings claim for lack of subject matter jurisdiction. *Id.*; Appx0068. The CFC entered a final judgment in Case Nos. 00-512 and 11-775 on February 29, 2016, disposing of all of Petro-Hunt's claims. Appx0001; Appx002.

## SUMMARY OF THE ARGUMENT

A series of legal errors by the CFC in applying the court's numerous jurisdictional barriers have now deprived Petro-Hunt of any opportunity to vindicate its constitutional and contractual rights.

*First*, Petro-Hunt's permanent takings and contract claims were not time-barred when it filed suit in the CFC on August 24, 2000. Petro-Hunt initially invoked its right to maintain title to its mineral property in the Quiet

Title Action rather than conceding title to the Government to pursue any takings or contract claims. Before the Fifth Circuit held in 2007 that the United States now owns the mineral property for which it held in 1951 the United States paid nothing, did not buy, and did not own, Petro-Hunt had no way to know that its property interests, confirmed by *Nebo Oil* and reflected in the land records of Louisiana and the United States, had been modified or abridged in a way to give rise to a takings claim. This Court has held that if an element to a claim must be established in another forum, that claim will not accrue until the missing element is established. The Fifth Circuit's 2007 decision, not the Government's unsubstantiated claims that contradicted precedent and public records, was the legal predicate to the accrual of Petro-Hunt's claims. Until the Quiet Title Action ended, Petro-Hunt's permanent takings and contract claims were not ripe for adjudication in the CFC.

*Second*, the CFC misguidedly concluded that Petro-Hunt's temporary takings claims, which were based on a series of 10-year mineral leases issued by the Government, accrued when the United States issued the leases, instead of when the leases ended. Under Louisiana mineral law, Petro-Hunt had the option to adopt any operations under an intrusive lease as its own, or to take legal action to confirm title or pursue compensation for an unlawful taking or unjust enrichment. Under this Court's precedent, and Louisiana

16

mineral law, Petro-Hunt was entitled to wait until the process that began the taking ended, when Petro-Hunt knew the full extent of its claims, before filing suit. Thus, Petro-Hunt's temporary takings claims for leases that ended within six years of August 24, 2000, were not untimely.

*Third*, the Section 1500 jurisdictional trap to avoid duplicative litigation did not apply to Petro-Hunt's temporary takings claims in the CFC. Because the district lacked jurisdiction to award monetary relief, Petro-Hunt's alternative request for compensation cannot be considered a "pending claim" under Section 1500 without raising serious constitutional questions. As a result, Section 1500's jurisdictional bar was not invoked because the legally operative facts of the two suits were not substantially the same. In any event, Section 1500 cannot be construed as a statutory bar to claims asserting a self-executing constitutional right to compensation, which do not require a waiver of sovereign immunity.

*Fourth*, the CFC erred in dismissing Petro-Hunt's judicial takings claim for compensation because the CFC would not be required to scrutinize another court's decision to resolve the claim. The taking of private property—through whatever method—without justly compensating the owner is a violation of the Fifth Amendment. As the Supreme Court and this Court have recognized, the elimination of an established property right

through judicial action can constitute a taking. Petro-Hunt's judicial takings claim was exclusively within the CFC's Tucker Act jurisdiction. The CFC's conclusion that it could not hear Petro-Hunt's judicial takings claim is tantamount to ruling that there can be no takings claims for a federal court's actions.

As a result of the CFC's decisions, the confounding and often arbitrary obstacles in the CFC's jurisdictional labyrinth have precluded Petro-Hunt from asserting its constitutional right to just compensation. Without a judicial forum to hear Petro-Hunt's claims, after more than 80 years, the United States will have finally acquired this valuable mineral property without paying for it. This Court should reverse the CFC's judgment so that Petro-Hunt can maintain its claims against the United States.

## STANDARD OF REVIEW

This Court reviews de novo a dismissal by the Court of Federal Claims for lack of jurisdiction. *Fidelity and Guar. Ins. Underwriters, Inc. v. United States*, 805 F.3d 1082, 1087 (Fed. Cir. 2015).

<u>**ARGUMENT**</u>

I. **Petro-Hunt's Permanent Takings Claim and Contract Claims Were Not Time-Barred Because They Did Not Accrue Until the Quiet Title Action Concluded**

Ripeness and accrual can often be viewed as two sides of the same coin. The Tucker Act, 28 U.S.C. § 1491(a)(1), provides the Court of Federal Claims with jurisdiction over takings claims brought against the United States. Monetary claims under the Tucker Act do not accrue until they have sufficiently ripened. *See, e.g.*, *Samish Indian Nation v. United States*, 419 F.3d 1355, 1369 (Fed. Cir. 2005); *Hopland Band of Pomo Indians v. United States,* 855 F.2d 1573, 1577 (Fed. Cir. 1988). A plaintiff must bring a Tucker Act claim "within six years after such claim first accrues." 28 U.S.C. § 2501. A Tucker Act claim does not accrue, however, until all of the events that fix the United States' liability have occurred and entitle the claimant to institute an action. *See Samish*, 419 F3d at 1369 (citing *Martinez v. United States*, 333 F. 3d 1295, 1303 (Fed. Cir. 2003) (en banc)).

If a necessary element to a claim must be established in a different forum, the claim will not accrue until that element is finally established in the other forum. *Id.* (citing *Heck v. Humphrey*, 512 U.S. 477, 489-90 (1994); *Midgett v. United States*, 603 F.3d 835, 839 (Ct. Cl. 1979)); *see also Fort Mojave Indian Tribe v. United States*, 23 Cl. Ct. 417, 428-430 (1991), *aff'd*,

19

No. 9550-14, 1995 WL 495536 (Fed. Cir. 1995) (tribe's claim for damages did not accrue until 1983 when the Supreme Court interpreted the tribe's rights established in 1964 decree).

Petro-Hunt filed suit in the CFC on August 24, 2000. The CFC incorrectly concluded that Petro-Hunt's permanent takings and contract claims accrued sometime between 1991 and 1993 and were untimely under the six-year limitations period. Appx0017–0018. The CFC based this erroneous accrual date on certain letters exchanged during that time between the United States, Hunt Petroleum (a co-owner of the mineral servitudes), and later Placid Oil Company (Petro-Hunt's predecessor in title), in which the United States claimed mineral ownership of specific parcels in the Kisatchie. *Id.*; Appx0843-0852.

Despite the parties' agreements and precedent contrary to the United States' ownership claims, the CFC deemed these letters sufficient to put the mineral servitude owners on notice that a permanent takings claim should be pursued. Appx0018. The letters referenced the United States' attempt to issue mineral leases to specific, small parcels in the Kisatchie. Appx 0843-0852. The Government's title opinion referenced in the letters conflicted

with federal and state public land records and, critically, the precedential decision in *Nebo Oil*.[6] Appx0862–0870; Appx0017.

Having decided that Petro-Hunt's claims accrued at this earlier time, the CFC held that the accrual suspension rule could not save Petro-Hunt's claims from the statute of limitations. Appx0016–0018. But the CFC's reliance on the letters in reaching that conclusion only compounded its initial accrual date mistake.

### A. The Fifth Circuit's 2007 Decision in the Quiet Title Action Was a Necessary Element to Petro-Hunt's Court of Federal Claims Suit

So when did Petro-Hunt's permanent takings and contract claims accrue? The claims could not have accrued until the Quiet Title Action concluded in 2007, when the Fifth Circuit affirmed the district court's judgment, and the United States acquired Petro-Hunt's ownership interest without just compensation.

---

[6] Anything but conclusive, the 1986 title opinion discusses the Government's potential legal arguments. Appx0862–0870. For instance, the opinion acknowledges that "[a] potential argument is that since the Forest Service tracts [at issue in *Little Lake Misere*] were not acquired pursuant to the Weeks Act, *Little Lake Misere* is not controlling as Act 315, which frustrated the purpose of the Migratory Bird Conservation Act, does not frustrate the purpose of the Weeks Act." Appx0866. The opinion states nebulously, "It is therefore arguable that *Nebo* is no longer valid law in light of *Little Lake Misere*." Appx0869.

As a precursor to prevailing in the CFC, Petro-Hunt had to establish a necessary element to its claims in a different forum. Petro-Hunt never conceded title to the mineral servitudes until after the Quiet Title Action concluded. An essential element of a valid takings claim is an admission or concession that the property has been taken. *See, e.g., Block v. North Dakota ex rel. Bd. of University and Sch. Lands*, 461 U.S. 273, 280-81 (1983) ("Since the passage of the Tucker Act in 1887, those claimants willing to settle for monetary damages rather than title to the disputed land could sue in the Court of Claims . . ."); *Oak Forest v. United States*, 23 Cl. Ct. 90 (1991).

If Petro-Hunt had maintained its title to the mineral property, then it would not have had any claims for compensation. The CFC lacks jurisdiction under the Quiet Title Act, 28 U.S.C. § 2409a, to declare present title. *See, e.g.*, *Dwen v. United States*, 62 Fed. Cl. 76, 81 (2004). The CFC has jurisdiction to determine if a claimant *had* a compensable property interest, incident to determining whether a taking occurred, but that is the case only if the claimant is seeking compensation and not present title. *Id.* The governmental action constituting the permanent taking and breach of contract had not occurred until the Quiet Title Action ended, title was transferred to the Government without compensation, and the Government's liability fixed. *See Samish*, 419 F.3d at 1369.

In *Samish*, as in this case, the plaintiffs' claims did not accrue until the missing element to its claim in the CFC was established in a different forum. *Id.* The Samish tribe sued the United States in the CFC for the Government's failure to pay past benefits. This Court held that the tribe's CFC claim for retroactive benefits accrued when the district court found that the United States had wrongfully denied prior recognition of the tribe. *Id*. Without that determination, the tribe would have been unable to make a claim in the CFC for the denied benefits.

Likewise, the result of the Quiet Title Action was necessary to Petro-Hunt's takings claim being fully ripe in the CFC and is akin to the threshold determination in *Samish*. While quiet title decisions usually adjudicate a contest of rights between the parties, here the parties' rights were already established in *Nebo Oil*. The Fifth Circuit's unexpected change of course in 2007 was necessary for the adjudication of Petro-Hunt's permanent takings and contract claims in the CFC. At that point, Petro-Hunt's mineral property was taken, its contract with the United States breached, and its claims ripe in the CFC. Those claims would have been unnecessary if Petro-Hunt had retained title to the mineral property in perpetuity.

In distinguishable circumstances, this Court has held that claim accrual was not dependent on a court's decision in related actions. In *San*

*Carlos Apache Tribe v. United States*, 639 F.3d 1346 (Fed. Cir. 2011), the plaintiffs argued that their claim in the CFC for breach of fiduciary duty accrued when the Arizona Supreme Court held in 2006 that the tribe was bound to a 1935 consent decree in prior litigation that resolved all issues about the tribe's water rights to the Gila River. The Court held that all of the events fixing the government's liability occurred and the tribe's claims accrued upon entry of the 1935 decree, not after the 2006 decision. The terms of the decree itself formed the basis for the Court's decision, which stated, "the Tribe knew or should have known that the terms of the Decree precluded the Tribe from seeking additional Gila River water rights." *Id.* at 1351. Rejecting the comparison to *Samish*, the Court stated that the Arizona Supreme Court "simply stated what was readily apparent on the face of the 1935 Decree." *Id.* at 1352.

Unlike the plaintiffs in *San Carlos*, Petro-Hunt and its predecessors in title had a clear judicial construction of the law of prescription *in their favor in perpetuity*. Only after the Quiet Title Action concluded and *Nebo Oil*'s application limited was title to Petro-Hunt's mineral rights changed and the Government's liability fixed. The operation of *Nebo Oil* was the determinative factor in Petro-Hunt's Quiet Title Action.

Importantly, the Fifth Circuit's decision in the Quiet Title Action did not and could not "simply state[] what was readily apparent" from prior precedent and law. Until the Quiet Title Action ended, Petro-Hunt had no way to know that its property interests under *Nebo Oil* had been modified or abridged in such a way as to give rise to a takings claim. This belief was justified considering that: (i) the Government never made any effort to contravene Nebo Oil's affidavits in the public records, nor altered its own publicly-available land records; (ii) several federal and state courts, including the Fifth Circuit in *Central Pines Land Co. v. United States*, said *Nebo Oil* was good law;[7] (iii) in 2001, the district court found that the *res judicata* effect of *Nebo Oil* extended to all 180,000 acres of Petro-Hunt's mineral property; and (iv) even today, *Nebo Oil* has never been overruled, only limited, as Petro-Hunt's mineral rights to the 800-acre parcel described in *Nebo Oil* remain imprescriptible, and only an en banc panel of the Fifth Circuit could overturn the decision. Furthermore, at present, as it has since

---

[7] In *Central Pines*, the Fifth Circuit noted that it was unnecessary to determine whether *Little Lake Misere* had implicitly overruled *Nebo Oil*, and also noted that the *Central Pines* court could not overrule *Nebo Oil*, nor had any Fifth Circuit en banc opinion done so. 274 F.3d 881, 890, 893-94 (5th Cir. 2001), *cert denied*, 537 U.S. 822 (2002). Other courts had previously concluded that *Little Lake Misere* did not overrule *Nebo*. *See*, *e.g.*, *Anadarko Prod. Co. v. Caddo Parish Sch. Bd.*, 455 So. 2d 699, 702 (La. App. 2 Cir. 1984) ("We do not find, as the [defendant] contends, that [*Little Lake Misere*] had the effect of overriding the decisions in . . . *Nebo*.").

1940, Louisiana law provides that reserved mineral rights to property sold to the United States are imprescriptible. *See* La. Rev. Stat. Ann. § 31:149(B).

The statute of limitations could not start to run until an essential element of Petro-Hunt's claims was established. The missing element was finally established on March 6, 2007, when the Fifth Circuit affirmed the district court's judgment on ownership of the servitudes. Consequently, Petro-Hunt's permanent takings claims and contract claims were not time-barred.

### B. Under the Court of Federal Claims' Reasoning, Petro-Hunt Would Have Had to Make an Election of Remedies to Secure Any Judicial Relief

To seek just compensation in the CFC, Petro-Hunt should not have been forced to concede title for property that Petro-Hunt justifiably believed that it owned in perpetuity based on *Nebo Oil* and other indicia of title. The two suits were necessary to effectuate the complete relief needed because while Congress has authorized the claims, it has not allowed them to be joined in a single action. "[T]he government may not deny a benefit to a person because he exercises a constitutional right." *Koontz v. St. John's River Water Mgmt. Dist.*, 133 S. Ct. 2586, 2594 (2013) (quoting *Regan v. Taxation With Representation of Wash.*, 461 U.S. 540, 545 (1983)). Nor may the United States do the converse: force a property owner to give up its

constitutional right to seek just compensation so that it may pursue an action to quiet title to his property. *Id.*

Petro-Hunt was within its rights to confirm its title in the district court before pursuing a potential takings claim in the CFC. In the end, the United States acquired valuable mineral property for which it did not pay and never intended to pay.[8] Petro-Hunt then moved on to the next challenge in the tortured history of this dispute: establishing jurisdiction in the CFC.

Because the necessary element to Petro-Hunt's permanent takings claim and contract claims was not established until the Quiet Title Action ended in 2007, Petro-Hunt's claims that were filed before this time were not barred by the statute of limitations. This Court should reverse the CFC's error dismissing Petro-Hunt's claims as time-barred under 28 U.S.C. § 2501.

## II. Petro-Hunt's Temporary Takings Claims Were Not Time-Barred Because They Did Not Accrue Until Each Mineral Lease Effecting the Taking Ended

Petro-Hunt's temporary takings claims are based on a series of 10-year mineral leases issued by the United States. Appx0019. In deciding the "close issue" of when these claims accrued, the CFC erred in finding that the date the United States issued the mineral lease, and not when the lease expired or were terminated, served as the date of accrual. Appx0022.

---

[8] *See Nebo Oil*, 190 F.2d at 1009-10.

Applying that erroneous finding, the CFC ruled that Petro-Hunt's takings claims related to any intrusive leases that were issued more than six years before August 24, 2000, were untimely, resulting in the dismissal of some, but not all, of the temporary takings claims. *Id.*

As a general matter, a temporary taking differs from a permanent taking because a temporary taking is limited in duration or is acknowledged to be readily reversible. *See Yuba Natural Resources, Inc. v. United States*, 821 F.2d 638, 641-41 (Fed. Cir. 1987). In *Bass Enterprises Production Co. v. United States*, 133 F.3d 893, 896 (Fed. Cir. 1998), this Court held that a temporary regulatory takings claim *may* be brought before cessation of the regulation, but not that it *must* be brought before that time.

Whether regulatory or physical in nature, a temporary takings claim should accrue at the same time: when the "process that began it has ended." *Creppel v. United States*, 41 F.3d 627, 632 (Fed. Cir. 1994) (statute of limitations begins to run on a temporary regulatory takings claim when the temporary takings period ends).Without running afoul of the statute of limitations, a temporary physical or regulatory takings claimant should have the option to file its claim once the taking begins or wait and determine the extent of the taking, and the amount of just compensation owed, before filing suit.

The temporary takings of Petro-Hunt's mineral property began when the United States issued the intrusive mineral leases and ended when the leases expired or were terminated. The resulting temporary takings claim accrued, and the statute of limitations began to run, at the end of each lease.

Both the Louisiana Mineral Code (La. Rev. Stat. Ann. § 31:115 – 117) and the Mineral Leasing Act (31 U.S.C. § 226) provide that the primary terms of a mineral lease can be no longer than 10 years, but may continue after the primary term if oil and gas is produced in paying quantities, under federal law, or for so long as drilling operations or production occur, under Louisiana law. All intrusive leases issued by the United States on Petro-Hunt's mineral property were limited to 10 years by their express terms. Appx0019; Appx1077.

Faced with these considerations, it is essential to distinguish the act of issuing the leases from the activities that occur under those leases. The accrual date of Petro-Hunt's temporary takings claims and the extent to which the leases diminished the value of Petro-Hunt's mineral property depends on the lessees' actions to explore and develop the property.

The nature of mineral rights in Louisiana supports Petro-Hunt's accrual argument. In determining the effects of federal action on real property, courts look to the law of the state where the property is located.

*See Foster v. United States*, 607 F.2d 943, 948 (Ct. Cl. 1979). In Louisiana, mineral servitude holders own the minerals only after they have been captured and reduced to possession. *See* La. Rev. Stat. Ann. § 31:21. Once the United States' intrusive mineral leases ended, some measure of value was restored to Petro-Hunt's mineral property. Before that time, Petro-Hunt nor its predecessors knew if drilling operations or production would commence or if the United States' lessees would actually reduce any minerals to possession and ownership.

To illustrate, a mineral owner might contest the United States' leasing activities but elect not to pursue legal action if no drilling or production has occurred under the lease. The six-year limitations period may pass before a United States' lessee elects to begin operations under the 10-year term of the lease. If the lessee then drilled for and produced minerals from the owner's servitude, the damages from the taking would be necessarily different. But under the CFC's reasoning here, the mineral owner's temporary takings claim asserted at this point would be untimely.

In Louisiana, claims relating to property disputes involving mineral leases do not accrue, and the statute of limitations does not begin to run, until the leases have expired. *See Chauvin v. Kirchoff*, 194 So. 2d 805, 814 (La. App. 1967) (internal citations omitted) ("[T]he controlling date for the

commencement of the one-year prescriptive period [statute of limitations] . . . is not the date of registry or recordation, but is one year from the date said disturbance ceases."). Also, under the Louisiana Mineral Code, a mineral owner has the right to choose whether to adopt as its own any operations conducted under an intrusive lease or instead take legal action regarding establishment of title, unlawful taking, or unjust enrichment. *See* La. Rev. Stat. Ann. § 31:44, *et seq.* and Comments.

The accrual of Petro-Hunt's temporary takings claims is comparable to that of a claim for breach of contract based on anticipatory repudiation. In *Franconia Associates v. United States,* 536 U.S. 129, 144 (2002), the Supreme Court noted that a non-breaching party faced with the repudiation of a contract may elect to treat the repudiation as a breach and bring suit immediately or wait until performance is due. At that point, the statute of limitations begins to run. The Supreme Court recognized that "[t]he plaintiff should not be penalized for leaving to the defendant an opportunity to retract his wrongful repudiation . . . ." *Id.* at 146 (quoting 4 Arthur L. Corbin, *Contracts* § 989, at 967 (1951)) (internal quotation marks omitted).

Under this Court's precedent, analogous principles, and the facts presented, this Court should find that Petro-Hunt's temporary takings claims accrued when each intrusive mineral lease ended and reverse the CFC's

dismissal of Petro-Hunt's takings claims for leases that ended less than six years before Petro-Hunt filed suit on August 24, 2000.

### III. Section 1500 Did Not Apply to Petro-Hunt's Temporary Takings Claims

Derided as "purposeless," "anachronistic," "unjust," "a trap for the unwary," and the "confederate ghost that haunts the federal courts," Section 1500 of Title 28 of the United States Code is a "judicial quagmire" that claimants must overcome to assert their constitutional claims in the CFC.[9] If a plaintiff, upon filing, has a suit pending in any other court "for or in respect to" the same claim, Section 1500 bars jurisdiction over the CFC suit. *Keene Corp. v. United States*, 508 U.S. 200, 209 (1993). The Supreme Court's latest interpretation of Section 1500 is that "[t]wo suits are for or in respect to the same claim, precluding jurisdiction in the CFC, if they are based on substantially the same operative facts, regardless of the relief sought in each suit." *Tohono*, 563 U.S. at 317.

Three years after the CFC determined that they were not time-barred, Petro-Hunt's remaining temporary takings claims were met with the "significant jurisdictional limitation" of Section 1500. *Id.* at 314. After

---

[9] Quotations and authorities from Emily S. Bremer and Jonathan R. Siegel, *Clearing the Path to Justice: The Need to Reform 28 U.S.C. §1500*, 65 Ala. L. Rev. 1, 3, 37-38 (2013).

reviewing cases interpreting and applying Section 1500, the CFC expressed "serious doubts" that Petro-Hunt's Quiet Title Action implicated Section 1500's bar. Appx0037. Nevertheless, the CFC speciously determined that because Petro-Hunt included an alternative request for just compensation in its district court complaint, Section 1500 divested the CFC of jurisdiction over Petro-Hunt's remaining temporary takings claims. Appx0037–38. Only through this void request did the court reach the conclusion, albeit with limited explanation, that Petro-Hunt's temporary takings claims "still rely upon facts that were operative in the district court action that was pending at the time the case *sub judice* was filed." Appx 0038. The Court should reverse the CFC's error.

### A. Petro-Hunt's Alternative Request for Just Compensation in the Quiet Title Action Was Not a "Claim"

As an initial matter, Petro-Hunt's alternative request for compensation in the district court should not be considered a "claim" under applicable law. Under Federal Rule of Civil Procedure 8(a), a "claim for relief" contains three elements: (1) "a short and plain statement of the grounds for the court's jurisdiction;" (2) "a short and plain statement of the claim;" and (3) "a demand for the relief sought, which may include relief in the alternative." Federal courts have recognized that the "demand for judgment is not considered part of the claim." *Laird v. Integrated Res., Inc.*, 897 F.2d 826,

842 n. 69 (5th Cir. 1990) (citing 5 Charles Alan Wright and Arthur Miller, FEDERAL PRACTICE AND PROCEDURE § 1255, at 251-52 (1969)); *see also Coll v. First Am. Title Ins. Co.*, 642 F.3d 876, 901 (10th Cir. 2011) (quoting *Daniels v. Thomas*, 225 F.2d 795, 797 & n. 5 (10th Cir. 1955) ("[T]he prayer for relief is no part of the cause of action and . . . the parties are entitled to such relief and to such judgment as the complaint . . . makes out.").

In the district court complaint, Petro-Hunt asserted claims or causes of action for a declaratory judgment and to quiet title in real property. In accordance with Federal Rule of Civil Procedure 8(a)(1), Petro-Hunt cited as grounds for the district court's jurisdiction 28 U.S.C. § 1346(f), which provides that the district court "shall have exclusive original jurisdiction of civil actions . . . to quiet title to an . . . interest in real property in which an interest is claimed by the United States." Appx1128. Petro-Hunt did not invoke 28 U.S.C. § 1346(a)(2), which grants jurisdiction to the district court for takings claims seeking just compensation amounting to less than $10,000 (the "Little Tucker Act").

As to Federal Rule of Civil Procedure 8(a)(2), under the section titled "CAUSE OF ACTION" in the complaint, Petro-Hunt stated that the suit was one "for declaratory judgment pursuant to 28 U.S.C. § 2201 and to quiet title to real estate pursuant to 28 U.S.C. § 2409a." Appx1128. Petro-Hunt did not

assert that it was bringing a cause of action for a taking without just compensation.

As to Federal Rule of Civil Procedure 8(a)(3), Petro-Hunt prayed for three different forms of relief arising out of its declaratory and quiet title actions. Petro-Hunt's sole reference to a potential taking in the district court complaint is under the section titled "RELIEF REQUESTED," in which Petro-Hunt stated that "[i]n the alternative, and only in the event that Plaintiffs are not found to be entitled to the declaratory relief sought in the preceding paragraphs[,]" the plaintiffs may be entitled to compensation for a Fifth Amendment taking. Appx1140. Under the applicable rules, Petro-Hunt's alternative request in the district court should not be considered a "claim" for Section 1500 purposes.

## B. Petro-Hunt's Alternative Request for Compensation in the Quiet Title Action Was Not "Pending"

Petro-Hunt's alternative compensation request was never litigated, argued, decided, or appealed. The Government asserted that the district court lacked jurisdiction; Petro-Hunt never pursued the request; and the district court never entertained the merits of the request because it lacked jurisdiction to do so.

The purpose of Section 1500 is to prevent the United States from facing liability in multiple lawsuits involving the same subject matter at the

same time in separate fora. *See Brandt v. United States*, 710 F.3d 1369, 1374 (Fed. Cir. 2013) ("As the Supreme Court recently explained, § 1500 'effects a significant jurisdictional limitation' and was designed to 'save the Government from burdens of redundant litigation.'") (quoting *Tohono,* 563 U.S. at 314); *see also Trusted Integration, Inc. v. United States*, 659 F.3d 1159, 1170 (2011) ("Finally, our conclusion that Count II and the district court complaint are not for or in respect to the same claim is consistent with the purpose of the predecessor to § 1500, which was to prevent claimants from seeking double recovery by maintaining two suits arising from the same factual foundation, but pleaded under different legal theories.").

Considering its intended purpose, Section 1500 should not bar a claim or request for compensation where the potential for duplicative litigation is not possible. So what purpose does Section 1500 serve where the possibility of duplicative litigation has been eliminated? The answer, which this Court has not yet fully addressed, is none.

The CFC misconstrued Section 1500 to include claims that were never litigated, argued, decided or appealed in a court that lacked jurisdiction, based on sovereign immunity principles. Adopting such a sweeping definition of "pending" claims inevitably leads to "serious constitutional questions" about the interplay of Section 1500 and the statute of limitations

functioning to deny Petro-Hunt a judicial forum in which to assert constitutional claims. *See Ministerio Roca Solida v. United States,* 778 F.3d 1351, 1360-61 (Fed. Cir.) (Taranto, J. concurring), *cert. denied*, 136 S. Ct. 479 (2015).

Recently, this Court found that a claim was not "pending" under Section 1500 after that claim was dismissed or denied in the district court but before a motion for reconsideration or notice of appeal was filed. *Brandt*, 710 F.3d at 1380. Since the Court found this to be a sufficient basis not to apply Section 1500, it avoided the "complex" and "complicated" question of "whether a § 1500 analysis is inapplicable to a claim over which the district court concludes it lacks jurisdiction." *Id.* at 1374 n.3, 1380 n.9.

Under the Tucker Act, the CFC has exclusive jurisdiction over takings claims for greater than $10,000, while the Little Tucker Act provides the district court with concurrent jurisdiction over takings claims for less than $10,000. *See* 28 U.S.C. § 1346(a)(2) and 1491; *Smith v. Orr*, 855 F.2d 1544, 1552 (Fed. Cir. 1988). Respect for the exclusive jurisdiction of the CFC is an important concept, especially when it implicates the issue of sovereign immunity. *Christopher Vill., L.P. v. United States*, 360 F.3d 1319, 1332 (Fed. Cir. 2004). As to sovereign immunity:

> Consent alone gives jurisdiction to adjudge against a sovereign. Absent that consent, the attempted exercise of judicial power is

> void. The failure of officials to seek review cannot give force to
> this exercise of judicial power. Public policy forbids the suit
> unless consent is given, as clearly as public policy makes
> jurisdiction exclusive by declaration of the legislative body.

*United States v. U.S. Fid. & Guar. Co.*, 309 U.S. 506, 514 (1940).

Several implications arise from the fact that an attempted exercise of judicial power by a court that lacks jurisdiction, based on sovereign immunity principles, is treated as void. For one, the doctrine of sovereign immunity may "allow a party to collaterally attack the jurisdiction of a court, thereby overriding the *res judicata* effect of the court's decision." *Christopher Vill.*, 360 F.3d at 1332 (citing *Durfee v. Duke*, 375 U.S. 106, 114 (1963)).[10] Similarly, the *res judicata* effect of a prior decision should be overridden "when its issuing court's lack of jurisdiction 'directly implicat[es] issues of sovereign immunity.'" *Id.* (quoting *Int'l Air Response v. United States*, 324 F.3d 1376 (Fed. Cir. 2003)). Another implication is that sovereign immunity also "'permits the United States to ignore proceedings instituted against it in the wrong court' because such decisions are void," *id.* at 1332 (quoting *United States v. Cnty. of Cook*, 157 F.3d 381, 390 (7th Cir. 1999)), and subsequently "protects the United States from *ex parte* judgments entered in those cases." *Cnty. of Cook*, 157 F.3d at 390.

---

[10] The doctrine of sovereign immunity provides an exception to the "general rule of finality of jurisdictional determinations." *Durfee*, 375 U.S. at 114.

The United States is thus able to use, to its advantage, the "void" nature of a court's attempt to exercise jurisdiction over a claim when the Government has not consented to that court's jurisdiction. The United States may collaterally attack the *res judicata* effect of that court's judgment, or it may ignore the proceedings instituted against it and be protected from any *ex parte* judgment issued. The import of these implications is clear: The United States should not be allowed to assert that a claim was "pending" and use Section 1500 as a jurisdictional shield, specifically where the statute of limitations has run on Petro-Hunt's takings claims after the Government's decade-long wait to invoke Section 1500.

The doctrine of constitutional avoidance provides that where there are two interpretations of a statute, courts should construe the statute to avoid constitutional problems. *Edward J. DeBartolo Corp. v. Fl. Gulf Coast Bldg. & Constr. Trades Council*, 485 U.S. 568, 575 (1988); *Solid Waste Agency of N. Cook Cnty v. U.S. Army Corps of Eng'rs*, 531 U.S. 159, 173 (2001) (quoting *DeBartolo*, 485 U.S. at 575). To avoid the "substantiality of the constitutional questions" that a sweeping definition of "pending" would produce, Section 1500 should be narrowly applied "when necessary to avoid those questions." *See Ministerio Roca Solida,* 778 F.3d at 1361 (Taranto, J., concurring) (discussing cases giving narrow applications to statutes "as

applied to particular situations to avoid substantial constitutional problems, even when other considerations, including textual considerations, pointed the other way.").

Under the doctrine of constitutional avoidance, "pending" claims under Section 1500 should not include claims brought in a court that lacks jurisdiction, based on sovereign immunity, which in this and many other cases includes constitutional compensation claims. This construction would promote judicial efficiency and fairness, fulfill Congressional intent, and avoid the constitutional concerns presented by a more expansive definition.

For the simplest basis for reversal and to avoid serious constitutional issues, Petro-Hunt's "alternative request for relief" should not be considered a pending claim for or in respect to the takings claims in the CFC. At most, the alternative request constituted an "either-or" proposition in a necessarily sequential suit.[11] In its infinite wisdom, Congress decided to split jurisdiction between the district courts, which exclusively quiets title under 28 U.S.C. § 2409a, and the CFC, which awards just compensation. Either Petro-Hunt was entitled to a declaratory judgment quieting title, which the

---

[11] *See* 5 Charles Alan Wright & Arthur B. Miller, FEDERAL PRACTICE AND PROCEDURE § 1282 (3d ed. 1998) (when a plaintiff pleads a claim for relief in the "alternative," it constitutes an "either-or" proposition).

only district court had the authority to issue, or if Petro-Hunt was not entitled to that relief, it could be entitled to just compensation for a taking, relief that Petro-Hunt did not assert the district court had jurisdiction to grant.

The Court should find that for the purposes of Section 1500, Petro-Hunt's temporary takings claims were not pending in the district court when it filed suit in the CFC.

### C. Petro-Hunt's Temporary Takings Claims in the Court of Federal Claims Were Not "Based on Substantially the Same Operative Facts" as the Claims in the Quiet Title Action

To trigger Section 1500's jurisdictional bar, the CFC suit and the district court suit must be "for or in respect to" the same claims, which means the two claims are "based on substantially the same operative facts, regardless of the relief sought in each suit." *Tohono*, 563 U.S. at 317. But there is no set test to determine when "two suits have sufficient factual overlap to trigger the jurisdictional bar." *Id.* at 318.

While the Supreme Court did little to explain what is meant by "operative facts," it is known that claims that share nothing more than facts providing context for the claims presented in each suit do not trigger Section 1500's bar. *See, e.g.*, *Central Pines Land Co. v. United States*, 697 F.3d

1360, 1365 (Fed. Cir. 2008) (distinguishing between "mere background facts" and operative facts).

Here, the CFC defined operative facts as "those that must be proven in order to recover on a given claim." Appx0037. The CFC failed to identify any specific operative facts common to both the district court claims to quiet title and the temporary takings claims in the CFC. Instead, the court deemed the void compensation request in the district court to be a pending claim under Section 1500, made the conclusory statement that the claims in both actions relied on the same operative facts, and dismissed the claims. Appx0038. In doing so, the CFC improperly conflated operative facts with those that merely provide background, seemingly concluding that all facts in the district court action were operative.

Because Petro-Hunt's alternative compensation request should not be considered a pending claim, only the facts operative to the district court claims to quiet title and those operative to the CFC temporary takings claims should be compared. While sharing certain facts underlying the overall dispute, the facts that were relevant to the claims to quiet title were unrelated to the conduct that gave rise to the takings, and Section 1500 does not apply.

### 1. Operative Facts in Petro-Hunt's Quiet Title Action

The operative facts of the Quiet Title Action related solely to ownership of the mineral servitudes.[12] It is uncontested that the issues ultimately developed and litigated concerned the *res judicata* effect of *Nebo Oil* and the application of the law prescription. *See Petro-Hunt II*, 365 F.3d 385. The exploration and production of the mineral servitudes by Petro-Hunt and its predecessors later became operative facts necessary to the district court's final judgment on present ownership, after the Fifth Circuit's decision and remand. Appx0247–0249. No other facts, including facts related to the United States' leasing activities, were necessary to the judgment.

### 2. Operative Facts in Petro-Hunt's Court of Federal Claims Action

In the CFC, Petro-Hunt sought just compensation for the temporary takings of its mineral property. Facts relating to ownership of the mineral property were not operative for the purpose of its takings claims. The result of the Quiet Title Action is itself an operative fact in the CFC action.

---

[12] *See* 28 U.S.C. § 2409a(d) (in a suit to quiet title "The complaint shall set forth with particularity the nature of the right, title, or interest which the plaintiff claims in the real property, the circumstances under which it was acquired, and the right, title, or interest claimed by the United States.").

The operative facts of Petro-Hunt's temporary takings claims are those relevant to the United States' leasing activities, whether such activity was a temporary taking and, if so, what amount of just compensation is due Petro-Hunt for that taking. Appx0146–0147; 0149–0150. These are the operative facts essential to determining the existence, scope, and valuation of the taking. These were not legally operative facts in the district court case, but provided only background to the dispute over title.

The CFC doubted whether Petro-Hunt's Quiet Title Action ought to implicate Section 1500, but for the void alternative compensation request. Appx0037. Nevertheless, the CFC found that under Section 1500, the request, which Petro-Hunt did not and could not litigate in the district court, prevented Petro-Hunt from litigating its temporary takings claims in the only court with jurisdiction to hear them. This Court should reverse the CFC's error and find that Section 1500 is inapplicable to Petro-Hunt's claims.

### D. Section 1500 Cannot Bar Petro-Hunt's Constitutional Right to Just Compensation Under the Fifth Amendment

If this Court construes Section 1500 such that it applies to Petro-Hunt's claims, then it must resolve whether Section 1500 can bar takings claims arising directly under the Constitution. The answer to that "serious constitutional question" is that it cannot.

Because of the CFC's decision applying Section 1500, federal

jurisdictional statutes will have forced Petro-Hunt to choose between securing constitutionally-guaranteed just compensation for a taking and pursuing other claims that could have prevented or ended the underlying action alleged to be a taking. *See Ministerio Roca Solida*, 778 F.3d at 1360; s*ee also Blanchette v. Conn. Gen. Ins. Corps.*, 419 U.S. 102, 148-49 (1974) (deprivation of a takings claim under the Tucker Act would "raise serious constitutional questions").

The Fifth Amendment provides that private property shall not "be taken for public use, without just compensation." U.S. Const. amend. V. The Fifth Amendment guarantees the right to just compensation for a taking, and that right is meaningless without a remedy. The Government is allowed to take private property only if it pays the owner just compensation, but it is not allowed to take private property and then exploit an arbitrary jurisdictional trap to prevent a property owner from vindicating a constitutional right.

As a consequence, Section 1500 should not be read to preclude meritorious constitutional claims. Congress may not dispense with the constitutional right to just compensation by withholding jurisdiction through statute. *See Jacobs v. United States*, 290 U.S. 13, 17 (1933) ("[T]he right to just compensation could not be taken away by statute or be qualified by the omission of a provision for interest.") (citing *Seaboard Air Lone R. Co. v.*

*United States*, 261 U.S. 299, 306 (1923); *Phelps v. United States,* 274 U.S. 341, 343-44 (1927)). But since *Tohono* was decided, the Government has used Section 1500 as a tool to escape its constitutional obligations, in a manner far beyond Section 1500's intended purpose.

By its terms, *Tohono* applies to those actions in which "Congress has permitted claims against the United States for monetary relief in the CFC," noting that for those claims, "relief is available by grace and not by right." *Tohono*, 563 U.S. at 317 (quoting *Beers v. Arkansas*, 61 U.S. 527, 529 (1857) ("[A]s this permission is altogether voluntary on the part of the sovereignty, it follows that it may prescribe the terms and conditions on which it consents to be sued, and the manner in which the suit shall be conducted")). Petro-Hunt's takings claims arise directly from the Fifth Amendment and are different from those addressed in *Tohono*. The United States has not "volunteered" to pay just compensation for a taking; it is required to do so under the Constitution. The right to just compensation is self-executing. A waiver of sovereign immunity is unnecessary for Petro-Hunt to seek to enforce that obligation because Constitutional Framers waived sovereign immunity when they adopted the Fifth Amendment.

Yet the overly broad application of Section 1500 continues to trample constitutional rights with impunity. If this Court determines that Petro-

Hunt's claims gave rise to Section 1500's potential application, the Court should not avoid answering the serious constitutional questions that Section 1500 poses in an uncertain hope that Congress will someday correct the havoc this unjust statute continues to wreak. Too much wasteful litigation has already occurred over this "judicial quagmire" while waiting for a legislative resolution that may never come. Section 1500 should not be read to preclude Petro-Hunt from maintaining its constitutionally-guaranteed right to just compensation.[13]

## IV. The Court of Federal Claims Had Exclusive Jurisdiction over Petro-Hunt's Judicial Takings Claim

Although Petro-Hunt's judicial takings claim escaped the jurisdictional trap of Section 1500, the CFC later erroneously ruled that it lacked jurisdiction because Petro-Hunt's claim would require the CFC to scrutinize another court's decision. Appx0067-68.

Judicial action eliminated Petro-Hunt's established property right and effected an uncompensated taking. *See Stop the Beach Renourishment, Inc. v. Fla. Dept. of Env. Res.*, 560 U.S. 702, 715 (2010) (plurality opinion) ("If a

---

[13] If this Court reverses the CFC's dismissal of Petro-Hunt's other takings claims and contract claims discussed in sections I and II, it should also find that Section 1500 does not bar those claims either.

legislature *or a court* declares that what was once an established right of private property no longer exists, it has taken that property, no less than if the State had physically appropriated it or destroyed its value by regulation.") (emphasis in original). This Court has recognized that judicial action can give rise to takings claims. *See Smith v. United States*, 709 F.3d 1114, 1116–17 (Fed. Cir.), *cert. denied*, 134 S. Ct. 259 (2013) ("It was recognized prior to *Stop the Beach* that judicial action could constitute a taking of property. . . . The Court in *Stop the Beach* did not create this law but applied it.") (internal citation omitted).

While the CFC acknowledged that a federal court may have effected an uncompensated taking of Petro-Hunt's property, it declined to exercise its exclusive role as arbiter of federal takings claims and instead followed a deficient analysis of what its jurisdiction encompasses. Appx0066. The CFC has exclusive jurisdiction over *all* takings claims brought under the Tucker Act against the federal government. The CFC is the only forum in which Petro-Hunt can bring its claim for an uncompensated judicial taking. *See, e.g.*, *E. Enters. v. Apfel*, 524 U.S. 498, 520 (1998) ("[A] claim for just compensation under the Takings Clause must be brought in the Court of Federal Claims in the first instance, unless Congress has withdrawn the Tucker Act grant of jurisdiction in the relevant statutes.").

To say that the CFC lacks the authority to review a federal court's decision—not to determine whether it was correct but whether it effected an uncompensated taking—is equivalent to saying that there can be no cause of action for a judicial taking. A claim for a taking founded on a federal court's decision is either a viable or it is not. The *Stop the Beach* Court and this Court in *Smith* both stated that claims for judicial takings are actionable. *See Stop the Beach*, 560 U.S. at 715; *Smith*, 709 F.3d at 1116–17.

If a judicial takings claim is actionable and a former owner is entitled to pursue its right to compensation against the United States under the Tucker Act, then the CFC's conclusion that it lacks the authority to "scrutinize" other court's decisions is actually an abdication of its jurisdiction. Federal courts have a "virtually unflagging obligation . . . to exercise the jurisdiction given them." *Colo. River Water Conservation Dist. v. United States,* 424 U.S. 800, 817 (1976) (internal citations omitted). Chief Justice Marshall noted long ago that federal courts "have no more right to decline the exercise of jurisdiction which is given, than to usurp that which is not given. The one or the other would be treason to the [C]onstitution." *Cohens v. Virginia,* 19 U.S. (6 Wheat.) 264, 404 (1821).

Petro-Hunt's appeal gives this Court the opportunity to resolve this apparent conflict and make a necessary distinction so that federal takings

claimants are not deprived of their constitutional right to just compensation. Since the CFC can find that Petro-Hunt suffered a uncompensated taking, without affecting the judgment of another court or altering property ownership, Petro-Hunt asks this Court to reverse the CFC's dismissal of its judicial takings claim.

This Court has already held that the CFC may exercise jurisdiction over takings claims that involve another other court's decision. In *Boise Cascade Corp. v. United States*, 296 F.3d 1339, 1344 (Fed. Cir. 2002), *cert. denied*, 538 U.S. 906 (2003), the district court enjoined the plaintiff from certain logging activities without a permit. The U.S. Fish and Wildlife Service then determined that the permit was no longer required, and the district court lifted the injunction. Boise "accepted the validity of the injunction" and sued the Government in the CFC "to determine whether the Service's assertion of jurisdiction over it by seeking and obtaining an injunction worked a taking of its property that required compensation under the Takings Clause." *Id.* at 1344.

In *Boise*, the Court found that "[b]ecause the takings claim does not require the trial court to review the district court's actions, there is no constitutional defect in the Court of Federal Claims' assertion of jurisdiction over this case." *Id.* at 1344. The issue of whether the government action

amounted to a taking of Boise's property was not before the district court, "nor could it have been." *Id.*

Likewise, Petro-Hunt accepts the finality of the Quiet Title Action result. Petro-Hunt's claim for a judicial taking is not an appeal of the Fifth Circuit's decision. All appeals in the Quiet Title Action have been exhausted, and this claim is to address the result: an uncompensated taking. This Court's reasoning for the CFC's exercise of jurisdiction in *Boise* controls here: Petro-Hunt's judicial takings claim does not require the reversal of another court's judgment, and, by the nature of the claim itself, could not have been decided in the district court action. *See Boise*, 296 F.3d at 1345.

*Shinnecock Indian Nation v. United States,* 782 F.3d 1345 (Fed. Cir. 2015), is this Court's only decision post-*Stop the Beach* regarding the CFC's jurisdiction over judicial takings. The *Shinnecock* judicial takings claim had issues that are absent from Petro-Hunt's claim, and the CFC's reliance on *Shinnecock* was misplaced. Appx0062–64. In *Shinnecock*, this Court found that the CFC lacked jurisdiction over the Nation's takings claim because the CFC could not review the merits of the federal district court's decision about the Nation's legal right to bring suit. The federal district court's dismissal of the plaintiff's suit for damages against the state of New York formed the basis for the Nation's CFC claim. *Id.* at 1347. The Nation's appeal to the

51

U.S. Court of Appeals for the Second Circuit was still pending when this Court issued its decision. In further contrast, the Nation's alleged property interest was the legal right to sue for the loss of its tribal lands. *Id.* at 1348. The Nation was not asserting a taking of an interest in the lands, which the Nation has not occupied in over 150 years.

> In *Shinnecock,* this Court distinguished *Boise*:
>
> We emphasized, moreover, that "the sole forum available to hear Boise's claim" was the Court of Federal Claims. [citation omitted] Here, by contrast, the question of whether the Nation has the right to bring an action for the loss of its tribal lands was squarely before the district court, and the Nation's pending appeal to the Second Circuit provides it with a forum to challenge any errors in the district court's judgment.

*Id.* at 1353 n.9. Unlike Petro-Hunt's judicial takings claim, the Nation's claim for the extinction of a legal right to bring suit was directly before the district court with proper jurisdiction, had yet to be fully resolved on appeal, and did not involve the transfer of property from private to public use without compensation. Petro-Hunt's judicial takings claim was not before the district court, nor could it or any of Petro-Hunt's other takings claims have been.[14]

---

[14] The CFC implicitly acknowledged as much when it declined to dismiss Petro-Hunt's judicial takings claim under Section 1500 because the claim was based on "'legally operative' facts that were not at issue before the district court and requires proof of 'different conduct.'" Appx0040.

The CFC also relied on this Court's decision in *Allustiarte v. United States*, 256 F.3d 1349 (Fed. Cir. 2001). Appx0065–0067. But it too provides no answer to the jurisdictional questions presented here. In *Allustiarte*, the Court found that it lacked jurisdiction over the plaintiffs' takings claim that was based on alleged errors by a court-appointed bankruptcy trustee. The plaintiffs contended that the bankruptcy court's approval of these actions constituted a taking, but some of the *Allustiarte* plaintiffs had not yet appealed the bankruptcy court's decision. The Court affirmed the CFC's dismissal of the plaintiffs' claims because that case would have required the Court to review the merits of the bankruptcy court's decision. *Id.* at 1352-53.

In a consolidated appeal, this Court allowed the CFC to exercise jurisdiction over a group of plaintiffs' takings claims that were based on another court's actions. *A & D Auto Sales, Inc. v. United States*, 748 F.3d 1142, 1149 n.4 (Fed. Cir. 2014) ("The government also moved to dismiss for lack of subject matter jurisdiction. It is not clear that the government presses that issue on appeal. In any event, we see no lack of subject matter jurisdiction in the Claims Court.").

In the cases from the CFC that were consolidated on appeal, former automobile dealers brought a takings action against the United States related to the application of the Troubled Asset Relief Program and the 2009

bankruptcies of General Motors Corporation and Chrysler LLC. *Colonial Chevrolet v. United States* 103 Fed. Cl. 570 (2013); *Alley's of Kingsport v. United States* 103 Fed. Cl. 449 (2013). The CFC stated, "The dealers present unusual allegations that nevertheless create the prima facie feel of a takings case warranting just compensation." *Colonial Chevrolet*, 103 Fed. Cl. at 574; *Alley's of Kingsport*, 103 Fed. Cl. at 453. Relying on *Boise*, the CFC rejected the Government's comparison of the plaintiffs' takings claim to the claim in *Allustiarte*, as the plaintiff-dealers brought "an entirely different case," and their takings claims were not and could not have been at issue in the prior proceeding. *Colonial Chevrolet*, 103 Fed. Cl. at 572; *Alley's of Kingsport*, 103 Fed. Cl. at 451.

Here, rather than recognizing that Petro-Hunt was presenting "an entirely different case" within its jurisdiction, the CFC stated that it would have to scrutinize the propriety of another court's decision to resolve Petro-Hunt's claim. Petro-Hunt's claim calls for the CFC to examine the *result* of Petro-Hunt's Quiet Title Action—an uncompensated taking—solely within the narrow confine of determining whether Petro-Hunt held a compensable property interest that was taken and, if so, what just compensation is due. That form of review fulfills the CFC's exclusive role in adjudicating takings claims against the United States.

The branch of government that effected the taking is not the focus for answering the jurisdictional question. It is incidental and, ultimately, irrelevant under *Stop the Beach* that a court effected the taking. Because the CFC has exclusive subject matter jurisdiction over all takings claims brought under the Tucker Act, it was reversible error to dismiss Petro-Hunt's judicial takings claim.

## CONCLUSION

This Court should reverse the Court of Federal Claims' dismissal of Petro-Hunt's permanent, temporary, and judicial takings claims, breach of contract claims, and claims for reformation and remand for the Court of Federal Claims to proceed with adjudicating Petro-Hunt's claims on the merits.


July 5, 2016                          Respectfully submitted,


                                      /s/ J. Ralph White
                                      J. Ralph White
Edmund M. Amorosi                     Sharon L. Andrews
SMITH PACHTER MCWHORTER PLC           B. Alan Baker
8000 Towers Crescent Drive            WHITE ANDREWS &
Suite 900                             SHACKELFORD, LLC
Tysons Corner, Virginia 22182         650 Poydras Street, Suite 2319
703-847-6300                          New Orleans, Louisiana 70130
eamorosi@smithpachter.com             (504) 799-2585
                                      ralph@whiteandrews.com


D. Joe Smith
JENNER & BLOCK LLP
1099 New York Avenue, NW
Suite 900
Washington, DC 20001
202-639-6000 (phone)
jsmith@jenner.com

*Counsel for Petro-Hunt, L.L.C.*

# ADDENDUM

# Table of Contents

Judgment in Case No. 00-512L,
  (February 29, 2016) (Dkt. 223)……………………………………Appx0001

Judgment in Case No. 11-775L,
    (February 29, 2016) (Dkt. 25)………………………………………...Appx0002

Order Dismissing Petro-Hunt's Permanent Takings Claim, Temporary Takings Claims, in part, Breach of Contract Claims, and Claims for Reformation under 28 U.S.C. § 2501
    (November 6, 2009) (No. 00-512L Dkt. 77)……….………..Appx0003–0029

Order Denying Petro-Hunt's Motion for Reconsideration,
    (November 30, 2009) (No. 00-512L Dkt. 80)………….............Appx0030–0031

Order Dismissing Petro-Hunt's Temporary Takings Claims under 28 U.S.C. § 1500,
    (May 2, 2012) (No. 00-512L Dkt. 125)………………………...Appx0032–0043

Order Denying Petro-Hunt's Motion for Reconsideration,
    (May 30, 2012) (No. 00-512L Dkt. 127)…………….............Appx0044–0046

Order Dismissing Petro-Hunt's Judicial Takings Claim,
    (February 29, 2016, Reissued for Publication, April 26, 2016)
    (No. 00-512L Dkt. 228; No. 11-775 Dkt. 24)………….............Appx0047–0068

*Petro-Hunt, L.L.C. v. United States* (*Petro-Hunt III*), No. 06-30095,
    2007 WL 715270 (5th Cir. Mar. 6, 2007)………………….....Appx2080–2082

**Judgment in Case No. 00-512L**

**Dated February 29, 2016 (Dkt. 223)**

# In the United States Court of Federal Claims

## No. 00-512 L

**PETRO-HUNT, L.L.C.**

                                                                        **JUDGMENT**

    **v.**

**THE UNITED STATES**


       Pursuant to the court's Opinion, filed February 29, 2016, granting defendant's motion to dismiss,

       IT IS ORDERED AND ADJUDGED this date, pursuant to Rule 58, that plaintiff's complaint is dismissed.


                                      Hazel C. Keahey
                                      Clerk of Court

**February 29, 2016**           By:    s/ Debra L. Samler

                                        Deputy Clerk


NOTE: As to appeal, 60 days from this date, see RCFC 58.1, re number of copies and listing of all plaintiffs.  Filing fee is $505.00.

**Judgment in Case No. 11-775L**

**Dated February 29, 2016 (Dkt. 25)**

# In the United States Court of Federal Claims

### No. 11-775 L

**PETRO-HUNT, L.L.C.**

        **v.**

**THE UNITED STATES**

                                                **JUDGMENT**

        Pursuant to the court's Opinion, filed February 29, 2016, granting defendant's motion to dismiss,

        IT IS ORDERED AND ADJUDGED this date, pursuant to Rule 58, that plaintiff's complaint is dismissed.

                                   Hazel C. Keahey
                                   Clerk of Court

**February 29, 2016**         By:    s/ Debra L. Samler

                                   Deputy Clerk

NOTE: As to appeal, 60 days from this date, see RCFC 58.1, re number of copies and listing of all plaintiffs.  Filing fee is $505.00.

**Order Dismissing Petro-Hunt's Permanent Takings Claims, Temporary Takings Claims, in Part, Breach of Contract Claims, and Claims for Reformation under 28 U.S.C. § 2501**

**Dated November 6, 2009 (No. 00-512L Dkt. 77)**

# In The United States Court of Federal Claims

No.  00-512L

(Filed:  November 6, 2009)

_____

| | | |
|---|---|---|
| PETRO-HUNT, L.L.C., | * | Takings and contract case; Motion to |
| | * | dismiss under RCFC 12(b); Servitudes – |
| Plaintiff, | * | prescription under Louisiana law; Mineral |
| | * | leases; Statute of limitations – 28 U.S.C. |
| v. | * | § 2501; Permanent takings claim – accrual |
| | * | suspension rule; Permanent takings claim |
| THE UNITED STATES, | * | untimely; Temporary takings; Temporary |
| | * | physical takings claim accrual point; |
| Defendant. | * | Temporary takings claim allegedly |
| | * | occasioned by certain mineral leases made |
| | * | by the United States on property owned by |
| | * | plaintiff held timely; Contract claims held |
| | * | untimely; Temporary takings – mineral |
| | * | servitudes are compensable property |
| | * | interest; Nature of mineral lease under |
| | * | Louisiana law; Reformation. |

_____

**OPINION**

_____

*Joseph Ralph White,* White Law Firm, New Orleans, LA, for plaintiff.

*James D. Gette*, United States Department of Justice, Washington, D.C., with whom was Acting Assistant Attorney General *John C. Cruden*, for defendant.

**ALLEGRA, Judge:**

Scylla and Charybdis were the treacherous sea monsters of Greek mythology, who lurked on the opposing sides of the Straits of Messina between Sicily and Calabria.  According to lore, these nightmarish creatures were strategically placed so as to pose an inescapable threat to passing ships – sail too close to the peninsula and Scylla would seize and devour your crew with her six serpentine heads; compensate, by navigating closer to the island of Sicily, and face the loss of your entire ship in the maelstroms belched from Charybdis' gaping mouth.  On the advice

of Circe, Odysseus chose to sail closer to Scylla – costing him six of his men, but leaving his ship intact to sail another day.

Some might say that, in Federal takings law, these fictional leviathans have been replaced by the doctrines of ripeness and limitations, both of which must successfully be navigated by claimants seeking to bring their cases before this court.  File too early and risk having your case dismissed as premature; delay too long, however, and face the loss of your entire suit, as time-barred.  *See Bayou Des Familles Dev. Corp. v. United States*, 130 F.3d 1034, 1037-38 (Fed. Cir. 1997).  In some situations, litigants may find themselves between a rock and a hard place (a veiled reference, as it turns out, to the twin monsters of old).

Pending before the court in this takings and contract case is defendant's motion to dismiss under RCFC 12(b), in which defendant's principal claim – as the foregoing intimates – is that various counts are time-barred under the applicable six-year statute of limitations.  For the reasons that follow, the court **GRANTS**, in part, and **DENIES**, in part, defendant's motion.

## I.      BACKGROUND

While this case has a long and complicated history, the court need summarize here only those facts necessary to provide context.

Unlike other states, Louisiana does not recognize the existence of separate mineral estates.  Instead, mineral rights take the form of a mineral servitude, the holder of which has the right to enter the property and extract the minerals.  *See* La. Rev. Stat. § 31:21.  Louisiana law has long provided that such servitudes are extinguished by "prescription resulting from nonuse for ten years."  La. Rev. Stat. § 31:27; *see also Central Pines Land Co. v. United States*, 274 F.3d 881, 884 (5th Cir. 2001), *cert. denied*, 537 U.S. 822 (2002).  The period of prescription on mineral servitudes begins to run on the date a servitude is created, and is interrupted only by "good faith operations for the discovery and production of minerals."  La. Rev. Stat. § 31:20.  This rule may not be abrogated by contract.  *See Leiter Minerals, Inc. v. California Co.*, 132 So. 2d 845, 853 (La. 1961).

In 1932, five Louisiana lumber companies agreed to pool the mineral rights on their respective lands.  They created a joint venture called the "Good Pine Oil Company" (Good Pine), to which they conveyed the rights to explore and develop their property for the production of oil, gas and sulphur.  Between November 12, 1932, and May 3, 1934, two of the five companies, Bodcaw Lumber and Grant Timber, made six conveyances of mineral rights, involving 180,000 acres of land, to Good Pine.  As the affected parcels were noncontiguous, the transfers created multiple mineral servitudes under Louisiana law – ninety-six in all.  Each of the deeds conveying mineral rights to Good Pine contained a clause explicitly providing that the ten-year period of prescription applied.

In the 1930s, the United States sought to buy land in Louisiana to consolidate into a national forest authorized by the Weeks Act of 1911, 36 Stat. 961, ch. 186, *as amended by* the Clarke-McNary Act of 1924, 43 Stat. 653, ch. 348.  Although the Weeks Act allowed owners selling property to the United States to reserve their rights to minerals, *see* 36 Stat. 962, owners of large tracts of land in Louisiana were unwilling to sell their property to the United States, cognizant of several court decisions that had held that the reservation of mineral rights in Louisiana created only a "right in the nature of a servitude" which was subject to the prescription rule outlined above.  After Bodcaw Lumber and Grant Timber rejected an offer to sell their surface estates to the United States, the Forest Service of the United States Department of Agriculture (the Forest Service) supplied the companies with an opinion by the Assistant Solicitor of the Department of Agriculture declaring that the prescription provisions of the Louisiana Civil Code would not apply to land sold to the United States under the Weeks Act. Allegedly in reliance on this opinion, Bodcaw Lumber and Grant Timber agreed to sell the surface estates of various tracts of timber land to the United States.

From November 1934 through January 1937, Bodcaw Lumber and Grant Timber conveyed to the United States the surface rights to approximately 180,000 acres of land located in Grant, Winn and Natchitoches Parishes.  The eleven instruments of transfer all expressly excluded from the transactions the mineral servitudes that had previously been conveyed to Good Pine.  At the time of these sales, the officers and directors of Bodcaw and Grant believed that the mineral rights underlying this land were valuable.  It is alleged that they would not have sold the timber lands to the United States at the price agreed had they thought the prescriptive provisions of Louisiana law applied.

In the years that followed, the United States' efforts to acquire land in Louisiana continued to be met by resistance from landowners fearful of losing their mineral reservations through prescription.  In 1940, the Louisiana Legislature passed Act 315 (the 1940 Act) to eliminate the rule of prescription for mineral rights on lands held by the United States:

> [W]hen land is acquired by conventional deed or contract, condemnation or expropriation proceedings by the United States of America . . . and by the act of acquisition, verdict or judgment, oil, gas, and/or other minerals or royalties are reserved, or the land so acquired is by the act of acquisition conveyed subject to a prior sale or reservation of oil, gas and/or other minerals or royalties, still in force and effect, said rights so reserved or previously sold shall be imprescriptible.

La. Rev. Stat. § 9:5806 (Supp. 1973) (repealed 1975); *see also* La. Rev. Stat. § 31:149 (2004) (codifying a similar rule).  The purpose of the 1940 Act was to facilitate the Forest Service's purchase of large tracts of lands for national forests and parks, as well as military installations. *See United States v. Little Lake Misere Land Co.*, 412 U.S. 580, 599 & n.16 (1973) (citing *Leiter Minerals, Inc.*, 132 So. 2d at 851).  Sometime after this statute was passed, Nebo Oil Company (Nebo Oil) acquired all of the mineral rights formerly held by Good Pine.

Despite its prior representations, the United States, in 1948, filed a declaratory judgment action against Nebo Oil to quiet title to the minerals on a particular servitude claimed by the company as successor in interest to Good Pine.  The complaint referred to a specific parcel, approximately 800 acres in size, lying in portions of section 19 (Township 13 North, Range 6 West) and section 24 (Township 13, Range 7 West) in Natchitoches Parish.  This parcel was one of several acquired by the United States through a February 11, 1936, deed from Bodcaw Lumber, which covered 24,943.93 acres.  Nebo Oil claimed a mineral servitude on the 800-acre parcel as a result of the 1932 conveyance of mineral rights from Bodcaw to Good Pine.  In its complaint, the United States averred that: (i) no drilling operations had been conducted on the 800-acre parcel during the ten-year period beginning on November 12, 1932; (ii) the mineral servitude on the parcel had, therefore, prescribed for nonuse; and (iii) Nebo Oil intended to drill a well on the land and had advised the government that the company would resist interference. The United States sought declaratory relief and an order permanently enjoining Nebo Oil from entering the 800-acre parcel for mineral production.

The United States District Court for the Western District of Louisiana concluded, *inter alia*, that the mineral rights underlying the tract in question were imprescriptible by virtue of the 1940 Act.  *United States v. Nebo Oil Co., Inc.*, 90 F. Supp. 73, 83-84 (W.D. La. 1950).  It rejected defendant's claim that the Louisiana statute was unconstitutional, as interfering with the United States' rights to the minerals.  Via the transaction, it noted, the United States "had no vested property right in such minerals, either present or future," but rather had only the "vaguest expectancy of acquiring them at some future time" based on a contingency that could be changed by local law.  *Id.* at 84.

On appeal, the United States Court of Appeals for the Fifth Circuit affirmed.  *United States v. Nebo Oil Co., Inc.*, 190 F.2d 1003 (5th Cir. 1950).  That court first noted that it was bound by rulings of the Supreme Court of Louisiana, which in considering the impact of the 1940 Act on another 1936 sale made by Bodcaw Lumber to the United States, had "held that Act 315 of 1940 was applicable because of the general rule [in Louisiana] that laws of prescription and those limiting the time within which actions may be brought are retrospective in their operation." *Id.* at 1008 (citing *Whitney Nat. Bank of New Orleans v. Little Creek Oil Co., Inc.*, 33 So. 2d 693 (La. 1947)).  After carefully reviewing other relevant precedents, the court reaffirmed the district court's holding that the statute was constitutional, concluding –

Act 315 of 1940 provides that when lands are conveyed to the United States subject to a prior sale or reservation of oil, gas, or other minerals still in force and effect, the rights so reserved or previously sold shall be imprescribable.  It does not state or imply that the reserved rights shall be increased or varied but only that they shall not be lost by prescription.  The consideration of $1.75 per acre paid by the United States did not cover the value of any mineral rights.  Indeed, since the minerals underlying the lands had previously been sold to Good Pine Oil without limit for time of their enjoyment, Bodcaw did not own any minerals which it could sell to the United States.  Neither could it reserve nor sell the expectation of a servitude lapsed for nonuser.  All that Bodcaw had which it could sell to the United States was the timber land itself.  That was the obligation of the contract

-4-

and it remains unimpaired.  By virtue of its ownership of the land appellant could merely hope that the outstanding servitude might lapse but this hope or expectancy was born of a statute of prescription based on the then existing public policy of the State as declared by its legislature.  It was not a part of the obligation of the contract.  It was wholly given by law and the power that gave it could increase, diminish, or otherwise alter, or wholly take it away without violating the Federal Constitution.

*Nebo Oil*, 190 F.2d at 1010 (citations omitted).

So stood the law for twenty years.  Subsequent to the Fifth Circuit's decision, Nebo Oil placed affidavits in the land records of Grant, Winn and Natchitoches parishes in Louisiana wherein it claimed title, *inter alia*, to all the mineral rights conveyed to Good Pine through the conveyance instruments described above.  During this same period, the land records of the Forest Service reflected that the minerals underlying the land in question were held by others in perpetuity.

In 1969, the United States filed suit in the United States District Court for the Western District of Louisiana seeking to quiet title to two parcels of land which it had acquired pursuant to the Migratory Bird Conservation Act, 45 Stat. 1222, 16 U.S.C. § 715, *et seq.*, as part of the Lacassine Wildlife Refuge.  The two transfer documents reserved to Little Lake Misere the rights to minerals for a period of ten years (and as long as any production begun during this period continued), and recited that, after this period, "complete fee title to said lands shall thereby become vested in the United States."  Although no production occurred during the period indicated, Little Lake Misere argued that it retained the right to the minerals under the 1940 Act.  The district court and, in turn, the Fifth Circuit agreed, relying on the earlier *Nebo Oil* decision.  *See United States v. Little Lake Misere Land Co.*, 453 F.2d 360 (5th Cir. 1971).  But, the Supreme Court granted certiorari and reversed.  *United States v. Little Lake Misere Land Co., Inc.*, 412 U.S. 580 (1973).

The Court did not reject the *Nebo Oil* decision.  Rather, invoking the choice-of-law doctrine in *Clearfield Trust Co. v. United States*, 318 U.S. 363 (1943), it held that the Fifth Circuit had erred in applying Louisiana state law.  It reasoned that because the land acquisition agreement was "explicitly authorized" by the Migratory Bird Conservation Act and thus "ar[ose] from and [bore] heavily upon a federal regulatory program," federal law governed.  412 U.S. at 593-94.  The court determined that applying the 1940 Act would deprive the United States of its "bargained-for-contractual interests" by abrogating "a consummated land transaction under a contract which specifically defined conditions for prolonging the vendor's mineral reservation."  *Id.* at 597.  It held instead that the appropriate rule of decision should be supplied by either federal common law or "residual" state law, neither of which would give effect to the 1940 Act "as plainly hostile to the interests of the United States" and both of which instead would give effect to the contract terms.  *Id.* at 597, 604.  Notably, the Court observed, albeit in *obiter dicta*, that without a contractual term setting out the conditions under which the United States would obtain the mineral rights, "it might be said that the Government acknowledged and intended to be bound by unforeseeable changes in state law."  *Id.* at 602-03.

After the decision in *Little Lake Misere*, the United States began granting mineral leases allowing the exploitation of minerals in the servitudes in question. At first, this activity was sporadic. While the parties disagree as to the exact timing of these leases (and, indeed, even as to number thereof), it appears that the wide majority of them were granted beginning in 1991, with more than forty-five leases made from that year up to the beginning of this lawsuit. Each of the leases was for a period of ten years.

Issues regarding the application of the 1940 Act rose yet again in the late 1990s. At that time, Central Pines Land Co. filed a declaratory judgment action against the United States and several oil companies that had entered into lease agreements with the United States for the exploration and production of oil and gas in the area of various servitudes. On April 7, 1999, the district court ruled that the 1940 Act was inapplicable to a 1929 servitude created before the 1940 passage of the Act, but applied to servitudes that arose in 1941 through 1981, rendering the latter servitudes imprescriptible. On July 28, 2000, the same court ruled that, based on inactivity, the 1929 servitude, in fact, had prescribed.

In affirming these rulings, the Fifth Circuit first decided whether *Little Lake Misere* required application of federal common law to the case. *Central Pines Land Co.*, 274 F.3d at 888. Noting that the Supreme Court's ruling had hinged, in part, on the interpretation of a particular land acquisition agreement, the Fifth Circuit observed that the United States' right to the minerals associated with the 1929 servitude was "arguably weaker" because it did not arise from the transfer agreement, but rather from the Louisiana prescription rule. *Id*. at 888. The court, nonetheless, concluded that the analysis in *Little Lake Misere* applied and that the operative rule of decision was federal common law. Holding that it need not decide whether "*Nebo Oil* [was] . . . implicitly overruled by *Little Lake*," *id*. at 890, the court concluded that "there is a conflicting federal interest – that in obtaining the mineral rights via the default rule of prescription in place before Act 315," *id*. at 891, requiring the court to "balanc[e] . . . [the] state and federal interests to determine whether the state rule should apply." *Id*. It held that the *Little Lake Misere* had struck this balance in favor of applying a federal rule of decision where there was "retroactive application of Act 315," but that the considerations cited by the Supreme Court did not compel the same conclusion where a prospective application of the same statutes was involved. In the latter instance, the Fifth Circuit found, "Act 315 provides the background rule that the United States bargained under." *Id*. at 892-93. Finally, the court viewed its prior decisions, including *Nebo Oil*,[1] as precluding it from reconsidering whether the 1940 Act unconstitutionally discriminated against the United States. *Id*. at 893-94.

---

[1] The Fifth Circuit did not cite *Nebo Oil*. Rather, it indicated that it could not reconsider these constitutional points based upon its decision in *United States v. Little Lake Misere Land Co.*, 453 F.2d 360 (5ᵗʰ Cir. 1971), noting the Supreme Court, in reversing that opinion, had reserved any ruling regarding the constitutionality of the 1940 Act. *Central Pines*, 274 F.3d at 893. That said, the Fifth Circuit's ruling in *Little Lake Misere* was squarely based on its prior ruling in *Nebo Oil*. *See Little Lake Misere*, 453 F.2d at 362.

On February 18, 2000, after the first of the district court's rulings in *Central Pines,* but before the second, Petro-Hunt, along with the other co-owners of the mineral estate, brought a quiet title action against the United States in the United States District Court for the Western District of Louisiana – a lawsuit apparently triggered by the United States' continuing and burgeoning leasing activity.  On August 24, 2000, Petro-Hunt filed suit in this court.  On November 2, 2000, this court granted the parties' joint motion to stay this action pending a final decision in the quiet title action.  Meanwhile, in the district court, Petro-Hunt and the other plaintiffs filed a motion for summary judgment asserting that the combined effect of the decision in *Nebo Oil* and the doctrine of *res judicata* precluded the United States from arguing that the servitudes in question had prescribed.  On December 18, 2001, the district court granted this motion, holding that the preclusive effect of *Nebo Oil* barred the United States from asserting the prescription defense not only to the 800-acre servitude directly addressed in *Nebo Oil*, but also to all 24,942.93 acres of land that were acquired in the transaction involving the 800-acre servitude ***and*** as to the remainder of approximately 180,000 acres of land acquired by the United States in ten additional transactions.  *Petro-Hunt, L.L.C. v. United States*, 179 F. Supp. 2d 669, 681-82 (W.D. La. 2001).  In this regard, the district court concluded that "the entire 180,000 acres was similarly situated to the 800 acres at issue in *Nebo Oil*."  *Id*. at 682.

On appeal, the Fifth Circuit reversed.  *Petro Hunt, LLC v. United States*, 365 F.3d 385 (5th Cir.), *cert. denied*, 543 U.S. 1034 (2004).  It held that neither *res judicata* nor collateral estoppel precluded the United States from relitigating the applicability of the 1940 Act to ninety-five of the ninety-six Good Pine servitudes.  Rather, the court found, the United States was prohibited only from relitigating the title to the single servitude burdening the 800-acre parcel of land directly at issue in *Nebo Oil*.  The court held that "res judicata is no bar to the United States' defense in this action because its claim with respect to each servitude depends on a unique set of operative facts."  *Id*. at 397.  The court then concluded that collateral estoppel did not apply to the rulings in *Nebo Oil* because the relevant question – involving the choice of law – had not been litigated in the earlier Fifth Circuit case.  *Id*. at 398.  Even if that issue had been raised, the court found, changes in the controlling legal principles effectuated by the decisions in *Little Lake Misere* and *Central Pines* would permit the United States to relitigate the issue.  *Id*. at 399. Based upon the rulings in the latter two cases, the Fifth Circuit concluded that it was "prohibited from borrowing Act 315 as the federal rule of decision because it is hostile to the federal interests at stake."  *Id*.  The court remanded the case to the district court to determine which of the ninety-five servitudes that were not at issue in *Nebo Oil* had prescribed.  *Id*.  After the Supreme Court denied a petition for certiorari, it ultimately was determined that the United States owned ninety servitudes and plaintiff remained the owner of six (the servitude at issue in *Nebo Oil* and five others).

On June 25, 2008, plaintiff filed its first amended complaint in this court, in which it asserted seven counts.  In the first six of these, plaintiff averred that the United States had effectuated:  (i) a permanent taking of ninety servitudes; (ii) a temporary taking of ninety-one servitudes by issuing mineral leases to third parties; (iii) a temporary taking of servitudes over which the United States had asserted ownership during the quiet title action; (iv) breaches of the

original land conveyance contracts which plaintiff may pursue as the successor-in-interest to Good Pine; (v) breaches of the original land conveyance contracts which plaintiff may pursue as a third-party beneficiary; and (vi) breaches of the covenant of good faith and fair dealing associated with the original land conveyance contracts. A seventh count sought reformation of the original land conveyance contracts. On September 2, 2008, defendant moved to dismiss the amended complaint for lack of jurisdiction, primarily arguing that the claims were time-barred. It also argued that various counts in the complaint failed to state a claim. Following the completion of briefing on that motion, the court conducted oral argument on the motion on April 9, 2009. The court ordered supplemental briefing, which was completed on July 31, 2009.

## II.    DISCUSSION

Defendant raises a host of objections to plaintiff's amended complaint. As the court previously indicated to the parties, the court will resolve only those objections properly raised in the context of RCFC 12, *to wit*, issues involving jurisdiction and whether various counts of plaintiff's complaint fail to state a claim. It will not consider, at this time, defendant's alternative motion for summary judgment, which relies on evidence that goes well beyond the specific allegations in the complaint. The arguments made in this alternative motion are, in the court's view, premature and must await the completion of discovery.

### A.    Lack of Jurisdiction – Statute of Limitations

In considering a motion challenging jurisdiction, the court construes factual allegations in the complaint most favorably to the plaintiff, resolving ambiguities in its favor. *Scheuer v. Rhodes*, 416 U.S. 232, 236 (1974). The court may look beyond the pleadings and "inquire into jurisdictional facts" to determine whether jurisdiction exists. *Rocovich v. United States*, 933 F.2d 991, 993 (Fed. Cir. 1991). RCFC 12(c) provides that if "matters outside the pleadings are presented to and not excluded by the court, the motion shall treated as one for summary judgment." But, this provision "does not apply to a motion made under Rule 12(b)(1) to dismiss for lack of jurisdiction over the subject matter," under which the court undoubtedly may "address matters outside the pleadings." *Reed Island-MLC, Inc. v. United States*, 67 Fed. Cl. 27, 32 (2005) (citing *Toxgon Corp. v. BNFL, Inc.*, 312 F.3d 1379, 1383 (Fed. Cir. 2002)).

The Tucker Act, 28 U.S.C. § 1491(a)(1), grants this court jurisdiction to render judgment on any claim against the United States founded, *inter alia*, on the Constitution or a contract. *See United States v. Testan*, 424 U.S. 392, 397-98 (1976). A claimant must bring a claim under the this provision "within six years after such claim first accrues." 28 U.S.C. § 2501; *see also Samish Indian Nation v. United States*, 419 F.3d 1355, 1369 (Fed. Cir. 2005). This is a jurisdictional limit that cannot be waived. *John R. Sand & Gravel Co. v. United States*, 552 U.S. 130 (2008). It is well-established that a claim accrues under section 2501 "when 'all events have occurred to fix the Government's alleged liability, entitling the claimant to demand payment and sue here for his money.'" *Martinez v. United States*, 333 F.3d 1295, 1303 (Fed. Cir. 2003) (en banc), *cert. denied*, 540 U.S. 1177 (2004) (quoting *Nager Elec. Co. v. United States*, 368 F.2d

847, 851 (Ct. Cl. 1966)); *see also Samish*, 419 F.3d at 1369.  Because, as noted, this requirement is jurisdictional, plaintiff bears the burden of demonstrating that its claims were timely.  *See Alder Terrace, Inc. v. United States*, 161 F.3d 1372, 1377 (Fed. Cir. 1998); *Entines v. United States*, 39 Fed. Cl. 673, 678 (1997), *cert. denied*, 526 U.S. 1117 (1999); *see also John R. Sand & Gravel Co. v. United States*, 457 F.3d 1345, 1362 (Fed. Cir. 2006) (Newman, J., dissenting); *Reynolds v. Army and Air Force Exchange Serv.*, 846 F.2d 746, 748 (Fed. Cir. 1988).[2]

In the 1930s, defendant persuaded the prior owners of the property in question to sell their surface rights by supplying them with an opinion that held that the prescriptive provisions of Louisiana law did not apply to these lands.  Consistent with that view, the documents transferring those surface rights reserved the associated mineral interests.  In 1940, the Louisiana legislature passed a law stating that the prescriptive provisions did not apply to land acquired by the United States.  In its 1950 *Nebo Oil* decision, the Fifth Circuit, relying upon prior decisions of the Louisiana Supreme Court, held that this statute applied to one of the servitudes at issue in this case.  Subsequent to this ruling, Louisiana State and Interior Department records reflected that the minerals underlying the land in question were not owned by the United States.  A 1973 decision of the Supreme Court raised doubts regarding the impact of the 1940 Act, but did so in a case involving a contract in which the United States had bargained for and seemingly obtained the mineral interests in question.  A 2001 ruling of the Fifth Circuit distinguished the 1973 precedent on this and other bases, and held that *Nebo Oil* was still good law.  In a lawsuit filed shortly before this suit was initiated, a district court, in 2001, held that the *res judicata* impact of the *Nebo Oil* decisions precluded defendant from asserting interests in any of the servitudes involved in this case.  That ruling was reversed by the Fifth Circuit in 2004, ultimately leading to a finding, on remand, that the United States owned ninety of the ninety-six servitudes involved here.

Despite the recentness of the latest of these developments, defendant claims that most of the counts in plaintiff's lawsuit are barred by the statute of limitations – contending, in its original motion, that the claims accrued "long before" the 2004 court rulings on the servitudes.  Defendant's choice of the pliant phrase "long before" apparently was not inadvertent, for, in briefing the pending motion, it has taken various views as to when the claims here accrued for limitations purposes.  At points, it has argued that the claims accrued in the 1940s – when the minerals allegedly first came into the possession of the United States under the Louisiana law of prescription.  Alternatively, it has asserted that the claims accrued in 1973 when the Supreme Court issued its opinion in *Little Lake Misere*.  And, at still other instances, it has asseverated that the claims accrued during the late 1980s and early 1990s, when defendant began to grant

---

[2]  *See also Kingman Reef Atoll Investments, L.L.C. v. United States*, 541 F.3d 1189, 1197 (9th Cir. 2008) ("Although ordinarily the defendant bears the burden of proving an affirmative statute of limitations defense, here the statute of limitations is jurisdictional, and, '[w]hen subject matter jurisdiction is challenged under Federal Rule of Procedure 12(b)(1), the plaintiff has the burden of proving jurisdiction in order to survive the motion.'" (quoting *Tosco Corp. v. Comtys. for a Better Env't*, 236 F.3d 495, 499 (9th Cir. 2001)).

mineral leases relating to the properties.  Yet, while itself advocating alternating accrual dates that span nearly a half a century, defendant audaciously managed, in its final brief, to accuse plaintiff of "throwing . . . alternative arguments at the wall, [in hopes] one will stick" – a classic example of the pot calling the kettle black, if there ever was one.  As it turns out, both parties present arguments that are a bit viscid.  To sort through them – and to determine which adhere to the fabric of the law – the court will consider plaintiff's permanent takings, temporary takings and contract claims *seriatim*.

### 1.      Permanent Takings

The Fifth Amendment provides that private property shall not "be taken for public use without just compensation."  U.S. Const. Amend. V.  A claim alleging a Fifth Amendment taking "'accrues when that taking action occurs.'"  *Goodrich v. United States*, 434 F.3d 1329, 1333 (Fed. Cir. 2006) (quoting *Alliance of Descendants of Tex. Land Grants v. United States*, 37 F.3d 1478, 1481 (Fed. Cir. 1994)).  Apart from a condemnation, such a taking generally occurs when the government deprives an owner of the use and enjoyment of his or her property.  *United States v. Causby*, 328 U.S. 256, 261-62  (1946); *United States v. General Motors Corp.*, 323 U.S. 373, 378 (1945); *see also Boling v. United States*, 220 F.3d 1365, 1371 (Fed. Cir. 2000).  A permanent takings claim arises when: (i) all the events which fix the government's liability have occurred; and (ii) the plaintiff knew or should have known of the existence of these events.  *See Ingrum v. United States*, 560 F.3d 1311, 1314 (Fed. Cir.), *cert. denied*, 2009 WL 22404042 (U.S. Oct. 5, 2009); *Alliance of Descendants of Tex. Land Grants*, 37 F.3d at 1481.  As plaintiff points out, each prong of this analysis has bred its own set of corollaries which, in turn, may control when a given takings claim arises.

One such corollary – focusing on when the government's liability is fixed – stems from the interlocking nature of this court's Tucker Act jurisdiction with that of the district courts under the Administrative Procedure Act, 5 U.S.C. § 551 *et seq*., and other statutes.  It holds that if a necessary element to a claim must be established in a different forum, the claim will not accrue for section 2501 until that element is finally established in the other proceeding.  A prime example of this rule at work may be found in *Samish*, 419 F.3d at 1369.  There, the Samish claimed that they were entitled to damages for benefits lost when the Bureau of Indian Affairs (BIA) terminated their status as a Federally-recognized tribe.  The Federal Circuit observed that an essential element of this claim was a finding that the Samish were entitled to be treated as a Federally-recognized tribe, but noted that "[o]nly a district court, acting on challenge under the APA, ha[d] the authority to review the . . . executive's recognition determination" in this regard. *Id*.  It held that the plaintiff's claim did not accrue until the Samish "obtained a final ruling by a district court under the APA" that they were entitled to be treated as a Federally-recognized tribe. *Id*. at 1369.  Other cases have likewise concluded that where a ruling by another tribunal is a precondition to the maintenance of a claim, the claim cannot accrue until that ruling is obtained.[3]

---

[3]  *See also, e.g., Heck v. Humphrey*, 512 U.S. 477, 489–90 (1994) (claim for wrongful conviction did not accrue until the conviction or sentence has been invalidated); *Midgett v.*

This line of cases takes it lead from *Nager Elec. Co.,* 368 F.2d at 859, where the Court of Claims held that a claim "cannot logically mature for limitation purposes . . . before the plaintiff has a proper cause of action to allege in court – a claim which is proof against a motion to dismiss – and the time period does not run until the claim ripens in that sense."

Is this a case like *Samish*?  Plaintiff certainly thinks so.  It contends that it had to complete its quiet title action in the district court before it could pursue its permanent takings claims here.  Unlike in *Samish*, however, there was no legal requirement that plaintiff obtain a ruling from the district court to establish an element of its permanent takings claim.  To be sure, it is axiomatic that to maintain a takings claim, a claimant must show that it had a property interest that was impacted by government action.  *See, e.g., Air Pegasus of D.C., Inc. v. United States*, 424 F.3d 1206, 1212-13 (Fed. Cir. 2005); *Am. Pelagic Fishing Co. L.P. v. United States*, 379 F.3d 1363, 1372 (Fed. Cir. 2004), *cert. denied*, 545 U.S. 1139 (2005).  And, in several discrete subject areas (*e.g.*, unpatented mining claims), Congress has vested in the district courts the sole authority to determine the validity of certain types of property interests.  *See Freese v. United States*, 221 Ct. Cl. 963, 963 (1979); *see also Aulston v. United States*, 823 F.2d 510, 514 (Fed. Cir. 1987) (this court "does not acquire authority to review an agency action otherwise reviewable only in district court merely because plaintiff's effort to obtain review is couched in terms of a taking claim").  Yet, as numerous cases attest, questions regarding the existence or loss of most property interests, including those of real property, may be – and often are – litigated in this court in resolving a takings claim.[4]  And this occurs even where reference to state law is

---

*United States*, 603 F.2d 835, 839 (Ct. Cl. 1979) (claim for death gratuity did not accrue until Virginia decree of death); *Fort Mojave Indian Tribe v. United States*, 23 Cl. Ct. 417, 429 (1991) (claim for breach of trust in the loss of water rights did not accrue until Supreme Court confirmed that rights had been lost); *see also Peak v. United States*, 353 U.S. 43, 45 (1957) (claim accrues for limitation purposes when the claimant "might have successfully maintained her suit").

[4]  *See, e.g., Acceptance Ins. Cos., Inc. v. United States*, 2009 WL 3127774, at *7 (Fed. Cir. Oct. 1, 2009); *see also Branch v. United States*, 69 F.3d 1571, 1575 (Fed. Cir. 1995), *cert. denied*, 519 U.S. 810 (1996) ("In analyzing a takings claim, a court must first determine what was taken.").  In *Dwen v. United States*, 62 Fed. Cl. 76, 81 (2004), this court noted that while it plainly lacks jurisdiction under the Quiet Title Act, 28 U.S.C. § 2409a, to declare titles, that does not prevent the court from determining property rights in the context of resolving takings claims.  In this regard, the court noted –

> After the passage of the QTA, however, the government frequently argued that the court was divested of jurisdiction to adjudicate takings claims where resolution of a title dispute was subsumed in the determination.  That argument, however, has been firmly laid to rest.  It is now well-established that the court has jurisdiction to make independent factual determinations of a claimant's specific property interest as a matter of course in adjudicating takings claims.  *Mannatt v. United States*, 48 Fed. Cl. 148, 152 (2000); *Chevy Chase Land Co. of Montgomery County v.*

required – indeed, the latter is usually the case.[5]  Accordingly, nothing prevented this court from determining, in the context of a takings claim, plaintiff's rights to the servitudes at issue here.  As such, this is not an instance in which the accrual of a claim here had to await a ruling by another tribunal.

While the *Samish*-line of cases deals with situations where a claim has not yet accrued, another salvific corollary invoked by plaintiff – the so-called "accrual suspension rule" – applies where  "an accrual date has been ascertained, but plaintiff does not know of his claim." *Japanese War Notes Claimants Ass'n v. United States*, 373 F.2d 356, 358-59 (Ct. Cl.), *cert. denied*, 389 U.S. 971 (1967); *Benchmark Resources Corp. v. United States*, 64 Fed. Cl. 526, 532 (2005).

Under the accrual suspension rule, "the accrual of a claim against the United States is suspended, for purposes of 28 U.S.C. § 2501, until the claimant knew or should have known that the claim existed."  *Martinez*, 333 F.3d at 1319; *Young v. United States*, 529 F.3d 1380, 1384 (Fed. Cir. 2008).  This concept derives directly from the meaning of the term "accrues," as used in section 2501, and, therefore, is viewed as a matter of statutory interpretation, rather than a form of equitable tolling.  *Martinez*, 333 F.3d at 1319; *L-3 Comms. Integrated Sys., L.P. v. United States*, 79 Fed. Cl. 453, 463 (2007).[6]  To achieve such a suspension, the plaintiff "must either show that defendant has concealed its acts with the result that plaintiff was unaware of their existence or it must show that its injury was 'inherently unknowable' at the accrual date." *Id.* (quoting *Welcker v. United States*, 752 F.2d 1577, 1580 (Fed. Cir.), *cert. denied*, 474 U.S. 826 (1985)); *see also Young*, 529 F.3d at 1384.  While some cases talk in terms of requiring "active" or "intentional" concealment, *see, e.g.*, *Rosales v. United States*, 2009 WL 3286594, at * 7 (Fed, Cl. Oct. 7, 2009); *Central Pines Land*, 61 Fed. Cl. at 533, others seem to proceed from the notion that the *mens rea* underlying the concealment is largely irrelevant, so long as the nondisclosure

---

*United States*, 37 Fed. Cl. 545, 564 (1997); *Oak Forest*, 23 Cl. Ct. at 96; *Yaist*, 228 Ct. Cl. at 285-86, 656 F.2d 616.

*Dwen*, 62 Fed. Cl. at 81; *see also Bourgeois v. United States*, 545 F.2d 727, 729 n.1 (Ct. Cl. 1976) (stating that in a suit seeking compensation, the court is not denied jurisdiction simply because there is a quiet title issue involved in determining compensation); *Oak Forest, Inc. v. United States*, 23 Cl. Ct. 90, 96 (1991) ("[T]he mere fact that title must be determined as part of [a takings claim] does not oust the court of jurisdiction, assuming it otherwise exists.").

[5]  *See Am. Pelagic Fishing Co.*, 379 F.3d at 1376; *Conti v. United States*, 291 F.3d 1334, 1340 (Fed. Cir. 2002), *cert. denied*, 537 U.S. 1112 (2003) (determining property interests by considering "'background principles' derived from an independent source, such as state . . . law"); *see also Lucas v. S.C. Coastal Council*, 505 U.S. 1003, 1029-30 (1992).

[6]  This is important, of course, as there can be no equitable tolling of the statute of limitations in section 2501, which is jurisdictional.  *See John R. Sand & Gravel Co.*, 552 U.S. at 133-34, 137-39.

prevented the claimant from knowing that its claim had arisen. *See Bleak v. United States*, 214 Ct. Cl. 812, 813 (1977) ("we need not delve deeply into the technical rules that surround this technical point of law to be reminded that the underlying precept is that the limitations cannot begin to run until the claimant has reason to know he holds a ripe claim"); *Japanese War Notes Claimants*, 373 F.2d at 359; *see also L.S.S. Leasing Corp. v. United States*, 695 F.2d 1359, 1366 (Fed. Cir. 1982).[7]  These and other cases also teach that a claim is "inherently unknowable" when there is nothing to alert one to the wrong at the time it occurs. *See Japanese War Notes Claimants*, 373 F.2d at 358-59; *Texas Nat. Bank v. United States*, 86 Fed. Cl. 403, 414 (2009); *see also Ramirez-Carlo v. United States*, 496 F.3d 41, 47 (1st Cir. 2007) (cause of action is "inherently unknowable" if "it was incapable of detection by the plaintiff through the exercise of reasonable diligence").

Mindful that the "accrual suspension" rule is to be "strictly and narrowly applied," *Martinez*, 333 F.3d at 1319, courts have concluded that a misunderstanding of the meaning of the law or one's legal rights does not trigger this rule  *See Catawba Indian Tribe of S.C.*, 982 F.2d 1564, 1572 (Fed. Cir.), *cert. denied*, 509 U.S. 904 (1993) (declining to apply the rule where "all the relevant facts were known.  It was the meaning of the law that was misunderstood."); *Black v. United States*, 84 Fed. Cl. 439, 448 (2008); *see also United States v. Kubrick*, 444 U.S. 111, 122 (1979).  Yet, several cases involving this rule and the related discovery rule[8] intimate that the suspension rule may apply where a claimant, through the exercise of reasonable diligence, could not have known that its legal rights had been modified or abridged in a way giving rise to a claim.  Cases of this sort typically involve situations in which the change in circumstance arises out of a decision that overrules or alters prior precedent, with the claim deemed to have been tolled until the modifying decision was made.  In *Neely v. United States*, 546 F.2d 1059, 1068 (3d Cir. 1976), for example, the Third Circuit held that the Tucker Act's statute of limitations was not triggered until the Supreme Court had overruled several prior opinions, thereby giving rise to the claims at issue.  Finding that the alterations in the claimants' rights worked by the Supreme Court's opinion were "inherently unknowable," the court commented that "[t]o require

---

[7]  The rule has been applied in cases where defendant has deliberately or fraudulently concealed its acts from plaintiff. *See, e.g., Barrett v. United States*, 689 F.2d 324, 327-328 (2d Cir. 1982); *L-3 Communs.*, 79 Fed. Cl. at 464; *see also Hopland Band of Pomo Indians v. United States*, 855 F.2d 1573, 1577 (Fed. Cir. 1988).  In other instances, however, the same result has obtained where critical facts simply have not been disclosed. *Spevack v. United States*, 390 F.2d 977, 981 (Ct. Cl. 1968) (suspending accrual of patent infringement claim where defendant performed patented process secretly, pursuant to applicable security regulations); *Manchester Band of Pomo Indians v. United States*, 363 F. Supp. 1238, 1249 (N.D. Cal. 1973) (suspending accrual of claim for breach of fiduciary duties where defendant was not in the practice of paying out income or accounting to plaintiffs on a regular basis).

[8]  *See Kubrick*, 444 U.S. at 120-22; *Urie v. Thompson*, 337 U.S. 163, 169 (1949) (statute of limitations not triggered where facts were "unknown and inherently unknowable"); *see also Ramirez-Carlo*, 496 F.3d at 47 (applying this rule to a case under the Federal Tort Claims Act).

clairvoyance in predicting new jurisprudential furrows plowed by the Supreme Court, under these circumstances, would be to impose an unconscionable prerequisite to asserting a timely claim." *Id.*[9]  Cases such as *Neely* are readily distinguishable from those in which the facts are known, but the legal implications are not.  *Red Chevrolet Impala Sedan*, 457 F.2d at 1358 ("This is not . . . a case in which a plaintiff is ignorant of his rights, but rather a case of a plaintiff without a right.").

But, again, is this a case like *Neely*?  Plaintiff asserts that prior to the 2004 ruling of the Fifth Circuit, its permanent takings claim was not legally apparent.  It argues that until this decision, it had every reason to believe that the Louisiana law of prescription did not apply to its servitudes.  Its predecessors, of course, had been assured of that by the Department of Agriculture in inducing them to sell their surface rights, and the transfer documents reflected this view.  As further evidence that prescription did not apply, plaintiff cites not only the 1950 ruling of the Fifth Circuit in *Nebo Oil*, but the 2000 ruling of that same court in *Central Pines,* and even the 2001 ruling of the Louisiana district court in the quiet title action related to this case.  And while defendant asserts that the 1973 decision in *Little Lake Misere* should have alerted plaintiff that the law had changed to its detriment, plaintiff notes that: (i) the decision was factually distinguishable; (ii) the Fifth Circuit, in *Central Pines,* held that *Nebo Oil* was still good law; and (iii) there was good reason to believe that even if *Nebo Oil* had been overruled, the *res judicata* impact of that ruling remained and still protected all of its servitudes – a belief validated by the Louisiana district court as late as 2001.  Based on this, plaintiff contends that its permanent takings claims were inherently unknowable until the Fifth Circuit reversed the district court's ruling that the *res judicata* impact of *Nebo Oil* applied to all ninety-six servitudes.  It was not until that point, plaintiff contends, that it knew or should have known that it had a permanent takings claim.

Were these all the relevant facts, plaintiff's suspension claim, in the court's view, would be compelling.  There is little doubt that the accrual suspension rule applied here to some extent.  Otherwise, the permanent takings claim here would have accrued when the servitudes in question prescribed, which for some of the properties, and perhaps almost all, occurred in the 1940s – it was at that time that the property interests here were obtained by the United States.  The question, rather, is how long that suspension lasted – did it extend, critically, all the way until August 28, 1994, so as to be within six years of the filing of the original lawsuit here?  Almost certainly, that suspension was in effect when the Louisiana legislature passed the 1941 Act (recall that statute was retroactive) and, later, when the Fifth Circuit decided *Nebo Oil*.  And while defendant claims otherwise, it would appear that plaintiff has the better of the case in asserting that the suspension remained in effect even after the Supreme Court's decision in *Little Lake*

---

[9]  *See also Wollman v. Gross*, 637 F.2d 544, 547 (8th Cir. 1980), *cert. denied*, 454 U.S. 893 (1981) (rule applies where "new law applied retroactively has created a new basis for a claim"); *United States v. One 1961 Red Chevrolet Impala Sedan*, 457 F.2d 1353, 1358 (5th Cir. 1972) (same); *cf. Venture Coal Sales Co. v. United States*, 57 Fed. Cl. 52, 54 (2003), *aff'd*, 370 F.3d 1102 (Fed. Cir.), *cert. denied*, 593 U.S. 1020 (2004) (recognizing concept, but finding it inapplicable).

*Misere*, particularly because the latter case left unaffected plaintiff's ability to invoke *res judicata* as to the earlier *Nebo Oil* opinion.[10]   But, these events bring us only to 1973 or thereabouts – and not all the way to August of 1994.  Alas for plaintiff, it appears that the suspension ceased – that plaintiff knew or should have known it had a permanent takings claim – and the statute of limitations was triggered in 1991 (or, at the latest, in 1993).

In the 1970s and 1980s, the United States entered into a few mineral leases relating to the servitudes in question.  Perhaps, those isolated leases should have aroused suspicions.  Perhaps not.  Then, in 1991, when defendant sought to enter into several new leases, one of plaintiff's predecessors-in-interest, Hunt Petroleum Corporation, formally protested, claiming in a March 18, 1991, letter that it owned the relevant servitudes and requesting that the Bureau of Land Management (BLM) withdraw the parcels.[11]   Four days later, on March 22, 1991, the Forest Service advised the BLM that while two of the parcels involved had not prescribed, the remainder had prescribed making the Federal government the legal owner thereof.  This letter, on which Hunt Petroleum was copied, cited a 1986 opinion by the Office of General Counsel of the Department of Agriculture and indicated that the United States had taken ownership of servitudes on parcels that were acquired prior to 1940 and on which no wells had been drilled.  On November 2, 1993, Hunt Petroleum again protested to the BLM the inclusion of certain lands in a competitive lease sale.  On December 10, 1993, the BLM notified Hunt Petroleum and Placid Oil Company that the protest had been denied, citing an April 19, 1993, title report as indicating that the minerals in question "were in fact prescribed to the United States."

---

[10]  In *Central Pines Land Co. v. United States*, 61 Fed. Cl. 527 (2004), a takings case that was stayed pending the resolution of the *Central Pines* quiet title action discussed above, this court concluded that the plaintiff's claims were time-barred because they were filed more than six years after the servitudes in question had prescribed under Louisiana law.  *Id.* at 535.  It rejected the plaintiff's contention that its claim was unknowable because it believed, based on *Nebo Oil*, that mineral servitudes on federally-owned lands were imprescriptible under Louisiana law.  In so concluding, the court found that the plaintiff had no basis to rely upon *Nebo Oil* after the 1973 decision in *Little Lake Misere*.  *Id.*  For reasons unexplained, however, the court failed to take cognizance of the fact that the Fifth Circuit, in its own *Central Pines Land* case, had concluded that *Nebo Oil* was still good law following the Supreme Court's decision.  Moreover, there is no indication in the opinion that Central Pines, like the plaintiff here, could argue that the *res judicata* effect of *Nebo Oil* survived *Little Lake Misere* – an argument, of course, that was accepted by the district court in the quiet title action involving the servitudes at issue.  Accordingly, *Central Pines* casts little light on the proper result here.

[11]  For reasons unexplained, it seems that defendant first made this point in its supplemental brief – late enough that the court would be disinclined to consider this point were it not related to jurisdiction.  Even then, while claiming that Hunt Petroleum was a "predecessor" to plaintiff, defendant failed to cite any evidence in support of that claim.  However, the record contains an affidavit filed by plaintiff in the Louisiana quiet title action in which it admits that Hunt Petroleum was an "ancestor in title."

These documents in themselves should have indicated to plaintiff's predecessor-in-interest that a permanent takings claim should be pursued – and with that task taking on added urgency in January of 1994 (again more than six years prior to the filing suit), when the Forest Service engaged in a series of additional leases.  Moreover, the documents discussed above reference title reports that plaintiff does not deny were publicly available, which reports would have further revealed the extent of (and rationale underlying) defendant's prescription claims.  *See Catawba*, 982 F.2d at 1570-72 (party is charged with knowledge of information that is available from public records); *Menominee Tribe of Indians v. United States*, 726 F.2d 718, 720-21 (Fed. Cir. 1984) (same).  Accordingly, it appears that by 1991 and, certainly, no later than in 1993, plaintiff was "'on inquiry as to its possible injury,' and the statute of limitations began to run."  *Ingrum*, 560 F.3d at 1315 (quoting *Coastal Petroleum*, 228 Ct. Cl 864, 867 (1981)); *see also Welcker*, 752 F.2d at 1580 ("Once plaintiff is on inquiry that it has a potential claim, the statute can start to run.").  Certainly, by this time, the nature and extent of its claim was no longer either concealed or inherently unknowable.

Because plaintiff filed suit more than six years after that critical juncture, the court must conclude that its permanent takings claim was time-barred.[12]

## 2.    Temporary Takings

Landowners, of course, must be justly compensated for both permanent and temporary takings.  *See First English Evangelical Lutheran Church of Glendale v. County of Los Angeles, California*, 482 U.S. 304, 318 (1987) ( "'[T]emporary' takings . . . are not different in kind from permanent takings, for which the Constitution clearly requires compensation.").  As a general matter, "'the distinction between 'permanent' and 'temporary' takings refers to the nature of the intrusion and not its temporal duration.'"  *Bass Enters. Prod. Co. v. United States*, 133 F.3d 893, 896 (Fed. Cir. 1998) (quoting *Skip Kirchdorfer, Inc. v. United States*, 6 F.3d 1573, 1582 (Fed. Cir. 1993)); *see also Reed Island*, 67 Fed. Cl. at 33.

---

[12]  Plaintiff also argues that its takings claims are timely under the "continuing claims" doctrine, asserting that the government's issuance of leases are wrongful acts that took place over a period of time, culminating in defendant's assertion of ownership in the 2001 quiet title action.  The continuing claims doctrine applies where a plaintiff's claim is "inherently susceptible to being broken down into a series of independent and distinct events or wrongs, each having its own associated damages."  *Brown Park Estates-Fairfield Dev. Co. v. United States*, 127 F.3d 1449, 1456 (Fed. Cir. 1997).  The doctrine allows "later arising claims even if the statute of limitations has lapsed for earlier events."  *Ariadne Fin. Servs. Pty. Ltd. v. United States*, 133 F.3d 874, 879 (Fed. Cir. 1998); *see also Tamerlane, Ltd. v. United States*, 550 F.3d 1135, 1145 (Fed. Cir. 2008).  In the court's view, however, the leasing activity in question is appropriately viewed more as a temporary taking and should be analyzed as such.  Plaintiff has made several other glancing arguments regarding claim accrual that the court has considered and also rejects.

In the case *sub judice*, the temporary takings claims are predicated upon a series of mineral leases entered into between the United States and third parties, involving the servitudes at issue. Each of these leases had a term of ten years. The parties have filed competing affidavits cataloguing the leases they believe are at issue.[13] Those affidavits differ in terms of the number of leases made and when those leases were created. Plaintiff asserts that there were sixty-eight "intrusive" leases – twenty-one on the servitudes that were held in the quiet title action not to have prescribed to the United States and forty-seven on the servitudes that were held to have prescribed. Defendant admits to having issued fifteen mineral leases on the servitudes that did not prescribe, but does not provide any information as to the leases entered into with respect to the servitudes that prescribed. All the leases listed by defendant and all but two of those listed by plaintiff were entered into after August 24, 1984, and thus all ended within six years of the filing of this lawsuit.[14] Fifty-six of the leases cited by plaintiff apparently were initiated during that same six-year limitations period.

The decisional law suggests that the timing of the accrual of a temporary takings claim may depend upon the nature of the takings involved. Several cases indicate that a temporary regulatory takings claim accrues when the "process that began it has ended" because, among other things, the property owner "would not know the extent of [its] damages until the Government completes the 'temporary' taking." *Creppel v. United States*, 41 F.3d 627, 632 (Fed. Cir. 1994); *see also Hornback v. United States*, 56 Fed. Cl. 359, 364 (2003).[15] In *Reed Island*, the court suggested that this rule also applies to temporary physical takings, operating much like the doctrine applicable to suits upon repudiation of a contract – that is, a plaintiff may file a claim on a temporary takings theory once the taking begins or wait and determine the duration of the taking before filing suit. *Reed Island*, 67 Fed. Cl. at 36 (discussing *Franconia Assocs. v. United States*, 536 U.S. 129, 144 (2002)). Other decisions, however, take a different view. Thus, for example, in *Kemp v. United States*, 65 Fed. Cl. 818 (2005), the plaintiff claimed that the National Park Service had allowed the public to use her land without her permission, resulting in a physical takings. Rejecting the argument that this claim accrued only when the temporary takings had ended, this court instead held that where a temporary physical takings is

---

[13] Again, as these affidavits involve jurisdictional facts, the court may consider them even though they present matter not found within the four corners of the amended complaint.

[14] Plaintiff's affidavit recites one lease entered into on August 1, 1983, on Servitude No. 2, and another entered into on February 1, 1973.

[15] In *Creppel*, the Federal Circuit determined that the alleged temporary taking occurred in 1976 when an Army Corps of Engineers' officer issued an order modifying a flood control levee project in Jefferson Parish, Louisiana. 41 F.3d at 629-30, 632. The Federal Circuit further concluded that the temporary taking ended, and thus the temporary takings cause of action accrued, in August 1984, when the federal district court ordered the original flood control levee project to proceed. *Id*. at 632. Because plaintiff did not file suit until 1991, the Federal Circuit found that plaintiffs' temporary takings claim was barred by the statute of limitations.

involved, "the statute of limitations begins to run when the United States comes into physical possession of the plaintiff's land." *Id.* at 822 (citing *Dow*, 357 U.S. at 21); *see also Roth v. United States*, 73 Fed. Cl. 144, 149 (2006). *Kemp* and similar cases hold that "[w]hether a physical taking is permanent or temporary is irrelevant to the application of the statute of limitations because the accrual date is the same for both." *Kemp*, 65 Fed. Cl. at 822 (citing *Caldwell v. United States*, 391 F.3d 1226, 1235 (Fed. Cir. 2004), *cert. denied*, 546 U.S. 826 (2005)).

Plaintiff asserts that the leases made by the United States effectuated physical takings. The court agrees that because these leases authorized the physical occupation of property, they should be analyzed as potentially giving rise to physical, not regulatory takings. *See Lucas*, 505 U.S. at 1017; *Pettro v. United States*, 47 Fed. Cl. 136, 144-46 (2000); *see also Tahoe-Sierra Preservation Council v. Tahoe Reg'l Planning Agency*, 535 U.S. 302, 324 n.19 (2002). As such, the accrual rule applicable to temporary regulatory takings is not controlling here. For fifty-six of the leases cited by plaintiff, of course, it matters not whether the accrual rule applicable to temporary physical takings is triggered by the initial deprivation of access or the end of the takings, because these leases were entered into during the six-year period preceding the filing of the original complaint herein. Whether a special accrual rule applies to temporary physical takings, however, does make a difference as to the twelve leases cited by plaintiff that were entered into before the six-year limitations period began, but which terminated thereafter. Accordingly, the court is compelled to decide for itself when a temporary physical takings accrues.

While a close issue, there are several reasons why temporary and permanent physical takings claims seemingly ought to be treated the same for accrual purposes. In both instances, the "taking occurs when the owner is deprived of the use of the property." *Caldwell*, 391 F.3d at 1235. That rationale does not apply to regulatory takings, which arise only where, in the oft-quoted words of Justice Holmes, a "regulation goes too far." *Pa. Coal Co. v. Mahon*, 260 U.S. 383, 415 (1922); *see also Lucas*, 505 U.S. at 1019 n.8; *Yee v. City of Escondido*, 503 U.S. 519, 522-23 (1992). To decide whether the latter is true, courts must either determine that the regulation has denied the owner "all economically beneficial or productive use of land," *Lucas*, 505 U.S. at 1015, or, barring such a finding, employ the three-factored test outlined in *Penn Cent. Transp. Co. v. City of New York*, 438 U.S. 104, 124 (1978). The latter test famously considers "[t]he economic impact of the regulation on the claimant" and "the extent to which the regulation has interfered with distinct investment-backed expectations." *Penn Central*, 438 U.S. at 124; *see also Brace v. United States*, 72 Fed. Cl. 337, 346 (2006), *aff'd,* 250 Fed. Appx. 359 (2007), *cert. denied*, 128 S. Ct. 1658 (2008).

It is in the context of these factors, with their heavy emphasis on the degree of diminution of the value of the property, that courts have found it appropriate to await the end of a temporary takings before treating a claim as accrued. The delay allows the property owner to assess fully the economic impact of the regulation in question. Thus, after reviewing the three-pronged *Penn Central* test, the Federal Circuit in *Creppel* reasoned –

> [T]he Constitution recognizes a distinction between a temporary and a permanent taking. Simply declaring a regulation that takes property invalid does not grant a constitutionally sufficient remedy. Thus, property owners cannot sue for a temporary taking until the regulatory process that began it has ended. This is because they would not know the extent of their damages until the Government completes the 'temporary' taking. Only then may property owners seek compensation.

41 F.3d at 632 (citations omitted). On this basis, the court held that the plaintiff's temporary takings claim accrued when a district court overturned an agency order halting the plaintiff's land reclamation project, because the court order "restored some potential expectation of completion of the Project and thus some measure of the property's value." *Id*. at 364. But, none of the considerations outlined in *Creppel,* or in other temporary regulatory takings cases, for that matter, resonates when the question is whether a physical takings has occurred. In the latter instance, any deprivation in the use or enjoyment of property triggers a takings, regardless of its impact on value. *See Tahoe-Sierra*, 535 U.S. at 322; *Casitas Mun. Water Dist. v. United States*, 543 F.3d 1276, 1292 (Fed. Cir. 2008) ("in the physical taking jurisprudence any impairment is sufficient"). The effect is immediate and there is no reason, as in a temporary regulatory takings, to await the completion of the harm.

Moreover, with all due respect to contrary decisions, any analogy between the accrual rules for temporary physical takings and the repudiation of contracts is superficial and strained. In *Franconia*, the Supreme Court held that the enactment of the Emergency Low Income Housing Preservation Act (ELIHPA) effectuated a repudiation of prior loan contracts entered into by the Farmers' Home Administration, not an immediate breach. 536 U.S. at 143. In this regard, the Court found that ELIHPA "conveyed an announcement by the Government that it would not perform as represented in the promissory notes if and when, at some point in the future, petitioners attempted to prepay their mortgages." *Id*. Relying upon the Restatement (Second) of Contracts § 250 and other contract treatises, the court noted that the time of accrual varied, depending upon "'whether the injured party chooses to treat the . . . repudiation as a present breach." *Id*. at 144. If that were true, the accrual date of the contract claim would be the date on which the injured party made the election; if no such election were made, that date would be the time fixed for performance. *Id*.[16] In either instance, then, the statute of limitations was triggered

---

[16] In this regard, the Supreme Court explained –

In sum, once it is understood that ELIHPA is most sensibly characterized as a repudiation, the decisions below lose force. To recapitulate, "[t]he time of accrual . . . depends on whether the injured party chooses to treat the . . . repudiation as a present breach." 1 C. Corman, Limitation of Actions § 7.2.1, p. 488 (1991). If that party "[e]lects to place the repudiator in breach before the performance date, the accrual date of the cause of action is accelerated from [the] time of performance to the date of such election." *Id*., at 488-489. But if the injured party

-19-

by an actual breach of contract. These common law contract principles hold no sway in the law of physical takings, in which the injured party does not have the election of deciding when the takings occurs. Accordingly, *Franconia* provides no extendable rationale for delaying the accrual of a temporary physical takings to when the takings ceases.

Finally, it should not be overlooked that, in drawing major distinctions between permanent and temporary physical takings, the accrual rule espoused by plaintiff (and the decisions discussed above) has the potential to bail out some claims, but sink others. The decisional law suggests that the "distinction between 'temporary' and 'permanent' prohibitions is tenuous." *Tahoe-Sierra*, 535 U.S. at 346-47 (Rehnquist, C.J., dissenting); *see also Lucas*, 505 U.S. at 1017; *First English*, 482 U.S. at 318. Accordingly, any attempt to distinguish between these types of takings in determining when a claim accrues risks having a claimant make the wrong choice, that is, to await the filing of its suit thinking that it has temporary takings, only to find out later – indeed, when it is too late – that the takings instead was of the permanent variety. Even though prudential considerations should play little or no role in deciding what is the appropriate accrual point here, the court hesitates to adopt an accrual rule that would require claimants to make distinctions that the law itself has found difficult to make consistently. The straits leading to this court's jurisdictional harbor are perilous enough without introducing yet another potentially-obscured obstacle.

To sum up, the court concludes, as this court did in *Kemp*, that the accrual date is the same for both permanent or temporary physical takings. As such, plaintiff's claims with respect to the twelve leases that were entered into more than six years before the initiation of this lawsuit are untimely and, to that extent, must be dismissed. The remainder of the plaintiff's temporary takings claims that are at issue are predicated upon leases that were executed within the six-year limitations period and thus meet the requirements of section 2501.[17]

### 3.      Breach of Contract

A breach of contract claim accrues "when all the events have occurred which fix the liability of the Government and entitle the claimant to institute an action." *Oceanic S.S. Co. v.*

------------------------

  instead opts to await performance, "the cause of action accrues, and the statute of limitations commences to run, from the time fixed for performance rather than from the earlier date of repudiation." *Id.*, at 488.

536 U.S. at 144; *see also Indiana Mich. Power Co. v. United States*, 422 F.3d 1369, 1374 (Fed. Cir. 2005) ("For an aggrieved party to recover damages for an anticipatory repudiation, it must elect to treat the repudiation as a total breach."); *Arakaki v. United States*, 62 Fed. Cl. 244, 254 (2004).

  [17] Should discovery produce new facts regarding the mineral leases, either party may revisit this ruling in an appropriate motion for summary judgment.

*United States*, 165 Ct. Cl. 217, 225 (1964). Nevertheless, the accrual suspension rule also may apply to breaches of contract, delaying the accrual of such claims. *Texas Nat. Bank*, 86 Fed. Cl. at 413-14; *see also L-3 Comms.*, 79 Fed. Cl. at 463-64.

Preliminarily, defendant contends that because plaintiff's contract claim was not filed until it amended its complaint in 2008, that claim is well out of time. RCFC 15(c)(1)(B), however, provides that "[a]n amendment to a pleading relates back to the date of the original pleading when . . . the amendment asserts a claim or defense that arose out of the conduct, transaction, or occurrence set out – or attempted to be set out – in the original pleading." The Federal Circuit has instructed that "'the inquiry in a determination of whether a claim should relate back will focus on the notice given by the general fact situation set forth in the original pleading.'" *Barron Bancshares, Inc. v. United States*, 366 F.3d 1360, 1369 (Fed. Cir. 2004) (quoting *Snoqualmie Tribe v. United States*, 372 F.2d 951, 961 (Ct. Cl. 1967)). Applying this standard, the court has reviewed plaintiff's original complaint. It lists the contracts under which the United States acquired the "surface (but not the minerals) of the lands subject to" the servitudes and avers that in *Nebo Oil*, "the court found specifically that the United States did not intend to buy, nor did it pay for, minerals or mineral servitudes at the time it acquired the surface of this same property." The latter statement is, in essence, the predicate for plaintiff's breach of contract claim and, in the court's view, provided defendant with adequate notice that a breach of contract claim might arise out of the transactions listed.

That plaintiff's contract claim arose from the same transaction that gave rise to its takings claim, however, leaves plaintiff with the same statute of limitations problem encountered above. In short, while it would appear that the accrual of plaintiff's breach claim was suspended for many years, every indication is that plaintiff was constructively on notice of that claim (through its predecessor) at the same time it became aware of its takings claims. That was in 1991, or, at the latest, 1993, and thus more than six years prior to the filing of this lawsuit. Accordingly, plaintiff's breach of contract claims must also be dismissed as time-barred under section 2501.[18]

_____

[18] Defendant further argues that plaintiff's contract claim is barred by the doctrine of laches. Laches is an inexcusable delay that results in prejudice to the defendant. *See Nat'l R.R. Passenger Corp. v. Morgan*, 536 U.S. 101, 122 (2002); *Kansas v. Colorado*, 514 U.S. 673, 687 (1995); *Galliher v. Cadwell*, 145 U.S. 368, 373 (1892) ("[L]aches is not . . . a mere matter of time."). Here, the flurry of activity that followed the filing of the original complaint cuts against defendant's position that plaintiff's delay in pursuing its contract claim was unreasonable or inexcusable. Moreover, defendant has made no showing of real prejudice, except to claim, without any details, that the delay in filing the amended complaint has caused "witnesses' memories . . . [to have] faded" (since the contracts here were entered into in the 1930s, one must wonder whether the witnesses themselves, and not just their memories, have faded). Laches thus does not provide an additional basis for striking plaintiff's contract claims.

**B. Failure to State a Claim**

In its motion to dismiss, defendant also contends that a variety of counts in plaintiff's amended complaint fail to state a claim upon which relief may be granted and thus must be dismissed under RCFC 12(b)(6). To survive such a motion, the complaint must have sufficient "facial plausibility" to "allow[ ] the court to draw the reasonable inference that the defendant is liable." *Ashcroft v. Iqbal*, 129 S. Ct. 1937, 1949 (2009); *see also Colida v. Nokia, Inc.*, 2009 WL 3172724, at *1 (Fed. Cir. Oct. 6, 2009). Thus, the plaintiff's factual allegations must "raise a right to relief above the speculative level" and cross "the line from conceivable to plausible." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555, 570 (2007). Nevertheless, the Federal Circuit has recently reiterated that "[i]n ruling on a 12(b)(6) motion to dismiss, the court must accept as true the complaint's undisputed factual allegations and should construe them in a light most favorable to the plaintiff." *Cambridge v. United States*, 558 F.3d 1331, 1335 (Fed. Cir. 2009); *see also Bank of Guam v. United States*, 578 F.3d 1318, 1326 (Fed. Cir. 2009).

The court will consider defendant's merits arguments only insofar as it has concluded that it has jurisdiction over the enumerated claims. In other words, it will not address arguments regarding the counts that will be dismissed as untimely.

**1. Temporary Takings**

Defendant asserts that plaintiff's temporary takings claims should be dismissed with respect to the ninety prescribed servitudes that were determined to have prescribed in the quiet title action. It contends that the judgment of the United States District Court for the Western District of Louisiana collaterally estops plaintiff from contending that it has a compensable property interest in the prescribed servitudes, requiring its temporary takings claims as to those servitudes to be dismissed.

It is, of course, "axiomatic that only persons with a valid property interest at the time of the taking are entitled to compensation." *Bair v. United States*, 515 F.3d 1323, 1327 (Fed. Cir.), *cert. denied*, 129 S. Ct. 763 (2008) (quoting *Wyatt v. United States*, 271 F.3d 1090, 1096 (Fed. Cir. 2001), *cert. denied*, 535 U.S. 1077 (2002)); *see also Maritrans v. United States*, 342 F.3d 1344, 1351 (Fed. Cir. 2003). Accordingly, there is little doubt that to support their temporary takings claims, plaintiff must show that, at the time of the leases in question, it owned the relevant servitudes. Likewise, it is beyond peradventure that the district court's judgment here is entitled to preclusive effect. "[O]nce an issue is actually and necessarily determined by a court of competent jurisdiction," the Supreme Court has instructed, "that determination is conclusive in subsequent suits based on a different cause of action involving a party to a prior litigation." *Montana v. United States*, 440 U.S. 147, 153 (1979); *see also In re Cyngnus Telecomm. Tech., LLC, Patent Litigation*, 536 F.3d 1343, 1349 (Fed. Cir. 2008), *cert. denied*, 129 S. Ct. 1906 (2009). By its terms, however, this rule applies only where "the point or question presented for determination in the subsequent action is the same as that litigated and determined in the original action" – in other words, the adjudication of an issue in the first case is not conclusive of a

distinct issue arising in the second. *United States v. Moser*, 266 U.S. 236, 241 (1924); *Banner v. United States*, 238 F.3d 1348, 1354 (Fed. Cir. 2001); *Underwood Livestock, Inc. v. United States*, 2009 WL 3286686, at *12 (Fed. Cl. Oct. 7, 2009); *see also Petro-Hunt, LLC*, 365 F.3d at 398-99. Any doubts in this regard are resolved against the party invoking the doctrine. *See Steen v. John Hancock Mut. Life Ins. Co.*, 106 F.3d 904, 912 (9th Cir. 1997).

Here, the district court effectively resolved which of the servitudes in question prescribed. There is no indication in the record, however, that it found **when** the prescriptions occurred. Indeed, the judgment rendered by that court on December 7, 2005, focused not on the properties that had prescribed, but instead concluded that plaintiff had retained interests on five servitudes and that any leases issued by the United States with respect to those servitudes were "cancelled and set aside as null and void." Unlike in the quiet title action, timing here is critical: we know plaintiff originally had a compensable property interest in the servitudes – the question is whether it still had that interest at the time that the leases in question were granted. If the prescription of a given servitude occurred after the lease thereon was let, then defendant conceivably could still be liable for any temporary takings associated with the leasing – at least for any period of overlap. Resolution of when the servitudes prescribed cannot be made based upon the facts disclosed in plaintiff's amended complaint and, therefore, must await resolution following discovery in this case.[19]

Finally, in arguing that plaintiff's temporary takings claims should be dismissed, defendant essentially asserts that the leases in question could not have effectuated a takings because, under the Louisiana law regarding mineral servitudes, plaintiff could not preclude defendant from making those leases. Defendant bases this remarkable claim on La. Rev. Stat. § 31:121, which states that "[a] mineral lessee may takes leases from persons claiming the leased land or mineral rights or interests therein adversely to his lessor." A comment in the Louisiana Code describes this provision, as follows:

> The rule stated in Article 121 is consistent with the rule of Article 120 that the mineral lessor's warranty is that of a seller. Early jurisprudence took a common-sense view of the mineral lease, holding that the rule that a lessee may not contest

_____

[19] A careful reader might perceive tension between this conclusion and the conclusion that plaintiff's permanent takings claim accrued in 1991, or at the latest 1993, and thus is untimely. In the court's view, however, that plaintiff's temporary takings claim may proceed, while its permanent takings claim does not, results from the different burdens plaintiff had in terms of responding to defendant's motion to dismiss. As to the jurisdictional prongs of that motion, plaintiff was obliged to show that its claims were timely – and its failure to demonstrate factually that any of the servitudes prescribed within six years of the filing of its complaint meant that its permanent takings claim was untimely. But, plaintiff is not obliged to demonstrate now when the servitudes in question prescribed for purposes of the claims made by defendant with respect to the merits. Rather, it may rely on its complaint which, in the court's view, demonstrates that it has a plausible claim.

his lessor's title is inapplicable to mineral leases. . . However, following the decision in *Gulf Refining Co. v. Glassell*, 186 La. 190, 171 So. 846 (1936), which held a mineral lease to be like a predial lease and denied lessees the right to bring real actions, the United States Court of Appeals refused to follow the early decisions on this point and held that a lessee cannot deny his lessor's title. *Sabine Lumber Co. v. Broderick*, 88 F.2d 588 (5th Cir. 1937). The problem posed by this jurisprudence has usually been met by the inclusion in mineral leases of a clause permitting the lessee to take leases from adverse claimants. Article 121 therefore lays to rest a question existing in the jurisprudence and adopts what has become customary practice in the industry.

Comment to La. Rev. Stat. § 31:121. Summarizing this history, a Louisiana Court of Appeals has observed that this provision "was incorporated into the Mineral Code to enable a mineral lessee to protect its rights to explore for and produce minerals." *Am. Lung Ass'n v. State of La.*, 645 So. 2d 1219, 1222 (La. Ct. App. 1994), *writ denied*, 650 So. 2d 1182 (La. 1995).

One obvious shortcoming in defendant's claim is that section 121, by its terms, is inapplicable here, as there is no indication – certainly nothing in the amended complaint – that defendant's lessees were previously leasing the same servitudes from plaintiff. Defendant, however, persists in suggesting that the existence of this provision indicates that a lessor in Louisiana is not liable to the rightful property owner for any damages occasioned by a mineral lease. But, can it be that Louisiana law holds blameless one who, without authorization, leases someone else's property? In fact, as the above commentary reveals, the provision cited by defendant is intended to protect **lessees** who wish to pursue drilling and extraction on contested lands, not to protect **lessors** who are found to have leased servitudes they did not own. One seeking confirmation of this need consider not only the many cases arising under Louisiana law in which the rightful owners of property have successfully pursued false lessors,[20] but also La. Rev. Stat. § 31:120, which explicitly gives the lessee the right to sue a lessor who does not have title to the interest leased for damages and other revenues that the lessee is obliged to pay to the true owner.[21] Moreover, while defendant deduces from section 121 that the "mere issuance of a

---

[20] *See, e.g.*, *Nelson v. Young*, 234 So. 2d 54 (La. 1970) (landowner who leased mineral interests owned by others liable to owners of mineral reservation for accounting and payment of amounts owed under leases); *State v. Jefferson Island Salt Mining Co.*, 163 So. 145 (La. 1935), *cert. denied*, 297 U.S. 716 (1936) (dispute between mineral owner and salt mining company); *Newman v. Livingston Parish Police Jury*, 603 So. 2d 250 (La. Ct. App. 1992) (dispute between competing claimants as to entitlement to mineral lease royalties); *Win Oil Co. v. UPG, Inc.*, 509 So. 2d 1023, 1026 (La. Ct. App. 1987) (dispute between competing claimants as to entitlement to oil royalties).

[21] Article 120 provides that "[a] mineral lessor impliedly warrants title to the interest leased unless such warranty is expressly excluded or limited. The liability of the lessor for breach of warranty is limited to recovery of money paid or other property or its value given to the lessor

lease" does not affect the true owner's use or enjoyment of the property, so as to effectuate a takings, this is far from clear as a factual matter. This is particularly so if one assumes that the leases meant what they said in indicating that the lessees were paying royalties to the United States (and not plaintiff) for the exclusive right (presumably, as against plaintiff) to drill for, mine, extract and remove all of the oil and gas on a given servitude (owned by plaintiff). At the least, this court is unwilling to adopt defendant's hollow characterizations of the leases in question based upon a statute that, on its face, is wholly inapplicable here.[22]

At this nascent stage of the proceedings, this court need go no further – contrary to defendant's intimations, plaintiff need not plead every single fact concerning every single lease in order to meet the "plausibility" standard of *Twombly*. The Supreme Court in the latter case (and, even more so in its recent decision in *Iqbal*) made clear that it intended neither to defenestrate the notice pleading rules that have reigned under *Conley v. Gibson*, 355 U.S. 41, 45 (1957), nor, correspondingly, to collapse discovery, summary judgment and trial into the pleading stages of a case. *See Twombly*, 550 U.S. at 555 ("a complaint attacked by a Rule 12(b)(6) motion to dismiss does not need detailed factual allegations"); *Iqbal*, 129 S. Ct. at 1949-50 ("Determining whether a complaint states a plausible claim for relief will . . . be a context-specific task that requires the reviewing court to draw on its judicial experience and common sense.").

Accordingly, this court finds that, to the extent plaintiff's temporary takings claims are timely, they state a valid claim.[23]

---

for execution or maintenance of the lease and any royalties delivered on production from the lease." Commentary to this provision indicates that Article 2506 of the Louisiana Civil Code authorizes the lessee to recover from the false lessor "the fruits or revenues when he is obliged to return them to the true owner." Comment to La. Rev. Stat. § 31:120.

[22] In arguing to the contrary, defendant relies upon *American Lung Ass'n*. In that case, a Louisiana intermediate appellate court was faced with a situation in which La. Rev. Stat. § 31:120 plainly applied, namely, one in which the lessee of the rightful property owner also entered into what the court termed a "protective" lease with a competing claimant. 645 So. 2d at 1222. The court concluded that the rightful owner could not sue the non-owner for damages, suggesting that instead the owner should pursue its own lessee for any amounts owed. In so concluding, the court not only emphasized that its ruling applied to the "protective" leases governed by the statute, but also suggested that its holding was based on the fact that the rightful lessor had not expressly prohibited its lessor from entering into such protective leases, as apparently the lessor could have done under state law. *Id.* at 1222-23. (Here, of course, plaintiff had no opportunity to prevent anyone from entering into leases with the United States.) In the court's view, the rationale of this case lends no weight to defendant's argument that the leases here could not effectuate a takings.

[23] Nor will the court resolve, at this early juncture, whether defendant did or did not issue leases with respect to certain of the servitudes still owned by plaintiff. In making factual claims

2.      **Reformation**

In its complaint, plaintiff seeks to reform the contracts entered into between its predecessor-in-interest and the United States.  While this court lacks general equitable powers, it may "exercise equitable powers as an incident to [its] general jurisdiction . . . by reforming a contract and enforcing it as reformed in an action of law."  *Carney v. United States*, 462 F.2d 1142, 1145 (Ct. Cl. 1972); *see also Lion Raisins, Inc. v. United States*, 51 Fed. Cl. 238, 244 (2001).  Plaintiff may prevail on its reformation claim only if that reformation is a precursor to a monetary judgment.  *See United States v. Milliken Imprinting Co.*, 202 U.S. 168, 173-74 (1906); *see also Quinault Allottee Ass'n v. United States*, 453 F.2d 1272, 1274 n.1 (Ct. Cl. 1972) ("Where the relief is monetary, we can call upon such equitable concepts as rescission and reformation to reach the right result.").  Plaintiff asserts that its claim for reformation is incidental to a claim for money damages, but does not explain how this is so, other than to suggest that the reformation claim buttresses its other contract claims.  Of course, if that is the case, then plaintiff's reformation claim must rise or fall with those other contract claims and, indeed, must be dismissed because those other claims have been determined to be untimely.  *See Bank of Guam*, 578 F.3d at 1331 (claim for declaratory relief properly dismissed where all other contract claims were dismissed).  But, even if plaintiff's reformation claim is viewed as giving rise to a damage claim separate and distinct from its other contract claims, it is hard to envision how any such other contract claim does not fall prey to the same timeliness limitations – again, the facts indicate that plaintiff (or its predecessor) should have known by 1991, or no later than 1993, that the United States no longer viewed the Louisiana law of prescription as inapplicable.

Accordingly, for a variety of reasons, plaintiff's reformation claim must also be dismissed.

III.   **CONCLUSION**

This court will not gild the lily.  Like Odysseus's Ithacan vessel of old, plaintiff's complaint survives for another day (albeit with a complement of fewer claims).

Based on the foregoing, the court **GRANTS**, in part, and **DENIES**, in part, defendant's motion to dismiss.  Specifically, the Clerk shall dismiss from the complaint Count I (permanent taking of the ninety-six servitudes); counts IV, V and VI (dealing with contract claims); and count VII (reformation).  In addition, count II shall be dismissed to the extent that it presents temporary takings claims as to particular leases that are not timely.  On or before November 30,

---

with respect to these and other issues, defendant relies upon detailed declarations (and associated charts) from two expert witnesses, seemingly swatting aside the evidentiary limitations associated with a motion to dismiss.  To the extent those declarations assert facts that are non-jurisdictional, this court hereby excludes that matter and will not convert defendant's motion into what the court views as a premature motion for summary judgment.  *See* RCFC 56(d).

2009, the parties shall file a joint status report setting forth a proposed discovery plan for this case.

**IT IS SO ORDERED**.

s/ Francis M. Allegra
Francis M. Allegra
Judge

**Order Denying Motion for Reconsideration**

**Dated November 30, 2009 (No. 00-512L Dkt. 80)**

# In The United States Court of Federal Claims

No.  00-512L

(Filed:  November 30, 2009)
_____

PETRO-HUNT, L.L.C.,

                         Plaintiff,

      v.

THE UNITED STATES,

                         Defendant.

_____

### ORDER
_____

On November 6, 2009, this court granted, in part, and denied, in part, defendant's motion to dismiss this case.  It held, *inter alia*, that plaintiff's permanent takings claims were time-barred under 28 U.S.C. § 2501.  *Petro-Hunt, L.L.C. v. United States*, 2009 WL 3765495, at *8-9 (Fed. Cl. Nov. 6, 2009).  On November 23, 2009, plaintiff filed a motion for reconsideration under RCFC 59, seeking to overturn this court's permanent takings ruling.

To prevail on a motion for reconsideration under RCFC 59, the movant must identify a "manifest error of law, or mistake of fact."  *Fru-Con Constr. Corp. v. United States*, 44 Fed. Cl. 298, 300 (1999) (quoting *Bishop v. United States*, 26 Cl. Ct. 281, 286 (1992)), *aff'd*, 250 F.3d 762 (Fed. Cir. 2000); *see also Alli v. United States*, 86 Fed. Cl. 33, 34 (2009).  Specifically, the moving party must show: (i) an intervening change in controlling law; (ii) the availability of previously unavailable evidence; or (iii) the necessity of granting the motion to prevent manifest injustice.  *System Fuels, Inc. v. United States*, 79 Fed. Cl. 182, 184 (2007); *Stockton East Water Dist. v. United States*, 76 Fed. Cl. 497, 499-500 (2007); *Griswold v. United States*, 61 Fed. Cl. 458, 460-61 (2004).  The court has considerable discretion in ruling on a motion for reconsideration.  *See Yuba Natural Res., Inc. v. United States*, 904 F.2d 1577, 1583 (Fed. Cir. 1990); *see also Banks v. United States*, 84 Fed. Cl. 288, 291 (2008).  Nevertheless, granting such relief requires "a showing of extraordinary circumstances."  *Caldwell v. United States*, 391 F.3d 1226, 1235 (Fed. Cir. 2004) (citation omitted), *cert. denied*, 546 U.S. 826 (2005); *see also Alli*, 86 Fed. Cl. at 34.

In support of its motion, plaintiff reargues a number of points that this court already has rejected.  These points are no more persuasive the second time around.  Factually speaking, plaintiff asserts that, contrary to this court's ruling, it was not a successor-in-interest to Hunt Petroleum Corporation.  In this regard, it relies upon a new affidavit to rebut an affidavit it previously filed in the Louisiana quiet title action in which it admitted that Hunt Petroleum was an "ancestor in title."  The court, however, need not address this factual quandary as plaintiff admits that it is a successor-in-interest to Placid Oil Company.  This is significant as the latter company, more than six years prior to the filing of this suit, received a letter on December 10, 1993, putting it on notice that a permanent takings claim against the United States may have accrued.  *See Petro-Hunt*, 2009 WL

3765495, at * 12.  In that letter, the Bureau of Land Management (BLM) rejected a protest filed by Hunt Petroleum and Placid Oil requesting that certain parcels be released from an impending lease sale, stating –

> As result of your protest, the Forest Service completed a further review and determined the minerals were in fact prescribed to the United States as stated in their April 19, 1993 title report.  Therefore, your request for withdrawal of these parcels is hereby denied.

In an appendix to its motion, plaintiff has included a letter from Placid Oil to the BLM, dated January 14, 1994, plainly indicating that the former had received the latter's December 10 letter.

Plaintiff discounts these communications by asserting that they reveal the existence of claims only as to the particular servitudes mentioned therein.  This assertion, however, fails to consider the narrow confines of the "accrual suspension" rule, which requires either that the defendant concealed its actions or that the injury was "inherently unknowable."  *Id*. at *10.  At least under the latter prong of that rule, the suspension no longer applies once plaintiff is "on inquiry as to its possible injury."  *Id*. at *12 (quoting *Ingrum v. United States*, 560 F.3d 1311, 1315 (Fed. Cir.), *cert. denied*, 130 S. Ct. 271 (2009) (quoting *Coastal Petroleum Co. v. United States*, 228 Ct. Cl. 864, 867 (1981))).  Contrary to plaintiff's claim, this rule does not apply on a "servitude-by-servitude basis."  Rather, in terms of the permanent takings claim, the court finds that the accrual suspension ceased once plaintiff had knowledge that the United States was claiming that certain servitudes had prescribed.[*]  Given the other documents in the record, plaintiff cannot argue that had it (or its predecessor) conducted an examination of the available records in 1993 and early 1994, it would have failed to discover the potential permanent takings claims against the United States.

Contrary to plaintiff's claim, it is simply not the law that its claim as to the permanent takings of a given servitude did not arise until facts demonstrating the existence of that specific claim were made known to plaintiff.  Such a ruling would turn the "accrual suspension" exception on its head.  Nor is it relevant, as plaintiff intimates, that it or its predecessor may not have had actual knowledge of the documents that would have revealed the potential for a claim.  Rather, it is black-letter law that a claim against the United States arises when "the claimant knew or ***should have known*** that the claim existed."  *Martinez v. United States*, 333 F.3d 1295, 1319 (Fed. Cir. 2003), *cert. denied*, 540 U.S. 1177 (2004) (emphasis added).

Based on the foregoing – and having considered and rejected the remainder of plaintiff's arguments – the court hereby **DENIES** plaintiff's motion for reconsideration.

**IT IS SO ORDERED**.

s/ Francis M. Allegra
Francis M. Allegra
Judge

---

[*]  Contrary to plaintiff's assertion, there is utterly no basis for the application of judicial estoppel to prevent defendant from making this argument.  Simply put, defendant's claim in this litigation is in no meaningful way in conflict with the position it took in the quiet title action.

**Order Dismissing Petro-Hunt's Temporary Takings Claims under 28 U.S.C. § 1500**

**Dated May 2, 2012 (No. 00-512L Dkt. 125)**

# In the United States Court of Federal Claims

No. 00-512L

(Filed:  May 2, 2012)
_____

| | | |
|---|---|---|
| PETRO-HUNT, L.L.C., | * | |
| | * | |
| | * | Takings action; Motion to dismiss under |
| Plaintiff, | * | RCFC 12(b)(1); 28 U.S.C. § 1500; Judicial |
| | * | takings; Supplemental pleading under RCFC |
| v. | * | 15(d); Portions of complaint dismissed. |
| | * | |
| THE UNITED STATES, | * | |
| | * | |
| Defendant. | * | |
| | * | |

_____

## OPINION
_____

*J. Ralph White,* White Law Firm, New Orleans, LA, for plaintiff.

   *William J. Shapiro*, Environment and Natural Resources Division, United States Department of Justice, Washington, D.C., with whom was Assistant Attorney General *Ignacia S. Moreno*, for defendant.

**ALLEGRA, Judge:**

   Defendant has moved to dismiss plaintiff's complaint under RCFC 12(b)(1), asserting that the prior filing of a district court action deprived this court of jurisdiction under 28 U.S.C. § 1500.   For the reasons that follow, the court **GRANTS**, in part, and **DENIES**, in part, this motion.

## I.      BACKGROUND[1]

--------------------------------------

   [1]  These facts are primarily drawn from plaintiff's complaint and, for purpose of this motion, are assumed to be correct.  *See Bell Atl. Corp. v. Twombly*, 550 U.S. 544 (2007). Additional procedural details are drawn from the docket of plaintiff's district court action.

From November 1934 through January 1937, Bodcaw Lumber Company of Louisiana, Inc. (Bodcaw Lumber), and Grant Timber & Manufacturing Company of Louisiana, Inc. (Grant Timber) conveyed the surface estates of 180,000 non-contiguous acres to the United States Forest Service (the Forest Service) for the creation of the Kisatchie National Forest.  The eleven instruments of transfer all expressly excluded the mineral servitudes, which the grantors reserved for Good Pine Oil, a joint venture created by Bodcaw Lumber, Grant Timber, and three other lumber companies.  In 1940, the Louisiana Legislature passed Act 315, creating an exception to the state's ten-year mineral prescription law and making mineral rights underlying land conveyed to the United States "imprescriptible."   In 1942, Nebo Oil Company acquired all of the mineral rights formerly held by Good Pine Oil.

In 1948, the United States filed a quite title action in district court to determine the owner of a particular mineral servitude underlying a parcel that was a part of the 180,000 acre tract Bodcaw Lumber and Grant Timber granted to the United States.  In 1950, a Louisiana district court, relying on Louisiana's Act 315, held that the owner of the mineral servitude was an owner in perpetuity.  *United States v. Nebo Oil Co.*, 90 F. Supp. 73 (W.D. La. 1950).  The Fifth Circuit affirmed the finding that the mineral servitudes were imprescriptible and belonged to Nebo Oil.  *United States v. Nebo Oil Co.*, 190 F.2d 1003 (5th Cir. 1951).

Two decades later, in a 1973 case with similar facts, the Supreme Court held that Act 315 was hostile to the United States' interests and could not be borrowed as a rule of decision in federal court.  *United States v. Little Lake Misere Land Co., Inc.*, 412 U.S. 580, 604 (1973).  Relying on this decision, in 1991, the United States began granting mineral leases on Forest Service lands it had acquired from Bodcaw Lumber and Grant Timber.  In 1998, Petro-Hunt L.L.C. (Petro-Hunt or plaintiff) became the record holder of a 64.3 percent undivided interest in the mineral servitudes previously owned by Nebo Oil.

On February 18, 2000, Petro-Hunt – along with two other oil and gas companies – filed suit against the United States in the U.S. District Court for the Western District of Louisiana. Their complaint requested a declaratory judgment quieting their title to the property, but alternatively asserted "that the actions of the United States in confiscating their mineral interests amounts to an unconstitutional taking in direct violation of the Fifth Amendment of the United States Constitution, for which Plaintiffs should be compensated."   In its June 5, 2000, response to this complaint, the United States asserted that the district court lacked jurisdiction to declare an unconstitutional takings and award compensation.  On August 24, 2000, Petro-Hunt filed a complaint in this court alleging a Fifth Amendment takings.  On October 31, 2000, the parties filed a joint motion to stay the case in this court pending resolution of the district court action. That motion was granted by this court on November 2, 2000.  On June 29, 2001, plaintiff filed its first amended complaint in the district court, which still included an "alternative" request for relief, stating that "in the event that Plaintiffs are not found to be entitled to the declaratory relief sought above, Plaintiffs pray for a money judgment against the United States of America in an amount that will represent just compensation for the unconstitutional taking of the Plaintiffs' Mineral Rights in violation of the Fifth Amendment of the United States Constitution."

The District Court for the Western District of Louisiana initially granted plaintiff's motion for summary judgment on *res judicata* grounds, *Petro-Hunt L.L.C. v. United States*, 179 F. Supp. 2d 669 (2001), but the Fifth Circuit reversed, finding that the 1950 opinion had only decided the ownership of the single parcel at issue in that case. *Petro-Hunt L.L.C. v. United States*, 365 F.3d 385 (5th Cir. 2004). On remand, the parties stipulated that Petro-Hunt retained control of only the *Nebo Oil* servitude and five others that had remained in use, constituting approximately 109,844.5 acres, while the United States had gained ownership of the remaining ninety servitudes through prescription. The Fifth Circuit affirmed a final judgment giving effect to this stipulation, *Petro-Hunt L.L.C. v. United States*, 2007 WL 715270 (5th Cir. 2007), and the U.S. Supreme Court denied certiorari on March 30, 2008. *Petro-Hunt L.L.C. v. United States*, 128 S. Ct. 1471 (2008).

On May 27, 2008, the court lifted the stay in this case. On June 25, 2008, plaintiff filed an amended seven-count complaint asserting permanent and temporary takings, breaches of the original land conveyance contract, and breaches of the covenant of good faith and fair dealing. On September 2, 2008, defendant filed a motion to dismiss, or, alternatively, for summary judgment. On November 6, 2009, the court granted, in part, and denied, in part, defendant's motion to dismiss. It dismissed plaintiff's permanent takings claims and those of its temporary takings claims that were untimely under the six-year limitations period found in 28 U.S.C. § 2501, but found that plaintiff could assert temporary takings claims as to the fifty-six mineral leases executed within the limitations period. *Petro-Hunt, L.L.C. v. United States*, 90 Fed. Cl. 51 (2009). On September 16, 2010, plaintiff filed a "Restated Second Amended Complaint" with three counts, deleting the dismissed claims (while reserving the right to later appeal this court's decision) and adding a judicial takings claim based upon the Supreme Court's decision in *Stop the Beach Renourishment, Inc. v. Florida Dept. of Env'l Protection*, 130 S. Ct. 2592 (2010).

On March 12, 2010, the court set a discovery schedule, with discovery to be completed by July 15, 2011. On December 22, 2010, the court extended this completion date to January 12, 2012. On May 31, 2011, defendant filed a motion to dismiss this cases for lack of jurisdiction under RCFC 12(b)(1). Defendant contends that this court lacks jurisdiction over this matter under 28 U.S.C. § 1500. Briefing and argument of this motion have now been completed.[2]

---

[2] On November 17, 2011, plaintiff filed a new complaint in this court, which reasserts plaintiff's seven original claims and adds its judicial takings claim. Defendant opposed plaintiff's motion to stay that case (No. 11-775), asking instead that it be dismissed as duplicative of the instant case. On December 16, 2011, the court granted plaintiff's motion to stay No. 11-775, but ordered defendant to respond to plaintiff's new complaint. Defendant did so on January 17, 2012, moving to dismiss the new complaint under RCFC 12(b)(1) and 12(b)(6). Briefing on that motion remains stayed.

## II.    DISCUSSION

Deciding a motion to dismiss "starts with the complaint, which must be well-pleaded in that it must state the necessary elements of the plaintiff's claim, independent of any defense that may be interposed." *Holley v. United States*, 124 F.3d 1462, 1465 (Fed. Cir. 1997); *see also Bell Atl. Corp.*, 550 U.S. at 554–55. In particular, the plaintiff must establish that the court has subject matter jurisdiction over its claims. *Trusted Integration, Inc. v. United States*, 659 F.3d 1159, 1163 (Fed. Cir. 2011); *Reynolds v. Army & Air Force Exch. Serv.*, 846 F.2d 746, 748 (Fed. Cir. 1988).

Plaintiff asserts federal subject-matter jurisdiction in this court under the Tucker Act, 28 U.S.C. § 1491. That provision grants this court "jurisdiction to render judgment upon any claim against the United States founded either upon the Constitution, or any Act of Congress or any regulation of an executive department, or upon any express or implied contract with the United States . . . ." 28 U.S.C. § 1491(a)(1). It is well-established that takings actions are covered by this grant of jurisdiction. *See Keene Corp. v. United States*, 508 U.S. 200, 205 (1993); *Bywaters v. United States*, 670 F.3d 1211, 1224 (Fed. Cir. 2012). Defendant, however, claims that jurisdiction is lacking here owing to the application of 28 U.S.C. § 1500.

Section 1500 of Title 28 provides:

> The United States Court of Federal Claims shall not have jurisdiction of any claim for or in respect to which the plaintiff or his assignee has pending in any other court any suit or process against the United States or any person who, at the time when the cause of action alleged in such suit or process arose, was, in respect thereto, acting or professing to act, directly or indirectly under the authority of the United States.

28 U.S.C. § 1500. "[T]he words of the statute are plain," the Supreme Court long ago stated, "with nothing in the context to make [its] meaning doubtful." *Corona Coal Co. v. United States*, 263 U.S. 537, 540 (1924); *see also Johns-Manville Corp. v. United States*, 855 F.2d 1556, 1565 (Fed. Cir. 1988), *cert. denied*, 489 U.S. 1066 (1989). Those words speak in terms of subject matter jurisdiction and "bar jurisdiction over the claim of a plaintiff who, upon filing [with the Court of Federal Claims], has an action pending in any other court 'for or in respect to' the same claim." *Keene Corp.*, 508 U.S. at 209; *see also Nez Perce Tribe v. United States*, 83 Fed. Cl. 186, 189 (2008). To determine whether this statute applies here, the court must answer two fundamental questions: (i) whether the district court action was "pending" at the time jurisdiction under section 1500 is measured; and (ii) if so, whether the claims presented to the district court were the same as those in the instant case. *See Kaw Nation of Oklahoma v. United States*, 2012 WL 639928, at *2 (Fed. Cl. Feb. 29, 2012); *Griffin v. United States*, 85 Fed. Cl. 179, 184 (2008), *aff'd*, 621 F.3d 1363 (Fed. Cir. 2010).

Plaintiff's "Restated Second Amended Complaint" rehashes many of the facts that were asserted in its initial complaint in this court. Count II of that complaint avers that the United

States effectuated a temporary takings of ninety-one servitudes by issuing mineral leases to parties that effectively blocked Petro-Hunt from engaging in any activity on the servitudes and precluded Petro-Hunt from itself engaging in any leasing activity.  Count III of the complaint avers that the United States effectuated a similar temporary takings of five (or six) servitudes during the pendency of the quiet title action.[3]  Finally, Count VIII of this complaint avers that the Fifth Circuit's decision that ninety-six mineral servitudes "belonging to Petro-Hunt as established in *Nebo Oil*, and by contract with the United States, were subject to prescription was contrary to its prior decision in *Nebo Oil* and resulted in a judicial taking of Petro-Hunt's established property rights."  For reasons that will become apparent, the two-pronged section 1500 analysis must be applied twice in this case – once to plaintiff's temporary takings claims and, again, to its more recent judicial takings claim.

<div align="center">A.</div>

From the outset of this case, it has been plaintiff's claim that the United States effectuated a takings of its mineral servitudes by issuing mineral leases to third parties and essentially precluding Petro-Hunt from engaging in leasing activities with respect to those properties.  *See* Complaint No. 00-512L (Aug. 24, 2000) at ¶ 12.b.  Plaintiff's temporary takings claims represent a subset of this broader claim and relate to actions that took place in the six-year period before their complaint was filed in 2000.  *See Petro-Hunt, L.L.C.*, 90 Fed. Cl. at 66-67 (describing the nature of these claims).  The district court action was pending when this initial complaint was filed.  This is important, because, as with most jurisdictional statutes, the impact of section 1500 is measured at the time the lawsuit in this court is filed.  *Keene Corp.*, 508 U.S. at 207; *see also Trusted Integration*, 659 F.3d at 1166 n.2; *Kaw Nation*, 2012 WL 639928, at *5 ("[The] measuring point, in the case of section 1500, is when the complaint is filed."); *Nez Perce Tribe v. United States*, 101 Fed. Cl. 139, 145 (2011); *Griffin*, 85 Fed. Cl. at 187.  Accordingly, it is dispositive, for the first prong of the section 1500 analysis, that the district court action here was pending at the time the action in this court was filed.  *See Trusted Integration*, 659 F.3d at 1166 n.2.

For section 1500 to apply to the temporary takings claims, however, the suit in this court and that in the district court must also be "for or in respect to" the same claim(s).  In *United States v. Tohono O'odham Nation*, 131 S. Ct. 1723 (2011), the Supreme Court held that this requirement is met when two claims are "based on substantially the same operative facts, regardless of the relief sought in each suit."  *Id.* at 1727; *see also Trusted Integration*, 659 F.3d at 1164.  The Court, nonetheless, suggested that the nature of the claims pled may be relevant in helping to identify which facts are "operative" – that is, the "facts parties must prove" in order to prevail.  *Tohono*, 131 S. Ct. at 1730; *see also Trusted Integration*, 659 F.3d at 1168.  Hence, determining whether two claims are "based on substantially the same operative facts" requires more than a  side-by-side comparison of the two complaints to see how much verbiage is in

---

[3]  The heading on this count refers to "five" servitudes, while the body of the count refers to "six."

common.  Before performing such comparisons, rather, the court must first isolate the facts in the complaint that are "operative," *i.e.*, those that must be proven in order to recover on a given claim.  *Trusted Integration*, 659 F.3d at 1168; *cf. Rosebud Sioux Tribe v. United States*, 102 Fed. Cl. 429, 437 (2011).  Similarity in those "operative" facts satisfies the second prong of the section 1500 analysis; conversely, differences in those operative facts can serve to render two claims dissimilar, making section 1500 inapplicable.  The Supreme Court confirmed this in *Tohono*, when it indicated that the claim comparison "can be informed by how claims are defined for *res judicata* purposes."  *Trusted Integration*, 659 F.3d at 1164 (citing *Tohono*, 131 S. Ct. at 1730); *see also Muscogee (Creek) Nation of Oklahoma v. United States*, 2011 WL 6017188, at *4 (Fed. Cl. Dec. 2, 2011).  As the Federal Circuit recently noted, the tests that governed the application of *res judicata* at the time the predecessor to section 1500 was enacted both focused on whether the legally determinative facts in the two suits were the same.  *Trusted Integration*, 659 F.3d at 1168-69.[4]

Given these standards, this court has serious doubts as to whether the pendency of a typical quiet title action in the district court ought to preclude this court from having jurisdiction over a later-filed takings action.[5]  But, the temporary takings portion of the case *sub judice*, as it turns out, is more straightforward because plaintiff raised a takings claim in its district court complaint that remained pending when plaintiff filed essentially the same takings claims in this court.  Indeed, as its original complaint in this court advised, plaintiff filed the instant lawsuit more as a protective matter, in case the district court failed to award damages.[6]  In circumstances

---

[4]  Applying these principles, the Federal Circuit, in *Trusted Integration*, concluded that the presence, in a pending district court complaint, of counts based upon implied-in-fact contracts did not prevent this court from exercising jurisdiction over a separate count based upon breach of a licensing agreement.  In this regard, the court noted that "[n]ot only are these distinct contracts, but their breach requires different conduct."  659 F.3d at 1168.  It added that "[i]mportantly, the facts that would give rise to breach of either of these agreements are not legally operative for establishing the breach of the other."  *Id.*  To buttress this conclusion, the Federal Circuit analyzed the case under the *res judicata* principles identified in *Tohono*.  It concluded that under the *res judicata* principles that were in effect when the predecessor of section 1500 was first enacted, a decision on the implied-in-fact contract would not be *res judicata* of the claim based upon the licensing agreement.  659 F.3d at 1168-70.

[5]  *See, e.g. Trusted Integration*, 659 F.3d at 1168 (suggesting that the focus is on the "legally operative" facts; *Stockton East Water Dist. v. United States*, 101 Fed. Cl. 352, 359 (2011); *see generally,* Craig A. Schwartz, "Footloose:  How to Tame the Tucker Act Shuffle After *United States v. Tohono O'Odham Nation*," 59 UCLA L. Rev. Discourse 2 (2011) (suggesting that "necessarily sequential" lawsuits ought not in effect be covered by section 1500); *cf. Kingman Reef Atoll Invest., LLC v. United States*, 2012 WL 833888, at *33 (Fed. Cl. March 8, 2012); *Central Pines Land Co. v. United States*, 99 Fed. Cl. 394, 400-401 (2011).

[6]  In this regard, plaintiff's original complaint in this court stated that:

like these, section 1500 is undoubtedly triggered, causing this court to lose jurisdiction over plaintiff's temporary takings claims. *See Pellegrini v. United States*, 2012 WL 171912, at *5 (Fed. Cl. Jan. 20, 2012); *Brandt v. United States*, 102 Fed. Cl. 72, 81-82 (2011). It is irrelevant, for this purpose, that the district court lacked jurisdiction over plaintiff's takings claim. *See, e.g.*, *Pellegrini*, 2012 WL 171912, at *5; *Young v. United States*, 60 Fed. Cl. 418, 424 (2004). Nor is this portion of plaintiff's complaint saved by the fact that plaintiff, in subsequent amendments to its complaint in this court, has refined further the legal theories on which its temporary takings claims are based. *See Keene*, 508 U.S. at 212 ("That the two actions were based on different legal theories [does] not matter."); *Trusted Integration*, 659 F.3d at 1163 (section 1500 "was enacted to prevent a claimant from seeking recovery in district court and the Court of Claims for the same conduct pleaded under different legal theories"). Those claims still rely upon facts that were operative in the district court action that was pending at the time the case *sub judice* was filed. Hence, section 1500 precludes this court from having jurisdiction over plaintiff's temporary takings claims.[7]

## B.

The same conclusion, however, does not obtain as to plaintiff's judicial takings count. Count VIII of plaintiff's Restated Second Amended Complaint asserts that the Fifth Circuit's second decision in *Petro-Hunt L.L.C.*, holding that mineral servitudes belonging to Petro-Hunt were subject to prescription, "resulted in a judicial taking of Petro-Hunt's established property rights." Plaintiff asserts that this claim "arose when the United States Supreme Court denied

---

[i]f, in plaintiff's Louisiana Quiet Title Act suit, the District Court rules that plaintiff was the owner of Plaintiff's Mineral Rights, but that the United States has taken same; then, to the extent the District Court does not award plaintiff damages and payment for the same pursuant to 28 U.S.C. § 2909(a), part (b), then plaintiff asks this Court to award it just compensation for this taking by the United States.

[7] The court is troubled that defendant initially moved to stay this case, then allowed this case to remain dormant while defendant was litigating cases like *Tohono*, and did not raise the section 1500 issue until recently, when the filing of a new suit for the same years at issue was barred by the statute of limitations contained in 28 U.S.C. § 2501. While the court hesitantly accepts defendant's explanation that the unfortunate phasing of its positions was inadvertent – designed neither to mislead the court nor to entrap plaintiff – defendant should expect, at the least, that its future entreaties to stay actions will fall on skeptical ears if there is any possibility that defendant will, at some later point, move to dismiss the same case under section 1500. Moreover, if ever asked again to dismiss a case in circumstances like these, the court will seriously consider whether monetary sanctions should be imposed upon defendant. *See also Northrop Grumman Computing Sys., Inc. v. United States*, 99 Fed. Cl. 651, 660 (2011) (noting that "courts have, on occasion, sanctioned a party viewed as having brought belatedly a motion to dismiss for lack of jurisdiction").

plaintiff's petition for *certiorari*." The Fifth Circuit's second decision was issued on March 6, 2007, and the Supreme Court's denial of *certiorari* was on March 3, 2008. Because these events occurred after the filing of plaintiff's original complaint, to the extent plaintiff's most recent complaint raises a judicial takings issue, it must be viewed not as an amended complaint under RFCF 15(c), but rather as a supplemental complaint under RCFC 15(d). The latter rule allows a party to "serve a supplemental pleading setting out any transaction, or occurrence or events that happened after the date of the pleading to be supplemented." *Id.*; *see also Prasco LLC v. Medicis Pharm. Corp.*, 537 F.3d 1328, 1337 (Fed. Cir. 2008); 6A Charles Alan Wright, Arthur R. Miller & Mary Kay Kane, Fed. Prac. & Proc. § 1504, at 184 (hereinafter "Wright, Miller & Kane"). Recent cases confirm that a supplemental pleading may include a new cause of action "provided there is some relationship between the original and the later accruing material." *Id.* ; *see also Quaratino v. Tiffany & Co.*, 71 F.3d 58, 66 (2d Cir. 1995); *Keith v. Volpe*, 858 F.2d 467 (9th Cir. 1988); *Ohio Valley Envt'l Coal. v. U.S. Army Corps of Engineers*, 243 F.R.D. 253 (S.D. W.Va. 2007).

Defendant argues that, like an amended complaint, supplemental complaints cannot be used to avoid section 1500. That is true, however, only to a point. Supplemental pleadings under RCFC 15(d) may not be used to cure jurisdiction by adding new facts to a preexisting cause of action that, as originally pled, was barred under section 1500. In other words, if a pending district court complaint had the effect of barring, under section 1500, this court from exercising jurisdiction over a subsequently-filed suit, that defect cannot be cured by adding new facts to the old cause of action after the district court case is no longer pending. *See Central Pines Land Co. v. United States*, 99 Fed. Cl. 394, 403-04 (2011). But, that is not this case. Here, plaintiff filed a supplemental complaint that added an entirely new cause of action based upon a takings that allegedly occurred seven years after the filing of its original complaint. Unlike RCFC 15(c), RCFC 15(d) does not indicate whether such a supplemental pleading relates back to the date of the original complaint. Wright, Miller & Kane, *supra*, at § 1508. Construing the analogous Federal rules, various decisions hold that a supplemental pleading that "requires proof of independent operative facts peculiar to the transaction involved and constitutes a separate claim" does not relate back to the date the original complaint was filed for purposes of applying relevant statutes of limitation. *Blau v. Lamb*, 191 F. Supp. 906, 906 (S.D.N.Y. 1961), *rev'd on other grounds*, 314 F.2d 618 (2d Cir.), *cert. denied*, 375 U.S. 813 (1963); *see also William Inglis & Sons Baking Co. v. ITT Continental Baking Co., Inc.*, 668 F.2d 1014, 1057 (9th Cir. 1981) (following *Blau*); *Soler v. G & U, Inc.*, 103 F.R.D. 69, 75 (S.D.N.Y. 1984) (same); *see also Vann v. United States*, 420 F.3d 968, 974 (Ct. Cl. 1970); Wright, Miller & Kane, *supra*, at § 1508.

The logic of these cases suggests that section 1500 ought not apply to the portion of a supplemental complaint that raises a new claim that "requires proof of independent operative facts" if, at the time the supplemental complaint is filed, no other suit involving that same claim is pending in another court. This result makes eminent sense because, as this court recently observed, the new count in the supplemental complaint is an "independent claim[] that could have been brought in an entirely separate suit." *Stockton East Water Dist.*, 101 Fed. Cl. at 361. Conversely, it makes little sense to hold, as defendant essentially suggests, that plaintiff's

judicial takings claim is barred by section 1500 because that new count was added to a suit filed when the district court action was pending, but would not be barred if plaintiff chose to file a new suit featuring that count and then moved to consolidate that suit with this case.

Critically, plaintiff's judicial takings claim rests upon "independent operative facts" that are not only unlike those in the first two complaints it filed in this case, but also unlike those that were operative in the claims that it originally pursued in the district court. On brief, defendant never quite comes to grips with the fact that the judicial takings claim rests upon the Fifth Circuit's second opinion and that this opinion did not exist when plaintiff filed its action in the district court. The judicial takings claim thus rests on "legally operative" facts that were not at issue before the district court and requires proof of "different conduct." *Trusted Integration*, 659 F.3d at 1168. As such, it follows, *a fortiori*, that the judicial takings claim is not "for or in respect to" the claims originally filed in the district court. In such a situation, section 1500 does not apply. *See Stockton East Water Dist.*, 101 Fed. Cl. at 361-62. Accordingly, section 1500 does not require the dismissal of plaintiff's judicial takings claim.

<div align="center">C.</div>

Finally, the court must reject plaintiff's argument that section 1500 violates the Equal Protection Clause of the Constitution. This claim is rooted in the notion that the statute makes arbitrary distinctions based upon the order in which suits are filed. *See Tecon Engineers, Inc. v. United States*, 343 F.2d 943 (Ct. Cl. 1965), *cert. denied*, 382 U.S. 976 (1966). Finding the statute invalid would be tempting if its constitutionality hinged on whether it was the most sensible and effective way to address the problem of duplicative litigation.[8] But, the latter is not the standard by which the constitutionality of this statute must be adjudged.

"The federal interest in ensuring that all citizens have access to the courts is obviously a weighty one." *Three Affiliated Tribes of Fort Berthold Reservation v. World Engineering*, 476 U.S. 877, 888 (1986); *see also Ca. Motor Transp. Co. v. Trucking Unlimited*, 404 U.S. 508, 510, 513-514 (1972); *Bill Johnson's Rest., Inc. v. NLRB*, 461 U.S. 731, 741, 742-744 (1983). But, from time immemorial, that access has been subject to another foundational principle of our judicial system, *to wit*, that "[t]he Federal Government cannot be sued without its consent." *United States v. Navajo Nation*, 556 U.S. 287, 289 (2009); *FDIC v. Meyer*, 510 U.S. 471, 474 (1994); *see also* Alexander Hamilton, Federalist No. 81 ("It is inherent in the nature of sovereignty not to be amenable to the suit of an individual without its consent."). Given this, it should come as no surprise that Congress has broad discretion not only in generally defining the jurisdiction of the lower federal courts, but, particularly, in deciding the conditions under which the sovereign immunity of the United States will be waived. *See Crown Coat Front Co. v. United States*, 386 U.S. 503, 520 (1967); *State of Minnesota v. United States*, 305 U.S. 382, 388

---

[8] *See, e.g., Griffin v. United States*, 85 Fed. Cl. 179, 191 (2008), *aff'd*, 621 F.3d 1363 (Fed. Cir. 2010)*; see also United Keetoowah Band of Cherokee Indians in Okla. v. United States*, 2012 WL 1005907, at *9 (Fed. Cl. March 27, 2012); *Kaw*, 2012 WL 639928, at *14.

(1939); *Luckenbach S.S. Co. v. United States*, 272 U.S. 533, 536-37(1926); *see also*, *Seaboard Lumber Co. v. United States*, 903 F.2d 1560, 1562-64 (Fed. Cir. 1990). There is little debate that Congress "employed [this] power" when it enacted section 1500. *Keene Corp.*, 508 U.S. at 207.

Because individuals seeking to sue the United States are not a "suspect class" and their access to federal courts under waiver statutes, like the Tucker Act, is not a "fundamental right," *see Miller v. United States*, 73 F.3d 878, 881 (9th Cir. 1993), Congress' classification of claims under section 1500 needs merely to be "rationally related" to a legitimate government interest. *See Vacco v. Quill*, 521 U.S. 739, 799-801 (1991); *see also Costo v. United States*, 248 F.3d 863, 870 (9th Cir. 2001) (Ferguson, J., dissenting). The classifications made by that statute, therefore, must be sustained "so long as there is a plausible policy reason for the classification, the legislative facts on which the classification is apparently based rationally may have been considered to be true by the governmental decision-maker, and the relationship of the classification to its goal is not so attenuated as to render the distinction arbitrary or irrational." *Fitzgerald v. Racing Ass'n of Central Iowa*, 539 U.S. 103, 107 (2003); *U.S. R.R. Retirement Bd. v. Fritz*, 449 U.S. 166, 174 (1980). This standard "does not allow [the court] to substitute [its] personal notions of good public policy for those of Congress." *Schweiker v. Wilson*, 450 U.S. 221, 234 (1981); *see also City of New Orleans v. Dulles*, 427 U.S. 297, 303 (1976).

Applying this standard, courts have regularly rejected challenges to waiver statutes premised upon the complaint that the waiver is granted to some parties and not to others, finding, in each instance, that Congress had a plausible reason for the classification. *See Obadele v. United States*, 52 Fed. Cl. 432, 441 (2002) (denying African-American plaintiffs from seeking redress under a statute granting reparations to interned Japanese-Americans, noting "[l]egislation inevitably benefits certain persons to the exclusion of others. But such classifications are not necessarily unconstitutional."); *Daliberti v. Republic of Iraq*, 97 F. Supp. 2d 38, 52 (D.D.C. 2000) (upholding withdrawal of sovereign immunity only as to nations classified as "sponsors of terrorism"); *O'Halloran v. United States*, 817 F. Supp. 829, 832 (N.D. Cal. 1993) (rejecting challenge to service requirements associated with certain waivers); *Montalva v. Graham*, 390 F. Supp. 533, 534 (E.D. Wisc. 1975) (administrative exhaustion requirement under Federal Tort Claims Act held not to violate equal protection).[9] The latter is also the case here.

---

[9] *See also Sealock v. Colorado*, 218 F.3d 1205, 1212 (10th Cir. 2000) (provisions of Colorado statute that excluded from waiver suits brought by incarcerated individuals did not violate equal protection); *Grimes v. Pearl River Valley Water Supply Dist.*, 930 F.2d 441, 444 (5th Cir. 1991) (finding it rational for state legislature to waive sovereign immunity of some state agencies, but not others); *Celli v. Metro-North Commuter RR.*, 891 F. Supp. 124, 127-28 (S.D.N.Y. 1995) ("[I]t is well settled law in this State that limitations imposed on actions as a condition of the State's limited waiver of sovereign immunity are matters of legislative discretion not amendable to an equal protection challenge."); *Gooslin v. State of Md.*, 752 A.2d 642, 644-45 (Md. App. 2000) (Maryland Tort Claims Act's cap on state liability not violative of equal protection); *Murphy v. Richland Memorial Hosp.*, 455 S.E. 2d 688, 690 (S.C. 1995) (shorter statute of limitations when suing state is "rationally designed to minimize the undue burden on the public entity); *Turnbull v. Fink*, 668 A.2d 1370 (De. 1995) (holding that statutory

- 10 -

The Supreme Court recently described the purpose of section 1500 as "sav[ing] the Government from burdens of redundant litigation." *Tohono*, 131 S. Ct. at 1730; *see also Keene Corp.*, 508 U.S. at 206; *Trusted Integration*, 659 F.3d at 1170 (indicating that the purpose of section 1500 was "to prevent claimants from seeking double recovery by maintaining two suits arising from the same factual foundation, but pleaded under different legal theories."). But, although one might get a different impression from reading defendant's briefs, Congress did not intend section 1500 to be all-encompassing, that is, to prevent all forms of redundant litigation, however encountered. *See Kaw Nation*, 2012 WL 639928, at *12. Nor is this required – from an equal protection standpoint, it is simply not true that if Congress wanted to bar some redundant litigation, it had to bar all of such litigation. Recent cases, moreover, make clear that the distinction drawn in *Tecon*, in which only suits filed before a suit filed in this court trigger the statute, makes sense by preventing a plaintiff from using the filing of a suit in a district court as a tactical device to divest this court of jurisdiction and produce a dismissal of its own lawsuit without prejudice. *See Kaw Nation*, 2012 WL 638828, at *16; *see also Tecon*, 343 F.2d at 949.[10]

_____

waiver of sovereign immunity only up to $300,000 did not violate equal protection); *Woodard v. Laurens County*, 456 S.E. 2d 581 (Ga. 1995) ("A waiver of sovereign immunity is a mere privilege, not a right, and the extension of that privilege is solely a matter of legislative grace."); *Stout v. Grand Prairie Ind. Sch. Dist.*, 733 S.W. 2d 290 (Tex. App. 1987) (equal protection not violated by statute immunizing public school teachers from suits alleging tortuous conduct).

[10] In *Kaw*, defendant sought to have this court abandon the holding in *Tecon*. The court rejected that claim finding that *Tecon* remains binding precedent in this circuit. *Kaw Nation*, 2012 WL 639928, at *3-4; *see also United Keetoowah Band of Cherokee Indians in Okla. v. United States*, 2012 WL 1005907, at *3-4. The court went on, however, to discuss why *Tecon* was correctly decided, and, in so doing, pointed out the following example of why having later-filed district court actions trigger section 1500 made no sense –

> Another example of why defendant's expansive interpretation of section 1500 may backfire comes straight from the pages of *Tecon*. Recall, that in that case, it was the plaintiff who was arguing that its filing of a subsequent district court case deprived this court of jurisdiction and the defendant who was arguing otherwise. Defendant urged the latter position because it believed that a plaintiff should not be able to use the filing of a district court action to restart its case over from scratch. Imagine, then, a situation where a case like this one goes to trial and, for a variety of reasons, the plaintiff anticipates that it will lose. Under defendant's view, nothing would prevent that plaintiff from then filing a district court case seeking an accounting, thereby triggering a dismissal, without prejudice, under section 1500. The plaintiff could then proceed anew in the district court, having used this court as a place to conduct not a trial, but a "trial run"—the plaintiff would have its discovery from this case, a set of "draft" rulings from this court to guide its presentation, and even knowledge as to how particular witnesses will perform on the stand. . . . Under this scenario, there would not be the glancing

Accordingly, contrary to plaintiff's claims, there is a plausible reason for distinguishing between district court lawsuits filed before and after a complaint is filed in this court. And, indeed, every court to consider the constitutionality of section 1500 has held that it passes muster. *See Agustin v. United States*, 92 Fed. Appx. 786 (Fed. Cir. 2004) ("To the extent that Agustin claims that section 1500 is unconstitutional, that argument is without merit."); *Davis v. United States*, 30 Fed. Cl. 201, 204 (1993) (upholding the constitutionality of section 1500); *Donnelly v. United States*, 28 Fed. Cl. 62, 64-65 (1993) (same).

In sum, while it is regrettable that certain litigants may be unaware of the jurisprudence surrounding section 1500 and file their claims in the district court before filing in this court, that does not render section 1500 unconstitutional.

## III.    CONCLUSION

Based on the foregoing, defendant's motion to dismiss is hereby **GRANTED,** in part, and **DENIED**, in part. On or before June 4, 2012, the parties shall file a joint status report indicating how this case (and No. 11-775) should proceed, with a proposed schedule, as appropriate. Before filing that report, the parties shall have at least one serious conversation regarding settlement of these matters.

**IT IS SO ORDERED**.


s/ Francis M. Allegra
Francis M. Allegra
Judge

---

overlap of cases that we have now, but rather a situation in which two full blown trials are conducted—certainly, the worst form of duplication imaginable—and likely the reason why defendant so many years ago wisely argued against the position that it espouses now. Asked about this scenario during oral argument, defendant's counsel indicated that the anomalous result described was dictated by Congress. This court thinks not.

*Kaw Nation*, 2012 WL 639928, at *16; *see also Tecon*, 343 F.2d at 949 (citing a similar example and stating that "[t]his court cannot permit control of its jurisdiction and administration of its functions at the mere whim of a litigant."); *Keetoowah Band*, 2012 WL 1005907, at *9.

**Order Denying Motion for Reconsideration**

**Dated May 30, 2016 (No. 00-512L Dkt. 127)**

# In the United States Court of Federal Claims

No. 00-512L

(Filed:  May 30, 2012)
_____

| | |
|---|---|
| PETRO-HUNT, L.L.C.,       * | |

<table>
<tr><td>PETRO-HUNT, L.L.C.,</td><td>*</td><td rowspan="11">Takings action; Motion for reconsideration under RCFC 59; 28 U.S.C. § 1500; Motion denied.</td></tr>
</table>

PETRO-HUNT, L.L.C.,

                Plaintiff,

       v.

THE UNITED STATES,

                Defendant.

\*  \*  \*  \*  \*  \*  \*  \*  \*  \*

Takings action; Motion for reconsideration under RCFC 59; 28 U.S.C. § 1500; Motion denied.

_____

## ORDER
_____

*J. Ralph White,* White Law Firm, New Orleans, LA, for plaintiff.

    *William J. Shapiro*, Environment and Natural Resources Division, United States Department of Justice, Washington, D.C., with whom was Assistant Attorney General *Ignacia S. Moreno*, for defendant.

**ALLEGRA, Judge:**

    On May 2, 2012, this court granted, in part, defendant's motion to dismiss plaintiff's complaint under RCFC 12(b)(1), holding that the prior filing of a district court action deprived this court of jurisdiction over some of plaintiff's claims under 28 U.S.C. § 1500.  *Petro-Hunt, L.L.C. v. United States*, 2012 WL 1571004 (Fed. Cl. May 2, 2012).  On May 29, 2012, plaintiff filed a motion for reconsideration under RCFC 59.  The court deems further briefing on this motion unnecessary.

    To prevail on a motion for reconsideration under RCFC 59, the movant must identify a "manifest error of law, or mistake of fact."  *Fru-Con Constr. Corp. v. United States*, 44 Fed. Cl. 298, 300 (1999) (quoting *Bishop v. United States*, 26 Cl. Ct. 281, 286 (1992)), *aff'd*, 250 F.3d 762 (Fed. Cir. 2000); *see also Alli v. United States*, 86 Fed. Cl. 33, 34 (2009); *Six v. United States,* 80 Fed. Cl. 694, 697 (2008).  Specifically, the moving party must show: (i) an intervening change in controlling law; (ii) the availability of previously unavailable evidence; or (iii) the necessity of granting the motion to prevent manifest injustice.  *Stovall v. United States*, 86 Fed.

Cl. 770, 771 (2009); *System Fuels, Inc. v. United States*, 79 Fed. Cl. 182, 184 (2007); *Stockton East Water Dist. v. United States*, 76 Fed. Cl. 497, 499-500 (2007).  The court has considerable discretion in ruling on a motion for reconsideration.  *See Yuba Natural Res., Inc. v. United States*, 904 F.2d 1577, 1583 (Fed. Cir. 1990); *see also Stovall*, 86 Fed. Cl. at 771; *Banks v. United States*, 84 Fed. Cl. 288, 291 (2008).  Nevertheless, granting such relief requires "a showing of extraordinary circumstances."  *Caldwell v. United States*, 391 F.3d 1226, 1235 (Fed. Cir. 2004) (citation omitted), *cert. denied*, 546 U.S. 826 (2005); see also *Stovall*, 86 Fed. Cl. at 772; *Alli*, 86 Fed. Cl. at 34.

Plaintiff argues that this court erred in dismissing its temporary takings claims.  It argues that, under *Loveladies Harbor, Inc. v. United States*, 27 F.3d 1545 (Fed. Cir. 1994) (en banc), section 1500 does not apply to the extent that a district court lacks jurisdiction over a claim filed prior to suit being filed in this court.  Plaintiff asserts that because the district court here lacked jurisdiction over its takings claims, section 1500 is, therefore, inapplicable.

In fact, though, a number of cases have held that the prohibition under section 1500 applies regardless of whether the district court has jurisdiction over the other action.  *See Franz Equipment v. United States*, 98 F. Supp. 579, 580 (Ct. Cl. 1951) ("The applicability of Sec. 1500 . . . is not conditioned upon the question of whether the District Court had jurisdiction of the claim asserted by the plaintiff therein . . . ."); *see also Pelligrini v. United States*, 103 Fed. Cl. 47, 52 (2012) ("Even if a claim is ultimately dismissed for lack of subject-matter jurisdiction, it was pending from the time it was filed until dismissal."); *Brandt v. United States*, 102 Fed. Cl. 72, 77 n.4 (2011) (holding that this jurisdictional argument "is without merit"); *Forsgren v. United States*, 73 Fed. Cl. 135, 142-43 (2006) (same).  These cases proceed from the notion that a lawsuit is "pending" under section 1500 whether *vel non* a district court has jurisdiction.  *See, e.g.*, *Pelligrini v. United States*, 103 Fed. Cl. at 52.

To be sure, the Federal Circuit cast doubt on the continuing viability of *Franz Equipment* in *Eastern Shawnee Tribe of Oklahoma*, but its decision in that case was, in turn, reversed by the Supreme Court on the authority of the latter's opinion in *United States v. Tohono O'odham Nation*, 131 S. Ct. 1723 (2011).  *See Eastern Shawnee Tribe of Oklahoma v. United States*, 582 F.3d 1306, 1312 n.4 (Fed. Cir. 2009), *denying rehearing*, 598 F.3d 1326 (Fed. Cir. 2010), *vacated*, 131 S. Ct. 2872 (2011); *see also UNR Indus. Inc. v. United States*, 962 F.2d 1013, 1022 (Fed. Cir. 1992) (overruling *Brown v. United States*, 358 F.2d 1002, 1004 (Ct. Cl. 1966)), *aff'd*, *Keene Corp. v. United States*, 508 U.S. 200, 216 n.12 (1993).  To the extent that *Loveladies Harbor* may be read as establishing an analysis that hinges not on whether the prior district court action was still "pending," but rather on whether that court had jurisdiction over the matter, it cannot be viewed as still good law.  Neither the analysis of section 1500 in *Tohono*, nor that in *Keene*, is the least bit sensitive to whether the district court has jurisdiction over an action that remains "pending" when a successor suit is filed here.  *See Tohono O'odham Nation*, 131 S. Ct. at 1729; *Keene Corp. v. United States*, 508 U.S. 200, 210-14 (1993); *see also Trusted Integration Co., Inc. v. United States*, 659 F.3d 1159, 1166 n.2 (Fed. Cir. 2011).  Indeed, in both Supreme Court cases, it appeared that the district court lacked jurisdiction over the lawsuit that the Supreme Court concluded gave rise to the prohibition under section 1500.  *See Tohono*

*O'odham*, 131 S. Ct. at 1729; *Keene Corp.*, 508 U.S. at 204 (noting that the district court action had been dismissed for lack of jurisdiction).

Based on the foregoing, plaintiff's motion for reconsideration under RCFC 59 is hereby **DENIED**.

**IT IS SO ORDERED**.

s/ Francis M. Allegra
Francis M. Allegra
Judge

**Order Dismissing Petro-Hunt's Judicial Takings Claim**

**Dated February 29, 2016**

**(No. 00-512 Dkt. 228; No. 11-775 Dkt. No. 24)**

# In the United States Court of Federal Claims

**Nos. 00-512L, 11-775L**
**Filed: February 29, 2016**
**Reissued for Publication: April 26, 2016[1]**

```
* * * * * * * * * * * * * *   *
                                 *
PETRO-HUNT, L.L.C.,              *
                                 *
              Plaintiff,         *
                                 *
        v.                       *
                                 *
UNITED STATES,                   *
                                 *
              Defendant.         *
                                 *
* * * * * * * * * * * * * *   *
```

Takings; Judicial Takings
Claim; Motion to Dismiss;
Subject-Matter Jurisdiction.

**Joseph R. White**, White Law Firm, New Orleans, LA, for plaintiff.

**William J. Shapiro**, Trial Attorney, Natural Resources Section, Environment and Natural Resources Division, United States Department of Justice, Sacramento, CA, for the defendant.  With him was **Emily M. Meeker**, Trial Attorney, Natural Resources Section, and **John C. Cruden**, Assistant Attorney General, Environment and Natural Resources Division, United States Department of Justice, Washington, D.C.

## O P I N I O N

**HORN, J.**

The above captioned cases involve the government's alleged taking in violation of the Fifth Amended to the United States Constitution of ninety mineral servitudes underlying roughly 58,000 acres of the Kisatchie National Forest in Louisiana.  Plaintiff alleges that the United States Court of Appeals for the Fifth Circuit took its property by holding that the mineral servitudes were subject to the Louisiana law of prescription. See Petro-Hunt, L.L.C. v. United States, 365 F.3d 385 (5th Cir.), cert. denied, 543 U.S. 1034 (2004). These cases are currently before this court on defendant's motion to dismiss

---

[1] This opinion was issued under seal on February 29, 2016. The parties filed a joint status report indicating no redactions were required. After subsequent review of the opinion by the court, the court agrees no redactions are warranted, and, therefore, the opinion is hereby unsealed and reissued without redaction.

plaintiff's judicial takings claims and the parties' cross motions for summary judgment on the judicial takings claims.[2]

## FINDINGS OF FACT

Between 1932 and 1934, two companies, Bodcaw Lumber Company of Louisiana (Bodcaw) and Grant Timber & Manufacturing Company of Louisiana, Inc. (Grant), conveyed 96 mineral servitudes underlying approximately 180,000 acres of land to Good Pine Oil Company, Inc., a joint venture created by Bodcaw, Grant, and three other lumber companies.

In the early 1930s, the United States approached Bodcaw and Grant with an offer to purchase the surface land of the 180,000 acres.  The United States intended to acquire this land pursuant to the Weeks Law, which authorized the government to purchase lands throughout the United States to establish national forests.  See Weeks Law of 1911, ch. 186, 36 Stat. 961 (1911) (codified as amended at 16 U.S.C. §§ 515–519, 521, 552, 563 (2012)).  Bodcaw and Grant expressed concern over the application of the Louisiana law of prescription, which states that mineral servitudes to the owner of the surface estate extinguish after ten years of nonuse.  See La. Civil Code art. 789, 3546 (1870) (currently codified as amended at La. Rev. Stat. § 31:27 (2015)).  On May 29, 1935, an Assistant Solicitor of the United States Department of Agriculture issued an opinion stating that the prescriptive provisions of the Louisiana Civil Code would not apply to lands sold to the United States for national forest purposes. The Forest Service delivered the 1935 opinion to Bodcaw and Grant to ease their fears that the land would prescribe to the United States. Between 1934 and 1937, the two companies conveyed the surface land of the 180,000 non-contiguous acres to the United States through several conveyances for the creation of the Kisatchie National Forest.[3]

---

[2] Judge Francis Allegra, the Judge previously assigned to these cases, issued seven earlier opinions in Case No. 00-512L. See Petro-Hunt, L.L.C. v. United States, 114 Fed. Cl. 143 (2013); Petro-Hunt, L.L.C. v. United States, 113 Fed. Cl. 80 (2013); Petro-Hunt, L.L.C. v. United States, 108 Fed. Cl. 398 (2013); Petro-Hunt, L.L.C. v. United States, 105 Fed. Cl. 132 (2012); Petro-Hunt, L.L.C. v. United States, 105 Fed. Cl. 37 (2012); Petro-Hunt, L.L.C. v. United States, 91 Fed. Cl. 447 (2010); Petro-Hunt, L.L.C. v. United States, 90 Fed. Cl. 51 (2009). The court includes only the findings of fact relevant to this opinion in order to address the pending motions.

[3] As Judge Allegra previously noted: "The eleven instruments of transfer all expressly excluded the mineral servitudes, which the grantors reserved for Good Pine Oil, a joint venture created by Bodcaw Lumber, Grant Timber, and three other lumber companies." Petro-Hunt, L.L.C. v. United States, 105 Fed. Cl. at 40.

In 1940, the Louisiana legislature enacted Act 315 of 1940 (Act 315), declaring that when the United States acquired land subject to the prior sale of the oil, gas or other mineral rights, the mineral rights were imprescriptible.[4]  In 1948, the United States filed a quiet title action in the United States District Court for the Western District of Louisiana to determine the owner of a mineral servitude underlying approximately 800 acres of the 180,000 acres in dispute in these cases. The court held, relying on Act 315, that the Louisiana law of prescription did not apply and the servitude affecting the approximately 800 acres remained in the hands of Petro-Hunt's predecessor in interest, the Nebo Oil Company.[5]  See United States v. Nebo Oil Co., 90 F. Supp. at 84.  Although Act 315 was passed four years after the sale of the land above the servitude affecting the approximately 800 acres, the Western District of Louisiana found that the law still applied because the conveyance occurred within ten years of Act 315. See id. at 81.

The holding of Nebo Oil came into question when the United States Supreme Court decided United States v. Little Lake Misere Land Co., 412 U.S. 580 (1973). The Little Lake Misere case involved two parcels of land in Louisiana acquired by the United States in 1937 and 1939 in accordance with the Migratory Bird Conservation Act, with the express provision that the mineral rights associated with the land were reserved to Little Lake Misere for a period of 10 years, or longer if Little Lake Misere continued the production of minerals on the site. See id. at 582–83. The Supreme Court determined that because the land acquisition was "one arising from and bearing heavily upon a federal regulatory program" and involved the United States as a party, the case should be interpreted according to federal law. See id. at 593–94. The Supreme Court held that the retroactive application of Louisiana's Act 315 was "plainly hostile to the interests of the United States" and "[t]o permit state abrogation of the explicit terms of a federal land acquisition would deal a serious blow to the congressional scheme contemplated by the Migratory Bird Conservation Act and indeed all other federal land acquisition programs." Id. at 596–97.  Accordingly, the Supreme Court held that the land in question had prescribed to the United States. See id. at 604.

---

[4] The relevant part of Act 315 provides: "Be it enacted by the Legislature of Louisiana, That when land is acquired by conventional deed or contract, condemnation or expropriation proceedings by the United States of America, or any of its subdivisions or agencies, from any person, firm or corporation, and by the act of acquisition conveyed subject to a prior sale or reservation of oil, gas, and/or other minerals or royalties, still in force and effect, said rights so reserved or previously sold shall be imprescriptible." United States v. Nebo Oil Co., 90 F. Supp. 73, 80 (W.D. La. 1950) (quoting Act 315 (codified as amended at La. Rev. Stat. Ann. § 31:149)), aff'd, 190 F.2d 1003 (5th Cir. 1951).

[5] In 1942, Nebo Oil Company acquired all of the mineral rights formerly held by Good Pine Oil Company, Inc.

3

In 1991, the United States began granting mineral leases on some of the conveyed land at issue in these cases.  In 1998, through various conveyances, Petro-Hunt became the record holder of a 64.3% undivided interest in the mineral servitudes once owned by Good Pine Oil Company, Inc.  On February 18, 2000, Petro-Hunt, along with the co-owners of Petro-Hunt's mineral estate, filed a quiet title action in the United States District Court for the Western District of Louisiana, seeking a declaration that they were the owners in perpetuity of the mineral servitudes. See Petro-Hunt, L.L.C. v. United States, No. 00-303 (W.D. La. filed Feb. 18, 2000).  Their complaint requested a declaratory judgment quieting their title to the property, but alternatively asserted "that the actions of the United States in confiscating their mineral interests amounts to an unconstitutional taking in direct violation of the Fifth Amendment of the United States Constitution, for which Plaintiffs should be compensated." In its June 5, 2000, response to this complaint, the United States asserted that the United States District Court for the Western District of Louisiana lacked jurisdiction to declare an unconstitutional takings and award compensation.

On August 24, 2000, Petro-Hunt filed a complaint in this court, Case No. 00-512L, alleging that the United States had breached its contract and the Fifth Amendment Takings Clause by exercising ownership over the mineral servitudes.  On November 2, 2000, the case in this court was stayed pending the resolution of the quiet title action in the United States District Court for the Western District of Louisiana. On December 18, 2001, the Western District of Louisiana held that the law of prescriptions did not apply and that Petro-Hunt retained title to the mineral servitudes. Petro-Hunt, L.L.C. v. United States, 179 F. Supp. 2d 669 (W.D. La. 2001).  The United States Court of Appeals for the Fifth Circuit reversed, holding that the law of prescriptions did apply to Petro-Hunt's mineral servitudes. See Petro-Hunt, L.L.C. v. United States, 365 F.3d at 399. In its ruling, the Fifth Circuit expressly relied upon the Little Lake Misere decision and a 2001 Fifth Circuit decision, Central Pines Land Co. v. United States, 274 F.3d 881 (5th Cir. 2001), cert. denied, 537 U.S. 822 (2002).  See Petro-Hunt, L.L.C. v. United States, 365 F.3d at 392–93 (discussing the two cases).  Central Pines held that "Act 315 cannot be borrowed as the rule of decision for application to pre-1940 transactions, because it is hostile to the interests of the United States."  Cent. Pines Land Co. v. United States, 274 F.3d at 886.[6]

---

[6] The Central Pines case addressed the seemingly contrary precedent of Nebo Oil, and determined that Nebo Oil's limited holding only addressed the constitutionality of Act 315 under the Contract Clause of the United States Constitution and the Due Process Clause of the Fourteenth Amendment.  See Cent. Pines Land Co. v. United States, 274 F.3d at 889 ("Nebo Oil holds only that the 'mere hope' or 'expectancy' in the prescription of mineral rights is not protected by the Contract Clause of the U.S. Constitution, and that the retroactive application of Act 315 does not violate the Due Process Clause of the Fourteenth Amendment or dispose of United States property in violation of Article IV, Section 3, clause 2." (footnote omitted)). Therefore, Little Lake Misere's holding that Act 315 could not be applied as a matter of federal common law did not necessarily overrule the constitutional analysis of Nebo Oil, although it did "reject[] the presumption in Nebo

4

Relying on Central Pines, the Fifth Circuit held that it was "prohibited from borrowing Act 315 as the federal rule of decision" and remanded the case United States District Court for the Western District of Louisiana to determine which of Petro-Hunt's mineral servitudes had prescribed to the United States through nonuse.  Petro Hunt, L.L.C. v. United States, 365 F.3d at 399.

In accordance with the Fifth Circuit decision, the quiet title action was remanded to the United States District Court for the Western District of Louisiana.  Petro-Hunt filed a motion for trial on the issue of whether Act 315 applied to its mineral servitudes.  See Petro-Hunt, L.L.C. v. United States, No. 00-0303 (W.D. La. Mar. 14, 2005). The court denied the motion, finding that the only issue to be determined was "which of the 95 servitudes not at issue in Nebo Oil ha[d] in fact prescribed for nonuse."  Order, Petro-Hunt, L.L.C. v. United States, No. 00-0303 (W.D. La. Nov. 21, 2005) (internal quotation marks omitted). On December 7, 2005, the United States District Court for the Western District of Louisiana held that Petro-Hunt remained the owner of six servitudes,[7] underlying roughly 122,000 acres, with the remaining 90 having prescribed to the United States through nonuse.  Petro-Hunt, L.L.C. v. United States, No. 00-0303 (W.D. La. Dec. 7, 2005).

Petro-Hunt appealed, arguing that the United States District Court for the Western District of Louisiana erred in denying its motion for trial, or in the alternative, that the Fifth Circuit's 2004 mandate was clearly erroneous and should be withdrawn.  See Petro-Hunt, L.L.C. v. United States, No. 06-30095, 2007 WL 715270, at *1 (5th Cir. Mar. 6, 2007), cert. denied, 552 U.S. 1242 (2008).  On March 6, 2007, the Fifth Circuit affirmed the denial of the motion for trial and denied plaintiff's request that the previous mandate be withdrawn.  Id. at *3.  On March 3, 2008, the Supreme Court denied plaintiff's petition for a writ of certiorari, rendering the Fifth Circuit's decision final.  See Petro-Hunt, L.L.C. v. United States, 552 U.S. 1242 (2008).

On May 27, 2008, the stay in Case No. 00-512L in this court was lifted. On September 2, 2008, defendant filed a motion to dismiss, or, alternatively, for summary judgment. On November 6, 2009, Judge Allegra granted, in part, and denied, in part, defendant's motion to dismiss.  Petro-Hunt, L.L.C. v. United States, 90 Fed. Cl. 51. Judge

---

Oil that Louisiana law governed the terms of the transactions at issue."  Petro-Hunt, L.L.C. v. United States, 365 F.3d at 393 (citing Cent. Pines Land Co. v. United States, 274 F.3d at 889–90) (footnote omitted).

[7] This decision specifically addressed five servitudes, which had not prescribed because they had been maintained by drilling or production activities.  The sixth servitude is the Nebo Oil servitude, which had not prescribed to the United States because of the res judicata effect of the Nebo Oil decision.  See Petro-Hunt, L.L.C. v. United States, 365 F.3d at 397 (holding that the res judicata effect of Nebo Oil only extends to the particular servitudes at issue in that case).

Allegra dismissed plaintiff's contract claims, permanent takings claims, and certain of its temporary taking claims that were untimely, see id. at 64, 67, 68, but found that other temporary takings claims were timely. See id. at 71.

On September 16, 2010, plaintiff filed its second amended complaint, adding a claim that the Fifth Circuit's decision in the quiet title action constituted a judicial taking of plaintiff's mineral servitudes. On May 31, 2011, defendant filed a motion to dismiss asserting that plaintiff's prior filing of the district court action deprived the court of jurisdiction under 28 U.S.C. § 1500 (2006). On May 2, 2012, Judge Allegra dismissed plaintiff's temporary takings claims as barred by 28 U.S.C. § 1500, but denied the motion to dismiss as to the new judicial takings claim. See Petro-Hunt, L.L.C. v. United States, 105 Fed. Cl. 37.[8]  The judicial takings claim is all that remains in the above captioned cases.

After discovery was completed in 2015, defendant filed a motion to dismiss pursuant to Rules 12(b)(1), 12(c), and 12(h)(3) (2015) of the Rules of the United States Court of Federal Claims (RCFC), and a motion for summary judgment pursuant to RCFC 56 (2015). Defendant raises four main arguments in support of its motions. First,

---

[8] Judge Allegra's earlier decision did not address whether the court had jurisdiction to consider the plaintiff's judicial takings claims, only that the judicial takings claims were not barred by 28 U.S.C. § 1500.  In his decision, Judge Allegra noted that:

> The Fifth Circuit's second decision was issued on March 6, 2007, and the Supreme Court's denial of certiorari was on March 3, 2008. Because these events occurred after the filing of plaintiff's original complaint, to the extent plaintiff's most recent complaint raises a judicial takings issue, it must be viewed not as an amended complaint under RCFC 15(c), but rather as a supplemental complaint under RCFC 15(d).

Petro-Hunt, L.L.C. v. United States, 105 Fed. Cl. at 44.  Judge Allegra also concluded that:

> [I]t makes little sense to hold, as defendant essentially suggests, that plaintiff's judicial takings claim is barred by section 1500 because that new count was added to a suit filed when the district court action was pending, but would not be barred if plaintiff chose to file a new suit featuring that count and then moved to consolidate that suit with this case. Critically, plaintiff's judicial takings claim rests upon "independent operative facts" that are not only unlike those in the first two complaints it filed in this case, but also unlike those that were operative in the claims that it originally pursued in the district court.

Petro-Hunt, L.L.C. v. United States, 105 Fed. Cl. at 45.

defendant argues that the United States Court of Federal Claims lacks jurisdiction over the judicial takings claim because it requires the court to scrutinize the decision of another federal court. Second, defendant argues that the appropriate remedy for a judicial takings claim is the invalidation of the offending court decision, and the Court of Federal Claims lacks jurisdiction to grant this remedy. Third, defendant asserts that plaintiff's claim is barred by res judicata, because plaintiff already litigated its claims in the Fifth Circuit. Finally, defendant asserts that it should succeed on the merits because the Fifth Circuit did not take an established property right from the plaintiff.

In response, plaintiff filed a cross-motion for summary judgment in addition to responding to the motion to dismiss, alleging that it did have an established property right that was taken by the Fifth Circuit's 2007 decision. Regarding its judicial takings claims, plaintiff argues that "Petro-Hunt's valid judicial takings claim is subject to this Court's jurisdiction," and citing to Smith v. United States, 709 F.3d 1114 (Fed. Cir.), cert. denied, 134 S. Ct. 259 (2013) argues that "[t]he Federal Circuit has recognized that judicial action can give rise to claims for the taking of private property."

## DISCUSSION

Prior to addressing the cross-motions for summary judgment, the court first considers defendant's motion to dismiss for lack of jurisdiction. It is well established that "'subject-matter jurisdiction, because it involves a court's power to hear a case, can never be forfeited or waived.'" Arbaugh v. Y & H Corp., 546 U.S. 500, 514 (2006) (quoting United States v. Cotton, 535 U.S. 625, 630 (2002)). "[F]ederal courts have an independent obligation to ensure that they do not exceed the scope of their jurisdiction, and therefore they must raise and decide jurisdictional questions that the parties either overlook or elect not to press." Henderson ex rel. Henderson v. Shinseki, 131 S. Ct. 1197, 1202 (2011); see also Gonzalez v. Thaler, 132 S. Ct. 641, 648 (2012) ("When a requirement goes to subject-matter jurisdiction, courts are obligated to consider sua sponte issues that the parties have disclaimed or have not presented."); Hertz Corp. v. Friend, 559 U.S. 77, 94 (2010) ("Courts have an independent obligation to determine whether subject-matter jurisdiction exists, even when no party challenges it." (citing Arbaugh v. Y & H Corp., 546 U.S. at 514)); Special Devices, Inc. v. OEA, Inc., 269 F.3d 1340, 1342 (Fed. Cir. 2001) ("[A] court has a duty to inquire into its jurisdiction to hear and decide a case." (citing Johannsen v. Pay Less Drug Stores N.W., Inc., 918 F.2d 160, 161 (Fed. Cir. 1990)); View Eng'g, Inc. v. Robotic Vision Sys., Inc., 115 F.3d 962, 963 (Fed. Cir. 1997) ("[C]ourts must always look to their jurisdiction, whether the parties raise the issue or not."). "Objections to a tribunal's jurisdiction can be raised at any time, even by a party that once conceded the tribunal's subject-matter jurisdiction over the controversy." Sebelius v. Auburn Reg'l Med. Ctr., 133 S. Ct. 817, 824 (2013); see also Arbaugh v. Y & H Corp., 546 U.S. at 506 ("The objection that a federal court lacks subject-matter jurisdiction . . . may be raised by a party, or by a court on its own initiative, at any stage in the litigation, even after trial and the entry of judgment."); Cent. Pines Land Co., L.L.C. v. United States, 697 F.3d 1360, 1364 n.1 (Fed. Cir. 2012) ("An objection to a court's subject matter jurisdiction can be

raised by any party or the court at any stage of litigation, including after trial and the entry of judgment." (citing Arbaugh v. Y & H Corp., 546 U.S. at 506–07)); Rick's Mushroom Serv., Inc. v. United States, 521 F.3d 1338, 1346 (Fed. Cir. 2008) ("[A]ny party may challenge, or the court may raise sua sponte, subject matter jurisdiction at any time." (citing Arbaugh v. Y & H Corp., 546 U.S. at 506; Folden v. United States, 379 F.3d 1344, 1354 (Fed. Cir.), reh'g and reh'g en banc denied (Fed. Cir. 2004), cert. denied, 545 U.S. 1127 (2005); and Fanning, Phillips & Molnar v. West, 160 F.3d 717, 720 (Fed. Cir. 1998))); Pikulin v. United States, 97 Fed. Cl. 71, 76, appeal dismissed, 425 F. App'x 902 (Fed. Cir. 2011). In fact, "[s]ubject matter jurisdiction is an inquiry that this court must raise sua sponte, even where . . . neither party has raised this issue." Metabolite Labs., Inc. v. Lab. Corp. of Am. Holdings, 370 F.3d 1354, 1369 (Fed. Cir.) (citing Textile Prods., Inc. v. Mead Corp., 134 F.3d 1481, 1485 (Fed. Cir.), reh'g denied and en banc suggestion declined (Fed. Cir.), cert. denied, 525 U.S. 826 (1998)), reh'g and reh'g en banc denied (Fed. Cir. 2004), cert. granted in part sub. nom Lab. Corp. of Am. Holdings v. Metabolite Labs., Inc., 546 U.S. 975 (2005), cert. dismissed as improvidently granted, 548 U.S. 124 (2006)); see also Avid Identification Sys., Inc. v. Crystal Import Corp., 603 F.3d 967, 971 (Fed. Cir.) ("This court must always determine for itself whether it has jurisdiction to hear the case before it, even when the parties do not raise or contest the issue."), reh'g and reh'g en banc denied, 614 F.3d 1330 (Fed. Cir. 2010), cert. denied, 5 U.S. 1169 (2011).

Pursuant to the RCFC and the Federal Rules of Civil Procedure, a plaintiff need only state in the complaint "a short and plain statement of the grounds for the court's jurisdiction," and "a short and plain statement of the claim showing that the pleader is entitled to relief." RCFC 8(a)(1), (2) (2015); Fed. R. Civ. P. 8(a)(1), (2) (2016); see also Ashcroft v. Iqbal, 556 U.S. 662, 677–78 (2009) (citing Bell Atl. Corp. v. Twombly, 550 U.S. 544, 555–57, 570 (2007)). "Determination of jurisdiction starts with the complaint, which must be well-pleaded in that it must state the necessary elements of the plaintiff's claim, independent of any defense that may be interposed." Holley v. United States, 124 F.3d 1462, 1465 (Fed. Cir.) (citing Franchise Tax Bd. v. Constr. Laborers Vacation Trust, 463 U.S. 1 (1983)), reh'g denied (Fed. Cir. 1997); see also Klamath Tribe Claims Comm. v. United States, 97 Fed. Cl. 203, 208 (2011); Gonzalez-McCaulley Inv. Grp., Inc. v. United States, 93 Fed. Cl. 710, 713 (2010). "Conclusory allegations of law and unwarranted inferences of fact do not suffice to support a claim." Bradley v. Chiron Corp., 136 F.3d 1317, 1322 (Fed. Cir. 1998); see also McZeal v. Sprint Nextel Corp., 501 F.3d 1354, 1363 n.9 (Fed. Cir. 2007) (Dyk, J., concurring in part, dissenting in part) (quoting C. Wright and A. Miller, Federal Practice and Procedure § 1286 (3d ed. 2004)). "A plaintiff's factual allegations must 'raise a right to relief above the speculative level' and cross 'the line from conceivable to plausible.'" Three S Consulting v. United States, 104 Fed. Cl. 510, 523 (2012) (quoting Bell Atl. Corp. v. Twombly, 550 U.S. at 555), aff'd, 562 F. App'x 964 (Fed. Cir.), reh'g denied (Fed. Cir. 2014). As stated in Ashcroft v. Iqbal, "[a] pleading that offers 'labels and conclusions' or 'a formulaic recitation of the elements of a cause of action will not do.' 550 U.S. at 555. Nor does a complaint suffice if it tenders 'naked assertion[s]' devoid of 'further factual enhancement.'" Ashcroft v. Iqbal, 556 U.S. at 678 (quoting Bell Atl. Corp. v. Twombly, 550 U.S. at 555).

8

When deciding a case based on a lack of subject matter jurisdiction or for failure to state a claim, this court must assume that all undisputed facts alleged in the complaint are true and must draw all reasonable inferences in the non-movant's favor. See Erickson v. Pardus, 551 U.S. 89, 94 (2007) ("In addition, when ruling on a defendant's motion to dismiss, a judge must accept as true all of the factual allegations contained in the complaint." (citing Bell Atl. Corp. v. Twombly, 550 U.S. at 555-56 (citing Swierkiewicz v. Sorema N. A., 534 U.S. 506, 508 n.1 (2002)))); Scheuer v. Rhodes, 416 U.S. 232, 236 (1974) ("Moreover, it is well established that, in passing on a motion to dismiss, whether on the ground of lack of jurisdiction over the subject matter or for failure to state a cause of action, the allegations of the complaint should be construed favorably to the pleader."), abrogated on other grounds by Harlow v. Fitzgerald, 457 U.S. 800 (1982), recognized by Davis v. Scherer, 468 U.S. 183, 190 (1984); United Pac. Ins. Co. v. United States, 464 F.3d 1325, 1327-28 (Fed. Cir. 2006); Samish Indian Nation v. United States, 419 F.3d 1355, 1364 (Fed. Cir. 2005); Boise Cascade Corp. v. United States, 296 F.3d 1339, 1343 (Fed. Cir.), reh'g and reh'g en banc denied (Fed. Cir. 2002), cert. denied, 538 U.S. 906 (2003).

The Tucker Act grants jurisdiction to this court as follows:

> The United States Court of Federal Claims shall have jurisdiction to render judgment upon any claim against the United States founded either upon the Constitution, or any Act of Congress or any regulation of an executive department, or upon any express or implied contract with the United States, or for liquidated or unliquidated damages in cases not sounding in tort.

28 U.S.C. § 1491(a)(1) (2012). As interpreted by the United States Supreme Court, the Tucker Act waives sovereign immunity to allow jurisdiction over claims against the United States (1) founded on an express or implied contract with the United States, (2) seeking a refund from a prior payment made to the government, or (3) based on federal constitutional, statutory, or regulatory law mandating compensation by the federal government for damages sustained. See United States v. Navajo Nation, 556 U.S. 287, 289–90 (2009); United States v. Mitchell, 463 U.S. 206, 216 (1983); see also Greenlee Cnty., Ariz. v. United States, 487 F.3d 871, 875 (Fed. Cir.), reh'g and reh'g en banc denied (Fed. Cir. 2007), cert. denied, 552 U.S. 1142 (2008); Palmer v. United States, 168 F.3d 1310, 1314 (Fed. Cir. 1999).

"Not every claim invoking the Constitution, a federal statute, or a regulation is cognizable under the Tucker Act. The claim must be one for money damages against the United States . . . ." United States v. Mitchell, 463 U.S. at 216; see also United States v. White Mountain Apache Tribe, 537 U.S. 465, 472 (2003); Smith v. United States, 709 F.3d at 1116; RadioShack Corp. v. United States, 566 F.3d 1358, 1360 (Fed. Cir. 2009); Rick's Mushroom Serv., Inc. v. United States, 521 F.3d at 1343 ("[P]laintiff must . . . identify a substantive source of law that creates the right to recovery of money damages

against the United States."); <u>Golden v. United States</u>, 118 Fed. Cl. 764, 768 (2014). In <u>Ontario Power Generation, Inc. v. United States</u>, the United States Court of Appeals for the Federal Circuit identified three types of monetary claims for which jurisdiction is lodged in the United States Court of Federal Claims. The court wrote:

> The underlying monetary claims are of three types. . . . First, claims alleging the existence of a contract between the plaintiff and the government fall within the Tucker Act's waiver. . . . Second, the Tucker Act's waiver encompasses claims where "the plaintiff has paid money over to the Government, directly or in effect, and seeks return of all or part of that sum." <u>Eastport S.S. [Corp. v. United States</u>, 178 Ct. Cl. 599, 605–06,] 372 F.2d [1002,] 1007-08 [(1967)] (describing illegal exaction claims as claims "in which 'the Government has the citizen's money in its pocket'" (quoting <u>Clapp v. United States</u>, 127 Ct. Cl. 505, 117 F. Supp. 576, 580 (1954)) . . . . Third, the Court of Federal Claims has jurisdiction over those claims where "money has not been paid but the plaintiff asserts that he is nevertheless entitled to a payment from the treasury." <u>Eastport S.S.</u>, 372 F.2d at 1007. Claims in this third category, where no payment has been made to the government, either directly or in effect, require that the "particular provision of law relied upon grants the claimant, expressly or by implication, a right to be paid a certain sum." <u>Id.</u>; <u>see also</u> [<u>United States v. ]Testan</u>, 424 U.S. [392,] 401-02 [1976] ("Where the United States is the defendant and the plaintiff is not suing for money improperly exacted or retained, the basis of the federal claim-whether it be the Constitution, a statute, or a regulation-does not create a cause of action for money damages unless, as the Court of Claims has stated, that basis 'in itself . . . can fairly be interpreted as mandating compensation by the Federal Government for the damage sustained.'" (quoting <u>Eastport S.S.</u>, 372 F.2d at 1009)). This category is commonly referred to as claims brought under a "money-mandating" statute.

<u>Ontario Power Generation, Inc. v. United States</u>, 369 F.3d 1298, 1301 (Fed. Cir. 2004); <u>see also</u> <u>Twp. of Saddle Brook v. United States</u>, 104 Fed. Cl. 101, 106 (2012).

To prove that a statute or regulation is money-mandating, a plaintiff must demonstrate that an independent source of substantive law relied upon "'can fairly be interpreted as mandating compensation by the Federal Government.'" <u>United States v. Navajo Nation</u>, 556 U.S. at 290 (quoting <u>United States v. Testan</u>, 424 U.S. 392, 400 (1976)); <u>see also</u> <u>United States v. White Mountain Apache Tribe</u>, 537 U.S. at 472; <u>United States v. Mitchell</u>, 463 U.S. at 217; <u>Blueport Co., LLC v. United States</u>, 533 F.3d 1374, 1383 (Fed. Cir. 2008), <u>cert.</u> <u>denied</u>, 555 U.S. 1153 (2009). The source of law granting monetary relief must be distinct from the Tucker Act itself. <u>See</u> <u>United States v. Navajo Nation</u>, 556 U.S. at 290 (The Tucker Act does not create "substantive rights; [it is simply a] jurisdictional provision[] that operate[s] to waive sovereign immunity for claims

10

premised on other sources of law (*e.g.*, statutes or contracts).")." "'If the statute is not money-mandating, the Court of Federal Claims lacks jurisdiction, and the dismissal should be for lack of subject matter jurisdiction.'" Jan's Helicopter Serv., Inc. v. Fed. Aviation Admin., 525 F.3d 1299, 1308 (Fed. Cir. 2008) (quoting Greenlee Cnty., Ariz. v. United States, 487 F.3d at 876); Fisher v. United States, 402 F.3d 1167, 1173 (Fed. Cir. 2005) (The absence of a money-mandating source is "fatal to the court's jurisdiction under the Tucker Act."); Peoples v. United States, 87 Fed. Cl. 553, 565–66 (2009).

The Takings Clause of the Fifth Amendment to the United States Constitution provides in pertinent part: "nor shall private property be taken for public use without just compensation." U.S. Const. amend. V.  The purpose of this Fifth Amendment provision is to prevent the government from "'forcing some people alone to bear public burdens which, in all fairness and justice, should be borne by the public as a whole.'" Palazzolo v. Rhode Island, 533 U.S. 606, 618 (2001) (quoting Armstrong v. United States, 364 U.S. 40, 49 (1960)), abrogated on other grounds by Lingle v. Chevron U.S.A. Inc., 544 U.S. 528 (2005), recognized by Hageland Aviation Servs., Inc. v. Harms, 210 P.3d 444 (Alaska 2009); see also Penn Cent. Transp. Co. v. City of New York, 438 U.S. 104, 123-24, reh'g denied, 439 U.S. 883 (1978); Lingle v. Chevron U.S.A. Inc., 544 U.S. 528, 536 (2005); E. Enters. v. Apfel, 524 U.S. 498, 522 (1998); Rose Acre Farm, Inc. v. United States, 559 F.3d 1260, 1266 (Fed. Cir.), reh'g en banc denied (Fed. Cir. 2009), cert. denied, 130 S. Ct. 1501 (2010); Janowsky v. United States, 133 F.3d 888, 892 (Fed. Cir. 1998); Res. Invs., Inc. v. United States, 85 Fed. Cl. 447, 469-70 (2009); Pumpelly v. Green Bay & Miss. Canal Co., 80 U.S. (13 Wall.) 166, 179 (1871) (citing to principles which establish that "private property may be taken for public uses when public necessity or utility requires" and that there is a "clear principle of natural equity that the individual whose property is thus sacrificed must be indemnified").

Therefore, "a claim for just compensation under the Takings Clause must be brought to the Court of Federal Claims in the first instance, unless Congress has withdrawn the Tucker Act grant of jurisdiction in the relevant statute." E. Enters. v. Apfel, 524 U.S. at 520 (citing Ruckelshaus v. Monsanto Co., 467 U.S. 986, 1016-19 (1984)); see also Acceptance Ins. Cos. v. United States, 503 F.3d 1328, 1336 (Fed. Cir. 2007); Morris v. United States, 392 F.3d 1372, 1375 (Fed. Cir. 2004) ("Absent an express statutory grant of jurisdiction to the contrary, the Tucker Act provides the Court of Federal Claims exclusive jurisdiction over takings claims for amounts greater than $10,000."). The United States Supreme Court has declared: "If there is a taking, the claim is 'founded upon the Constitution' and within the jurisdiction of the [United States Court of Federal Claims] to hear and determine." Preseault v. Interstate Commerce Comm'n, 494 U.S. 1, 12 (1990) (quoting United States v. Causby, 328 U.S. 256, 267 (1946)); see also Lion Raisins, Inc. v. United States, 416 F.3d 1356, 1368 (Fed. Cir. 2005); Narramore v. United States, 960 F.2d 1048, 1052 (Fed. Cir. 1992); Perry v. United States, 28 Fed. Cl. 82, 84 (1993).

11

To succeed under the Fifth Amendment Takings Clause, a plaintiff must show that the government took a private property interest for public use without just compensation. See Adams v. United States, 391 F.3d 1212, 1218 (Fed. Cir. 2004), cert. denied, 546 U.S. 811 (2005); Arbelaez v. United States, 94 Fed. Cl. 753, 762 (2010); Gahagan v. United States, 72 Fed. Cl. 157, 162 (2006).  "The issue of whether a taking has occurred is a question of law based on factual underpinnings."  Huntleigh USA Corp. v. United States, 525 F.3d 1370, 1377-78 (Fed. Cir.), cert. denied, 555 U.S. 1045 (2008).  The government must be operating in its sovereign rather than in its proprietary capacity when it initiates a taking.  See St. Christopher Assocs., L.P. v. United States, 511 F.3d 1376, 1385 (Fed. Cir. 2008).

The United States Court of Appeals for the Federal Circuit has established a two-part test to determine whether government actions amount to a taking of private property under the Fifth Amendment. See Klamath Irr. Dist. v. United States, 635 F.3d 505, 511 (Fed. Cir. 2011); Am. Pelagic Fishing Co. v. United States, 379 F.3d 1363, 1372 (Fed. Cir.) (citing M & J Coal Co. v. United States, 47 F.3d 1148, 1153-54 (Fed. Cir.), cert. denied, 516 U.S. 808 (1995)), reh'g denied (Fed. Cir. 2004), cert. denied, 545 U.S. 1139 (2005).  A court first determines whether a plaintiff possesses a cognizable property interest in the subject of the alleged takings.  Then, the court must determine whether the government action is a "'compensable taking of that property interest.'"  Huntleigh USA Corp v. United States, 525 F.3d at 1377 (quoting Am. Pelagic Fishing Co., L.P. v. United States, 379 F.3d at 1372).

To establish a taking, a plaintiff must have a legally cognizable property interest, such as the right of possession, use, or disposal of the property. See Loretto v. Teleprompter Manhattan CATV Corp., 458 U.S. 419, 435 (1982) (citing United States v. Gen. Motors Corp., 323 U.S. 373 (1945)); CRV Enters., Inc. v. United States, 626 F.3d 1241, 1249 (Fed. Cir. 2010), cert. denied, 131 S. Ct. 2459 (2011); Karuk Tribe of Cal. v. Ammon, 209 F.3d 1366, 1374-75 (Fed. Cir.), reh'g denied and en banc suggestion denied (Fed. Cir. 2000), cert. denied, 532 U.S. 941 (2001). "'It is axiomatic that only persons with a valid property interest at the time of the taking are entitled to compensation.'" Am. Pelagic Fishing Co. v. United States, 379 F.3d at 1372 (quoting Wyatt v. United States, 271 F.3d 1090, 1096 (Fed. Cir. 2001), cert. denied, 353 U.S. 1077 (2002) and citing Cavin v. United States, 956 F.2d 1131, 1134 (Fed. Cir. 1992)).  Therefore, "[i]f the claimant fails to demonstrate the existence of a legally cognizable property interest, the courts [sic] task is at an end." Am. Pelagic Fishing Co. v. United States, 379 F.3d at 1372 (citing Maritrans Inc. v. United States, 342 F.3d 1344, 1352 (Fed. Cir. 2003) and M & J Coal Co. v. United States, 47 F.3d at 1154).  The court does not address the second step "without first identifying a cognizable property interest." Air Pegasus of D.C., Inc. v. United States, 424 F.3d 1206, 1213 (Fed. Cir.) (citing Am. Pelagic Fishing Co. v. United States, 379 F.3d at 1381 and Conti v. United States, 291 F.3d 1334, 1340 (Fed. Cir.), reh'g en banc denied (Fed. Cir. 2002), cert. denied, 537 U.S. 1112 (2003)), reh'g denied and reh'g en banc denied (Fed. Cir. 2005).  Only if there is to be a next step, "'after having identified a valid property interest, the court must determine whether the governmental action at issue

amounted to a compensable taking of that property interest.'" <u>Huntleigh USA Corp. v. United States</u>, 525 F.3d at 1378 (quoting <u>Am. Pelagic Fishing Co. v. United States</u>, 379 F.3d at 1372).

Judicial Takings

The contours—and even the existence—of a judicial takings doctrine has been debated in federal courts and in legal scholarship. <u>See</u> <u>generally</u> <u>Stop the Beach Renourishment, Inc. v. Fla. Dep't of Envtl. Prot.</u>, 560 U.S. 702 (2010); Frederic Bloom & Christopher Serkin, "Suing Courts," 79 U. Chi. L. Rev. 553, 555 (2012); Stacey L. Dogan & Ernest A. Young, "Judicial Takings and Collateral Attack on State Court Property Decisions," 6 Duke J. Const. L. & Pub. Pol'y 107, 112–13 (2011); John D. Echeverria, "Stop the Beach Renourishment: Why the Judiciary is Different," 35 Vt. L. Rev. 475 (2010); Daniel L. Siegel, "Why We Will Probably Never See a Judicial Takings Doctrine," 35 Vt. L. Rev. 459 (2010); Barton H. Thompson, Jr., "Judicial Takings," 76 Va. L. Rev. 1449 (1990).

The door to judicial takings claims was cracked ajar by the Supreme Court's decision in <u>Stop the Beach Renourishment, Inc. v. Florida Department of Environmental Protection</u>. <u>See</u> <u>generally</u> <u>Stop the Beach Renourishment, Inc. v. Fla. Dep't of Envtl. Prot.</u>, 560 U.S. 702. In <u>Stop the Beach</u>, a group of beachfront landowners from the city of Destin and Walton County, Florida, alleged that the Supreme Court of Florida took their property when it held that the Beach and Shore Preservation Act of 1961 did not unconstitutionally deprive landowners of their littoral rights without just compensation. <u>See</u> <u>Stop the Beach Renourishment, Inc. v. Fla. Dep't of Envtl. Prot.</u>, 560 U.S. at 709–12. The eight justices who took part in the case[9] held that the Florida Supreme Court's decision did not constitute a violation of the Fifth Amendment Takings Clause "[b]ecause the Florida Supreme Court's decision did not contravene the established property rights of petitioner's Members." <u>Id.</u> at 733 (majority opinion). Specifically, the majority opinion found that "[t]here is no taking unless petitioner can show that, before the Florida Supreme Court's decision, littoral-property owners had rights to future accretions and contact with the water superior to the State's right to fill in its submerged land." <u>Id.</u> at 730.

The justices, however, did not agree on the definition of a judicial taking, or even whether judicial takings claims are cognizable in federal court. The plurality opinion by Justice Scalia, which was joined by Chief Justice Roberts, Justice Thomas, and Justice Alito, asserted that courts can violate the Fifth Amendment through their actions, since "[t]he [Takings] Clause is not addressed to the action of a specific branch or branches. It is concerned simply with the act, and not with the governmental actor." <u>Id.</u> at 713–14 (plurality opinion). The plurality determined that a successful judicial takings plaintiff "must prove the elimination of an established property right" by the judicial decision. <u>See</u> <u>id.</u> at 726.

---

[9] Justice John Paul Stevens recused himself from the case.

Justice Kennedy, joined by Justice Sotomayor, would have decided the case under the Due Process Clause of the Fourteenth Amendment, rather than the Takings Clause, and stated that it was unnecessary "to determine whether, or when, a judicial decision determining the rights of property owners can violate the Takings Clause of the Fifth Amendment of the United States Constitution." Id. at 733–37 (Kennedy, J., concurring in part and concurring in the judgment).  Justice Kennedy acknowledged that "[t]o announce that courts too can effect a taking when they decide cases involving property rights, would raise certain difficult questions." Id. at 737. Justice Kennedy feared that a judicial takings doctrine would give judges more power by allowing them to decide what property should or should not be taken and paid for by the government, a responsibility that the judiciary historically has not possessed. See id. at 738–39.  Additionally, "it may be unclear in certain situations how a party should properly raise a judicial takings claim" and what remedy courts are able to grant. See id. at 740–41.

Justice Breyer's concurrence, joined by Justice Ginsburg, found no unconstitutional taking had occurred and indicated it was unnecessary to decide whether courts could effect a taking or what would constitute a judicial taking.  See id. at 742–44 (Breyer, J., concurring in part and concurring in the judgment).  Justice Breyer shared some of the concerns expressed by Justice Kennedy about establishing a judicial takings doctrine, since it "would invite a host of federal takings claims without the mature consideration of potential procedural or substantive legal principles that might limit federal interference in matters that are primarily the subject of state law." Id. at 743.  In the end, a majority of the Supreme Court justices were only able to agree that if there could be such a thing as a judicial taking, the Florida Supreme Court decision under review was not one.  See id. at 733 (majority opinion).

Since the Stop the Beach decision, courts have varied in their treatment of judicial takings claims.  Some courts, including the United States Court of Appeals for the Federal Circuit, have determined that judicial takings can exist, although without concluding that a judicial taking actually occurred. See Smith v. United States, 709 F.3d at 1116 ("In that case [Stop the Beach], the Court recognized that a takings claim can be based on the action of a court."); Vandevere v. Lloyd, 644 F.3d 957, 964 n.4 (9th Cir.) ("[A]ny branch of state government could, in theory, effect a taking." (citing Stop the Beach Renourishment, Inc. v. Fla. Dep't of Envtl. Prot., 560 U.S. at 713–15 (plurality opinion))), cert. denied, 132 S. Ct. 850 (2011).  A number of courts faced with judicial takings claims have declined to address the question of whether a court can effect a taking, and have dismissed the claims on other grounds.  See, e.g., Bettendorf v. St. Croix Cnty., 631 F.3d 421, 435 n.5 (7th Cir. 2011) (declining to decide "whether a court decision can effect a compensable taking of property"); Allustiarte v. United States, 256 F.3d 1349, 1352 (Fed. Cir.) (finding that the court lacked jurisdiction over a judicial takings claim), cert. denied, 534 U.S. 1042 (2001); Weigel v. Maryland, 950 F. Supp. 2d 811, 837–38 (D. Md. 2013) ("The Court need not determine whether a judicial takings claim is constitutionally cognizable here, because

Appx0060

the Plaintiffs have failed to show a clear likelihood of success on their claim that a 'taking' has occurred in the first place."), appeal dismissed, (4th Cir. 2014).

Two United States Court of Appeals for the Federal Circuit decisions indicate that a court could effect a taking in violation of the Fifth Amendment, at least in theory. First, Boise Cascade Corporation v. United States held that the Court of Federal Claims had jurisdiction to consider a claim that a district court injunction took plaintiff's property rights, although the court went on to dismiss the claim as unripe. Boise Cascade Corp. v. United States, 296 F.3d 1339, 1344, 1357 (Fed. Cir.), reh'g and reh'g en banc denied (Fed. Cir. 2002), cert. denied, 538 U.S. 906 (2003).  More recently, the Federal Circuit in Smith v. United States stated that in Stop the Beach, "the Court recognized that a takings claim can be based on the action of a court" and that "it was recognized prior to Stop the Beach that judicial action could constitute a taking of property." Smith v. United States, 709 F.3d at 1116–17.  The Federal Circuit went on to dismiss the judicial takings claim for violating the statute of limitations. See id. at 1117. This court finds that it is not necessary to determine if plaintiff's judicial takings claim is cognizable in federal court because, even if it is, the United States Court of Federal Claims lacks jurisdiction to determine if a judicial taking occurred in these cases.

The Federal Circuit has repeatedly held that the Court of Federal Claims lacks jurisdiction over judicial takings claims that require the court to scrutinize the decisions of other tribunals for the same plaintiff given the same set of facts.[10] See Shinnecock Indian Nation v. United States, 782 F.3d 1345, 1352 (Fed. Cir. 2015) ("Binding precedent establishes that the Court of Federal Claims has no jurisdiction to review the merits of a decision rendered by a federal district court."); Innovair Aviation Ltd. v. United States, 632 F.3d 1336, 1344 (Fed. Cir.) ("[T]he Court of Federal Claims does not have jurisdiction to review the decision of district courts and cannot entertain a taking[s] claim that requires the court to scrutinize the actions of another tribunal." (internal quotation marks omitted; brackets in original)), reh'g en banc denied, (Fed. Cir. 2011), cert. denied, 132 S. Ct. 999 (2012); Vereda Ltda. v. United States, 271 F.3d 1367, 1375 (Fed. Cir. 2001) ("[T]he Court of Federal Claims cannot entertain a taking claim that requires the court to scrutinize the actions of another tribunal." (internal quotation marks omitted)); Allustiarte v. United States, 256 F.3d at 1352 ("'[T]he Court of Federal Claims does not have jurisdiction to review the decisions of district courts.'" (quoting Joshua v. United States, 17 F.3d 378, 380 (Fed. Cir. 1994))); see also Potter v. United States, 121 Fed. Cl. 168, 169 (2015);

---

[10] In a non-presidential opinion, the Federal Circuit also has indicated that "[t]he appellant [Barth] asked the Court of Federal Claims to scrutinize the actions of coordinate federal courts to determine whether their actions effected a taking of his property. That was beyond the Court of Federal Claims' jurisdiction." Barth v. United States, 76 F. App'x 944, 945–46 (Fed. Cir.), cert. denied, 540 U.S. 1049 (2003) (footnote omitted).

Martl v. United States,[11] No. 09-299, 2010 WL 369212, at *2 (Fed. Cl. Jan. 29, 2010) (unpublished) ("[T]his court has no jurisdiction over takings claims that are founded on a challenge to the judgment of another federal court.").

The most recent, precedential decision regarding judicial takings is Shinnecock Indian Nation v. United States decided by the United States Court of Appeals for the Federal Circuit in 2015. In Shinnecock, the Federal Circuit explained:

> Permitting parties aggrieved by the decisions of Article III tribunals to challenge the merits of those decisions in the Court of Federal Claims would circumvent the statutorily defined appellate process and severely undercut the orderly resolution of claims. See 28 U.S.C. § 1291 ("The court of appeals . . . shall have jurisdiction of appeals from all final decisions of the district courts of the United States."); Plaut v. Spendthrift Farm, Inc., 514 U.S. 211, 218–19, 115 S. Ct. 1447, 131 L. Ed. 2d 328 (1995) (explaining

---

[11] The Martl case is related to a recent decision of the undersigned, Milgroom et al. v. United States, 122 Fed. Cl. 779 (2015), involving the same underlying facts as the Martl case. In the Milgroom case, this court determined:

> This court is without jurisdiction to review the alleged taking by the District Court, a judicial taking, see Stop the Beach Renourishment, Inc. v. Florida Dep't of Envtl. Protection et al., 560 U.S. 702 (2010), because review in this case of such a taking "would require the Court of Federal Claims to scrutinize the merits of the district court's judgment, a task it is without authority to undertake." Shinnecock Indian Nation v. United States, 782 F.3d 1345, 1352 (Fed. Cir. 2015); see also Joshua v. United States, 17 F.3d 378, 380 (Fed. Cir. 1994) ("[T]he Court of Federal Claims does not have jurisdiction to review the decisions of district courts or the clerks of district courts relating to proceedings before those courts."). Just as the Court of Federal Claims does not have jurisdiction to review the decisions of the United States District Courts, the Court of Federal Claims also does not have jurisdiction to review decisions of the United States Bankruptcy Courts. See Allustiarte v. United States, 256 F.3d 1349, 1351 (Fed. Cir. 2001) (holding that the Court of Federal Claims does not have jurisdiction to entertain judicial takings claims against federal bankruptcy courts because "[s]uch a determination would require the court to scrutinize the actions of the bankruptcy trustees and courts"), cert. denied, 534 U.S. 1042 (2001); Mora v. United States, 118 Fed. Cl. 713, 716 (2014) ("[T]his court does not have jurisdiction to review the decisions of state courts, federal bankruptcy courts, federal district courts, or federal circuit courts of appeals.").

Milgroom et al. v. United States, 122 Fed. Cl. at 801-802.

that Article III "gives the Federal Judiciary the power, not merely to rule on cases, but to *decide* them, subject to review only by superior courts in the Article III hierarchy").

Shinnecock Indian Nation v. United States, 782 F.3d at 1353 (emphasis in original); see also Brace v. United States, 72 Fed. Cl. 337, 359 (2006) (finding that it would be "untenable" for the Court of Federal Claims to hear judicial takings claims because "it would constantly be called upon by disappointed litigants to act as a super appellate tribunal reviewing the decisions of other courts to determine whether they represented substantial departures from prior decisional law"), aff'd, 250 F. App'x 359 (Fed. Cir. 2007), cert. denied, 552 U.S. 1258 (2008).[12] Often, a judicial takings claim is brought as a "collateral attack" on the judgment of another tribunal.  See Shinnecock Indian Nation v. United States, 782 F.3d at 1353 (characterizing plaintiff's judicial takings claim as "an attempt to mount an improper collateral attack on the judgment of the district court"); Innovair Aviation Ltd. v. United States, 632 F.3d at 1344 ("[T]he trial court's finding that the bond amount was not just compensation is a collateral attack on the Arizona Court's approval of the bond amount."); Allustiarte v. United States, 256 F.3d at 1352 ("To permit collateral attacks on bankruptcy court judgments would 'seriously undercut[ ] the orderly process of the law.'" (quoting Celotex Corp. v. Edwards, 514 U.S. 300, 313 (1995))).[13]

---

[12] In an non-precedential decision, the United States Court of Appeals for the Federal Circuit also indicated:

> The Court of Federal Claims is a court of limited jurisdiction. It is vested with jurisdiction under the Tucker Act to adjudicate monetary claims against the United States founded upon the Takings Clause of the United States Constitution, Acts of Congress, regulations, or contracts, and requires a money mandating act to confirm jurisdiction. 28 U.S.C. § 1491(a)(1); United States v. Mitchell, 463 U.S. 206, 215–218 (1983). The Court of Federal Claims "has no jurisdiction to adjudicate any claims whatsoever under the federal criminal code." Joshua v. United States, 17 F.3d 378, 379 (Fed. Cir. 1994). It does not have jurisdiction to review the judgments of the United States district courts or circuit courts. Shinnecock Indian Nation v. United States, 782 F.3d 1345, 1353 (Fed. Cir. 2015). We thus find no error in the Court of Federal Claims' conclusions that it lacks jurisdiction to review the judgments of the Eighth Circuit, and that Garcia has failed to allege a cause of action over which the court has subject matter jurisdiction.

Garcia v. United States, No. 2015-5099, 2015 WL 5845350, at *1 (Fed. Cir. Oct. 8, 2015).

[13] The Federal Circuit in Shinnecock noted that

> [t]he situation presented here parallels that presented in Allustiarte, 256 F.3d at 1351–53. There the plaintiffs brought suit in the Court of Federal

Based on these principles, the Court of Federal Claims and the Federal Circuit have rejected a variety of claims that required the court to review the decisions of another federal tribunal in a takings context. See, e.g., Shinnecock Indian Nation v. United States, 782 F.3d at 1348, 1352–53 (affirming a Court of Federal Claims decision, which barred plaintiff from amending its complaint to add a judicial takings claim because such a claim would be "futile"); Innovair Aviation Ltd. v. United States, 632 F.3d at 1344 (holding that the court lacked jurisdiction over plaintiff's "collateral attack" on an Arizona court's approval of a res bond); Barth v. United States, 76 F. App'x at 945–46 (ruling that the Court of Federal Claims lacked jurisdiction to determine whether a federal court's decision not to abate a nuisance constituted a taking); Vereda, Ltda. v. United States, 271 F.3d at 1375 (holding that the Court of Federal Claims lacked jurisdiction to review an in rem administrative forfeiture of property); Allustiarte v. United States, 256 F.3d at 1352 (holding that the Court of Federal Claims lacked jurisdiction to determine if a bankruptcy court effected a taking of the plaintiff's property by approving the bankruptcy trustee's alleged mishandling of assets); Joshua v. United States, 17 F.3d at 380 (affirming the dismissal of the plaintiff's claim that the dismissal of his earlier federal district court claim violated the Takings Clause); Martl v. United States, 2010 WL 369212, at *2 (dismissing for lack of jurisdiction where plaintiff claimed that a federal district court committed a taking when it issued a default judgment against her that required the sale of her property).

The case of Boise Cascade Corp. v. United States stands alone as the one case in which the Federal Circuit has found that the United States Court of Federal Claims did in fact have jurisdiction over a judicial takings claim. See Boise Cascade Corp. v. United

---

Claims alleging that bankruptcy courts in the Ninth Circuit took their property without just compensation when they allowed the plaintiffs' assets to be sold at less than fair value. Id. at 1350–51. The Court of Federal Claims dismissed the plaintiffs' suit for lack of jurisdiction and this court affirmed. We explained that the Court of Federal Claims was without authority to scrutinize the decisions of the bankruptcy courts (which are subordinate to Article III courts) and "to determine whether [the plaintiffs] suffered a categorical taking of their property at the hands of the . . . courts."

Shinnecock Indian Nation v. United States, 782 F.3d at 1352-53 (quoting Allustiarte v. United States, 256 F.3d at 1352). The Federal Circuit in Shinnecock noted that "[a] similar analysis applies here. The Nation alleges that in applying the doctrine of laches to bar its land claim, the district court improperly "took away the Nation's legal right to sue for compensation for its stolen land." The Court of Federal Claims, however, is without authority to adjudicate the Nation's claim that it suffered a compensable taking at the hands of the district court." Id. at 1353. The Federal Circuit concluded that "the Court [of Federal Claims] has no jurisdiction to review the decisions 'of district courts and cannot entertain a taking[s] claim that requires the court to scrutinize the actions of another tribunal.'" Id. (quoting Innovair Aviation Ltd. v. United States, 632 F.3d at 1344).

States, 296 F.3d at 1344. The plaintiff in Boise Cascade Corp. alleged that a federal district court took its property when the court issued an injunction preventing Boise from logging on its land unless it obtained an Incidental Take Permit pursuant to the Endangered Species Act. See id. at 1341–42. The Federal Circuit ultimately dismissed the claim as unripe, but first it determined that the Court of Federal Claims could exercise jurisdiction. The Federal Circuit in Boise acknowledged that "Article III forbids the Court of Federal Claims, an Article I tribunal, from reviewing the actions of an Article III court." Id. at 1344 (citing Plaut v. Spendthrift Farm, Inc., 514 U.S. at 218–19). The Federal Circuit found, however, that:

> [R]esolution of this case did not require the Court of Federal Claims to review the merits of the district court's order enjoining Boise from logging without a permit.  Boise has accepted the validity of the injunction, and only filed suit in the Court of Federal Claims to determine whether the Service's assertion of jurisdiction over it by seeking and obtaining the injunction worked a taking of its property that requires compensation under the Takings Clause.  Whether or not the government action took Boise's property was not before the district court, nor could it have been.  Because Boise seeks over $10,000 in compensation for this alleged taking, the Court of Federal Claims is the sole forum available to hear Boise's claim.  See 28 U.S.C. § 1346(a)(2) (2000).  Because the takings claim does not require the trial court to review the district court's actions, there is no constitutional defect in the Court of Federal Claims' assertion of jurisdiction over this case.

Id. In addition to emphasizing that the Court of Federal Claims was not required to review the merits of the decision of the District Court, the Boise court sought to distinguish Boise's claim from other cases in which the Federal Circuit found that the Court of Federal Claims lacked jurisdiction to scrutinize the decisions of other tribunals, with particular focus on Allustiarte v. United States, 256 F.3d 1349 and Vereda, Ltda. v. United States, 271 F.3d 1367.  See Boise Cascade Corp. v. United States, 296 F.3d at 1344–45.

As noted above, in Allustiarte, several plaintiffs alleged that they suffered a taking at the hands of the bankruptcy courts in the Ninth Circuit.  See Allustiarte v. United States, 256 F.3d at 1350–51. Specifically, they alleged that the court-appointed bankruptcy trustee had mishandled their assets, and the bankruptcy court wrongfully approved the trustee's actions.  See id. The Federal Circuit held that the Court of Federal Claims lacked jurisdiction over the plaintiffs' claims because determining whether a judicial taking occurred "would require the court to scrutinize the actions of the bankruptcy trustees and courts," which the Court of Federal Claims lacks jurisdiction to do. Id. at 1352 (citing Joshua v. United States, 17 F.3d at 380).  In Vereda, the Federal Circuit similarly held that a mortgagee may not assert a Fifth Amendment taking claim in the Court of Federal Claims following the government's in rem administrative forfeiture of the property securing its mortgage. See Vereda, Ltda. v. United States 271 F.3d at 1396, 1375.

The <u>Boise</u> court held that "unlike in <u>Vereda</u> and <u>Allustiarte</u>, Boise's takings claim is not based on the propriety of the district court's decision, and the trial court therefore would not be called upon to review the merits of the district court's decision in order to decide the merits of Boise's claim."  <u>Boise Cascade Corp. v. United States</u>, 296 F.3d at 1345.  Boise's challenge was not to the validity of the district court's injunction, but to the government's use of the courts to enforce the provisions of the Endangered Species Act and restrict the use of its land.  As the court noted, the fact that the government "chose to effectuate its mandate to enforce the ESA [Endangered Species Act] through a court action rather than through an agency cease and desist order, for instance, cannot insulate the United States from its duty to pay compensation that may be required by the Fifth Amendment."  <u>Id.</u>

In the above captioned cases, the court must determine if Petro-Hunt's judicial takings claim requires the court to scrutinize the United States Court of Appeals for the Fifth Circuit's decision, or, like <u>Boise</u>, can be decided without the need to scrutinize the ruling of another tribunal.  This court finds that plaintiff's claim is not like <u>Boise</u>, and would require the court to scrutinize the decision of the Fifth Circuit.  Plaintiff's claim does not attack the discretionary action of a government agency, which chose to exercise its authority through the courts.  Instead, these cases are more like those that ask this court to review the decision of an "impartial judicial arbiter whose actions have been improperly appealed to the Court of Federal Claims." <u>Boise Cascade Corp. v. United States</u>, 296 F.3d at 1345. Indeed, deciding Petro-Hunt's current claim on the merits would require this court to determine if Petro-Hunt had an established property right that was taken by the Fifth Circuit.  <u>See</u> <u>Stop the Beach Renourishment, Inc. v. Fla. Dep't of Envtl. Prot.</u>, 560 U.S. at 715 (plurality opinion).  The only way to determine if Petro-Hunt had an established property right in the mineral servitudes is to decide whether the mineral servitudes had prescribed, as a matter of federal common law, to the United States prior to the Fifth Circuit's 2007 decision.  In other words, this court would have to determine if the Fifth Circuit was correct in its finding that <u>Little Lake Misere</u> and <u>Central Pines</u> established that lands sold to the United States before the enactment of Act 315, like the surface lands in question here, were subject to Louisiana's ten-year prescription rule.  <u>See</u> <u>Petro-Hunt, L.L.C. v. United States</u>, 365 F.3d at 392–93.  If the Fifth Circuit was correct in this finding, then Petro-Hunt lost possession of its land long before the 2007 Fifth Circuit decision and it had no established property right that could have been taken by the court's decision.  If the Fifth Circuit was incorrect in its application of precedent, and actually created a new rule depriving Petro-Hunt of its previously established property, then the Fifth Circuit may have effected a compensable taking of Petro-Hunt's mineral servitudes. This court lacks jurisdiction to determine whether or not the Fifth Circuit correctly interpreted its own precedent, and, therefore, lacks jurisdiction over plaintiff's judicial takings claim. <u>See</u> <u>Shinnecock Indian Nation v. United States</u>, 782 F.3d at 1348, 1352–53; <u>Allustiarte v. United States</u>, 256 F.3d at 1352.

In <u>Stop the Beach</u>, the majority of the Supreme Court made clear that "[t]here is no taking unless petitioner can show that, before the Florida Supreme Court's decision,

littoral-property owners had rights to future accretions and contact with the water superior to the State's right to fill in its submerged land." Stop the Beach Renourishment, Inc. v. Fla. Dep't of Envtl. Prot., 560 U.S. at 730. In deciding whether the petitioner had an established property right, the Court analyzed the challenged decision and determined that the Florida Supreme Court had reached the correct conclusion. Id. at 730–33 (majority opinion) (holding that the Florida Supreme Court decision was consistent with the state's property law in finding that petitioner did not have the littoral rights). Similarly, this court would have to analyze the correctness of the Fifth Circuit decision to rule on plaintiff's claim. In Stop the Beach, the Supreme Court had the authority to scrutinize the decision of the Florida Supreme Court, as the case had properly been appealed to the Supreme Court for review. See Stop the Beach Renourishment, Inc. v. Fla. Dep't of Envtl. Prot., 557 U.S. 903 (2009) (granting certiorari). The Court of Federal Claims, however, has no appellate authority over decisions of the Fifth Circuit and cannot undertake the type of review that the Supreme Court exercised in Stop the Beach.

Petro-Hunt, like the plaintiffs in Allustiarte and Martl, insists that the court does not have to scrutinize the decision of another tribunal, because plaintiff does not challenge whether or not the Fifth Circuit was correct. Before this court, plaintiff claims that "the Court does not have to examine the propriety of a court's decision to resolve Petro-Hunt's takings claim." This language is similar to the Allustiarte plaintiffs' argument before the Court of Federal Claims, in which the Allustiarte plaintiffs claimed that they were "not seeking to avoid, defeat, or evade any judgment of a bankruptcy court," but only to obtain just compensation for the taking. Allustiarte v. United States, 46 Fed. Cl. 713 (2000), aff'd, 256 F.3d 1349 (Fed. Cir.), cert. denied, 534 U.S. 1042 (2001). Likewise in Martl v. United States, the Martl plaintiff claimed that the case before the Court of Federal Claims was not a collateral attack against the district court judgment. The Martl court, however, found that "there is no other interpretation of her suit. Her complaint is replete with allegations of wrongdoing and errors of law committed by the district court to the exclusion of any other averred basis for relief." Martl v. United States, 2010 WL 369212, at *2.

Petro-Hunt's own submissions undercut the argument that it is not challenging the propriety of the Fifth Circuit's decision. For example, plaintiff's response to the motion to dismiss frames this court's role as determining if the Fifth Circuit decisions "effectively transformed Petro-Hunt's private property into public property," and argues that the mineral servitudes were "imprescriptible" prior to the Fifth Circuit decision in 2007. Additionally, plaintiff argues that Nebo Oil should have controlled the outcome of the case, and argues that the Fifth Circuit's decision was incorrect, and claims that "[t]he ultimate result of the QTA [quiet title action] was inconsistent with the principles set forth in Nebo [Oil] and the other relevant principles applicable to Petro-Hunt's established property right and deprived Petro-Hunt of its ownership of the mineral servitudes in perpetuity." This court, however, cannot determine if plaintiff's mineral servitudes were "previously imprescriptible," or "transformed" from private to public property, without determining whether the Fifth Circuit's interpretation of precedent was correct. Because the court cannot determine whether the Fifth Circuit took plaintiff's property without scrutinizing the

Appx0067

Fifth Circuit's decision, the court lacks jurisdiction over plaintiff's claim. The court does not need to address the remaining arguments in defendant's motion to dismiss or the parties' cross motions for summary judgment.[14]

## CONCLUSION

For the foregoing reasons, defendant's motion to dismiss is hereby **GRANTED**. Plaintiff's complaint is **DISMISSED**. The Clerk of the Court shall enter **JUDGMENT** consistent with this opinion in Case No. 00-512L and Case No. 11-775L.

**IT IS SO ORDERED.**

s/Marian Blank Horn
**MARIAN BLANK HORN**
**Judge**

---

[14] As conceded by plaintiff's counsel at oral argument, if the court grants defendant's motion for a lack of jurisdiction as a result of the judicial taking, both of plaintiff's cases should be dismissed. Plaintiff's counsel stated, first "[i]f you rule against us on jurisdiction and the cause of action, then I would think you would dismiss both cases," and in response to a question from the bench reiterated, "if you dismiss for either lack of jurisdiction or if you hold there's no cause of action for a judicial taking, yes, you would dismiss both." Plaintiff retains all appeal rights regarding Judge Allegra's earlier decisions, as well as the ability to appeal this decision.

22

***Petro-Hunt, L.L.C. v. United States*** (***Petro-Hunt III***)**, No. 06-30095,
2007 WL 715270 (5th Cir. Mar. 6, 2007)**

2007 WL 715270
Only the Westlaw citation is currently available.
This case was not selected for
publication in the Federal Reporter.
Not for Publication in West's Federal Reporter
See Fed. Rule of Appellate Procedure 32.1
generally governing citation of judicial
decisions issued on or after Jan. 1, 2007. See
also Fifth Circuit Rules 28.7, 47.5.3, 47.5.4.
(Find CTA5 Rule 28 and Find CTA5 Rule 47)
United States Court of Appeals,
Fifth Circuit.

PETRO-HUNT, L.L.C.; Hunt
Petroleum Corporation; and Kingfisher
Resources, Inc., Plaintiffs-Appellants,

v.

UNITED STATES of America, Aspect Resources,
L.L.C.; Bayou Petroleum Co.; First Texas
Hydrocarbons, Inc.; Oscar C. Forland; Gulf Coast
Oil & Gas Co.; Justiss Oil Co. Inc.; MB Exploration,
L.L.C; Northstar Energy, L.L.C.; Palmer Petroleum,
Inc.; Howell R. Spear; John P. Strang; Ocean Energy
Resources Inc., formerly known as UMC Petroleum
Corp.; Wheless T.D.L. Exploration Co., L.L.C.;
Devon S.F.S. Operating Inc., formerly known as
Santa Fe Snyder Corp.; J. Bradley Jeffreys; Energy
Arrow Exploration L.L.C., Defendants-Appellees.

No. 06-30095.
|
Decided March 6, 2007.

**Attorneys and Law Firms**

J. Ralph White, Freeland & Freeland, Oxford, MS, W.
Michael Adams, Blanchard, Walker, O'Quin & Roberts,
Shreveport, LA, John Mason McCollam, Matthew
Joseph Randazzo, III, Aimee Williams Hebert, Gordon,
Arata, McCollam, Duplantis & Eagan, New Orleans, LA,
for Plaintiffs-Appellants.

Karen J. King, U.S. Attorney's Office Western District
of Louisiana, Patrick S. Ottinger, Ottinger Hebert,
Lafayette, LA, John Smeltzer, U.S. Department of
Justice Environment & Natural Resources Division,
Washington, DC, Evans Martin McLeod, Phelps Dunbar,
New Orleans, LA, Charles Brownman, Denver, CO,

Edward Nicholas Milam, Urban Libiolics Foundation,
Evanston, IL, R. Joseph Wilson, Gaharan & Wilson, Jena,
LA, Jaren Howard, David L. Smelley, Hargrove Smelley
& Strickland, James Fleet Howell, Shreveport, LA, for
Defendants-Appellees.

Oscar C. Forland, Silverhill, AL, pro se.

Howell R. Spear, Pensacola, FL, pro se.

John P. Strang, New York, NY, pro se.

J. Bradley Jeffreys, San Diego, CA, pro se.

Appeal from the United States District Court for the
Western District of Louisiana.

Before SMITH, BARKSDALE, and DENNIS, Circuit
Judges.

**Opinion**

PER CURIAM: [*]

[*]   Pursuant to 5th Cir. R. 47.5, the court has determined
      that this opinion should not be published and is not
      precedent except under the limited circumstances set
      forth in 5th Cir. R. 47.5.4.

 **\*1**  Plaintiffs Petro-Hunt, L.L.C.; Hunt Petroleum Corp.;
and Kingfisher Resources, Inc. (collectively, "Petro-
Hunt") brought this suit in order to quiet title to 95
Louisiana mineral servitudes claimed by the United
States. The servitudes are related to 180,000 acres of
surface land acquired by the United States in the late 1930s
for incorporation into the Kisatchie National Forest. The
case now comes before us on its second appeal. *See
Petro-Hunt, L.L.C. v. United States,* 365 F.3d 385 (5th
Cir.2004). Our prior opinion lays out the extensive factual
and procedural history behind the case. On this appeal,
Petro-Hunt argues that the district court erred on remand
by denying a motion for trial; failing that, Petro-Hunt
argues that the court's prior mandate is clearly erroneous
and should be withdrawn. For the reasons below, we
AFFIRM.

The central issue behind the suit is whether Louisiana Act
315, which passed subsequent to the acquisition at issue
in this case, operates retroactively to render the mineral
servitudes imprescriptible, such that they may never revert
to the United States through non-use. The lands to which
these servitudes relate were acquired by the United States

Appx2080

at the same time as the 800 acres of land and the single mineral servitude at issue in our earlier decision in *United States v. Nebo Oil,* 190 F.2d 1003 (5th Cir.1951). For present purposes, it is enough to note that the earlier Petro-Hunt appeal determined that the *Nebo Oil* decision did not quiet title to anything beyond the 800 acres of land and the single mineral servitude at issue in that case and that therefore *Nebo Oil* did not, through either res judicata or collateral estoppel, bar the present suit. *See Petro-Hunt,* 365 F.3d at 396-97.

Having reached that determination, the panel then looked to the Supreme Court's decision in *United States v. Little Lake Misere Land Co.,* 412 U.S. 580 (1973), and this court's subsequent decision in *Central Pines Land Co. v. United States,* 274 F.3d 881 (5th Cir.2001). Following that precedent, the first *Petro-Hunt* panel determined that federal law governed the choice-of-law decision presented by the facts of this case and that Act 315 could not be used as the federal rule of decision because it is hostile to the federal interest at stake. *Petro-Hunt,* 365 F.3d at 399. Accordingly, the panel found that "the 95 servitudes that were not at issue in *Nebo Oil* are subject to the contractual provisions permitting prescription after ten years' nonuse" and remanded the case "so that the district court can determine which servitudes have in fact prescribed." *Id.*

On remand, Petro-Hunt filed a motion for trial on the question of whether Act 315 was "hostile to the government" and therefore could not be applied to the facts of this case-in other words, whether the 95 servitudes in this case are subject to the rule of prescription. The district court denied the motion for trial, citing the mandate in the first appeal for the proposition that the "only issue to be determined is which of the #95 servitudes that were not at issue in *Nebo Oil* ' have in fact prescribed for nonuse." The parties then stipulated that five of the servitudes-constituting approximately 109,844.5 acres-still exist through use and that the remainder had prescribed. The district court entered final judgment based on this stipulation, granting Petro-Hunt's earlier alternative motion for summary judgment. The judgment declared the five extant servitudes to be in "full force and effect" and declared any leases on lands burdened by those servitudes to be "null and void." On appeal, Petro-Hunt argues that the district court overstepped its bounds by denying the motion for trial; failing that, Petro-Hunt argues that the court's prior mandate is clearly erroneous

and should be withdrawn. We find no merit in either assertion.

**\*2** Petro-Hunt's first argument is that the prior panel's statement regarding the applicability of *Little Lake Misere* and *Central Pines* to the present case constituted dicta, since only the questions of res judicata and collateral estoppel were raised before either the district court or the circuit panel during the first appeal. This court, however, has decided issues "on which the lower court has had no occasion to rule," in situations when "the issue before [the court] is a purely legal one." *Cont'l Sav. Ass'n v. U.S. Fid. & Guar. Co.,* 752 F.2d 1239, 1244 n. 4 (5th Cir.1985). Such rulings are "most efficient to dispose of [an] issue promptly, thus truncating the subsequent development of [a] case." *Id.* Where deciding the issue "require [s] no further factfinding by the district court and ... ha[s] been briefed by the parties in trial briefs included in the record," such action by the court "promotes the finality of litigation, consistent with the goal that "the federal system aims at a single judgment and a single appeal." *Harris v. Sentry Title Co.,* 806 F.2d 1278, 1280 n. 1 (5th Cir.1987) (per curiam) (citing 1B JAMES WM. MOORE ET AL., MOORE'S FEDERAL PRACTICE ¶ 0.404[10] (1984)).

> [T]his Court often addresses issues for the guidance of the parties and the district court on remand. It cannot be said that such considered statements should be dismissed as dictum simply because the Court was not absolutely required to raise and address such an issue. Such statements constitute the "professed deliberate determinations of the [court]" and, when done in this fashion, may not be summarily dismissed as dictum. *See* BLACK'S LAW DICTIONARY 409 (5th ed.1979).

*Harris,* 806 F.2d at 1280 n. 1.

We find that the earlier panel offered just such a deliberate, considered statement in ruling on the choice-of-law issue. The district court could not, therefore, have properly disregarded the panel's explicit directions regarding the scope of the remand and acted properly in limiting its review in accordance with those instructions. *See Briggs v. Penn. R.R. Co.,* 334 U.S. 304 (1948); *Harris,* 806 F.2d at 1280 n. 1.

With regard to Petro-Hunt's second argument-that the prior mandate of this court is clearly erroneous and should be withdrawn-we begin by noting the well-established rule that one panel within this circuit may not overrule

WESTLAW  © 2016 Thomson Reuters. No claim to original U.S. Government Works.

Appx2081

the opinion of another. *Ryals v. Estelle,* 661 F.2d 904 (5th Cir.1981); *United States v. Henry,* 727 F.2d 1373 (5th Cir.1984). Furthermore, the law-of-the-case doctrine forbids us from re-examining issues of law or fact decided in a prior appeal. *See United States v. Becerra,* 155 F.3d 740, 752 (5th Cir.1998). There are three exceptions to this doctrine: we may re-examine an earlier decision only when (1) substantially different evidence is presented; (2) there is a change in controlling legal authority; or (3) "the decision was clearly erroneous and would work a manifest injustice." *Id.; see also White v. Murtha,* 377 F.2d 428 (5th Cir.1967). "Mere doubts or disagreement about the wisdom of a prior disagreement ... will not suffice." *Hopwood v. State of Texas,* 236 F.3d 256, 272 (5th Cir.2000). Petro-Hunt relies on the third of these narrow exceptions, but in support only reasserts the arguments raised before this court during the first appeal. We are not persuaded that the prior panel decision results in such manifest injustice as to warrant the exception, and we therefore decline to apply the exception and revisit the earlier decision.

**\*3** The district court properly limited the scope of its remand in accordance with the earlier panel instructions, and Petro-Hunt has not shown that the earlier decision on appeal is so clearly erroneous as to work a manifest injustice. We therefore AFFIRM the district court's ruling.

**All Citations**

Slip Copy, 2007 WL 715270

---

© 2016 Thomson Reuters. No claim to original U.S. Government Works.

© 2016 Thomson Reuters. No claim to original U.S. Government Works.

Appx2082

## CERTIFICATE OF SERVICE

I hereby certify that on July 5, 2016, the foregoing Brief of Plaintiff-Appellant was electronically filed with the Clerk of the Court for the United States Court of Appeals for the Federal Circuit using the appellate CM/ECF system. All participants in the case are registered CM/ECF users and service will be accomplished by the appellate CM/ECF system.


July 5, 2016                          /s/ J. Ralph White

J. Ralph White
WHITE ANDREWS &
SHACKELFORD, LLC
650 Poydras Street, Suite 2319
New Orleans, Louisiana 70130
(504) 799-2585 (phone)
(504) 799-2586 (fax)
ralph@whiteandrews.com

*Counsel for Petro-Hunt, L.L.C.*

## CERTIFICATE OF COMPLIANCE

Counsel for Plaintiff-Appellant certifies that the brief contained herein has a proportionally spaced 14-point typeface, and contains <u>12,271</u> words, based on the "Word Count" feature of Word for Mac 2011, including footnotes and endnotes. In accordance with Federal Rule of Appellate Procedure 32(a)(7)(B)(iii) and Federal Circuit Rule 32(b), this word count does not include the words contained in the Certificate of Interest, Table of Contents, Table of Authorities, Abbreviations, and Statement of Related Cases.

July 5, 2016

<u>/s/ J. Ralph White</u>
J. Ralph White
WHITE ANDREWS &
SHACKELFORD, LLC
650 Poydras Street, Suite 2319
New Orleans, Louisiana 70130
(504) 799-2585 (phone)
(504) 799-2586 (fax)
ralph@whiteandrews.com

*Counsel for Petro-Hunt, L.L.C.*