# United States Court of Appeals
# for the Federal Circuit

PETRO-HUNT, L.L.C.

*Plaintiff-Appellant*

v.

UNITED STATES,

*Defendant-Appellee.*

On Appeal From The United States Court of Federal Claims
Case Nos. 00-512L, 11-775L, Judge Marian Blank Horn

## JOINT APPENDIX

Edmund M. Amorosi
SMITH PACHTER MCWHORTER PLC
8000 Towers Crescent Drive
Suite 900
Tysons Corner, Virginia 22182
(703) 847-6300
eamorosi@smithpachter.com

D. Joe Smith
JENNER & BLOCK LLP
1099 New York Avenue, NW
Suite 900
Washington, D.C. 20001
(202) 639-6000
jsmith@jenner.com

J. Ralph White
Sharon L. Andrews
B. Alan Baker
WHITE ANDREWS &
SHACKELFORD, LLC
650 Poydras Street, Suite 2319
New Orleans, Louisiana  70130
(504) 799-2585
ralph@whiteandrews.com

*Counsel for Petro-Hunt, L.L.C.*

**PETRO-HUNT, L.L.C. v. UNITED STATES**

**NO. 16-1981**

**JOINT APPENDIX
TABLE OF CONTENTS**

JUDGMENTS AND ORDERS

Judgment in Case No. 00-512L,
Dated February 29, 2016 (Dkt. 223) ............................................... Appx0001

Judgment in Case No. 11-775L,
Dated February 29, 2016 (Dkt. 25) ................................................. Appx0002

Opinion and Order Dismissing Petro-Hunt's Permanent Takings Claim,
Temporary Takings Claims, in part, Breach of Contract Claims, and Claims
for Reformation under 28 U.S.C. § 2501, Dated November 6, 2009
(No. 00-512L) (Dkt. 77) ........................................................ Appx0003–0029

Order Denying Petro-Hunt's Motion for Reconsideration,
Dated November 30, 2009 (No. 00-512L) (Dkt. 80)............. Appx0030–0031

Opinion and Order Dismissing Petro-Hunt's Temporary Takings Claims
under 28 U.S.C. § 1500, Dated May 2, 2012 (No. 00-512L)
(Dkt. 125) .......................................................................... Appx0032–0043

Order Denying Petro-Hunt's Motion for Reconsideration,
Dated May 30, 2012 (No. 00-512L) (Dkt. 127) .................... Appx0044–0046

Opinion and Order Dismissing Petro-Hunt's Judicial Takings Claim,
Dated February 29, 2016, Reissued for Publication, April 26, 2016
(No. 00-512L Dkt. 228; No. 11-775 Dkt. 24) ....................... Appx0047–0068

DOCKET SHEETS

Civil Docket for Case No. 1:00−cv−00512−MBH ................ Appx0069-0086

Civil Docket for Case No. 1:11−cv−00775−MBH ................ Appx0087-0089

**DOCKET ENTRIES**

Complaint, No. 00-512L,
Dated August 24, 2000 ............................................................ Appx0090-104

First Amended Complaint, No. 00-512L,
Dated June 25, 2008 (Dkt. 51) ................................................ Appx0105-124

Restated Second Amended Complaint, No. 00-512L,
Dated September 16, 2010 (Dkt. 95) ..................................... Appx0136-0162

Complaint, No. 11-775L,
Dated November 17, 2011 (Dkt. 1) ........................................ Appx0194-0217

    Exhibit 5 to Complaint, Judgment in *Petro-Hunt, L.L.C., et al. v.*
    *United States, et al.*, No. CV00-0303, Western District of Louisiana,
    Dated December 7, 2005 (No. 11-775) (Dkt. 1-2) ....... Appx0247-0280

Certain Exhibits to Initial Supplemental Brief in Support of United States'
Motion to Dismiss (No. 00-512) (Dkt. 73)

    Exhibit 3 – Letter to Ida Doup, BLM from Bradford J. Russell,
    Hunt Petroleum, re: April 10, 1991 Competitive Lease Sale
    (No. 00-512) (Dkt. 73-4) .............................................. Appx0843-0845

    Exhibit 4 – Letter to Francis Javes, BLM from Kenn Frye, Forest
    Service, re: Hunt Petroleum's letter of March 18, 1991
    (No. 00-512) (Dkt. 73-5) ........................................................ Appx0846

    Exhibit 5 – Letters to BLM from Bradford J. Russell,
    Hunt Petroleum, re: Competitive Lease Sale, November 9, 1993
    (No. 00-512) (Dkt. 73-6) .............................................. Appx0847-0848

    Exhibit 6 – Protest Denials, dated Dec. 10, 1993 and April 12, 1994
    (No. 00-512) (Dkt. 73-7) .............................................. Appx0849-0852

    Exhibit 8 – Memo to Richard Fowler from Patrick C. Murphy re:
    Ownership of Mineral Rights in and to 264,900 acres located in the
    Kisatchie National Forest, Louisiana (No. 00-512)
    (Dkt. 73-9) .................................................................... Appx0862-0870

Exhibit to Petro-Hunt's Supplemental Brief on the Timeliness of Its Breach of Contract and Takings Claims (No. 00-512) (Dkt. 74)

Exhibit D – Supplemental and Amending Affidavit Concerning Intrusive Oil, Gas, and Mineral Leases (No. 00-512) (Dkt. 74-7)............................................. Appx1061-1078

Exhibit to Memorandum in Support of United States' Motion to Dismiss for Lack of Subject Matter Jurisdiction, dated May 31, 2011 (No. 00-512) (Dkt. 109)

Exhibit 1 – Complaint, *Petro-Hunt, L.L.C., et al. v. United States, et al.*, W.D. La., Civ. Act. No. 00-0303, dated February 18, 2000 (No. 00-512) (Dkt. 109-1)........................................... Appx1126-1141

Certain Exhibits to United States' Motion to Dismiss or, in the Alternative, for Summary Judgment and Memorandum in Support (No. 00-512) (Dkt. 198)

Exhibit 2 – Memorandum in Support of Motion for Summary Judgment by Plaintiffs Against Defendants, *Petro-Hunt, L.L.C., et al. v. United States, et al.*, W.D. La., Civ. Act. No. 00-0303 (DCT ECF No. 85) (No. 00-512) (Dkt. 198-1) (excerpt).....Appx1276, Appx1287

Exhibit 4 – First Supplemental and Amended Complaint, *Petro-Hunt, L.L.C., et al. v. United States, et al.*, W.D. La., Civ. Act. No. 00-0303 (DCT ECF No. 96) (No. 00-512) (Dkt. 198-1)..........Appx1314-1317

Exhibit 11 – Order denying Motion for Trial in *Petro-Hunt, L.L.C., et al. v. United States, et al.*, No. 5:00-cv-00303-DEW-KLH (W.D. La.), dated November 21, 2005 (No. 00-512) (Dkt. 198-2)..........Appx1402

Petro-Hunt's Memorandum in Opposition to Defendant's Motion to Dismiss, dated November 14, 2008 (No. 00-512) (Dkt. 58) (excerpt)……………………………………………………..Appx2083-2091

Petro-Hunt's Memorandum in Opposition to Defendant's Motion to Dismiss, dated July 18, 2011 (No. 00-512) (Dkt. 114) (excerpt)……………………………………………………..Appx2092-2109

Exhibit to United States' Reply to Response to Motion to Dismiss Pursuant to Rule 12(b)(1), dated August 26, 2011 (No. 00-512) (Dkt. 116)

Exhibit 2 – United States' Chart Demonstrating the Substantial Factual Overlap Between the DCT and CFC Complaints (No. 00-512) (Dkt. 116-1)…………………………………………..Appx2110-2123

Petro-Hunt's Motion for Leave to File Supplemental Memorandum in Opposition to Motion to Dismiss *and* Supplemental Memorandum in Opposition to Motion to Dismiss, dated January 24, 2012 (No. 00-512) (Dkt. 122 *and* 122-1)………………………………………...Appx2124-2130

Petro-Hunt's Motion for Reconsideration of Order Dismissing in Part the Claims of Petro-Hunt based on an Alternative Claim for a Taking in the District Court for which the Court Had No Jurisdiction, dated May 29, 2012 (No. 00-512) (Dkt. 126) (excerpt)…………………………...Appx2131-2145

United States' Reply in Support of its Motion to Dismiss for Lack of Subject Matter Jurisdiction, dated August 26, 2011 (No. 00-512) (Dkt. 116) (excerpt)……………………………………………………..Appx2153-2160

## TRANSCRIPTS

Transcript of Proceedings held on November 3, 2015, before Judge Marian Blank Horn, dated November 19, 2015 (No. 00-512) (Dkt. 220 at 1, 28-33) (excerpt)……………………………………………………..Appx2146-2152

Transcript of Proceedings held on January 31, 2012, before Judge Francis Allegra, dated February 1, 2012 (No. 00-512) (excerpt)……Appx2161-2181

## NONPRECEDENTIAL OPINION

*Petro-Hunt, L.L.C. v. United States* (*Petro-Hunt III*), No. 06-30095, 2007 WL 715270 (5th Cir. Mar. 6, 2007) (per curiam)……..Appx2080-2082

# In the United States Court of Federal Claims

**No. 00-512 L**


**PETRO-HUNT, L.L.C.**


                                                     **JUDGMENT**

    **v.**

**THE UNITED STATES**


       Pursuant to the court's Opinion, filed February 29, 2016, granting defendant's motion to dismiss,

       IT IS ORDERED AND ADJUDGED this date, pursuant to Rule 58, that plaintiff's complaint is dismissed.


                                   Hazel C. Keahey
                                   Clerk of Court

**February 29, 2016**        By:    s/ Debra L. Samler

                                   Deputy Clerk


<u>NOTE</u>: As to appeal, 60 days from this date, see RCFC 58.1, re number of copies and listing of <u>all plaintiffs</u>.  Filing fee is $505.00.

# In the United States Court of Federal Claims

**No. 11-775 L**

**PETRO-HUNT, L.L.C.**

                                                           **JUDGMENT**

    **v.**

**THE UNITED STATES**

Pursuant to the court's Opinion, filed February 29, 2016, granting defendant's motion to dismiss,

IT IS ORDERED AND ADJUDGED this date, pursuant to Rule 58, that plaintiff's complaint is dismissed.

                                           Hazel C. Keahey
                                           Clerk of Court

**February 29, 2016**           By:    s/ Debra L. Samler

                                           Deputy Clerk

NOTE: As to appeal, 60 days from this date, see RCFC 58.1, re number of copies and listing of all plaintiffs.  Filing fee is $505.00.

# In The United States Court of Federal Claims

No. 00-512L

(Filed: November 6, 2009)
_____

| | |
|---|---|
| PETRO-HUNT, L.L.C., | * Takings and contract case; Motion to |
| | * dismiss under RCFC 12(b); Servitudes – |
| Plaintiff, | * prescription under Louisiana law; Mineral |
| | * leases; Statute of limitations – 28 U.S.C. |
| v. | * § 2501; Permanent takings claim – accrual |
| | * suspension rule; Permanent takings claim |
| THE UNITED STATES, | * untimely; Temporary takings; Temporary |
| | * physical takings claim accrual point; |
| Defendant. | * Temporary takings claim allegedly |
| | * occasioned by certain mineral leases made |
| | * by the United States on property owned by |
| | * plaintiff held timely; Contract claims held |
| | * untimely; Temporary takings – mineral |
| | * servitudes are compensable property |
| | * interest; Nature of mineral lease under |
| | * Louisiana law; Reformation. |

_____

## OPINION
_____

*Joseph Ralph White,* White Law Firm, New Orleans, LA, for plaintiff.

*James D. Gette*, United States Department of Justice, Washington, D.C., with whom was Acting Assistant Attorney General *John C. Cruden*, for defendant.

**ALLEGRA, Judge:**

Scylla and Charybdis were the treacherous sea monsters of Greek mythology, who lurked on the opposing sides of the Straits of Messina between Sicily and Calabria. According to lore, these nightmarish creatures were strategically placed so as to pose an inescapable threat to passing ships – sail too close to the peninsula and Scylla would seize and devour your crew with her six serpentine heads; compensate, by navigating closer to the island of Sicily, and face the loss of your entire ship in the maelstroms belched from Charybdis' gaping mouth. On the advice

of Circe, Odysseus chose to sail closer to Scylla – costing him six of his men, but leaving his ship intact to sail another day.

Some might say that, in Federal takings law, these fictional leviathans have been replaced by the doctrines of ripeness and limitations, both of which must successfully be navigated by claimants seeking to bring their cases before this court. File too early and risk having your case dismissed as premature; delay too long, however, and face the loss of your entire suit, as time-barred. *See Bayou Des Familles Dev. Corp. v. United States*, 130 F.3d 1034, 1037-38 (Fed. Cir. 1997). In some situations, litigants may find themselves between a rock and a hard place (a veiled reference, as it turns out, to the twin monsters of old).

Pending before the court in this takings and contract case is defendant's motion to dismiss under RCFC 12(b), in which defendant's principal claim – as the foregoing intimates – is that various counts are time-barred under the applicable six-year statute of limitations. For the reasons that follow, the court **GRANTS**, in part, and **DENIES**, in part, defendant's motion.

## I.      BACKGROUND

While this case has a long and complicated history, the court need summarize here only those facts necessary to provide context.

Unlike other states, Louisiana does not recognize the existence of separate mineral estates. Instead, mineral rights take the form of a mineral servitude, the holder of which has the right to enter the property and extract the minerals. *See* La. Rev. Stat. § 31:21. Louisiana law has long provided that such servitudes are extinguished by "prescription resulting from nonuse for ten years." La. Rev. Stat. § 31:27; *see also Central Pines Land Co. v. United States*, 274 F.3d 881, 884 (5th Cir. 2001), *cert. denied*, 537 U.S. 822 (2002). The period of prescription on mineral servitudes begins to run on the date a servitude is created, and is interrupted only by "good faith operations for the discovery and production of minerals." La. Rev. Stat. § 31:20. This rule may not be abrogated by contract. *See Leiter Minerals, Inc. v. California Co.*, 132 So. 2d 845, 853 (La. 1961).

In 1932, five Louisiana lumber companies agreed to pool the mineral rights on their respective lands. They created a joint venture called the "Good Pine Oil Company" (Good Pine), to which they conveyed the rights to explore and develop their property for the production of oil, gas and sulphur. Between November 12, 1932, and May 3, 1934, two of the five companies, Bodcaw Lumber and Grant Timber, made six conveyances of mineral rights, involving 180,000 acres of land, to Good Pine. As the affected parcels were noncontiguous, the transfers created multiple mineral servitudes under Louisiana law – ninety-six in all. Each of the deeds conveying mineral rights to Good Pine contained a clause explicitly providing that the ten-year period of prescription applied.

-2-

In the 1930s, the United States sought to buy land in Louisiana to consolidate into a national forest authorized by the Weeks Act of 1911, 36 Stat. 961, ch. 186, *as amended by* the Clarke-McNary Act of 1924, 43 Stat. 653, ch. 348.  Although the Weeks Act allowed owners selling property to the United States to reserve their rights to minerals, *see* 36 Stat. 962, owners of large tracts of land in Louisiana were unwilling to sell their property to the United States, cognizant of several court decisions that had held that the reservation of mineral rights in Louisiana created only a "right in the nature of a servitude" which was subject to the prescription rule outlined above.  After Bodcaw Lumber and Grant Timber rejected an offer to sell their surface estates to the United States, the Forest Service of the United States Department of Agriculture (the Forest Service) supplied the companies with an opinion by the Assistant Solicitor of the Department of Agriculture declaring that the prescription provisions of the Louisiana Civil Code would not apply to land sold to the United States under the Weeks Act.  Allegedly in reliance on this opinion, Bodcaw Lumber and Grant Timber agreed to sell the surface estates of various tracts of timber land to the United States.

From November 1934 through January 1937, Bodcaw Lumber and Grant Timber conveyed to the United States the surface rights to approximately 180,000 acres of land located in Grant, Winn and Natchitoches Parishes.  The eleven instruments of transfer all expressly excluded from the transactions the mineral servitudes that had previously been conveyed to Good Pine.  At the time of these sales, the officers and directors of Bodcaw and Grant believed that the mineral rights underlying this land were valuable.  It is alleged that they would not have sold the timber lands to the United States at the price agreed had they thought the prescriptive provisions of Louisiana law applied.

In the years that followed, the United States' efforts to acquire land in Louisiana continued to be met by resistance from landowners fearful of losing their mineral reservations through prescription.  In 1940, the Louisiana Legislature passed Act 315 (the 1940 Act) to eliminate the rule of prescription for mineral rights on lands held by the United States:

> [W]hen land is acquired by conventional deed or contract, condemnation or expropriation proceedings by the United States of America . . . and by the act of acquisition, verdict or judgment, oil, gas, and/or other minerals or royalties are reserved, or the land so acquired is by the act of acquisition conveyed subject to a prior sale or reservation of oil, gas and/or other minerals or royalties, still in force and effect, said rights so reserved or previously sold shall be imprescriptible.

La. Rev. Stat. § 9:5806 (Supp. 1973) (repealed 1975); *see also* La. Rev. Stat. § 31:149 (2004) (codifying a similar rule).  The purpose of the 1940 Act was to facilitate the Forest Service's purchase of large tracts of lands for national forests and parks, as well as military installations. *See United States v. Little Lake Misere Land Co.*, 412 U.S. 580, 599 & n.16 (1973) (citing *Leiter Minerals, Inc.*, 132 So. 2d at 851).  Sometime after this statute was passed, Nebo Oil Company (Nebo Oil) acquired all of the mineral rights formerly held by Good Pine.

Despite its prior representations, the United States, in 1948, filed a declaratory judgment action against Nebo Oil to quiet title to the minerals on a particular servitude claimed by the company as successor in interest to Good Pine. The complaint referred to a specific parcel, approximately 800 acres in size, lying in portions of section 19 (Township 13 North, Range 6 West) and section 24 (Township 13, Range 7 West) in Natchitoches Parish. This parcel was one of several acquired by the United States through a February 11, 1936, deed from Bodcaw Lumber, which covered 24,943.93 acres. Nebo Oil claimed a mineral servitude on the 800-acre parcel as a result of the 1932 conveyance of mineral rights from Bodcaw to Good Pine. In its complaint, the United States averred that: (i) no drilling operations had been conducted on the 800-acre parcel during the ten-year period beginning on November 12, 1932; (ii) the mineral servitude on the parcel had, therefore, prescribed for nonuse; and (iii) Nebo Oil intended to drill a well on the land and had advised the government that the company would resist interference. The United States sought declaratory relief and an order permanently enjoining Nebo Oil from entering the 800-acre parcel for mineral production.

The United States District Court for the Western District of Louisiana concluded, *inter alia*, that the mineral rights underlying the tract in question were imprescriptible by virtue of the 1940 Act. *United States v. Nebo Oil Co., Inc.*, 90 F. Supp. 73, 83-84 (W.D. La. 1950). It rejected defendant's claim that the Louisiana statute was unconstitutional, as interfering with the United States' rights to the minerals. Via the transaction, it noted, the United States "had no vested property right in such minerals, either present or future," but rather had only the "vaguest expectancy of acquiring them at some future time" based on a contingency that could be changed by local law. *Id.* at 84.

On appeal, the United States Court of Appeals for the Fifth Circuit affirmed. *United States v. Nebo Oil Co., Inc.*, 190 F.2d 1003 (5th Cir. 1950). That court first noted that it was bound by rulings of the Supreme Court of Louisiana, which in considering the impact of the 1940 Act on another 1936 sale made by Bodcaw Lumber to the United States, had "held that Act 315 of 1940 was applicable because of the general rule [in Louisiana] that laws of prescription and those limiting the time within which actions may be brought are retrospective in their operation." *Id.* at 1008 (citing *Whitney Nat. Bank of New Orleans v. Little Creek Oil Co., Inc.*, 33 So. 2d 693 (La. 1947)). After carefully reviewing other relevant precedents, the court reaffirmed the district court's holding that the statute was constitutional, concluding –

> Act 315 of 1940 provides that when lands are conveyed to the United States subject to a prior sale or reservation of oil, gas, or other minerals still in force and effect, the rights so reserved or previously sold shall be imprescribable. It does not state or imply that the reserved rights shall be increased or varied but only that they shall not be lost by prescription. The consideration of $1.75 per acre paid by the United States did not cover the value of any mineral rights. Indeed, since the minerals underlying the lands had previously been sold to Good Pine Oil without limit for time of their enjoyment, Bodcaw did not own any minerals which it could sell to the United States. Neither could it reserve nor sell the expectation of a servitude lapsed for nonuser. All that Bodcaw had which it could sell to the United States was the timber land itself. That was the obligation of the contract

-4-

and it remains unimpaired.  By virtue of its ownership of the land appellant could merely hope that the outstanding servitude might lapse but this hope or expectancy was born of a statute of prescription based on the then existing public policy of the State as declared by its legislature.  It was not a part of the obligation of the contract.  It was wholly given by law and the power that gave it could increase, diminish, or otherwise alter, or wholly take it away without violating the Federal Constitution.

*Nebo Oil*, 190 F.2d at 1010 (citations omitted).

So stood the law for twenty years.  Subsequent to the Fifth Circuit's decision, Nebo Oil placed affidavits in the land records of Grant, Winn and Natchitoches parishes in Louisiana wherein it claimed title, *inter alia*, to all the mineral rights conveyed to Good Pine through the conveyance instruments described above.  During this same period, the land records of the Forest Service reflected that the minerals underlying the land in question were held by others in perpetuity.

In 1969, the United States filed suit in the United States District Court for the Western District of Louisiana seeking to quiet title to two parcels of land which it had acquired pursuant to the Migratory Bird Conservation Act, 45 Stat. 1222, 16 U.S.C. § 715, *et seq.*, as part of the Lacassine Wildlife Refuge.  The two transfer documents reserved to Little Lake Misere the rights to minerals for a period of ten years (and as long as any production begun during this period continued), and recited that, after this period, "complete fee title to said lands shall thereby become vested in the United States."  Although no production occurred during the period indicated, Little Lake Misere argued that it retained the right to the minerals under the 1940 Act.  The district court and, in turn, the Fifth Circuit agreed, relying on the earlier *Nebo Oil* decision.  *See United States v. Little Lake Misere Land Co.*, 453 F.2d 360 (5th Cir. 1971).  But, the Supreme Court granted certiorari and reversed.  *United States v. Little Lake Misere Land Co., Inc.*, 412 U.S. 580 (1973).

The Court did not reject the *Nebo Oil* decision.  Rather, invoking the choice-of-law doctrine in *Clearfield Trust Co. v. United States*, 318 U.S. 363 (1943), it held that the Fifth Circuit had erred in applying Louisiana state law.  It reasoned that because the land acquisition agreement was "explicitly authorized" by the Migratory Bird Conservation Act and thus "ar[ose] from and [bore] heavily upon a federal regulatory program," federal law governed.  412 U.S. at 593-94.  The court determined that applying the 1940 Act would deprive the United States of its "bargained-for-contractual interests" by abrogating "a consummated land transaction under a contract which specifically defined conditions for prolonging the vendor's mineral reservation."  *Id.* at 597.  It held instead that the appropriate rule of decision should be supplied by either federal common law or "residual" state law, neither of which would give effect to the 1940 Act "as plainly hostile to the interests of the United States" and both of which instead would give effect to the contract terms.  *Id.* at 597, 604.  Notably, the Court observed, albeit in *obiter dicta*, that without a contractual term setting out the conditions under which the United States would obtain the mineral rights, "it might be said that the Government acknowledged and intended to be bound by unforeseeable changes in state law."  *Id.* at 602-03.

-5-

After the decision in *Little Lake Misere*, the United States began granting mineral leases allowing the exploitation of minerals in the servitudes in question. At first, this activity was sporadic. While the parties disagree as to the exact timing of these leases (and, indeed, even as to number thereof), it appears that the wide majority of them were granted beginning in 1991, with more than forty-five leases made from that year up to the beginning of this lawsuit. Each of the leases was for a period of ten years.

Issues regarding the application of the 1940 Act rose yet again in the late 1990s. At that time, Central Pines Land Co. filed a declaratory judgment action against the United States and several oil companies that had entered into lease agreements with the United States for the exploration and production of oil and gas in the area of various servitudes. On April 7, 1999, the district court ruled that the 1940 Act was inapplicable to a 1929 servitude created before the 1940 passage of the Act, but applied to servitudes that arose in 1941 through 1981, rendering the latter servitudes imprescriptible. On July 28, 2000, the same court ruled that, based on inactivity, the 1929 servitude, in fact, had prescribed.

In affirming these rulings, the Fifth Circuit first decided whether *Little Lake Misere* required application of federal common law to the case. *Central Pines Land Co.*, 274 F.3d at 888. Noting that the Supreme Court's ruling had hinged, in part, on the interpretation of a particular land acquisition agreement, the Fifth Circuit observed that the United States' right to the minerals associated with the 1929 servitude was "arguably weaker" because it did not arise from the transfer agreement, but rather from the Louisiana prescription rule. *Id*. at 888. The court, nonetheless, concluded that the analysis in *Little Lake Misere* applied and that the operative rule of decision was federal common law. Holding that it need not decide whether "*Nebo Oil* [was] . . . implicitly overruled by *Little Lake*," *id*. at 890, the court concluded that "there is a conflicting federal interest – that in obtaining the mineral rights via the default rule of prescription in place before Act 315," *id*. at 891, requiring the court to "balanc[e] . . . [the] state and federal interests to determine whether the state rule should apply." *Id*. It held that the *Little Lake Misere* had struck this balance in favor of applying a federal rule of decision where there was "retroactive application of Act 315," but that the considerations cited by the Supreme Court did not compel the same conclusion where a prospective application of the same statutes was involved. In the latter instance, the Fifth Circuit found, "Act 315 provides the background rule that the United States bargained under." *Id*. at 892-93. Finally, the court viewed its prior decisions, including *Nebo Oil*,[1] as precluding it from reconsidering whether the 1940 Act unconstitutionally discriminated against the United States. *Id*. at 893-94.

_____

[1] The Fifth Circuit did not cite *Nebo Oil*. Rather, it indicated that it could not reconsider these constitutional points based upon its decision in *United States v. Little Lake Misere Land Co.*, 453 F.2d 360 (5th Cir. 1971), noting the Supreme Court, in reversing that opinion, had reserved any ruling regarding the constitutionality of the 1940 Act. *Central Pines*, 274 F.3d at 893. That said, the Fifth Circuit's ruling in *Little Lake Misere* was squarely based on its prior ruling in *Nebo Oil*. *See Little Lake Misere*, 453 F.2d at 362.

Appx0008

On February 18, 2000, after the first of the district court's rulings in *Central Pines,* but before the second, Petro-Hunt, along with the other co-owners of the mineral estate, brought a quiet title action against the United States in the United States District Court for the Western District of Louisiana – a lawsuit apparently triggered by the United States' continuing and burgeoning leasing activity. On August 24, 2000, Petro-Hunt filed suit in this court. On November 2, 2000, this court granted the parties' joint motion to stay this action pending a final decision in the quiet title action. Meanwhile, in the district court, Petro-Hunt and the other plaintiffs filed a motion for summary judgment asserting that the combined effect of the decision in *Nebo Oil* and the doctrine of *res judicata* precluded the United States from arguing that the servitudes in question had prescribed. On December 18, 2001, the district court granted this motion, holding that the preclusive effect of *Nebo Oil* barred the United States from asserting the prescription defense not only to the 800-acre servitude directly addressed in *Nebo Oil*, but also to all 24,942.93 acres of land that were acquired in the transaction involving the 800-acre servitude *and* as to the remainder of approximately 180,000 acres of land acquired by the United States in ten additional transactions. *Petro-Hunt, L.L.C. v. United States*, 179 F. Supp. 2d 669, 681-82 (W.D. La. 2001). In this regard, the district court concluded that "the entire 180,000 acres was similarly situated to the 800 acres at issue in *Nebo Oil*." *Id*. at 682.

On appeal, the Fifth Circuit reversed. *Petro Hunt, LLC v. United States*, 365 F.3d 385 (5th Cir.), *cert. denied*, 543 U.S. 1034 (2004). It held that neither *res judicata* nor collateral estoppel precluded the United States from relitigating the applicability of the 1940 Act to ninety-five of the ninety-six Good Pine servitudes. Rather, the court found, the United States was prohibited only from relitigating the title to the single servitude burdening the 800-acre parcel of land directly at issue in *Nebo Oil*. The court held that "res judicata is no bar to the United States' defense in this action because its claim with respect to each servitude depends on a unique set of operative facts." *Id*. at 397. The court then concluded that collateral estoppel did not apply to the rulings in *Nebo Oil* because the relevant question – involving the choice of law – had not been litigated in the earlier Fifth Circuit case. *Id*. at 398. Even if that issue had been raised, the court found, changes in the controlling legal principles effectuated by the decisions in *Little Lake Misere* and *Central Pines* would permit the United States to relitigate the issue. *Id*. at 399. Based upon the rulings in the latter two cases, the Fifth Circuit concluded that it was "prohibited from borrowing Act 315 as the federal rule of decision because it is hostile to the federal interests at stake." *Id*. The court remanded the case to the district court to determine which of the ninety-five servitudes that were not at issue in *Nebo Oil* had prescribed. *Id*. After the Supreme Court denied a petition for certiorari, it ultimately was determined that the United States owned ninety servitudes and plaintiff remained the owner of six (the servitude at issue in *Nebo Oil* and five others).

On June 25, 2008, plaintiff filed its first amended complaint in this court, in which it asserted seven counts. In the first six of these, plaintiff averred that the United States had effectuated: (i) a permanent taking of ninety servitudes; (ii) a temporary taking of ninety-one servitudes by issuing mineral leases to third parties; (iii) a temporary taking of servitudes over which the United States had asserted ownership during the quiet title action; (iv) breaches of the

original land conveyance contracts which plaintiff may pursue as the successor-in-interest to Good Pine; (v) breaches of the original land conveyance contracts which plaintiff may pursue as a third-party beneficiary; and (vi) breaches of the covenant of good faith and fair dealing associated with the original land conveyance contracts. A seventh count sought reformation of the original land conveyance contracts. On September 2, 2008, defendant moved to dismiss the amended complaint for lack of jurisdiction, primarily arguing that the claims were time-barred. It also argued that various counts in the complaint failed to state a claim. Following the completion of briefing on that motion, the court conducted oral argument on the motion on April 9, 2009. The court ordered supplemental briefing, which was completed on July 31, 2009.

## II. DISCUSSION

Defendant raises a host of objections to plaintiff's amended complaint. As the court previously indicated to the parties, the court will resolve only those objections properly raised in the context of RCFC 12, *to wit*, issues involving jurisdiction and whether various counts of plaintiff's complaint fail to state a claim. It will not consider, at this time, defendant's alternative motion for summary judgment, which relies on evidence that goes well beyond the specific allegations in the complaint. The arguments made in this alternative motion are, in the court's view, premature and must await the completion of discovery.

### A. Lack of Jurisdiction – Statute of Limitations

In considering a motion challenging jurisdiction, the court construes factual allegations in the complaint most favorably to the plaintiff, resolving ambiguities in its favor. *Scheuer v. Rhodes*, 416 U.S. 232, 236 (1974). The court may look beyond the pleadings and "inquire into jurisdictional facts" to determine whether jurisdiction exists. *Rocovich v. United States*, 933 F.2d 991, 993 (Fed. Cir. 1991). RCFC 12(c) provides that if "matters outside the pleadings are presented to and not excluded by the court, the motion shall treated as one for summary judgment." But, this provision "does not apply to a motion made under Rule 12(b)(1) to dismiss for lack of jurisdiction over the subject matter," under which the court undoubtedly may "address matters outside the pleadings." *Reed Island-MLC, Inc. v. United States*, 67 Fed. Cl. 27, 32 (2005) (citing *Toxgon Corp. v. BNFL, Inc*., 312 F.3d 1379, 1383 (Fed. Cir. 2002)).

The Tucker Act, 28 U.S.C. § 1491(a)(1), grants this court jurisdiction to render judgment on any claim against the United States founded, *inter alia*, on the Constitution or a contract. *See United States v. Testan*, 424 U.S. 392, 397-98 (1976). A claimant must bring a claim under the this provision "within six years after such claim first accrues." 28 U.S.C. § 2501; *see also Samish Indian Nation v. United States*, 419 F.3d 1355, 1369 (Fed. Cir. 2005). This is a jurisdictional limit that cannot be waived. *John R. Sand & Gravel Co. v. United States*, 552 U.S. 130 (2008). It is well-established that a claim accrues under section 2501 ''when 'all events have occurred to fix the Government's alleged liability, entitling the claimant to demand payment and sue here for his money.''' *Martinez v. United States*, 333 F.3d 1295, 1303 (Fed. Cir. 2003) (en banc), *cert. denied*, 540 U.S. 1177 (2004) (quoting *Nager Elec. Co. v. United States*, 368 F.2d

-8-

847, 851 (Ct. Cl. 1966)); *see also Samish*, 419 F.3d at 1369. Because, as noted, this requirement is jurisdictional, plaintiff bears the burden of demonstrating that its claims were timely. *See Alder Terrace, Inc. v. United States*, 161 F.3d 1372, 1377 (Fed. Cir. 1998); *Entines v. United States*, 39 Fed. Cl. 673, 678 (1997), *cert. denied*, 526 U.S. 1117 (1999); *see also John R. Sand & Gravel Co. v. United States*, 457 F.3d 1345, 1362 (Fed. Cir. 2006) (Newman, J., dissenting); *Reynolds v. Army and Air Force Exchange Serv.*, 846 F.2d 746, 748 (Fed. Cir. 1988).[2]

In the 1930s, defendant persuaded the prior owners of the property in question to sell their surface rights by supplying them with an opinion that held that the prescriptive provisions of Louisiana law did not apply to these lands. Consistent with that view, the documents transferring those surface rights reserved the associated mineral interests. In 1940, the Louisiana legislature passed a law stating that the prescriptive provisions did not apply to land acquired by the United States. In its 1950 *Nebo Oil* decision, the Fifth Circuit, relying upon prior decisions of the Louisiana Supreme Court, held that this statute applied to one of the servitudes at issue in this case. Subsequent to this ruling, Louisiana State and Interior Department records reflected that the minerals underlying the land in question were not owned by the United States. A 1973 decision of the Supreme Court raised doubts regarding the impact of the 1940 Act, but did so in a case involving a contract in which the United States had bargained for and seemingly obtained the mineral interests in question. A 2001 ruling of the Fifth Circuit distinguished the 1973 precedent on this and other bases, and held that *Nebo Oil* was still good law. In a lawsuit filed shortly before this suit was initiated, a district court, in 2001, held that the *res judicata* impact of the *Nebo Oil* decisions precluded defendant from asserting interests in any of the servitudes involved in this case. That ruling was reversed by the Fifth Circuit in 2004, ultimately leading to a finding, on remand, that the United States owned ninety of the ninety-six servitudes involved here.

Despite the recentness of the latest of these developments, defendant claims that most of the counts in plaintiff's lawsuit are barred by the statute of limitations – contending, in its original motion, that the claims accrued "long before" the 2004 court rulings on the servitudes. Defendant's choice of the pliant phrase "long before" apparently was not inadvertent, for, in briefing the pending motion, it has taken various views as to when the claims here accrued for limitations purposes. At points, it has argued that the claims accrued in the 1940s – when the minerals allegedly first came into the possession of the United States under the Louisiana law of prescription. Alternatively, it has asserted that the claims accrued in 1973 when the Supreme Court issued its opinion in *Little Lake Misere*. And, at still other instances, it has asseverated that the claims accrued during the late 1980s and early 1990s, when defendant began to grant

---

[2] *See also Kingman Reef Atoll Investments, L.L.C. v. United States*, 541 F.3d 1189, 1197 (9th Cir. 2008) ("Although ordinarily the defendant bears the burden of proving an affirmative statute of limitations defense, here the statute of limitations is jurisdictional, and, '[w]hen subject matter jurisdiction is challenged under Federal Rule of Procedure 12(b)(1), the plaintiff has the burden of proving jurisdiction in order to survive the motion.'" (quoting *Tosco Corp. v. Comtys. for a Better Env't*, 236 F.3d 495, 499 (9th Cir. 2001)).

Appx0011

mineral leases relating to the properties. Yet, while itself advocating alternating accrual dates that span nearly a half a century, defendant audaciously managed, in its final brief, to accuse plaintiff of "throwing . . . alternative arguments at the wall, [in hopes] one will stick" – a classic example of the pot calling the kettle black, if there ever was one. As it turns out, both parties present arguments that are a bit viscid. To sort through them – and to determine which adhere to the fabric of the law – the court will consider plaintiff's permanent takings, temporary takings and contract claims *seriatim*.

### 1.    Permanent Takings

The Fifth Amendment provides that private property shall not "be taken for public use without just compensation." U.S. Const. Amend. V. A claim alleging a Fifth Amendment taking "'accrues when that taking action occurs.'" *Goodrich v. United States*, 434 F.3d 1329, 1333 (Fed. Cir. 2006) (quoting *Alliance of Descendants of Tex. Land Grants v. United States*, 37 F.3d 1478, 1481 (Fed. Cir. 1994)). Apart from a condemnation, such a taking generally occurs when the government deprives an owner of the use and enjoyment of his or her property. *United States v. Causby*, 328 U.S. 256, 261-62 (1946); *United States v. General Motors Corp.*, 323 U.S. 373, 378 (1945); *see also Boling v. United States*, 220 F.3d 1365, 1371 (Fed. Cir. 2000). A permanent takings claim arises when: (i) all the events which fix the government's liability have occurred; and (ii) the plaintiff knew or should have known of the existence of these events. *See Ingrum v. United States*, 560 F.3d 1311, 1314 (Fed. Cir.), *cert. denied*, 2009 WL 22404042 (U.S. Oct. 5, 2009); *Alliance of Descendants of Tex. Land Grants*, 37 F.3d at 1481. As plaintiff points out, each prong of this analysis has bred its own set of corollaries which, in turn, may control when a given takings claim arises.

One such corollary – focusing on when the government's liability is fixed – stems from the interlocking nature of this court's Tucker Act jurisdiction with that of the district courts under the Administrative Procedure Act, 5 U.S.C. § 551 *et seq.*, and other statutes. It holds that if a necessary element to a claim must be established in a different forum, the claim will not accrue for section 2501 until that element is finally established in the other proceeding. A prime example of this rule at work may be found in *Samish*, 419 F.3d at 1369. There, the Samish claimed that they were entitled to damages for benefits lost when the Bureau of Indian Affairs (BIA) terminated their status as a Federally-recognized tribe. The Federal Circuit observed that an essential element of this claim was a finding that the Samish were entitled to be treated as a Federally-recognized tribe, but noted that "[o]nly a district court, acting on challenge under the APA, ha[d] the authority to review the . . . executive's recognition determination" in this regard. *Id.* It held that the plaintiff's claim did not accrue until the Samish "obtained a final ruling by a district court under the APA" that they were entitled to be treated as a Federally-recognized tribe. *Id.* at 1369. Other cases have likewise concluded that where a ruling by another tribunal is a precondition to the maintenance of a claim, the claim cannot accrue until that ruling is obtained.[3]

_____

[3] *See also, e.g., Heck v. Humphrey*, 512 U.S. 477, 489–90 (1994) (claim for wrongful conviction did not accrue until the conviction or sentence has been invalidated); *Midgett v.*

This line of cases takes it lead from *Nager Elec. Co., 368 F.2d at 859,* where the Court of Claims held that a claim "cannot logically mature for limitation purposes . . . before the plaintiff has a proper cause of action to allege in court – a claim which is proof against a motion to dismiss – and the time period does not run until the claim ripens in that sense."

Is this a case like *Samish*?  Plaintiff certainly thinks so.  It contends that it had to complete its quiet title action in the district court before it could pursue its permanent takings claims here.  Unlike in *Samish*, however, there was no legal requirement that plaintiff obtain a ruling from the district court to establish an element of its permanent takings claim.  To be sure, it is axiomatic that to maintain a takings claim, a claimant must show that it had a property interest that was impacted by government action.  *See, e.g., Air Pegasus of D.C., Inc. v. United States,* 424 F.3d 1206, 1212-13 (Fed. Cir. 2005); *Am. Pelagic Fishing Co. L.P. v. United States,* 379 F.3d 1363, 1372 (Fed. Cir. 2004), *cert. denied,* 545 U.S. 1139 (2005).  And, in several discrete subject areas (*e.g.,* unpatented mining claims), Congress has vested in the district courts the sole authority to determine the validity of certain types of property interests.  *See Freese v. United States,* 221 Ct. Cl. 963, 963 (1979); *see also Aulston v. United States,* 823 F.2d 510, 514 (Fed. Cir. 1987) (this court "does not acquire authority to review an agency action otherwise reviewable only in district court merely because plaintiff's effort to obtain review is couched in terms of a taking claim").  Yet, as numerous cases attest, questions regarding the existence or loss of most property interests, including those of real property, may be – and often are – litigated in this court in resolving a takings claim.[4]  And this occurs even where reference to state law is

———————————

*United States,* 603 F.2d 835, 839 (Ct. Cl. 1979) (claim for death gratuity did not accrue until Virginia decree of death); *Fort Mojave Indian Tribe v. United States,* 23 Cl. Ct. 417, 429 (1991) (claim for breach of trust in the loss of water rights did not accrue until Supreme Court confirmed that rights had been lost); *see also Peak v. United States,* 353 U.S. 43, 45 (1957) (claim accrues for limitation purposes when the claimant "might have successfully maintained her suit").

[4]  *See, e.g., Acceptance Ins. Cos., Inc. v. United States,* 2009 WL 3127774, at *7 (Fed. Cir. Oct. 1, 2009); *see also Branch v. United States,* 69 F.3d 1571, 1575 (Fed. Cir. 1995), *cert. denied,* 519 U.S. 810 (1996) ("In analyzing a takings claim, a court must first determine what was taken.").  In *Dwen v. United States,* 62 Fed. Cl. 76, 81 (2004), this court noted that while it plainly lacks jurisdiction under the Quiet Title Act, 28 U.S.C. § 2409a, to declare titles, that does not prevent the court from determining property rights in the context of resolving takings claims.  In this regard, the court noted –

> After the passage of the QTA, however, the government frequently argued that the court was divested of jurisdiction to adjudicate takings claims where resolution of a title dispute was subsumed in the determination.  That argument, however, has been firmly laid to rest.  It is now well-established that the court has jurisdiction to make independent factual determinations of a claimant's specific property interest as a matter of course in adjudicating takings claims.  *Mannatt v. United States,* 48 Fed. Cl. 148, 152 (2000); *Chevy Chase Land Co. of Montgomery County v.*

required – indeed, the latter is usually the case.[5]  Accordingly, nothing prevented this court from determining, in the context of a takings claim, plaintiff's rights to the servitudes at issue here.  As such, this is not an instance in which the accrual of a claim here had to await a ruling by another tribunal.

While the *Samish*-line of cases deals with situations where a claim has not yet accrued, another salvific corollary invoked by plaintiff – the so-called "accrual suspension rule" – applies where "an accrual date has been ascertained, but plaintiff does not know of his claim."  *Japanese War Notes Claimants Ass'n v. United States*, 373 F.2d 356, 358-59 (Ct. Cl.), *cert. denied*, 389 U.S. 971 (1967); *Benchmark Resources Corp. v. United States*, 64 Fed. Cl. 526, 532 (2005).

Under the accrual suspension rule, "the accrual of a claim against the United States is suspended, for purposes of 28 U.S.C. § 2501, until the claimant knew or should have known that the claim existed."  *Martinez*, 333 F.3d at 1319; *Young v. United States*, 529 F.3d 1380, 1384 (Fed. Cir. 2008).  This concept derives directly from the meaning of the term "accrues," as used in section 2501, and, therefore, is viewed as a matter of statutory interpretation, rather than a form of equitable tolling.  *Martinez*, 333 F.3d at 1319; *L-3 Comms. Integrated Sys., L.P. v. United States*, 79 Fed. Cl. 453, 463 (2007).[6]  To achieve such a suspension, the plaintiff "must either show that defendant has concealed its acts with the result that plaintiff was unaware of their existence or it must show that its injury was 'inherently unknowable' at the accrual date."  *Id.* (quoting *Welcker v. United States*, 752 F.2d 1577, 1580 (Fed. Cir.), *cert. denied*, 474 U.S. 826 (1985)); *see also Young*, 529 F.3d at 1384.  While some cases talk in terms of requiring "active" or "intentional" concealment, *see, e.g.*, *Rosales v. United States*, 2009 WL 3286594, at * 7 (Fed, Cl. Oct. 7, 2009); *Central Pines Land*, 61 Fed. Cl. at 533, others seem to proceed from the notion that the *mens rea* underlying the concealment is largely irrelevant, so long as the nondisclosure

---

*United States*, 37 Fed. Cl. 545, 564 (1997); *Oak Forest*, 23 Cl. Ct. at 96; *Yaist*, 228 Ct. Cl. at 285-86, 656 F.2d 616.

*Dwen*, 62 Fed. Cl. at 81; *see also Bourgeois v. United States*, 545 F.2d 727, 729 n.1 (Ct. Cl. 1976) (stating that in a suit seeking compensation, the court is not denied jurisdiction simply because there is a quiet title issue involved in determining compensation); *Oak Forest, Inc. v. United States*, 23 Cl. Ct. 90, 96 (1991) ("[T]he mere fact that title must be determined as part of [a takings claim] does not oust the court of jurisdiction, assuming it otherwise exists.").

[5]  *See Am. Pelagic Fishing Co.*, 379 F.3d at 1376; *Conti v. United States*, 291 F.3d 1334, 1340 (Fed. Cir. 2002), *cert. denied*, 537 U.S. 1112 (2003) (determining property interests by considering "'background principles' derived from an independent source, such as state . . . law"); *see also Lucas v. S.C. Coastal Council*, 505 U.S. 1003, 1029-30 (1992).

[6]  This is important, of course, as there can be no equitable tolling of the statute of limitations in section 2501, which is jurisdictional.  *See John R. Sand & Gravel Co.*, 552 U.S. at 133-34, 137-39.

prevented the claimant from knowing that its claim had arisen. *See Bleak v. United States*, 214 Ct. Cl. 812, 813 (1977) ("we need not delve deeply into the technical rules that surround this technical point of law to be reminded that the underlying precept is that the limitations cannot begin to run until the claimant has reason to know he holds a ripe claim"); *Japanese War Notes Claimants*, 373 F.2d at 359; *see also L.S.S. Leasing Corp. v. United States*, 695 F.2d 1359, 1366 (Fed. Cir. 1982).[7] These and other cases also teach that a claim is "inherently unknowable" when there is nothing to alert one to the wrong at the time it occurs. *See Japanese War Notes Claimants*, 373 F.2d at 358-59; *Texas Nat. Bank v. United States*, 86 Fed. Cl. 403, 414 (2009); *see also Ramirez-Carlo v. United States*, 496 F.3d 41, 47 (1st Cir. 2007) (cause of action is "inherently unknowable" if "it was incapable of detection by the plaintiff through the exercise of reasonable diligence").

Mindful that the "accrual suspension" rule is to be "strictly and narrowly applied," *Martinez*, 333 F.3d at 1319, courts have concluded that a misunderstanding of the meaning of the law or one's legal rights does not trigger this rule *See Catawba Indian Tribe of S.C.*, 982 F.2d 1564, 1572 (Fed. Cir.), *cert. denied*, 509 U.S. 904 (1993) (declining to apply the rule where "all the relevant facts were known. It was the meaning of the law that was misunderstood."); *Black v. United States*, 84 Fed. Cl. 439, 448 (2008); *see also United States v. Kubrick*, 444 U.S. 111, 122 (1979). Yet, several cases involving this rule and the related discovery rule[8] intimate that the suspension rule may apply where a claimant, through the exercise of reasonable diligence, could not have known that its legal rights had been modified or abridged in a way giving rise to a claim. Cases of this sort typically involve situations in which the change in circumstance arises out of a decision that overrules or alters prior precedent, with the claim deemed to have been tolled until the modifying decision was made. In *Neely v. United States*, 546 F.2d 1059, 1068 (3d Cir. 1976), for example, the Third Circuit held that the Tucker Act's statute of limitations was not triggered until the Supreme Court had overruled several prior opinions, thereby giving rise to the claims at issue. Finding that the alterations in the claimants' rights worked by the Supreme Court's opinion were "inherently unknowable," the court commented that "[t]o require

--------

[7] The rule has been applied in cases where defendant has deliberately or fraudulently concealed its acts from plaintiff. *See, e.g., Barrett v. United States*, 689 F.2d 324, 327-328 (2d Cir. 1982); *L-3 Communs.*, 79 Fed. Cl. at 464; *see also Hopland Band of Pomo Indians v. United States*, 855 F.2d 1573, 1577 (Fed. Cir. 1988). In other instances, however, the same result has obtained where critical facts simply have not been disclosed. *Spevack v. United States*, 390 F.2d 977, 981 (Ct. Cl. 1968) (suspending accrual of patent infringement claim where defendant performed patented process secretly, pursuant to applicable security regulations); *Manchester Band of Pomo Indians v. United States*, 363 F. Supp. 1238, 1249 (N.D. Cal. 1973) (suspending accrual of claim for breach of fiduciary duties where defendant was not in the practice of paying out income or accounting to plaintiffs on a regular basis).

[8] *See Kubrick*, 444 U.S. at 120-22; *Urie v. Thompson*, 337 U.S. 163, 169 (1949) (statute of limitations not triggered where facts were "unknown and inherently unknowable"); *see also Ramirez-Carlo*, 496 F.3d at 47 (applying this rule to a case under the Federal Tort Claims Act).

-13-

clairvoyance in predicting new jurisprudential furrows plowed by the Supreme Court, under these circumstances, would be to impose an unconscionable prerequisite to asserting a timely claim." *Id.*[9] Cases such as *Neely* are readily distinguishable from those in which the facts are known, but the legal implications are not. *Red Chevrolet Impala Sedan*, 457 F.2d at 1358 ("This is not . . . a case in which a plaintiff is ignorant of his rights, but rather a case of a plaintiff without a right.").

But, again, is this a case like *Neely*? Plaintiff asserts that prior to the 2004 ruling of the Fifth Circuit, its permanent takings claim was not legally apparent. It argues that until this decision, it had every reason to believe that the Louisiana law of prescription did not apply to its servitudes. Its predecessors, of course, had been assured of that by the Department of Agriculture in inducing them to sell their surface rights, and the transfer documents reflected this view. As further evidence that prescription did not apply, plaintiff cites not only the 1950 ruling of the Fifth Circuit in *Nebo Oil*, but the 2000 ruling of that same court in *Central Pines,* and even the 2001 ruling of the Louisiana district court in the quiet title action related to this case. And while defendant asserts that the 1973 decision in *Little Lake Misere* should have alerted plaintiff that the law had changed to its detriment, plaintiff notes that: (i) the decision was factually distinguishable; (ii) the Fifth Circuit, in *Central Pines,* held that *Nebo Oil* was still good law; and (iii) there was good reason to believe that even if *Nebo Oil* had been overruled, the *res judicata* impact of that ruling remained and still protected all of its servitudes – a belief validated by the Louisiana district court as late as 2001. Based on this, plaintiff contends that its permanent takings claims were inherently unknowable until the Fifth Circuit reversed the district court's ruling that the *res judicata* impact of *Nebo Oil* applied to all ninety-six servitudes. It was not until that point, plaintiff contends, that it knew or should have known that it had a permanent takings claim.

Were these all the relevant facts, plaintiff's suspension claim, in the court's view, would be compelling. There is little doubt that the accrual suspension rule applied here to some extent. Otherwise, the permanent takings claim here would have accrued when the servitudes in question prescribed, which for some of the properties, and perhaps almost all, occurred in the 1940s – it was at that time that the property interests here were obtained by the United States. The question, rather, is how long that suspension lasted – did it extend, critically, all the way until August 28, 1994, so as to be within six years of the filing of the original lawsuit here? Almost certainly, that suspension was in effect when the Louisiana legislature passed the 1941 Act (recall that statute was retroactive) and, later, when the Fifth Circuit decided *Nebo Oil*. And while defendant claims otherwise, it would appear that plaintiff has the better of the case in asserting that the suspension remained in effect even after the Supreme Court's decision in *Little Lake*

---

[9] *See also Wollman v. Gross*, 637 F.2d 544, 547 (8th Cir. 1980), *cert. denied*, 454 U.S. 893 (1981) (rule applies where "new law applied retroactively has created a new basis for a claim"); *United States v. One 1961 Red Chevrolet Impala Sedan*, 457 F.2d 1353, 1358 (5th Cir. 1972) (same); *cf. Venture Coal Sales Co. v. United States*, 57 Fed. Cl. 52, 54 (2003), *aff'd*, 370 F.3d 1102 (Fed. Cir.), *cert. denied*, 593 U.S. 1020 (2004) (recognizing concept, but finding it inapplicable).

-14-

*Misere*, particularly because the latter case left unaffected plaintiff's ability to invoke *res judicata* as to the earlier *Nebo Oil* opinion.[10] But, these events bring us only to 1973 or thereabouts – and not all the way to August of 1994. Alas for plaintiff, it appears that the suspension ceased – that plaintiff knew or should have known it had a permanent takings claim – and the statute of limitations was triggered in 1991 (or, at the latest, in 1993).

In the 1970s and 1980s, the United States entered into a few mineral leases relating to the servitudes in question. Perhaps, those isolated leases should have aroused suspicions. Perhaps not. Then, in 1991, when defendant sought to enter into several new leases, one of plaintiff's predecessors-in-interest, Hunt Petroleum Corporation, formally protested, claiming in a March 18, 1991, letter that it owned the relevant servitudes and requesting that the Bureau of Land Management (BLM) withdraw the parcels.[11] Four days later, on March 22, 1991, the Forest Service advised the BLM that while two of the parcels involved had not prescribed, the remainder had prescribed making the Federal government the legal owner thereof. This letter, on which Hunt Petroleum was copied, cited a 1986 opinion by the Office of General Counsel of the Department of Agriculture and indicated that the United States had taken ownership of servitudes on parcels that were acquired prior to 1940 and on which no wells had been drilled. On November 2, 1993, Hunt Petroleum again protested to the BLM the inclusion of certain lands in a competitive lease sale. On December 10, 1993, the BLM notified Hunt Petroleum and Placid Oil Company that the protest had been denied, citing an April 19, 1993, title report as indicating that the minerals in question "were in fact prescribed to the United States."

---

[10] In *Central Pines Land Co. v. United States*, 61 Fed. Cl. 527 (2004), a takings case that was stayed pending the resolution of the *Central Pines* quiet title action discussed above, this court concluded that the plaintiff's claims were time-barred because they were filed more than six years after the servitudes in question had prescribed under Louisiana law. *Id.* at 535. It rejected the plaintiff's contention that its claim was unknowable because it believed, based on *Nebo Oil*, that mineral servitudes on federally-owned lands were imprescriptible under Louisiana law. In so concluding, the court found that the plaintiff had no basis to rely upon *Nebo Oil* after the 1973 decision in *Little Lake Misere*. *Id.* For reasons unexplained, however, the court failed to take cognizance of the fact that the Fifth Circuit, in its own *Central Pines Land* case, had concluded that *Nebo Oil* was still good law following the Supreme Court's decision. Moreover, there is no indication in the opinion that Central Pines, like the plaintiff here, could argue that the *res judicata* effect of *Nebo Oil* survived *Little Lake Misere* – an argument, of course, that was accepted by the district court in the quiet title action involving the servitudes at issue. Accordingly, *Central Pines* casts little light on the proper result here.

[11] For reasons unexplained, it seems that defendant first made this point in its supplemental brief – late enough that the court would be disinclined to consider this point were it not related to jurisdiction. Even then, while claiming that Hunt Petroleum was a "predecessor" to plaintiff, defendant failed to cite any evidence in support of that claim. However, the record contains an affidavit filed by plaintiff in the Louisiana quiet title action in which it admits that Hunt Petroleum was an "ancestor in title."

-15-

These documents in themselves should have indicated to plaintiff's predecessor-in-interest that a permanent takings claim should be pursued – and with that task taking on added urgency in January of 1994 (again more than six years prior to the filing suit), when the Forest Service engaged in a series of additional leases. Moreover, the documents discussed above reference title reports that plaintiff does not deny were publicly available, which reports would have further revealed the extent of (and rationale underlying) defendant's prescription claims. *See Catawba*, 982 F.2d at 1570-72 (party is charged with knowledge of information that is available from public records); *Menominee Tribe of Indians v. United States*, 726 F.2d 718, 720-21 (Fed. Cir. 1984) (same). Accordingly, it appears that by 1991 and, certainly, no later than in 1993, plaintiff was "'on inquiry as to its possible injury,' and the statute of limitations began to run." *Ingrum*, 560 F.3d at 1315 (quoting *Coastal Petroleum*, 228 Ct. Cl 864, 867 (1981)); *see also Welcker*, 752 F.2d at 1580 ("Once plaintiff is on inquiry that it has a potential claim, the statute can start to run."). Certainly, by this time, the nature and extent of its claim was no longer either concealed or inherently unknowable.

Because plaintiff filed suit more than six years after that critical juncture, the court must conclude that its permanent takings claim was time-barred.[12]

## 2. Temporary Takings

Landowners, of course, must be justly compensated for both permanent and temporary takings. *See First English Evangelical Lutheran Church of Glendale v. County of Los Angeles, California*, 482 U.S. 304, 318 (1987) ( "'[T]emporary' takings . . . are not different in kind from permanent takings, for which the Constitution clearly requires compensation."). As a general matter, "'the distinction between 'permanent' and 'temporary' takings refers to the nature of the intrusion and not its temporal duration.'" *Bass Enters. Prod. Co. v. United States*, 133 F.3d 893, 896 (Fed. Cir. 1998) (quoting *Skip Kirchdorfer, Inc. v. United States*, 6 F.3d 1573, 1582 (Fed. Cir. 1993)); *see also Reed Island*, 67 Fed. Cl. at 33.

_____

[12] Plaintiff also argues that its takings claims are timely under the "continuing claims" doctrine, asserting that the government's issuance of leases are wrongful acts that took place over a period of time, culminating in defendant's assertion of ownership in the 2001 quiet title action. The continuing claims doctrine applies where a plaintiff's claim is "inherently susceptible to being broken down into a series of independent and distinct events or wrongs, each having its own associated damages." *Brown Park Estates-Fairfield Dev. Co. v. United States*, 127 F.3d 1449, 1456 (Fed. Cir. 1997). The doctrine allows "later arising claims even if the statute of limitations has lapsed for earlier events." *Ariadne Fin. Servs. Pty. Ltd. v. United States*, 133 F.3d 874, 879 (Fed. Cir. 1998); *see also Tamerlane, Ltd. v. United States*, 550 F.3d 1135, 1145 (Fed. Cir. 2008). In the court's view, however, the leasing activity in question is appropriately viewed more as a temporary taking and should be analyzed as such. Plaintiff has made several other glancing arguments regarding claim accrual that the court has considered and also rejects.

-16-

In the case *sub judice*, the temporary takings claims are predicated upon a series of mineral leases entered into between the United States and third parties, involving the servitudes at issue. Each of these leases had a term of ten years. The parties have filed competing affidavits cataloguing the leases they believe are at issue.[13] Those affidavits differ in terms of the number of leases made and when those leases were created. Plaintiff asserts that there were sixty-eight "intrusive" leases – twenty-one on the servitudes that were held in the quiet title action not to have prescribed to the United States and forty-seven on the servitudes that were held to have prescribed. Defendant admits to having issued fifteen mineral leases on the servitudes that did not prescribe, but does not provide any information as to the leases entered into with respect to the servitudes that prescribed. All the leases listed by defendant and all but two of those listed by plaintiff were entered into after August 24, 1984, and thus all ended within six years of the filing of this lawsuit.[14] Fifty-six of the leases cited by plaintiff apparently were initiated during that same six-year limitations period.

The decisional law suggests that the timing of the accrual of a temporary takings claim may depend upon the nature of the takings involved. Several cases indicate that a temporary regulatory takings claim accrues when the "process that began it has ended" because, among other things, the property owner "would not know the extent of [its] damages until the Government completes the 'temporary' taking." *Creppel v. United States*, 41 F.3d 627, 632 (Fed. Cir. 1994); *see also Hornback v. United States*, 56 Fed. Cl. 359, 364 (2003).[15] In *Reed Island*, the court suggested that this rule also applies to temporary physical takings, operating much like the doctrine applicable to suits upon repudiation of a contract – that is, a plaintiff may file a claim on a temporary takings theory once the taking begins or wait and determine the duration of the taking before filing suit. *Reed Island*, 67 Fed. Cl. at 36 (discussing *Franconia Assocs. v. United States*, 536 U.S. 129, 144 (2002)). Other decisions, however, take a different view. Thus, for example, in *Kemp v. United States*, 65 Fed. Cl. 818 (2005), the plaintiff claimed that the National Park Service had allowed the public to use her land without her permission, resulting in a physical takings. Rejecting the argument that this claim accrued only when the temporary takings had ended, this court instead held that where a temporary physical takings is

---

[13] Again, as these affidavits involve jurisdictional facts, the court may consider them even though they present matter not found within the four corners of the amended complaint.

[14] Plaintiff's affidavit recites one lease entered into on August 1, 1983, on Servitude No. 2, and another entered into on February 1, 1973.

[15] In *Creppel*, the Federal Circuit determined that the alleged temporary taking occurred in 1976 when an Army Corps of Engineers' officer issued an order modifying a flood control levee project in Jefferson Parish, Louisiana. 41 F.3d at 629-30, 632. The Federal Circuit further concluded that the temporary taking ended, and thus the temporary takings cause of action accrued, in August 1984, when the federal district court ordered the original flood control levee project to proceed. *Id*. at 632. Because plaintiff did not file suit until 1991, the Federal Circuit found that plaintiffs' temporary takings claim was barred by the statute of limitations.

involved, "the statute of limitations begins to run when the United States comes into physical possession of the plaintiff's land." *Id.* at 822 (citing *Dow*, 357 U.S. at 21); *see also Roth v. United States*, 73 Fed. Cl. 144, 149 (2006). *Kemp* and similar cases hold that "[w]hether a physical taking is permanent or temporary is irrelevant to the application of the statute of limitations because the accrual date is the same for both." *Kemp*, 65 Fed. Cl. at 822 (citing *Caldwell v. United States*, 391 F.3d 1226, 1235 (Fed. Cir. 2004), *cert. denied*, 546 U.S. 826 (2005)).

Plaintiff asserts that the leases made by the United States effectuated physical takings. The court agrees that because these leases authorized the physical occupation of property, they should be analyzed as potentially giving rise to physical, not regulatory takings. *See Lucas*, 505 U.S. at 1017; *Pettro v. United States*, 47 Fed. Cl. 136, 144-46 (2000); *see also Tahoe-Sierra Preservation Council v. Tahoe Reg'l Planning Agency*, 535 U.S. 302, 324 n.19 (2002). As such, the accrual rule applicable to temporary regulatory takings is not controlling here. For fifty-six of the leases cited by plaintiff, of course, it matters not whether the accrual rule applicable to temporary physical takings is triggered by the initial deprivation of access or the end of the takings, because these leases were entered into during the six-year period preceding the filing of the original complaint herein. Whether a special accrual rule applies to temporary physical takings, however, does make a difference as to the twelve leases cited by plaintiff that were entered into before the six-year limitations period began, but which terminated thereafter. Accordingly, the court is compelled to decide for itself when a temporary physical takings accrues.

While a close issue, there are several reasons why temporary and permanent physical takings claims seemingly ought to be treated the same for accrual purposes. In both instances, the "taking occurs when the owner is deprived of the use of the property." *Caldwell*, 391 F.3d at 1235. That rationale does not apply to regulatory takings, which arise only where, in the oft-quoted words of Justice Holmes, a "regulation goes too far." *Pa. Coal Co. v. Mahon*, 260 U.S. 383, 415 (1922); *see also Lucas*, 505 U.S. at 1019 n.8; *Yee v. City of Escondido*, 503 U.S. 519, 522-23 (1992). To decide whether the latter is true, courts must either determine that the regulation has denied the owner "all economically beneficial or productive use of land," *Lucas*, 505 U.S. at 1015, or, barring such a finding, employ the three-factored test outlined in *Penn Cent. Transp. Co. v. City of New York*, 438 U.S. 104, 124 (1978). The latter test famously considers "[t]he economic impact of the regulation on the claimant" and "the extent to which the regulation has interfered with distinct investment-backed expectations." *Penn Central*, 438 U.S. at 124; *see also Brace v. United States*, 72 Fed. Cl. 337, 346 (2006), *aff'd,* 250 Fed. Appx. 359 (2007), *cert. denied*, 128 S. Ct. 1658 (2008).

It is in the context of these factors, with their heavy emphasis on the degree of diminution of the value of the property, that courts have found it appropriate to await the end of a temporary takings before treating a claim as accrued. The delay allows the property owner to assess fully the economic impact of the regulation in question. Thus, after reviewing the three-pronged *Penn Central* test, the Federal Circuit in *Creppel* reasoned –

-18-

> [T]he Constitution recognizes a distinction between a temporary and a permanent taking. Simply declaring a regulation that takes property invalid does not grant a constitutionally sufficient remedy. Thus, property owners cannot sue for a temporary taking until the regulatory process that began it has ended. This is because they would not know the extent of their damages until the Government completes the 'temporary' taking. Only then may property owners seek compensation.

41 F.3d at 632 (citations omitted). On this basis, the court held that the plaintiff's temporary takings claim accrued when a district court overturned an agency order halting the plaintiff's land reclamation project, because the court order "restored some potential expectation of completion of the Project and thus some measure of the property's value." *Id.* at 364. But, none of the considerations outlined in *Creppel,* or in other temporary regulatory takings cases, for that matter, resonates when the question is whether a physical takings has occurred. In the latter instance, any deprivation in the use or enjoyment of property triggers a takings, regardless of its impact on value. *See Tahoe-Sierra*, 535 U.S. at 322; *Casitas Mun. Water Dist. v. United States*, 543 F.3d 1276, 1292 (Fed. Cir. 2008) ("in the physical taking jurisprudence any impairment is sufficient"). The effect is immediate and there is no reason, as in a temporary regulatory takings, to await the completion of the harm.

Moreover, with all due respect to contrary decisions, any analogy between the accrual rules for temporary physical takings and the repudiation of contracts is superficial and strained. In *Franconia*, the Supreme Court held that the enactment of the Emergency Low Income Housing Preservation Act (ELIHPA) effectuated a repudiation of prior loan contracts entered into by the Farmers' Home Administration, not an immediate breach. 536 U.S. at 143. In this regard, the Court found that ELIHPA "conveyed an announcement by the Government that it would not perform as represented in the promissory notes if and when, at some point in the future, petitioners attempted to prepay their mortgages." *Id.* Relying upon the Restatement (Second) of Contracts § 250 and other contract treatises, the court noted that the time of accrual varied, depending upon "'whether the injured party chooses to treat the . . . repudiation as a present breach." *Id.* at 144. If that were true, the accrual date of the contract claim would be the date on which the injured party made the election; if no such election were made, that date would be the time fixed for performance. *Id.*[16] In either instance, then, the statute of limitations was triggered

---

[16] In this regard, the Supreme Court explained –

In sum, once it is understood that ELIHPA is most sensibly characterized as a repudiation, the decisions below lose force. To recapitulate, "[t]he time of accrual . . . depends on whether the injured party chooses to treat the . . . repudiation as a present breach." 1 C. Corman, Limitation of Actions § 7.2.1, p. 488 (1991). If that party "[e]lects to place the repudiator in breach before the performance date, the accrual date of the cause of action is accelerated from [the] time of performance to the date of such election." *Id.*, at 488-489. But if the injured party

-19-

by an actual breach of contract. These common law contract principles hold no sway in the law of physical takings, in which the injured party does not have the election of deciding when the takings occurs. Accordingly, *Franconia* provides no extendable rationale for delaying the accrual of a temporary physical takings to when the takings ceases.

Finally, it should not be overlooked that, in drawing major distinctions between permanent and temporary physical takings, the accrual rule espoused by plaintiff (and the decisions discussed above) has the potential to bail out some claims, but sink others. The decisional law suggests that the "distinction between 'temporary' and 'permanent' prohibitions is tenuous." *Tahoe-Sierra*, 535 U.S. at 346-47 (Rehnquist, C.J., dissenting); *see also Lucas*, 505 U.S. at 1017; *First English*, 482 U.S. at 318. Accordingly, any attempt to distinguish between these types of takings in determining when a claim accrues risks having a claimant make the wrong choice, that is, to await the filing of its suit thinking that it has temporary takings, only to find out later – indeed, when it is too late – that the takings instead was of the permanent variety. Even though prudential considerations should play little or no role in deciding what is the appropriate accrual point here, the court hesitates to adopt an accrual rule that would require claimants to make distinctions that the law itself has found difficult to make consistently. The straits leading to this court's jurisdictional harbor are perilous enough without introducing yet another potentially-obscured obstacle.

To sum up, the court concludes, as this court did in *Kemp*, that the accrual date is the same for both permanent or temporary physical takings. As such, plaintiff's claims with respect to the twelve leases that were entered into more than six years before the initiation of this lawsuit are untimely and, to that extent, must be dismissed. The remainder of the plaintiff's temporary takings claims that are at issue are predicated upon leases that were executed within the six-year limitations period and thus meet the requirements of section 2501.[17]

### 3.     Breach of Contract

A breach of contract claim accrues "when all the events have occurred which fix the liability of the Government and entitle the claimant to institute an action." *Oceanic S.S. Co. v.*

---

instead opts to await performance, "the cause of action accrues, and the statute of limitations commences to run, from the time fixed for performance rather than from the earlier date of repudiation." *Id.*, at 488.

536 U.S. at 144; *see also Indiana Mich. Power Co. v. United States*, 422 F.3d 1369, 1374 (Fed. Cir. 2005) ("For an aggrieved party to recover damages for an anticipatory repudiation, it must elect to treat the repudiation as a total breach."); *Arakaki v. United States*, 62 Fed. Cl. 244, 254 (2004).

[17]  Should discovery produce new facts regarding the mineral leases, either party may revisit this ruling in an appropriate motion for summary judgment.

*United States*, 165 Ct. Cl. 217, 225 (1964). Nevertheless, the accrual suspension rule also may apply to breaches of contract, delaying the accrual of such claims. *Texas Nat. Bank*, 86 Fed. Cl. at 413-14; *see also L-3 Comms.*, 79 Fed. Cl. at 463-64.

Preliminarily, defendant contends that because plaintiff's contract claim was not filed until it amended its complaint in 2008, that claim is well out of time. RCFC 15(c)(1)(B), however, provides that "[a]n amendment to a pleading relates back to the date of the original pleading when . . . the amendment asserts a claim or defense that arose out of the conduct, transaction, or occurrence set out – or attempted to be set out – in the original pleading." The Federal Circuit has instructed that "'the inquiry in a determination of whether a claim should relate back will focus on the notice given by the general fact situation set forth in the original pleading.'" *Barron Bancshares, Inc. v. United States*, 366 F.3d 1360, 1369 (Fed. Cir. 2004) (quoting *Snoqualmie Tribe v. United States*, 372 F.2d 951, 961 (Ct. Cl. 1967)). Applying this standard, the court has reviewed plaintiff's original complaint. It lists the contracts under which the United States acquired the "surface (but not the minerals) of the lands subject to" the servitudes and avers that in *Nebo Oil*, "the court found specifically that the United States did not intend to buy, nor did it pay for, minerals or mineral servitudes at the time it acquired the surface of this same property." The latter statement is, in essence, the predicate for plaintiff's breach of contract claim and, in the court's view, provided defendant with adequate notice that a breach of contract claim might arise out of the transactions listed.

That plaintiff's contract claim arose from the same transaction that gave rise to its takings claim, however, leaves plaintiff with the same statute of limitations problem encountered above. In short, while it would appear that the accrual of plaintiff's breach claim was suspended for many years, every indication is that plaintiff was constructively on notice of that claim (through its predecessor) at the same time it became aware of its takings claims. That was in 1991, or, at the latest, 1993, and thus more than six years prior to the filing of this lawsuit. Accordingly, plaintiff's breach of contract claims must also be dismissed as time-barred under section 2501.[18]

_____

[18] Defendant further argues that plaintiff's contract claim is barred by the doctrine of laches. Laches is an inexcusable delay that results in prejudice to the defendant. *See Nat'l R.R. Passenger Corp. v. Morgan*, 536 U.S. 101, 122 (2002); *Kansas v. Colorado*, 514 U.S. 673, 687 (1995); *Galliher v. Cadwell*, 145 U.S. 368, 373 (1892) ("[L]aches is not . . . a mere matter of time."). Here, the flurry of activity that followed the filing of the original complaint cuts against defendant's position that plaintiff's delay in pursuing its contract claim was unreasonable or inexcusable. Moreover, defendant has made no showing of real prejudice, except to claim, without any details, that the delay in filing the amended complaint has caused "witnesses' memories . . . [to have] faded" (since the contracts here were entered into in the 1930s, one must wonder whether the witnesses themselves, and not just their memories, have faded). Laches thus does not provide an additional basis for striking plaintiff's contract claims.

-21-

### B.    Failure to State a Claim

In its motion to dismiss, defendant also contends that a variety of counts in plaintiff's amended complaint fail to state a claim upon which relief may be granted and thus must be dismissed under RCFC 12(b)(6).  To survive such a motion, the complaint must have sufficient "facial plausibility" to "allow[ ] the court to draw the reasonable inference that the defendant is liable." *Ashcroft v. Iqbal*, 129 S. Ct. 1937, 1949 (2009); *see also Colida v. Nokia, Inc.*, 2009 WL 3172724, at *1 (Fed. Cir. Oct. 6, 2009).  Thus, the plaintiff's factual allegations must "raise a right to relief above the speculative level" and cross "the line from conceivable to plausible." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555, 570 (2007).  Nevertheless, the Federal Circuit has recently reiterated that "[i]n ruling on a 12(b)(6) motion to dismiss, the court must accept as true the complaint's undisputed factual allegations and should construe them in a light most favorable to the plaintiff." *Cambridge v. United States*, 558 F.3d 1331, 1335 (Fed. Cir. 2009); *see also Bank of Guam v. United States*, 578 F.3d 1318, 1326 (Fed. Cir. 2009).

The court will consider defendant's merits arguments only insofar as it has concluded that it has jurisdiction over the enumerated claims.  In other words, it will not address arguments regarding the counts that will be dismissed as untimely.

### 1.    Temporary Takings

Defendant asserts that plaintiff's temporary takings claims should be dismissed with respect to the ninety prescribed servitudes that were determined to have prescribed in the quiet title action.  It contends that the judgment of the United States District Court for the Western District of Louisiana collaterally estops plaintiff from contending that it has a compensable property interest in the prescribed servitudes, requiring its temporary takings claims as to those servitudes to be dismissed.

It is, of course, "axiomatic that only persons with a valid property interest at the time of the taking are entitled to compensation." *Bair v. United States*, 515 F.3d 1323, 1327 (Fed. Cir.), *cert. denied*, 129 S. Ct. 763 (2008) (quoting *Wyatt v. United States*, 271 F.3d 1090, 1096 (Fed. Cir. 2001), *cert. denied*, 535 U.S. 1077 (2002)); *see also Maritrans v. United States*, 342 F.3d 1344, 1351 (Fed. Cir. 2003).  Accordingly, there is little doubt that to support their temporary takings claims, plaintiff must show that, at the time of the leases in question, it owned the relevant servitudes.  Likewise, it is beyond peradventure that the district court's judgment here is entitled to preclusive effect.  "[O]nce an issue is actually and necessarily determined by a court of competent jurisdiction," the Supreme Court has instructed, "that determination is conclusive in subsequent suits based on a different cause of action involving a party to a prior litigation." *Montana v. United States*, 440 U.S. 147, 153 (1979); *see also In re Cyngnus Telecomm. Tech., LLC, Patent Litigation*, 536 F.3d 1343, 1349 (Fed. Cir. 2008), *cert. denied*, 129 S. Ct. 1906 (2009).  By its terms, however, this rule applies only where "the point or question presented for determination in the subsequent action is the same as that litigated and determined in the original action" – in other words, the adjudication of an issue in the first case is not conclusive of a

-22-

distinct issue arising in the second. *United States v. Moser*, 266 U.S. 236, 241 (1924); *Banner v. United States*, 238 F.3d 1348, 1354 (Fed. Cir. 2001); *Underwood Livestock, Inc. v. United States*, 2009 WL 3286686, at *12 (Fed. Cl. Oct. 7, 2009); *see also Petro-Hunt, LLC*, 365 F.3d at 398-99. Any doubts in this regard are resolved against the party invoking the doctrine. *See Steen v. John Hancock Mut. Life Ins. Co.*, 106 F.3d 904, 912 (9th Cir. 1997).

Here, the district court effectively resolved which of the servitudes in question prescribed. There is no indication in the record, however, that it found **when** the prescriptions occurred. Indeed, the judgment rendered by that court on December 7, 2005, focused not on the properties that had prescribed, but instead concluded that plaintiff had retained interests on five servitudes and that any leases issued by the United States with respect to those servitudes were "cancelled and set aside as null and void." Unlike in the quiet title action, timing here is critical: we know plaintiff originally had a compensable property interest in the servitudes – the question is whether it still had that interest at the time that the leases in question were granted. If the prescription of a given servitude occurred after the lease thereon was let, then defendant conceivably could still be liable for any temporary takings associated with the leasing – at least for any period of overlap. Resolution of when the servitudes prescribed cannot be made based upon the facts disclosed in plaintiff's amended complaint and, therefore, must await resolution following discovery in this case.[19]

Finally, in arguing that plaintiff's temporary takings claims should be dismissed, defendant essentially asserts that the leases in question could not have effectuated a takings because, under the Louisiana law regarding mineral servitudes, plaintiff could not preclude defendant from making those leases. Defendant bases this remarkable claim on La. Rev. Stat. § 31:121, which states that "[a] mineral lessee may takes leases from persons claiming the leased land or mineral rights or interests therein adversely to his lessor." A comment in the Louisiana Code describes this provision, as follows:

> The rule stated in Article 121 is consistent with the rule of Article 120 that the mineral lessor's warranty is that of a seller. Early jurisprudence took a common-sense view of the mineral lease, holding that the rule that a lessee may not contest

---

[19] A careful reader might perceive tension between this conclusion and the conclusion that plaintiff's permanent takings claim accrued in 1991, or at the latest 1993, and thus is untimely. In the court's view, however, that plaintiff's temporary takings claim may proceed, while its permanent takings claim does not, results from the different burdens plaintiff had in terms of responding to defendant's motion to dismiss. As to the jurisdictional prongs of that motion, plaintiff was obliged to show that its claims were timely – and its failure to demonstrate factually that any of the servitudes prescribed within six years of the filing of its complaint meant that its permanent takings claim was untimely. But, plaintiff is not obliged to demonstrate now when the servitudes in question prescribed for purposes of the claims made by defendant with respect to the merits. Rather, it may rely on its complaint which, in the court's view, demonstrates that it has a plausible claim.

his lessor's title is inapplicable to mineral leases. . . However, following the decision in *Gulf Refining Co. v. Glassell*, 186 La. 190, 171 So. 846 (1936), which held a mineral lease to be like a predial lease and denied lessees the right to bring real actions, the United States Court of Appeals refused to follow the early decisions on this point and held that a lessee cannot deny his lessor's title. *Sabine Lumber Co. v. Broderick*, 88 F.2d 588 (5th Cir. 1937). The problem posed by this jurisprudence has usually been met by the inclusion in mineral leases of a clause permitting the lessee to take leases from adverse claimants. Article 121 therefore lays to rest a question existing in the jurisprudence and adopts what has become customary practice in the industry.

Comment to La. Rev. Stat. § 31:121. Summarizing this history, a Louisiana Court of Appeals has observed that this provision "was incorporated into the Mineral Code to enable a mineral lessee to protect its rights to explore for and produce minerals." *Am. Lung Ass'n v. State of La.*, 645 So. 2d 1219, 1222 (La. Ct. App. 1994), *writ denied*, 650 So. 2d 1182 (La. 1995).

One obvious shortcoming in defendant's claim is that section 121, by its terms, is inapplicable here, as there is no indication – certainly nothing in the amended complaint – that defendant's lessees were previously leasing the same servitudes from plaintiff. Defendant, however, persists in suggesting that the existence of this provision indicates that a lessor in Louisiana is not liable to the rightful property owner for any damages occasioned by a mineral lease. But, can it be that Louisiana law holds blameless one who, without authorization, leases someone else's property? In fact, as the above commentary reveals, the provision cited by defendant is intended to protect ***lessees*** who wish to pursue drilling and extraction on contested lands, not to protect ***lessors*** who are found to have leased servitudes they did not own. One seeking confirmation of this need consider not only the many cases arising under Louisiana law in which the rightful owners of property have successfully pursued false lessors,[20] but also La. Rev. Stat. § 31:120, which explicitly gives the lessee the right to sue a lessor who does not have title to the interest leased for damages and other revenues that the lessee is obliged to pay to the true owner.[21] Moreover, while defendant deduces from section 121 that the "mere issuance of a

---

[20] *See, e.g.*, *Nelson v. Young*, 234 So. 2d 54 (La. 1970) (landowner who leased mineral interests owned by others liable to owners of mineral reservation for accounting and payment of amounts owed under leases); *State v. Jefferson Island Salt Mining Co.*, 163 So. 145 (La. 1935), *cert. denied*, 297 U.S. 716 (1936) (dispute between mineral owner and salt mining company); *Newman v. Livingston Parish Police Jury*, 603 So. 2d 250 (La. Ct. App. 1992) (dispute between competing claimants as to entitlement to mineral lease royalties); *Win Oil Co. v. UPG, Inc.*, 509 So. 2d 1023, 1026 (La. Ct. App. 1987) (dispute between competing claimants as to entitlement to oil royalties).

[21] Article 120 provides that "[a] mineral lessor impliedly warrants title to the interest leased unless such warranty is expressly excluded or limited. The liability of the lessor for breach of warranty is limited to recovery of money paid or other property or its value given to the lessor

-24-

lease" does not affect the true owner's use or enjoyment of the property, so as to effectuate a takings, this is far from clear as a factual matter. This is particularly so if one assumes that the leases meant what they said in indicating that the lessees were paying royalties to the United States (and not plaintiff) for the exclusive right (presumably, as against plaintiff) to drill for, mine, extract and remove all of the oil and gas on a given servitude (owned by plaintiff). At the least, this court is unwilling to adopt defendant's hollow characterizations of the leases in question based upon a statute that, on its face, is wholly inapplicable here.[22]

At this nascent stage of the proceedings, this court need go no further – contrary to defendant's intimations, plaintiff need not plead every single fact concerning every single lease in order to meet the "plausibility" standard of *Twombly*. The Supreme Court in the latter case (and, even more so in its recent decision in *Iqbal*) made clear that it intended neither to defenestrate the notice pleading rules that have reigned under *Conley v. Gibson*, 355 U.S. 41, 45 (1957), nor, correspondingly, to collapse discovery, summary judgment and trial into the pleading stages of a case. *See Twombly*, 550 U.S. at 555 ("a complaint attacked by a Rule 12(b)(6) motion to dismiss does not need detailed factual allegations"); *Iqbal*, 129 S. Ct. at 1949-50 ("Determining whether a complaint states a plausible claim for relief will . . . be a context-specific task that requires the reviewing court to draw on its judicial experience and common sense.").

Accordingly, this court finds that, to the extent plaintiff's temporary takings claims are timely, they state a valid claim.[23]

---

for execution or maintenance of the lease and any royalties delivered on production from the lease." Commentary to this provision indicates that Article 2506 of the Louisiana Civil Code authorizes the lessee to recover from the false lessor "the fruits or revenues when he is obliged to return them to the true owner." Comment to La. Rev. Stat. § 31:120.

[22] In arguing to the contrary, defendant relies upon *American Lung Ass'n*. In that case, a Louisiana intermediate appellate court was faced with a situation in which La. Rev. Stat. § 31:120 plainly applied, namely, one in which the lessee of the rightful property owner also entered into what the court termed a "protective" lease with a competing claimant. 645 So. 2d at 1222. The court concluded that the rightful owner could not sue the non-owner for damages, suggesting that instead the owner should pursue its own lessee for any amounts owed. In so concluding, the court not only emphasized that its ruling applied to the "protective" leases governed by the statute, but also suggested that its holding was based on the fact that the rightful lessor had not expressly prohibited its lessor from entering into such protective leases, as apparently the lessor could have done under state law. *Id.* at 1222-23. (Here, of course, plaintiff had no opportunity to prevent anyone from entering into leases with the United States.) In the court's view, the rationale of this case lends no weight to defendant's argument that the leases here could not effectuate a takings.

[23] Nor will the court resolve, at this early juncture, whether defendant did or did not issue leases with respect to certain of the servitudes still owned by plaintiff. In making factual claims

## 2. Reformation

In its complaint, plaintiff seeks to reform the contracts entered into between its predecessor-in-interest and the United States. While this court lacks general equitable powers, it may "exercise equitable powers as an incident to [its] general jurisdiction . . . by reforming a contract and enforcing it as reformed in an action of law." *Carney v. United States*, 462 F.2d 1142, 1145 (Ct. Cl. 1972); *see also Lion Raisins, Inc. v. United States*, 51 Fed. Cl. 238, 244 (2001). Plaintiff may prevail on its reformation claim only if that reformation is a precursor to a monetary judgment. *See United States v. Milliken Imprinting Co.*, 202 U.S. 168, 173-74 (1906); *see also Quinault Allottee Ass'n v. United States*, 453 F.2d 1272, 1274 n.1 (Ct. Cl. 1972) ("Where the relief is monetary, we can call upon such equitable concepts as rescission and reformation to reach the right result."). Plaintiff asserts that its claim for reformation is incidental to a claim for money damages, but does not explain how this is so, other than to suggest that the reformation claim buttresses its other contract claims. Of course, if that is the case, then plaintiff's reformation claim must rise or fall with those other contract claims and, indeed, must be dismissed because those other claims have been determined to be untimely. *See Bank of Guam*, 578 F.3d at 1331 (claim for declaratory relief properly dismissed where all other contract claims were dismissed). But, even if plaintiff's reformation claim is viewed as giving rise to a damage claim separate and distinct from its other contract claims, it is hard to envision how any such other contract claim does not fall prey to the same timeliness limitations – again, the facts indicate that plaintiff (or its predecessor) should have known by 1991, or no later than 1993, that the United States no longer viewed the Louisiana law of prescription as inapplicable.

Accordingly, for a variety of reasons, plaintiff's reformation claim must also be dismissed.

## III. CONCLUSION

This court will not gild the lily. Like Odysseus's Ithacan vessel of old, plaintiff's complaint survives for another day (albeit with a complement of fewer claims).

Based on the foregoing, the court **GRANTS**, in part, and **DENIES**, in part, defendant's motion to dismiss. Specifically, the Clerk shall dismiss from the complaint Count I (permanent taking of the ninety-six servitudes); counts IV, V and VI (dealing with contract claims); and count VII (reformation). In addition, count II shall be dismissed to the extent that it presents temporary takings claims as to particular leases that are not timely. On or before November 30,

---

with respect to these and other issues, defendant relies upon detailed declarations (and associated charts) from two expert witnesses, seemingly swatting aside the evidentiary limitations associated with a motion to dismiss. To the extent those declarations assert facts that are non-jurisdictional, this court hereby excludes that matter and will not convert defendant's motion into what the court views as a premature motion for summary judgment. *See* RCFC 56(d).

2009, the parties shall file a joint status report setting forth a proposed discovery plan for this case.

**IT IS SO ORDERED**.

s/ Francis M. Allegra
Francis M. Allegra
Judge

# In The United States Court of Federal Claims

No. 00-512L

(Filed: November 30, 2009)
_____

PETRO-HUNT, L.L.C.,

                Plaintiff,

    v.

THE UNITED STATES,

                Defendant.

_____

## ORDER
_____

On November 6, 2009, this court granted, in part, and denied, in part, defendant's motion to dismiss this case. It held, *inter alia*, that plaintiff's permanent takings claims were time-barred under 28 U.S.C. § 2501. *Petro-Hunt, L.L.C. v. United States*, 2009 WL 3765495, at *8-9 (Fed. Cl. Nov. 6, 2009). On November 23, 2009, plaintiff filed a motion for reconsideration under RCFC 59, seeking to overturn this court's permanent takings ruling.

To prevail on a motion for reconsideration under RCFC 59, the movant must identify a "manifest error of law, or mistake of fact." *Fru-Con Constr. Corp. v. United States*, 44 Fed. Cl. 298, 300 (1999) (quoting *Bishop v. United States*, 26 Cl. Ct. 281, 286 (1992)), *aff'd*, 250 F.3d 762 (Fed. Cir. 2000); *see also Alli v. United States*, 86 Fed. Cl. 33, 34 (2009). Specifically, the moving party must show: (i) an intervening change in controlling law; (ii) the availability of previously unavailable evidence; or (iii) the necessity of granting the motion to prevent manifest injustice. *System Fuels, Inc. v. United States*, 79 Fed. Cl. 182, 184 (2007); *Stockton East Water Dist. v. United States*, 76 Fed. Cl. 497, 499-500 (2007); *Griswold v. United States*, 61 Fed. Cl. 458, 460-61 (2004). The court has considerable discretion in ruling on a motion for reconsideration. *See Yuba Natural Res., Inc. v. United States*, 904 F.2d 1577, 1583 (Fed. Cir. 1990); *see also Banks v. United States*, 84 Fed. Cl. 288, 291 (2008). Nevertheless, granting such relief requires "a showing of extraordinary circumstances." *Caldwell v. United States*, 391 F.3d 1226, 1235 (Fed. Cir. 2004) (citation omitted), *cert. denied*, 546 U.S. 826 (2005); *see also Alli*, 86 Fed. Cl. at 34.

In support of its motion, plaintiff reargues a number of points that this court already has rejected. These points are no more persuasive the second time around. Factually speaking, plaintiff asserts that, contrary to this court's ruling, it was not a successor-in-interest to Hunt Petroleum Corporation. In this regard, it relies upon a new affidavit to rebut an affidavit it previously filed in the Louisiana quiet title action in which it admitted that Hunt Petroleum was an "ancestor in title." The court, however, need not address this factual quandary as plaintiff admits that it is a successor-in-interest to Placid Oil Company. This is significant as the latter company, more than six years prior to the filing of this suit, received a letter on December 10, 1993, putting it on notice that a permanent takings claim against the United States may have accrued. *See Petro-Hunt*, 2009 WL

3765495, at * 12.  In that letter, the Bureau of Land Management (BLM) rejected a protest filed by Hunt Petroleum and Placid Oil requesting that certain parcels be released from an impending lease sale, stating –

> As result of your protest, the Forest Service completed a further review and determined the minerals were in fact prescribed to the United States as stated in their April 19, 1993 title report.  Therefore, your request for withdrawal of these parcels is hereby denied.

In an appendix to its motion, plaintiff has included a letter from Placid Oil to the BLM, dated January 14, 1994, plainly indicating that the former had received the latter's December 10 letter.

Plaintiff discounts these communications by asserting that they reveal the existence of claims only as to the particular servitudes mentioned therein.  This assertion, however, fails to consider the narrow confines of the "accrual suspension" rule, which requires either that the defendant concealed its actions or that the injury was "inherently unknowable."  *Id*. at *10.  At least under the latter prong of that rule, the suspension no longer applies once plaintiff is "on inquiry as to its possible injury."  *Id*. at *12 (quoting *Ingrum v. United States*, 560 F.3d 1311, 1315 (Fed. Cir.), *cert. denied*, 130 S. Ct. 271 (2009) (quoting *Coastal Petroleum Co. v. United States*, 228 Ct. Cl. 864, 867 (1981))).  Contrary to plaintiff's claim, this rule does not apply on a "servitude-by-servitude basis."  Rather, in terms of the permanent takings claim, the court finds that the accrual suspension ceased once plaintiff had knowledge that the United States was claiming that certain servitudes had prescribed.[*]  Given the other documents in the record, plaintiff cannot argue that had it (or its predecessor) conducted an examination of the available records in 1993 and early 1994, it would have failed to discover the potential permanent takings claims against the United States.

Contrary to plaintiff's claim, it is simply not the law that its claim as to the permanent takings of a given servitude did not arise until facts demonstrating the existence of that specific claim were made known to plaintiff.  Such a ruling would turn the "accrual suspension" exception on its head.  Nor is it relevant, as plaintiff intimates, that it or its predecessor may not have had actual knowledge of the documents that would have revealed the potential for a claim.  Rather, it is black-letter law that a claim against the United States arises when "the claimant knew or *should have known* that the claim existed."  *Martinez v. United States*, 333 F.3d 1295, 1319 (Fed. Cir. 2003), *cert. denied*, 540 U.S. 1177 (2004) (emphasis added).

Based on the foregoing – and having considered and rejected the remainder of plaintiff's arguments – the court hereby **DENIES** plaintiff's motion for reconsideration.

**IT IS SO ORDERED**.

s/ Francis M. Allegra
Francis M. Allegra
Judge

---

[*]  Contrary to plaintiff's assertion, there is utterly no basis for the application of judicial estoppel to prevent defendant from making this argument.  Simply put, defendant's claim in this litigation is in no meaningful way in conflict with the position it took in the quiet title action.

# In the United States Court of Federal Claims

No. 00-512L

(Filed:  May 2, 2012)
_____

| | | |
|---|---|---|
| PETRO-HUNT, L.L.C., | * | |
| | * | |
| | * | Takings action; Motion to dismiss under |
| Plaintiff, | * | RCFC 12(b)(1); 28 U.S.C. § 1500; Judicial |
| | * | takings; Supplemental pleading under RCFC |
| v. | * | 15(d); Portions of complaint dismissed. |
| | * | |
| THE UNITED STATES, | * | |
| | * | |
| Defendant. | * | |
| | * | |

_____

**OPINION**
_____

*J. Ralph White,* White Law Firm, New Orleans, LA, for plaintiff.

*William J. Shapiro*, Environment and Natural Resources Division, United States Department of Justice, Washington, D.C., with whom was Assistant Attorney General *Ignacia S. Moreno,* for defendant.

**ALLEGRA, Judge:**

Defendant has moved to dismiss plaintiff's complaint under RCFC 12(b)(1), asserting that the prior filing of a district court action deprived this court of jurisdiction under 28 U.S.C. § 1500.   For the reasons that follow, the court **GRANTS**, in part, and **DENIES**, in part, this motion.

## I.    BACKGROUND[1]

---

[1]  These facts are primarily drawn from plaintiff's complaint and, for purpose of this motion, are assumed to be correct. *See Bell Atl. Corp. v. Twombly*, 550 U.S. 544 (2007). Additional procedural details are drawn from the docket of plaintiff's district court action.

From November 1934 through January 1937, Bodcaw Lumber Company of Louisiana, Inc. (Bodcaw Lumber), and Grant Timber & Manufacturing Company of Louisiana, Inc. (Grant Timber) conveyed the surface estates of 180,000 non-contiguous acres to the United States Forest Service (the Forest Service) for the creation of the Kisatchie National Forest.  The eleven instruments of transfer all expressly excluded the mineral servitudes, which the grantors reserved for Good Pine Oil, a joint venture created by Bodcaw Lumber, Grant Timber, and three other lumber companies.  In 1940, the Louisiana Legislature passed Act 315, creating an exception to the state's ten-year mineral prescription law and making mineral rights underlying land conveyed to the United States "imprescriptible."  In 1942, Nebo Oil Company acquired all of the mineral rights formerly held by Good Pine Oil.

In 1948, the United States filed a quite title action in district court to determine the owner of a particular mineral servitude underlying a parcel that was a part of the 180,000 acre tract Bodcaw Lumber and Grant Timber granted to the United States.  In 1950, a Louisiana district court, relying on Louisiana's Act 315, held that the owner of the mineral servitude was an owner in perpetuity.  *United States v. Nebo Oil Co.*, 90 F. Supp. 73 (W.D. La. 1950).  The Fifth Circuit affirmed the finding that the mineral servitudes were imprescriptible and belonged to Nebo Oil. *United States v. Nebo Oil Co.*, 190 F.2d 1003 (5th Cir. 1951).

Two decades later, in a 1973 case with similar facts, the Supreme Court held that Act 315 was hostile to the United States' interests and could not be borrowed as a rule of decision in federal court.  *United States v. Little Lake Misere Land Co., Inc.*, 412 U.S. 580, 604 (1973). Relying on this decision, in 1991, the United States began granting mineral leases on Forest Service lands it had acquired from Bodcaw Lumber and Grant Timber.  In 1998, Petro-Hunt L.L.C. (Petro-Hunt or plaintiff) became the record holder of a 64.3 percent undivided interest in the mineral servitudes previously owned by Nebo Oil.

On February 18, 2000, Petro-Hunt – along with two other oil and gas companies – filed suit against the United States in the U.S. District Court for the Western District of Louisiana. Their complaint requested a declaratory judgment quieting their title to the property, but alternatively asserted "that the actions of the United States in confiscating their mineral interests amounts to an unconstitutional taking in direct violation of the Fifth Amendment of the United States Constitution, for which Plaintiffs should be compensated."  In its June 5, 2000, response to this complaint, the United States asserted that the district court lacked jurisdiction to declare an unconstitutional takings and award compensation.  On August 24, 2000, Petro-Hunt filed a complaint in this court alleging a Fifth Amendment takings.  On October 31, 2000, the parties filed a joint motion to stay the case in this court pending resolution of the district court action. That motion was granted by this court on November 2, 2000.  On June 29, 2001, plaintiff filed its first amended complaint in this court, which still included an "alternative" request for relief, stating that "in the event that Plaintiffs are not found to be entitled to the declaratory relief sought above, Plaintiffs pray for a money judgment against the United States of America in an amount that will represent just compensation for the unconstitutional taking of the Plaintiffs' Mineral Rights in violation of the Fifth Amendment of the United States Constitution."

The District Court for the Western District of Louisiana initially granted plaintiff's motion for summary judgment on *res judicata* grounds, *Petro-Hunt L.L.C. v. United States*, 179 F. Supp. 2d 669 (2001), but the Fifth Circuit reversed, finding that the 1950 opinion had only decided the ownership of the single parcel at issue in that case. *Petro-Hunt L.L.C. v. United States*, 365 F.3d 385 (5th Cir. 2004). On remand, the parties stipulated that Petro-Hunt retained control of only the *Nebo Oil* servitude and five others that had remained in use, constituting approximately 109,844.5 acres, while the United States had gained ownership of the remaining ninety servitudes through prescription. The Fifth Circuit affirmed a final judgment giving effect to this stipulation, *Petro-Hunt L.L.C. v. United States*, 2007 WL 715270 (5th Cir. 2007), and the U.S. Supreme Court denied certiorari on March 30, 2008. *Petro-Hunt L.L.C. v. United States*, 128 S. Ct. 1471 (2008).

On May 27, 2008, the court lifted the stay in this case. On June 25, 2008, plaintiff filed an amended seven-count complaint asserting permanent and temporary takings, breaches of the original land conveyance contract, and breaches of the covenant of good faith and fair dealing. On September 2, 2008, defendant filed a motion to dismiss, or, alternatively, for summary judgment. On November 6, 2009, the court granted, in part, and denied, in part, defendant's motion to dismiss. It dismissed plaintiff's permanent takings claims and those of its temporary takings claims that were untimely under the six-year limitations period found in 28 U.S.C. § 2501, but found that plaintiff could assert temporary takings claims as to the fifty-six mineral leases executed within the limitations period. *Petro-Hunt, L.L.C. v. United States*, 90 Fed. Cl. 51 (2009). On September 16, 2010, plaintiff filed a "Restated Second Amended Complaint" with three counts, deleting the dismissed claims (while reserving the right to later appeal this court's decision) and adding a judicial takings claim based upon the Supreme Court's decision in *Stop the Beach Renourishment, Inc. v. Florida Dept. of Env'l Protection*, 130 S. Ct. 2592 (2010).

On March 12, 2010, the court set a discovery schedule, with discovery to be completed by July 15, 2011. On December 22, 2010, the court extended this completion date to January 12, 2012. On May 31, 2011, defendant filed a motion to dismiss this cases for lack of jurisdiction under RCFC 12(b)(1). Defendant contends that this court lacks jurisdiction over this matter under 28 U.S.C. § 1500. Briefing and argument of this motion have now been completed.[2]

---

[2] On November 17, 2011, plaintiff filed a new complaint in this court, which reasserts plaintiff's seven original claims and adds its judicial takings claim. Defendant opposed plaintiff's motion to stay that case (No. 11-775), asking instead that it be dismissed as duplicative of the instant case. On December 16, 2011, the court granted plaintiff's motion to stay No. 11-775, but ordered defendant to respond to plaintiff's new complaint. Defendant did so on January 17, 2012, moving to dismiss the new complaint under RCFC 12(b)(1) and 12(b)(6). Briefing on that motion remains stayed.

## II. DISCUSSION

Deciding a motion to dismiss "starts with the complaint, which must be well-pleaded in that it must state the necessary elements of the plaintiff's claim, independent of any defense that may be interposed." *Holley v. United States*, 124 F.3d 1462, 1465 (Fed. Cir. 1997); *see also Bell Atl. Corp.*, 550 U.S. at 554–55. In particular, the plaintiff must establish that the court has subject matter jurisdiction over its claims. *Trusted Integration, Inc. v. United States*, 659 F.3d 1159, 1163 (Fed. Cir. 2011); *Reynolds v. Army & Air Force Exch. Serv.*, 846 F.2d 746, 748 (Fed. Cir. 1988).

Plaintiff asserts federal subject-matter jurisdiction in this court under the Tucker Act, 28 U.S.C. § 1491. That provision grants this court "jurisdiction to render judgment upon any claim against the United States founded either upon the Constitution, or any Act of Congress or any regulation of an executive department, or upon any express or implied contract with the United States . . . ." 28 U.S.C. § 1491(a)(1). It is well-established that takings actions are covered by this grant of jurisdiction. *See Keene Corp. v. United States*, 508 U.S. 200, 205 (1993); *Bywaters v. United States*, 670 F.3d 1211, 1224 (Fed. Cir. 2012). Defendant, however, claims that jurisdiction is lacking here owing to the application of 28 U.S.C. § 1500.

Section 1500 of Title 28 provides:

> The United States Court of Federal Claims shall not have jurisdiction of any claim for or in respect to which the plaintiff or his assignee has pending in any other court any suit or process against the United States or any person who, at the time when the cause of action alleged in such suit or process arose, was, in respect thereto, acting or professing to act, directly or indirectly under the authority of the United States.

28 U.S.C. § 1500. "[T]he words of the statute are plain," the Supreme Court long ago stated, "with nothing in the context to make [its] meaning doubtful." *Corona Coal Co. v. United States*, 263 U.S. 537, 540 (1924); *see also Johns-Manville Corp. v. United States*, 855 F.2d 1556, 1565 (Fed. Cir. 1988), *cert. denied*, 489 U.S. 1066 (1989). Those words speak in terms of subject matter jurisdiction and "bar jurisdiction over the claim of a plaintiff who, upon filing [with the Court of Federal Claims], has an action pending in any other court 'for or in respect to' the same claim." *Keene Corp.*, 508 U.S. at 209; *see also Nez Perce Tribe v. United States*, 83 Fed. Cl. 186, 189 (2008). To determine whether this statute applies here, the court must answer two fundamental questions: (i) whether the district court action was "pending" at the time jurisdiction under section 1500 is measured; and (ii) if so, whether the claims presented to the district court were the same as those in the instant case. *See Kaw Nation of Oklahoma v. United States*, 2012 WL 639928, at *2 (Fed. Cl. Feb. 29, 2012); *Griffin v. United States*, 85 Fed. Cl. 179, 184 (2008), *aff'd*, 621 F.3d 1363 (Fed. Cir. 2010).

Plaintiff's "Restated Second Amended Complaint" rehashes many of the facts that were asserted in its initial complaint in this court. Count II of that complaint avers that the United

States effectuated a temporary takings of ninety-one servitudes by issuing mineral leases to parties that effectively blocked Petro-Hunt from engaging in any activity on the servitudes and precluded Petro-Hunt from itself engaging in any leasing activity. Count III of the complaint avers that the United States effectuated a similar temporary takings of five (or six) servitudes during the pendency of the quiet title action.[3] Finally, Count VIII of this complaint avers that the Fifth Circuit's decision that ninety-six mineral servitudes "belonging to Petro-Hunt as established in *Nebo Oil*, and by contract with the United States, were subject to prescription was contrary to its prior decision in *Nebo Oil* and resulted in a judicial taking of Petro-Hunt's established property rights." For reasons that will become apparent, the two-pronged section 1500 analysis must be applied twice in this case – once to plaintiff's temporary takings claims and, again, to its more recent judicial takings claim.

<div align="center">A.</div>

From the outset of this case, it has been plaintiff's claim that the United States effectuated a takings of its mineral servitudes by issuing mineral leases to third parties and essentially precluding Petro-Hunt from engaging in leasing activities with respect to those properties. *See* Complaint No. 00-512L (Aug. 24, 2000) at ¶ 12.b. Plaintiff's temporary takings claims represent a subset of this broader claim and relate to actions that took place in the six-year period before their complaint was filed in 2000. *See Petro-Hunt, L.L.C.*, 90 Fed. Cl. at 66-67 (describing the nature of these claims). The district court action was pending when this initial complaint was filed. This is important, because, as with most jurisdictional statutes, the impact of section 1500 is measured at the time the lawsuit in this court is filed. *Keene Corp.*, 508 U.S. at 207; *see also Trusted Integration*, 659 F.3d at 1166 n.2; *Kaw Nation*, 2012 WL 639928, at *5 ("[The] measuring point, in the case of section 1500, is when the complaint is filed."); *Nez Perce Tribe v. United States*, 101 Fed. Cl. 139, 145 (2011); *Griffin*, 85 Fed. Cl. at 187. Accordingly, it is dispositive, for the first prong of the section 1500 analysis, that the district court action here was pending at the time the action in this court was filed. *See Trusted Integration*, 659 F.3d at 1166 n.2.

For section 1500 to apply to the temporary takings claims, however, the suit in this court and that in the district court must also be "for or in respect to" the same claim(s). In *United States v. Tohono O'odham Nation*, 131 S. Ct. 1723 (2011), the Supreme Court held that this requirement is met when two claims are "based on substantially the same operative facts, regardless of the relief sought in each suit." *Id.* at 1727; *see also Trusted Integration*, 659 F.3d at 1164. The Court, nonetheless, suggested that the nature of the claims pled may be relevant in helping to identify which facts are "operative" – that is, the "facts parties must prove" in order to prevail. *Tohono*, 131 S. Ct. at 1730; *see also Trusted Integration*, 659 F.3d at 1168. Hence, determining whether two claims are "based on substantially the same operative facts" requires more than a  side-by-side comparison of the two complaints to see how much verbiage is in

---

[3] The heading on this count refers to "five" servitudes, while the body of the count refers to "six."

common.  Before performing such comparisons, rather, the court must first isolate the facts in the complaint that are "operative," *i.e.*, those that must be proven in order to recover on a given claim.  *Trusted Integration*, 659 F.3d at 1168; *cf. Rosebud Sioux Tribe v. United States*, 102 Fed. Cl. 429, 437 (2011).  Similarity in those "operative" facts satisfies the second prong of the section 1500 analysis; conversely, differences in those operative facts can serve to render two claims dissimilar, making section 1500 inapplicable.  The Supreme Court confirmed this in *Tohono*, when it indicated that the claim comparison "can be informed by how claims are defined for *res judicata* purposes."  *Trusted Integration*, 659 F.3d at 1164 (citing *Tohono*, 131 S. Ct. at 1730); *see also Muscogee (Creek) Nation of Oklahoma v. United States*, 2011 WL 6017188, at *4 (Fed. Cl. Dec. 2, 2011).  As the Federal Circuit recently noted, the tests that governed the application of *res judicata* at the time the predecessor to section 1500 was enacted both focused on whether the legally determinative facts in the two suits were the same.  *Trusted Integration*, 659 F.3d at 1168-69.[4]

Given these standards, this court has serious doubts as to whether the pendency of a typical quiet title action in the district court ought to preclude this court from having jurisdiction over a later-filed takings action.[5]  But, the temporary takings portion of the case *sub judice*, as it turns out, is more straightforward because plaintiff raised a takings claim in its district court complaint that remained pending when plaintiff filed essentially the same takings claims in this court.  Indeed, as its original complaint in this court advised, plaintiff filed the instant lawsuit more as a protective matter, in case the district court failed to award damages.[6]  In circumstances

---

[4]  Applying these principles, the Federal Circuit, in *Trusted Integration*, concluded that the presence, in a pending district court complaint, of counts based upon implied-in-fact contracts did not prevent this court from exercising jurisdiction over a separate count based upon breach of a licensing agreement.  In this regard, the court noted that "[n]ot only are these distinct contracts, but their breach requires different conduct."  659 F.3d at 1168.  It added that "[i]mportantly, the facts that would give rise to breach of either of these agreements are not legally operative for establishing the breach of the other."  *Id.*  To buttress this conclusion, the Federal Circuit analyzed the case under the *res judicata* principles identified in *Tohono*.  It concluded that under the *res judicata* principles that were in effect when the predecessor of section 1500 was first enacted, a decision on the implied-in-fact contract would not be *res judicata* of the claim based upon the licensing agreement.  659 F.3d at 1168-70.

[5]  *See, e.g. Trusted Integration*, 659 F.3d at 1168 (suggesting that the focus is on the "legally operative" facts; *Stockton East Water Dist. v. United States*, 101 Fed. Cl. 352, 359 (2011); *see generally,* Craig A. Schwartz, "Footloose:  How to Tame the Tucker Act Shuffle After *United States v. Tohono O'Odham Nation*," 59 UCLA L. Rev. Discourse 2 (2011) (suggesting that "necessarily sequential" lawsuits ought not in effect be covered by section 1500); *cf. Kingman Reef Atoll Invest., LLC v. United States*, 2012 WL 833888, at *33 (Fed. Cl. March 8, 2012); *Central Pines Land Co. v. United States*, 99 Fed. Cl. 394, 400-401 (2011).

[6]  In this regard, plaintiff's original complaint in this court stated that:

like these, section 1500 is undoubtedly triggered, causing this court to lose jurisdiction over plaintiff's temporary takings claims. *See Pellegrini v. United States*, 2012 WL 171912, at *5 (Fed. Cl. Jan. 20, 2012); *Brandt v. United States*, 102 Fed. Cl. 72, 81-82 (2011). It is irrelevant, for this purpose, that the district court lacked jurisdiction over plaintiff's takings claim. *See, e.g.*, *Pellegrini*, 2012 WL 171912, at *5; *Young v. United States*, 60 Fed. Cl. 418, 424 (2004). Nor is this portion of plaintiff's complaint saved by the fact that plaintiff, in subsequent amendments to its complaint in this court, has refined further the legal theories on which its temporary takings claims are based. *See Keene*, 508 U.S. at 212 ("That the two actions were based on different legal theories [does] not matter."); *Trusted Integration*, 659 F.3d at 1163 (section 1500 "was enacted to prevent a claimant from seeking recovery in district court and the Court of Claims for the same conduct pleaded under different legal theories"). Those claims still rely upon facts that were operative in the district court action that was pending at the time the case *sub judice* was filed. Hence, section 1500 precludes this court from having jurisdiction over plaintiff's temporary takings claims.[7]

### B.

The same conclusion, however, does not obtain as to plaintiff's judicial takings count. Count VIII of plaintiff's Restated Second Amended Complaint asserts that the Fifth Circuit's second decision in *Petro-Hunt L.L.C.*, holding that mineral servitudes belonging to Petro-Hunt were subject to prescription, "resulted in a judicial taking of Petro-Hunt's established property rights." Plaintiff asserts that this claim "arose when the United States Supreme Court denied

---

[i]f, in plaintiff's Louisiana Quiet Title Act suit, the District Court rules that plaintiff was the owner of Plaintiff's Mineral Rights, but that the United States has taken same; then, to the extent the District Court does not award plaintiff damages and payment for the same pursuant to 28 U.S.C. § 2909(a), part (b), then plaintiff asks this Court to award it just compensation for this taking by the United States.

[7] The court is troubled that defendant initially moved to stay this case, then allowed this case to remain dormant while defendant was litigating cases like *Tohono*, and did not raise the section 1500 issue until recently, when the filing of a new suit for the same years at issue was barred by the statute of limitations contained in 28 U.S.C. § 2501. While the court hesitantly accepts defendant's explanation that the unfortunate phasing of its positions was inadvertent – designed neither to mislead the court nor to entrap plaintiff – defendant should expect, at the least, that its future entreaties to stay actions will fall on skeptical ears if there is any possibility that defendant will, at some later point, move to dismiss the same case under section 1500. Moreover, if ever asked again to dismiss a case in circumstances like these, the court will seriously consider whether monetary sanctions should be imposed upon defendant. *See also Northrop Grumman Computing Sys., Inc. v. United States*, 99 Fed. Cl. 651, 660 (2011) (noting that "courts have, on occasion, sanctioned a party viewed as having brought belatedly a motion to dismiss for lack of jurisdiction").

plaintiff's petition for *certiorari*." The Fifth Circuit's second decision was issued on March 6, 2007, and the Supreme Court's denial of *certiorari* was on March 3, 2008. Because these events occurred after the filing of plaintiff's original complaint, to the extent plaintiff's most recent complaint raises a judicial takings issue, it must be viewed not as an amended complaint under RFCF 15(c), but rather as a supplemental complaint under RCFC 15(d). The latter rule allows a party to "serve a supplemental pleading setting out any transaction, or occurrence or events that happened after the date of the pleading to be supplemented." *Id.*; *see also Prasco LLC v. Medicis Pharm. Corp.*, 537 F.3d 1328, 1337 (Fed. Cir. 2008); 6A Charles Alan Wright, Arthur R. Miller & Mary Kay Kane, Fed. Prac. & Proc. § 1504, at 184 (hereinafter "Wright, Miller & Kane"). Recent cases confirm that a supplemental pleading may include a new cause of action "provided there is some relationship between the original and the later accruing material." *Id.*; *see also Quaratino v. Tiffany & Co.*, 71 F.3d 58, 66 (2d Cir. 1995); *Keith v. Volpe*, 858 F.2d 467 (9th Cir. 1988); *Ohio Valley Envt'l Coal. v. U.S. Army Corps of Engineers*, 243 F.R.D. 253 (S.D. W.Va. 2007).

Defendant argues that, like an amended complaint, supplemental complaints cannot be used to avoid section 1500. That is true, however, only to a point. Supplemental pleadings under RCFC 15(d) may not be used to cure jurisdiction by adding new facts to a preexisting cause of action that, as originally pled, was barred under section 1500. In other words, if a pending district court complaint had the effect of barring, under section 1500, this court from exercising jurisdiction over a subsequently-filed suit, that defect cannot be cured by adding new facts to the old cause of action after the district court case is no longer pending. *See Central Pines Land Co. v. United States*, 99 Fed. Cl. 394, 403-04 (2011). But, that is not this case. Here, plaintiff filed a supplemental complaint that added an entirely new cause of action based upon a takings that allegedly occurred seven years after the filing of its original complaint. Unlike RCFC 15(c), RCFC 15(d) does not indicate whether such a supplemental pleading relates back to the date of the original complaint. Wright, Miller & Kane, *supra*, at § 1508. Construing the analogous Federal rules, various decisions hold that a supplemental pleading that "requires proof of independent operative facts peculiar to the transaction involved and constitutes a separate claim" does not relate back to the date the original complaint was filed for purposes of applying relevant statutes of limitation. *Blau v. Lamb*, 191 F. Supp. 906, 906 (S.D.N.Y. 1961), *rev'd on other grounds*, 314 F.2d 618 (2d Cir.), *cert. denied*, 375 U.S. 813 (1963); *see also William Inglis & Sons Baking Co. v. ITT Continental Baking Co., Inc.*, 668 F.2d 1014, 1057 (9th Cir. 1981) (following *Blau*); *Soler v. G & U, Inc.*, 103 F.R.D. 69, 75 (S.D.N.Y. 1984) (same); *see also Vann v. United States*, 420 F.3d 968, 974 (Ct. Cl. 1970); Wright, Miller & Kane, *supra*, at § 1508.

The logic of these cases suggests that section 1500 ought not apply to the portion of a supplemental complaint that raises a new claim that "requires proof of independent operative facts" if, at the time the supplemental complaint is filed, no other suit involving that same claim is pending in another court. This result makes eminent sense because, as this court recently observed, the new count in the supplemental complaint is an "independent claim[] that could have been brought in an entirely separate suit." *Stockton East Water Dist.*, 101 Fed. Cl. at 361. Conversely, it makes little sense to hold, as defendant essentially suggests, that plaintiff's

- 8 -

judicial takings claim is barred by section 1500 because that new count was added to a suit filed when the district court action was pending, but would not be barred if plaintiff chose to file a new suit featuring that count and then moved to consolidate that suit with this case.

Critically, plaintiff's judicial takings claim rests upon "independent operative facts" that are not only unlike those in the first two complaints it filed in this case, but also unlike those that were operative in the claims that it originally pursued in the district court. On brief, defendant never quite comes to grips with the fact that the judicial takings claim rests upon the Fifth Circuit's second opinion and that this opinion did not exist when plaintiff filed its action in the district court. The judicial takings claim thus rests on "legally operative" facts that were not at issue before the district court and requires proof of "different conduct." *Trusted Integration*, 659 F.3d at 1168. As such, it follows, *a fortiori*, that the judicial takings claim is not "for or in respect to" the claims originally filed in the district court. In such a situation, section 1500 does not apply. *See Stockton East Water Dist.*, 101 Fed. Cl. at 361-62. Accordingly, section 1500 does not require the dismissal of plaintiff's judicial takings claim.

C.

Finally, the court must reject plaintiff's argument that section 1500 violates the Equal Protection Clause of the Constitution. This claim is rooted in the notion that the statute makes arbitrary distinctions based upon the order in which suits are filed. *See Tecon Engineers, Inc. v. United States*, 343 F.2d 943 (Ct. Cl. 1965), *cert. denied*, 382 U.S. 976 (1966). Finding the statute invalid would be tempting if its constitutionality hinged on whether it was the most sensible and effective way to address the problem of duplicative litigation.[8] But, the latter is not the standard by which the constitutionality of this statute must be adjudged.

"The federal interest in ensuring that all citizens have access to the courts is obviously a weighty one." *Three Affiliated Tribes of Fort Berthold Reservation v. World Engineering*, 476 U.S. 877, 888 (1986); *see also Ca. Motor Transp. Co. v. Trucking Unlimited*, 404 U.S. 508, 510, 513-514 (1972); *Bill Johnson's Rest., Inc. v. NLRB*, 461 U.S. 731, 741, 742-744 (1983). But, from time immemorial, that access has been subject to another foundational principle of our judicial system, *to wit*, that "[t]he Federal Government cannot be sued without its consent." *United States v. Navajo Nation*, 556 U.S. 287, 289 (2009); *FDIC v. Meyer*, 510 U.S. 471, 474 (1994); *see also* Alexander Hamilton, Federalist No. 81 ("It is inherent in the nature of sovereignty not to be amenable to the suit of an individual without its consent."). Given this, it should come as no surprise that Congress has broad discretion not only in generally defining the jurisdiction of the lower federal courts, but, particularly, in deciding the conditions under which the sovereign immunity of the United States will be waived. *See Crown Coat Front Co. v. United States*, 386 U.S. 503, 520 (1967); *State of Minnesota v. United States*, 305 U.S. 382, 388

---

[8] *See, e.g.*, *Griffin v. United States*, 85 Fed. Cl. 179, 191 (2008), *aff'd*, 621 F.3d 1363 (Fed. Cir. 2010)*; see also United Keetoowah Band of Cherokee Indians in Okla. v. United States*, 2012 WL 1005907, at *9 (Fed. Cl. March 27, 2012); *Kaw*, 2012 WL 639928, at *14.

(1939); *Luckenbach S.S. Co. v. United States*, 272 U.S. 533, 536-37(1926); *see also*, *Seaboard Lumber Co. v. United States*, 903 F.2d 1560, 1562-64 (Fed. Cir. 1990). There is little debate that Congress "employed [this] power" when it enacted section 1500. *Keene Corp.*, 508 U.S. at 207.

Because individuals seeking to sue the United States are not a "suspect class" and their access to federal courts under waiver statutes, like the Tucker Act, is not a "fundamental right," *see Miller v. United States*, 73 F.3d 878, 881 (9th Cir. 1993), Congress' classification of claims under section 1500 needs merely to be "rationally related" to a legitimate government interest. *See Vacco v. Quill*, 521 U.S. 739, 799-801 (1991); *see also Costo v. United States*, 248 F.3d 863, 870 (9th Cir. 2001) (Ferguson, J., dissenting). The classifications made by that statute, therefore, must be sustained "so long as there is a plausible policy reason for the classification, the legislative facts on which the classification is apparently based rationally may have been considered to be true by the governmental decision-maker, and the relationship of the classification to its goal is not so attenuated as to render the distinction arbitrary or irrational." *Fitzgerald v. Racing Ass'n of Central Iowa*, 539 U.S. 103, 107 (2003); *U.S. R.R. Retirement Bd. v. Fritz*, 449 U.S. 166, 174 (1980). This standard "does not allow [the court] to substitute [its] personal notions of good public policy for those of Congress." *Schweiker v. Wilson*, 450 U.S. 221, 234 (1981); *see also City of New Orleans v. Dulles*, 427 U.S. 297, 303 (1976).

Applying this standard, courts have regularly rejected challenges to waiver statutes premised upon the complaint that the waiver is granted to some parties and not to others, finding, in each instance, that Congress had a plausible reason for the classification. *See Obadele v. United States*, 52 Fed. Cl. 432, 441 (2002) (denying African-American plaintiffs from seeking redress under a statute granting reparations to interned Japanese-Americans, noting "[l]egislation inevitably benefits certain persons to the exclusion of others. But such classifications are not necessarily unconstitutional."); *Daliberti v. Republic of Iraq*, 97 F. Supp. 2d 38, 52 (D.D.C. 2000) (upholding withdrawal of sovereign immunity only as to nations classified as "sponsors of terrorism"); *O'Halloran v. United States*, 817 F. Supp. 829, 832 (N.D. Cal. 1993) (rejecting challenge to service requirements associated with certain waivers); *Montalva v. Graham*, 390 F. Supp. 533, 534 (E.D. Wisc. 1975) (administrative exhaustion requirement under Federal Tort Claims Act held not to violate equal protection).[9] The latter is also the case here.

_____

[9] *See also Sealock v. Colorado*, 218 F.3d 1205, 1212 (10th Cir. 2000) (provisions of Colorado statute that excluded from waiver suits brought by incarcerated individuals did not violate equal protection); *Grimes v. Pearl River Valley Water Supply Dist.*, 930 F.2d 441, 444 (5th Cir. 1991) (finding it rational for state legislature to waive sovereign immunity of some state agencies, but not others); *Celli v. Metro-North Commuter RR.*, 891 F. Supp. 124, 127-28 (S.D.N.Y. 1995) ("[I]t is well settled law in this State that limitations imposed on actions as a condition of the State's limited waiver of sovereign immunity are matters of legislative discretion not amendable to an equal protection challenge."); *Gooslin v. State of Md.*, 752 A.2d 642, 644-45 (Md. App. 2000) (Maryland Tort Claims Act's cap on state liability not violative of equal protection); *Murphy v. Richland Memorial Hosp.*, 455 S.E. 2d 688, 690 (S.C. 1995) (shorter statute of limitations when suing state is "rationally designed to minimize the undue burden on the public entity); *Turnbull v. Fink*, 668 A.2d 1370 (De. 1995) (holding that statutory

The Supreme Court recently described the purpose of section 1500 as "sav[ing] the Government from burdens of redundant litigation." *Tohono*, 131 S. Ct. at 1730; *see also Keene Corp.*, 508 U.S. at 206; *Trusted Integration*, 659 F.3d at 1170 (indicating that the purpose of section 1500 was "to prevent claimants from seeking double recovery by maintaining two suits arising from the same factual foundation, but pleaded under different legal theories."). But, although one might get a different impression from reading defendant's briefs, Congress did not intend section 1500 to be all-encompassing, that is, to prevent all forms of redundant litigation, however encountered. *See Kaw Nation*, 2012 WL 639928, at *12. Nor is this required – from an equal protection standpoint, it is simply not true that if Congress wanted to bar some redundant litigation, it had to bar all of such litigation. Recent cases, moreover, make clear that the distinction drawn in *Tecon*, in which only suits filed before a suit filed in this court trigger the statute, makes sense by preventing a plaintiff from using the filing of a suit in a district court as a tactical device to divest this court of jurisdiction and produce a dismissal of its own lawsuit without prejudice. *See Kaw Nation*, 2012 WL 638828, at *16; *see also Tecon*, 343 F.2d at 949.[10]

_____

waiver of sovereign immunity only up to $300,000 did not violate equal protection); *Woodard v. Laurens County*, 456 S.E. 2d 581 (Ga. 1995) ("A waiver of sovereign immunity is a mere privilege, not a right, and the extension of that privilege is solely a matter of legislative grace."); *Stout v. Grand Prairie Ind. Sch. Dist.*, 733 S.W. 2d 290 (Tex. App. 1987) (equal protection not violated by statute immunizing public school teachers from suits alleging tortuous conduct).

[10]  In *Kaw*, defendant sought to have this court abandon the holding in *Tecon*. The court rejected that claim finding that *Tecon* remains binding precedent in this circuit. *Kaw Nation*, 2012 WL 639928, at *3-4; *see also United Keetoowah Band of Cherokee Indians in Okla. v. United States*, 2012 WL 1005907, at *3-4. The court went on, however, to discuss why *Tecon* was correctly decided, and, in so doing, pointed out the following example of why having later-filed district court actions trigger section 1500 made no sense –

> Another example of why defendant's expansive interpretation of section 1500 may backfire comes straight from the pages of *Tecon*. Recall, that in that case, it was the plaintiff who was arguing that its filing of a subsequent district court case deprived this court of jurisdiction and the defendant who was arguing otherwise. Defendant urged the latter position because it believed that a plaintiff should not be able to use the filing of a district court action to restart its case over from scratch. Imagine, then, a situation where a case like this one goes to trial and, for a variety of reasons, the plaintiff anticipates that it will lose. Under defendant's view, nothing would prevent that plaintiff from then filing a district court case seeking an accounting, thereby triggering a dismissal, without prejudice, under section 1500. The plaintiff could then proceed anew in the district court, having used this court as a place to conduct not a trial, but a "trial run"—the plaintiff would have its discovery from this case, a set of "draft" rulings from this court to guide its presentation, and even knowledge as to how particular witnesses will perform on the stand. . . .   Under this scenario, there would not be the glancing

Accordingly, contrary to plaintiff's claims, there is a plausible reason for distinguishing between district court lawsuits filed before and after a complaint is filed in this court. And, indeed, every court to consider the constitutionality of section 1500 has held that it passes muster. *See Agustin v. United States*, 92 Fed. Appx. 786 (Fed. Cir. 2004) ("To the extent that Agustin claims that section 1500 is unconstitutional, that argument is without merit."); *Davis v. United States*, 30 Fed. Cl. 201, 204 (1993) (upholding the constitutionality of section 1500); *Donnelly v. United States*, 28 Fed. Cl. 62, 64-65 (1993) (same).

In sum, while it is regrettable that certain litigants may be unaware of the jurisprudence surrounding section 1500 and file their claims in the district court before filing in this court, that does not render section 1500 unconstitutional.

## III.   CONCLUSION

Based on the foregoing, defendant's motion to dismiss is hereby **GRANTED,** in part, and **DENIED**, in part. On or before June 4, 2012, the parties shall file a joint status report indicating how this case (and No. 11-775) should proceed, with a proposed schedule, as appropriate. Before filing that report, the parties shall have at least one serious conversation regarding settlement of these matters.

**IT IS SO ORDERED**.

s/ Francis M. Allegra
Francis M. Allegra
Judge

---

overlap of cases that we have now, but rather a situation in which two full blown trials are conducted—certainly, the worst form of duplication imaginable—and likely the reason why defendant so many years ago wisely argued against the position that it espouses now. Asked about this scenario during oral argument, defendant's counsel indicated that the anomalous result described was dictated by Congress. This court thinks not.

*Kaw Nation*, 2012 WL 639928, at *16; *see also Tecon*, 343 F.2d at 949 (citing a similar example and stating that "[t]his court cannot permit control of its jurisdiction and administration of its functions at the mere whim of a litigant."); *Keetoowah Band*, 2012 WL 1005907, at *9.

# In the United States Court of Federal Claims

No. 00-512L

(Filed:  May 30, 2012)
_____

|  |  |  |
|---|---|---|
| PETRO-HUNT, L.L.C., | *<br>*<br>* | |
| Plaintiff, | *<br>* | Takings action; Motion for reconsideration<br>under RCFC 59; 28 U.S.C. § 1500; Motion<br>denied. |
| v. | *<br>*<br>* | |
| THE UNITED STATES, | *<br>* | |
| Defendant. | *<br>* | |

_____

## ORDER
_____

*J. Ralph White,* White Law Firm, New Orleans, LA, for plaintiff.

*William J. Shapiro*, Environment and Natural Resources Division, United States Department of Justice, Washington, D.C., with whom was Assistant Attorney General *Ignacia S. Moreno*, for defendant.

**ALLEGRA, Judge:**

On May 2, 2012, this court granted, in part, defendant's motion to dismiss plaintiff's complaint under RCFC 12(b)(1), holding that the prior filing of a district court action deprived this court of jurisdiction over some of plaintiff's claims under 28 U.S.C. § 1500.  *Petro-Hunt, L.L.C. v. United States*, 2012 WL 1571004 (Fed. Cl. May 2, 2012).  On May 29, 2012, plaintiff filed a motion for reconsideration under RCFC 59.  The court deems further briefing on this motion unnecessary.

To prevail on a motion for reconsideration under RCFC 59, the movant must identify a "manifest error of law, or mistake of fact."  *Fru-Con Constr. Corp. v. United States*, 44 Fed. Cl. 298, 300 (1999) (quoting *Bishop v. United States*, 26 Cl. Ct. 281, 286 (1992)), *aff'd*, 250 F.3d 762 (Fed. Cir. 2000); *see also Alli v. United States*, 86 Fed. Cl. 33, 34 (2009); *Six v. United States,* 80 Fed. Cl. 694, 697 (2008).  Specifically, the moving party must show: (i) an intervening change in controlling law; (ii) the availability of previously unavailable evidence; or (iii) the necessity of granting the motion to prevent manifest injustice.  *Stovall v. United States*, 86 Fed.

Cl. 770, 771 (2009); *System Fuels, Inc. v. United States*, 79 Fed. Cl. 182, 184 (2007); *Stockton East Water Dist. v. United States*, 76 Fed. Cl. 497, 499-500 (2007).  The court has considerable discretion in ruling on a motion for reconsideration.  *See Yuba Natural Res., Inc. v. United States*, 904 F.2d 1577, 1583 (Fed. Cir. 1990); *see also Stovall*, 86 Fed. Cl. at 771; *Banks v. United States*, 84 Fed. Cl. 288, 291 (2008).  Nevertheless, granting such relief requires "a showing of extraordinary circumstances."  *Caldwell v. United States*, 391 F.3d 1226, 1235 (Fed. Cir. 2004) (citation omitted), *cert. denied*, 546 U.S. 826 (2005); see also *Stovall*, 86 Fed. Cl. at 772; *Alli*, 86 Fed. Cl. at 34.

Plaintiff argues that this court erred in dismissing its temporary takings claims.  It argues that, under *Loveladies Harbor, Inc. v. United States*, 27 F.3d 1545 (Fed. Cir. 1994) (en banc), section 1500 does not apply to the extent that a district court lacks jurisdiction over a claim filed prior to suit being filed in this court.  Plaintiff asserts that because the district court here lacked jurisdiction over its takings claims, section 1500 is, therefore, inapplicable.

In fact, though, a number of cases have held that the prohibition under section 1500 applies regardless of whether the district court has jurisdiction over the other action.  *See Franz Equipment v. United States*, 98 F. Supp. 579, 580 (Ct. Cl. 1951) ("The applicability of Sec. 1500 . . . is not conditioned upon the question of whether the District Court had jurisdiction of the claim asserted by the plaintiff therein . . . ."); *see also Pelligrini v. United States*, 103 Fed. Cl. 47, 52 (2012) ("Even if a claim is ultimately dismissed for lack of subject-matter jurisdiction, it was pending from the time it was filed until dismissal."); *Brandt v. United States*, 102 Fed. Cl. 72, 77 n.4 (2011) (holding that this jurisdictional argument "is without merit"); *Forsgren v. United States*, 73 Fed. Cl. 135, 142-43 (2006) (same).  These cases proceed from the notion that a lawsuit is "pending" under section 1500 whether *vel non* a district court has jurisdiction.  *See, e.g.*, *Pelligrini v. United States*, 103 Fed. Cl. at 52.

To be sure, the Federal Circuit cast doubt on the continuing viability of *Franz Equipment* in *Eastern Shawnee Tribe of Oklahoma*, but its decision in that case was, in turn, reversed by the Supreme Court on the authority of the latter's opinion in *United States v. Tohono O'odham Nation*, 131 S. Ct. 1723 (2011).  *See Eastern Shawnee Tribe of Oklahoma v. United States*, 582 F.3d 1306, 1312 n.4 (Fed. Cir. 2009), *denying rehearing*, 598 F.3d 1326 (Fed. Cir. 2010), *vacated*, 131 S. Ct. 2872 (2011); *see also UNR Indus. Inc. v. United States*, 962 F.2d 1013, 1022 (Fed. Cir. 1992) (overruling *Brown v. United States*, 358 F.2d 1002, 1004 (Ct. Cl. 1966)), *aff'd*, *Keene Corp. v. United States*, 508 U.S. 200, 216 n.12 (1993).  To the extent that *Loveladies Harbor* may be read as establishing an analysis that hinges not on whether the prior district court action was still "pending," but rather on whether that court had jurisdiction over the matter, it cannot be viewed as still good law.  Neither the analysis of section 1500 in *Tohono*, nor that in *Keene*, is the least bit sensitive to whether the district court has jurisdiction over an action that remains "pending" when a successor suit is filed here.  *See Tohono O'odham Nation*, 131 S. Ct. at 1729; *Keene Corp. v. United States*, 508 U.S. 200, 210-14 (1993); *see also Trusted Integration Co., Inc. v. United States*, 659 F.3d 1159, 1166 n.2 (Fed. Cir. 2011).  Indeed, in both Supreme Court cases, it appeared that the district court lacked jurisdiction over the lawsuit that the Supreme Court concluded gave rise to the prohibition under section 1500.  *See Tohono*

- 2 -

*O'odham*, 131 S. Ct. at 1729; *Keene Corp.*, 508 U.S. at 204 (noting that the district court action had been dismissed for lack of jurisdiction).

Based on the foregoing, plaintiff's motion for reconsideration under RCFC 59 is hereby **DENIED**.

**IT IS SO ORDERED**.

s/ Francis M. Allegra
Francis M. Allegra
Judge

# In the United States Court of Federal Claims

Nos. 00-512L, 11-775L
Filed: February 29, 2016
Reissued for Publication: April 26, 2016[1]

```
* * * * * * * * * * * * * * *   *
                                 *
PETRO-HUNT, L.L.C.,              *
                                 *
              Plaintiff,         *
                                 *
      v.                         *       Takings; Judicial Takings
                                 *       Claim; Motion to Dismiss;
UNITED STATES,                   *       Subject-Matter Jurisdiction.
                                 *
              Defendant.         *
                                 *
* * * * * * * * * * * * * * *   *
```

**Joseph R. White**, White Law Firm, New Orleans, LA, for plaintiff.

**William J. Shapiro**, Trial Attorney, Natural Resources Section, Environment and Natural Resources Division, United States Department of Justice, Sacramento, CA, for the defendant.  With him was **Emily M. Meeker**, Trial Attorney, Natural Resources Section, and **John C. Cruden**, Assistant Attorney General, Environment and Natural Resources Division, United States Department of Justice, Washington, D.C.

# O P I N I O N

## HORN, J.

The above captioned cases involve the government's alleged taking in violation of the Fifth Amended to the United States Constitution of ninety mineral servitudes underlying roughly 58,000 acres of the Kisatchie National Forest in Louisiana.  Plaintiff alleges that the United States Court of Appeals for the Fifth Circuit took its property by holding that the mineral servitudes were subject to the Louisiana law of prescription. See Petro-Hunt, L.L.C. v. United States, 365 F.3d 385 (5th Cir.), cert. denied, 543 U.S. 1034 (2004). These cases are currently before this court on defendant's motion to dismiss

---

[1] This opinion was issued under seal on February 29, 2016. The parties filed a joint status report indicating no redactions were required. After subsequent review of the opinion by the court, the court agrees no redactions are warranted, and, therefore, the opinion is hereby unsealed and reissued without redaction.

plaintiff's judicial takings claims and the parties' cross motions for summary judgment on the judicial takings claims.[2]

## FINDINGS OF FACT

Between 1932 and 1934, two companies, Bodcaw Lumber Company of Louisiana (Bodcaw) and Grant Timber & Manufacturing Company of Louisiana, Inc. (Grant), conveyed 96 mineral servitudes underlying approximately 180,000 acres of land to Good Pine Oil Company, Inc., a joint venture created by Bodcaw, Grant, and three other lumber companies.

In the early 1930s, the United States approached Bodcaw and Grant with an offer to purchase the surface land of the 180,000 acres.  The United States intended to acquire this land pursuant to the Weeks Law, which authorized the government to purchase lands throughout the United States to establish national forests.  See Weeks Law of 1911, ch. 186, 36 Stat. 961 (1911) (codified as amended at 16 U.S.C. §§ 515–519, 521, 552, 563 (2012)).  Bodcaw and Grant expressed concern over the application of the Louisiana law of prescription, which states that mineral servitudes to the owner of the surface estate extinguish after ten years of nonuse.  See La. Civil Code art. 789, 3546 (1870) (currently codified as amended at La. Rev. Stat. § 31:27 (2015)).  On May 29, 1935, an Assistant Solicitor of the United States Department of Agriculture issued an opinion stating that the prescriptive provisions of the Louisiana Civil Code would not apply to lands sold to the United States for national forest purposes. The Forest Service delivered the 1935 opinion to Bodcaw and Grant to ease their fears that the land would prescribe to the United States. Between 1934 and 1937, the two companies conveyed the surface land of the 180,000 non-contiguous acres to the United States through several conveyances for the creation of the Kisatchie National Forest.[3]

---

[2] Judge Francis Allegra, the Judge previously assigned to these cases, issued seven earlier opinions in Case No. 00-512L. See Petro-Hunt, L.L.C. v. United States, 114 Fed. Cl. 143 (2013); Petro-Hunt, L.L.C. v. United States, 113 Fed. Cl. 80 (2013); Petro-Hunt, L.L.C. v. United States, 108 Fed. Cl. 398 (2013); Petro-Hunt, L.L.C. v. United States, 105 Fed. Cl. 132 (2012); Petro-Hunt, L.L.C. v. United States, 105 Fed. Cl. 37 (2012); Petro-Hunt, L.L.C. v. United States, 91 Fed. Cl. 447 (2010); Petro-Hunt, L.L.C. v. United States, 90 Fed. Cl. 51 (2009). The court includes only the findings of fact relevant to this opinion in order to address the pending motions.

[3] As Judge Allegra previously noted: "The eleven instruments of transfer all expressly excluded the mineral servitudes, which the grantors reserved for Good Pine Oil, a joint venture created by Bodcaw Lumber, Grant Timber, and three other lumber companies." Petro-Hunt, L.L.C. v. United States, 105 Fed. Cl. at 40.

In 1940, the Louisiana legislature enacted Act 315 of 1940 (Act 315), declaring that when the United States acquired land subject to the prior sale of the oil, gas or other mineral rights, the mineral rights were imprescriptible.[4]  In 1948, the United States filed a quiet title action in the United States District Court for the Western District of Louisiana to determine the owner of a mineral servitude underlying approximately 800 acres of the 180,000 acres in dispute in these cases. The court held, relying on Act 315, that the Louisiana law of prescription did not apply and the servitude affecting the approximately 800 acres remained in the hands of Petro-Hunt's predecessor in interest, the Nebo Oil Company.[5]  See United States v. Nebo Oil Co., 90 F. Supp. at 84.  Although Act 315 was passed four years after the sale of the land above the servitude affecting the approximately 800 acres, the Western District of Louisiana found that the law still applied because the conveyance occurred within ten years of Act 315. See id. at 81.

The holding of Nebo Oil came into question when the United States Supreme Court decided United States v. Little Lake Misere Land Co., 412 U.S. 580 (1973). The Little Lake Misere case involved two parcels of land in Louisiana acquired by the United States in 1937 and 1939 in accordance with the Migratory Bird Conservation Act, with the express provision that the mineral rights associated with the land were reserved to Little Lake Misere for a period of 10 years, or longer if Little Lake Misere continued the production of minerals on the site. See id. at 582–83. The Supreme Court determined that because the land acquisition was "one arising from and bearing heavily upon a federal regulatory program" and involved the United States as a party, the case should be interpreted according to federal law. See id. at 593–94. The Supreme Court held that the retroactive application of Louisiana's Act 315 was "plainly hostile to the interests of the United States" and "[t]o permit state abrogation of the explicit terms of a federal land acquisition would deal a serious blow to the congressional scheme contemplated by the Migratory Bird Conservation Act and indeed all other federal land acquisition programs." Id. at 596–97.  Accordingly, the Supreme Court held that the land in question had prescribed to the United States. See id. at 604.

---

[4] The relevant part of Act 315 provides: "Be it enacted by the Legislature of Louisiana, That when land is acquired by conventional deed or contract, condemnation or expropriation proceedings by the United States of America, or any of its subdivisions or agencies, from any person, firm or corporation, and by the act of acquisition conveyed subject to a prior sale or reservation of oil, gas, and/or other minerals or royalties, still in force and effect, said rights so reserved or previously sold shall be imprescriptible." United States v. Nebo Oil Co., 90 F. Supp. 73, 80 (W.D. La. 1950) (quoting Act 315 (codified as amended at La. Rev. Stat. Ann. § 31:149)), aff'd, 190 F.2d 1003 (5th Cir. 1951).

[5] In 1942, Nebo Oil Company acquired all of the mineral rights formerly held by Good Pine Oil Company, Inc.

3

In 1991, the United States began granting mineral leases on some of the conveyed land at issue in these cases.  In 1998, through various conveyances, Petro-Hunt became the record holder of a 64.3% undivided interest in the mineral servitudes once owned by Good Pine Oil Company, Inc.  On February 18, 2000, Petro-Hunt, along with the co-owners of Petro-Hunt's mineral estate, filed a quiet title action in the United States District Court for the Western District of Louisiana, seeking a declaration that they were the owners in perpetuity of the mineral servitudes. See Petro-Hunt, L.L.C. v. United States, No. 00-303 (W.D. La. filed Feb. 18, 2000).  Their complaint requested a declaratory judgment quieting their title to the property, but alternatively asserted "that the actions of the United States in confiscating their mineral interests amounts to an unconstitutional taking in direct violation of the Fifth Amendment of the United States Constitution, for which Plaintiffs should be compensated." In its June 5, 2000, response to this complaint, the United States asserted that the United States District Court for the Western District of Louisiana lacked jurisdiction to declare an unconstitutional takings and award compensation.

On August 24, 2000, Petro-Hunt filed a complaint in this court, Case No. 00-512L, alleging that the United States had breached its contract and the Fifth Amendment Takings Clause by exercising ownership over the mineral servitudes.  On November 2, 2000, the case in this court was stayed pending the resolution of the quiet title action in the United States District Court for the Western District of Louisiana. On December 18, 2001, the Western District of Louisiana held that the law of prescriptions did not apply and that Petro-Hunt retained title to the mineral servitudes.  Petro-Hunt, L.L.C. v. United States, 179 F. Supp. 2d 669 (W.D. La. 2001).  The United States Court of Appeals for the Fifth Circuit reversed, holding that the law of prescriptions did apply to Petro-Hunt's mineral servitudes. See Petro-Hunt, L.L.C. v. United States, 365 F.3d at 399. In its ruling, the Fifth Circuit expressly relied upon the Little Lake Misere decision and a 2001 Fifth Circuit decision, Central Pines Land Co. v. United States, 274 F.3d 881 (5th Cir. 2001), cert. denied, 537 U.S. 822 (2002).  See Petro-Hunt, L.L.C. v. United States, 365 F.3d at 392–93 (discussing the two cases).  Central Pines held that "Act 315 cannot be borrowed as the rule of decision for application to pre-1940 transactions, because it is hostile to the interests of the United States." Cent. Pines Land Co. v. United States, 274 F.3d at 886.[6]

---

[6] The Central Pines case addressed the seemingly contrary precedent of Nebo Oil, and determined that Nebo Oil's limited holding only addressed the constitutionality of Act 315 under the Contract Clause of the United States Constitution and the Due Process Clause of the Fourteenth Amendment.  See Cent. Pines Land Co. v. United States, 274 F.3d at 889 ("Nebo Oil holds only that the 'mere hope' or 'expectancy' in the prescription of mineral rights is not protected by the Contract Clause of the U.S. Constitution, and that the retroactive application of Act 315 does not violate the Due Process Clause of the Fourteenth Amendment or dispose of United States property in violation of Article IV, Section 3, clause 2." (footnote omitted)). Therefore, Little Lake Misere's holding that Act 315 could not be applied as a matter of federal common law did not necessarily overrule the constitutional analysis of Nebo Oil, although it did "reject[] the presumption in Nebo

Relying on <u>Central Pines</u>, the Fifth Circuit held that it was "prohibited from borrowing Act 315 as the federal rule of decision" and remanded the case United States District Court for the Western District of Louisiana to determine which of Petro-Hunt's mineral servitudes had prescribed to the United States through nonuse.  <u>Petro Hunt, L.L.C. v. United States</u>, 365 F.3d at 399.

In accordance with the Fifth Circuit decision, the quiet title action was remanded to the United States District Court for the Western District of Louisiana.  Petro-Hunt filed a motion for trial on the issue of whether Act 315 applied to its mineral servitudes.  <u>See Petro-Hunt, L.L.C. v. United States</u>, No. 00-0303 (W.D. La. Mar. 14, 2005). The court denied the motion, finding that the only issue to be determined was "which of the 95 servitudes not at issue in <u>Nebo Oil</u> ha[d] in fact prescribed for nonuse."  Order, <u>Petro-Hunt, L.L.C. v. United States</u>, No. 00-0303 (W.D. La. Nov. 21, 2005) (internal quotation marks omitted). On December 7, 2005, the United States District Court for the Western District of Louisiana held that Petro-Hunt remained the owner of six servitudes,[7] underlying roughly 122,000 acres, with the remaining 90 having prescribed to the United States through nonuse.  <u>Petro-Hunt, L.L.C. v. United States</u>, No. 00-0303 (W.D. La. Dec. 7, 2005).

Petro-Hunt appealed, arguing that the United States District Court for the Western District of Louisiana erred in denying its motion for trial, or in the alternative, that the Fifth Circuit's 2004 mandate was clearly erroneous and should be withdrawn.  <u>See Petro-Hunt, L.L.C. v. United States</u>, No. 06-30095, 2007 WL 715270, at *1 (5th Cir. Mar. 6, 2007), <u>cert</u>. <u>denied</u>, 552 U.S. 1242 (2008).  On March 6, 2007, the Fifth Circuit affirmed the denial of the motion for trial and denied plaintiff's request that the previous mandate be withdrawn.  <u>Id</u>. at *3.  On March 3, 2008, the Supreme Court denied plaintiff's petition for a writ of certiorari, rendering the Fifth Circuit's decision final.  <u>See Petro-Hunt, L.L.C. v. United States</u>, 552 U.S. 1242 (2008).

On May 27, 2008, the stay in Case No. 00-512L in this court was lifted. On September 2, 2008, defendant filed a motion to dismiss, or, alternatively, for summary judgment. On November 6, 2009, Judge Allegra granted, in part, and denied, in part, defendant's motion to dismiss.  <u>Petro-Hunt, L.L.C. v. United States</u>, 90 Fed. Cl. 51.  Judge

---

<u>Oil</u> that Louisiana law governed the terms of the transactions at issue."  <u>Petro-Hunt, L.L.C. v. United States</u>, 365 F.3d at 393 (citing <u>Cent. Pines Land Co. v. United States</u>, 274 F.3d at 889–90) (footnote omitted).

[7] This decision specifically addressed five servitudes, which had not prescribed because they had been maintained by drilling or production activities.  The sixth servitude is the <u>Nebo Oil</u> servitude, which had not prescribed to the United States because of the <u>res judicata</u> effect of the <u>Nebo Oil</u> decision.  <u>See Petro-Hunt, L.L.C. v. United States</u>, 365 F.3d at 397 (holding that the <u>res judicata</u> effect of <u>Nebo Oil</u> only extends to the particular servitudes at issue in that case).

Allegra dismissed plaintiff's contract claims, permanent takings claims, and certain of its temporary taking claims that were untimely, see id. at 64, 67, 68, but found that other temporary takings claims were timely. See id. at 71.

On September 16, 2010, plaintiff filed its second amended complaint, adding a claim that the Fifth Circuit's decision in the quiet title action constituted a judicial taking of plaintiff's mineral servitudes. On May 31, 2011, defendant filed a motion to dismiss asserting that plaintiff's prior filing of the district court action deprived the court of jurisdiction under 28 U.S.C. § 1500 (2006). On May 2, 2012, Judge Allegra dismissed plaintiff's temporary takings claims as barred by 28 U.S.C. § 1500, but denied the motion to dismiss as to the new judicial takings claim. See Petro-Hunt, L.L.C. v. United States, 105 Fed. Cl. 37.[8]  The judicial takings claim is all that remains in the above captioned cases.

After discovery was completed in 2015, defendant filed a motion to dismiss pursuant to Rules 12(b)(1), 12(c), and 12(h)(3) (2015) of the Rules of the United States Court of Federal Claims (RCFC), and a motion for summary judgment pursuant to RCFC 56 (2015). Defendant raises four main arguments in support of its motions. First,

---

[8] Judge Allegra's earlier decision did not address whether the court had jurisdiction to consider the plaintiff's judicial takings claims, only that the judicial takings claims were not barred by 28 U.S.C. § 1500.  In his decision, Judge Allegra noted that:

> The Fifth Circuit's second decision was issued on March 6, 2007, and the Supreme Court's denial of certiorari was on March 3, 2008. Because these events occurred after the filing of plaintiff's original complaint, to the extent plaintiff's most recent complaint raises a judicial takings issue, it must be viewed not as an amended complaint under RCFC 15(c), but rather as a supplemental complaint under RCFC 15(d).

Petro-Hunt, L.L.C. v. United States, 105 Fed. Cl. at 44.  Judge Allegra also concluded that:

> [I]t makes little sense to hold, as defendant essentially suggests, that plaintiff's judicial takings claim is barred by section 1500 because that new count was added to a suit filed when the district court action was pending, but would not be barred if plaintiff chose to file a new suit featuring that count and then moved to consolidate that suit with this case. Critically, plaintiff's judicial takings claim rests upon "independent operative facts" that are not only unlike those in the first two complaints it filed in this case, but also unlike those that were operative in the claims that it originally pursued in the district court.

Petro-Hunt, L.L.C. v. United States, 105 Fed. Cl. at 45.

defendant argues that the United States Court of Federal Claims lacks jurisdiction over the judicial takings claim because it requires the court to scrutinize the decision of another federal court. Second, defendant argues that the appropriate remedy for a judicial takings claim is the invalidation of the offending court decision, and the Court of Federal Claims lacks jurisdiction to grant this remedy. Third, defendant asserts that plaintiff's claim is barred by res judicata, because plaintiff already litigated its claims in the Fifth Circuit. Finally, defendant asserts that it should succeed on the merits because the Fifth Circuit did not take an established property right from the plaintiff.

In response, plaintiff filed a cross-motion for summary judgment in addition to responding to the motion to dismiss, alleging that it did have an established property right that was taken by the Fifth Circuit's 2007 decision. Regarding its judicial takings claims, plaintiff argues that "Petro-Hunt's valid judicial takings claim is subject to this Court's jurisdiction," and citing to Smith v. United States, 709 F.3d 1114 (Fed. Cir.), cert. denied, 134 S. Ct. 259 (2013) argues that "[t]he Federal Circuit has recognized that judicial action can give rise to claims for the taking of private property."

## DISCUSSION

Prior to addressing the cross-motions for summary judgment, the court first considers defendant's motion to dismiss for lack of jurisdiction. It is well established that "'subject-matter jurisdiction, because it involves a court's power to hear a case, can never be forfeited or waived.'" Arbaugh v. Y & H Corp., 546 U.S. 500, 514 (2006) (quoting United States v. Cotton, 535 U.S. 625, 630 (2002)). "[F]ederal courts have an independent obligation to ensure that they do not exceed the scope of their jurisdiction, and therefore they must raise and decide jurisdictional questions that the parties either overlook or elect not to press." Henderson ex rel. Henderson v. Shinseki, 131 S. Ct. 1197, 1202 (2011); see also Gonzalez v. Thaler, 132 S. Ct. 641, 648 (2012) ("When a requirement goes to subject-matter jurisdiction, courts are obligated to consider sua sponte issues that the parties have disclaimed or have not presented."); Hertz Corp. v. Friend, 559 U.S. 77, 94 (2010) ("Courts have an independent obligation to determine whether subject-matter jurisdiction exists, even when no party challenges it." (citing Arbaugh v. Y & H Corp., 546 U.S. at 514)); Special Devices, Inc. v. OEA, Inc., 269 F.3d 1340, 1342 (Fed. Cir. 2001) ("[A] court has a duty to inquire into its jurisdiction to hear and decide a case." (citing Johannsen v. Pay Less Drug Stores N.W., Inc., 918 F.2d 160, 161 (Fed. Cir. 1990)); View Eng'g, Inc. v. Robotic Vision Sys., Inc., 115 F.3d 962, 963 (Fed. Cir. 1997) ("[C]ourts must always look to their jurisdiction, whether the parties raise the issue or not."). "Objections to a tribunal's jurisdiction can be raised at any time, even by a party that once conceded the tribunal's subject-matter jurisdiction over the controversy." Sebelius v. Auburn Reg'l Med. Ctr., 133 S. Ct. 817, 824 (2013); see also Arbaugh v. Y & H Corp., 546 U.S. at 506 ("The objection that a federal court lacks subject-matter jurisdiction . . . may be raised by a party, or by a court on its own initiative, at any stage in the litigation, even after trial and the entry of judgment."); Cent. Pines Land Co., L.L.C. v. United States, 697 F.3d 1360, 1364 n.1 (Fed. Cir. 2012) ("An objection to a court's subject matter jurisdiction can be

raised by any party or the court at any stage of litigation, including after trial and the entry of judgment." (citing Arbaugh v. Y & H Corp., 546 U.S. at 506–07)); Rick's Mushroom Serv., Inc. v. United States, 521 F.3d 1338, 1346 (Fed. Cir. 2008) ("[A]ny party may challenge, or the court may raise sua sponte, subject matter jurisdiction at any time." (citing Arbaugh v. Y & H Corp., 546 U.S. at 506; Folden v. United States, 379 F.3d 1344, 1354 (Fed. Cir.), reh'g and reh'g en banc denied (Fed. Cir. 2004), cert. denied, 545 U.S. 1127 (2005); and Fanning, Phillips & Molnar v. West, 160 F.3d 717, 720 (Fed. Cir. 1998))); Pikulin v. United States, 97 Fed. Cl. 71, 76, appeal dismissed, 425 F. App'x 902 (Fed. Cir. 2011). In fact, "[s]ubject matter jurisdiction is an inquiry that this court must raise sua sponte, even where . . . neither party has raised this issue." Metabolite Labs., Inc. v. Lab. Corp. of Am. Holdings, 370 F.3d 1354, 1369 (Fed. Cir.) (citing Textile Prods., Inc. v. Mead Corp., 134 F.3d 1481, 1485 (Fed. Cir.), reh'g denied and en banc suggestion declined (Fed. Cir.), cert. denied, 525 U.S. 826 (1998)), reh'g and reh'g en banc denied (Fed. Cir. 2004), cert. granted in part sub. nom Lab. Corp. of Am. Holdings v. Metabolite Labs., Inc., 546 U.S. 975 (2005), cert. dismissed as improvidently granted, 548 U.S. 124 (2006)); see also Avid Identification Sys., Inc. v. Crystal Import Corp., 603 F.3d 967, 971 (Fed. Cir.) ("This court must always determine for itself whether it has jurisdiction to hear the case before it, even when the parties do not raise or contest the issue."), reh'g and reh'g en banc denied, 614 F.3d 1330 (Fed. Cir. 2010), cert. denied, 5 U.S. 1169 (2011).

Pursuant to the RCFC and the Federal Rules of Civil Procedure, a plaintiff need only state in the complaint "a short and plain statement of the grounds for the court's jurisdiction," and "a short and plain statement of the claim showing that the pleader is entitled to relief." RCFC 8(a)(1), (2) (2015); Fed. R. Civ. P. 8(a)(1), (2) (2016); see also Ashcroft v. Iqbal, 556 U.S. 662, 677–78 (2009) (citing Bell Atl. Corp. v. Twombly, 550 U.S. 544, 555–57, 570 (2007)). "Determination of jurisdiction starts with the complaint, which must be well-pleaded in that it must state the necessary elements of the plaintiff's claim, independent of any defense that may be interposed." Holley v. United States, 124 F.3d 1462, 1465 (Fed. Cir.) (citing Franchise Tax Bd. v. Constr. Laborers Vacation Trust, 463 U.S. 1 (1983)), reh'g denied (Fed. Cir. 1997); see also Klamath Tribe Claims Comm. v. United States, 97 Fed. Cl. 203, 208 (2011); Gonzalez-McCaulley Inv. Grp., Inc. v. United States, 93 Fed. Cl. 710, 713 (2010). "Conclusory allegations of law and unwarranted inferences of fact do not suffice to support a claim." Bradley v. Chiron Corp., 136 F.3d 1317, 1322 (Fed. Cir. 1998); see also McZeal v. Sprint Nextel Corp., 501 F.3d 1354, 1363 n.9 (Fed. Cir. 2007) (Dyk, J., concurring in part, dissenting in part) (quoting C. Wright and A. Miller, Federal Practice and Procedure § 1286 (3d ed. 2004)). "A plaintiff's factual allegations must 'raise a right to relief above the speculative level' and cross 'the line from conceivable to plausible.'" Three S Consulting v. United States, 104 Fed. Cl. 510, 523 (2012) (quoting Bell Atl. Corp. v. Twombly, 550 U.S. at 555), aff'd, 562 F. App'x 964 (Fed. Cir.), reh'g denied (Fed. Cir. 2014). As stated in Ashcroft v. Iqbal, "[a] pleading that offers 'labels and conclusions' or 'a formulaic recitation of the elements of a cause of action will not do.' 550 U.S. at 555. Nor does a complaint suffice if it tenders 'naked assertion[s]' devoid of 'further factual enhancement.'" Ashcroft v. Iqbal, 556 U.S. at 678 (quoting Bell Atl. Corp. v. Twombly, 550 U.S. at 555).

When deciding a case based on a lack of subject matter jurisdiction or for failure to state a claim, this court must assume that all undisputed facts alleged in the complaint are true and must draw all reasonable inferences in the non-movant's favor. See Erickson v. Pardus, 551 U.S. 89, 94 (2007) ("In addition, when ruling on a defendant's motion to dismiss, a judge must accept as true all of the factual allegations contained in the complaint." (citing Bell Atl. Corp. v. Twombly, 550 U.S. at 555-56 (citing Swierkiewicz v. Sorema N. A., 534 U.S. 506, 508 n.1 (2002)))); Scheuer v. Rhodes, 416 U.S. 232, 236 (1974) ("Moreover, it is well established that, in passing on a motion to dismiss, whether on the ground of lack of jurisdiction over the subject matter or for failure to state a cause of action, the allegations of the complaint should be construed favorably to the pleader."), abrogated on other grounds by Harlow v. Fitzgerald, 457 U.S. 800 (1982), recognized by Davis v. Scherer, 468 U.S. 183, 190 (1984); United Pac. Ins. Co. v. United States, 464 F.3d 1325, 1327-28 (Fed. Cir. 2006); Samish Indian Nation v. United States, 419 F.3d 1355, 1364 (Fed. Cir. 2005); Boise Cascade Corp. v. United States, 296 F.3d 1339, 1343 (Fed. Cir.), reh'g and reh'g en banc denied (Fed. Cir. 2002), cert. denied, 538 U.S. 906 (2003).

The Tucker Act grants jurisdiction to this court as follows:

> The United States Court of Federal Claims shall have jurisdiction to render judgment upon any claim against the United States founded either upon the Constitution, or any Act of Congress or any regulation of an executive department, or upon any express or implied contract with the United States, or for liquidated or unliquidated damages in cases not sounding in tort.

28 U.S.C. § 1491(a)(1) (2012). As interpreted by the United States Supreme Court, the Tucker Act waives sovereign immunity to allow jurisdiction over claims against the United States (1) founded on an express or implied contract with the United States, (2) seeking a refund from a prior payment made to the government, or (3) based on federal constitutional, statutory, or regulatory law mandating compensation by the federal government for damages sustained. See United States v. Navajo Nation, 556 U.S. 287, 289–90 (2009); United States v. Mitchell, 463 U.S. 206, 216 (1983); see also Greenlee Cnty., Ariz. v. United States, 487 F.3d 871, 875 (Fed. Cir.), reh'g and reh'g en banc denied (Fed. Cir. 2007), cert. denied, 552 U.S. 1142 (2008); Palmer v. United States, 168 F.3d 1310, 1314 (Fed. Cir. 1999).

"Not every claim invoking the Constitution, a federal statute, or a regulation is cognizable under the Tucker Act. The claim must be one for money damages against the United States . . . ." United States v. Mitchell, 463 U.S. at 216; see also United States v. White Mountain Apache Tribe, 537 U.S. 465, 472 (2003); Smith v. United States, 709 F.3d at 1116; RadioShack Corp. v. United States, 566 F.3d 1358, 1360 (Fed. Cir. 2009); Rick's Mushroom Serv., Inc. v. United States, 521 F.3d at 1343 ("[P]laintiff must . . . identify a substantive source of law that creates the right to recovery of money damages

9

against the United States."); Golden v. United States, 118 Fed. Cl. 764, 768 (2014). In Ontario Power Generation, Inc. v. United States, the United States Court of Appeals for the Federal Circuit identified three types of monetary claims for which jurisdiction is lodged in the United States Court of Federal Claims. The court wrote:

> The underlying monetary claims are of three types. . . . First, claims alleging the existence of a contract between the plaintiff and the government fall within the Tucker Act's waiver. . . . Second, the Tucker Act's waiver encompasses claims where "the plaintiff has paid money over to the Government, directly or in effect, and seeks return of all or part of that sum." Eastport S.S. [Corp. v. United States, 178 Ct. Cl. 599, 605–06,] 372 F.2d [1002,] 1007-08 [(1967)] (describing illegal exaction claims as claims "in which 'the Government has the citizen's money in its pocket'" (quoting Clapp v. United States, 127 Ct. Cl. 505, 117 F. Supp. 576, 580 (1954)) . . . . Third, the Court of Federal Claims has jurisdiction over those claims where "money has not been paid but the plaintiff asserts that he is nevertheless entitled to a payment from the treasury." Eastport S.S., 372 F.2d at 1007. Claims in this third category, where no payment has been made to the government, either directly or in effect, require that the "particular provision of law relied upon grants the claimant, expressly or by implication, a right to be paid a certain sum." Id.; see also [United States v. ]Testan, 424 U.S. [392,] 401-02 [1976] ("Where the United States is the defendant and the plaintiff is not suing for money improperly exacted or retained, the basis of the federal claim-whether it be the Constitution, a statute, or a regulation-does not create a cause of action for money damages unless, as the Court of Claims has stated, that basis 'in itself . . . can fairly be interpreted as mandating compensation by the Federal Government for the damage sustained.'" (quoting Eastport S.S., 372 F.2d at 1009)). This category is commonly referred to as claims brought under a "money-mandating" statute.

Ontario Power Generation, Inc. v. United States, 369 F.3d 1298, 1301 (Fed. Cir. 2004); see also Twp. of Saddle Brook v. United States, 104 Fed. Cl. 101, 106 (2012).

To prove that a statute or regulation is money-mandating, a plaintiff must demonstrate that an independent source of substantive law relied upon "'can fairly be interpreted as mandating compensation by the Federal Government.'" United States v. Navajo Nation, 556 U.S. at 290 (quoting United States v. Testan, 424 U.S. 392, 400 (1976)); see also United States v. White Mountain Apache Tribe, 537 U.S. at 472; United States v. Mitchell, 463 U.S. at 217; Blueport Co., LLC v. United States, 533 F.3d 1374, 1383 (Fed. Cir. 2008), cert. denied, 555 U.S. 1153 (2009). The source of law granting monetary relief must be distinct from the Tucker Act itself. See United States v. Navajo Nation, 556 U.S. at 290 (The Tucker Act does not create "substantive rights; [it is simply a] jurisdictional provision[] that operate[s] to waive sovereign immunity for claims

10

premised on other sources of law (*e.g.*, statutes or contracts).")." "'If the statute is not money-mandating, the Court of Federal Claims lacks jurisdiction, and the dismissal should be for lack of subject matter jurisdiction.'" <u>Jan's Helicopter Serv., Inc. v. Fed. Aviation Admin.</u>, 525 F.3d 1299, 1308 (Fed. Cir. 2008) (quoting <u>Greenlee Cnty., Ariz. v. United States</u>, 487 F.3d at 876); <u>Fisher v. United States</u>, 402 F.3d 1167, 1173 (Fed. Cir. 2005) (The absence of a money-mandating source is "fatal to the court's jurisdiction under the Tucker Act."); <u>Peoples v. United States</u>, 87 Fed. Cl. 553, 565–66 (2009).

The Takings Clause of the Fifth Amendment to the United States Constitution provides in pertinent part: "nor shall private property be taken for public use without just compensation." U.S. Const. amend. V.  The purpose of this Fifth Amendment provision is to prevent the government from "'forcing some people alone to bear public burdens which, in all fairness and justice, should be borne by the public as a whole.'" <u>Palazzolo v. Rhode Island</u>, 533 U.S. 606, 618 (2001) (quoting <u>Armstrong v. United States</u>, 364 U.S. 40, 49 (1960)), <u>abrogated</u> <u>on</u> <u>other</u> <u>grounds</u> <u>by</u> <u>Lingle v. Chevron U.S.A. Inc.</u>, 544 U.S. 528 (2005), <u>recognized by</u> <u>Hageland Aviation Servs., Inc. v. Harms</u>, 210 P.3d 444 (Alaska 2009); <u>see</u> <u>also</u> <u>Penn Cent. Transp. Co. v. City of New York</u>, 438 U.S. 104, 123-24, <u>reh'g denied</u>, 439 U.S. 883 (1978); <u>Lingle v. Chevron U.S.A. Inc.</u>, 544 U.S. 528, 536 (2005); <u>E. Enters. v. Apfel</u>, 524 U.S. 498, 522 (1998); <u>Rose Acre Farm, Inc. v. United States</u>, 559 F.3d 1260, 1266 (Fed. Cir.), <u>reh'g en banc denied</u> (Fed. Cir. 2009), <u>cert. denied</u>, 130 S. Ct. 1501 (2010); <u>Janowsky v. United States</u>, 133 F.3d 888, 892 (Fed. Cir. 1998); <u>Res. Invs., Inc. v. United States</u>, 85 Fed. Cl. 447, 469-70 (2009); <u>Pumpelly v. Green Bay & Miss. Canal Co.</u>, 80 U.S. (13 Wall.) 166, 179 (1871) (citing to principles which establish that "private property may be taken for public uses when public necessity or utility requires" and that there is a "clear principle of natural equity that the individual whose property is thus sacrificed must be indemnified").

Therefore, "a claim for just compensation under the Takings Clause must be brought to the Court of Federal Claims in the first instance, unless Congress has withdrawn the Tucker Act grant of jurisdiction in the relevant statute." <u>E. Enters. v. Apfel</u>, 524 U.S. at 520 (citing <u>Ruckelshaus v. Monsanto Co.</u>, 467 U.S. 986, 1016-19 (1984)); <u>see</u> <u>also</u> <u>Acceptance Ins. Cos. v. United States</u>, 503 F.3d 1328, 1336 (Fed. Cir. 2007); <u>Morris v. United States</u>, 392 F.3d 1372, 1375 (Fed. Cir. 2004) ("Absent an express statutory grant of jurisdiction to the contrary, the Tucker Act provides the Court of Federal Claims exclusive jurisdiction over takings claims for amounts greater than $10,000."). The United States Supreme Court has declared: "If there is a taking, the claim is 'founded upon the Constitution' and within the jurisdiction of the [United States Court of Federal Claims] to hear and determine." <u>Preseault v. Interstate Commerce Comm'n</u>, 494 U.S. 1, 12 (1990) (quoting <u>United States v. Causby</u>, 328 U.S. 256, 267 (1946)); <u>see also</u> <u>Lion Raisins, Inc. v. United States</u>, 416 F.3d 1356, 1368 (Fed. Cir. 2005); <u>Narramore v. United States</u>, 960 F.2d 1048, 1052 (Fed. Cir. 1992); <u>Perry v. United States</u>, 28 Fed. Cl. 82, 84 (1993).

To succeed under the Fifth Amendment Takings Clause, a plaintiff must show that the government took a private property interest for public use without just compensation. See Adams v. United States, 391 F.3d 1212, 1218 (Fed. Cir. 2004), cert. denied, 546 U.S. 811 (2005); Arbelaez v. United States, 94 Fed. Cl. 753, 762 (2010); Gahagan v. United States, 72 Fed. Cl. 157, 162 (2006). "The issue of whether a taking has occurred is a question of law based on factual underpinnings." Huntleigh USA Corp. v. United States, 525 F.3d 1370, 1377-78 (Fed. Cir.), cert. denied, 555 U.S. 1045 (2008). The government must be operating in its sovereign rather than in its proprietary capacity when it initiates a taking. See St. Christopher Assocs., L.P. v. United States, 511 F.3d 1376, 1385 (Fed. Cir. 2008).

The United States Court of Appeals for the Federal Circuit has established a two-part test to determine whether government actions amount to a taking of private property under the Fifth Amendment. See Klamath Irr. Dist. v. United States, 635 F.3d 505, 511 (Fed. Cir. 2011); Am. Pelagic Fishing Co. v. United States, 379 F.3d 1363, 1372 (Fed. Cir.) (citing M & J Coal Co. v. United States, 47 F.3d 1148, 1153-54 (Fed. Cir.), cert. denied, 516 U.S. 808 (1995)), reh'g denied (Fed. Cir. 2004), cert. denied, 545 U.S. 1139 (2005). A court first determines whether a plaintiff possesses a cognizable property interest in the subject of the alleged takings. Then, the court must determine whether the government action is a "'compensable taking of that property interest.'" Huntleigh USA Corp v. United States, 525 F.3d at 1377 (quoting Am. Pelagic Fishing Co., L.P. v. United States, 379 F.3d at 1372).

To establish a taking, a plaintiff must have a legally cognizable property interest, such as the right of possession, use, or disposal of the property. See Loretto v. Teleprompter Manhattan CATV Corp., 458 U.S. 419, 435 (1982) (citing United States v. Gen. Motors Corp., 323 U.S. 373 (1945)); CRV Enters., Inc. v. United States, 626 F.3d 1241, 1249 (Fed. Cir. 2010), cert. denied, 131 S. Ct. 2459 (2011); Karuk Tribe of Cal. v. Ammon, 209 F.3d 1366, 1374-75 (Fed. Cir.), reh'g denied and en banc suggestion denied (Fed. Cir. 2000), cert. denied, 532 U.S. 941 (2001). "'It is axiomatic that only persons with a valid property interest at the time of the taking are entitled to compensation.'" Am. Pelagic Fishing Co. v. United States, 379 F.3d at 1372 (quoting Wyatt v. United States, 271 F.3d 1090, 1096 (Fed. Cir. 2001), cert. denied, 353 U.S. 1077 (2002) and citing Cavin v. United States, 956 F.2d 1131, 1134 (Fed. Cir. 1992)). Therefore, "[i]f the claimant fails to demonstrate the existence of a legally cognizable property interest, the courts [sic] task is at an end." Am. Pelagic Fishing Co. v. United States, 379 F.3d at 1372 (citing Maritrans Inc. v. United States, 342 F.3d 1344, 1352 (Fed. Cir. 2003) and M & J Coal Co. v. United States, 47 F.3d at 1154). The court does not address the second step "without first identifying a cognizable property interest." Air Pegasus of D.C., Inc. v. United States, 424 F.3d 1206, 1213 (Fed. Cir.) (citing Am. Pelagic Fishing Co. v. United States, 379 F.3d at 1381 and Conti v. United States, 291 F.3d 1334, 1340 (Fed. Cir.), reh'g en banc denied (Fed. Cir. 2002), cert. denied, 537 U.S. 1112 (2003)), reh'g denied and reh'g en banc denied (Fed. Cir. 2005). Only if there is to be a next step, "'after having identified a valid property interest, the court must determine whether the governmental action at issue

amounted to a compensable taking of that property interest.'" Huntleigh USA Corp. v. United States, 525 F.3d at 1378 (quoting Am. Pelagic Fishing Co. v. United States, 379 F.3d at 1372).

Judicial Takings

The contours—and even the existence—of a judicial takings doctrine has been debated in federal courts and in legal scholarship. See generally Stop the Beach Renourishment, Inc. v. Fla. Dep't of Envtl. Prot., 560 U.S. 702 (2010); Frederic Bloom & Christopher Serkin, "Suing Courts," 79 U. Chi. L. Rev. 553, 555 (2012); Stacey L. Dogan & Ernest A. Young, "Judicial Takings and Collateral Attack on State Court Property Decisions," 6 Duke J. Const. L. & Pub. Pol'y 107, 112–13 (2011); John D. Echeverria, "Stop the Beach Renourishment: Why the Judiciary is Different," 35 Vt. L. Rev. 475 (2010); Daniel L. Siegel, "Why We Will Probably Never See a Judicial Takings Doctrine," 35 Vt. L. Rev. 459 (2010); Barton H. Thompson, Jr., "Judicial Takings," 76 Va. L. Rev. 1449 (1990).

The door to judicial takings claims was cracked ajar by the Supreme Court's decision in Stop the Beach Renourishment, Inc. v. Florida Department of Environmental Protection. See generally Stop the Beach Renourishment, Inc. v. Fla. Dep't of Envtl. Prot., 560 U.S. 702. In Stop the Beach, a group of beachfront landowners from the city of Destin and Walton County, Florida, alleged that the Supreme Court of Florida took their property when it held that the Beach and Shore Preservation Act of 1961 did not unconstitutionally deprive landowners of their littoral rights without just compensation. See Stop the Beach Renourishment, Inc. v. Fla. Dep't of Envtl. Prot., 560 U.S. at 709–12. The eight justices who took part in the case[9] held that the Florida Supreme Court's decision did not constitute a violation of the Fifth Amendment Takings Clause "[b]ecause the Florida Supreme Court's decision did not contravene the established property rights of petitioner's Members." Id. at 733 (majority opinion). Specifically, the majority opinion found that "[t]here is no taking unless petitioner can show that, before the Florida Supreme Court's decision, littoral-property owners had rights to future accretions and contact with the water superior to the State's right to fill in its submerged land." Id. at 730.

The justices, however, did not agree on the definition of a judicial taking, or even whether judicial takings claims are cognizable in federal court. The plurality opinion by Justice Scalia, which was joined by Chief Justice Roberts, Justice Thomas, and Justice Alito, asserted that courts can violate the Fifth Amendment through their actions, since "[t]he [Takings] Clause is not addressed to the action of a specific branch or branches. It is concerned simply with the act, and not with the governmental actor." Id. at 713–14 (plurality opinion). The plurality determined that a successful judicial takings plaintiff "must prove the elimination of an established property right" by the judicial decision. See id. at 726.

---

[9] Justice John Paul Stevens recused himself from the case.

Justice Kennedy, joined by Justice Sotomayor, would have decided the case under the Due Process Clause of the Fourteenth Amendment, rather than the Takings Clause, and stated that it was unnecessary "to determine whether, or when, a judicial decision determining the rights of property owners can violate the Takings Clause of the Fifth Amendment of the United States Constitution." Id. at 733–37 (Kennedy, J., concurring in part and concurring in the judgment).  Justice Kennedy acknowledged that "[t]o announce that courts too can effect a taking when they decide cases involving property rights, would raise certain difficult questions." Id. at 737. Justice Kennedy feared that a judicial takings doctrine would give judges more power by allowing them to decide what property should or should not be taken and paid for by the government, a responsibility that the judiciary historically has not possessed. See id. at 738–39.  Additionally, "it may be unclear in certain situations how a party should properly raise a judicial takings claim" and what remedy courts are able to grant. See id. at 740–41.

Justice Breyer's concurrence, joined by Justice Ginsburg, found no unconstitutional taking had occurred and indicated it was unnecessary to decide whether courts could effect a taking or what would constitute a judicial taking. See id. at 742–44 (Breyer, J., concurring in part and concurring in the judgment).  Justice Breyer shared some of the concerns expressed by Justice Kennedy about establishing a judicial takings doctrine, since it "would invite a host of federal takings claims without the mature consideration of potential procedural or substantive legal principles that might limit federal interference in matters that are primarily the subject of state law." Id. at 743.  In the end, a majority of the Supreme Court justices were only able to agree that if there could be such a thing as a judicial taking, the Florida Supreme Court decision under review was not one. See id. at 733 (majority opinion).

Since the Stop the Beach decision, courts have varied in their treatment of judicial takings claims.  Some courts, including the United States Court of Appeals for the Federal Circuit, have determined that judicial takings can exist, although without concluding that a judicial taking actually occurred. See Smith v. United States, 709 F.3d at 1116 ("In that case [Stop the Beach], the Court recognized that a takings claim can be based on the action of a court."); Vandevere v. Lloyd, 644 F.3d 957, 964 n.4 (9th Cir.) ("[A]ny branch of state government could, in theory, effect a taking." (citing Stop the Beach Renourishment, Inc. v. Fla. Dep't of Envtl. Prot., 560 U.S. at 713–15 (plurality opinion))), cert. denied, 132 S. Ct. 850 (2011).  A number of courts faced with judicial takings claims have declined to address the question of whether a court can effect a taking, and have dismissed the claims on other grounds. See, e.g., Bettendorf v. St. Croix Cnty., 631 F.3d 421, 435 n.5 (7th Cir. 2011) (declining to decide "whether a court decision can effect a compensable taking of property"); Allustiarte v. United States, 256 F.3d 1349, 1352 (Fed. Cir.) (finding that the court lacked jurisdiction over a judicial takings claim), cert. denied, 534 U.S. 1042 (2001); Weigel v. Maryland, 950 F. Supp. 2d 811, 837–38 (D. Md. 2013) ("The Court need not determine whether a judicial takings claim is constitutionally cognizable here, because

the Plaintiffs have failed to show a clear likelihood of success on their claim that a 'taking' has occurred in the first place."), <u>appeal</u> <u>dismissed</u>, (4th Cir. 2014).

Two United States Court of Appeals for the Federal Circuit decisions indicate that a court could effect a taking in violation of the Fifth Amendment, at least in theory. First, <u>Boise Cascade Corporation v. United States</u> held that the Court of Federal Claims had jurisdiction to consider a claim that a district court injunction took plaintiff's property rights, although the court went on to dismiss the claim as unripe. <u>Boise Cascade Corp. v. United States</u>, 296 F.3d 1339, 1344, 1357 (Fed. Cir.), <u>reh'g</u> <u>and</u> <u>reh'g</u> <u>en banc</u> <u>denied</u> (Fed. Cir. 2002), <u>cert.</u> <u>denied</u>, 538 U.S. 906 (2003).  More recently, the Federal Circuit in <u>Smith v. United States</u> stated that in <u>Stop the Beach</u>, "the Court recognized that a takings claim can be based on the action of a court" and that "it was recognized prior to <u>Stop the Beach</u> that judicial action could constitute a taking of property." <u>Smith v. United States</u>, 709 F.3d at 1116–17.  The Federal Circuit went on to dismiss the judicial takings claim for violating the statute of limitations. <u>See</u> <u>id.</u> at 1117.  This court finds that it is not necessary to determine if plaintiff's judicial takings claim is cognizable in federal court because, even if it is, the United States Court of Federal Claims lacks jurisdiction to determine if a judicial taking occurred in these cases.

The Federal Circuit has repeatedly held that the Court of Federal Claims lacks jurisdiction over judicial takings claims that require the court to scrutinize the decisions of other tribunals for the same plaintiff given the same set of facts.[10]  <u>See</u> <u>Shinnecock Indian Nation v. United States</u>, 782 F.3d 1345, 1352 (Fed. Cir. 2015) ("Binding precedent establishes that the Court of Federal Claims has no jurisdiction to review the merits of a decision rendered by a federal district court."); <u>Innovair Aviation Ltd. v. United States</u>, 632 F.3d 1336, 1344 (Fed. Cir.) ("[T]he Court of Federal Claims does not have jurisdiction to review the decision of district courts and cannot entertain a taking[s] claim that requires the court to scrutinize the actions of another tribunal." (internal quotation marks omitted; brackets in original)), <u>reh'g</u> <u>en banc</u> <u>denied</u>, (Fed. Cir. 2011), <u>cert.</u> <u>denied</u>, 132 S. Ct. 999 (2012); <u>Vereda Ltda. v. United States</u>, 271 F.3d 1367, 1375 (Fed. Cir. 2001) ("[T]he Court of Federal Claims cannot entertain a taking claim that requires the court to scrutinize the actions of another tribunal." (internal quotation marks omitted)); <u>Allustiarte v. United States</u>, 256 F.3d at 1352 ("'[T]he Court of Federal Claims does not have jurisdiction to review the decisions of district courts.'" (quoting <u>Joshua v. United States</u>, 17 F.3d 378, 380 (Fed. Cir. 1994))); <u>see</u> <u>also</u> <u>Potter v. United States</u>, 121 Fed. Cl. 168, 169 (2015);

---

[10] In a non-presidential opinion, the Federal Circuit also has indicated that "[t]he appellant [Barth] asked the Court of Federal Claims to scrutinize the actions of coordinate federal courts to determine whether their actions effected a taking of his property. That was beyond the Court of Federal Claims' jurisdiction." <u>Barth v. United States</u>, 76 F. App'x 944, 945–46 (Fed. Cir.), <u>cert.</u> <u>denied</u>, 540 U.S. 1049 (2003) (footnote omitted).

15

Martl v. United States,[11] No. 09-299, 2010 WL 369212, at *2 (Fed. Cl. Jan. 29, 2010) (unpublished) ("[T]his court has no jurisdiction over takings claims that are founded on a challenge to the judgment of another federal court.").

The most recent, precedential decision regarding judicial takings is Shinnecock Indian Nation v. United States decided by the United States Court of Appeals for the Federal Circuit in 2015. In Shinnecock, the Federal Circuit explained:

Permitting parties aggrieved by the decisions of Article III tribunals to challenge the merits of those decisions in the Court of Federal Claims would circumvent the statutorily defined appellate process and severely undercut the orderly resolution of claims. See 28 U.S.C. § 1291 ("The court of appeals . . . shall have jurisdiction of appeals from all final decisions of the district courts of the United States."); Plaut v. Spendthrift Farm, Inc., 514 U.S. 211, 218–19, 115 S. Ct. 1447, 131 L. Ed. 2d 328 (1995) (explaining

---

[11] The Martl case is related to a recent decision of the undersigned, Milgroom et al. v. United States, 122 Fed. Cl. 779 (2015), involving the same underlying facts as the Martl case. In the Milgroom case, this court determined:

This court is without jurisdiction to review the alleged taking by the District Court, a judicial taking, see Stop the Beach Renourishment, Inc. v. Florida Dep't of Envtl. Protection et al., 560 U.S. 702 (2010), because review in this case of such a taking "would require the Court of Federal Claims to scrutinize the merits of the district court's judgment, a task it is without authority to undertake." Shinnecock Indian Nation v. United States, 782 F.3d 1345, 1352 (Fed. Cir. 2015); see also Joshua v. United States, 17 F.3d 378, 380 (Fed. Cir. 1994) ("[T]he Court of Federal Claims does not have jurisdiction to review the decisions of district courts or the clerks of district courts relating to proceedings before those courts."). Just as the Court of Federal Claims does not have jurisdiction to review the decisions of the United States District Courts, the Court of Federal Claims also does not have jurisdiction to review decisions of the United States Bankruptcy Courts. See Allustiarte v. United States, 256 F.3d 1349, 1351 (Fed. Cir. 2001) (holding that the Court of Federal Claims does not have jurisdiction to entertain judicial takings claims against federal bankruptcy courts because "[s]uch a determination would require the court to scrutinize the actions of the bankruptcy trustees and courts"), cert. denied, 534 U.S. 1042 (2001); Mora v. United States, 118 Fed. Cl. 713, 716 (2014) ("[T]his court does not have jurisdiction to review the decisions of state courts, federal bankruptcy courts, federal district courts, or federal circuit courts of appeals.").

Milgroom et al. v. United States, 122 Fed. Cl. at 801-802.

16

that Article III "gives the Federal Judiciary the power, not merely to rule on cases, but to *decide* them, subject to review only by superior courts in the Article III hierarchy").

Shinnecock Indian Nation v. United States, 782 F.3d at 1353 (emphasis in original); see also Brace v. United States, 72 Fed. Cl. 337, 359 (2006) (finding that it would be "untenable" for the Court of Federal Claims to hear judicial takings claims because "it would constantly be called upon by disappointed litigants to act as a super appellate tribunal reviewing the decisions of other courts to determine whether they represented substantial departures from prior decisional law"), aff'd, 250 F. App'x 359 (Fed. Cir. 2007), cert. denied, 552 U.S. 1258 (2008).[12] Often, a judicial takings claim is brought as a "collateral attack" on the judgment of another tribunal.  See Shinnecock Indian Nation v. United States, 782 F.3d at 1353 (characterizing plaintiff's judicial takings claim as "an attempt to mount an improper collateral attack on the judgment of the district court"); Innovair Aviation Ltd. v. United States, 632 F.3d at 1344 ("[T]he trial court's finding that the bond amount was not just compensation is a collateral attack on the Arizona Court's approval of the bond amount."); Allustiarte v. United States, 256 F.3d at 1352 ("To permit collateral attacks on bankruptcy court judgments would 'seriously undercut[ ] the orderly process of the law.'" (quoting Celotex Corp. v. Edwards, 514 U.S. 300, 313 (1995))).[13]

─────────────────

[12] In an non-precedential decision, the United States Court of Appeals for the Federal Circuit also indicated:

> The Court of Federal Claims is a court of limited jurisdiction. It is vested with jurisdiction under the Tucker Act to adjudicate monetary claims against the United States founded upon the Takings Clause of the United States Constitution, Acts of Congress, regulations, or contracts, and requires a money mandating act to confirm jurisdiction. 28 U.S.C. § 1491(a)(1); United States v. Mitchell, 463 U.S. 206, 215–218 (1983). The Court of Federal Claims "has no jurisdiction to adjudicate any claims whatsoever under the federal criminal code." Joshua v. United States, 17 F.3d 378, 379 (Fed. Cir. 1994). It does not have jurisdiction to review the judgments of the United States district courts or circuit courts. Shinnecock Indian Nation v. United States, 782 F.3d 1345, 1353 (Fed. Cir. 2015). We thus find no error in the Court of Federal Claims' conclusions that it lacks jurisdiction to review the judgments of the Eighth Circuit, and that Garcia has failed to allege a cause of action over which the court has subject matter jurisdiction.

Garcia v. United States, No. 2015-5099, 2015 WL 5845350, at *1 (Fed. Cir. Oct. 8, 2015).

[13] The Federal Circuit in Shinnecock noted that

> [t]he situation presented here parallels that presented in Allustiarte, 256 F.3d at 1351–53. There the plaintiffs brought suit in the Court of Federal

Based on these principles, the Court of Federal Claims and the Federal Circuit have rejected a variety of claims that required the court to review the decisions of another federal tribunal in a takings context. See, e.g., Shinnecock Indian Nation v. United States, 782 F.3d at 1348, 1352–53 (affirming a Court of Federal Claims decision, which barred plaintiff from amending its complaint to add a judicial takings claim because such a claim would be "futile"); Innovair Aviation Ltd. v. United States, 632 F.3d at 1344 (holding that the court lacked jurisdiction over plaintiff's "collateral attack" on an Arizona court's approval of a res bond); Barth v. United States, 76 F. App'x at 945–46 (ruling that the Court of Federal Claims lacked jurisdiction to determine whether a federal court's decision not to abate a nuisance constituted a taking); Vereda, Ltda. v. United States, 271 F.3d at 1375 (holding that the Court of Federal Claims lacked jurisdiction to review an in rem administrative forfeiture of property); Allustiarte v. United States, 256 F.3d at 1352 (holding that the Court of Federal Claims lacked jurisdiction to determine if a bankruptcy court effected a taking of the plaintiff's property by approving the bankruptcy trustee's alleged mishandling of assets); Joshua v. United States, 17 F.3d at 380 (affirming the dismissal of the plaintiff's claim that the dismissal of his earlier federal district court claim violated the Takings Clause); Martl v. United States, 2010 WL 369212, at *2 (dismissing for lack of jurisdiction where plaintiff claimed that a federal district court committed a taking when it issued a default judgment against her that required the sale of her property).

The case of Boise Cascade Corp. v. United States stands alone as the one case in which the Federal Circuit has found that the United States Court of Federal Claims did in fact have jurisdiction over a judicial takings claim. See Boise Cascade Corp. v. United

---

Claims alleging that bankruptcy courts in the Ninth Circuit took their property without just compensation when they allowed the plaintiffs' assets to be sold at less than fair value. Id. at 1350–51. The Court of Federal Claims dismissed the plaintiffs' suit for lack of jurisdiction and this court affirmed. We explained that the Court of Federal Claims was without authority to scrutinize the decisions of the bankruptcy courts (which are subordinate to Article III courts) and "to determine whether [the plaintiffs] suffered a categorical taking of their property at the hands of the . . . courts."

Shinnecock Indian Nation v. United States, 782 F.3d at 1352-53 (quoting Allustiarte v. United States, 256 F.3d at 1352). The Federal Circuit in Shinnecock noted that "[a] similar analysis applies here. The Nation alleges that in applying the doctrine of laches to bar its land claim, the district court improperly "took away the Nation's legal right to sue for compensation for its stolen land." The Court of Federal Claims, however, is without authority to adjudicate the Nation's claim that it suffered a compensable taking at the hands of the district court." Id. at 1353. The Federal Circuit concluded that "the Court [of Federal Claims] has no jurisdiction to review the decisions 'of district courts and cannot entertain a taking[s] claim that requires the court to scrutinize the actions of another tribunal.'" Id. (quoting Innovair Aviation Ltd. v. United States, 632 F.3d at 1344).

States, 296 F.3d at 1344. The plaintiff in Boise Cascade Corp. alleged that a federal district court took its property when the court issued an injunction preventing Boise from logging on its land unless it obtained an Incidental Take Permit pursuant to the Endangered Species Act. See id. at 1341–42. The Federal Circuit ultimately dismissed the claim as unripe, but first it determined that the Court of Federal Claims could exercise jurisdiction. The Federal Circuit in Boise acknowledged that "Article III forbids the Court of Federal Claims, an Article I tribunal, from reviewing the actions of an Article III court." Id. at 1344 (citing Plaut v. Spendthrift Farm, Inc., 514 U.S. at 218–19). The Federal Circuit found, however, that:

> [R]esolution of this case did not require the Court of Federal Claims to review the merits of the district court's order enjoining Boise from logging without a permit.  Boise has accepted the validity of the injunction, and only filed suit in the Court of Federal Claims to determine whether the Service's assertion of jurisdiction over it by seeking and obtaining the injunction worked a taking of its property that requires compensation under the Takings Clause.  Whether or not the government action took Boise's property was not before the district court, nor could it have been.  Because Boise seeks over $10,000 in compensation for this alleged taking, the Court of Federal Claims is the sole forum available to hear Boise's claim.  See 28 U.S.C. § 1346(a)(2) (2000).  Because the takings claim does not require the trial court to review the district court's actions, there is no constitutional defect in the Court of Federal Claims' assertion of jurisdiction over this case.

Id. In addition to emphasizing that the Court of Federal Claims was not required to review the merits of the decision of the District Court, the Boise court sought to distinguish Boise's claim from other cases in which the Federal Circuit found that the Court of Federal Claims lacked jurisdiction to scrutinize the decisions of other tribunals, with particular focus on Allustiarte v. United States, 256 F.3d 1349 and Vereda, Ltda. v. United States, 271 F.3d 1367.  See Boise Cascade Corp. v. United States, 296 F.3d at 1344–45.

As noted above, in Allustiarte, several plaintiffs alleged that they suffered a taking at the hands of the bankruptcy courts in the Ninth Circuit.  See Allustiarte v. United States, 256 F.3d at 1350–51. Specifically, they alleged that the court-appointed bankruptcy trustee had mishandled their assets, and the bankruptcy court wrongfully approved the trustee's actions.  See id. The Federal Circuit held that the Court of Federal Claims lacked jurisdiction over the plaintiffs' claims because determining whether a judicial taking occurred "would require the court to scrutinize the actions of the bankruptcy trustees and courts," which the Court of Federal Claims lacks jurisdiction to do. Id. at 1352 (citing Joshua v. United States, 17 F.3d at 380).  In Vereda, the Federal Circuit similarly held that a mortgagee may not assert a Fifth Amendment taking claim in the Court of Federal Claims following the government's in rem administrative forfeiture of the property securing its mortgage. See Vereda, Ltda. v. United States 271 F.3d at 1396, 1375.

The <u>Boise</u> court held that "unlike in <u>Vereda</u> and <u>Allustiarte</u>, Boise's takings claim is not based on the propriety of the district court's decision, and the trial court therefore would not be called upon to review the merits of the district court's decision in order to decide the merits of Boise's claim." <u>Boise Cascade Corp. v. United States</u>, 296 F.3d at 1345. Boise's challenge was not to the validity of the district court's injunction, but to the government's use of the courts to enforce the provisions of the Endangered Species Act and restrict the use of its land. As the court noted, the fact that the government "chose to effectuate its mandate to enforce the ESA [Endangered Species Act] through a court action rather than through an agency cease and desist order, for instance, cannot insulate the United States from its duty to pay compensation that may be required by the Fifth Amendment." <u>Id.</u>

In the above captioned cases, the court must determine if Petro-Hunt's judicial takings claim requires the court to scrutinize the United States Court of Appeals for the Fifth Circuit's decision, or, like <u>Boise</u>, can be decided without the need to scrutinize the ruling of another tribunal. This court finds that plaintiff's claim is not like <u>Boise</u>, and would require the court to scrutinize the decision of the Fifth Circuit. Plaintiff's claim does not attack the discretionary action of a government agency, which chose to exercise its authority through the courts. Instead, these cases are more like those that ask this court to review the decision of an "impartial judicial arbiter whose actions have been improperly appealed to the Court of Federal Claims." <u>Boise Cascade Corp. v. United States</u>, 296 F.3d at 1345. Indeed, deciding Petro-Hunt's current claim on the merits would require this court to determine if Petro-Hunt had an established property right that was taken by the Fifth Circuit. <u>See</u> <u>Stop the Beach Renourishment, Inc. v. Fla. Dep't of Envtl. Prot.</u>, 560 U.S. at 715 (plurality opinion). The only way to determine if Petro-Hunt had an established property right in the mineral servitudes is to decide whether the mineral servitudes had prescribed, as a matter of federal common law, to the United States prior to the Fifth Circuit's 2007 decision. In other words, this court would have to determine if the Fifth Circuit was correct in its finding that <u>Little Lake Misere</u> and <u>Central Pines</u> established that lands sold to the United States before the enactment of Act 315, like the surface lands in question here, were subject to Louisiana's ten-year prescription rule. <u>See</u> <u>Petro-Hunt, L.L.C. v. United States</u>, 365 F.3d at 392–93. If the Fifth Circuit was correct in this finding, then Petro-Hunt lost possession of its land long before the 2007 Fifth Circuit decision and it had no established property right that could have been taken by the court's decision. If the Fifth Circuit was incorrect in its application of precedent, and actually created a new rule depriving Petro-Hunt of its previously established property, then the Fifth Circuit may have effected a compensable taking of Petro-Hunt's mineral servitudes. This court lacks jurisdiction to determine whether or not the Fifth Circuit correctly interpreted its own precedent, and, therefore, lacks jurisdiction over plaintiff's judicial takings claim. <u>See</u> <u>Shinnecock Indian Nation v. United States</u>, 782 F.3d at 1348, 1352–53; <u>Allustiarte v. United States</u>, 256 F.3d at 1352.

In <u>Stop the Beach</u>, the majority of the Supreme Court made clear that "[t]here is no taking unless petitioner can show that, before the Florida Supreme Court's decision,

littoral-property owners had rights to future accretions and contact with the water superior to the State's right to fill in its submerged land." Stop the Beach Renourishment, Inc. v. Fla. Dep't of Envtl. Prot., 560 U.S. at 730. In deciding whether the petitioner had an established property right, the Court analyzed the challenged decision and determined that the Florida Supreme Court had reached the correct conclusion. Id. at 730–33 (majority opinion) (holding that the Florida Supreme Court decision was consistent with the state's property law in finding that petitioner did not have the littoral rights). Similarly, this court would have to analyze the correctness of the Fifth Circuit decision to rule on plaintiff's claim. In Stop the Beach, the Supreme Court had the authority to scrutinize the decision of the Florida Supreme Court, as the case had properly been appealed to the Supreme Court for review. See Stop the Beach Renourishment, Inc. v. Fla. Dep't of Envtl. Prot., 557 U.S. 903 (2009) (granting certiorari). The Court of Federal Claims, however, has no appellate authority over decisions of the Fifth Circuit and cannot undertake the type of review that the Supreme Court exercised in Stop the Beach.

Petro-Hunt, like the plaintiffs in Allustiarte and Martl, insists that the court does not have to scrutinize the decision of another tribunal, because plaintiff does not challenge whether or not the Fifth Circuit was correct. Before this court, plaintiff claims that "the Court does not have to examine the propriety of a court's decision to resolve Petro-Hunt's takings claim." This language is similar to the Allustiarte plaintiffs' argument before the Court of Federal Claims, in which the Allustiarte plaintiffs claimed that they were "not seeking to avoid, defeat, or evade any judgment of a bankruptcy court," but only to obtain just compensation for the taking. Allustiarte v. United States, 46 Fed. Cl. 713 (2000), aff'd, 256 F.3d 1349 (Fed. Cir.), cert. denied, 534 U.S. 1042 (2001). Likewise in Martl v. United States, the Martl plaintiff claimed that the case before the Court of Federal Claims was not a collateral attack against the district court judgment. The Martl court, however, found that "there is no other interpretation of her suit. Her complaint is replete with allegations of wrongdoing and errors of law committed by the district court to the exclusion of any other averred basis for relief." Martl v. United States, 2010 WL 369212, at *2.

Petro-Hunt's own submissions undercut the argument that it is not challenging the propriety of the Fifth Circuit's decision. For example, plaintiff's response to the motion to dismiss frames this court's role as determining if the Fifth Circuit decisions "effectively transformed Petro-Hunt's private property into public property," and argues that the mineral servitudes were "imprescriptible" prior to the Fifth Circuit decision in 2007. Additionally, plaintiff argues that Nebo Oil should have controlled the outcome of the case, and argues that the Fifth Circuit's decision was incorrect, and claims that "[t]he ultimate result of the QTA [quiet title action] was inconsistent with the principles set forth in Nebo [Oil] and the other relevant principles applicable to Petro-Hunt's established property right and deprived Petro-Hunt of its ownership of the mineral servitudes in perpetuity." This court, however, cannot determine if plaintiff's mineral servitudes were "previously imprescriptible," or "transformed" from private to public property, without determining whether the Fifth Circuit's interpretation of precedent was correct. Because the court cannot determine whether the Fifth Circuit took plaintiff's property without scrutinizing the

Appx0067

Fifth Circuit's decision, the court lacks jurisdiction over plaintiff's claim. The court does not need to address the remaining arguments in defendant's motion to dismiss or the parties' cross motions for summary judgment.[14]

## CONCLUSION

For the foregoing reasons, defendant's motion to dismiss is hereby **GRANTED**. Plaintiff's complaint is **DISMISSED**. The Clerk of the Court shall enter **JUDGMENT** consistent with this opinion in Case No. 00-512L and Case No. 11-775L.

**IT IS SO ORDERED.**

<div align="right">

s/Marian Blank Horn
**MARIAN BLANK HORN**
**Judge**

</div>

---

[14] As conceded by plaintiff's counsel at oral argument, if the court grants defendant's motion for a lack of jurisdiction as a result of the judicial taking, both of plaintiff's cases should be dismissed. Plaintiff's counsel stated, first "[i]f you rule against us on jurisdiction and the cause of action, then I would think you would dismiss both cases," and in response to a question from the bench reiterated, "if you dismiss for either lack of jurisdiction or if you hold there's no cause of action for a judicial taking, yes, you would dismiss both." Plaintiff retains all appeal rights regarding Judge Allegra's earlier decisions, as well as the ability to appeal this decision.

Appx0068

1500,APPEAL,CLOSED,ECF,PROTO

# US Court of Federal Claims
## United States Court of Federal Claims (COFC)
## CIVIL DOCKET FOR CASE #: 1:00–cv–00512–MBH

PETRO–HUNT, L.L.C. v. USA
Assigned to: Judge Marian Blank Horn
Demand: $0
Case in other court:  16–01981
Cause: 28:1491 Tucker Act

Date Filed: 08/24/2000
Date Terminated: 02/29/2016
Jury Demand: None
Nature of Suit: 512 Taking – Realty
Jurisdiction: U.S. Government Defendant

**Plaintiff**

**PETRO–HUNT, L.L.C.**

represented by **Joseph Ralph White**
White Law Firm
2086 Old Taylor Road
Suite 201
Oxford, MS 38655
(504) 799–2585
Fax: (504) 799–2586
Email: jralphwhitepllc@bellsouth.net
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

V.

**Defendant**

**USA**

represented by **James David Gette**
U. S. Department of Justice
Environmental Division
601 D Street, N.W.
Washington, DC 20004
(202) 305–1461
Fax: (202) 305–0274
Email: james.gette@usdoj.gov
*TERMINATED: 05/31/2011*
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Marc Alan Smith**
U. S. Department of Justice
Environment &Natural Resources Division
P.O. Box 663
Ben Franklin Station
Washington, DC 20044–0663
(202) 305–0244
Fax: (202) 305–0506
Email: marc.smith@usdoj.gov
*TERMINATED: 02/15/2001*
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Susan V. Cook**
U. S. Department of Justice
Environment &Natural Resources Division
P.O. Box 663
Ben Franklin Station
Washington, DC 20044–0663
(202) 305–0470
Fax: (202) 305–0506
Email: susan.cook@usdoj.gov
*TERMINATED: 01/11/2006*
*LEAD ATTORNEY*

*ATTORNEY TO BE NOTICED*

**William James Shapiro**
U.S. Department of Justice
Environment &Natural Resources Division
501 I Street
Room 9–700
Sacramento, CA 95814
(916) 930–2207
Fax: (916) 930–2210
Email: william.shapiro@usdoj.gov
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

| Date Filed | # | Docket Text |
|---|---|---|
| 08/24/2000 | 1 | COMPLAINT, FILING FEE $120, RECEIPT #050266. Answer due on 10/23/00. (FE) (Entered: 08/24/2000) |
| 08/24/2000 | 2 | Notice of assignment to Judge Francis M. Allegra. Copy to parties. (FE) (Entered: 08/24/2000) |
| 10/26/2000 | 3 | NOTICE of Attorney Appearance for USA by Marc Alan Smith Service : 10/25/00 (JT) (Entered: 10/27/2000) |
| 10/30/2000 | 4 | SPECIAL PROCEDURES ORDER of Judge Francis M. Allegra directing parties to confer with chambers and arrange for preliminary status conference; identifying timing and filing requirements for conference (with special requirements if defendant intends to proceed by motion in lieu of answer); precluding the filing of dispositive motions until the conference has been held; and establishing special procedures regarding, inter alia,mandatory disclosure, limitations on discovery, enlargements and the content of the joint preliminary status report. Copy to parties. (JT) (Entered: 10/31/2000) |
| 10/31/2000 | 5 | MOTION by PETRO–HUNT, L.C.C., USA for Leave to File joint motion to stay proceedings. (JT) (Entered: 11/02/2000) |
| 11/02/2000 | 6 | ORDER granting [5–1] motion for Leave to File joint motion to stay proceedings. Set joint Status Report deadline to 1/31/01 and every 90 days thereafter. ( signed by Judge Francis M. Allegra ) Copy to parties. (JT) Modified on 11/06/2000 (ac7). (Entered: 11/06/2000) |
| 01/24/2001 | 7 | STATUS REPORT by PETRO–HUNT, L.C.C. and USA. Service: 1/24/01. (FE) (Entered: 01/25/2001) |
| 01/24/2001 | | Deadline updated; (90 days) Status Report deadline to 4/24/01 . (FE) (Entered: 01/25/2001) |
| 02/12/2001 | 8 | STATUS REPORT ORDER. Status report due on 5/23/01 (signed by Judge Francis M. Allegra). Copy to parties. (FE) (Entered: 02/13/2001) |
| 02/15/2001 | 9 | NOTICE of Attorney Appearance for USA by Susan V. Cook Service : 2/14/01 (DS) (Entered: 02/15/2001) |
| 05/23/2001 | 10 | JOINT STATUS REPORT. (LTD) (Entered: 05/25/2001) |
| 07/17/2001 | 11 | NOTICE of change of address by Susan V. Cook (DS) (Entered: 07/20/2001) |
| 09/07/2001 | 12 | JOINT STATUS REPORT. (LTD) (Entered: 09/07/2001) |
| 11/20/2001 | 13 | JOINT STATUS REPORT. (LTD) (Entered: 11/21/2001) |
| 11/21/2001 | | Deadline updated; Status Report deadline to 1/21/02 (HW) (Entered: 11/27/2001) |
| 02/22/2002 | 14 | JOINT STATUS REPORT by PETRO–HUNT, L.C.C. and USA. Service: 2/22/02. (FE) (Entered: 02/25/2002) |

| 05/23/2002 | 15 | JOINT STATUS REPORT filed. (DS) (Entered: 05/24/2002) |
| 05/23/2002 | | Deadline updated; Status Report due 8/21/02 (every 90 days) (DS) (Entered: 05/24/2002) |
| 08/26/2002 | 16 | JOINT MOTION by USA (Service: 8/26/02) for Leave to file joint status report, out of time . Response due: 9/12/02. (LTD) (Entered: 08/29/2002) |
| 09/24/2002 | 17 | ORDER granting [16–1] motion for Leave to file joint status report, out of time Joint Status Report due to 12/2/02 (signed by Judge Francis M. Allegra). Copy to parties. (LTD) (Entered: 09/30/2002) |
| 09/24/2002 | 18 | JOINT STATUS REPORT. (LTD) (Entered: 09/30/2002) |
| 12/02/2002 | 19 | JOINT STATUS REPORT. (LTD) (Entered: 12/04/2002) |
| 03/06/2003 | 20 | JOINT MOTION for Leave to file joint status report, out of time . (LTD) (Entered: 03/07/2003) |
| 03/11/2003 | 21 | ORDER denying [20–1] joint motion for Leave to file joint status report, out of time (signed by Judge Francis M. Allegra). Copy to parties. (LTD) (Entered: 03/12/2003) |
| 03/11/2003 | 22 | JOINT STATUS REPORT. Filed by leave of the Judge. (LTD) (Entered: 03/12/2003) |
| 06/03/2003 | 23 | JOINT STATUS REPORT by PETRO–HUNT, L.C.C., UNITED STATES. (jat, ) (Entered: 06/12/2003) |
| 06/03/2003 | | Set/Reset Deadlines: . Joint Status Report due by 9/2/2003. (Every 90 days) (jat, ) (Entered: 06/12/2003) |
| 08/29/2003 | 24 | JOINT STATUS REPORT by PETRO–HUNT, L.C.C., USA. (jcp, ) (Entered: 09/04/2003) |
| 08/29/2003 | | Set/Reset Deadlines: Status Report due by 11/17/2003 and every 90 days thereafter. (jcp, ) (Entered: 09/04/2003) |
| 12/01/2003 | 25 | JOINT STATUS REPORT by all parties. [FILED BY LEAVE OF THE JUDGE] (jcp, ) (Entered: 12/04/2003) |
| 03/01/2004 | 26 | JOINT STATUS REPORT by all parties. Service: 3/1/2004.(hw1, ) (Entered: 03/02/2004) |
| 03/01/2004 | | Set Deadlines/Hearings: . Joint Status Report due by 6/1/2004. (hw1, ) (Entered: 03/02/2004) |
| 06/01/2004 | 27 | JOINT STATUS REPORT by all parties. (jcp, ) (Entered: 06/04/2004) |
| 06/01/2004 | | Set/Reset Deadlines: Joint Status Report due 8/30/2004 and every 90 days thereafter. (jcp, ) (Entered: 06/04/2004) |
| 08/26/2004 | 28 | JOINT STATUS REPORT by all parties. (jcp, ) (Entered: 08/27/2004) |
| 08/26/2004 | | Set/Reset Deadlines: Joint Status Report due 11/24/2004 and every 90 days thereafter. (jcp, ) (Entered: 08/27/2004) |
| 12/02/2004 | 29 | MOTION for Leave of Court to File Joint Status Report Out of Time by USA.Service: 12/2/2004. Response due by 12/20/2004. (jcp, ) (Entered: 12/09/2004) |
| 12/07/2004 | 30 | ORDER granting 29 Motion for Leave to File joint status report Signed by Judge Lawrence M. Baskir. (lg1, ) (Entered: 12/13/2004) |
| 12/07/2004 | 31 | STATUS REPORT by all parties. The parties hereto will submit their next status report approximately 90 days following November 29, 2004, the date upon which this report is due, or on or about 2/25/2005 (lg1, ) (Entered: 12/13/2004) |
| 02/25/2005 | 32 | JOINT STATUS REPORT by all parties. Service: 2/25/2005.(mb2, ) (Entered: 02/28/2005) |

| 03/25/2005 | 33 | ORDER directing the Clerk to designate this case as an electronic (ECF) case. All future filings will be in electronic form. Signed by Judge Francis M. Allegra. (jat, ) (Entered: 03/25/2005) |
| 03/25/2005 | 34 | NOTICE of Designation of Electronic Case. (jat, ) (Entered: 03/25/2005) |
| 05/26/2005 | 35 | JOINT STATUS REPORT by all parties. (Cook, Susan) (Entered: 05/26/2005) |
| 08/24/2005 | 36 | STATUS REPORT by all parties. (Cook, Susan) (Entered: 08/24/2005) |
| 11/22/2005 | 37 | JOINT STATUS REPORT, filed by all parties. (Cook, Susan) (Entered: 11/22/2005) |
| 01/11/2006 | 38 | NOTICE of Appearance by James David Gette for USA. (Gette, James) (Entered: 01/11/2006) |
| 02/16/2006 | 39 | STATUS REPORT, filed by all parties. (Gette, James) (Entered: 02/16/2006) |
| 05/19/2006 | 40 | STATUS REPORT, filed by all parties. (Gette, James) (Entered: 05/19/2006) |
| 08/17/2006 | 41 | JOINT STATUS REPORT, filed by all parties. (White, Joseph) (Entered: 08/17/2006) |
| 11/14/2006 | 42 | JOINT STATUS REPORT, filed by all parties. (Gette, James) (Entered: 11/14/2006) |
| 02/13/2007 | 43 | JOINT STATUS REPORT, filed by all parties. (Gette, James) (Entered: 02/13/2007) |
| 05/11/2007 | 44 | JOINT STATUS REPORT, filed by all parties. (Gette, James) (Entered: 05/11/2007) |
| 08/09/2007 | 45 | JOINT STATUS REPORT, filed by all parties. (Gette, James) (Entered: 08/09/2007) |
| 11/09/2007 | 46 | JOINT STATUS REPORT, filed by all parties. (Gette, James) (Entered: 11/09/2007) |
| 02/11/2008 | 47 | JOINT STATUS REPORT, filed by all parties. (Gette, James) (Entered: 02/11/2008) |
| 05/12/2008 | 48 | JOINT STATUS REPORT, filed by all parties. (Gette, James) (Entered: 05/12/2008) |
| 05/12/2008 | 49 | Joint MOTION to Lift Stay, filed by PETRO–HUNT, L.C.C., USA.Response due by 5/29/2008. (Attachments: #_1 Text of Proposed Order)(Gette, James) (Entered: 05/12/2008) |
| 05/27/2008 | 50 | ORDER granting 49 Motion Lifting Stay. Amended Complaint due by 6/26/2008. Signed by Judge Francis M. Allegra. (si) (Entered: 05/27/2008) |
| 06/25/2008 | 51 | AMENDED COMPLAINT, filed by PETRO–HUNT, L.C.C... (Attachments: #_1 Corporate Disclosure Statement, #_2 Exhibit 1–4)(White, Joseph) (Entered: 06/25/2008) |
| 06/25/2008 | | Set Deadline: Answer to 51 Amended Complaint due by 7/14/2008. (dls) (Entered: 06/25/2008) |
| 07/09/2008 | 52 | First MOTION for Extension of Time until September 2, 2008 to Respond to Amended Complaint, filed by USA.Response due by 7/28/2008.(Gette, James) (Entered: 07/09/2008) |
| 07/10/2008 | | ORDER granting 52 Motion for Extension of Time to file a response to plaintiff's amended complaint. Response due by 9/2/2008, no further enlargements of this deadline will be granted. Signed by Judge Francis M. Allegra. (si) (Entered: 07/10/2008) |
| 09/02/2008 | 53 | MOTION to Dismiss pursuant to Rule 12(b)(1) and (6) or, in the alternative, for Summary Judgment, filed by USA. Response due 10/3/08. (Attachments: #_1 Exhibit A, #_2 Exhibit B, #_3 Exhibit C)(Gette, James) Modified on 9/3/2008 to edit docket text for clarity.(dls). (Entered: 09/02/2008) |

| 09/02/2008 | 54 | PROPOSED FINDINGS of Uncontroverted Fact RE: 53 MOTION to Dismiss pursuant to Rule 12(b)(1) and (6) or, in the alternative, for Summary Judgment, filed by USA. (Gette, James) Modified on 9/3/2008 to edit docket text for clarity.(dls). (Entered: 09/02/2008) |
|---|---|---|
| 09/22/2008 | 55 | Unopposed MOTION for Extension of Time until 11/3/2008 to File Response to 53 MOTION to Dismiss pursuant to Rule 12(b)(1) and (6), etc., filed by PETRO–HUNT, L.C.C.. Response due by 10/9/2008.(White, Joseph) (Entered: 09/22/2008) |
| 09/23/2008 | | ORDER granting 55 Motion for Extension of Time to File Response to 53 MOTION to Dismiss pursuant to Rule 12(b)(1) and (6), etc. Response due by 11/3/2008. Signed by Judge Francis M. Allegra. (si) (Entered: 09/23/2008) |
| 10/28/2008 | 56 | Unopposed MOTION for Extension of Time until November 17, 2008 to File an Opposition to the United States' Motion to Dismiss and alternative Motion for Summary Judgment, filed by PETRO–HUNT, L.C.C..Response due by 11/14/2008.(White, Joseph) (Entered: 10/28/2008) |
| 10/29/2008 | 57 | ORDER granting 56 Motion for Extension of Time Response due by 11/17/2008. No further enlargements of this deadline will be granted. Signed by Judge Francis M. Allegra. (si) (Entered: 10/29/2008) |
| 10/29/2008 | | Set/Reset Deadlines: Response due by 11/17/2008. (jt1) (Entered: 10/29/2008) |
| 11/14/2008 | 58 | RESPONSE to 53 MOTION to Dismiss pursuant to Rule 12(b)(1) MOTION to Dismiss pursuant to Rule 12(b)(6) MOTION for Summary Judgment MOTION to Dismiss pursuant to Rule 12(b)(1) MOTION to Dismiss pursuant to Rule 12(b)(6), filed by PETRO–HUNT, L.C.C..Reply due by 11/28/2008. (Attachments: # 1 Proposed Findings of Fact in Opposition to Defendant's Motion for Summary Judgment, # 2 Exhibit to Proposed Findings of Fact in Opposition to Defendant's Motion for Summary Judgment, # 3 Exhibit A, # 4 Exhibit A, # 5 Exhibit A, # 6 Exhibit A, # 7 Exhibit B, # 8 Exhibit A, # 9 Exhibit C–F, # 10 Exhibit G, # 11 Exhibit H, # 12 Exhibit I, # 13 Exhibit J, # 14 Exhibit K, # 15 Exhibit L)(White, Joseph) (Entered: 11/14/2008) |
| 11/14/2008 | 59 | RESPONSE to 54 PROPOSED FINDINGS of Uncontroverted Fact *Pursuant to RCFC 56(h)2)*, filed by PETRO–HUNT, L.C.C., filed by PETRO–HUNT, L.C.C.. (White, Joseph) (Entered: 11/14/2008) |
| 11/14/2008 | 60 | MOTION Deny or Continue Defendant's Motion for Summary Judgment in Order to Conduct Needed Discovery Pursuant to RCFC 56(f), filed by PETRO–HUNT, L.C.C.. Response due by 12/15/2008. (Attachments: # 1 Affidavit of J. Ralph White Pursuant to RCFC 56(f) Relating to the United States' Alternative Motion for Summary Judgment)(White, Joseph) Modified on 11/25/2008 to correct response due date. (dls). (Entered: 11/14/2008) |
| 11/18/2008 | 61 | SCHEDULING ORDER: All further briefing on defendant's motion for summary judgment is hereby stayed until further order of the court. Defendant shall Reply to plaintiff's response on or before 11/28/2008. Signed by Judge Francis M. Allegra. (si) (Entered: 11/18/2008) |
| 11/25/2008 | | Set/Reset Deadline: Response to 60 Motion pursuant to Rule 56(f) due by 12/15/2008. (dls) (Entered: 11/25/2008) |
| 11/25/2008 | 62 | First MOTION for Extension of Time until December 19, 2008 to File Response or Reply as to 58 Response to Motion,,,, filed by USA.Response due by 12/12/2008.(Gette, James) (Entered: 11/25/2008) |
| 11/25/2008 | | ORDER granting 62 Motion for Extension of Time to File Response/Reply re 62 First MOTION for Extension of Time until December 19, 2008 to File Response or Reply as to 58 Response to Motion. Response due by 12/19/2008. Signed by Judge Francis M. Allegra. (si) (Entered: 11/25/2008) |
| 12/15/2008 | 63 | RESPONSE to 60 MOTION Deny or Continue Defendant's Motion for Summary Judgment in Order to Conduct Needed Discovery Pursuant to RCFC 56(f) MOTION Deny or Continue Defendant's Motion for Summary Judgment in Order to Conduct Needed Discovery Pursuant to RCFC 56(f), filed by USA.Reply due by |

| | | |
|---|---|---|
| | | 12/29/2008. (Gette, James) (Entered: 12/15/2008) |
| 12/18/2008 | 64 | Unopposed MOTION for Extension of Time until 1/9/2009 to File Response or Reply as to 63 Response to Motion,, filed by PETRO–HUNT, L.C.C..Response due by 1/5/2009.(White, Joseph) (Entered: 12/18/2008) |
| 12/19/2008 | | ORDER granting 64 Motion for Extension of Time to File Response/Reply re [64]Unopposed MOTION for Extension of Time until 1/9/2009 to File Response or Reply as to 63 Response to Motion. Response/Reply due by 1/9/2009. Signed by Judge Francis M. Allegra. (si) (Entered: 12/19/2008) |
| 12/19/2008 | 65 | REPLY to Response to Motion re 53 MOTION to Dismiss pursuant to Rule 12(b)(1) MOTION to Dismiss pursuant to Rule 12(b)(6) MOTION for Summary Judgment MOTION to Dismiss pursuant to Rule 12(b)(1) MOTION to Dismiss pursuant to Rule 12(b)(6), filed by USA. (Attachments: # 1 Exhibit A)(Gette, James) (Entered: 12/19/2008) |
| 01/06/2009 | 66 | ORDER: Defendant's motion to dismiss is fully briefed. Plaintiff need not file its reply to defendants response in opposition to plaintiffs motion to deny or continue defendants motion for summary judgment in order to conduct further discovery pursuant to rule 56(f), currently due January 9, 2009. Signed by Judge Francis M. Allegra. (si) (Entered: 01/06/2009) |
| 02/20/2009 | 67 | ORDER Setting Hearing on Motion 53 MOTION to Dismiss pursuant to Rule 12(b): Oral Argument set for 4/9/2009 02:00 PM in National Courts Building before Judge Francis M. Allegra. Signed by Judge Francis M. Allegra. (si) (Entered: 02/20/2009) |
| 04/10/2009 | | Minute Entry for proceeding held in Washington, DC on 4/9/2009, ended on 4/9/2009, before Judge Francis M. Allegra: Oral Argument. [Total number of days of proceeding: 1]. Official Record of proceeding taken via electronic digital recording (EDR). (Click HERE for link to Court of Federal Claims web site forms page for information on ordering: certified transcript from reporter or certified transcript of proceeding from official digital recording.)(si) (Entered: 04/10/2009) |
| 04/13/2009 | 68 | ORDER supplemental brief: Each party shall file a supplemental brief (no more than 20 pages)by 6/12/2009. Each party shall file a supplemental reply brief (no more than 10 pages)by 7/13/2009. Signed by Judge Francis M. Allegra. (si) (Entered: 04/13/2009) |
| 04/13/2009 | | Set/Reset Deadlines: Brief due by 7/13/2009 (jt1) (Entered: 04/14/2009) |
| 04/15/2009 | 69 | Notice Of Filing Of Official Transcript for proceedings held on April 9, 2009 in Washington, DC. (dw1) (Entered: 04/16/2009) |
| 04/15/2009 | 70 | TRANSCRIPT of Proceedings (pages 1–161) held on April 9, 2009 before Judge Francis M. Allegra. Procedures Re: Electronic Transcripts and Redactions. For copy, contact Heritage Court Reporting, (202) 628–4888. Forms to Request Transcripts. Notice of Intent to Redact due 4/22/2009. Redacted Transcript Deadline set for 5/18/2009. Release of Transcript Restriction set for 7/14/2009. (dw1) (Entered: 04/16/2009) |
| 06/09/2009 | 71 | Unopposed MOTION for Extension of Time until June 19, 2009 to File Supplemental Briefs, filed by USA.Response due by 6/26/2009.(Gette, James) (Entered: 06/09/2009) |
| 06/10/2009 | 72 | ORDER granting 71 Motion for Extension of Time. Supplemental briefs due by 6/19/2009; Supplemental reply briefs due by 7/31/2009. Signed by Judge Francis M. Allegra. (Allegra, Francis) (Entered: 06/10/2009) |
| 06/11/2009 | | Set Deadlines/Hearings: re: 72 Order on Motion for Extension of Time to File Notice of Compliance due by 7/31/2009. (jt1) (Entered: 06/11/2009) |
| 06/19/2009 | 73 | SUPPLEMENTAL BRIEF re: 53 Motion to Dismiss – Rule 12(b)(1), Motion to Dismiss – Rule 12(b)(6), Motion for Summary Judgment, Motion to Dismiss – Rule 12(b)(1), Motion to Dismiss – Rule 12(b)(6),, filed by USA. (Attachments: # 1 Exhibit 1, # 2 Exhibit 2, # 3 Exhibit 3, # 4 Exhibit 4, # 5 Exhibit 5, # 6 Exhibit 6, # 7 Exhibit 7, # 8 Exhibit 8, # 9 Exhibit 9, # 10 Exhibit 10, # 11 Exhibit 10a, # 12 |

| | | |
|---|---|---|
| | | Exhibit 10b, #_13 Exhibit 10c, #_14 Exhibit 11)(Gette, James) (Entered: 06/19/2009) |
| 06/19/2009 | 74 | SUPPLEMENTAL BRIEF re: 53 Motion to Dismiss – Rule 12(b)(1), Motion to Dismiss – Rule 12(b)(6), Motion for Summary Judgment, Motion to Dismiss – Rule 12(b)(1), Motion to Dismiss – Rule 12(b)(6), 68 Order,, filed by PETRO–HUNT, L.C.C.. (Attachments: #_1 Exhibit Exhibit A, #_2 Exhibit Exhibit A–2, #_3 Exhibit Exhibit B, #_4 Exhibit Exhibit B–2, #_5 Exhibit Exhibit C, #_6 Exhibit Exhibits D &E)(White, Joseph) (Entered: 06/19/2009) |
| 07/31/2009 | 75 | REPLY to Response to Motion re 53 MOTION to Dismiss pursuant to Rule 12(b)(1) MOTION to Dismiss pursuant to Rule 12(b)(6) MOTION for Summary Judgment MOTION to Dismiss pursuant to Rule 12(b)(1) MOTION to Dismiss pursuant to Rule 12(b)(6), filed by USA. (Attachments: #_1 Exhibit A)(Acock, Kelle) (Entered: 07/31/2009) |
| 07/31/2009 | 76 | SUPPLEMENTAL BRIEF re: 53 Motion to Dismiss – Rule 12(b)(1), Motion to Dismiss – Rule 12(b)(6), Motion for Summary Judgment, Motion to Dismiss – Rule 12(b)(1), Motion to Dismiss – Rule 12(b)(6), 68 Order, *on Timeliness of its Breach of Contract and Takings Claim*, filed by PETRO–HUNT, L.C.C.. (Attachments: #_1 Exhibit A–F, #_2 Exhibit G–H)(White, Joseph) (Entered: 07/31/2009) |
| 11/06/2009 | 77 | PUBLISHED OPINION ( Joint Status Report due by 11/30/2009) granting in part and denying in part 53 Motion to Dismiss – Rule 12(b)(1); granting in part and denying in part 53 Motion to Dismiss – Rule 12(b)(6). The Clerk shall dismiss from the complaint Count I (permanent taking of the ninety–six servitudes); counts IV, V and VI (dealing with contract claims); and count VII (reformation). In addition, count II shall be dismissed to the extent that it presents temporary takings claims as to particular leases that are not timely. Signed by Judge Francis M. Allegra. (si) (Entered: 11/06/2009) |
| 11/23/2009 | 78 | First MOTION for Reconsideration – Rule 59(a), filed by PETRO–HUNT, L.C.C.. (Attachments: #_1 Memorandum in Support of Motion, #_2 Exhibit Exhibits 1 &2)(White, Joseph) (Entered: 11/23/2009) |
| 11/24/2009 | 79 | MOTION for Extension of Time until 12/11/2009 to file the Preliminary Joint Status Report and Discovery Plan, filed by PETRO–HUNT, L.C.C..**Response due by 12/11/2009.**(White, Joseph) (Entered: 11/24/2009) |
| 11/30/2009 | | ORDER granting 79 Motion for Extension of Time. **JPSR and discovery plan due by 12/11/2009.** Signed by Judge Francis M. Allegra. (Allegra, Francis) (Entered: 11/30/2009) |
| 11/30/2009 | 80 | ORDER denying 78 Motion for Reconsideration – Rule 59(a). Signed by Judge Francis M. Allegra. (si) (Entered: 11/30/2009) |
| 12/11/2009 | 81 | JOINT STATUS REPORT *and Proposed Discovery Schedule*, filed by PETRO–HUNT, L.C.C., USA. (White, Joseph) (Entered: 12/11/2009) |
| 12/11/2009 | 82 | MOTION for Entry of Judgment under Rule 54(b) *or, in the Alternative, to Certify for Interlocutory Appeal*, filed by PETRO–HUNT, L.C.C..**Response due by 1/11/2010.**(White, Joseph) (Entered: 12/11/2009) |
| 12/11/2009 | 83 | First MOTION for Leave to File Attached Answer Out of Time, filed by USA.**Response due by 12/28/2009.** (Attachments: #_1 Exhibit Answer)(Gette, James) (Entered: 12/11/2009) |
| 12/15/2009 | | ORDER: Defendant shall file a response re: 82 MOTION for Entry of Judgment. **Response due on or before 1/4/2010.** Signed by Judge Francis M. Allegra. (si) (Entered: 12/15/2009) |
| 12/28/2009 | 84 | First MOTION for Extension of Time until January 11, 2010 to File Response as to Order, 82 Motion for Entry of Judgment under Rule 54(b) *or, in the Alternative, to Certify for Interlocutory Appeal*, filed by USA.**Response due by 1/14/2010.**(Gette, James) (Entered: 12/28/2009) |

| | | |
|---|---|---|
| 12/29/2009 | | ORDER granting 84 Motion for Extension of Time to File Response to 82 MOTION for Entry of Judgment under Rule 54(b) *or, in the Alternative, to Certify for Interlocutory Appeal. **Response due by 1/11/2010. NO FURTHER ENLARGEMENTS OF THIS DEADLINE WILL BE GRANTED.** Signed by Judge Francis M. Allegra. (Allegra, Francis) (Entered: 12/29/2009)* |
| 01/11/2010 | 85 | RESPONSE to 82 MOTION for Entry of Judgment under Rule 54(b) *or, in the Alternative, to Certify for Interlocutory Appeal,* filed by USA. (Gette, James) Modified on 1/12/2010 to remove reply deadline (jt1). (Entered: 01/11/2010) |
| 01/19/2010 | 86 | PUBLISHED OPINION denying 82 Motion for Entry of Judgment under Rule 54(b). Signed by Judge Francis M. Allegra. (si) (Entered: 01/19/2010) |
| 02/22/2010 | 87 | STATUS CONFERENCE ORDER: **Status Conference set for 3/11/2010 at 2:00 PM (EST) via telephone before Judge Francis M. Allegra.** Signed by Judge Francis M. Allegra. (si) (Entered: 02/22/2010) |
| 03/09/2010 | | ORDER granting 83 Motion for Leave to File Out of Time. Signed by Judge Francis M. Allegra. (si) (Entered: 03/09/2010) |
| 03/11/2010 | | Minute Entry for proceeding held in Washington, DC on 3/11/2010, ended on 3/11/2010, before Judge Francis M. Allegra: Status Conference. [Total number of days of proceeding: 1]. Official Record of proceeding taken via electronic digital recording (EDR). (Click HERE for link to Court of Federal Claims web site forms page for information on ordering: certified transcript from reporter or certified transcript of proceeding from official digital recording.)(si) (Entered: 03/11/2010) |
| 03/12/2010 | 88 | DISCOVERY SCHEDULING ORDER: **Fact Discovery completed by 2/1/2011. Joint Status Report due by 2/15/2011. Expert Discovery completed by 7/15/2011. Joint Status Report due by 7/29/2011.** Signed by Judge Francis M. Allegra. (si) Modified on 3/15/2010 to correct text(jt1). (Entered: 03/12/2010) |
| 03/12/2010 | | Set/Reset Deadlines: Status Report due by 7/29/2011 (jt1) (Entered: 03/15/2010) |
| 03/12/2010 | | Set/Reset Deadlines: Status Report due by 2/15/2011 Status Report due by 7/29/2011 (jt1) (Entered: 03/15/2010) |
| 08/09/2010 | 89 | MOTION for Leave to File Second Amended Complaint, filed by PETRO–HUNT, L.C.C..**Response due by 8/26/2010.** (Attachments: # 1 Proposed Document–2nd Amended Complaint, # 2 Exhibit Exhibits 1–4 to 2nd Amended Complaint)(White, Joseph) (Entered: 08/09/2010) |
| 08/19/2010 | 90 | SCHEDULING ORDER: **Discovery Hearing set for 8/20/2010 10:00 AM in Chambers (Telephonic) before Judge Francis M. Allegra.** Signed by Judge Francis M. Allegra. (Allegra, Francis) (Entered: 08/19/2010) |
| 08/26/2010 | 91 | RESPONSE to 89 MOTION for Leave to File Second Amended Complaint, filed by USA.**Reply due by 9/7/2010.** (Gette, James) (Entered: 08/26/2010) |
| 09/07/2010 | 92 | REPLY to Response to Motion re 89 MOTION for Leave to File Second Amended Complaint, filed by PETRO–HUNT, L.C.C.. (White, Joseph) (Entered: 09/07/2010) |
| 09/07/2010 | 93 | AMENDED DOCUMENT, filed by PETRO–HUNT, L.C.C.. Amendment to 92 Reply to Response to Motion. (White, Joseph) (Entered: 09/07/2010) |
| 09/13/2010 | 94 | ORDER granting in part and denying in part 89 Motion for Leave to File amended complaint. **Amended complaint due by 9/17/2010, without the claims dismissed in this court's November 6, 2009, opinion.** Signed by Judge Francis M. Allegra. (si) (Entered: 09/13/2010) |
| 09/16/2010 | 95 | AMENDED COMPLAINT *(Restated Second Amended Complaint)* against.Answer due by 10/4/2010. (Attachments: # 1 Exhibit 1–4)(White, Joseph) (Entered: 09/16/2010) |
| 10/04/2010 | 96 | *Defendant's* ANSWER to Amended Complaint, filed by USA. (Gette, James) (Entered: 10/04/2010) |

| | | |
|---|---|---|
| 10/06/2010 | 97 | MOTION to Compel *Discovery*, filed by PETRO–HUNT, L.C.C..**Response due by 10/25/2010.** (Attachments: #1 Memorandum in Support, #2 Certification of Good Faith Efforts to Confer, #3 Appendix 1, #4 Appendix 2, #5 Appendix 3, #6 Exhibit A–K, #7 Exhibit L–T)(White, Joseph) (Entered: 10/06/2010) |
| 10/22/2010 | 98 | First MOTION for Extension of Time until October 29, 2010 to File Response as to 97 MOTION to Compel *Discovery*, filed by USA.**Response due by 11/8/2010.**(Gette, James) (Entered: 10/22/2010) |
| 10/22/2010 | | ORDER granting 98 Motion for Extension of Time to File Response re 98 First MOTION for Extension of Time until October 29, 2010 to File Response as to 97 MOTION to Compel. **Response due by 10/29/2010.** Signed by Judge Francis M. Allegra. (si) (Entered: 10/22/2010) |
| 10/29/2010 | 99 | RESPONSE to 97 MOTION to Compel *Discovery*, filed by USA.**Reply due by 11/8/2010.** (Attachments: #1 Exhibit A, #2 Exhibit B, #3 Exhibit C, #4 Exhibit D, #5 Exhibit E, #6 Exhibit F, #7 Exhibit G, #8 Exhibit H)(Gette, James) (Entered: 10/29/2010) |
| 11/05/2010 | 100 | Joint MOTION for Extension of Time to Enlarge the Discovery Period and to File Plaintiff's Reply Brief, filed by PETRO–HUNT, L.C.C., USA.**Response due by 11/22/2010.**(White, Joseph) (Entered: 11/05/2010) |
| 11/08/2010 | 101 | ORDER granting in part and denying in part 100 Motion for Extension of Time. **Plaintiff shall file its reply brief by 1/7/2011.** Signed by Judge Francis M. Allegra. (si) (Entered: 11/08/2010) |
| 12/10/2010 | 102 | Joint MOTION for Status Conference, filed by PETRO–HUNT, L.C.C., USA.**Response due by 12/27/2010.**(White, Joseph) (Entered: 12/10/2010) |
| 12/13/2010 | 103 | STATUS CONFERENCE ORDER: **Status Conference set for 12/22/2010 at 10:00 AM (EST)via telephone before Judge Francis M. Allegra.** Signed by Judge Francis M. Allegra. (si) (Entered: 12/13/2010) |
| 12/22/2010 | | Minute Entry for proceeding held in Washington, DC on 12/22/2010, ended on 12/22/2010, before Judge Francis M. Allegra: Status Conference. [Total number of days of proceeding: 1]. Official Record of proceeding taken via electronic digital recording (EDR). (Click HERE for link to Court of Federal Claims web site forms page for information on ordering: certified transcript from reporter or certified transcript of proceeding from official digital recording.)(si) (Entered: 12/22/2010) |
| 12/22/2010 | 104 | DISCOVERY SCHEDULING ORDER: **Joint Motion for Protective Order (or competing such motions) due by 1/5/11. Fact Discovery to be completed by 8/1/2011. Joint Status Report due by 8/15/2011. Expert Discovery to be completed by 1/13/2012. Joint Status Report due by 1/27/2012.** Signed by Judge Francis M. Allegra. (si) Modified on 12/28/2010 to add due date for motion.(dls). (Entered: 12/22/2010) |
| 12/22/2010 | | ORDER denying 97 Motion to Compel. Signed by Judge Francis M. Allegra. (si) (Entered: 12/22/2010) |
| 01/05/2011 | 105 | Joint MOTION for Protective Order, filed by PETRO–HUNT, L.C.C., USA.**Response due by 1/24/2011.** (Attachments: #1 Text of Proposed Order)(Meeker, Emily) (Entered: 01/05/2011) |
| 01/10/2011 | 106 | PROTECTIVE ORDER. Signed by Judge Francis M. Allegra. (si) (Entered: 01/10/2011) |
| 05/31/2011 | 107 | NOTICE of Appearance by William James Shapiro for USA. (Shapiro, William) (Entered: 05/31/2011) |
| 05/31/2011 | 108 | MOTION to Dismiss pursuant to Rule 12(b)(1), filed by USA.**Response due by 7/1/2011.**(Shapiro, William) (Entered: 05/31/2011) |
| 05/31/2011 | 109 | MEMORANDUM re: 108 Motion to Dismiss – Rule 12(b)(1), filed by USA. (Attachments: #1 Exhibit 1)(Shapiro, William) (Entered: 05/31/2011) |
| 05/31/2011 | 110 | MOTION Motion to Stay Discovery, filed by USA.**Response due by 6/17/2011.**(Shapiro, William) (Entered: 05/31/2011) |

| 06/02/2011 | <u>111</u> | Joint MOTION to Stay Discovery *or, In the Alternative, Joint Request for a Status Conference*, filed by PETRO–HUNT, L.C.C., USA.**Response due by 6/20/2011.**(White, Joseph) (Entered: 06/02/2011) |
| 06/02/2011 | | ORDER mooting <u>110</u> Defendant's Motion to Stay discovery and; granting <u>111</u> Joint Motion to Stay Discovery. Signed by Judge Francis M. Allegra. (si) Copy to parties. (Entered: 06/02/2011) |
| 06/20/2011 | <u>112</u> | Joint MOTION for Extension of Time until 7/18/2011 to Plaintiff's Opposition to Defendant's Motion to Dismiss *(Document 108)*, filed by PETRO–HUNT, L.C.C., USA.**Response due by 7/7/2011.**(White, Joseph) (Entered: 06/20/2011) |
| 06/20/2011 | <u>113</u> | ORDER granting <u>112</u> Motion for Extension of Time.**Plaintiff shall response to defendant's mtoion to dismiss due by 7/18/2011. Defendant shall reply to plaintiff's response to its motion tto dismiss due by 8/26/2011.** Signed by Judge Francis M. Allegra. (si) Copy to parties. (Entered: 06/20/2011) |
| 07/18/2011 | <u>114</u> | RESPONSE to <u>108</u> MOTION to Dismiss pursuant to Rule 12(b)(1) *Memorandum in Opposition*, filed by PETRO–HUNT, L.C.C..**Reply due by 8/26/2011.** (White, Joseph) Modified on 7/19/2011 – corrected reply date(jt1). (Entered: 07/18/2011) |
| 08/24/2011 | <u>115</u> | MOTION for Leave to Exceed Page Limit of Reply Memorandum in Support of Motion to Dismiss by 7 pages, filed by USA.**Response due by 9/12/2011.**(Shapiro, William) (Entered: 08/24/2011) |
| 08/25/2011 | | ORDER denying <u>115</u> Motion for Leave to File Excess Pages. Signed by Judge Francis M. Allegra. (si) Copy to parties. (Entered: 08/25/2011) |
| 08/26/2011 | <u>116</u> | REPLY to Response to Motion re <u>108</u> MOTION to Dismiss pursuant to Rule 12(b)(1), filed by USA. (Attachments: #<u>1</u> Exhibit 2)(Shapiro, William) (Entered: 08/26/2011) |
| 09/07/2011 | <u>117</u> | MOTION for Leave to File Petro–Hunt, L.L.C.'s Supplemental Memorandum in Opposition to Defendant's Motion to Dismiss *108* , filed by PETRO–HUNT, L.C.C..**Response due by 9/26/2011.** (Attachments: #<u>1</u> Supplemental Memorandum in Opposition to Defendant's Motion to Dismiss)(White, Joseph) (Entered: 09/07/2011) |
| 09/08/2011 | | ORDER granting <u>117</u> Motion for Leave to File Supplemental Memorandum. Signed by Judge Francis M. Allegra. (si) Copy to parties. (Entered: 09/08/2011) |
| 09/26/2011 | <u>118</u> | Unopposed MOTION for Leave to File Response to Supplemental Memorandum, filed by USA.**Response due by 10/13/2011.** (Attachments: #<u>1</u> Response to Supplemental Memorandum)(Shapiro, William) (Entered: 09/26/2011) |
| 09/27/2011 | | ORDER granting <u>118</u> Motion for Leave to File response to supplemental memorandum. Signed by Judge Francis M. Allegra. (si) Copy to parties. (Entered: 09/27/2011) |
| 11/28/2011 | <u>119</u> | ORDER Setting Hearing on Motion <u>108</u> MOTION to Dismiss pursuant to Rule 12(b)(1): **Oral Argument set for 1/19/2012 at 2:00 PM (EST) in National Courts Building before Judge Francis M. Allegra.** Signed by Judge Francis M. Allegra. (si) Copy to parties. (Entered: 11/28/2011) |
| 01/06/2012 | <u>120</u> | ORDER: Hearing on Motion <u>108</u> MOTION to Dismiss pursuant to Rule 12(b)(1): **Oral Argument set for 1/31/2012 at 2:00 PM (EST)in National Courts Building before Judge Francis M. Allegra.** Signed by Judge Francis M. Allegra. (si) Copy to parties. (Entered: 01/06/2012) |
| 01/20/2012 | <u>121</u> | NOTICE of Additional Authority (Shapiro, William) (Entered: 01/20/2012) |
| 01/24/2012 | <u>122</u> | MOTION for Leave to File supplemental memo in opposition to motion to dismiss, filed by PETRO–HUNT, L.C.C..**Response due by 2/10/2012.** (Attachments: #<u>1</u> Exhibit A)(White, Joseph) (Entered: 01/24/2012) |
| 01/25/2012 | <u>123</u> | NOTICE of Additional Authority (White, Joseph) (Entered: 01/25/2012) |
| 01/25/2012 | | ORDER denying, without prejudice <u>122</u> Motion for Leave to File supplemental memo in opposition to motion to dismiss. Signed by Judge Francis M. Allegra. (si) Copy to parties. (Entered: 01/25/2012) |

| 01/31/2012 | | Minute Entry for proceeding held in Washington, DC on 1/31/2012, ended on 1/31/2012, before Judge Francis M. Allegra: Oral Argument. [Total number of days of proceeding: 1]. Official Record of proceeding taken via electronic digital recording (EDR). (Click HERE for link to Court of Federal Claims web site forms page for information on ordering: certified transcript from reporter or certified transcript of proceeding from official digital recording.)(si) (Entered: 01/31/2012) |
| --- | --- | --- |
| 03/09/2012 | 124 | NOTICE of Additional Authority (Attachments: # 1 Exhibit A)(Shapiro, William) (Entered: 03/09/2012) |
| 05/02/2012 | 125 | PUBLISHED OPINION: (Joint Status Report due by 6/4/2012) granting, in part, and denying, in part 108 Motion to Dismiss – Rule 12(b)(1). Signed by Judge Francis M. Allegra. (si) Copy to parties. (lld). (Entered: 05/02/2012) |
| 05/29/2012 | 126 | MOTION for Reconsideration – Rule 59(a) re 125 Order on Motion to Dismiss – Rule 12(b)(1), Published Opinion, MOTION for Reconsideration, filed by PETRO–HUNT, L.C.C.. (Attachments: # 1 Exhibit)(White, Joseph) (Entered: 05/29/2012) |
| 05/30/2012 | 127 | PUBLISHED OPINION/ORDER: denying 126 Motion for Reconsideration – Rule 59(a). Signed by Judge Francis M. Allegra. (si) Copy to parties. (Entered: 05/30/2012) |
| 06/04/2012 | 128 | JOINT STATUS REPORT, filed by PETRO–HUNT, L.C.C., USA. (Shapiro, William) (Entered: 06/04/2012) |
| 06/05/2012 | 129 | ORDER STAYING CASE. **Joint Status Report due by 6/22/2012.** Signed by Judge Francis M. Allegra. (si) Copy to parties. (Entered: 06/05/2012) |
| 06/22/2012 | 130 | JOINT STATUS REPORT *and Proposed Schedule*, filed by All Parties. (White, Joseph) (Entered: 06/22/2012) |
| 06/25/2012 | 131 | STATUS REPORT ORDER. **Status Report due by 7/9/2012.** Signed by Judge Francis M. Allegra. (si) Copy to parties. (Entered: 06/25/2012) |
| 07/09/2012 | 132 | STATUS REPORT, filed by USA. (Shapiro, William) (Entered: 07/09/2012) |
| 07/11/2012 | 133 | DISCOVERY SCHEDULING ORDER: **Fact Discovery Completed by 1/28/2013. Expert Discovery Completed by 4/22/2013. Joint Status Report due by 5/6/2013.** Signed by Judge Francis M. Allegra. (si) Copy to parties. (Entered: 07/11/2012) |
| 10/18/2012 | 134 | MOTION for Reconsideration re 125 Order on Motion to Dismiss – Rule 12(b)(1), Published Opinion, MOTION for Reconsideration – Rule 59(a), filed by USA.(Shapiro, William) (Entered: 10/18/2012) |
| 10/18/2012 | 135 | MOTION to Stay discovery, filed by USA.**Response due by 11/5/2012.** (Attachments: # 1 Exhibit 1)(Shapiro, William) (Entered: 10/18/2012) |
| 10/19/2012 | | ORDER denying 135 Motion to Stay.**Discovery shall continue while the court considers defendant's motion for reconsideration. If defendant has concerns regarding the scope of that discovery, it shall conduct good faith negotiations with plaintiff; if those negotiations prove unfruitful, defendant may file appropriate motions.** Signed by Judge Francis M. Allegra. (Allegra, Francis) Copy to parties. (Entered: 10/19/2012) |
| 10/19/2012 | 136 | SCHEDULING ORDER:**Materials to be filed by defendant on or before 10/22/2012. Response to Motion for Reconsideration 134 due by 11/9/2012. Reply due by 11/30/2012.** Signed by Judge Francis M. Allegra. (Allegra, Francis) Copy to parties. (Entered: 10/19/2012) |
| 10/22/2012 | 137 | SUPPLEMENTAL BRIEF re: 136 Scheduling Order,, filed by USA. (Attachments: # 1 Exhibit 1, # 2 Exhibit 2)(Shapiro, William) (Entered: 10/22/2012) |
| 11/09/2012 | 138 | RESPONSE to 134 Motion for Reconsideration, Motion for Reconsideration – Rule 59(a) *Opposition*, filed by PETRO–HUNT, L.C.C.. (White, Joseph) (Entered: 11/09/2012) |

| | | |
|---|---|---|
| 11/30/2012 | 139 | REPLY to Response to Motion re 134 MOTION for Reconsideration re 125 Order on Motion to Dismiss – Rule 12(b)(1), Published Opinion MOTION for Reconsideration – Rule 59(a), filed by USA. (Shapiro, William) (Entered: 11/30/2012) |
| 12/04/2012 | 140 | MOTION to Enforce 136 Scheduling Order or for Leave to file a Sur–Reply, filed by PETRO–HUNT, L.C.C..**Response due by 12/21/2012.**(White, Joseph) Modified on 12/6/2012 – corrected docket entry(jt1). (Entered: 12/04/2012) |
| 12/06/2012 | 141 | ORDER denying 140 Motion to enforce the scheduling order or for Leave to File a sur–reply. No further briefing on defendant's motion for reconsideration is necessary. Signed by Judge Francis M. Allegra. (si) Copy to parties. (Entered: 12/06/2012) |
| 12/20/2012 | 142 | Joint MOTION to Amend Schedule re: 133 Discovery Scheduling Order, filed by All Parties.**Response due by 1/7/2013.**(Shapiro, William) (Entered: 12/20/2012) |
| 12/21/2012 | 143 | ORDER granting 142 Motion to Amend Schedule. **Fact Discovery completed by 5/3/2013. Plaintiff shall disclose their expert materials by 5/31/2013. Defendant shall disclose their expert materials by 6/28/2013. Expert Discovery completed by 8/2/2013. Joint Status Report due by 8/16/2013.** Signed by Judge Francis M. Allegra. (si) Copy to parties. (Entered: 12/21/2012) |
| 01/08/2013 | 144 | PUBLISHED OPINION denying 134 Motion for Reconsideration – Rule 59(a). The discovery schedule in this case remains in effect and will not be further altered. Signed by Judge Francis M. Allegra. (si) Copy to parties. (Entered: 01/08/2013) |
| 04/04/2013 | 145 | **SEALED** MOTION to Compel , filed by USA.**Response due by 4/22/2013.** (Attachments: # 1 Exhibit 1–3, # 2 Exhibit 4–6, # 3 Exhibit 7–8, # 4 Exhibit 9 Part 1, # 5 Exhibit 9 Part 2, # 6 Exhibit 10–11)(Meeker, Emily) (Entered: 04/04/2013) |
| 04/05/2013 | 146 | ORDER directing plaintiff to response to 145 SEALED MOTION to Compel. **Response due by 4/17/2013.** Signed by Judge Francis M. Allegra. (si) Copy to parties. (Entered: 04/05/2013) |
| 04/11/2013 | 147 | **SEALED** MOTION for Protective Order , filed by PETRO–HUNT, L.C.C..**Response due by 4/17/2013.** (Attachments: # 1 Memorandum in Support, # 2 Appendix Appendix 1, # 3 Exhibit Exhibit A Pl's Discovery Reponse to 1st Interrogatories &Request for Production, # 4 Exhibit Exhibit B Pl's Supp Response to 1st Interrogatoroies &1st RFP, # 5 Exhibit Exhibit C Pl's Response to 2nd RFP, # 6 Exhibit Exhibit D Pl's Obj &Responses to 3rd RFP, # 7 Exhibit Exhibit E 3/27/13 Pl's to USG Discovery Letter, # 8 Exhibit Exhibit F 4/1/13 email from USGwith Deposition Topics, # 9 Exhibit Exhibit G 4/3/13 Pl's to USG Discovery Letter, # 10 Exhibit Exhibit H Notice of Deposition of Petro–Hunt L.L.C., # 11 Exhibit Exhibit I 3/20/98 Acquisition Letter, # 12 Exhibit Exhibit J PHLLC/234 Undeveloped Leases, # 13 Exhibit Exhibit K Allocated Value)(White, Joseph) Modified on 4/12/2013 – reset response deadline (jt1). (Entered: 04/11/2013) |
| 04/11/2013 | 148 | **SEALED**RESPONSE to 145 MOTION to Compel *Production of Discovery*, filed by PETRO–HUNT, L.C.C..**Reply due by 4/17/2013.** (Attachments: # 1 Appendix Memorandum in Support of Motion for Protective Order)(White, Joseph) Modified on 4/12/2013 – reset reply deadline (jt1). (Entered: 04/11/2013) |
| 04/12/2013 | | ORDER directing defendant to file its response to 147 Motion for Protective Order. **Response due by 4/17/2013.** Signed by Judge Francis M. Allegra. (si) Copy to parties. (Entered: 04/12/2013) |
| 04/17/2013 | 149 | **SEALED**RESPONSE to 147 MOTION for Protective Order (Reply due by 4/29/2013.), REPLY to Response to Motion re 145 MOTION to Compel , filed by USA. (Attachments: # 1 Exhibit 12)(Shapiro, William) (Entered: 04/17/2013) |
| 04/18/2013 | 150 | **SEALED**REPLY to Response to Motion re 147 MOTION for Protective Order , filed by PETRO–HUNT, L.C.C.. (Attachments: # 1 Exhibit A Accounting Summary Documents, # 2 Exhibit B Lease Operating Statements)(White, Joseph) (Entered: 04/18/2013) |

| 04/19/2013 | 151 | Rule 7.1 Disclosure Statement *Supplemental*, filed by PETRO–HUNT, L.C.C.. (White, Joseph) (Entered: 04/19/2013) |
|---|---|---|
| 04/24/2013 | 152 | STATUS CONFERENCE ORDER: **Telephonic Status Conference set for 4/30/2013 at 2:00 PM (EDT)before Judge Francis M. Allegra.** Signed by Judge Francis M. Allegra. (si) Copy to parties. (Entered: 04/24/2013) |
| 04/26/2013 | 153 | **SEALED** MOTION to Quash *Notice of Deposition and Motion for a Protective Order*, filed by PETRO–HUNT, L.C.C..**Response due by 5/13/2013.** (Attachments: #1 Exhibit A US Notice of Deposition of Ed Stacey, #2 Exhibit B Letter from William Shapiro dated April 23, 2013, #3 Exhibit C Letter from William Shapiro dated April 24, 2013, #4 Exhibit D Letter from Sharon Andrews dated April 25, 2013, #5 Exhibit E Table II Lease Reserve Summary, #6 Exhibit F Tables 26, 27 and 661 of 2013 Evaluation Summary)(White, Joseph) (Entered: 04/26/2013) |
| 04/26/2013 | | ORDER STAYING CASE. All discovery in this matter is stayed until further order. Signed by Judge Francis M. Allegra. (Allegra, Francis) Copy to parties. (Entered: 04/26/2013) |
| 04/29/2013 | 154 | **SEALED**RESPONSE to 153 MOTION to Quash *Notice of Deposition and Motion for a Protective Order* , filed by USA.**Reply due by 5/9/2013.** (Attachments: #1 Exhibit Exhibits 1–10)(Meeker, Emily) (Entered: 04/29/2013) |
| 05/01/2013 | | Minute Entry for proceeding held in Washington, DC on 4/30/2013, ended on 4/30/2013, before Judge Francis M. Allegra: Status Conference. [Total number of days of proceeding: 1]. Official Record of proceeding taken via electronic digital recording (EDR). (Click HERE for link to Court of Federal Claims web site forms page for information on ordering: certified transcript from reporter or certified transcript of proceeding from official digital recording.)(si) (Entered: 05/01/2013) |
| 05/02/2013 | 155 | **SEALED** DIGITAL AUDIO RECORDING of Proceedings held on 04/30/2013 before Judge Allegra. (dh) (Entered: 05/02/2013) |
| 05/02/2013 | 156 | ORDER granting, in part, and denying, in part 147 Motion for Protective Order; granting, in part, and denying, in part 145 Motion to Compel; finding as moot 153 Motion to Quash. Expert discovery is STAYED until further order. Signed by Judge Francis M. Allegra. (si) Copy to parties. (Entered: 05/02/2013) |
| 05/10/2013 | 157 | **See Order of 05/16/2013 Striking This Document** ~~Notice Of Filing Of Certified Transcript for proceedings held on April 30, 2013 in Washington, DC.~~ (dwl) (Entered: 05/10/2013) |
| 05/10/2013 | 158 | **See Order of 05/16/2013 Striking This Document** ~~TRANSCRIPT of Proceedings held on April 30, 2013 before Judge Francis M. Allegra. Total No. of Pages: 1–99. Procedures Re: Electronic Transcripts and Redactions. For copy, contact Heritage Court Reporting, (202) 628–4888. Forms to Request Transcripts. Notice of Intent to Redact due by 5/17/2013. Redacted Transcript Deadline set for 6/10/2013. Release of Transcript Restriction set for 8/8/2013.~~ (dwl) (Entered: 05/10/2013) |
| 05/14/2013 | 159 | NOTICE, filed by PETRO–HUNT, L.C.C. re 156 Order on Motion to Compel, Order on Motion for Protective Order, Order on Motion to Quash,,, *of service* (White, Joseph) (Entered: 05/14/2013) |
| 05/16/2013 | 160 | NOTICE OF INTENT TO REDACT 158 TRANSCRIPT, filed by PETRO–HUNT, L.C.C. (White, Joseph) (Entered: 05/16/2013) |
| 05/16/2013 | | ORDER Striking 157 Notice of Filing Transcript and striking 158 Transcript taken on April 30, 2013, the court will not accept for filing a transcript made from an electronic digital recording (EDR). The Clerk is hereby ordered to remove the unofficial transcript from CM/ECF system. The parties are advised that court will not allow, as costs, the cost of transcribing an electronic digital recording. Signed by Judge Francis M. Allegra. (si) Copy to parties. (Entered: 05/16/2013) |
| 05/28/2013 | 161 | **SEALED**NOTICE, filed by PETRO–HUNT, L.C.C. re 156 Order on Motion to Compel, Order on Motion for Protective Order, Order on Motion to Quash,,, *Notice of Compliance* (White, Joseph) (Entered: 05/28/2013) |

| 05/28/2013 | 162 | **SEALED** MOTION for Protective Order *Renewed*, filed by PETRO–HUNT, L.C.C..**Response due by 6/7/2013.** (White, Joseph) Modified on 5/30/2013 – updated response deadline(jt1). (Entered: 05/28/2013) |
| 05/29/2013 | 163 | ORDER modifying response time for response to motion 162 Motion for Protective Order.**Defendant's response due on or before 6/7/2013.** Signed by Judge Francis M. Allegra. (Allegra, Francis) Copy to parties. (Entered: 05/29/2013) |
| 06/07/2013 | 164 | **SEALED**RESPONSE to 162 MOTION for Protective Order *Renewed* , filed by USA.**Reply due by 6/17/2013.** (Attachments: # 1 Exhibit 1, # 2 Exhibit 2, # 3 Exhibit 3)(Shapiro, William) (Entered: 06/07/2013) |
| 06/14/2013 | 165 | **SEALED**REPLY to Response to Motion re 162 MOTION for Protective Order *Renewed* , filed by PETRO–HUNT, L.C.C.. (Attachments: # 1 Exhibit A and B)(White, Joseph) (Entered: 06/14/2013) |
| 06/21/2013 | 166 | **SEALED** MOTION to Compel *Discovery*, filed by PETRO–HUNT, L.C.C..**Response due by 7/8/2013.** (Attachments: # 1 Supplement Memorandum in Support of Petro–Hunt's Motion to Compel Discovery, # 2 Exhibit A–M, # 3 Exhibit N–Y, # 4 Supplement Certification of Good Faith Efforts to Confer)(White, Joseph) (Entered: 06/21/2013) |
| 06/25/2013 | 167 | ORDER denying 162 Renewed Motion for Protective Order. Defendant statement of expenses incurred in opposing this motion, including attorneys fees due by 7/16/13. Discovery completed by 8/6/2013 (this deadline remains tentative). Signed by Judge Francis M. Allegra. (si) Copy to parties. (Entered: 06/25/2013) |
| 06/28/2013 | 168 | Unopposed MOTION for Extension of Time until 7/19/13 to Respond to Court's June 25, 2013 Order , filed by USA.**Response due by 7/15/2013.**(Shapiro, William) (Entered: 06/28/2013) |
| 07/01/2013 | | ORDER granting 168 Motion for Extension of Time to Respond to Court's June 25, 2013,Order. **Notice of Compliance due by 7/19/2013.** Signed by Judge Francis M. Allegra. (si) Copy to parties. (Entered: 07/01/2013) |
| 07/02/2013 | 169 | **SEALED**RESPONSE to 166 Motion to Compel, , filed by USA. (Attachments: # 1 Exhibit 1, # 2 Exhibit 2, # 3 Exhibit 3)(Meeker, Emily) Reply due: 7/12/2013 Modified on 7/3/2013 – set reply deadline(jt1). (Entered: 07/02/2013) |
| 07/12/2013 | 170 | **SEALED**REPLY to Response to Motion re 166 MOTION to Compel *Discovery* , filed by PETRO–HUNT, L.C.C.. (Attachments: # 1 Exhibit A Transcript excerpt)(White, Joseph) (Entered: 07/12/2013) |
| 07/19/2013 | 171 | STATEMENT OF EXPENSES INCURRED, filed by USA. (Attachments: # 1 Exhibit 1, # 2 Exhibit 2)(Shapiro, William) Modified on 7/24/2013 – corrected docket text/case flags (no response due) (jt1). (Entered: 07/19/2013) |
| 07/29/2013 | 172 | Joint MOTION for Extension of Time,until 09–06–2013, to Complete Discovery , filed by All Parties.**Response due by 8/15/2013.**(Shapiro, William) (Entered: 07/29/2013) |
| 08/02/2013 | 173 | ORDER. **Notice of Compliance (re en camera review) due by 8/19/2013.** Signed by Judge Francis M. Allegra. (Allegra, Francis) Copy to parties. (Entered: 08/02/2013) |
| 08/09/2013 | 174 | ORDER: RCFC 37(a)(5)(B) requires plaintiff be given an opportunity to be heard regarding 171 STATEMENT OF EXPENSES INCURRED filed by defendant. **Brief due by 9/9/2013.** Signed by Judge Francis M. Allegra. (si) Copy to parties. (Entered: 08/09/2013) |
| 09/09/2013 | 175 | **SEALED**RESPONSE to 171 Bill of Costs , filed by PETRO–HUNT, L.C.C..(White, Joseph) (Entered: 09/09/2013) |
| 10/04/2013 | 176 | PUBLISHED OPINION re: 171 Statement of Expenses. Plaintiff shall file a notice confirming that it has complied with this court's order by 10/28/2013. Signed by Judge Francis M. Allegra. (si) Copy to parties. (Entered: 10/04/2013) |

| 11/04/2013 | 177 | MOTION for Leave to File Attached Notice of Compliance with Order (Dkt. 176) Out of Time , filed by PETRO–HUNT, L.C.C..**Response due by 11/21/2013.** (Attachments: #1 Exhibit Notice of Compliance)(White, Joseph) (Entered: 11/04/2013) |
| --- | --- | --- |
| 11/05/2013 | | ORDER granting 177 Motion for Leave to File Out of Time. Signed by Judge Francis M. Allegra. (Allegra, Francis) Copy to parties. (Entered: 11/05/2013) |
| 11/05/2013 | 178 | NOTICE, filed by PETRO–HUNT, L.C.C. re 176 Published Opinion *of Compliance with Order* (White, Joseph) (Entered: 11/05/2013) |
| 11/15/2013 | 179 | ORDER Setting Hearing on Motion 166 MOTION to Compel *Discovery*: **Telephonic Oral Argument set for 12/5/2013 at 2:00 PM (EST) before Judge Francis M. Allegra.** Signed by Judge Francis M. Allegra. (si) Copy to parties. (Entered: 11/15/2013) |
| 11/26/2013 | 180 | **SEALED** MOTION for Leave to Supplement Exhibits to 166 Motion to Compel , filed by PETRO–HUNT, L.C.C.. **Response due by 12/3/2013.** (Attachments: #1 Exhibit Z 1–5, #2 Exhibit Z 6 – 26)(White, Joseph) Modified on 11/26/2013––corrected docket text (jb). Modified on 12/2/2013––corrected response deadline pursuant to Order dated 12/2/2013 (jb). (Entered: 11/26/2013) |
| 12/02/2013 | | ORDER **Defendant shall respond to plaintiff's motion for leave to file supplemental exhibits on or before 12/3/2013.** Signed by Judge Francis M. Allegra. (Allegra, Francis) Copy to parties. (Entered: 12/02/2013) |
| 12/03/2013 | 181 | RESPONSE to 180 MOTION for Leave to File 166 *Supplement Motion to Compel Exhibits* , filed by USA.**Reply due by 12/13/2013.** (Shapiro, William) (Entered: 12/03/2013) |
| 12/03/2013 | | ORDER: **The oral argument scheduled for December 4, 2013, will focus on waiver and be limited to 30 minutes per side. In preparation for that argument, the parties should familiarize themselves with, and formulate positions as to the applicability of, Federal Rule of Evidence 502(a).** Signed by Judge Francis M. Allegra. (Allegra, Francis) Copy to parties. (Entered: 12/03/2013) |
| 12/03/2013 | | ORDER **The court notes that the immediate prior order mistakenly refers to the argument as being scheduled for 12/4/2013; argument is actually scheduled for 12/5/2013.** Signed by Judge Francis M. Allegra. (Allegra, Francis) Copy to parties. (Entered: 12/03/2013) |
| 12/05/2013 | | ORDER granting 180 Motion for Leave to File. Signed by Judge Francis M. Allegra. (Allegra, Francis) Copy to parties. (Entered: 12/05/2013) |
| 12/11/2013 | 182 | **SEALED**DIGITAL AUDIO RECORDING of Proceedings (Oral Argument) held on 12/5/2013 before Judge Allegra. (si) (Entered: 12/11/2013) |
| 12/11/2013 | 183 | **SEALED**SUPPLEMENTAL BRIEF re: 166 Motion to Compel, *Supplemental Authorities*, filed by PETRO–HUNT, L.L.C.. (White, Joseph) (Entered: 12/11/2013) |
| 12/19/2013 | 184 | PUBLISHED OPINION denying 166 Motion to Compel. Signed by Judge Francis M. Allegra. (si) Copy to parties. (Entered: 12/19/2013) |
| 01/08/2014 | 185 | STATUS REPORT ORDER. **Joint Status Report due by 1/17/2014.** Signed by Judge Francis M. Allegra. (si) Copy to parties. (Entered: 01/08/2014) |
| 01/13/2014 | 186 | **SEALED** MOTION for Reconsideration re 184 Order on Motion to Compel, Published Opinion , filed by PETRO–HUNT, L.L.C.. (White, Joseph) (Entered: 01/13/2014) |
| 01/14/2014 | | ORDER denying 186 Motion for Reconsideration. **While plaintiff may be correct in terms of the court's mistaken use of the word "lease" rather than "servitude," the court's opinion 184 was intended to and did, in fact, address the actual issues presented by the motion to compel. The court sees no basis for reconsideration.** Signed by Judge Francis M. Allegra. (Allegra, Francis) Copy to parties. (Entered: 01/14/2014) |

| 01/17/2014 | 187 | STATUS REPORT *and Proposed Schedule for Further Proceedings*, filed by USA. (Shapiro, William) (Entered: 01/17/2014) |
| 01/17/2014 | 188 | STATUS REPORT *and Proposed Schedule for Further Proceedings*, filed by PETRO–HUNT, L.L.C.. (White, Joseph) (Entered: 01/17/2014) |
| 01/23/2014 | 189 | DISCOVERY SCHEDULING ORDER: **Fact Discovery completed by 3/31/2014. Plaintiff shall disclose its Expert Report due by 5/29/2014. Defandant shall disclose its Expert Report due by 7/21/2014. Expert Discovery completed by 9/18/2014. Joint Status Report due by 10/2/2014.** Signed by Judge Francis M. Allegra. (si) Copy to parties. (Entered: 01/23/2014) |
| 05/08/2014 | 190 | Joint MOTION for Discovery , filed by USA.**Response due by 5/27/2014.**(Shapiro, William) (Entered: 05/08/2014) |
| 05/12/2014 | 191 | ORDER granting 190 Joint Motion for Discovery, pursuant to RCFC 26(c)(1). Signed by Judge Francis M. Allegra. (si) Copy to parties. (Entered: 05/12/2014) |
| 09/16/2014 | 192 | Joint MOTION for Extension of Time until 10/29/2014 to complete discovery , filed by USA.**Response due by 10/3/2014.**(Shapiro, William) (Entered: 09/16/2014) |
| 09/17/2014 | 193 | ORDER granting 192 Motion for Extension of Time to complete discovery. **Expert Discovery complete by 10/29/2014. Joint Status Report due by 11/12/2014.** Signed by Judge Francis M. Allegra. (si) Copy to parties. (Entered: 09/17/2014) |
| 11/12/2014 | 194 | JOINT STATUS REPORT *and Proposed Scheduling Order*, filed by USA. (Shapiro, William) (Entered: 11/12/2014) |
| 11/18/2014 | 195 | STATUS CONFERENCE ORDER: **Telephonic Status Conference set for 12/15/2014 at 2:00 PM (EST) before Judge Francis M. Allegra.** Signed by Judge Francis M. Allegra. (si) Copy to parties. (Entered: 11/18/2014) |
| 12/15/2014 | 196 | DIGITAL AUDIO RECORDING of Proceedings (Telephonic Status Conference) held on 12/15/2014 before Judge Allegra. (si) (Entered: 12/15/2014) |
| 12/15/2014 | 197 | SCHEDULING ORDER: **Brief due by 1/23/2015. Plaintiff's response to the motion for summary judgment and its Cross–Motions, if any, due by 3/20/2015. Defendant Reply in support of its motion for summary judgment and response to plaintiff's cross–motion, if any, due by 4/17/2015. Plaintiff Reply in support of its motion, in any, due by 5/8/2015.** Signed by Judge Francis M. Allegra. (si) Copy to parties. (Entered: 12/15/2014) |
| 01/23/2015 | 198 | **SEALED** MOTION to Dismiss pursuant to Rules 12(b)(1) and (6) , MOTION for Summary Judgment *and Memorandum in Support*, filed by USA.**Response due by 3/20/2015.** (Attachments: # 1 Exhibit 1–4, # 2 Exhibit 5–11, # 3 Exhibit 12–17)(Shapiro, William) Modified on 2/24/2015 – corrected response deadline (jt1). (Entered: 01/23/2015) |
| 03/19/2015 | 199 | **SEALED**CROSS MOTION and RESPONSE to 198 Motion to Dismiss – Rules 12(b)(1) and (6), Motion for Summary Judgment,, filed by USA, filed by PETRO–HUNT, L.L.C..**Response due by 4/17/2015.** (Attachments: # 1 Exhibit A–D, # 2 Exhibit E–K, # 3 Exhibit L–M, # 4 Exhibit N–S, # 5 Exhibit T–W, # 6 Exhibit X (Part 1), # 7 Exhibit X (Part 2), # 8 Exhibit X (Part 3), # 9 Exhibit Y–CC)(White, Joseph) Modified on 3/19/2015 to correct response entry, pursuant to court order (ar). (Entered: 03/19/2015) |
| 04/17/2015 | 200 | **SEALED**RESPONSE and reply to 199 CROSS MOTION and RESPONSE to 198 Motion to Dismiss – Rules 12(b)(1) and (6), Motion for Summary Judgment,, filed by USA (Reply due by 5/8/2015.), REPLY to Response to Motion re 198 MOTION to Dismiss pursuant to Rules 12(b)(1) and (6) MOTION for Summary Judgment *and Memorandum in Support* , filed by USA.(Shapiro, William) Modified on 4/20/2015 – corrected reply deadline(jt1). (Entered: 04/17/2015) |
| 05/08/2015 | 201 | **SEALED**REPLY to Response to Motion re 199 CROSS MOTION and RESPONSE to 198 Motion to Dismiss – Rules 12(b)(1) and (6), Motion for Summary Judgment,, filed by USA , filed by PETRO–HUNT, L.L.C..(White, Joseph) (Entered: 05/08/2015) |

| 06/23/2015 | 202 | ORDER DIRECTING CLERK TO RANDOMLY REASSIGN CASE pursuant to RCFC 40.1(c) Signed by Chief Judge Patricia E. Campbell–Smith. (lld) Copy to parties. (Entered: 06/23/2015) |
| 06/23/2015 | 203 | NOTICE of Reassignment. Case reassigned to Judge Marian Blank Horn for all further proceedings. Judge Francis M. Allegra no longer assigned to the case. (ar) (Entered: 06/24/2015) |
| 07/01/2015 | 204 | ORDER: **Status conference set for 7/7/2015, 4:30 PM.** Signed by Judge Marian Blank Horn. (jm5) Copy to parties. (Entered: 07/01/2015) |
| 07/01/2015 | 205 | ORDER: **Status conference rescheduled for 7/14/2015, 2:30 PM.** Signed by Judge Marian Blank Horn. (jm5) Copy to parties. (Entered: 07/01/2015) |
| 07/09/2015 | 206 | ORDER: **Status conference set for 7/21/2015.** Signed by Judge Marian Blank Horn. (ss) Copy to parties. (Entered: 07/09/2015) |
| 07/22/2015 | | Minute Entry – Was the proceeding sealed to the public? no. Proceeding held in Washington, DC on 7/21/2015 before Judge Marian Blank Horn: Status Conference. [Total number of days of proceeding: 1]. Proceeding was not officially recorded. (jm5) (Entered: 07/22/2015) |
| 07/23/2015 | 207 | ORDER STAYING CASE until 11/3/2015. **Argument scheduled for 11/3/2015, 10:30 AM.** Signed by Judge Marian Blank Horn. (jm5) Copy to parties. (Entered: 07/23/2015) |
| 07/28/2015 | 208 | MEMORANDUM re: 207 Order Staying Case, filed by PETRO–HUNT, L.L.C.. (White, Joseph) (Entered: 07/28/2015) |
| 07/28/2015 | 209 | MEMORANDUM re: 207 Order Staying Case, filed by USA. (Shapiro, William) (Entered: 07/28/2015) |
| 07/29/2015 | 210 | ORDER Case Numbers 00–512L and 11–775L are CONSOLIDATED for case management purposes. Signed by Judge Marian Blank Horn. (es) Copy to parties. (Entered: 07/29/2015) |
| 08/07/2015 | 211 | STATUS REPORT *on Oral Argument*, filed by PETRO–HUNT, L.L.C.. (White, Joseph) (Entered: 08/07/2015) |
| 10/07/2015 | 212 | NOTICE of Additional Authority (Attachments: # 1 Exhibit A)(Shapiro, William) (Entered: 10/07/2015) |
| 11/03/2015 | | Minute Entry – Was the proceeding sealed to the public? no. Proceeding held in Washington, DC on 11/3/2015 before Judge Marian Blank Horn: Oral Argument. [Total number of days of proceeding: 1]. Official record of proceeding taken by court reporter. To order a certified transcript or an audio copy of the proceeding (click HERE) (jm5) (Entered: 11/03/2015) |
| 11/03/2015 | 213 | ORDER: **Submissions due by 11/6/2015.** Signed by Judge Marian Blank Horn. (jm5) Copy to parties. (Entered: 11/03/2015) |
| 11/06/2015 | 214 | STATUS REPORT *Regarding Protective Order, Sealed Documents, and Prior Findings of Fact*, filed by PETRO–HUNT, L.L.C.. (White, Joseph) (Entered: 11/06/2015) |
| 11/06/2015 | 215 | MEMORANDUM re: 213 Order, filed by USA. (Shapiro, William) (Entered: 11/06/2015) |
| 11/09/2015 | 216 | ORDER: **Defendant's response due by 11/20/2015.** Signed by Judge Marian Blank Horn. (jm5) Copy to parties. (Entered: 11/09/2015) |
| 11/10/2015 | 217 | MOTION for Extension of Time to File Response as to 216 Order , filed by USA.**Response due by 11/30/2015.**(Shapiro, William) (Entered: 11/10/2015) |
| 11/12/2015 | 218 | ORDER granting 217 Motion for Extension of Time to File Response. **Response due by 12/4/2015.** Signed by Judge Marian Blank Horn. (jm5) Copy to parties. (Entered: 11/12/2015) |
| 11/19/2015 | 219 | Notice Of Filing Of Certified Transcript for proceedings held on November 3, 2015 in Washington, D.C. (ew) (Entered: 11/19/2015) |

| 11/19/2015 | 220 | TRANSCRIPT of Proceedings held on November 3, 2015 before Judge Marian Blank Horn. Total No. of Pages: 1–62. Procedures Re: Electronic Transcripts and Redactions. To order a copy of the proceeding (click HERE) Notice of Intent to Redact due 11/30/2015. Redacted Transcript Deadline set for 12/21/2015. Release of Transcript Restriction set for 2/19/2016. (ew) (Entered: 11/19/2015) |
|---|---|---|
| 12/03/2015 | 221 | MEMORANDUM re: 214 Status Report, filed by USA. (Shapiro, William) (Entered: 12/03/2015) |
| 02/29/2016 | 222 | **SEALED** ORDER granting 198 Motion to Dismiss. Signed by Judge Marian Blank Horn. (jm5) Copy to parties. (Entered: 02/29/2016) |
| 02/29/2016 | 223 | JUDGMENT entered, pursuant to Rule 58, dismissing plaintiff's complaint. (Copy to parties) (dls) (Entered: 02/29/2016) |
| 03/02/2016 | 224 | ORDER: **Joint Status Report on Redactions due by 3/14/2016.** Signed by Judge Marian Blank Horn. (jm5) Copy to parties. (Entered: 03/02/2016) |
| 03/14/2016 | 225 | JOINT STATUS REPORT *and Joint Request to Unseal the Court's February 29, 2016 Opinion*, filed by USA. (Shapiro, William) (Entered: 03/14/2016) |
| 03/28/2016 | 226 | JOINT STATUS REPORT , filed by USA. (Shapiro, William) (Entered: 03/28/2016) |
| 04/25/2016 | 227 | NOTICE OF APPEAL as to 77 Order on Motion to Dismiss – Rule 12(b)(1), Order on Motion to Dismiss – Rule 12(b)(6), Reported Opinion,,,,,, 223 Judgment, 127 Order on Motion for Reconsideration – Rule 59(a), Reported Opinion, 184 Order on Motion to Compel, Reported Opinion, 222 Order on Motion to Dismiss – Rule 12(b)(1) and (6), Order Dismissing Case, 80 Order on Motion for Reconsideration – Rule 59(a), 125 Order on Motion to Dismiss – Rule 12(b)(1), Reported Opinion, filed by PETRO–HUNT, L.L.C.. Filing fee $ 505, receipt number 9998–3301569. Copies to judge, opposing party and CAFC. (White, Joseph) (Entered: 04/25/2016) |
| 04/26/2016 | 228 | REPORTED OPINION. Signed by Judge Marian Blank Horn. (jm5) Copy to parties. Modified on 5/3/2016 – correction to pdf(jt1). (Entered: 04/26/2016) |
| 04/26/2016 | 229 | ORDER: Redactions deferred. Signed by Judge Marian Blank Horn. (jm5) Copy to parties. (Entered: 04/26/2016) |
| 05/03/2016 | | Transmission of Notice of Appeal and Docket Sheet to US Court of Appeals for the Federal Circuit re 227 Notice of Appeal,, (hw1) (Entered: 05/17/2016) |
| 05/04/2016 | | CAFC Case Number 2016–1981 for 227 Notice of Appeal,, filed by PETRO–HUNT, L.L.C. (hw1) (Entered: 05/04/2016) |

APPEAL,CLOSED,ECF

# US Court of Federal Claims
## United States Court of Federal Claims (COFC)
## CIVIL DOCKET FOR CASE #: 1:11–cv–00775–MBH

PETRO–HUNT, L.L.C. v. USA
Assigned to: Judge Marian Blank Horn
Demand: $65,633,000
Case in other court:  16–01983
Cause: 28:1491 Tucker Act

Date Filed: 11/17/2011
Date Terminated: 02/29/2016
Jury Demand: None
Nature of Suit: 512 Taking – Realty
Jurisdiction: U.S. Government Defendant

**Plaintiff**

**PETRO–HUNT, L.L.C.**            represented by   **Joseph Ralph White**
White Law Firm
650 Poydras Street
Suite 1605
New Orleans, LA 70130
(504) 799–2585
Fax: (504) 799–2586
Email: jralphwhitepllc@bellsouth.net
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

V.

**Defendant**

**USA**            represented by   **William James Shapiro**
U.S. Department of Justice
Environment &Natural Resources Division
501 I Street
Room 9–700
Sacramento, CA 95814
(916) 930–2207
Fax: (916) 930–2210
Email: william.shapiro@usdoj.gov
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

| Date Filed | # | Docket Text |
|---|---|---|
| 11/17/2011 | 1 | COMPLAINT against USA (DOI) (Filing fee $350, Receipt number 073026) (Copy Served Electronically on Department of Justice), filed by PETRO–HUNT, L.C.C..**Answer due by 1/17/2012.** (Attachments: #1 Civil Cover Sheet, #2 Exhibit 1–5)(ac7) (Entered: 11/18/2011) |
| 11/17/2011 | 2 | MOTION to Stay Case, filed by PETRO–HUNT, L.C.C..**Response due by 12/5/2011.**(ac7) (Entered: 11/18/2011) |
| 11/17/2011 | 3 | NOTICE of Directly Related Case(s) [00–512], filed by PETRO–HUNT, L.C.C.. (ac7) (Entered: 11/18/2011) |
| 11/17/2011 | 4 | Rule 7.1 Disclosure Statement, filed by PETRO–HUNT, L.C.C.. (ac7) (Entered: 11/18/2011) |
| 11/17/2011 | 5 | NOTICE of Assignment to Judge Francis M. Allegra. (ac7) (Entered: 11/18/2011) |
| 11/17/2011 | 6 | NOTICE of Designation of Electronic Case. (ac7) (Entered: 11/18/2011) |
| 12/05/2011 | 7 | RESPONSE to 2 MOTION to Stay case, filed by USA.**Reply due by 12/15/2011.** (Shapiro, William) (Entered: 12/05/2011) |
| 12/05/2011 | 8 | NOTICE of Appearance by William James Shapiro for USA. (Shapiro, William) (Entered: 12/05/2011) |

| 12/07/2011 | 9 | SPECIAL PROCEDURES ORDER. Signed by Judge Francis M. Allegra. (si) Copy to parties. (Entered: 12/07/2011) |
|---|---|---|
| 12/15/2011 | 10 | REPLY to Response to Motion re 2 MOTION to Stay case *Upon Filing*, filed by PETRO–HUNT, L.C.C.. (White, Joseph) (Entered: 12/15/2011) |
| 12/16/2011 | 11 | ORDER granting, part 2 Motion to Stay. **Defendant shall file its response to plaintiff's complaint by 1/17/2012. All other proceedings in this case are stayed until further order. Signed by Judge Francis M. Allegra. (si) Copy to parties. (Entered: 12/16/2011)** |
| 01/17/2012 | 12 | MOTION to Dismiss pursuant to Rules 12(b)(1) and (6), filed by USA.**Response due by 2/17/2012.**(Shapiro, William) (Entered: 01/17/2012) |
| 01/31/2012 | | ORDER: staying further briefing re: 12 motion to dismiss, until further order. Signed by Judge Francis M. Allegra. (si) Copy to parties. (Entered: 01/31/2012) |
| 06/05/2012 | 13 | ORDER STAYING CASE. **Joint Status Report due by 6/22/2012.** Signed by Judge Francis M. Allegra. (si) Copy to parties. (Entered: 06/05/2012) |
| 06/25/2012 | 14 | See 06/25/2012 ORDER in 00–512L re: no further motions to dismiss, discovery schedule, and briefing on defendant's motion to dismiss remains sayted. (jt1) Copy to parties. (Entered: 07/23/2012) |
| 04/19/2013 | 15 | Rule 7.1 Disclosure Statement *Supplemental*, filed by PETRO–HUNT, L.C.C.. (White, Joseph) (Entered: 04/19/2013) |
| 06/23/2015 | 16 | ORDER DIRECTING THE CLERK TO RANDOMLY REASSIGN CASE PURSUANT TO RULE 40.1(c) Signed by Chief Judge Patricia E. Campbell–Smith. (lld) Copy to parties. (Entered: 06/23/2015) |
| 06/23/2015 | 17 | NOTICE of Reassignment. Case reassigned to Judge Marian Blank Horn for all further proceedings. Judge Francis M. Allegra no longer assigned to the case. (ar) (Entered: 06/24/2015) |
| 07/01/2015 | 18 | ORDER: **Status conference set for 7/7/2015, 4:30 PM.** Signed by Judge Marian Blank Horn. (jm5) Copy to parties. (Entered: 07/01/2015) |
| 07/01/2015 | 19 | ORDER: **Status conference rescheduled for 7/14/2015, 2:30 PM.** Signed by Judge Marian Blank Horn. (jm5) Copy to parties. (Entered: 07/01/2015) |
| 07/09/2015 | 20 | ORDER: **Status conference set for 7/21/2015.** Signed by Judge Marian Blank Horn. (ss) Copy to parties. (Entered: 07/09/2015) |
| 07/22/2015 | | Minute Entry – Was the proceeding sealed to the public? no. Proceeding held in Washington, DC on 7/21/2015 before Judge Marian Blank Horn: Status Conference. [Total number of days of proceeding: 1]. Proceeding was not officially recorded. (jm5) (Entered: 07/22/2015) |
| 07/23/2015 | 21 | ORDER: **Submissions due by 7/28/2015.** Signed by Judge Marian Blank Horn. (jm5) Copy to parties. (Entered: 07/23/2015) |
| 07/29/2015 | 22 | ORDER Case Numbers 00–512L and 11–775L are CONSOLIDATED for case management purposes. Signed by Judge Marian Blank Horn. (es) Copy to parties. (Entered: 07/29/2015) |
| 11/03/2015 | | Minute Entry – Was the proceeding sealed to the public? no. Proceeding held in Washington, DC on 11/3/2015 before Judge Marian Blank Horn: Oral Argument. [Total number of days of proceeding: 1]. Official record of proceeding taken by court reporter. To order a certified transcript or an audio copy of the proceeding (click HERE) (jm5) (Entered: 11/03/2015) |
| 11/03/2015 | 23 | ORDER: **Submissions due by 11/6/2015.** Signed by Judge Marian Blank Horn. (jm5) Copy to parties. (Entered: 11/03/2015) |
| 02/29/2016 | 24 | **SEALED** ORDER granting 12 Motion to Dismiss. Signed by Judge Marian Blank Horn. (jm5) Copy to parties. (Entered: 02/29/2016) |
| 02/29/2016 | 25 | JUDGMENT entered, pursuant to Rule 58, dismissing plaintiff's complaint. (Copy to parties) (dls) (Entered: 02/29/2016) |

| 03/02/2016 | 26 | ORDER: **Joint Status Report on Redactions due by 3/14/2016.** Signed by Judge Marian Blank Horn. (jm5) Copy to parties. (Entered: 03/02/2016) |
|---|---|---|
| 04/25/2016 | 27 | NOTICE OF APPEAL as to 24 Order on Motion to Dismiss – Rule 12(b)(1) and (6), Order Dismissing Case, 25 Judgment, filed by PETRO–HUNT, L.L.C.. Filing fee $ 505, receipt number 9998–3301578. Copies to judge, opposing party and CAFC. (White, Joseph) (Entered: 04/25/2016) |
| 04/26/2016 | 28 | REPORTED OPINION. Signed by Judge Marian Blank Horn. (jm5) Copy to parties. (Entered: 04/26/2016) |
| 05/03/2016 |  | Transmission of Notice of Appeal and Docket Sheet to US Court of Appeals for the Federal Circuit re 27 Notice of Appeal, (hw1) (Entered: 05/17/2016) |
| 05/04/2016 |  | CAFC Case Number 2016–1983 for 27 Notice of Appeal, filed by PETRO–HUNT, L.L.C. (hw1) (Entered: 05/04/2016) |

IN THE UNITED STATES COURT OF FEDERAL CLAIMS

NUMBER _____ **00 - 512 L**

PETRO-HUNT, L.L.C.
Plaintiff

**FILED** AUG 2 4 2000

versus

THE UNITED STATES OF AMERICA,
Defendant

## COMPLAINT

Plaintiff, Petro-Hunt L.L.C., a Delaware Limited Liability Company, respectfully represents as follows:

1.

The claims of the plaintiff against the United States are based upon unconstitutional takings of plaintiff's mineral interests in property located within the confines of the Kisatchie National Forest in the State of Louisiana, without compensation, in direct violation of the Fifth Amendment to the United States Constitution. Jurisdiction therefore, exists in the United States Court of Federal Claims pursuant to 28 U.S.C. §1491.

2.

Plaintiff is the owner of a 64% undivided interest, in perpetuity, of all of the oil, gas and other minerals (termed collectively, "Plaintiff's Mineral Rights") which may be located in, on or under properties located in Grant, Winn, and Natchitoches Parishes, Louisiana, as more particularly described in Exhibit "A", attached to this Complaint. Plaintiff's Mineral Rights include 180,021.31 acres, more or less, situated as follows: Grant Parish: 56,562.86 acres, more or less; Natchitoches

Parish: 25,024.17 acres, more or less; and Winn Parish: 98,434.28 acres, more or less.

3.

Plaintiffs' Mineral Rights were created as a result of the following conveyances and transactions:

(a) Sale of Minerals from Bodcaw Lumber Company of Louisiana, Inc. to Good Pine Oil Company, Inc. dated November 12, 1932, recorded in Conveyance Book 168, Folio 419, Entry No. 63721, in the records of Natchitoches Parish;

(b) Sale of Minerals from Grant Timber & Mfg. Company of La., Inc. to Good Pine Oil Company, Inc., dated November 16, 1932, recorded in Conveyance Book WW, Folio 552, Entry No. 25943, in the records of Grant Parish;

(c) Sale of Minerals from Grant Timber & Mfg. Company of La., Inc. to Good Pine Oil Company, Inc., dated November 16, 1932, recorded in Conveyance Book 42, Folio 255, Entry No. 25548, in the records of Winn Parish; and

(d) Sale of Minerals from Bodcaw Lumber Company of Louisiana, Inc. to Good Pine Oil Company, Inc. dated November 16, 1932, recorded in Conveyance Book 42, Folio 259, Entry No. 25552, in the records of Winn Parish;

(e) Sale of Minerals from Bodcaw Lumber Company of La., Inc. to Good Pine Oil Company, Inc., dated May 3, 1934, recorded in Conveyance Book 171, Folio 72, Entry No. 65277, in the records of Natchitoches Parish;

(f) Sale of Minerals from Bodcaw Lumber Company of La., Inc. to Good Pine Oil Company, Inc., dated May 3, 1934, recorded in Conveyance Book 44, Folio 26, Entry No. 26708, in the records of Winn Parish.

Appx0091

4.

The United States of America owns the surface (but not the minerals) of the lands subject to Plaintiffs' Mineral Rights as a result of, *inter alia*, the following conveyance and transactions:

(a)     Sale of lands by Bodcaw Lumber Company of Louisiana, Inc. to the United States of America dated February 11, 1936, recorded in Conveyance Book 173, Folio 400, Entry No. 66862, in the records of Natchitoches Parish; sale made subject to prior sales of minerals noted in Paragraph 3 above;

(b)     Sale of lands by Grant Timber & Manufacturing Company of Louisiana, Inc. to the United States of America, dated November 28, 1934, recorded in Conveyance Book ZZ, Folio 359, Entry No. 27363, in the records of Grant Parish; sale made subject to prior sales of minerals noted in Paragraph 3 above.

(c)     Sale of lands by Grant Timber and Manufacturing Company of Louisiana, Inc. to the United States of America, dated March 26, 1935, recorded in Conveyance Book 53, Folio 78, Entry No. 27600, in the records of Grant Parish; sale made subject to prior sales of minerals noted in Paragraph 3 above;

(d)     Sale of lands by Grant Timber & Manufacturing Company of Louisiana, Inc. to the United States of America, dated November 28, 1934, recorded in Conveyance Book 44, Folio 131, Entry No. 26836, in the records of Winn Parish; sale made subject to prior sales of minerals noted in Paragraph 3 above;

(e)     Sale of lands by Bodcaw Lumber Company of Louisiana, Inc. to the United States of America, dated December 20, 1934, recorded in Conveyance Book 44, Folio 160, Entry No. 26887, in the records of Winn Parish; sale made subject to prior sales of

Appx0092

minerals noted in Paragraph 3 above;

(f)     Sale of lands by Grant Timber & Manufacturing Company of Louisiana, Inc. to the United States of America, dated March 26, 1935, recorded in Conveyance Book 44, Folio 413, Entry No. 27139, in the records of Winn Parish; sale made subject to prior sales of minerals noted in Paragraph 3 above; and

(g)     Sale of lands by Bodcaw Lumber Company of Louisiana, Inc. to the United States of America, dated June 12, 1935, recorded in Conveyance Book 44, Folio 546, Entry No. 27280, in the records of Winn Parish; sale made subject to prior sales of minerals noted in Paragraph 3 above.

(h)     Sale of lands by Grant Timber & Manufacturing Company of Louisiana, Inc. to the United States of America, dated March 26, 1935, recorded in Conveyance Book 44, Folio 419, Entry No. 27140, in the records of Winn Parish, Louisiana; sale made subject to prior sales of minerals noted in Paragraph 3 above; and

(i)     Judgment in favor of the United States of America against Bodcaw Lumber Company of Louisiana, Inc., dated January 28, 1937, recorded in Conveyance Book 48, Folio 22, Entry No. 29731, in the records of Winn Parish; judgment subject to prior sales of minerals noted in Paragraph 3 above.

(j)     Judgment in favor of the United States of America against Bodcaw Lumber Company of Louisiana, Inc., dated January 28, 1937, recorded in Conveyance Book 177, Folio 612, Entry No. 69177, in the records of Natchitoches Parish; judgment subject to prior sales of minerals noted in Paragraph 3 above.

Appx0093

5.

Plaintiff, Petro-Hunt, is the successor in interest, with respect to Plaintiff's Mineral Rights, to Nebo Oil Company, Inc. In United States v. Nebo Oil Co., 90 F.Supp. 73 (W.D.La. 1950), *aff'd*, 190 F.2d 1003 (5th Cir. 1951) (the "Nebo Oil Case"), title to a portion of Plaintiff's Mineral Rights was litigated and Nebo Oil Company was found to be the owner of same in perpetuity. As a result of the doctrines of collateral estoppel, *res judicata,* and issue and claim preclusion, Nebo Oil Company, and hence, Petro-Hunt, L.L.C., as its successor in interest, is the owner in perpetuity of all of the property described above as "Plaintiff's Mineral Rights." See attached Exhibit A.

Nebo Oil Company, Inc. placed of record an affidavit wherein it claimed title to all of the property shown in Exhibit A (Plaintiff's Mineral Rights) and said affidavit of ownership can be found in Conveyance Book 99, Folio 93, Entry No. 47969, in the records of Grant Parish; Conveyance Book 73, Folio 314, Entry No. 49398, in the records of Winn Parish; and Conveyance Book 216, Folio 331, Entry No. 97034, in the records of Natchitoches Parish. Grant, Winn and Natchitoches Parishes are all located within the State of Louisiana. Upon information and belief, the United States of America acknowledged and publicly declared in a number of instances that Nebo Oil Company, Inc. and its successors were indeed the owners of Plaintiff's Mineral Rights at all times until some time at or about 1991.

6.

Plaintiff's Mineral Rights are owned by plaintiff as a result of, *inter alia*, the following conveyances, declarations and transactions:

(a)    Conveyance of Minerals from Good Pine oil Company, Inc. to William C. Brown, et al., dated December 29, 1941, recorded in Conveyance Book 69, Folio 519, Entry

No. 35127, in the records of Grant Parish;

(b)     Conveyance of Minerals from Good Pine Oil Company, Inc. to William C. Brown, et al., dated December 29, 1941, recorded in Conveyance Book 54, Folio 324, Entry No. 34486, in the records of Winn Parish;

(c)     Conveyance of Minerals from Good Pine Oil Company, Inc. to William C. Brown, et al., dated December 29, 1941, recorded in Conveyance Book 188, Folio 547, Entry No. 76585, in the records of Natchitoches Parish;

(d)     Conveyance of Minerals from William C. Brown, et al., to Nebo Oil Company Inc., dated January 20, 1942, recorded in Conveyance Book 71, Folio 181, Entry No. 35377, in the records of Grant Parish;

(e)     Conveyance of Minerals from William C. Brown, et al., to Nebo Oil Company, Inc. dated January 20, 1942, recorded in Conveyance Book 71, Folio 195, Entry No. 35378, in the records of Grant Parish;

(f)     Conveyance of Minerals from William C. Brown, et al., to Nebo Oil Company, Inc., dated January 20, 1942, recorded in Conveyance Book 56, Folio 1, Entry No. 34722, in the records of Winn Parish;

(g)     Conveyance of Minerals from William C. Brown, et al., to Nebo Oil Company, Inc. dated January 20, 1942, recorded in Conveyance Book 56, Folio 18, Entry No. 34723, in the records of Winn Parish;

(h)     Conveyance of Minerals from William C. Brown, et al., to Nebo Oil Company, Inc., dated January 20, 1942, recorded in Conveyance Book 189, Folio 370, Entry No. 76995, in the records of Natchitoches Parish;

Page -6-

Appx0095

(i)    Conveyance of Minerals from William C. Brown, et al., to Nebo Oil Company, Inc., dated January 20, 1942, recorded in Conveyance Book 189, Folio 382, Entry No. 76996, in the records of Natchitoches Parish;

(j)    Acknowledgment by Joe Smith, h/o Anita O'Neal Smith, to Nebo Oil Company, Inc., dated June 19, 1952, recorded in Conveyance Book 101, Folio 3, Entry No. 48538, in the records of Grant Parish; Conveyance Book 74, Folio 51, Entry No. 49817, in the records of Winn Parish; and Conveyance Book 217, Folio 80, Entry No. 97514, in the records of Natchitoches Parish (husband acknowledged in this document that property conveyance in (d), (e), (f), (g), (h) and (i) above was the separate property of his wife);

(k)    Acknowledgment by H.I. Kenney, h/o Grace Wagner Kenney, to Nebo Oil Company, Inc., dated June 18, 1952, recorded in Conveyance Book 101, Folio 5, Entry No. 48539, in the records of Grant Parish; Conveyance Book 74, Folio 52, Entry No. 49818, in the records of Winn Parish; and Conveyance Book 217, Folio 82, Entry No. 97515, in the records of Natchitoches Parish (husband acknowledged in this document that property conveyed in (d), (e), (f), (g), (h) and (i) above was the separate property of his wife);

(l)    Acknowledgment by S. J. Seeger, h/o Helen B. Seeger, to Nebo Oil Company, Inc., dated July 31, 1944, recorded in Conveyance Book 195, Folio 369, Entry No. 82455, in the records of Grant Parish (husband acknowledged in this document that property conveyed in (h) and (i) above was the property of his wife);

(m)    Acknowledgment by Mary Seeger O'Boyle, et al., being the heirs of S. J. Seeger,

Page -7-

Appx0096

deceased h/o Helen B. Seeger, to Nebo Oil Company, Inc., dated November 13, 1954, recorded in Conveyance Book 104, Folio 433, Entry No. 50887, in the records of Grant Parish; and Conveyance Book 235, Folio 717, Entry No. 175422, in the records of Winn Parish (heirs of deceased husband acknowledged in this document that property conveyed in (d), (e), (f) and (g) above was the separate property of his wife);

(n)    Certificate of Amendment of Certification of Incorporation (name change) from Nebo Oil Company, Inc. to Bodcaw Company, dated April 4, 1960, recorded in Conveyance Book 119, Folio 39. Entry No. 56054, in the records of Grant Parish; Conveyance Book 87, Folio 221, Entry 56325, in the records of Winn Parish; and Conveyance Book 238, Folio 401, Entry No. 111325, in the records of Natchitoches Parish;

(o)    Certificate of Agreement of Merger (Bodcaw Company merged into IPB, Inc., and IPB, Inc. changed its name to Bodcaw Company), dated October 10, 1979, recorded in Conveyance Book 226, Folio 84, Entry 84739, in the records of Grant Parish; Conveyance Book 143, Folio 608, Entry No. 110749, in the records of Winn Parish; and Conveyance Book 356, Folio 491, Entry No. 157257, in the records of Natchitoches Parish; all as further evidenced by (y) below;

(p)    Certificate of Ownership and Merger filed by Bodcaw Company, dated October 10, 1979, recorded in Conveyance Book 226, Folio 85, Entry No. 84740, in the records of Grant Parish; Conveyance Book 143, Folio 609, Entry No. 110750, in the records of Winn Parish; and Conveyance Book 356, Folio 492, Entry No. 157258, in the

Appx0097

records of Natchitoches Parish;

(q)     Mineral Deed from Bodcaw Company to Placid Oil Company, dated October 11, 1979, recorded in Conveyance Book 224, Folio 812, Entry No. 84742, in the records of Grant Parish; Conveyance Book 143, Folio 620, Entry No. 110752, in the records of Winn Parish; and Conveyance Book 356, Folio 508, Entry No. 157260, in the records of Natchitoches Parish;

(r)     Assignment, Conveyance and Bill of Sale from Placid Oil Company to Placid International Oil Limited, and in turn from Placid International Oil Limited to Louisiana-Hunt Petroleum Corporation and Rosewood Resources (POC), Inc., dated June 13, 1983, recorded in Conveyance Book 259, Folio 139, Entry No. 93374, in the records of Grant Parish; Conveyance Book 158, Folio 550, Entry No. 122732, in the records of Winn Parish; and Conveyance Book 388, Folio 19, Entry No. 167876, in the records of Natchitoches Parish;

(s)     Certificate of Ownership, Merger Name Change from Rosewood Resources (POC), Inc. to Rosewood Resources, Inc., dated December 31, 1984, recorded in Mortgage Book 134, Folio 880, Entry No. 44105, in the records of Grant Parish; Conveyance Book 172, Folio 553, Entry No. 134394, in the records of Winn Parish; and Conveyance Book 420, Folio 49, Entry No. 176881, in the records of Natchitoches Parish;

(t)     Certificate of Merger and Name Change from Louisiana-Hunt Petroleum Corporation to Hunt Petroleum Corporation, dated January 31, 1986, recorded in Conveyance Book 215, Folio 574, Entry 64469, in the records of Grant Parish; Conveyance Book

Appx0098

182, Folio 542, Entry 141085, in the records of Winn Parish; and Conveyance Book 442, Folio 127, Entry No. 182279, in the records of Natchitoches Parish;

(u) Assignment and Conveyance from Rosewood Resources, Inc. to Kingfisher Resources, Inc., dated April 24, 1996, recorded in Conveyance Book 338, Foiio 395, Entry No. 117748, in the records of Grant Parish; Conveyance Book 217, Folio 757, Entry No. 163185, in the records of Winn Parish; and Oil and Gas Book 296, Folio 836, Entry No. 230814, in the records of Natchitoches Parish; and

(v) Conveyance and Assumption Agreement from OXY USA, Inc. and Placid Oil Company to Petro-Hunt, L.L.C., executed April 6, 1998, recorded in Conveyance Book 348, Folio 191, Entry No. 121619, in the records of Grant Parish; Conveyance Book 227, Folio 85, Entry No. 169509, in the records of Winn Parish; and Conveyance Book 529, Folio 653, Entry No. 209089, in the records of Natchitoches Parish.

7.

Plaintiff is the owner in perpetuity of the minerals in, on or under the property described in Exhibit "A" attached herewith.

8.

The Plaintiffs' Mineral Rights are located within the Kisatchie National Forest, a National Forest administered by the Forest Service of the United States Department of Agriculture. The federal government acquired its surface interest in these lands as a result of the conveyances shown above in Paragraph 4.

Appx0099

9.

On information and belief, the United States Bureau of Land Management began, on or about 1991, to wrongfully grant as Lessor, a series of purported oil and gas leases, as well as entertained offers to grant oil and gas leases, purporting to cover portions of Plaintiff's Mineral Rights.

10.

In 1991 and thereafter, plaintiff, or its predecessors and/or co-owners, wrote a series of letters to the United States Department of Agriculture protesting the purported leasing by the United States Bureau of Land Management of the land subject to the Plaintiffs' Mineral Rights, but this agency did not acknowledge those letters and would not agree to stop this activity.

11.

Consequently, on or about February 18, 2000 plaintiff and plaintiff's co-owners filed suit in the United States District Court for the Western District of Louisiana, Civil Action No. CV00-0303 S, seeking declaratory relief and to remove this cloud on plaintiff's title, caused by the United States of America, pursuant to the Quiet Title Act. 28 U.S.C. §2409(a). Plaintiff also joined as parties defendant the following individuals or entities who had taken purported mineral leases from the USA: Aspect Resources, L.L.C., Bayou Petroleum Company, Catawba Energy, Inc., First Texas Hydrocarbons, Inc., Oscar C. Forland, et ux, Gulf Coast Oil & Gas Co., Justiss Oil Company, Inc., Matrix Energy, Inc., MB Exploration, L.L.C., Northstar Energy, L.L.C., Palmer Petroleum, Inc., Rice & Associates, L.L.C., Snyder Oil Corporation, Howell R. Spear, et ux, John P. Strang, et ux, Texaco Exploration and Production, Inc., TMR Exploration, Inc., UMC Petroleum Corporation, and Wheless TDL Exploration Co., L.L.C. In this suit, (hereinafter "Plaintiff's Louisiana Quiet Title Act Suit"), plaintiffs prayed that they be declared perpetual owners, in indivision, of one hundred

Appx0100

(100%) percent of the minerals in, on, under and that may be produced from the property described in Exhibit "A" to this Complaint and that a judgment be entered declaring that the defendants in Plaintiff's Louisiana Quiet Title Act Suit have no estate or interest in and to said minerals in said property adverse to plaintiffs and declaring any mineral leases granted by the United States allegedly applicable to any of the property described in Exhibit "A" to this Complaint to be null and void.

12.

While the United States District Court for the Western District of Louisiana has jurisdiction to determine title to the mineral property which is the subject of Plaintiff's Quiet Title Act Suit, the United States, in its answer to that suit has alleged that the District Court lacks jurisdiction to determine plaintiff's damages for the United States' unconstitutional taking of Plaintiff's Mineral Rights. Consequently, plaintiff has filed this action to recover just compensation for the unconstitutional taking of its property in violation of the Fifth Amendment to the United States Constitution. Plaintiff alleges and avers that the defendant, United States of America, has unlawfully and unconstitutionally taken Plaintiff's Mineral Rights and interests and plaintiff's rights to same in the following, non-exclusive, manner:

(a)     Plaintiff's Mineral Rights which are the subject of this action and the subject of Plaintiff's Quiet Title Act Suit, described above, constitute the same property to which title was adjudicated in favor of Nebo Oil Company in the case of United States v. Nebo Oil Co., 90 F.Supp. 73 (WDLa. 1950), aff'd. 190 F.2d 1003 (5th Cir. 1951).

The property which is the subject of the *Nebo Oil* case (and all other mineral property contained in the same or materially identical conveyance instruments used in the

Page -12-

Appx0101

1932 and 1934 conveyances of mineral rights by Bodcaw Lumber Company and Grant Timber & Mfg. Company of La., Inc. to Good Pine Oil Company, Inc.) is the same property which is owned by plaintiff. Plaintiff is the successor in interest (to the extent of its 64% undivided interest) of Nebo Oil Company. Therefore, by virtue of the Nebo Oil final judgment, and the well established rules of collateral estoppel; *see, e.g.* Southern Pacific RR v. United States, 168 US 1 (1897); plaintiff is the owner of an undivided interest in the entire 180,021.31 acre, more or less, mineral interest described in Exhibit A attached hereto, and this interest is imprescriptible.

In the Nebo Oil case the court found specifically that the United States did not intend to buy, nor did it pay for, minerals or mineral servitudes at the time it acquired the surface of this same property. However, if, in plaintiff's Louisiana Quiet Title Act Suit, the court holds that the United States is owner of the subject mineral rights, as well as the surface, then the United States has "taken" same without just compensation, i.e., it did not pay for the minerals and should be required to do so now at the prevailing market price.

(b)    If, in plaintiff's Louisiana Quiet Title Act Suit, the District Court rules that plaintiff owns the subject mineral property and mineral rights, then the United States is liable to plaintiff for taking Plaintiff's Mineral Rights, by claiming ownership of and leasing to others, Plaintiff's Mineral Rights, and should be required to pay for the damage suffered by plaintiff as a result of such conduct by defendant, United States, in casting a cloud on plaintiff's title.

(c)    If, in plaintiff's Louisiana Quiet Title Act Suit, the District Court rules that plaintiff

Appx0102

was the owner of Plaintiff's Mineral Rights, but that the United States has taken same; then, to the extent the District Court does not award plaintiff damages and payment for same pursuant to 28 U.S.C. §2909(a), part (b), then plaintiff asks this Court to award it just compensation for this taking by the United States.

(d)     On information and belief, plaintiff alleges that portions of Plaintiff's Mineral Rights were made the subject of intensive bombing practice and gunnery practice and consequently, the surface and subsurface of said land is littered with dangerous unexploded ordinance rendering such portions of such property hazardous and dangerous to develop, and thus depriving the plaintiff of the right and benefit to use said land for mineral development and production, and constitutes an obstruction to the use and benefit of Plaintiff's Mineral Rights and constitutes an unlawful taking in violation of the Constitution of the United States for which plaintiff should be awarded just compensation.

13.

The present proceeding is brought, in part, in the alternative, and the interests of justice and judicial economy require that it be stayed pending resolution of plaintiff's Louisiana Quiet Title Act Suit.

WHEREFORE, plaintiff prays that this proceeding be filed but that it be stayed pending resolution of plaintiff's Louisiana Quiet Title Act Suit, and that once the Louisiana Quiet Title Act Suit has reached final judgment, that the stay be lifted, and this matter then proceed to trial and that thereafter judgment be rendered in favor of plaintiff and against the United States in an amount as determined by this Honorable Court to be just compensation for the unconstitutional takings of

Page -14-

plaintiff's property in violation of the Fifth Amendment to the United States Constitution. Plaintiff prays for all other and further relief, whether in law or equity, to which it may be entitled.

Respectfully submitted,

JOSEPH RALPH WHITE
MONTGOMERY, BARNETT, BROWN,
READ, HAMMOND & MINTZ, L.L.P.
3200 Energy Centre
1100 Poydras Street
New Orleans, LA 70163-3200
Telephone: (504) 585-3200

COUNSEL FOR PLAINTIFF,
PETRO-HUNT, L.L.C.

Appx0104

## IN THE UNITED STATES COURT OF FEDERAL CLAIMS

PETRO-HUNT, L.L.C.        )
                                )
           Plaintiff,     )
                                )     Case No. 00-512L
v.                           )     Judge Allegra
                                )
THE UNITED STATES OF AMERICA,   )
                                )
           Defendant.    )
                                )

### FIRST AMENDED COMPLAINT

Pursuant to the Rules of the U.S. Court of Federal Claims, Petro-Hunt L.L.C., by counsel, respectfully submits its First Amended Complaint, and alleges as follows:

### PARTIES

1.     Plaintiff, Petro-Hunt, L.L.C. ("Petro-Hunt"), a Limited Liability Company organized under the laws of the State of Delaware having its principal place of business in Dallas, Texas, is primarily engaged in the business of oil and gas exploration and production as the owner and operator of mineral properties in and around the United States.

2.     Defendant, United States of America, acting through the Department of Interior and Department of Agriculture, is a republic formed pursuant to the U.S. Constitution, and exercising the powers therein subject to certain limitations including (1) the Fifth Amendment to the U.S. Constitution, which prohibits the taking of private property without payment of just compensation, (2) statutes, including the Tucker Act, that provide limited waivers of the government's sovereign immunity, and (3) regulations prescribing its authority.

3.     Petro-Hunt is the owner of a 64.28572% undivided interest in a mineral estate

1

located in the Kisatchie National Forest.[1]

## JURISDICTION

4.      This court has jurisdiction of this case under 28 U.S.C. § 1491 (the Tucker Act) as a "claim against the United States founded either upon the Constitution, or any Act of Congress or any regulation of an executive department or upon any express or implied contract with the United States..." seeking damages in excess of the minimum threshold.

## NATURE OF THE CASE

5.      Plaintiff seeks a judgment and related damages for a taking of its property, in the form of mineral rights, without just compensation and, alternatively, for breach of contract by the United States.

6.      The United States made certain representations to land owners that mineral rights which had already been transferred to another entity created by the land owners would remain in perpetuity with that entity if the land owners sold their surface rights to the United States.

7.      The land owners relied on these representations in deciding to sell their surface land to the United States for inclusion in the national forest system, and the compensation paid by the United States excluded the value of the mineral estate.

8.      The United States, contrary to its representations and in breach of material implied terms of the conveyances, subsequently sought to be declared the owner of the mineral estate without having paid just compensation.

9.      Plaintiff now comes before this Court seeking a judgment and relief related to claims arising under the Constitution and the Tucker Act.

---

1 The other co-owners of the mineral estate are Kingfisher Resources, Inc., which owns an 18.90756% undivided interest, and Hunt Petroleum Corporation, which owns a 16.80672% undivided interest.

2

## FACTS

A.    Formation of the Mineral Estate

10.    Prior to 1932, Bodcaw Lumber Company of Louisiana ("Bodcaw Lumber"), Grant Timber & Manufacturing Company of Louisiana, Inc. ("Grant Timber"), Good Pine Lumber Company of Louisiana, Inc., Trout Creek Lumber Company of Louisiana, Inc., and Tall Timber Lumber Company of Louisiana, Inc. separately owned large non-contiguous tracts of land located in Winn, Grant, and Natchitoches parishes in Louisiana.

11.    These five lumber companies organized the Good Pine Oil Company ("Good Pine Oil") on or about 1932 and vested it with the exclusive rights to explore mineral deposits in the subsurface of certain parcels of their land in Louisiana.

12.    Good Pine Oil was a joint venture of the five lumber companies.

13.    Pursuant to six mineral conveyances executed between November, 1932 through May, 1934, Bodcaw Lumber and Grant Timber transferred their mineral rights in 180,000 acres of land to Good Pine Oil. *See* Exhibit 1.

14.    Bodcaw Lumber and Grant Timber believed that valuable timber, oil, and gas existed on and underneath the 180,000 acres conveyed to Good Pine Oil.

15.    Bodcaw Lumber and Grant Timber reserved the surface rights to the 180,000 acres to themselves in the conveyances of the mineral rights to Good Pine Oil. *See* Exhibit 1.

16.    Good Pine Oil was formed to pool the mineral rights of the five lumber companies with respect to the overall parcels of land, including the 180,000 acres conveyed by Bodcaw Lumber and Grant Timber, to secure more favorable exploration and development.

17.    The five lumber companies agreed that each would share in any production

3

obtained from the pooled acreage in proportion to the acreage that each lumber company contributed to the pool.

18.    The deeds recited that the minerals were conveyed to Good Pine Oil, its successors and assigns, forever and that the vendors (including Bodcaw Lumber and Grant Timber) intended to confer upon the vendee absolutely and without limit for time of its enjoyment any and every right, title and interest that the vendors had in the minerals conveyed.

19.    The 180,000 non-contiguous acres contributed by Bodcaw Lumber and Grant Timber constituted 96 mineral servitudes owned by Good Pine Oil and its successors and assigns.[2]

B.    Establishment of the U.S. National Forest System

20.    In 1911, Congress enacted enabling legislation (the "Weeks Act") to create the U.S. Forest Service and authorizing it to purchase lands throughout the United States to establish the national forest system.

21.    A federal entity known as the National Forest Reservation Commission ("NFRC") was established to identify forest lands for acquisition.

22.    The NFRC was the final authority for determining the forest lands to be bought and the terms and conditions of sale.

23.    The Weeks Act expressly allowed mineral reservations as consistent with the purpose for which the land was acquired, i.e. the establishment of national forests.

---

2 A "servitude" is essentially a right of use. A mineral servitude conveys the right to explore for and produce the minerals on the property. Common law states allow minerals to be permanently severed. There is no direct common-law equivalent to a Louisiana mineral servitude. *Texaco v. La. Land & Exploration*, 136 B.R. 658 (M.D. La. 1992). However, every other state allows minerals to be permanently severed from the surface.

4

24.     Section 9 of the Weeks Act states: "that such acquisition may in any case be conditioned upon the exception and reservation to the owner from whom title passes to the United States of the minerals and of the merchantable timber, or either or any part of them within or upon such lands at the date of the conveyance..." 36 Stat. 962 c. 186, Sec. 9.

25.     The NFRC had adopted the policy of purchasing lands subject to the reservation of mineral rights in perpetuity.

26.     The Commission had also taken the position that it was without authority to purchase mineral rights with funds that had been appropriated for the acquisition of lands for national forest purposes.

27.     The NFRC recognized that properties in Louisiana were likely to be subject to mineral reservations, especially for oil and gas, given the known geological characteristics of the lands.

C.      U.S. Government Experiences Difficulty Purchasing Lands In Louisiana

28.     Prior to the year 1936, the United States was interested in purchasing lands in Louisiana for national forest purposes.

29.     The United States found that owners of large tracts of land were unwilling to sell their lands because of court decisions holding that the sale or reservation of mineral rights in Louisiana created only a "right in the nature of a servitude" which was subject to prescription by ten years non-use.

30.     Duly authorized agents of the United States approached duly authorized representatives of Bodcaw Lumber and Grant Timber seeking to acquire large tracts of land for inclusion in the national forest system.

5

31.     Upon information and belief, Bodcaw Lumber and Grant Timber refused to sell based on their belief that their valuable mineral rights would prescribe from Good Pine Oil (the holder of the mineral estate), to the United States, and not to Bodcaw Lumber and Grant Timber, the private owners of the surface estate, if they sold their surface estates to the United States.

32.     The United States Department of Agriculture did not agree that the Louisiana law of prescription of mineral servitudes applied to purchases of land by the United States for the national forest system.

33.     On May 29, 1935, the United States Department of Agriculture, Forest Service, produced an opinion of the Assistant Solicitor of the Department of Agriculture to Bodcaw Lumber and Grant Timber to the effect that the prescriptive provisions of the Louisiana Civil Code would not apply to lands sold to the United States for national forest purposes.

34.     Upon information and belief, authorized agents of the United States represented to Bodcaw Lumber and Grant Timber that the Louisiana law of prescription of mineral servitudes would not apply if they sold their lands to the United States prior to 1935.

35.     These representations were intended to induce the sale of the surface estate by Bodcaw Lumber and Grant Timber to the United States.

36.     In reliance on these representations, Bodcaw Lumber and Grant Timber agreed to sell to the United States the surface estate of various tracts of timber land.

D.     Bodcaw Lumber and Grant Timber Sell their Surface Estate to the United States

37.     From November 1934 through January 1937, the United States, acting through the Department of Agriculture, Forest Service, acquired the surface rights, pursuant to the Weeks Act, to approximately 180,000 acres of land located in Grant, Winn and Natchitoches Parishes

6

from Bodcaw Lumber and Grant Timber.

38.    These transactions were accomplished through eleven different conveyances --
nine deeds and two expropriation judgments. *See* Exhibit 2.

39.    At the time of the acquisitions, all of the surface lands acquired by the United
States from Bodcaw Lumber and Grant Timber were burdened by the 96 mineral servitudes
owned by Good Pine Oil.

40.    These lands were purchased by the United States for inclusion in the Kisatchie
National Forest and were specifically conveyed to it subject to the prior sale of all the minerals
by Bodcaw Lumber and Grant Timber to Good Pine Oil.

41.    These deeds were designed to confer a benefit on Good Pine Oil and any
successors-in-interest by expressly excluding the mineral estate from the transactions.

42.    The consideration paid by the United States under the various conveyances did not
include the value of any mineral rights in the 96 servitudes.

43.    The minerals underlying the lands had previously been conveyed to Good Pine
Oil, which was owned by Bodcaw Lumber, Grant Timber, and others.

44.    Bodcaw Lumber and Grant Timber did not own any minerals or mineral rights
that they could sell to the United States.

45.    Bodcaw Lumber and Grant Timber could also not reserve or sell the expectation
of a servitude lapsed for non-use.

46.    All that remained for Bodcaw Lumber and Grant Timber to sell to the United
States was the surface lands.

47.    At the time the sales were made, the officers and directors of Bodcaw Lumber and

7

Grant Timber believed that the mineral rights in the lands sold were valuable and that the

consideration paid by the United States for the surface lands acquired under the various deeds

did not reflect the value of any mineral rights contained in the 96 servitudes.

48.    Bodcaw Lumber and Grant Timber would not have sold the surface lands to the

United States had representatives of the United States then taken the position that the

prescriptive provisions of the Louisiana Civil Code would be applicable to the minerals under

the surface lands sold.

49.    At the time the United States purchased the surface estate from Bodcaw Lumber

and Grant Timber, the United States knew and understood that it was not purchasing any of the

minerals that had previously been sold to Good Pine Oil.

50.    At the time the United States purchased the surface estate from Bodcaw Lumber

and Grant Timber, the United States knew and understood that its duly authorized

representatives had concluded that the Louisiana law with respect to prescription of servitudes

would not apply and the United States would not acquire title to the mineral estate.

51.    On December 29, 1941, Good Pine Oil Company conveyed all of its mineral

interests in this property to William C. Brown, who, on January 20, 1942, conveyed all of his

interests to Nebo Oil Company. *See* Exhibit 3.

52.    Petro-Hunt, L.L.C is the owner of an approximately 64.3% undivided interest in

the mineral interests conveyed to Nebo Oil Company as a result of, *inter alia*, the conveyance

and transactions listed on Exhibit 3 as a successor-in-interest.[3]

E.    Federal Courts Deny United States' Claims to Ownership of the Mineral Estate

---

[3] Hunt Petroleum and Kingfisher Resources own their respective undivided interests via the same
conveyances and transactions listed on Exhibit 3.

53.    In 1948, the United States filed suit for declaratory judgment in the Western

District of Louisiana asserting ownership to a portion of the mineral rights previously reserved in

perpetuity to Nebo Oil Company ("Nebo Oil"), as the successor in interest to all of Good Pine

Oil's mineral rights.

54.    The United States argued that the mineral rights in a certain parcel had lapsed for

10 years non-use, and therefore under Louisiana law had prescribed to and were owned by the

United States.

55.    The United States' position in the declaratory judgment action was contrary to the

representations it made during negotiations for the sale of the surface lands, namely that the

Louisiana law of prescription would not apply to lands acquired by the United States.

56.    After a trial and appeal, the Fifth Circuit affirmed the district court's ruling that

Nebo Oil owned the mineral estate and held that the Louisiana law of prescription for 10 years'

non-use did not apply. *See United States v. Nebo Oil Co.*, 90 F. Supp. 73 (W.D. La. 1950), *aff'd*,

190 F.2d 1003 (5th Cir. 1951).

57.    Subsequent to the Fifth Circuit's decision, Nebo Oil placed an affidavit in the land

records of Louisiana wherein it claimed title to all of the property described in Exhibit 4

(hereinafter "Plaintiff's Mineral Estate").[4] This is the same property conveyed to Good Pine Oil

through the six conveyance instruments described in Exhibit 1.

58.    The land records of the United States Forest Service also reflected that the

minerals underlying the land conveyed to it by the instruments described in Exhibit 2 were held

---

4  Said affidavit of ownership can be found in Conveyance Book 99, Folio 93, Entry No. 47969, in the
records of Grant Parish; Conveyance Book 73, Folio 314, Entry No. 49398, in the records of Winn Parish;
and Conveyance Book 216, Folio 331, Entry No. 97034, in the records of Natchitoches Parish.  Grant, Winn
and Natchitoches Parishes are all located within the State of Louisiana.

in ownership by others in perpetuity up to and including the year 2000.

59.    Petro-Hunt and its predecessors-in-interest exercised their ownership of Plaintiff's

Mineral Estate in a manner consistent with the Fifth Circuit's holding in *U.S. v. Nebo Oil*

*Company*, 190 F.2d 1003 (5th Cir. 1951).

F.    The United States Disregards the Fifth Circuit's *Nebo Oil* Decision and
        Conveyances Reserving Mineral Rights to Petro-Hunt by Issuing Mineral Leases
        on the Servitudes Owned by Petro-Hunt

60.    The United States, acting through the Department of the Interior's Bureau of Land

Management ("BLM") and the Department of Agriculture's Forest Service, issued mineral leases

to third parties to certain lands in the Kisatchie National Forest within Plaintiff's Mineral Estate

that were burdened by the 96 mineral servitudes that originally ran in favor of Good Pine Oil,

followed by its successors-in-interest ending in Petro-Hunt at various times.

61.    Petro-Hunt, along with its co-owners, disputed the issuance of these leases as they

affected mineral rights within Plaintiff's Mineral Estate, which had been preserved in perpetuity

per the deeds of conveyance to Good Pine Oil and the Fifth Circuit's decision in *Nebo Oil*.

62.    Petro-Hunt along with its co-owners pursued relief through administrative process

before the U.S. Department of the Interior.

63.    The United States continued to issue leases for land within Plaintiff's Mineral

Estate despite Petro-Hunt's objections.

64.    The United States received valuable lease payments for land within Plaintiff's

Mineral Estate.

65.    Plaintiff was prevented from exercising its full use and enjoyment of its Mineral

Estate during the period in which the United States issued the mineral leases and was deprived of

10

valuable economic activity, including but not limited to exploration, leasing, and sales.

      G.     Litigation Arising From the United States' Issuance of the Mineral Leases

     66.    In response to BLM's issuance of the mineral leases, Petro-Hunt, along with other co-owners of Plaintiff's Mineral Estate, brought suit under the Quiet Title Act on February 18, 2000 in the Western District of Louisiana seeking a declaration that it was the owner in perpetuity of Plaintiff's Mineral Estate (the "Quiet Title action").

     67.    Later that same year, on August 24, 2000, Petro-Hunt filed a Complaint in this Court alleging facts similar to those alleged in this First Amended Complaint, and arising from the same transactions, acts and occurrences, requesting just compensation under the Fifth Amendment.

     68.    The Court granted a stay in this case on Petro-Hunt's motion pending the outcome of the Quiet Title action.

     69.    The Fifth Circuit ultimately held in the Quiet Title action that Plaintiff remained the owner of 5 servitudes and the United States owned 91 servitudes.

     70.    The United States did not dispute that the Plaintiff, via various conveyances, is a successor-in-interest to the mineral servitudes that had been previously owned by Good Pine Oil and later Nebo Oil Company, in the Quiet Title action.

### CLAIMS FOR RELIEF

### Count I – Permanent Taking of the Ninety-Six Servitudes

     71.    Plaintiff incorporates the allegations raised in the preceding paragraphs (¶¶ 1 -70).

     72.    The U.S. Constitution requires that the United States pay just compensation to private property owners for all property taken for public use.

<div align="center">11</div>

73.    To date, the United States has paid nothing to Petro-Hunt or any of its predecessors-in-interest for the valuable mineral estate it has taken for public use in violation of the U.S. Constitution.

74.    As a result of its acts and omissions, the United States has permanently taken the 96 servitudes previously owned by Petro-Hunt, which pursuant to the representations of the government were not subject to prescription, less and except the value of the servitudes which the Fifth Circuit held were now subject to prescription.

75.    Petro-Hunt has been damaged as a result of the United States' conduct in an amount to be determined equal to the just compensation due under the Fifth Amendment.

76.    Petro-Hunt brings this action seeking an award of just compensation under the Fifth Amendment to the Constitution for the value of mineral rights owned by plaintiff that have been taken by the United States without compensation.

### Count II – Temporary Taking of the Ninety-One Servitudes

77.    Plaintiff incorporates the allegations raised in the preceding paragraphs (¶¶ 1 - 70).

78.    The U.S. Constitution requires that the United States pay just compensation to private property owners for all property taken for public use.

79.    To date, the United States had paid nothing to Petro-Hunt or any of its predecessors-in-interest for the valuable mineral estate it has taken for public use in violation of the U.S. Constitution.

80.    The United States engaged in a temporary taking by asserting ownership of the 91 servitudes before and during the Quiet Title action.

81.    The United States engaged in a temporary taking by issuing mineral leases to third parties that were then within the Plaintiff's Mineral Estate.

12

82.    The United States' position effectively blocked Petro-Hunt from engaging in any activity on the servitudes, precluded Petro-Hunt from leasing activity, and diminished the value to prospective buyers.

83.    Petro-Hunt has been damaged as a result of the United States' conduct in an amount to be determined equal to the just compensation due under the Fifth Amendment. During the temporary taking, the United States received valuable lease payments for property then owned by Petro-Hunt.

84.    Petro-Hunt brings this action seeking an award of just compensation under the Fifth Amendment to the Constitution for the value of mineral rights owned by plaintiff which have been taken by the United States.

### Count III – Temporary Taking of the Five Servitudes

85.    Plaintiff incorporates the allegations raised in the preceding paragraphs (¶¶ 1 - 70).

86.    The U.S. Constitution requires that the United States pay just compensation to private property owners for all property taken for public use.

87.    To date, the United States has paid nothing to Petro-Hunt or any of its predecessors-in-interest for the valuable mineral estate it has taken for public use in violation of the U.S. Constitution.

88.    The United States engaged in a temporary taking by asserting ownership of the 5 servitudes before and during the Quiet Title action.

89.    The United States engaged in a temporary taking by issuing mineral leases to third parties that were within the Plaintiff's Mineral Estate.

90.    The United States effectively blocked Petro-Hunt from engaging in any activity on the 5 servitudes, precluded Petro-Hunt from leasing activity, and diminished the value to

13

Appx0117

prospective buyers.

91.    During the temporary taking, the United States received valuable lease payments for property owned by Petro-Hunt.

92.    Petro-Hunt has been damaged as a result of the United States' conduct in an amount to be determined equal to the just compensation due under the Fifth Amendment.

### Count IV – Breach of Contract

93.    Plaintiff incorporates the allegations raised in the preceding paragraphs (¶¶ 1 - 70).

94.    Plaintiff, as a successor-in-interest to Good Pine Oil, the alter ego of Bodcaw Lumber and Grant Timber, which were parties to the conveyances of the surface estates to the United States, has complied in all material respects with its obligations under the various land and mineral conveyances.

95.    The United States, as a party to those land conveyances, has breached its obligations by repudiating material terms of the parties' agreement and understanding with respect to the reservations of the mineral estate to Good Pine Oil, its successors and assigns, including Plaintiff.

96.    The United States' breach of contract entitles Plaintiff to (a) restitution damages equal to the value of the mineral estate acquired without payment by the United States; (b) reliance damages equal to the value of the mineral estate acquired without payment by the United States; (c) expectation damages equal to the profits that Plaintiff would have earned from the development of the mineral estate had the United States not committed a breach; (d) damages sustained by Petro-Hunt resulting from the United States' anticipatory repudiation of the terms and conditions of sale for the various tracts; and (e) other appropriate contract damages for losses sustained by Petro-Hunt as the result of wrongful acts by the United States.

14

## Count V – Breach of Contract for Implied Third-Party Beneficiary
## or Stipulation Pour Autri

97. Plaintiff incorporates the allegations raised in the preceding paragraphs (¶¶ 1 - 70).

98. In the alternative, Plaintiff as a third party beneficiary of the conveyances of the surface estate from Bodcaw Lumber and Grant Timber to the United States, has complied in all material respects with its obligations under the various mineral conveyances.

99. Plaintiff specifically pleads and claims the benefit of Louisiana law regarding Stipulation Pour Autri, pursuant to Louisiana Civil Code Articles 1978-1982.

100. The United States, as a party to the conveyances from Bodcaw Lumber and Grant Timber, has breached its obligations to Plaintiff, an intended third-party beneficiary, by repudiating the material terms of the agreement and understanding between Bodcaw Lumber and Grant Timber, on the one hand, and the United States, on the other hand, with respect to recognizing that the mineral rights were to be retained in perpetuity by Good Pine Oil and its successors-in-interest.

101. The United States' breach of contract entitles Plaintiff to (a) restitution damages equal to the value of the mineral estate acquired without payment by the United States; (b) reliance damages equal to the value of the mineral estate acquired without payment by the United States; (c) expectation damages equal to the profits that Plaintiff would have earned from the development of the mineral estate had the United States not committed a breach; (d) damages sustained by Petro-Hunt resulting from the United States' anticipatory repudiation of the terms and conditions of sale for the various tracts; and (e) other appropriate contract damages for losses sustained by Petro-Hunt as the result of wrongful acts by the United States.

## Count VI – Breach of the Covenant of Good Faith and Fair Dealing

15

102.    Plaintiff incorporates the allegations raised in the preceding paragraphs (¶¶ 1 - 70).

103.    In the alternative, Petro-Hunt seeks money damages and other appropriate relief in its capacity as a party in privity or as a third party beneficiary to the conveyances of land to the United States arising from Defendant's breach of the implied covenant of good faith and fair dealing.

104.    Plaintiff has complied in all material respects with its obligations under the various mineral conveyances.

105.    The United States, as a party to those conveyances, has breached its obligations to Plaintiff, either as the party in privity or as an intended third-party beneficiary, by repudiating the material terms of the agreement and understanding between Bodcaw Lumber and Grant Timber, on the one hand, and the United States, on the other hand, with respect to recognizing that the mineral rights were to be retained in perpetuity by Good Pine Oil and its successors-in-interest.

106.    The representations made by the United States to Bodcaw Lumber and Grant Timber, that the mineral estate would not prescribe, were made with the intent to induce Bodcaw Lumber and Grant Timber to sell the surface estate to the United States.

107.    The representations made by the United States to Bodcaw Lumber and Grant Timber, that the mineral estate would not prescribe, directly resulted in the sale of the surface estate to the United States.

108.    The United States later claimed ownership of certain of Plaintiff's Mineral Estate in 1948, contrary to the very representations made by its duly authorized agents on or around the date of the sale of the surface estate of the various tracts of land.

109.    The United States then issued leases for certain parts of Plaintiff's Mineral Estates despite the Fifth Circuit's ruling in *Nebo Oil*.

16

110.    During the Quiet Title action, the United States asserted ownership to certain parts of Plaintiff's Mineral Estate through prescription, despite its previous representations that the Louisiana law of prescription did not apply to lands acquired by the United States and that the mineral estate vested in Good Pine Oil and its successors would therefore be perpetual.

111.    The acts of the United States set forth in ¶¶ 1 - 110 above breached the covenant of good faith and fair dealing.

112.    The United States' breach of the covenant of good faith and fair dealing entitles Plaintiff to (a) restitution damages equal to the value of the mineral estate acquired without payment by the United States; (b) reliance damages equal to the value of the mineral estate acquired without payment by the United States; (c) expectation damages equal to the profits that Plaintiff would have earned from the development of the mineral estate had the United States not committed a breach; (d) damages sustained by Petro-Hunt resulting from the United States' anticipatory repudiation of the terms and conditions of sale for the various tracts; and (e) other appropriate contract damages for losses sustained by Petro-Hunt as the result of wrongful acts by the United States.

### Count VII - Reformation

113.    Plaintiff incorporates the allegations raised in the preceding paragraphs (¶¶ 1 - 70).

114.    In the alternative, Petro-Hunt seeks reformation of the conveyance instruments in which Bodcaw Lumber and Grant Timber conveyed the surface estate to reflect the true intentions of the parties, as expressed in the written and oral statements provided to Bodcaw Lumber and Grant Timber by the United States that the mineral rights would never prescribe as long as the United States owned the surface.

17

### PRAYER FOR RELIEF

**WHEREFORE**, Plaintiff prays for relief as follows:

1.    A money judgment equal to the just compensation owing to Plaintiff for the permanent taking of its property for public use, together with interest thereon at the legal rate from the date of the taking;

2.    A money judgment equal to the just compensation owing to Plaintiff for the temporary taking of its property for public use, together with interest thereon at the legal rate from the date of the taking;

3.    A money judgment equal to the damages owing to Plaintiff for the breach of contract by the United States under the alternative theories of restitution, reliance, expectation of damages, anticipatory repudiation, and, together with interest thereon at the legal rate;

4.    Attorneys' fees associated with bringing this action, including but not limited to those available under the Uniform Relocation Assistance and Real Property Acquisition Policies Act of 1970, (42 U.S.C. § 4654(c));

5.    The expenses of appraisers and other experts reasonably required to prosecute this action;

6.    All other reasonable costs associated with bringing this action;

7.    Such other and further relief as the Court deems just.


Respectfully Submitted,


18

Appx0122

*Attorneys for Plaintiff*

 s/J. Ralph White
J. Ralph White
*Counsel of Record*
THE LAW OFFICE OF J. RALPH WHITE, PLLC
650 Poydras Street, Suite 1605
New Orleans, Louisiana 70130
Telephone: 504-799-2585
Facsimile: 504-799-2588
E-Mail: jralphwhitepllc@bellsouth.net

*Of Counsel:*
D. Joe Smith
Edmund M. Amorosi
SMITH PACHTER MCWHORTER PLC
8000 Towers Crescent Drive, Suite 900
Vienna, Virginia 22182
Telephone: 703-847-6300
Facsimile: 703-847-6312
E-Mail: eamorosi@smithpachter.com

Dated: June 25, 2008

19

## CERTIFICATE OF ELECTRONIC FILING AND SERVICE

I hereby certify that on this 25th day of June, 2008, Plaintiff's First Amended Complaint was filed electronically. I understand that notice of this filing will be sent to counsel for the Defendant by operation of the Court's electronic filing system. Parties may access this filing through the Court's system.

<div style="margin-left:40%">

 s/J. Ralph White       
J. Ralph White

</div>

20

IN THE UNITED STATES COURT OF FEDERAL CLAIMS

_____

| | |
|---|---|
| PETRO-HUNT, L.L.C. | ) |
| | ) |
| Plaintiff, | ) |
| | ) Case No. 00-512L |
| v. | ) Judge Allegra |
| | ) |
| THE UNITED STATES OF AMERICA, | ) |
| | ) |
| Defendant. | ) |
| _____ | ) |

## RESTATED SECOND AMENDED COMPLAINT

*Reason for Restated Second Amended Complaint*

*On November 6, 2009, this Honorable Court dismissed counts I, IV, V, VI, and VII of plaintiff's complaint as barred by the Tucker Act's six-year statute of limitations. See Petro-Hunt, L.L.C. v. United States, 90 Fed. Cl. 71, 72 (2009). In its second amended complaint, Petro-Hunt re-alleged the dismissed claims to preserve its right to appeal this Court's November 6, 2009 decision dismissing those claims. Counts II and III, relating to temporary takings, were not dismissed and remain before the Court for decision. Count VIII is the additional cause of action asserting a judicial taking allowed by the Court's order of September 13, 2010. This September 13, 2010 order directed Petro-Hunt to remove the dismissed claims from this Restated Second Amended Complaint, which Petro-hunt has done, but only because of the Court's order. Petro-Hunt expressly reserves the right to appeal the dismissal of these claims.*

Petro-Hunt L.L.C. ("Petro-Hunt") files this Restated Second Amended Complaint alleging that defendant, United States, through its actions and omissions, violated the Fifth Amendment's prohibition against the taking of private property for public use without just compensation. On June

1

17, 2010, the United States Supreme Court, in a plurality opinion, found that the takings clause of the Fifth Amendment applies to judicial decisions that remove an "established right of private property." *Stop the Beach Renourishment v. Florida Dept. of Envt'l Protection*, 130 S.Ct. 2592, 2602 (June 17, 2010); see also *id*. at 2604, *id*. at 2608, fn. 9; *id*. at 2613. Petro-Hunt files this Amendment to its Original and First Amended Complaints to add counts to allege, in addition to those claims already asserted, that the Fifth Circuit's decision in *Petro-Hunt, L.L.C. v. United States*, 365 F.3d 385 (5th Cir. 2004), *cert. denied* 543 U.S. 1034 (Dec. 13, 2004) which divested Petro-Hunt of it's established private property rights in certain mineral servitudes located in the state of Louisiana and transformed said established property rights into public property without compensation, constitutes a judicial taking which claim arose when the United States Supreme Court denied plaintiff's petition for *certiorari*. Pursuant to the Rules of the United States Court of Federal Claims, Petro-Hunt, L.L.C., through counsel, respectfully submits this, its Second Amended Complaint, and alleges as follows:

## PARTIES

1.     Plaintiff, Petro-Hunt, L.L.C. ("Petro-Hunt"), a limited liability company organized under the laws of the State of Delaware having its principal place of business in Dallas, Texas, is primarily engaged in the business of oil and gas exploration and production as the owner and operator of mineral properties in and around the United States.

2.     Defendant, United States of America, is a republic formed pursuant to the U.S. Constitution, and exercising the powers therein subject to certain limitations including (1) the Fifth Amendment to the U.S. Constitution, which prohibits the taking of private property without payment of just compensation, (2) statutes, including the Tucker Act, which provide limited waivers of the government's sovereign immunity, and (3) regulations prescribing its authority.

2

3.      Petro-Hunt is the owner of a 64.28572% undivided interest in a mineral estate located in the Kisatchie National Forest.[1]

## JURISDICTION

4.      This court has jurisdiction of this case under 28 U.S.C. § 1491 (the Tucker Act) as a "claim against the United States founded either upon the Constitution, or any Act of Congress or any regulation of an executive department or upon any express or implied contract with the United States…" seeking damages in excess of the minimum threshold.

## NATURE OF THE CASE

5.      Plaintiff seeks a judgment and related damages under the Fifth Amendment to the U.S. Constitution for a taking of its property, in the form of mineral rights, without just compensation.[2]

6.      The United States made certain representations to land owners that mineral rights which had already been transferred to another entity created by the land owners would remain in perpetuity with that entity if the land owners sold their surface rights to the United States.

7.      The land owners relied on these representations in deciding to sell their surface land to the United States for inclusion in the national forest system, and the compensation paid by the United States excluded the value of the mineral estate.

8.      The United States, contrary to its representations and in breach of material implied terms of the conveyances, subsequently sought to be declared the owner of the mineral estate without having paid just compensation.

---

1  The other co-owners of the mineral estate are Kingfisher Resources, Inc., which owns an 18.90756% undivided interest, and Hunt Petroleum Corporation, which owns a 16.80672% undivided interest.
2  A reference to an alternative claim for breach of contract has been deleted from plaintiff's Second Amended Complaint only because of the Court's order of September 13, 2010.  Plaintiff expressly reserves the right to appeal the dismissal of its contract claim.

9.      Plaintiff now comes before this Court seeking a judgment and relief related to claims arising under the Constitution and the Tucker Act.

## FACTS

A.      Formation of the Mineral Estate

10.     Prior to 1932, Bodcaw Lumber Company of Louisiana ("Bodcaw Lumber"), Grant Timber & Manufacturing Company of Louisiana, Inc. ("Grant Timber"), Good Pine Lumber Company of Louisiana, Inc., Trout Creek Lumber Company of Louisiana, Inc., and Tall Timber Lumber Company of Louisiana, Inc. separately owned large non-contiguous tracts of land located in Winn, Grant, and Natchitoches parishes in Louisiana.

11.     These five lumber companies organized the Good Pine Oil Company ("Good Pine Oil") on or about 1932 and vested it with the exclusive rights to explore mineral deposits in the subsurface of certain parcels of their land in Louisiana.

12.     Good Pine Oil was a joint venture of the five lumber companies.

13.     Pursuant to six mineral conveyances executed between November, 1932 through May, 1934, Bodcaw Lumber and Grant Timber transferred their mineral rights in 180,000 acres of land to Good Pine Oil.  *See* Exhibit 1.

14.     Bodcaw Lumber and Grant Timber believed that valuable timber, oil, and gas existed on and underneath the 180,000 acres conveyed to Good Pine Oil.

15.     Bodcaw Lumber and Grant Timber reserved the surface rights to the 180,000 acres to themselves in the conveyances of the mineral rights to Good Pine Oil.  *See* Exhibit 1.

16.     Good Pine Oil was formed to pool the mineral rights of the five lumber companies with respect to the overall parcels of land, including the 180,000 acres conveyed by Bodcaw Lumber

4

and Grant Timber, to secure more favorable exploration and development.

17.     The five lumber companies agreed that each would share in any production obtained from the pooled acreage in proportion to the acreage that each lumber company contributed to the pool.

18.     The deeds recited that the minerals were conveyed to Good Pine Oil, its successors and assigns, forever and that the vendors (including Bodcaw Lumber and Grant Timber) intended to confer upon the vendee absolutely and without limit for time of its enjoyment any and every right, title and interest that the vendors had in the minerals conveyed.

19.     The 180,000 non-contiguous acres contributed by Bodcaw Lumber and Grant Timber constituted 96 mineral servitudes owned by Good Pine Oil and its successors and assigns.[3]

B.      Establishment of the U.S. National Forest System

20.     In 1911, Congress enacted enabling legislation (the "Weeks Act") to create the U.S. Forest Service and authorizing it to purchase lands throughout the United States to establish the national forest system.

21.     A federal entity known as the National Forest Reservation Commission ("NFRC") was established to identify forest lands for acquisition.

22.     The NFRC was the final authority for determining the forest lands to be bought and the terms and conditions of sale.

23.     The Weeks Act expressly allowed mineral reservations as consistent with the purpose for which the land was acquired, i.e. the establishment of national forests.

---

3 A "servitude" is essentially a right of use.  A mineral servitude conveys the right to explore for and produce the minerals on the property.  Common law states allow minerals to be permanently severed.  There is no direct common-law equivalent to a Louisiana mineral servitude.  *Texaco v. La. Land & Exploration,* 136 B.R. 658 (M.D. La. 1992).  However, every other state allows minerals to be permanently severed from the surface.

24.     Section 9 of the Weeks Act states: "that such acquisition may in any case be conditioned upon the exception and reservation to the owner from whom title passes to the United States of the minerals and of the merchantable timber, or either or any part of them within or upon such lands at the date of the conveyance…" 36 Stat. 962 c. 186, Sec. 9.

25.     The NFRC had adopted the policy of purchasing lands subject to the reservation of mineral rights in perpetuity.

26.     The Commission had also taken the position that it was without authority to purchase mineral rights with funds that had been appropriated for the acquisition of lands for national forest purposes.

27.     The NFRC recognized that properties in Louisiana were likely to be subject to mineral reservations, especially for oil and gas, given the known geological characteristics of the lands.

C.      U.S. Government Experiences Difficulty Purchasing Lands In Louisiana

28.     Prior to the year 1936, the United States was interested in purchasing lands in Louisiana for national forest purposes.

29.     The United States found that owners of large tracts of land were unwilling to sell their lands because of court decisions holding that the sale or reservation of mineral rights in Louisiana created only a "right in the nature of a servitude" which was subject to prescription by ten years non-use.

30.     Duly authorized agents of the United States approached duly authorized representatives of Bodcaw Lumber and Grant Timber seeking to acquire large tracts of land for inclusion in the national forest system.

31.     Upon information and belief, Bodcaw Lumber and Grant Timber refused to sell the

surface based on their belief that their valuable mineral rights would prescribe from Good Pine Oil (the holder of the mineral estate), to the United States, and not to Bodcaw Lumber and Grant Timber, the private owners of the surface estate, if they sold their surface estates to the United States.

32.     The United States Department of Agriculture did not believe that the Louisiana law of prescription of mineral servitudes applied to purchases of land by the United States for the national forest system.

33.     On May 29, 1935, the United States Department of Agriculture, Forest Service, produced an opinion of the Assistant Solicitor of the Department of Agriculture to Bodcaw Lumber and Grant Timber to the effect that the prescriptive provisions of the Louisiana Civil Code would not apply to lands sold to the United States for national forest purposes.

34.     Upon information and belief, authorized agents of the United States represented to Bodcaw Lumber and Grant Timber that the Louisiana law of prescription of mineral servitudes would not apply if they sold their lands to the United States prior to 1935.

35.     These representations were intended to induce the sale of the surface estate by Bodcaw Lumber and Grant Timber to the United States.

36.     In reliance on these representations, Bodcaw Lumber and Grant Timber agreed to sell to the United States the surface estate of various tracts of timber land.

D.     Bodcaw Lumber and Grant Timber Sell their Surface Estate to the United States

37.     From November 1934 through January 1937, the United States, acting through the Department of Agriculture, Forest Service, acquired the surface rights, pursuant to the Weeks Act, to approximately 180,000 acres of land located in Grant, Winn and Natchitoches Parishes from Bodcaw Lumber and Grant Timber.

7

Appx0142

38.     These transactions were accomplished through eleven different conveyances -- nine deeds and two expropriation judgments.  *See* Exhibit 2.

39.     At the time of the acquisitions, all of the surface lands acquired by the United States from Bodcaw Lumber and Grant Timber were burdened by the 96 mineral servitudes owned by Good Pine Oil.

40.     These lands were purchased by the United States for inclusion in the Kisatchie National Forest and were specifically conveyed to it subject to the prior sale of all the minerals by Bodcaw Lumber and Grant Timber to Good Pine Oil.

41.     These deeds were designed to confer a benefit on Good Pine Oil and any successors in interest by expressly excluding the mineral estate from the transactions.

42.     The consideration paid by the United States under the various conveyances did not include the value of any mineral rights in the 96 servitudes.

43.     The minerals underlying the lands had previously been conveyed to Good Pine Oil, which was owned by Bodcaw Lumber, Grant Timber, and others.

44.     Bodcaw Lumber and Grant Timber did not own any minerals or mineral rights that they could sell to the United States.

45.     Bodcaw Lumber and Grant Timber could also not reserve or sell the expectation of a servitude lapsed for non-use.

46.     All that remained for Bodcaw Lumber and Grant Timber to sell to the United States was the surface lands.

47.     At the time the sales were made, the officers and directors of Bodcaw Lumber and Grant Timber believed that the mineral rights in the lands sold were valuable and that the

8

consideration paid by the United States for the surface lands acquired under the various deeds did not reflect the value of any mineral rights contained in the 96 servitudes.

48.     Bodcaw Lumber and Grant Timber would not have sold the surface lands to the United States had representatives of the United States then taken the position that the prescriptive provisions of the Louisiana Civil Code would be applicable to the minerals under the surface lands sold.

49.     At the time the United States purchased the surface estate from Bodcaw Lumber and Grant Timber, the United States knew and understood that it was not purchasing any of the minerals that had previously been sold to Good Pine Oil.

50.     At the time the United States purchased the surface estate from Bodcaw Lumber and Grant Timber, the United States knew and understood that its duly authorized representatives had concluded that the Louisiana law with respect to prescription of servitudes would not apply and the United States would not acquire title to the mineral estate.

51.     On December 29, 1941, Good Pine Oil Company conveyed all of its mineral interests in this property to William C. Brown, who, on January 20, 1942, conveyed all of his interests to Nebo Oil Company.  *See* Exhibit 3.

52.     Petro-Hunt, L.L.C is the owner of an approximately 64.3% undivided interest in the mineral interests conveyed to Nebo Oil Company as a result of, *inter alia*, the conveyance and transactions listed on Exhibit 3 as a successor-in-interest.[4]

E.     Federal Courts Deny United States' Claims to Ownership of the Mineral Estate

53.     In 1948, the United States filed suit for declaratory judgment in the Western District of

---

4 Hunt Petroleum and Kingfisher Resources own their respective undivided interests via the same conveyances and transactions listed on Exhibit 3.

9

Louisiana asserting ownership to a portion of the mineral rights previously reserved in perpetuity to Nebo Oil Company ("Nebo Oil"), as the successor in interest to all of Good Pine Oil's mineral rights.

54.    The United States argued that the mineral rights in a certain parcel had lapsed for 10 years non-use, and therefore under Louisiana law had prescribed to and were owned by the United States.

55.    The United States' position in the declaratory judgment action was contrary to the representations it made during negotiations for the sale of the surface lands, namely that the Louisiana law of prescription would not apply to lands acquired by the United States.

56.    The district court rejected the government's arguments and held that all of the mineral servitudes owned by Nebo Oil were imprescriptable.  In support of this decision, the district court cited Act 315, Louisiana decisional law on prescription and property law, and the agreements between Nebo Oil's predecessors and the United States.

57.    On appeal, the Fifth Circuit affirmed the district court's ruling that Nebo Oil owned the entire mineral estate in perpetuity and held that the Louisiana law of prescription for ten years non-use did not apply.  *See United States v. Nebo Oil Co.*, 190 F.2d 1003, 1006, 1010 (5th Cir. 1951).

58.    Subsequent to the Fifth Circuit's decision, Nebo Oil placed an affidavit in the land records of Louisiana wherein it claimed title to all of the property described in Exhibit 4 (hereinafter "Plaintiff's Mineral Estate").[5]  This is the same property conveyed to Good Pine Oil through the six conveyance instruments described in Exhibit 1.

---

5 Said affidavit of ownership can be found in Conveyance Book 99, Folio 93, Entry No. 47969, in the records of Grant Parish; Conveyance Book 73, Folio 314, Entry No. 49398, in the records of Winn Parish; and Conveyance Book 216, Folio 331, Entry No. 97034, in the records of Natchitoches Parish.  Grant, Winn and Natchitoches Parishes are all located within the State of Louisiana.

59.     The land records of the United States Forest Service also reflected that the minerals underlying the land conveyed to it by the instruments described in Exhibit 2 were held in ownership by others in perpetuity up to and including the year 2000.

60.     Petro-Hunt and its predecessors in interest exercised their ownership of Plaintiff's Mineral Estate in a manner consistent with the Fifth Circuit's holding in *United States. v. Nebo Oil Co.*, 190 F.2d 1003 (5th Cir. 1951).

F.     The United States Disregards the Fifth Circuit's *Nebo Oil* Decision and Conveyances Reserving Mineral Rights to Petro-Hunt by Issuing Mineral Leases on the Servitudes Owned by Petro-Hunt

61.     The United States, acting through the Department of the Interior's Bureau of Land Management ("BLM") and the Department of Agriculture's Forest Service, issued mineral leases to third parties to certain lands in the Kisatchie National Forest within Plaintiff's Mineral Estate that were burdened by the 96 mineral servitudes that originally ran in favor of Good Pine Oil, followed by its successors in interest ending in Petro-Hunt at various times.

62.     Petro-Hunt, along with its co-owners, disputed the issuance of these leases as they affected mineral rights within Plaintiff's Mineral Estate, which had been preserved in perpetuity per the deeds of conveyance to Good Pine Oil and the Fifth Circuit's decision in *Nebo Oil*.

63.     Petro-Hunt along with its co-owners pursued relief through administrative process before the U.S. Department of the Interior.

64.     The United States continued to issue leases for land within Plaintiff's Mineral Estate despite Petro-Hunt's objections.

65.     The United States received valuable lease payments for land within Plaintiff's Mineral Estate.

66.     Plaintiff was prevented from exercising its full use and enjoyment of its Mineral Estate during the period in which the United States issued the mineral leases and was deprived of valuable economic activity, including but not limited to exploration, leasing, and sales.

G.      Litigation Arising From the United States' Issuance of the Mineral Leases

67.     In response to BLM's issuance of the mineral leases, Petro-Hunt, along with other co-owners of Plaintiff's Mineral Estate, brought suit under the Quiet Title Act on February 18, 2000 in the Western District of Louisiana, seeking a declaration that it was the owner in perpetuity of Plaintiff's Mineral Estate (the "Quiet Title action").

68.     Later that same year, on August 24, 2000, Petro-Hunt filed a Complaint in this Court alleging facts similar to those alleged in this Second Amended Complaint, and arising from the same transactions, acts and occurrences, requesting just compensation under the Fifth Amendment.

69.     The Court granted a stay in this case on Petro-Hunt's motion pending the outcome of the Quiet Title action.

70.     The United States did not dispute that the Plaintiff, via various conveyances, is a successor-in-interest to the mineral servitudes that had been previously owned by Good Pine Oil and later Nebo Oil Company, in the Quiet Title action.

H.      The Fifth Circuit's Decision Effected a Judicial Taking
        As It Divested Petro-Hunt of Its Established Property Rights

71.     In the Quiet Title action, the United States argued that the law of prescription applied to Petro-Hunt's property and that the servitudes had prescribed for ten years non-use.

72.     The district court rejected the Government's claim that the law of prescription applied and found Petro-Hunt to be the owner of the property in perpetuity based on the Fifth Circuit's holding in *Nebo Oil*.  The district court held that all 96 of the servitudes were imprescriptable and

12

belonged to Petro-Hunt.  Contrary to its earlier decision, the Fifth Circuit reversed the District Court's decision and applied the law of prescription to Petro-Hunt's servitudes.  The Fifth Circuit remanded to the District Court with instructions to apply the law of prescription and determine which servitudes had prescribed based on non-use.

73.     On remand, the district court applied the Louisiana law of prescription and determined that Petro-Hunt remained the owner of only six servitudes, with the remaining 90 servitudes having prescribed to the United States through non-use.

74.     The Fifth Circuit's decision divested Petro-Hunt of property rights that had been established by contract, statue, and precedent, and transformed those established property rights into public property without compensation.

75.     Petro-Hunt's appeals of the Fifth Circuit's decision in the Quiet Title action were not exhausted until 2008.  *Petro-Hunt, L.L.C. v. United States*, 2007 U.S. App. LEXIS 5233 (5th Cir. 2007), *cert. denied,* 552 U.S. 1242 (March 3, 2008).

76.     On June 17, 2010 the United States Supreme Court issued its decision in *Stop the Beach Renourishment, Inc. v. Florida Department of Environmental Protection*, 130 S.Ct 2592 (June 17, 2010).

77.     Writing for a plurality of the justices, Justice Scalia stated that the takings clause of the Fifth Amendment to the United States Constitution applies to judicial decisions that remove an "established right of private property."  *Stop the Beach Renourishment v. Florida Dept. of Envt'l Protection*, 130 S.Ct. 2592, 2602 (June 17, 2010); *see also id.* at 2604, *id.* at 2608, fn. 9; *id.* at 2613.

78.     The Fifth Circuit's decision in *Petro-Hunt L.L.C. v. United States* removed Petro-Hunt's established property rights without just compensation and constituted a taking under the Fifth

Amendment under the test established in *Stop the Beach*.

## CLAIMS FOR RELIEF

### Count II – Temporary Taking of the Ninety-One Servitudes[6]

79.    Plaintiff incorporates the allegations raised in the preceding paragraphs.

80.    The U.S. Constitution requires that the United States pay just compensation to private property owners for all property taken for public use.

81.    To date, the United States had paid nothing to Petro-Hunt or any of its predecessors in interest for the valuable mineral estate it has taken for public use in violation of the U.S. Constitution. *See Nebo Oil*, 190 F.2d at 1006, 1010.

82.    The United States engaged in a temporary taking by asserting ownership of the 91 servitudes before and during the Quiet Title action.

83.    The United States engaged in a temporary taking by issuing mineral leases to third parties that were then within the Plaintiff's Mineral Estate.

84.    The United States' position effectively blocked Petro-Hunt from engaging in any activity on the servitudes, precluded Petro-Hunt from leasing activity, and diminished the value to prospective buyers.

85.    Petro-Hunt has been damaged as a result of the United States' conduct in an amount to be determined equal to the just compensation due under the Fifth Amendment. During the temporary taking, the United States received valuable lease payments for property then owned by Petro-Hunt.

86.    Petro-Hunt brings this action seeking an award of just compensation under the Fifth Amendment to the Constitution for the value of mineral rights owned by plaintiff which have been

14

taken by the United States.

### Count III – Temporary Taking of the Five Servitudes

87.     Plaintiff incorporates the allegations raised in the preceding paragraphs.

88.     The U.S. Constitution requires that the United States pay just compensation to private property owners for all property taken for public use.

89.     To date, the United States has paid nothing to Petro-Hunt or any of its predecessors in interest for the valuable mineral estate it has taken for public use in violation of the U.S. Constitution.

90.     The United States engaged in a temporary taking by asserting ownership of the six servitudes before and during the Quiet Title action.

91.     The United States engaged in a temporary taking by issuing mineral leases to third parties that were within the Plaintiff's Mineral Estate.

92.     The United States effectively blocked Petro-Hunt from engaging in any activity on the six servitudes, precluded Petro-Hunt from leasing activity, and diminished the value to prospective buyers.

93.     During the temporary taking, the United States received valuable lease payments for property owned by Petro-Hunt.

94.     Petro-Hunt has been damaged as a result of the United States' conduct in an amount to be determined equal to the just compensation due under the Fifth Amendment.

### Count VIII – Judicial Taking[7]

95.     Plaintiff incorporates the allegations raised in the preceding paragraphs.

---

6 Count I in plaintiff's Second Amended Complaint has been deleted only because of the Court's order of September 13, 2010.  Plaintiff expressly reserves its right to appeal the dismissal of Count I.

96.     The U.S. Constitution requires that the United States pay just compensation to private property owners for all property taken for public use.

97.     To date, the United States has paid nothing to Petro-Hunt for the valuable mineral property it has taken for public use in violation of the U.S. Constitution.

98.     The Fifth Circuit's decision in *Petro-Hunt L.L.C. v. United States* that mineral servitudes belonging to Petro-Hunt as established in *Nebo Oil*, and by contract with the United States, were subject to prescription was contrary to its prior decision in *Nebo Oil* and resulted in a judicial taking of Petro-Hunt's established property rights.

99.     Petro-Hunt has been damaged as the result of the Fifth Circuit's decision in *Petro-Hunt, L.L.C. v. United States*, which divested Petro-Hunt of its established private property rights and transformed those established property rights into public property without compensation, and contrary to existing precedent.

100.    Petro-Hunt is entitled to just compensation for the judicial taking of its established property right.

101.    As a result of this judicial taking, Petro-Hunt was deprived of its ownership of all 96 servitudes which were not subject to prescription, less and except the servitudes which the Fifth Circuit held were now subject to prescription.

## PRAYER FOR RELIEF

**WHEREFORE**, Plaintiff prays for relief as follows:

---

7 Counts IV, V, VI and VII in plaintiff's second amended complaint have been deleted only because of the Court's order of September 13, 2010.  Plaintiff expressly reserves the right to appeal the dismissal of Counts IV, V, VI and VII.

16

Appx0151

1.      A money judgment equal to the just compensation owing to Plaintiff for the permanent taking of its property for public use as a result of the judicial takings of its property as set forth herein, together with interest thereon at the legal rate from the date of the taking;

2.      A money judgment equal to the just compensation owing to Plaintiff for the temporary taking of its property for public use, together with interest thereon at the legal rate from the date of the taking;

3.      Attorneys' fees associated with bringing this action, including but not limited to those available under the Uniform Relocation Assistance and Real Property Acquisition Policies Act of 1970, (42 U.S.C. § 4654(c));

4.      The expenses of appraisers and other experts reasonably required to prosecute this action;

5.      All other reasonable costs associated with bringing this action;

6.      Such other and further relief as the Court deems just.

Respectfully Submitted,

                        *Attorneys for Plaintiff*

                         s/J. Ralph White
                        J. Ralph White
                        *Counsel of Record*
                        WHITE LAW FIRM
                        650 Poydras Street, Suite 2319
                        New Orleans, Louisiana 70130
                        Telephone: 504-799-2585
                        Facsimile: 504-799-2588
                        E-Mail: jralphwhitepllc@bellsouth.net

                        *Of Counsel:*

17

D. Joe Smith
Edmund M. Amorosi
SMITH PACHTER MCWHORTER PLC
8000 Towers Crescent Drive, Suite 900
Vienna, Virginia 22182
Telephone: 703-847-6300
Facsimile: 703-847-6312
E-Mail: eamorosi@smithpachter.com

Dated: September 16, 2010

18

**<u>CERTIFICATE OF ELECTRONIC FILING AND SERVICE</u>**

I hereby certify that on this 16th day of September, 2010, Plaintiff's Second Amended Complaint was filed electronically.  I understand that notice of this filing will be sent to counsel for the Defendant by operation of the Court's electronic filing system.  Parties may access this filing through the Court's system.

    s/J. Ralph White_____
J. Ralph White

Appx0154

ORIGINAL

**IN THE UNITED STATES COURT OF FEDERAL CLAIMS**

FILED
NOV 17 2011
U.S. COURT OF
FEDERAL CLAIMS

PETRO-HUNT, L.L.C.                    )
                                      )
    Plaintiff,                        )
                                      )    Case No. _____
v.                                    )    Judge _____
                                      )
THE UNITED STATES OF AMERICA,         )
                                      )
    Defendant                         )
                                      )    **11-775 L**

## COMPLAINT

### PREAMBLE

Petro-Hunt L.L.C. ("Petro-Hunt"), files this Complaint alleging that the defendant, the United States of America ("United States"), through its actions and omissions, violated the United States Constitution's Fifth Amendment prohibition against the taking of private property for public use without just compensation.  This new suit reasserts claims previously raised in *Petro-Hunt, L.L.C. v. United* States, Civil Action No. 00-512, pending in this Court, to avoid the possible punitive effect of the potential application of 28 U.S.C. § 1500.  Petro-Hunt denies that § 1500 is applicable, but files this suit out of an abundance of caution.

Petro-Hunt filed a complaint in this Court on August 24, 2000.  *See Petro-Hunt, L.L.C. v. United* States, Civil Action No. 00-512.  That case was stayed on November 2, 2000, pending resolution of a Quiet Title Action which was pending in the District Court for the Western District of Louisiana.  On November 6, 2009, the Court of Federal Claims dismissed Counts I, IV, V, VI, and VII of the complaint as barred by the Tucker Act's six-year statute of limitations.  *Petro-Hunt, L.L.C. v. United States*, 90 Fed. Cl. 71, 72 (2009).  Petro-Hunt realleges those claims here to preserve its rights on appeal, and for all other purposes allowed by law.  Petro-Hunt maintains that its claims under the Tucker Act did not accrue, and, thus, the statute of limitations

for all of the counts alleged below did not begin to run, until the United States Supreme Court denied Petro-Hunt's application for a writ of *certiorari*, and based on other arguments previously raised in case No. 00-512 or raised herein. *Petro-Hunt, L.L.C. v. U.S.,* 552 U.S. 1242, 128 S.Ct. 1471 (2008).[1]  Counts II and III, relating to temporary takings, were not dismissed at that time and remained before the Court for decision.  Petro-Hunt re-alleges the temporary takings claims in this new suit to preserve its rights to all temporary takings, not more than six years old as of March 3, 2008, or which are otherwise not barred by the six year statute of limitations.

On June 17, 2010, the U.S. Supreme Court, in a plurality opinion, found that the takings clause of the Fifth Amendment applies to judicial decisions that remove an "established right of private property." *Stop the Beach Renourishment v. Florida Dept. of Envt'l Protection,* 130 S.Ct. 2592, 2602 (June 17, 2010); *see also id.* at 2604; *id.* at 2608, fn. 9; id. at 2613.  On September 16, 2010, Petro-Hunt filed a supplemental complaint in case No. 00-512 to allege a judicial taking of Petro-Hunt's property, adding counts to allege, in addition to those claims already asserted, that the Fifth Circuit's decision in *Petro-Hunt, L.L.C. v. United States,* 365 F.3d 385 (5th Cir. 2004), *cert. denied,* 543 U.S. 1034 (Dec. 13, 2004) as implemented by the final judgment of the District Court entered on December 7, 2005[2], which divested Petro-Hunt of its established private property rights in certain mineral servitudes located in the State of Louisiana and transformed said established property rights into public property without compensation, constitutes a judicial taking which claim arose when the U.S. Supreme Court denied plaintiff's

---

[1] Petro-Hunt acknowledges that this Court has already rejected some of its arguments concerning whether plaintiff's claims are barred by the six year Tucker Act statute of limitations.  By filing this new action, Petro-Hunt, among other things, seeks the right to appeal all adverse rulings in a case not subject to the possible punitive effect of 28 U.S.C. § 1500.

[2] This decision remanded the case to the District Court and a final judgment was not issued by the District Court until December 7, 2005. See Petro-Hunt v. United States, No. CV00-0303 "S" US District Court for the Western District of Louisiana, Judgment entered December 7, 2005, Document 228.

2

petition for *certiorari* on March 3, 2008. Petro-Hunt re-alleges its judicial takings claim in this new suit to avoid the possible punitive effect of 28 U.S.C. § 1500.

On April 29, 2011, the U. S. Supreme Court decided *United States v. Tohono O'Odham Nation*, 131 S. Ct. 1723 (2011). *Tohono* held that for purposes of 28 U.S.C. § 1500, "[t]wo suits are for or in respect to the same claim, precluding jurisdiction in the CFC, if they are based on substantially the same operative facts, regardless of the relief sought in each suit." 131 S.Ct. at 1731. This case departed from established case law[3], which permitted claims based on separate relief to proceed even if there was overlap in operative facts.

On May 31, 2011, the United States filed a motion to dismiss the complaint filed with this Court in 2000 for lack of subject matter jurisdiction, based upon the *Tohono O'Odham* case. Petro-Hunt is filing this action to preserve its claims against the government. The District Court action which was pending at the time the original lawsuit was filed in this Court terminated on March 3, 2008, when the United States Supreme Court denied Petro-Hunt's petition for a writ of *certiorari*. *See Petro-Hunt, L.L.C. v. United States*, 552 U.S. 1242, 128 S.Ct. 1471 (2008.)

Petro-Hunt will file a motion asking the Court to stay this case or hold it in abeyance until such time as the motion to dismiss in the original action in this Court has been resolved.

## PARTIES

1.      Plaintiff, Petro-Hunt, L.L.C. ("Petro-Hunt"), a limited liability company organized under the laws of the State of Delaware having its principal place of business in Dallas, Texas, is primarily engaged in the business of oil and gas exploration and production as the owner and operator of mineral properties in and around the United States.

2.      Defendant, United States of America, is a republic formed pursuant to the U.S.

---

[3] *Keene Corp. v. United States* 508 U.S. 200, 113 S.Ct. 2035, 124 L.Ed.2d 118 (1993); *Loveladies Harbor, Inc. v. United States*, 27 F.3d 1545 (Fed.Cir.1994) (*en banc*).

Constitution, and exercising the powers therein subject to certain limitations including (1) the Fifth Amendment to the U.S. Constitution, which prohibits the taking of private property without payment of just compensation, (2) statutes, including the Tucker Act, which provide limited waivers of the government's sovereign immunity, and (3) regulations prescribing its authority.

3.      Petro-Hunt is the owner of a 64.28572% undivided interest in a mineral estate located in the Kisatchie National Forest.[4]

## JURISDICTION

4.      This court has jurisdiction of this case pursuant to 28 U.S.C. § 1491 (the Tucker Act) as a "claim against the United States founded either upon the Constitution, or any Act of Congress or any regulation of an executive department or upon any express or implied contract with the United States" seeking damages in excess of the minimum threshold.

## NATURE OF THE CASE

5.      Plaintiff seeks a judgment and related damages under the Fifth Amendment to the U.S. Constitution for a taking of its property, in the form of mineral rights, without just compensation.

6.      The United States made certain representations to land owners that mineral rights which had already been transferred to another entity created by the land owners would remain in perpetuity with that entity if the land owners sold their surface rights to the United States.

7.      The land owners relied on these representations in deciding to sell their surface land to the United States for inclusion in the national forest system, and the compensation paid by the United States excluded the value of the mineral estate.

8.      The United States, contrary to its representations, and in breach of material

---

[4] The other co-owners of the mineral estate are Kingfisher Resources, Inc., which owns an 18.90756% undivided interest, and Hunt Petroleum Corporation, which owns a 16.80672% undivided interest.

4

implied terms of the conveyances, subsequently sought to be declared the owner of the mineral estate without having paid just compensation for it.

9.     Plaintiff comes before this Court seeking a judgment and relief related to claims arising under the Constitution and the Tucker Act.

## FACTS

### A. Formation of the Mineral Estate

10.    Prior to 1932, Bodcaw Lumber Company of Louisiana ("Bodcaw Lumber"), Grant Timber & Manufacturing Company of Louisiana, Inc. ("Grant Timber"), Good Pine Lumber Company of Louisiana, Inc., Trout Creek Lumber Company of Louisiana, Inc., and Tall Timber Lumber Company of Louisiana, Inc. separately owned large non-contiguous tracts of land located in Winn, Grant, and Natchitoches parishes in Louisiana.

11.    These five lumber companies organized the Good Pine Oil Company ("Good Pine Oil") on or about 1932 and vested it with the exclusive rights to explore mineral deposits in the subsurface of certain parcels of their land in Louisiana. Bodcaw Lumber, Grant Timber and Good Pine Oil had shared members in common on their boards of directors, and had common ownership and management.

12.    Good Pine Oil was a joint venture of the five lumber companies, formed to pool the mineral rights of the five lumber companies with respect to the overall parcels of land.

13.    The five lumber companies agreed that each would share in any production obtained from the pooled acreage in proportion to the acreage that each lumber company contributed to the pool.

5

14.     Pursuant to six mineral conveyances executed between November, 1932 through May, 1934, Bodcaw Lumber and Grant Timber transferred their mineral rights in 180,000 acres of land to Good Pine Oil. *See* Exhibit 1.

15.     Bodcaw Lumber and Grant Timber believed that valuable timber, oil, and gas existed on and underneath the 180,000 acres conveyed to Good Pine Oil.

16.     Bodcaw Lumber and Grant Timber reserved the surface rights to the 180,000 acres to themselves in the conveyances of the mineral rights to Good Pine Oil. *See* Exhibit 1.

17.     The six mineral deeds recited that the minerals were conveyed to Good Pine Oil, its successors and assigns, forever, and that the vendors (including Bodcaw Lumber and Grant Timber) intended to confer upon the vendee absolutely, and without limit for time of its enjoyment, any and every right, title and interest that the vendors had in the minerals conveyed.

18.     The 180,000 non-contiguous acres contributed by Bodcaw Lumber and Grant Timber constituted 96 mineral servitudes owned by Good Pine Oil and its successors and assigns.[5]

### B. Establishment of the U.S. National Forest System

19.     In 1911, Congress enacted the Weeks Act. The Weeks Act was the enabling legislation which created the U.S. Forest Service and authorized it to purchase land throughout the United States to establish the national forest system.

20.     A federal entity known as the National Forest Reservation Commission ("NFRC") was established to identify forest lands for acquisition.

---

[5] A "servitude" is essentially a right of use. A mineral servitude conveys the right to explore for and produce the minerals on the property. There is no direct common law equivalent to a Louisiana mineral servitude. *Texaco v. La. Land & Exploration,* 136 B.R. 658 (M.D. La. 1992). However, every other state allows minerals to be permanently severed from the surface.

6

21.     The NFRC was the final authority for determining the forest land to be bought and the terms and conditions of sale.

22.     The Weeks Act expressly allowed for mineral reservations as consistent with the purpose for which the land was acquired, i.e. the establishment of national forests.

23.     Section 9 of the Weeks Act states: "that such acquisition may in any case be conditioned upon the exception and reservation to the owner from whom title passes to the United States of the minerals and of the merchantable timber, or either or any part of them within or upon such lands at the date of the conveyance" 36 Stat. 962 c. 186, Sec. 9.

24.     The NFRC took the position that it was without authority to purchase mineral rights with funds that had been appropriated for the acquisition of lands for national forest purposes and had adopted the policy of purchasing lands subject to the reservation of mineral rights in perpetuity.

25.     The NFRC recognized that properties in Louisiana were likely to be subject to mineral reservations, especially for oil and gas, given the known geological characteristics of the lands.

### C. U.S. Government Experiences Difficulty Purchasing Land in Louisiana

26.     Prior to 1936, the United States was interested in purchasing lands in Louisiana for national forest purposes.

27.     The United States found that land owners were unwilling to sell their land to the United States because of court decisions holding that the sale or reservation of mineral rights in Louisiana created only a "right in the nature of a servitude" which was subject to prescription by ten years nonuse.

7

28.     Authorized agents of the United States approached authorized representatives of Bodcaw Lumber and Grant Timber seeking to acquire large tracts of land for inclusion in the national forest system.

29.     Upon information and belief, Bodcaw Lumber and Grant Timber refused to sell the surface based on their belief that their valuable mineral rights would prescribe from Good Pine Oil (the holder of the mineral estate), to the United States, and not to Bodcaw Lumber and Grant Timber, the owners of the surface estate, if they sold their surface estates to the United States.

30.     The United States Department of Agriculture did not believe that the Louisiana law of prescription of mineral servitudes applied to purchases of land by the United States for the national forest system.

31.     On May 29, 1935, the United States Department of Agriculture, Forest Service, produced an opinion of the Assistant Solicitor of the Department of Agriculture to Bodcaw Lumber and Grant Timber to the effect that the prescriptive provisions of the Louisiana Civil Code would not apply to land sold to the United States for national forest purposes.

32.     Upon information and belief, authorized agents of the United States represented to Bodcaw Lumber and Grant Timber that the Louisiana law of prescription of mineral servitudes would not apply if they sold their land to the United States.

33.     These representations were made to induce the sale of the surface estate by Bodcaw Lumber and Grant Timber to the United States.

34.     Bodcaw Lumber and Grant Timber, in reliance on these representations, agreed to sell the surface estate of various tracts of timber land to the United States, understanding,

8

pursuant to the United States' representations, that the minerals would remain in the possession of Good Pine Oil and its assigns in perpetuity.

**D. Bodcaw Lumber and Grant Timber Sell their Surface Estate to the United States**

35.     From November 1934 through January 1937, through eleven different conveyances – nine deeds and two expropriation judgments, the United States, acting through the Department of Agriculture, Forest Service, acquired the surface rights, pursuant to the Weeks Act, to approximately 180,000 acres of land located in Grant, Winn and Natchitoches Parishes from Bodcaw Lumber and Grant Timber. *See* Exhibit 2.

36.     At the time of the acquisitions, all of the surface lands acquired by the United States from Bodcaw Lumber and Grant Timber were burdened by the 96 mineral servitudes owned by Good Pine Oil.

37.     These lands were purchased by the United States for inclusion in the Kisatchie National Forest, and were specifically conveyed to it subject to the prior sale of all the minerals by Bodcaw Lumber and Grant Timber to Good Pine Oil.

38.     These deeds were designed to confer a benefit on Good Pine Oil and any successors in interest by expressly excluding the mineral estate from the sale of property to the United States.

39.     The consideration paid by the United States under the various conveyances did not include the value of any mineral rights in the 96 servitudes.

40.     Bodcaw Lumber and Grant Timber did not own any minerals or mineral rights that they could sell to the United States, having previously conveyed those rights to Good Pine Oil.

9

41. Bodcaw Lumber and Grant Timber could not reserve or sell the expectation of a servitude lapsed for non-use.

42. The surface was the only thing that Bodcaw Lumber and Grant Timber could sell to the United States.

43. Bodcaw Lumber and Grant Timber would not have sold the surface lands to the United States had representatives of the United States then taken the position that the prescriptive provisions of the Louisiana Civil Code would be applicable to the minerals under the surface lands sold.

44. At the time the United States purchased the surface estate from Bodcaw Lumber and Grant Timber, the United States knew and understood that it was not purchasing any of the minerals that had previously been sold to Good Pine Oil.

45. At the time the United States purchased the surface estate from Bodcaw Lumber and Grant Timber, the United States knew and understood that its authorized representatives had concluded that the Louisiana law with respect to prescription of servitudes would not apply and the United States would not acquire title to the mineral estate.

46. On December 29, 1941, Good Pine Oil Company conveyed all of its mineral interests in this property to William C. Brown, who, on January 20, 1942, conveyed all of his interests to Nebo Oil Company. *See* Exhibit 3.

47. Petro-Hunt, L.L.C is the owner of a 64.28572% undivided interest in the mineral interests conveyed to Nebo Oil Company ("Nebo Oil") as a result of, *inter alia*, the conveyance and transactions listed on Exhibit 3 as a successor-in-interest.[6]

**E. Federal Courts Deny United States' Claims to Ownership of the Mineral Estate**

---

[6] Hunt Petroleum and Kingfisher Resources own their respective undivided interests via the same conveyances and transactions listed on Exhibit 3.

10

48.     In 1948, the United States filed suit for declaratory judgment in the Western District of Louisiana asserting ownership to a portion of the mineral rights previously reserved in perpetuity to Nebo Oil, as the successor in interest to all of Good Pine Oil's mineral rights.

49.     The United States argued that the mineral rights in a certain parcel had lapsed for ten years non-use, and therefore under Louisiana law, had prescribed to, and were owned by the United States.

50.     The United States' position in the 1948 declaratory judgment action was contrary to the representations it made during negotiations for the sale of the surface lands, namely that the Louisiana law of prescription would not apply to lands acquired by the United States.

51.     The district court rejected the government's arguments and held that all of the mineral servitudes owned by Nebo Oil were imprescriptable. In support of this decision, the district court cited Act 315, Louisiana decisional law on prescription and property law, and the agreements between Nebo Oil's predecessors and the United States.

52.     On appeal, the Fifth Circuit affirmed the district court's ruling that Nebo Oil owned the entire mineral estate in perpetuity and held that the Louisiana law of prescription for ten years non-use did not apply. *See United States v. Nebo Oil Co.*, 190 F.2d 1003, 1006, 1010 (5th Cir. 1951).

53.     Subsequent to the Fifth Circuit's decision, Nebo Oil placed an affidavit in the land records of Louisiana wherein it claimed title to all of the mineral property conveyed to Good Pine Oil through the six conveyance instruments described in Exhibit 1. (Hereinafter "Plaintiff's Mineral Estate.")[7] A copy of each of the Exhibits attached to the aforementioned Nebo Notices

---

[7] This affidavit of ownership can be found in Conveyance Book 99, Folio 93, Entry No. 47969, in the records of Grant Parish; Conveyance Book 73, Folio 314, Entry No. 49398, in the records of Winn Parish; and Conveyance Book 216, Folio 331, Entry No. 97034, in the records of Natchitoches Parish. Grant, Winn and Natchitoches Parishes are all located within the State of Louisiana.

11

filed in Grant, Winn and Natchitoches Parishes describing the Plaintiff's Mineral Estate is attached hereto as Exhibit 4.

54.     The land records of the United States Forest Service also reflected that the minerals underlying the land conveyed to it by the instruments described in Exhibit 2 were held in ownership by others in perpetuity up to and including at least the year 2000.

55.     Petro-Hunt and its predecessors in interest, exercised their ownership of their Mineral Estate in a manner consistent with the Fifth Circuit's holding in *United States v. Nebo Oil Co.*, 190 F.2d 1003 (5th Cir. 1951).

**F. The United States Disregards the Fifth Circuit's *Nebo Oil* Decision and Conveyances Reserving Mineral Rights to Petro-Hunt by Issuing Mineral Leases on the Servitudes Owned by Petro-Hunt**

56.     The United States, acting through the Department of the Interior's Bureau of Land Management ("BLM") and the Department of Agriculture's Forest Service, issued mineral leases at various times to third parties on certain lands in the Kisatchie National Forest that were burdened by the 96 mineral servitudes that originally ran in favor of Good Pine Oil, followed by its successors in interest ending in Petro-Hunt.

57.     Petro-Hunt, along with its co-owners, disputed the issuance of these leases as they affected mineral rights within Plaintiff's Mineral Estate, which had been reserved in perpetuity per the deeds of conveyance to Good Pine Oil and the Fifth Circuit's decision in *Nebo Oil*.

58.     Petro-Hunt along with its co-owners pursued relief through administrative process before the U.S. Department of the Interior.

59.     The United States continued to issue mineral leases on land located within Plaintiff's Mineral Estate, despite Petro-Hunt's objections.

12

60.     The United States received valuable lease payments for land within Plaintiff's Mineral Estate.

61.     Plaintiff was prevented from exercising the full use and enjoyment of its Mineral Estate during the period in which the United States issued the mineral leases and was deprived of valuable economic activity, including but not limited to exploration, leasing, and sales.

### G. Litigation Arising From the United States' Issuance of the Mineral Leases

62.     In response to BLM's issuance of the mineral leases, Petro-Hunt, along with the other co-owners of Plaintiff's Mineral Estate, brought suit under the Quiet Title Act on February 18, 2000 in the Western District of Louisiana, seeking a declaration that it was the owner in perpetuity of Plaintiff's Mineral Estate (the "Quiet Title action").

63.     The United States did not dispute that the Plaintiff, via various conveyances, is a successor-in-interest to the mineral servitudes that had been previously owned by Good Pine Oil and later, Nebo Oil, in the Quiet Title action.

### H. The Fifth Circuit's Decision and the Resulting Judgment of the District Court Dated December 7, 2005, Effected a Judicial Taking as it Divested Petro-Hunt of its Established Property Rights

64.     In the Quiet Title action, the United States argued that the law of prescription applied to Petro-Hunt's property and that the servitudes had prescribed for ten years non-use.

65.     The district court rejected the Government's claim that the law of prescription applied and found Petro-Hunt to be the owner of the property in perpetuity based on the Fifth Circuit's holding in *Nebo Oil*. The district court held that all 96 servitudes were imprescriptable and belonged to Petro-Hunt. Contrary to its earlier decision, the Fifth Circuit reversed the District Court's decision and applied the law of prescription to Petro-Hunt's servitudes. The Fifth

13

Circuit remanded the matter to the District Court with instructions to apply the law of prescription and determine which servitudes had prescribed based on non-use.

66.    On remand, the district court applied the Louisiana law of prescription and determined that Petro-Hunt remained the owner of only six servitudes, with the remaining 90 servitudes having prescribed to the United States through non-use. A copy of the District Court Judgment declaring that the Mineral Servitudes described therein are owned by Petro-Hunt is attached hereto as Exhibit 5.

67.    This Judgment of the District Court divested Petro-Hunt of property rights that had been established by contract, statute, and precedent, and, in doing so, transformed those established property rights into public property without compensation.

68.    Petro-Hunt's appeals of the Fifth Circuit's decision and District Court Judgment of December 7, 2005, in the Quiet Title action were not exhausted until 2008. *Petro-Hunt, L.L.C. v. United States*, 2007 U.S. App. LEXIS 5233 (5th Cir. 2007), *cert. denied,* 552 U.S. 1242 (March 3, 2008).

69.    On June 17, 2010, the United States Supreme Court issued its decision in *Stop the Beach Renourishment, Inc. v. Florida Dep't. of Envtl. Prot.*, 130 S.Ct 2592 (June 17, 2010).

70.    Writing for a plurality of the justices, Justice Scalia stated that the takings clause of the Fifth Amendment to the United States Constitution applies to judicial decisions that remove an "established right of private property." *Stop the Beach Renourishment v. Florida Dept. of Envt'l Prot.*, 130 S.Ct. 2592, 2602 (June 17, 2010); *see also id.* at 2604, *id.* at 2608, fn. 9; *id.* at 2613.

71.    Petro-Hunt's 96 servitudes were an established property right removed by a judicial determination.

14

72.    The Judgment entered by the District Court implementing the Fifth Circuit decision, in *Petro-Hunt L.L.C. v. United States* removed Petro-Hunt's established property rights without just compensation and constituted a taking under the Fifth Amendment under the test established in *Stop the Beach*.

## CLAIMS FOR RELIEF

### Count I – Permanent Taking of the Ninety-Six Servitudes

73.    Plaintiff incorporates the allegations raised in the preceding paragraphs (¶¶ 1 -72).

74.    The U.S. Constitution requires that the United States pay just compensation to private property owners for all property taken for public use.

75.    To date, the United States has paid nothing to Petro-Hunt or any of its predecessors-in-interest for the valuable mineral estate it has taken for public use, in violation of the U.S. Constitution.

76.    As a result of its acts and omissions, the United States has permanently taken the 96 servitudes previously owned by Petro-Hunt and described in Exhibit 4, which pursuant to the representations of the government were not subject to prescription, less and except the value of the servitudes described in Exhibit 5 which the Judgment of the District Court of December 7, 2005 held were now subject to prescription.

77.    Petro-Hunt has been damaged as a result of the United States' conduct in an amount to be determined equal to the just compensation due under the Fifth Amendment.

78.    Petro-Hunt brings this action seeking an award of just compensation under the Fifth Amendment to the United States Constitution for the value of mineral rights owned by plaintiff that have been taken by the United States without compensation.

**Count II – Temporary Taking of the Ninety Servitudes**

79.     Plaintiff incorporates the allegations raised in the preceding paragraphs (¶¶ 1 - 72).

80.     The U.S. Constitution requires that the United States pay just compensation to private property owners for all property taken for public use.

81.     To date, the United States had paid nothing to Petro-Hunt or any of its predecessors-in-interest for the valuable mineral estate it has taken for public use in violation of the U.S. Constitution.

82.     The United States engaged in a temporary taking by asserting ownership of the 90 servitudes before and during the Quiet Title action.

83.     The United States engaged in a temporary taking by issuing mineral leases to third parties that were then within the Plaintiff's Mineral Estate.

84.     The United States' position effectively blocked Petro-Hunt from engaging in any activity on the servitudes, precluded Petro-Hunt from leasing activity, and diminished the value of Petro-Hunt's property to prospective buyers.

85.     Petro-Hunt has been damaged as a result of the United States' conduct in an amount to be determined, equal to the just compensation due under the Fifth Amendment.

86.     During the temporary taking, the United States received valuable lease payments for property then owned by Petro-Hunt.

87.     Petro-Hunt brings this action seeking an award of just compensation under the Fifth Amendment to the Constitution for the value of mineral rights owned by plaintiff which have been taken by the United States.

16

Appx0209

**Count III – Temporary Taking of the Five Servitudes and the Nebo Servitude Described in Exhibit 4**

88.　　Plaintiff incorporates the allegations raised in the preceding paragraphs (¶¶ 1-72).

89.　　The U.S. Constitution requires that the United States pay just compensation to private property owners for all property taken for public use.

90.　　To date, the United States has paid nothing to Petro-Hunt or any of its predecessors-in-interest for the valuable mineral estate it has taken for public use in violation of the U.S. Constitution.

91.　　The United States engaged in a temporary taking by asserting ownership of the five servitudes described in Exhibit 5 and the Nebo Servitude before and during the Quiet Title action.

92.　　The United States engaged in a temporary taking by issuing mineral leases to third parties that were within the Plaintiff's Mineral Estate.

93.　　The United States effectively blocked Petro-Hunt from engaging in any activity on the 5 servitudes and the Nebo servitude, precluded Petro-Hunt from leasing activity, and diminished the value to prospective buyers.

94.　　During the temporary taking, the United States received valuable lease payments for property owned by Petro-Hunt.

95.　　Petro-Hunt has been damaged as a result of the United States' conduct in an amount to be determined equal to the just compensation due under the Fifth Amendment.

**Count IV – Breach of Contract**

96.　　Plaintiff incorporates the allegations raised in the preceding paragraphs (¶¶ 1-72).

97.　　Plaintiff, as a successor-in-interest to Good Pine Oil, the alter ego of Bodcaw Lumber and Grant Timber, which were parties to the conveyances of the surface estates to the

17

United States, has complied in all material respects with its obligations under the various land and mineral conveyances.

98.     The United States, as a party to those land conveyances, has breached its obligations by repudiating material terms of the parties' agreement and understanding with respect to the reservations of the mineral estate to Good Pine Oil, its successors and assigns, including Plaintiff.

99.     The United States' breach of contract entitles Plaintiff to (a) restitution damages equal to the value of the mineral estate acquired without payment by the United States; (b) reliance damages equal to the value of the mineral estate acquired without payment by the United States; (c) expectation damages equal to the profits that Plaintiff would have earned from the development of the mineral estate had the United States not committed a breach; (d) damages sustained by Petro-Hunt resulting from the United States' anticipatory repudiation of the terms and conditions of sale for the various tracts; and (e) other appropriate contract damages for losses sustained by Petro-Hunt as the result of wrongful acts by the United States.

### Count V – Breach of Contract for Implied Third-Party Beneficiary or *Stipulation Pour Autri*

100.     Plaintiff incorporates the allegations raised in the preceding paragraphs (¶¶ 1-72).

101.     In the alternative, Plaintiff as a third party beneficiary of the conveyances of the surface estate from Bodcaw Lumber and Grant Timber to the United States, has complied in all material respects with its obligations under the various mineral conveyances.

102.     Plaintiff specifically pleads and claims the benefit of Louisiana law regarding *stipulation pour autri*, pursuant to Louisiana Civil Code Articles 1978-1982.

103.     The United States, as a party to the conveyances from Bodcaw Lumber and Grant Timber, has breached its obligations to Plaintiff, an intended third-party beneficiary, by

18

repudiating the material terms of the agreement and understanding between Bodcaw Lumber and Grant Timber, on the one hand, and the United States, on the other hand, with respect to recognizing that the mineral rights were to be retained in perpetuity by Good Pine Oil and its successors-in-interest.

104.    The United States' breach of contract entitles Plaintiff to (a) restitution damages equal to the value of the mineral estate acquired without payment by the United States; (b) reliance damages equal to the value of the mineral estate acquired without payment by the United States; (c) expectation damages equal to the profits that Plaintiff would have earned from the development of the mineral estate had the United States not committed a breach; (d) damages sustained by Petro-Hunt resulting from the United States' anticipatory repudiation of the terms and conditions of sale for the various tracts; and (e) other appropriate contract damages for losses sustained by Petro-Hunt as the result of wrongful acts by the United States.

**Count VI – Breach of the Covenant of Good Faith and Fair Dealing**

105.    Plaintiff incorporates the allegations raised in the preceding paragraphs (¶¶ 1-72).

106.    In the alternative, Petro-Hunt seeks money damages and other appropriate relief in its capacity as a party in privity with Good Pine Oil or as a third party beneficiary to the conveyances of land to the United States arising from Defendant's breach of the implied covenant of good faith and fair dealing.

107.    Petro-Hunt has complied in all material respects with its obligations under the various mineral conveyances.

108.    The United States, as a party to those conveyances, has breached its obligations to Plaintiff, either as the party in privity or as an intended third-party beneficiary, by repudiating the material terms of the agreement and understanding between Bodcaw Lumber and Grant Timber,

19

on the one hand, and the United States, on the other hand, with respect to recognizing that the mineral rights were to be retained in perpetuity by Good Pine Oil and its successors-in-interest.

109.    The representations made by the United States to Bodcaw Lumber and Grant Timber, that the mineral estate would not prescribe, were made with the intent to induce Bodcaw Lumber and Grant Timber to sell the surface estate to the United States.

110.    The representations made by the United States to Bodcaw Lumber and Grant Timber, that the mineral estate would not prescribe, directly resulted in the sale of the surface estate to the United States.

111.    The United States later claimed ownership of certain of Plaintiff's Mineral Estate in 1948, contrary to the very representations made by its authorized agents on or around the date of the sale of the surface estate of the various tracts of land.

112.    The United States then issued leases for certain parts of Plaintiff's Mineral Estate despite the Fifth Circuit's ruling in *Nebo Oil*.

113.    During the Quiet Title action, the United States asserted ownership to certain parts of Plaintiff's Mineral Estate through prescription, despite its previous representations that the Louisiana law of prescription did not apply to lands acquired by the United States and that the mineral estate vested in Good Pine Oil and its successors would therefore be perpetual.

114.    The acts of the United States set forth in ¶¶ 1 – 113, above, breached the covenant of good faith and fair dealing.

115.    The United States' breach of the covenant of good faith and fair dealing entitles Plaintiff to (a) restitution damages equal to the value of the mineral estate acquired without payment by the United States; (b) reliance damages equal to the value of the mineral estate acquired without payment by the United States; (c) expectation damages equal to the profits that

20

Petro-Hunt would have earned from the development of the mineral estate had the United States not committed a breach; (d) damages sustained by Petro-Hunt resulting from the United States' anticipatory repudiation of the terms and conditions of sale for the various tracts; and (e) other appropriate contract damages for losses sustained by Petro-Hunt as the result of wrongful acts by the United States.

### Count VII - Reformation

116.     Plaintiff incorporates the allegations raised in the preceding paragraphs (¶¶ 1-72).

117.     In the alternative, Petro-Hunt seeks reformation of the conveyance instruments in which Bodcaw Lumber and Grant Timber conveyed the surface estate to reflect the true intentions of the parties, as expressed in the written and oral statements provided to Bodcaw Lumber and Grant Timber by the United States that the mineral rights would never prescribe as long as the United States owned the surface.

### Count VIII – Judicial Taking

118.     Plaintiff incorporates the allegations raised in the preceding paragraphs (¶¶ 1-72).

119.     The U.S. Constitution requires that the United States pay just compensation to private property owners for all property taken for public use.

120.     To date, the United States has paid nothing to Petro-Hunt for the valuable mineral property which it has taken for public use in violation of the U.S. Constitution.

121.     The Fifth Circuit's decision, implemented by the Judgment of the District Court entered on December 7, 2005, in *Petro-Hunt L.L.C. v. United States,* that mineral servitudes belonging to Petro-Hunt as established in *Nebo Oil,* and by contract with the United States, were subject to prescription was contrary to its prior decision in Nebo Oil and resulted in a judicial taking of Petro-Hunt's established property rights.

21

122.   Petro-Hunt has been damaged as the result of the Fifth Circuit's decision and the implementing Judgment of the District Court of December 7, 2005 in *Petro- Hunt, L.L.C. v. United States*, which divested Petro-Hunt of its established private property rights and transformed those established property rights into public property without compensation, contrary to existing precedent.

123.   Petro-Hunt is entitled to just compensation for the judicial taking of its established property right.

124.   As a result of this judicial taking, Petro-Hunt was deprived of its ownership of all 96 servitudes described in Exhibit 4 which were not subject to prescription, less and except the servitudes which the Judgment of the District Court of December 7, 2005, held were now subject to prescription and less and except the Nebo Servitude.   In addition, Petro-Hunt has been deprived of the formerly imprescriptable nature of its remaining servitudes described in Exhibit 5.

## PRAYER FOR RELIEF

**WHEREFORE**, Plaintiff prays for relief as follows:

1.   A money judgment equal to the just compensation owing to Plaintiff for the permanent taking of its property for public use, together with interest thereon at the legal rate from the date of the taking;

2.   A money judgment equal to the just compensation owing to Plaintiff for the temporary taking of its property for public use, together with interest thereon at the legal rate from the date of the taking;

3. A money judgment equal to the just compensation owing to Plaintiff for the judicial taking of its property for public use, together with interest thereon at the legal rate from the date of the taking;

4. A money judgment equal to the damages owing to Plaintiff for the breach of contract by the United States under the alternative theories of restitution, reliance, expectation of damages, anticipatory repudiation, and, together with interest thereon at the legal rate;

5. Attorneys' fees associated with bringing this action, including but not limited to those available under the Uniform Relocation Assistance and Real Property Acquisition Policies Act of 1970 (42 U.S.C. §4654(c));

6. The expenses of appraisers and other experts reasonably required to prosecute this action;

7. All other reasonable costs associated with bringing this action;

8. Such other and further relief as the Court deems just.

Respectfully Submitted,

*Attorneys for Plaintiff*

J. Ralph White
*Counsel of Record*
WHITE LAW FIRM
650 Poydras Street, Suite 2319
New Orleans, Louisiana 70130
Telephone: 504-799-2585
Facsimile: 504-799-2588
E-Mail: jralphwhitepllc@bellsouth.net

*Of Counsel:*
Edmund M. Amorosi
SMITH PACHTER MCWHORTER PLC
8000 Towers Crescent Drive, Suite 900
Vienna, Virginia 22182
Telephone: 703-847-6300

23

Facsimile: 703-847-6312
E-Mail: eamorosi@smithpachter.com

Dated: November 16, 2011

24

## Exhibit 1

The conveyances made in 1935 and 1936 from Bodcaw Lumber and Grant Timber to Good Pine Oil are described as follows:

(a)    Sale of Minerals from Bodcaw Lumber Company of Louisiana, Inc. to Good Pine Oil Company, Inc. dated November 12, 1932, recorded in Conveyance Book 168, Folio 419, Entry No. 63721, in the records of Natchitoches Parish;

(b)    Sale of Minerals from Grant Timber & Mfg. Company of La., Inc. to Good Pine Oil Company, Inc., dated November 16, 1932, recorded in Conveyance Book WW, Folio 552, Entry No. 25943, in the records of Grant Parish;

(c)    Sale of Minerals from Grant Timber & Mfg. Company of La., Inc. to Good Pine Oil Company, Inc., dated November 16, 1932, recorded in Conveyance Book 42, Folio 255, Entry No. 25548, in the records of Winn Parish; and

(d)    Sale of Minerals from Bodcaw Lumber Company of Louisiana, Inc. to Good Pine Oil Company, Inc. dated November 16, 1932, recorded in Conveyance Book 42, Folio 259, Entry No. 25552, in the records of Winn Parish;

(e)    Sale of Minerals from Bodcaw Lumber Company of La., Inc. to Good Pine Oil Company, Inc., dated May 3, 1934, recorded in Conveyance Book 171, Folio 72, Entry No. 65277, in the records of Natchitoches Parish;

(f)    Sale of Minerals from Bodcaw Lumber Company of La., Inc. to Good Pine Oil Company, Inc., dated May 3, 1934, recorded in Conveyance Book 44, Folio 26, Entry No. 26708, in the records of Winn Parish.

## Exhibit 2

(a)   Sale of lands by Bodcaw Lumber Company of Louisiana, Inc. to the United States of America dated February 11, 1936, recorded in Conveyance Book 173, Folio 400, Entry No. 66862, in the records of Natchitoches Parish; sale made subject to prior sales of minerals; and

(b)   Sale of lands by Grant Timber & Manufacturing Company of Louisiana, Inc. to the United States of America, dated November 28, 1934, recorded in Conveyance Book ZZ, Folio 359, Entry No. 27363, in the records of Grant Parish; sale made subject to prior sales of minerals; and

(c)   Sale of lands by Grant Timber and Manufacturing Company of Louisiana, Inc. to the United States of America, dated March 26, 1935, recorded in Conveyance Book 53, Folio 78, Entry No. 27600, in the records of Grant Parish; sale made subject to prior sales of minerals; and

(d)   Sale of lands by Grant Timber & Manufacturing Company of Louisiana, Inc. to the United States of America, dated November 28, 1934, recorded in Conveyance Book 44, Folio 131, Entry No. 26836, in the records of Winn Parish; sale made subject to prior sales of minerals; and

(e)   Sale of lands by Bodcaw Lumber Company of Louisiana, Inc. to the United States of America, dated December 20, 1934, recorded in Conveyance Book 44, Folio 160, Entry No. 26887, in the records of Winn Parish; sale made subject to prior sales of minerals; and

(f)   Sale of lands by Grant Timber & Manufacturing Company of Louisiana, Inc. to the United States of America, dated March 26, 1935, recorded in Conveyance

Book 44, Folio 413, Entry No. 27139, in the records of Winn Parish; sale made subject to prior sales of minerals; and

(g)     Sale of lands by Bodcaw Lumber Company of Louisiana, Inc. to the United States of America, dated June 12, 1935, recorded in Conveyance Book 44, Folio 546, Entry No. 27280, in the records of Winn Parish; sale made subject to prior sales of minerals; and

(h)     Sale of lands by Grant Timber & Manufacturing Company of Louisiana, Inc. to the United States of America, dated March 26, 1935, recorded in Conveyance Book 44, Folio 419, Entry No. 27140, in the records of Winn Parish, Louisiana; sale made subject to prior sales of minerals; and

(i)     Judgment in favor of the United States of America against Bodcaw Lumber Company of Louisiana, Inc., dated January 28, 1937, recorded in Conveyance Book 48, Folio 22, Entry No. 29731, in the records of Winn Parish; judgment subject to prior sales of minerals; and

(j)     Judgment in favor of the United States of America against Bodcaw Lumber Company of Louisiana, Inc., dated January 28, 1937, recorded in Conveyance Book 177, Folio 612, Entry No. 69177, in the records of Natchitoches Parish; judgment subject to prior sales of minerals.

## Exhibit 3

(a)   Conveyance of Minerals from Good Pine Oil Company, Inc. to William C. Brown, et al., dated December 29, 1941, recorded in Conveyance Book 69, Folio 519, Entry No. 35127, in the records of Grant Parish;

(b)   Conveyance of Minerals from Good Pine Oil Company, Inc. to William C. Brown, et al., dated December 29, 1941, recorded in Conveyance Book 54, Folio 324, Entry No. 34486, in the records of Winn Parish;

(c)   Conveyance of Minerals from Good Pine Oil Company, Inc. to William C. Brown, et al., dated December 29, 1941, recorded in Conveyance Book 188, Folio 547, Entry No. 76585, in the records of Natchitoches Parish;

(d)   Conveyance of Minerals from William C. Brown, et al., to Nebo Oil Company Inc., dated January 20, 1942, recorded in Conveyance Book 71, Folio 181, Entry No. 35377, in the records of Grant Parish;

(e)   Conveyance of Minerals from William C. Brown, et al., to Nebo Oil Company, Inc. dated January 20, 1942, recorded in Conveyance Book 71, Folio 195, Entry No. 35378, in the records of Grant Parish;

(f)   Conveyance of Minerals from William C. Brown, et al., to Nebo Oil Company, Inc., dated January 20, 1942, recorded in Conveyance Book 56, Folio 1, Entry No. 34722, in the records of Winn Parish;

(g)   Conveyance of Minerals from William C. Brown, et al., to Nebo Oil Company, Inc. dated January 20, 1942, recorded in Conveyance Book 56, Folio 18, Entry No. 34723, in the records of Winn Parish;

(h)    Conveyance of Minerals from William C. Brown, et al., to Nebo Oil Company, Inc., dated January 20, 1942, recorded in Conveyance Book 189, Folio 370, Entry No. 76995, in the records of Natchitoches Parish;

(i)    Conveyance of Minerals from William C. Brown, et al., to Nebo Oil Company, Inc., dated January 20, 1942, recorded in Conveyance Book 189, Folio 382, Entry No. 76996, in the records of Natchitoches Parish;

(j)    Acknowledgment by Joe Smith, h/o Anita O'Neal Smith, to Nebo Oil Company, Inc., dated June 19, 1952, recorded in Conveyance Book 101, Folio 3, Entry No. 48538, in the records of Grant Parish; Conveyance Book 74, Folio 51, Entry No. 49817, in the records of Winn Parish; and Conveyance Book 217, Folio 80, Entry No. 97514, in the records of Natchitoches Parish (husband acknowledged in this document that property conveyance in (d), (e), (f), (g), (h) and (i) above was the separate property of his wife);

(k)    Acknowledgment by H.I. Kenney, h/o Grace Wagner Kenney, to Nebo Oil Company, Inc., dated June 18, 1952, recorded in Conveyance Book 101, Folio 5, Entry No. 48539, in the records of Grant Parish; Conveyance Book 74, Folio 52, Entry No. 49818, in the records of Winn Parish; and Conveyance Book 217, Folio 82, Entry No. 97515, in the records of Natchitoches Parish (husband acknowledged in this document that property conveyed in (d), (e), (f), (g), (h) and (i) above was the separate property of his wife);

(l)    Acknowledgment by S. J. Seeger, h/o Helen B. Seeger, to Nebo Oil Company, Inc., dated July 31, 1944, recorded in Conveyance Book 195, Folio 369, Entry No. 82455, in the records of Grant Parish (husband acknowledged in this

document that property conveyed in (h) and (i) above was the property of his wife);

(m) Acknowledgment by Mary Seeger O'Boyle, et al., being the heirs of S. J. Seeger, deceased h/o Helen B. Seeger, to Nebo Oil Company, Inc., dated November 13, 1954, recorded in Conveyance Book 104, Folio 433, Entry No. 50887, in the records of Grant Parish; and Conveyance Book 235, Folio 717, Entry No. 175422, in the records of Winn Parish (heirs of deceased husband acknowledged in this document that property conveyed in (d), (e), (f) and (g) above was the separate property of his wife);

(n) Certificate of Amendment of Certification of Incorporation (name change) from Nebo Oil Company, Inc. to Bodcaw Company, dated April 4, 1960, recorded in Conveyance Book 119, Folio 39, Entry No. 56054, in the records of Grant Parish; Conveyance Book 87, Folio 221, Entry 56325, in the records of Winn Parish; and Conveyance Book 238, Folio 401, Entry No. 111325, in the records of Natchitoches Parish;

(o) Certificate of Agreement of Merger (Bodcaw Company merged into IPB, Inc., and IPB, Inc. changed its name to Bodcaw Company), dated October 10, 1979, recorded in Conveyance Book 226, Folio 84, Entry 84739, in the records of Grant Parish; Conveyance Book 143, Folio 608, Entry No. 110749, in the records of Winn Parish; and Conveyance Book 356, Folio 491, Entry No. 157257, in the records of Natchitoches Parish; all as further evidenced by (y) below;

(p) Certificate of Ownership and Merger filed by Bodcaw Company, dated October 10, 1979, recorded in Conveyance Book 226, Folio 85, Entry No. 84740, in the

records of Grant Parish; Conveyance Book 143, Folio 609, Entry No. 110750, in the records of Winn Parish; and Conveyance Book 356, Folio 492, Entry No. 157258, in the records of Natchitoches Parish;

(q)  Mineral Deed from Bodcaw Company to Placid Oil Company, dated October 11, 1979, recorded in Conveyance Book 224, Folio 812, Entry No. 84742, in the records of Grant Parish; Conveyance Book 143, Folio 620, Entry No. 110752, in the records of Winn Parish; and Conveyance Book 356, Folio 508, Entry No. 157260, in the records of Natchitoches Parish;

(r)  Assignment, Conveyance and Bill of Sale from Placid Oil Company to Placid International Oil Limited, and in turn from Placid International Oil Limited to Louisiana-Hunt Petroleum Corporation and Rosewood Resources (POC), Inc., dated June 13, 1983, recorded in Conveyance Book 259, Folio 139, Entry No. 93374, in the records of Grant Parish; Conveyance Book 158, Folio 550, Entry No. 122732, in the records of Winn Parish; and Conveyance Book 388, Folio 19, Entry No. 167876, in the records of Natchitoches Parish;

(s)  Certificate of Ownership, Merger Name Change from Rosewood Resources (POC), Inc. to Rosewood Resources, Inc., dated December 31, 1984, recorded in Mortgage Book 134, Folio 880, Entry No. 44105, in the records of Grant Parish; Conveyance Book 172, Folio 553, Entry No. 134394, in the records of Winn Parish; and Conveyance Book 420, Folio 49, Entry No. 176881, in the records of Natchitoches Parish;

(t)  Certificate of Merger and Name Change from Louisiana-Hunt Petroleum Corporation to Hunt Petroleum Corporation, dated January 31, 1986, recorded in

Conveyance Book 215, Folio 574, Entry 64469, in the records of Grant Parish; Conveyance Book 182, Folio 542, Entry 141085, in the records of Winn Parish; and Conveyance Book 442, Folio 127, Entry No. 182279, in the records of Natchitoches Parish;

(u)     Assignment and Conveyance from Rosewood Resources, Inc. to Kingfisher Resources, Inc., dated April 24, 1996, recorded in Conveyance Book 338, Folio 395, Entry No. 117748, in the records of Grant Parish; Conveyance Book 217, Folio 757, Entry No. 163185, in the records of Winn Parish; and Oil and Gas Book 296, Folio 836, Entry No. 230814, in the records of Natchitoches Parish; and

(v)     Conveyance and Assumption Agreement from OXY USA, Inc. and Placid Oil Company to Petro-Hunt, L.L.C., executed April 6, 1998, recorded in Conveyance Book 348, Folio 191, Entry No. 121619, in the records of Grant Parish; Conveyance Book 227, Folio 85, Entry No. 169509, in the records of Winn Parish; and Conveyance Book 529, Folio 653, Entry No. 209089, in the records of Natchitoches Parish.

**Exhibit 5**

RECEIVED

DEC 0 7 2005

ROBERT H. SHEMWELL, CLERK
WESTERN DISTRICT OF LOUISIANA
SHREVEPORT, LOUISIANA

## UNITED STATES DISTRICT COURT
## WESTERN DISTRICT OF LOUISIANA

| | | |
|---|---|---|
| PETRO-HUNT, L.L.C.; HUNT PETROLEUM CORPORATION AND KINGFISHER RESOURCES, INC. | * * * * | CIVIL ACTION |
| | * | NO. CV00-0303 "S" |
| VERSUS | * * | JUDGE WALTER |
| | * | |
| UNITED STATES OF AMERICA AND ASPECT RESOURCES, LLC,; BAYOU PETROLEUM COMPANY; CATAWBA ENERGY, INC.; FIRST TEXAS HYDROCARBONS, INC.; OSCAR C. FORLAND; GULF COAST OIL & GAS CO.; JUSTISS OIL COMPANY, INC.; MATRIX ENERGY, INC.;MB EXPLORATION LLC; NORTHSTAR ENERGY, LLC; PALMER PETROLEUM, INC; RICE & ASSOCIATES, LLC; SNYDER OIL CORPORATION; HOWELL R. SPEAR; JOHN P. STRANG; TEXACO EXPLORATION AND PRODUCTION, INC.; TMR EXPLORATION, INC.; UMC PETROLEUM CORPORATION; AND WHELESS TDL EXPLORATION CO., LLC | * * * * * * * * * * * * * * * * * * * | MAGISTRATE JUDGE HAYES |

*************************************************

### JUDGMENT

Before the court is plaintiffs' **PETRO-HUNT, L.L.C., HUNT PETROLEUM**

**CORPORATION** and **KINGFISHER RESOURCES, INC.,** Alternative Motion for

Summary Judgment pertaining to mineral servitudes which are held by drilling or production,

and which have not prescribed, pursuant to Louisiana mineral law. After considering the

motion and supporting memoranda and affidavits and noting that the government has not

opposed the motion, the Court finds plaintiffs' Motion to be well founded and it is hereby GRANTED;

IT IS THEREFORE ORDERED, ADJUDGED AND DECREED that judgment be and is hereby entered in favor of plaintiffs, Petro-Hunt, L.L.C., Hunt Petroleum Corporation and Kingfisher Resources, Inc., and against defendants, United States of America; Aspect Resources, L.L.C.; Justiss Oil Company; MB Exploration, L.L.C.; Palmer Petroleum, Inc.; Snyder Oil Corporation, a/k/a Santa Fe Snyder a/ka Devon SFS; John P. Strang; UMC Petroleum Corp. and its successor Ocean Energy Resources; Wheless TDL Exploration Co., Ltd.; Bayou Petroleum Company; First Texas Hydrocarbons, Inc.; Oscar C. Forland; Northstar Energy, L.L.C.; Howell R. Spear; Gulf Coast Oil & Gas Co.; J. Bradley Jeffreys and Energy Arrow Exploration, L.L.C., declaring that the five mineral servitudes described in Exhibit "A," are owned by plaintiffs and, at this time, remain in full force and effect and have not prescribed because of interruption of prescription by drilling or production of minerals, pursuant to the Louisiana rules of prescription of mineral servitudes; consequently this court finds that plaintiffs are the owners in indivision of the five mineral servitudes described on Exhibit "A," as follows:

| | |
|---|---|
| **PETRO-HUNT, L.L.C.:** | **64.28572%** |
| **HUNT PETROLEUM CORPORATION:** | **16.80672%** |
| **KINGFISHER RESOURCES, INC.:** | **18.90756%** |

IT IS FURTHER ORDERED, ADJUDGED AND DECREED that all mineral leases

– 2 –

issued by the United States of America on the five mineral servitudes described in Exhibit "A" are hereby cancelled and set aside as null and void and the **UNITED STATES OF AMERICA** shall cause the cancellation of all Oil, Gas or Mineral Leases which it has granted to any third party, that intrude onto the mineral servitudes described in Exhibit "A," and that such cancellation shall be filed in the records of the appropriate Parish of the situs of such lands and that a recorded copy of such cancellation shall be provided to plaintiffs.

IT IS FURTHER ORDERED, ADJUDGED AND DECREED that Plaintiffs hereby reserve the right to pursue any and all claims for damages, caused by or as a result of the issuance of all intrusive leases and any other claims they have against the United States of America in the U.S. Court of Federal Claims.

Ordered this ___7___ day of ___December___, 2005.

**UNITED STATES DISTRICT JUDGE**

– 3 –

Approved as to Form and Content:

**DONALD W. WASHINGTON**
United States Attorney
**KAREN J. KING (#23508)**
Assistant United States Attorney
United States Courthouse
800 Lafayette Street, Suite 2200
Lafayette, Louisiana 70501-6832
Telephone: (337) 262-6618

Attorneys for the United States

**and**

**J. RALPH WHITE (#13425)**
**STELLA SHACKELFORD (#27876)**
**FREELAND & FREELAND, LAWYERS**
P.O. BOX 269
1013 JACKSON AVENUE
OXFORD, MS 38655
Telephone: (662) 234-3414

**W. MICHAEL ADAMS (#2338)**
**BLANCHARD, WALKER, O'QUIN & ROBERTS**
(A Professional Law Corporation)
400 Texas Street, Suite 1400
P.O. Drawer 1126
Shreveport, LA 71163-1126
Telephone: (318) 221-6858

Attorneys for Petro-Hunt, L.L.C.

**and**

– 4 –

JOHN M. McCOLLAM (#7117)
MATTHEW J. RANDAZZO, III (#14340)
AIMEE WILLIAMS HEBERT (#25935)
GORDON, ARATA, McCOLLAM,
  DUPLANTIS & EAGAN, L.L.P.
210 St. Charles Avenue, Suite 4000
New Orleans, Louisiana 70115
Telephone: (504) 582-1111

Attorneys for Hunt Petroleum Corporation and Kingfisher Resources

– 5 –

## CERTIFICATE OF SERVICE

I HEREBY CERTIFY that I have on this 30th day of November, 2005, served a copy

· proposed Judgment on all counsel of record by depositing a copy of same in the United States

mail, properly addressed, and first-class postage prepaid.

/s/ W. Michael Adams

— 6 —

# EXHIBIT "A" ATTACHED HERETO AND MADE PART HEREOF

## SERVITUDE 1

### KISATCHIE NATIONAL FOREST LANDS
### SUBJECT TO PETRO HUNT MINERAL SERVITUDES
### WHICH ARE HELD BY DRILLING
### AS OF JUNE 1, 2005

**TOWNSHIP 13 NORTH, RANGE 7 WEST, LOUISIANA PM**

| Section | Legal Description | Approx. Acreage |
|---|---|---|
| 1 | E2E2, W2NENW, NWNW, NESW, SWSW, W2SESW, NWSE, | 360.61 |
| 2 | N2N2, S2NW, SW, S2SE | 475.03 |
| 10 | N2SWNE, SESWNE, SENE, E2SWSE, E2SE | 169.23 |
| 11 | All | 638.76 |
| 12 | E2NE/4, SW/4NE/4, W/2 NW/4, SE/4 NW/4, SW/4, W/2 SE/4 | 485.79 |
| 13 | E/2 NE/4, SW/4 NW/4, W/2 SW/4, NE/4 SE/4 | 282.19 |
| 14 | W2E2, SENE, NW, N2SW less and except approx. 7 acres being that part of the NWSW lying South of right-of-way for L & A Railroad; SESW less and except approx. 3 acres being that part of SESW lying South of right-of-way for L & A Railroad.; NESE | 518.99 |
| 15 | E2NE less and except approx. 5 acres being that part of the SENE lying South of right-of-way for L & A Railroad, NESE less and except approx. 35.76 acres being that part of the NESE lying South of right-of-way for L & A Railroad. | 73.68 |
| 23 | N2NE, E2NW less and except approx. 67.22 acres being that part of the E2NW lying South of right-of-way for L & A Railroad. | 92.61 |

## SERVITUDE 1

### KISATCHIE NATIONAL FOREST LANDS
### SUBJECT TO PETRO HUNT MINERAL SERVITUDES
### WHICH ARE HELD BY DRILLING
### AS OF JUNE 1, 2005

**TOWNSHIP 13 NORTH, RANGE 6 WEST, LOUISIANA PM**

| Section | Legal Description | Approx. Acreage |
|---|---|---|
| 6 | 16 acres in a square in the NW corner of the NWNE, 2 acres in the SE corner of the SWNE, W2, E2NWSE, SWNWSE, SWSE | 431.48 |
| 7 | NE/4, W/2, NE/4 SE/4 | 559.94 |
| 8 | NW, N2SW | 239.78 |
| 18 | NE less 30 acres on the South side, N2NW, SENW less 2 acres in a square in the Northwest corner, and less 3 acres described as beginning at a point 295 feet South of the Northwest corner of said forty acres, run thence East 210 yards, thence South 70 yards, thence West 210 yards, thence north 70 yards to the point of beginning; NWSW, NESW less 4 acres in a square in the Southeast corner | 224.87 |

**TOTAL ACREAGE FOR SERVITUDE 1:**        **4,552.96**

**SERVITUDE 2**

**KISATCHIE NATIONAL FOREST LANDS**
**SUBJECT TO PETRO HUNT MINERAL SERVITUDES**
**WHICH ARE HELD BY DRILLING**
**AS OF JUNE 1, 2005**

**TOWNSHIP 13 NORTH, RANGE 5 WEST, Louisiana PM**

| Section | Legal Description | Approx. Acreage |
|---------|-------------------|-----------------|
| 1 | NWSW | 39.14 |
| 2 | E2E2, SWNE, NW, S2S2SW, S2NWSE, SWSE | 453.33 |
| 3 | All | 629.68 |
| 4 | All | 630.80 |
| 5 | E2, E2W2, NWNW | 516.91 |
| 6 | E2NE | 81.00 |
| 7 | NESW, That part of the S2SW lying East of Saline Bayou, SWSE/4 | 153.70 |
| 8 | E2NE, NW NE, SWSE | 159.17 |
| 9 | All | 638.20 |
| 10 | N2, SW, N2SE, SWSE | 601.73 |

# SERVITUDE 2

## KISATCHIE NATIONAL FOREST LANDS
## SUBJECT TO PETRO HUNT MINERAL SERVITUDES
## WHICH ARE HELD BY DRILLING
## AS OF JUNE 1, 2005

### TOWNSHIP 13 NORTH, RANGE 5 WEST, Louisiana PM (continued)

| Section | Legal Description | Approx. Acreage |
|---|---|---|
| 11 | S2NE less 2 acres in a square in the NE corner, E2W2, W2NW, NWSW, E2SWSW, NWNESE, S2NESE, W2SESE, SESESE, W2SE less 2.005 acres described as follows: Commencing at the concrete monument located at the NW corner of the NESESE of Section 11, T13N, R5W; thence proceed S 84° 13' W, a distance of 1,269.8 feet, to a 2" aluminum pipe with a cap stamped with La. Reg. No. 4447 set at the north right-of-way of La. Hwy. 126, also being the Point of Beginning; | 517.51 |
| | Thence N 89° 29' W along said right-of-way, a distance of 300.00 feet, to a ½" diameter iron rod in the centerline of the Parish road; | |
| | Thence N 01° 22' W along said centerline, a distance of 122.93 feet, to a ½" diameter iron rod; | |
| | Thence N 10° 44' W along said centerline, a distance of 177.07 feet, to a ½" diameter iron rod; | |
| | Thence S 89° 40' E a distance of 300.00 feet, to a 2" aluminum pipe with a cap stamped with La. Reg. No. 4447; | |
| | Thence S 06° 52' E a distance of 300.00 feet, to the Point of Beginning. | |
| 12 | SESW, SWSE | 79.68 |
| 13 | W2NE, SENE, E2NW, SW, NESE, N2SESE, W2SE less and except 24.82 acres in the NWSE, being the same 24.82 acres acquired by the U.S. in Civil Action 2732, dated January 28, 1937. | 472.63 |
| 14 | S2NE, E2NW, SWNW, E2SW, NWSW, SE, | 480.27 |

## SERVITUDE 2

### KISATCHIE NATIONAL FOREST LANDS
### SUBJECT TO PETRO HUNT MINERAL SERVITUDES
### WHICH ARE HELD BY DRILLING
### AS OF JUNE 1, 2005

**TOWNSHIP 13 NORTH, RANGE 5 WEST, Louisiana PM (continued)**

| Section | Legal Description | Approx. Acreage |
|---|---|---|
| 15 | S2NE, W2NW, S2 | 480.33 |
| 16 | E2, NW, N2SW, E2SESW | 577.72 |
| 17 | NE, W2NW less 1 acre in SW corner of the NENW, SW, N2NESE, NWSE, SWSE less 5 acres in a square in the SW corner | 491.74 |
| 18 | W2NE, NESE, That part of the NWNW, NENW, SENW, W2SE, SESE lying East of Saline Bayou | 299.32 |
| 19 | That part of the E2NE lying East of Saline Bayou | 15.00 |
| 20 | W2NW, NESE less and except a strip on the West side, being 120 yards wide and containing 10.90 acres, SWSE less 8.00 acres in a square in the NE corner, SESE | 148.78 |
| 21 | E2, E2NW, E2SWNW, E2W2SWNW, SW | 589.59 |
| 22 | NENE less 3 acres in a square in the Southeast corner, W2NE, SENE, W2, SE | 634.78 |
| 23 | E2, E2NW, SWNW, SW | 599.82 |
| 24 | S2NE, E2NW, NWNW, S2 | 519.16 |
| 25 | W2NE less 15 acres off the West side described as follows: BEGINNING at the Southwest corner of NWNE, run thence due East 10 chains, thence North 15 chains, thence West 10 chains, thence South 15 chains, to the point of beginning., E2NW | 135.00 |
| 26 | All | 640.00 |

Appx0257

# SERVITUDE 2

## KISATCHIE NATIONAL FOREST LANDS
## SUBJECT TO PETRO HUNT MINERAL SERVITUDES
## WHICH ARE HELD BY DRILLING
## AS OF JUNE 1, 2005

### TOWNSHIP 13 NORTH, RANGE 5 WEST, Louisiana PM (continued)

| Section | Legal Description | Approx. Acreage |
|---------|-------------------|-----------------|
| 27 | NENE, W2NE, N2SENE, NENW, W2NW, 5 acres in a square in the Southeast corner of the SWSW, S2SESW, NENESE, S2NESE, W2NWSE, S2SE | 403.31 |
| 28 | NE, E2NW, NWNW, N2NESW, NWSW less 10 acres in a square in the Northwest corner, W2SWSW, SWSE, N2SESE | 410.05 |
| 29 | NENE, W2NE, That part of the W2 lying East of Saline Bayou containing 212.02 acres. SE, | 492.47 |
| 32 | That part of section lying East of Saline Bayou | 421.50 |
| 33 | S2NENE, NWNE, N2SWNE, SWSWNE, SENE, E2NW, SWNW, SW, N2SE, SESE less 5.5 acres in the Southeast corner, described as follows:  BEGIN at the Southeast corner of the section, and run thence West along the South line of section 40 rods, thence at right angles easterly 40 rods, to the East line of the section, thence southerly along the East line of the section to the place of beginning. | 484.50 |
| 34 | E2, NENW, NWNW less 2.0 acres described as follows: BEGIN at the Northwest corner of the section, run thence South 70 yards, thence East 140 yards, thence North 70 yards to the North boundary of the section, thence West 140 yards to the point of beginning., S2NW, SW | 637.76 |
| 35 | ALL | 639.12 |

## SERVITUDE 2

### KISATCHIE NATIONAL FOREST LANDS
### SUBJECT TO PETRO HUNT MINERAL SERVITUDES
### WHICH ARE HELD BY DRILLING
### AS OF JUNE 1, 2005

**TOWNSHIP 13 NORTH, RANGE 5 WEST, Louisiana PM (continued)**

| Section | Legal Description | Approx. Acreage |
|---------|-------------------|-----------------|
| 36 | S2NE, W2NWNE, E2NW, NWNW less 2 acres in the Northwest corner more particularly described as follows: BEGINNING at the Northwest corner of section and run thence due East 209 feet; thence South 418 feet; thence West 209 feet; thence North 418 feet to point of beginning, SWNW, SESW, SE | 457.91 |

**TOWNSHIP 12 NORTH, RANGE 5 WEST**

| Section | Legal Description | Approx. Acreage |
|---------|-------------------|-----------------|
| 1 | All | 638.12 |
| 2 | All | 614.40 |
| 3 | E2, E2NW, S2SW | 472.93 |
| 4 | SE, W2 | 468.13 |
| 5 | That part of the E2 of the Section lying East of Saline Bayou | 224.00 |
| 10 | N2, SESE | 361.80 |
| 11 | All | 619.76 |
| 12 | All | 641.80 |
| 13 | All | 641.96 |
| 14 | E2, NW, N2SW, N2SWSW, SESW | 604.55 |

## SERVITUDE 2

### KISATCHIE NATIONAL FOREST LANDS
### SUBJECT TO PETRO HUNT MINERAL SERVITUDES
### WHICH ARE HELD BY DRILLING
### AS OF JUNE 1, 2005

**TOWNSHIP 12 NORTH, RANGE 5 WEST, Louisiana PM (continued)**

| Section | Legal Description | Approx. Acreage |
|---|---|---|
| 15 | E2NE, SWNE less and except the North 24 acres, S2SW less and except the North 28 acres (N.457.04'), SE | 309.57 |
| 16 | That part of the Section lying East of Saline Bayou | 365.00 |
| 22 | W2NENE, NWNE, NENW, W2W2, SENW less and except 5 acres in a square in the Southeast corner, NESW less and except 3 acres in a square Northeast corner and less and except 2 acres described as follows: BEGINNING at the Southwest corner of the forty, run thence North along the West line of the forty 110 yards, thence East 154 yards to the point of beginning, thence North 140 yards, thence East 70 yards, thence South 140 yards, thence West 70 yards to point of beginning. | 330.79 |
| 23 | E2, E2NW4, SWNW, SW | 586.76 |
| 24 | All | 639.44 |
| 25 | All | 635.65 |
| 26 | NENE, N2SENE, W2E2, W2 | 529.16 |
| 27 | E2, NW, E2SW | 560.14 |
| 28 | That part of the S2SW lying East of Saline Bayou, SWSE | 115.35 |

## SERVITUDE 2

### KISATCHIE NATIONAL FOREST LANDS
### SUBJECT TO PETRO HUNT MINERAL SERVITUDES
### WHICH ARE HELD BY DRILLING
### AS OF JUNE 1, 2005

**TOWNSHIP 12 NORTH, RANGE 5 WEST, Louisiana PM (continued)**

| Section | Legal Description | Approx. Acreage |
|---------|-------------------|-----------------|
| 29 | E2SE | 79.15 |
| 33 | That part of Section lying East of Saline Bayou | 400.00 |
| 34 | W2NE, W2SENE, That part of the NENW described as follows: BEGINNING at the Northwest corner of the section and run thence North 88° 16' East 1,298 feet to point of beginning, thence continue on same course North 88° 16' East 1,298 feet, thence due South 860 feet, thence North 58° West 1,530 feet along North side of right-of-way of L & A Railway, thence due North 10 feet to point of beginning, said tract containing 12.96 acres, S2NWNW, SWNW, S2S2, NWSW, NESE | 413.30 |
| 35 | NWNW, E2SWNW | 58.92 |

**TOWNSHIP 11 NORTH, RANGE 5 WEST, Louisiana PM**

| Section | Legal Description | Approx. Acreage |
|---------|-------------------|-----------------|
| 1 | W2NW | 80.39 |
| 2 | NENE, W2NE, NW, NWSW | 318.72 |
| 3 | N2, N2SW, SWSW, NESE | 485.10 |

## SERVITUDE 2

### KISATCHIE NATIONAL FOREST LANDS
### SUBJECT TO PETRO HUNT MINERAL SERVITUDES
### WHICH ARE HELD BY DRILLING
### AS OF JUNE 1, 2005

**TOWNSHIP 11 NORTH, RANGE 5 WEST, Louisiana PM (continued)**

| Section | Legal Description | Approx. Acreage |
|---------|-------------------|-----------------|
| 4 | That part lying East of the Saline Bayou | 324.14 |
| 10 | W2E2, N2NW, SESW, SESE | 320.00 |

**TOWNSHIP 13 NORTH, RANGE 4 WEST, Louisiana PM**

| Section | Legal Description | Approx. Acreage |
|---------|-------------------|-----------------|
| 18 | SWNW, NWSW, W2SWSW | 100.01 |

**TOWNSHIP 12 NORTH, RANGE 4 WEST, Louisiana PM**

| Section | Legal Description | Approx. Acreage |
|---------|-------------------|-----------------|
| 6 | N2NW, SWNW less and except 77.05 acres lying in the N2NW and the SWNW which were exchanged to Willie Glen Emmett and Barbara Louise Webb Emmett by deed dated January 11, 1994, Exhibit I, Exchange Deed, FS Tract C-174, SW, W2SE, SESE | 325.70 |
| 7 | All | 636.80 |
| 8 | SW less and except the North 35 acres of the SW lying East LA Hwy. 501. | 125.27 |
| 17 | S2NWNE, SWNE, S2NENW, W2NW, SENW, SW, SWSE | 400.67 |
| 18 | All | 637.56 |
| 19 | All | 637.72 |

## SERVITUDE 2

### KISATCHIE NATIONAL FOREST LANDS
### SUBJECT TO PETRO HUNT MINERAL SERVITUDES
### WHICH ARE HELD BY DRILLING
### AS OF JUNE 1, 2005

**TOWNSHIP 12 NORTH, RANGE 4 WEST, Louisiana PM (continued)**

| Section | Legal Description | Approx. Acreage |
|---------|-------------------|-----------------|
| 20 | NENE, W2NE, W2, SE | 601.24 |
| 21 | SWSW | 40.03 |
| 26 | That part of the S2SW and the S2SE lying South of LA Hwy 1232 | 111.24 |
| 28 | W2NWNW, S2SW, W2SESE, | 119.95 |
| 29 | All | 638.92 |
| 30 | N/2 | 317.78 |
| 33 | E2NE4, SWNE, NENW, W2NW, S2 | 558.53 |
| 34 | NE, E2NW, SWNW, S2NESW, N2SESW, W2SW, N2SE | 478.92 |
| 35 | NE, W2NWNW, NESW, W2SW, S2NESE, NWSE, N2SESE | 380.02 |
| 36 | E2NE, SWNE, SENW, W2NW, N2SW, NWSE | 359.84 |

**TOTAL ACREAGE FOR SERVITUDE 2:**  32,840.54

## SERVITUDE 3

### KISATCHIE NATIONAL FOREST LANDS
### SUBJECT TO PETRO HUNT MINERAL SERVITUDES
### WHICH ARE HELD BY DRILLING
### AS OF MAY 1, 2005

**TOWNSHIP 11 NORTH, RANGE 5 WEST, Louisiana PM**

| Section | Legal Description | Approx. Acreage |
|---|---|---|
| 13 | S2 | 317.04 |
| 14 | SENE, Fractional SWNW, SENW, NESW, Fractional NWSW, E2SE, SWSE | 290.82 |
| 15 | Fractional SWNE, W2NW4, Fractional SENW, Fractional S2 | 260.20 |
| 21 | Fractional NENE | 29.18 |
| 22 | E2, NENW, S2NESW, E2SWSW, SESW, and that part of the S2NW, N2NESW, NWSW, AND W2SWSW lying East of the Monroe-Natchitoches Road. | 531.70 |
| 23 | NE, W2 | 479.55 |
| 24 | All | 634.40 |
| 25 | All | 632.80 |
| 26 | NENE, W2NWNE, N2SWNE, NENW, W2NW, N2NESENW, W2SENW, E2SE, SWSE | 345.11 |
| 27 | N2, SW, W2SE, W2SESE | 580.36 |
| 28 | E/2 | 320.00 |
| 33 | E2NE, SWNE, SE, W2 less and except 163.17 acres exchanged to the Salco Corporation by deed dated July 15, 1997, and described in Exhibit I, Exchange Deed, FS Tract C-169. | 446.83 |

## SERVITUDE 3

### KISATCHIE NATIONAL FOREST LANDS
### SUBJECT TO PETRO HUNT MINERAL SERVITUDES
### WHICH ARE HELD BY DRILLING
### AS OF MAY 1, 2005

**TOWNSHIP 11 NORTH, RANGE 5 WEST, Louisiana PM (continued)**

| Section | Legal Description | Approx. Acreage |
|---------|-------------------|-----------------|
| 34 | All | 640.00 |
| 35 | E2, E2NW, SWNW, SW | 600.00 |
| 36 | NENE, W2NE, W2, SE, | 596.02 |
| 37 | That part of irregular Section 37, otherwise known as the Emmanual Prudhomme entry within the limits of Sections 14 and 15 | 269.75 |

**TOWNSHIP 10 NORTH, RANGE 5 WEST, Louisiana PM**

| Section | Legal Description | Approx. Acreage |
|---------|-------------------|-----------------|
| 1 | W2NE, W2 | 405.72 |
| 2 | S2NE, N2NW, S2SW, SE | 398.75 |
| 3 | NE, NENW less and except 6 acres more particularly described as follows:  COMMENCING at a point 5 chains South of the Northwest corner of the NENW, run thence East 4 chains, thence South 15 chains, thence West 4 chains, thence North 15 chains to the point of beginning; NWNW, W2SENW, SESENW | 303.61 |
| 4 | N2NWNE, W2E2NW, W2NW, SW, NWSE, | 340.21 |
| 10 | NE, NENW less 12 acres in a square in the Northwest corner, and less 2.19 acres described as follows:  BEGINNING at the Northeast corner of the Wyatt 12 acre tract located in the Northwest corner of the NENW; thence South 10.95 chains to start; thence South 2 chains; thence West 10.95 chains, thence North 2 chains; thence East 10.95 chains to the point of beginning; SENW, E2SW, NWSW, SWSW less 4 acres in a square in the Southeast corner; W2SE less 1 acre in a square in the Northwest corner. | 461.41 |

## SERVITUDE 3

### KISATCHIE NATIONAL FOREST LANDS
### SUBJECT TO PETRO HUNT MINERAL SERVITUDES
### WHICH ARE HELD BY DRILLING
### AS OF MAY 1, 2005

**TOWNSHIP 10 NORTH, RANGE 5 WEST, Louisiana PM (continued)**

| Section | Legal Description | Approx. Acreage |
|---------|-------------------|-----------------|
| 11 | All less and except 2.71 acres located in the SWSE, which were quitclaimed to Couley Double Church and Cemetery Committee by deed dated November 2, 1988. | 639.49 |
| 12 | W2NE, NW, N2SW, W2SWSW, N2SESW, | 355.14 |
| 14 | N2NW | 80.05 |
| 15 | W2NE, E2NW, NWNW | 198.86 |
| 16 | NE less and except 1.62 acres described as follows:<br>Commencing at the Northeast corner of said Section 16, thence<br>S 35° 42' 13" W, a distance of 699.88 feet, to the Point of Beginning,<br>Thence S 41° 45' 42" E, a distance of 230.21 feet;<br>Thence S 19° 18' 00" W, a distance of 238.34 feet to the centerline<br>of an existing gravel road;<br>Thence N 47° 44' 22" W along said centerline, a distance of 329.47<br>feet, to the centerline of U.S. Hwy. 84;<br>Thence N 32° 11' 08" E along said centerline, a distance of 252.75 feet;<br>Thence S 41° 45' 42" E, a distance of 52.03 feet,<br>to the Point of Beginning. | 158.42 |

**TOWNSHIP 11 NORTH, RANGE 4 WEST, Louisiana PM**

| Section | Legal Description | Approx. Acreage |
|---------|-------------------|-----------------|
| 8 | S2NE, SWNW, SW, E2SE, W2W2SE, | 398.07 |
| 9 | SENW, S2 | 358.52 |

## SERVITUDE 3

### KISATCHIE NATIONAL FOREST LANDS
### SUBJECT TO PETRO HUNT MINERAL SERVITUDES
### WHICH ARE HELD BY DRILLING
### AS OF MAY 1, 2005

**TOWNSHIP 11 NORTH, RANGE 4 WEST, Louisiana PM (continued)**

| Section | Legal Description | Approx. Acreage |
|---|---|---|
| 10 | SWNE, S2NW, SWSW, SE less and except 2.88 acres described as follows:  Begin at the East one quarter corner of said Section 10, From said POB run:  S 0° 36' 08 " W, 400.53 feet to a point in the centerline of LA Hwy 501, thence with the meanders of the center-line of said highway three lines: | 314.52 |
| | N 58° 16' 28" W, 310.24 feet; | |
| | N 54° 23' 24" W, 211.04 feet; | |
| | N 50° 31' 57" W, 191.28 feet; thence | |
| | S 89° 18' 00" E, 588.70 feet to the point of beginning. | |
| 11 | N2NE, SWNE, SENE less 2 acres described as follows: Commencing at the Southeast corner of the SENE, thence run North along East line of same 121-28/47 yards to the point of beginning; thence Due North 98-19/47 yards; thence Due West 98-19/47 yards; thence Due South 98-19/47 yards; thence Due East 98-19/47 yards to the point of beginning; E2SW, NESE, W2SE, SESE less .80 acres described as follows:  Beginning at the SW corner of SESE, thence run North 3.50 chains; thence Due East 2.28 chains; thence Due South 3.50 chains; thence Due West 2.28 chains to the point of beginning. | 396.00 |
| 13 | W2W2 | 159.88 |
| 14 | NWNE, E2NW, SWNW, SW/4, SWSE less 10 acres off the East side. | 348.74 |
| 15 | W2NE, SENE, NW, NESW, SE | 477.60 |
| 16 | E2NE, SWNE, NENW, W2NW, NESE | 278.35 |
| 17 | All | 637.80 |

## SERVITUDE 3

### KISATCHIE NATIONAL FOREST LANDS
### SUBJECT TO PETRO HUNT MINERAL SERVITUDES
### WHICH ARE HELD BY DRILLING
### AS OF MAY 1, 2005

**TOWNSHIP 11 NORTH, RANGE 4 WEST, Louisiana PM (continued)**

| Section | Legal Description | Approx. Acreage |
|---|---|---|
| 18 | NE, SW | 316.18 |
| 19 | All | 631.77 |
| 20 | All | 638.64 |
| 21 | W2NE, W2, SE | 555.87 |
| 22 | N2NENE, SWNENE, W2NE, W2SENE, S/2 | 448.96 |
| 23 | NWNE, E2NW, NWNW, N2SWNW, SESWNW, SW | 349.34 |
| 24 | W2NW, SW | 239.11 |
| 25 | W2, SE | 477.27 |
| 26 | NWNE, N2SWNE, N2SENE, NENW, SENW less 5 acres off the East side, SW, W2NWSE, NWSWSE, S2SWSE, SESE | 404.33 |
| 27 | All | 639.64 |
| 28 | All | 635.24 |
| 29 | All | 637.92 |
| 30 | E2NE, N2NWNE, NWNW, NESW, S2SW, SE | 414.73 |
| 31 | E2NE, NWNE, NENW, W2NW, NWSW, SESW, E2SE, NWSE less 12 acres in a square in the SW corner, SWSE less 10 acres in a square in the Northwest corner | 453.62 |

## SERVITUDE 3

### KISATCHIE NATIONAL FOREST LANDS
### SUBJECT TO PETRO HUNT MINERAL SERVITUDES
### WHICH ARE HELD BY DRILLING
### AS OF MAY 1, 2005

**TOWNSHIP 11 NORTH, RANGE 4 WEST, Louisiana PM (continued)**

| Section | Legal Description | Approx. Acreage |
|---------|-------------------|-----------------|
| 32 | All | 638.00 |
| 33 | All | 634.20 |
| 34 | All | 639.68 |
| 35 | E2NE, NWNE, W2, NESE, | 477.72 |
| 36 | All | 635.88 |

**TOWNSHIP 10 NORTH, RANGE 4 WEST, Louisiana PM**

| Section | Legal Description | Approx. Acreage |
|---------|-------------------|-----------------|
| 1 | All | 645.76 |
| 2 | W2NE, E2NW | 158.18 |
| 3 | All | 649.45 |
| 5 | All | 643.40 |
| 6 | E2, E2NW, SWNW less and except 1.474 acres described as follows: Commencing at the Northwest corner of said SW, thence N 89° 55' E along the North line of said SW, a distance of 482.58 feet, to the centerline of U.S. Hwy. 84; thence S 61° 07' W along said centerline, a distance of 552.46 feet, to the West line of said SW, thence N 00° 15' E along said West line, a distance of 266.15 feet to the point of beginning; SW | 608.24 |
| 7 | All | 627.92 |

**TOTAL ACREAGE FOR SERVITUDE 3:**     **26,885.95**

## SERVITUDE 4

### KISATCHIE NATIONAL FOREST LANDS
### SUBJECT TO PETRO HUNT MINERAL SERVITUDES
### WHICH ARE HELD BY DRILLING
### AS OF JUNE 1, 2005

**TOWNSHIP 10 NORTH, RANGE 3 WEST, LOUISIANA PM**

| Section | Legal Description | Approx. Acreage |
|---|---|---|
| 25 | All | 635.76 |
| 26 | E2NE | 79.95 |
| 36 | E2, SESW | 357.01 |

**TOWNSHIP 9 NORTH, RANGE 3 WEST, LOUISIANA PM**

| | | |
|---|---|---|
| 1 | W2NE, W2, SE | 555.35 |
| 2 | S2SE | 79.67 |
| 11 | Fractional E2E2, NWNE, E2NW, SESW, SWSE | 253.34 |
| 37 | All | 566.37 |
| 12 | All | 174.00 |
| 13 | All | 638.64 |
| 14 | NE, N2SE, SESE | 280.74 |
| 22 | SENE, S2SW less 15.12 acres as described in deed between Grant Timber & Manufacturing Company of LA, Inc. and the U.S. dated January 28, 1934, and recorded in Book ZZ, Page 359 of Grant Parish; E2SE, NWSE less 11.80 acres as described in above referenced deed, SWSE | |
| 23 | SENE, E2NW, SWNW, S2 | 481.98 |

## SERVITUDE 4

### KISATCHIE NATIONAL FOREST LANDS
### SUBJECT TO PETRO HUNT MINERAL SERVITUDES
### WHICH ARE HELD BY DRILLING
### AS OF JUNE 1, 2005

**TOWNSHIP 9 NORTH, RANGE 3 WEST, LOUISIANA PM (continued)**

| Section | Legal Description | Approx. Acreage |
|---------|-------------------|-----------------|
| 24 | E2, E2NW, NWNW less 2.53 acres describes as follows: Begin at the Northwest corner of the section, thence run East along the North boundary line 113 yards, thence South 85 yards to the Northwest corner of the tract for a point of beginning, thence South 175 yards, thence East 70 yards, thence North 175 yards, thence West 70 yards to the point of beginning. | 637.23 |
| 25 | All | 642.00 |
| 26 | E2, NENW less 1 acre described as follows: Begin at the Northwest corner of the SENW and run due North 200 feet to to a point of beginning, run thence due east 210 feet; thence due north 210 feet, thence due West 210 feet; thence due South 210 feet to the point of beginning, W2NW, S2 | 600.88 |
| 27 | W2, SE | 481.92 |
| 34 | All | 641.20 |
| 35 | W2NE, W2, SE | 560.49 |
| 36 | NE, NENW, W2SW | 280.13 |

## SERVITUDE 4

### KISATCHIE NATIONAL FOREST LANDS
### SUBJECT TO PETRO HUNT MINERAL SERVITUDES
### WHICH ARE HELD BY DRILLING
### AS OF JUNE 1, 2005

**TOWNSHIP 10 NORTH, RANGE 2 WEST, LOUISIANA PM**

| Section | Legal Description | Approx. Acreage |
|---------|------------------|-----------------|
| 29 | SWNE, W2, W2SE, SESE excepting from these lands 10.07 acres of the Rock Island Arkansas and Louisiana Railroad Company right-of-way | 469.69 |
| 31 | NENE, S2N2, NWNW, S2 | 554.58 |
| 32 | E2E2, E2W2, SWNW | 354.19 |
| 33 | SWNW less 3.31 acres of the Rock Island Arkansas and Louisiana Railroad r-o-w, W2SW | 115.98 |

**TOTAL ACREAGE FOR SERVITUDE 4:**      **9,441.10**

## SERVITUDE 5

### KISATCHIE NATIONAL FOREST LANDS
### SUBJECT TO PETRO HUNT MINERAL SERVITUDES
### WHICH ARE HELD BY DRILLING
### AS OF JUNE 1, 2005

**TOWNSHIP 9 NORTH, RANGE 1 WEST, LOUISIANA PM**

| Section | Legal Description | Approx. Acreage |
|---|---|---|
| 3 | All | 634.44 |
| 4 | SENE, E2NW, S2NWNW, SWNW, NESW, S2SW, SE | 450.27 |
| 5 | N2NE less 3.78 acres in NWNE quitclaimed to Zion Baptist Church, by deed dated December 20, 1972, W2NWNW, S2NW, SW, S2SE | 407.03 |
| 6 | N2, N2SW, N2SWSW, SESWSW, SESW, SE | 614.25 |
| 7 | All | 638.24 |
| 8 | W2W2NW, NWSW | 79.38 |
| 9 | All less one acre described as follows: Commencing at a stake at the northeast corner of the NWNW, being the POB. Thence run West along the north boundary line of said section, 196.2 feet to a stake, thence South 204 feet to the north boundary line of the ROW of the L&A Railway Company, thence Southeasterly along said ROW line to the east line of the NWNW of Section 9, thence North along said east line 240 feet to the point of beginning. | 635.20 |
| 10 | NW, N2SW, W2SWSW, SE | 417.69 |
| 11 | All | 638.76 |
| 14 | NE, N2NW, E2SENW, SESW, N2SE less 2 acres in the southwest corner of the NESE as described in deed dated September 5, 1901, and recorded in CB "K", page 438 of the records of Grant Parish., W2SWSE | 400.01 |

Appx0273

## SERVITUDE 5

### KISATCHIE NATIONAL FOREST LANDS
### SUBJECT TO PETRO HUNT MINERAL SERVITUDES
### WHICH ARE HELD BY DRILLING
### AS OF JUNE 1, 2005

**TOWNSHIP 9 NORTH, RANGE 1 WEST, LOUISIANA PM (continued)**

| Section | Legal Description | Approx. Acreage |
|---------|-------------------|-----------------|
| 15 | N2, N2S2 | 479.25 |
| 16 | All | 637.20 |
| 17 | E2E2, S2S2NESW, W2SW, SESW, SWSE | 328.10 |
| 18 | NENW, South 5/8 of NWSW, S2S2 | 224.55 |
| 19 | All | 639.96 |
| 20 | All | 636.56 |
| 21 | All | 639.12 |
| 22 | S2S2NWNE, SWNE, S2SENE, NESENE, NWNENW, S2NENW, NWNW, S2NW, S2 | 548.11 |
| 23 | NE, NENW, S2NW, S2 | 601.20 |
| 24 | SWSW | 40.09 |
| 25 | NENE, NWNW, S2N2, S2 | 560.11 |
| 26 | All | 640.24 |
| 27 | All | 637.20 |
| 28 | All | 640.32 |
| 29 | All | 637.88 |
| 30 | NE, N2NW, SWNW, NWSE, SESE | 360.22 |

## SERVITUDE 5

### KISATCHIE NATIONAL FOREST LANDS
### SUBJECT TO PETRO HUNT MINERAL SERVITUDES
### WHICH ARE HELD BY DRILLING
### AS OF JUNE 1, 2005

**TOWNSHIP 9 NORTH, RANGE 1 WEST, LOUISIANA PM (continued)**

| Section | Legal Description | Approx. Acreage |
|---------|-------------------|-----------------|
| 31 | All | 641.76 |
| 32 | S2NE, E2NW, S2 | 479.67 |
| 33 | N2NE, SWNE, NENW, S2NW, SW | 400.50 |
| 34 | NENE, N2NWNE, SENWNE, NENW | 109.74 |
| 35 | N2N2, SENE | 220.00 |
| 36 | E/2, N/2 NW/4, E/2 SW/4 | 479.79 |

**TOWNSHIP 8 NORTH, RANGE 1 WEST, LOUISIANA PM**

| Section | Legal Description | Approx. Acreage |
|---------|-------------------|-----------------|
| 4 | E2, E2W2, NWNW, W2SW | 606.44 |
| 6 | NE, SENW, N2SW, SWSW less 2 acres in the southeast corner described as follows: Beginning in the southeast corner of said 40 acres, thence run North 20 rods, thence West 16 rods, thence South 20 rods, thence East 16 rods to the point of beginning, N2SE, SWSE | 438.30 |
| 18 | NWSW | 39.76 |

## SERVITUDE 5

### KISATCHIE NATIONAL FOREST LANDS
### SUBJECT TO PETRO HUNT MINERAL SERVITUDES
### WHICH ARE HELD BY DRILLING
### AS OF JUNE 1, 2005

**TOWNSHIP 9 NORTH, RANGE 2 WEST, LOUISIANA PM**

| Section | Legal Description | Approx. Acreage |
|---|---|---|
| 1 | All | 627.27 |
| 2 | NENE, N2NWSW, N2S2NWSW, S2S2 | 225.65 |
| 3 | N2, NESW, SE | 513.09 |
| 4 | NESE, S2SE | 117.39 |
| 5 | N2NW, SWNW, SW less 19.57 acres on the east side of the SW as shown on Exhibit 1 Map, being those lands conveyed to B. E. Melton by deed dated August 21, 1970. | 354.99 |
| 6 | E2 less 0.76 acres in SENE quitclaimed to Tyson Cemetery Committee by deed dated August 23, 1988 as described in Exhibit 2, NESW | 343.34 |
| 7 | Fractional S2S2 | 163.78 |
| 8 | E2E2, S2SW, SWSE | 280.26 |
| 37 | Part of Fractional Section 37, otherwise described as the N2S2 of Section 7 and the W2NE, NW, N2SW, NWSE of Section 8 | 496.76 |
| 9 | NWNE, S2NE, W2, SE | 595.91 |
| 10 | S2NW, S2 | 399.57 |
| 11 | N2NE, NENW, N2SENW, NWSW, S2S2, NWSE | 382.64 |
| 12 | NE, E2NW, N2SE, SESE | 361.30 |
| 13 | NENE, W2, SE | 521.46 |

## SERVITUDE 5

### KISATCHIE NATIONAL FOREST LANDS
### SUBJECT TO PETRO HUNT MINERAL SERVITUDES
### WHICH ARE HELD BY DRILLING
### AS OF JUNE 1, 2005

**TOWNSHIP 9 NORTH, RANGE 2 WEST, LOUISIANA PM (continued)**

| Section | Legal Description | Approx. Acreage |
|---------|-------------------|-----------------|
| 14 | All | 645.24 |
| 15 | All | 637.52 |
| 16 | All | 638.00 |
| 17 | All | 638.20 |
| 18 | N2, N2S2, S2SE | 526.12 |
| 19 | W2, W2SE, SESE | 414.15 |
| 20 | All | 637.60 |
| 21 | All | 638.00 |
| 22 | All | 637.34 |
| 23 | All | 644.00 |
| 24 | All | 642.20 |
| 25 | All | 642.60 |
| 26 | All | 642.80 |
| 27 | All | 638.32 |
| 28 | N2, SW, N2SE, SWSE | 598.50 |
| 29 | All | 636.80 |
| 30 | S2NW, NESW, N2SE, SESE | 226.52 |

**SERVITUDE 5**

**KISATCHIE NATIONAL FOREST LANDS
SUBJECT TO PETRO HUNT MINERAL SERVITUDES
WHICH ARE HELD BY DRILLING
AS OF JUNE 1, 2005**

**TOWNSHIP 9 NORTH, RANGE 2 WEST, LOUISIANA PM (continued)**

| Section | Legal Description | Approx. Acreage |
|---------|-------------------|-----------------|
| 31 | E2NE, NWNW, S2NW, N2SW, SESW, SE | 454.35 |
| 32 | N2, N2S2, SWSE | 518.70 |
| 33 | N2, NWSW, SESE | 399.62 |
| 34 | N/2, E/2 SW/4, SE/4 | 599.30 |
| 35 | All | 641.20 |
| 36 | NWNE, S2NE, NW, S2 | 600.94 |

**TOWNSHIP 8 NORTH, RANGE 2 WEST, LOUISIANA PM**

| Section | Legal Description | Approx. Acreage |
|---------|-------------------|-----------------|
| 1 | All | 635.75 |
| 2 | All | 645.44 |
| 3 | All | 640.40 |
| 4 | E2E2, SWNE, W2W2, SESW | 397.46 |
| 5 | E2, E2W2, SWNW, W2SW | 596.30 |
| 6 | NWNE, S2NE, E2NW, NESW, N2SE, SESE | 435.50 |
| 7 | All | 618.20 |
| 8 | N2, SW, NWSE, S2SE | 600.84 |
| 9 | N2, NESW, SWSW, SE | 557.02 |

## SERVITUDE 5

### KISATCHIE NATIONAL FOREST LANDS
### SUBJECT TO PETRO HUNT MINERAL SERVITUDES
### WHICH ARE HELD BY DRILLING
### AS OF JUNE 1, 2005

**TOWNSHIP 8 NORTH, RANGE 2 WEST, LOUISIANA PM (continued)**

| Section | Legal Description | Approx. Acreage |
|---------|-------------------|-----------------|
| 10 | NE, NENW, N2NWNW, E2SENW, E2W2SENW, S2NESE, SESE | 309.28 |
| 11 | NE, N2SW, SWSW, E2SE | 361.43 |
| 12 | N2NE, SWNE, W2, W2SE, SESE | 553.80 |
| 13 | NE, E2NW, SWNW, SW, N2SE, SWSE, and that part of the SESE lying north of Fish Creek | 586.91 |
| 14 | E2NE, W2NW, SW less 10 acres in the NWSW described as follows: Beginning at the northeast corner of the said NWSW, run South along the east line thereof 50 rods, thence West 32 rods, thence North 50 rods, thence East 32 rods, to the place of beginning, SE | 473.72 |
| 16 | N2, SW, NESE | 521.46 |
| 17 | N2, SW, W2SE, SESE | 603.30 |
| 18 | NE less 1 acre being near the northwest corner of said NE, as described in deed to White Chapel Church, by deed recorded in CB "M" Page 10, S2NW, SW, N2SE | 465.28 |
| 19 | All | 612.00 |
| 20 | N/2, NE/4 SW/4, SE/4 | 515.16 |
| 29 | W/2 NE/4, NW/4, N/2 SW/4 | 317.92 |
| 30 | E/2, W/2 NW/4, N/2 SW/4, SE/4 SW/4 | 499.34 |

## SERVITUDE 5

### KISATCHIE NATIONAL FOREST LANDS
### SUBJECT TO PETRO HUNT MINERAL SERVITUDES
### WHICH ARE HELD BY DRILLING
### AS OF JUNE 1, 2005

**TOWNSHIP 8 NORTH, RANGE 3 WEST, LOUISIANA PM**

| Section | Legal Description | Approx. Acreage |
|---|---|---|
| 1 | SWNE, W2, SE | 515.55 |
| 2 | All | 632.28 |
| 11 | N2, N2SW, SESW, SE | 599.77 |
| 12 | N2, N2SE | 397.85 |
| 13 | SESE | 39.78 |
| 14 | NWNE | 40.05 |
| 24 | S2NE, S2SW, SE | 318.04 |
| 25 | NE, S2NW, SW, N2SE, SWSE, W2SESE | 536.76 |

**TOTAL ACREAGE FOR SERVITUDE 5:**      36,123.98

# HUNT PETROLEUM CORPORATION
400 TRAVIS ST., SUITE 602
SHREVEPORT, LOUISIANA 71101-3163
(318) 221-2577

March 18, 1991

Ms. Ida Doup
Bureau of Land Management
Eastern States Office
350 South Pickett Street
Alexandria, Virginia  22304

Re:  April 10, 1991
     <u>Competitive Lease Sale</u>

Dear Ms. Doup:

Please be advised that Hunt Petroleum Corporation is the current owner of an undivided 16.80672% fee mineral interest under certain parcels that have been included in the BLM's April 10, 1991 Competitive Lease Sale.  Hunt Petroleum is also the owner of a leasehold working interest under the same parcels by virtue of an oil and gas lease covering an undivided 18.90756% fee mineral interest owned by Rosewood Resources, Inc.  The parcels are listed on the attached Exhibit "A".

Please withdraw the parcels from your April 10, 1991 sale.

Sincerely,

HUNT PETROLEUM CORPORATION

Bradford J. Russell
District Landman

BJR/sh
attachment

cc:  Ms. Delia Zarbashi
     Department of Agriculture
     U. S. Forest Service
     1720 Peachtree Street N.W.
     Atlanta, Georgia  30367

CERTIFIED MAIL - P25 7503695
RETURN RECEIPT REQUESTED

Appx0843

EXHIBIT "A"

**Parcel**

ES-310 – Note:   But only as to the S2S2 of Section 2, T9N-R2W,
                 Grant Parish, Louisiana.
ES-314 – Note:   But only as to the SWNW of Section 30, T9N-R2W,
                 Grant Parish, Louisiana.
ES-317 – Note:   But only as to the W2NW and SENW of Section 2, T9N-
                 R3W, Winn Parish, Louisiana.
ES-318
ES-319
ES-320
ES-321 – Note:   But only as to the SWSW of Section 23, T9N-R3W,
                 Winn Parish, Louisiana.
ES-323
ES-324
ES-325
ES-326
ES-327
ES-328
ES-329
ES-330
ES-331 – Note:   These lands are in Natchitoches Parish, Louisiana.
ES-332 – Note:   These lands are in Natchitoches Parish, Louisiana.
ES-333 – Note:   These lands are in Natchitoches Parish, Louisiana.
ES-334 – Note:   But only as to the SWSE and S2SW of Section 28,
                 T12N-R5W, Winn Parish, Louisiana.
ES-335 – Note:   These lands are in Natchitoches & Winn Parishes,
                 Louisiana.
ES-336 – Note:   These lands are in Natchitoches Parish, Louisiana.
ES-337
ES-338
ES-339
ES-341 – Note:   But only as to the NWSW of Section 6, T13N-R5W,
                 Winn Parish, Louisiana.
ES-342
ES-343 – Note:   But only as to the S2NWSE and W2NWNWSE of Section
                 13, T13N-R5W, Winn Parish, Louisiana.
ES-345
ES-346 – Note:   But only as to the E2NE of Section 19, T13N-R5W,
                 east of Saline Bayou, Winn Parish, Louisiana.
ES-347

**SENDER:** Complete items 1, 2, 3 and 4.
Put your address in the "RETURN TO" space on the reverse side. Failure to do this will prevent this card from being returned to you. The return receipt fee will provide you the name of the person delivered to and the date of delivery. For additional fees the following services are available. Consult postmaster for fees and check box(es) for service(s) requested.

1. ☐ Show to whom, date and address of delivery.
2. ☐ Restricted Delivery.

3. Article Addressed to:
Ms. Ida Doup
Bureau of Land Management
Eastern States Office
350 South Pickett Street
Alexandria

4. Type of Service:
☐ Registered  ☐ Insured
☒ Certified  ☐ COD
☐ Express Mail
Article Number: P25 7503695

Always obtain signature of addressee or agent and DATE DELIVERED.

5. Signature — Addressee:
X

6. Signature — Agent:
X

7. Date of Delivery

8. Addressee's Address (ONLY if requested and fee paid)

PS Form 3811, July 1983  447-845
DOMESTIC RETURN RECEIPT

---

P25  7503695

RECEIPT FOR CERTIFIED MAIL
NO INSURANCE COVERAGE PROVIDED—
NOT FOR INTERNATIONAL MAIL
(See Reverse)

SENT TO
IDA DOUP
STREET AND NO.

P.O. STATE AND ZIP CODE

| | | |
|---|---|---|
| POSTAGE | | $ .29 |
| CERTIFIED FEE | | 1.00 |
| SPECIAL DELIVERY | | |
| RESTRICTED DELIVERY | | |
| SHOW TO WHOM AND DATE DELIVERED | | 1.00 |
| SHOW TO WHOM, DATE, AND ADDRESS OF DELIVERY | | |
| SHOW TO WHOM AND DATE DELIVERED WITH RESTRICTED DELIVERY | | |
| SHOW TO WHOM, DATE AND ADDRESS OF DELIVERY WITH RESTRICTED DELIVERY | | |
| TOTAL POSTAGE AND FEES | | $ 2.29 |
| POSTMARK OR DATE | | |

3-18-91

PS Form 3800, Apr. 1976

---

**SENDER:** Complete items 1, 2, 3 and 4.
Put your address in the "RETURN TO" space on the reverse side. Failure to do this will prevent this card from being returned to you. The return receipt fee will provide you the name of the person delivered to and the date of delivery. For additional fees the following services are available. Consult postmaster for fees and check box(es) for service(s) requested.

1. ☐ Show to whom, date and address of delivery.
2. ☐ Restricted Delivery.

3. Article Addressed to:
Ms. Delia Zarbashi
Department of Agriculture
U. S. Forest Service
1720 Peachtree Street N.W.
Atlanta, Georgia  30367

4. Type of Service:
☐ Registered  ☐ Insured
☒ Certified  ☐ COD
☐ Express Mail
Article Number: P25 7503696

Always obtain signature of addressee or agent and DATE DELIVERED.

5. Signature — Addressee:
X

6. Signature — Agent:
X

7. Date of Delivery
3-10-91

8. Addressee's Address (ONLY if requested and fee paid)

PS Form 3811, July 1983  447-845
DOMESTIC RETURN RECEIPT

---

P25  7503696

RECEIPT FOR CERTIFIED MAIL
NO INSURANCE COVERAGE PROVIDED—
NOT FOR INTERNATIONAL MAIL
(See Reverse)

SENT TO
DELIA ZARBASHI
STREET AND NO.

P.O. STATE AND ZIP CODE

| | | |
|---|---|---|
| POSTAGE | | $ .29 |
| CERTIFIED FEE | | 1.00 |
| SPECIAL DELIVERY | | |
| RESTRICTED DELIVERY | | |
| SHOW TO WHOM AND DATE DELIVERED | | 1.00 |
| SHOW TO WHOM, DATE, AND ADDRESS OF DELIVERY | | |
| SHOW TO WHOM AND DATE DELIVERED WITH RESTRICTED DELIVERY | | |
| SHOW TO WHOM, DATE AND ADDRESS OF DELIVERY WITH RESTRICTED DELIVERY | | |
| TOTAL POSTAGE AND FEES | | $ 2.29 |
| POSTMARK OR DATE | | |

PS Form 3800, Apr. 1976

Reply to:  2820

Date: March 22, 1991

Bureau of Land Management
Eastern States Office
ATTN:  Francis Javes, Mineral Adjudication
350 South Pickett Street
Alexandria, Virginia  22304

Dear Ms. Javes:

We are in receipt of a copy of Hunt Petroleum Corporation's letter of March
18, 1991, where they claim an interest in a number of parcels on the Kis-
atchie National Forest.  These parcels are listed for auction on the April
10 sale.

I asked the Land/Mineral Staff Officer on the Forest, John Waddell, to dou-
ble check that both the acquisition date on these parcels was prior to 1940
and that there have been no wells drilled on them.  His information is that
evidence of wells being drill within the past five years was found for BLM
parcels #318 and #319.  Accordingly, we agree that these two tracts can be
taken off the sale; however, we believe that the Federal government owns
the mineral rights to all the other parcels and that they should be offered
in the sale.  A title opinion (6/20/86) by Patrick Murphy, Regional Attor-
ney, OGC, determined that the Federal government is the legal owner of
these lands.

If you have any additional concerns, please contact me at FTS 257-7884.

Sincerely,

KENN FRYE
Minerals Group Leader

cc:  Bradford Russell
     Hunt Petroleum Corporation
     400 Travis Street, Suite 602
     Shreveport, Louisiana  71101-3163

# HUNT PETROLEUM CORPORATION
### 400 TRAVIS ST., SUITE 602
### SHREVEPORT, LOUISIANA 71101-3163
### (318) 221-2577

**CERTIFIED MAIL — P 650 445 351**
**RETURN RECEIPT REQUESTED**

November 2, 1993

Bureau of Land Management
Eastern States Office
7450 Boston Boulevard
Springfield, Virginia   22153

Re:  Competitive Lease Sale
     November 9, 1993

Gentlemen:

Hunt Petroleum Corporation has received and reviewed the Notice of
Competitive Lease Sale for Oil and Gas to be held on November 9,
1993, in Springfield, Virginia.

Our review of the Lands Offered reveals the inclusion of certain
lands in which Hunt Petroleum Corporation, Placid Oil Company and
Rosewood Resources, Inc. are the present owners of the oil, gas and
mineral rights.  Said lands are listed in your proposed Lease Sale
under the Parcels set forth on Exhibit "A" attached hereto.

Therefore, Hunt Petroleum Corporation hereby demands that the Lands
Offered under the Parcels or portions thereof described on Exhibit
"A" be withdrawn from the Competitive Lease Sale referred to above.

If you have any questions, please feel free to call the undersigned
at (318) 221-2577.

Sincerely,

HUNT PETROLEUM CORPORATION

Bradford J. Russell
District Landman

BJR/vw
attachment

xc:  Ms. Delia Zarbashi-U. S. Forest Service

**HUNT PETROLEUM CORPORATION**
400 TRAVIS ST., SUITE 602
SHREVEPORT, LOUISIANA 71101-3163
(318) 221-2577

**CERTIFIED MAIL — P 246 377 191**
**RETURN RECEIPT REQUESTED**

April 4, 1994

Bureau of Land Management
Eastern States Office
7450 Boston Boulevard
Springfield, Virginia  22153

Re:  Competitive Lease Sale
April 28, 1994

Gentlemen:

Hunt Petroleum Corporation has received and reviewed the Amendments
to the Notice of Competitive Lease Sale for Oil and Gas to be held
on April 28, 1994 in Springfield, Virginia.

Be advised that Hunt Petroleum Corporation is the owner of an
undivided interest in the oil, gas and other minerals under the
parcel referred to as ES-160-04/94 LAES 46820 in your amended
Notice of Competitive Lease Sale.  Additionally, Hunt Petroleum
Corporation has acquired an oil and gas lease from Rosewood
Resources, Inc. covering its undivided interest in the oil, gas and
other minerals under the aforesaid parcel.

Because your inclusion of the aforesaid parcel in the April 28,
1994 Competitive Lease Sale places a cloud on our title, Hunt
Petroleum Corporation demands that the above mentioned parcel be
withdrawn from the Lease Sale.

Please advise the undersigned if you have any questions.

Sincerely,

HUNT PETROLEUM CORPORATION

Bradford J. Russell
District Landman

BJR/vw

3120(943)SB/TMB

DEC 1 0 1993

CERTIFIED NO.   P 010 178 861

**DECISION**

| | | |
|---|---|---|
| Hunt Petroleum Corporation | : | Oil and Gas |
| 400 Travis St., Suite 602 | : | |
| Shreveport, Louisiana  71101 | : | |
| | : | |
| Placid Oil Company | : | |
| 1601 Elm St., Suite 3800 | : | |
| Dallas, Texas  75201 | : | |

Protest Denied

Your protest was filed in this office November 5, 1993, requesting the withdrawal of certain parcels from the Eastern States Competitive Oil and Gas Lease Sale held November 9, 1993.

Title consent showing U.S. mineral ownership was received April 19, 1993 from the U.S. Forest Service for parcels ES-125, ES-127-136, ES-138, ES-140, and ES-141 covering lands in the Kisatchie National Forest, Louisiana.  Your protest indicates that the oil, gas and other mineral rights on the aforementioned parcels are presently owned by Placid Oil Company, Hunt Petroleum and Rosewood Resources, Inc.  However, no supporting documentation was submitted by you to justify removal of these parcels from the sale.

As a result of your protest, the Forest Service completed a further review and determined the minerals were in fact prescribed to the United States as stated in their April 19, 1993 title report. Therefore, your request for withdrawal of these parcels is hereby denied.

Subsequently, the parcels remained on the sale (43 CFR 3101.7-2(c)) and noncompetitive filings were received November 10, 1993 for parcels ES-125, ES-127-132, ES-134, ES-135, ES-140 and ES-141.

This decision may be appealed to the Interior Board of Land Appeals, Office of the Secretary, in accordance with the regulations contained in 43 CFR, Part 4 and the enclosed Form 1842-1.  If an appeal is taken, your notice of appeal must be filed in this office (at the letterhead address) within 30 days from receipt of this decision.  The appellant has the burden of showing that the decision appealed from is in error.

May 07 2009 3:44PM    HP LASERJET FAX    P.6

If you wish to file a petition (pursuant to regulation 43 CFR 4.21 (58 FR 4939, January 19, 1993) (request) for a stay (suspension) of the effectiveness of this decision during the time that your appeal is being reviewed by the Board, the petition for a stay must accompany your notice of appeal. A petition for a stay is required to show sufficient justification based on the standards listed below.

Copies of the notice of appeal and petition for a stay must also be sumitted to each party named in the decision and to the Interior Board of Land Appeals and to the appropriate Office of the Solicitor (see 43 CFR 4.413) at the same time the original documents are filed with this office. If you request a stay, you have the burden of proof to demonstrate that a stay should be granted.

<u>Standards for Obtaining a Stay</u>:  Except as otherwise provided by law or other pertinent regulation, a petition for a stay of a decision pending appeal shall show sufficient justification based on the following standards:  (1) The relative harm to the parties of the stay is granted or denied, (2) the likelihood of the appellant's success on the merits, (3) the likelihood of immediate and irreparable harm if the stay is not granted, and (4) whether the public favors granting the stay.

If an appeal is filed, the adverse party on whom you must also serve copies of your notice of appeal, statement of reasons, etc. is:

> Regional Forester
> Forest Service, Region 8
> U.S. Department of Agriculture
> 1720 Peachtree Road, N.W.
> Atlanta, Georgia 30367

*Ida V. Doup*

Ida V. Doup
Chief, Southern Adjudicative Section
Branch of Lands and Minerals Operations
Division of Operations

Enclosure

bc:  FS, Atlanta
     Jackson DO
943:SBeshir/TMBallard:12/9/93:440-1539:Protest

④

Case 1:00-cv-00512-FMA    Document 73-7    Filed 06/19/2009    Page 3 of 4

.APR 1 2 1994

*File Copy*
*S. Beshir*
*4/12/94*

3120(943)SB

CERTIFIED NO. P 852 292044

**DECISION**

| | | |
|---|---|---|
| Placid Oil Company | : | Oil and Gas |
| 1601 Elm St., Suite 3800 | : | |
| Dallas, Texas  75201 | : | |
| | : | |
| Hunt Petroleum Corporation | : | |
| 400 Travis St., Suite 602 | : | |
| Shreveport, LA  71101-3163 | : | |

**Protest Denied**

Your protest was filed in this office requesting the withdrawal of a parcel on the Eastern States Competitive Oil and Gas Lease Sale scheduled for April 28, 1994.

Title consent indicating U.S. mineral ownership for parcel ES-160 was received from the Forest Service dated January 12, 1994, covering lands in the Kisatchie National Forest. Your protest indicates that the oil, gas, and other mineral rights on the aforementioned parcel are presently owned by Placid Oil Company, Hunt Petroleum, and Rosewood Resources, Inc. However, no supporting documentation was submitted to justify removal of this parcel from the sale. Therefore, your request for withdrawal of this parcel is hereby denied.

This decision may be appealed to the Interior Board of Land Appeals, Office of the Secretary, in accordance with the regulations contained in 43 CFR, Part 4 and the enclosed Form 1842-1. If an appeal is taken, your notice of appeal must be filed in this office (at the letterhead address) within 30 days from receipt of this decision. The appellant has the burden of showing that the decision appealed from is in error.

If you wish to file a petition (pursuant to regulation 43 CFR 4.21 58 FR 4939, January 19, 1993) (request) for a stay (suspension) of the effectiveness of this decision during the time that your appeal is being reviewed by the Board, the petition for a stay must accompany your notice of appeal. A petition for a stay is required to show sufficient justification based on the standards listed below.

2

Copies of the notice of appeal and petition for a stay must also be submitted to each party named in the decision and to the Interior Board of Land Appeals and to the appropriate Office of the Solicitor (see 43 CFR 4.413) at the same time the original documents are filed with this office.  If you request a stay, you have the burden of proof to demonstrate that a stay should be granted.

**Standards for Obtaining a Stay:**  Except as otherwise provided by law or other pertinent regulation, a petition for a stay of a decision pending appeal shall show sufficient justification based on the following standards:  (1) The relative harm to the parties if the stay is granted or denied, (2) the likelihood of the appellant's success on the merits, (3) the likelihood of immediate and irreparable harm if the stay is not granted, and (4) whether the public favors granting the stay.

If an appeal is filed, the adverse party on whom you must also serve copies of your notice of appeal, statement of reasons, etc. is:

          Regional Forester
          Forest Service, Region 8
          U.S. Department of Agriculture
          1720 Peachtree Road, N.W.
          Atlanta, Georgia  30367

                    *Yondi M. Ballard*

          /s/ Ida V. Doup
              Chief, Southern Adjudicative Section
              Branch of Lands and Minerals Operations
              Division of Operations

Enclosure

bc:  FS, Atlanta
     Jackson DO
943:SBeshir:4/6/94:tjw:4/12/94:440-1538:Protest2

United States
Department of
Agriculture

Office of
General
Counsel

3201 Federal Building
Little Rock, AR   72201

January 8, 1986

TO:              Richard Fowler
                 Associate General Counsel
                 Community Development & Natural Resources
Division
                 Office of General Counsel, USDA
                 Washington, D. C.

                 Attention:   Clarence W. Brizee
                              Assistant General Counsel
                              Natural Resources Division

FROM:            Patrick C. Murphy, Regional Attorney
                 (Ref:  Joseph P. Stringer/FTS 740-5246)

SUBJECT:         Ownership of Mineral Rights In and To 264,900
                 Acres Located in the Kisatchie National Forest,
                 Louisiana

    We have been requested by the United States Forest Service
to advise them of the ownership status of mineral interests
underlying approximately 264,900 acres in the Kisatchie
National Forest, Louisiana.  Most of this acreage, purchased in
the 1930's, was burdened by outstanding or reserved mineral
interests when acquired by the United States.  Approximately
thirty (30) deeds provided for conveyance of mineral servitudes
or acknowledgement of outstanding mineral interests with
language of varying terms and specificity.  The legal issues
involved in ascertaining the rights of the United States to
these minerals have not been clearly resolved in over 40 years
of litigation.  As the value of these mineral rights is
considerable, we feel confident any assertion of ownership by
the United States will result in litigation.  The rental value
alone is $1 per acre per year.

    Louisiana law provides that ownership of minerals and
ownership of the surface cannot be divided to create two
separate estates.  When a surface owner desires to sell the
minerals underlying the property, a servitude is created in
favor of the grantee.  Frost-Johnson Lumber Co. v. Nabors Oil
and Gas Co., 149 La. 100, 88 So. 723 (1921).  A mineral
servitude is the right of enjoyment of land belonging to
another for the purpose of exploring for and producing minerals
and reducing them to possession and ownership.  Louisiana R.S.
31:21.  The servitude must be exercised by the grantee

Appx0862

10 years or the mineral rights revert to the owner of the
surface estate at the time of prescription. Louisiana R.S.
31:28.

For example, if A sells the mineral rights to B on January
1, 1930, B has until January 1, 1940, to exercise these rights
or they revert to A. If A sold the surface to C in 1935, and
he was the surface owner on January 1, 1940, C would then be
the owner of mineral rights. However, if on December 31, 1939,
B drilled a well on the tract, this drilling would interrupt
the running of the prescriptive period. Assuming that B capped
the well January 31, 1940, without production and no further
drilling occurred, the prescriptive period would run anew and
the minerals would prescribe to the owner of the surface on
February 1, 1950.

In 1940, the Louisiana Legislature passed Act 315 which
provides as follows:

Section 1. Be it enacted by the Legislature of Louisiana,
that when land is acquired by conventional deed or
contract, condemnation or expropriation proceedings by the
United States of America, or any of its subdivisions or
agencies, from any person, firm or corporation, and by that
act of acquisition, verdict or judgment, oil, gas and/or
other minerals or royalties are reserved, or the land so
acquired is by the act of acquisition conveyed subject to a
prior sale or reservation of oil, gas, and/or other
minerals or royalties, still in force and effect, said
right so reserved or previously sold shall be
inprescriptible.

Act 315 of 1940 was preceded by Act 151 of 1938, which
states:

When real estate is acquired by the United States of
America, the State of Louisiana, or any of its
subdivisions, from any person, firm, or corporation for use
in any public work and/or improvement, and, by the act of
acquisition, oil, and/or other minerals or royalties are
reserved, prescription shall not run against such
reservation of said oil, gas, and/or other minerals or
royalties.

The present version of these statutes is found at Louisiana
R.S. 31:149 and reads as follows:

When land is acquired from any person by the the United
States or the State of Louisiana or any subdivision or
agency of either by conventional deed or other contract or
by condemnation or expropriation proceedings and by act of

(2)

acquisition, order, or judgment, a mineral right otherwise subject to the prescription of nonuse is reserved, the prescription of nonuse shall not run against the right so long as title to the land remains in Government or any of its subdivisions or agencies. If, however, the land, or any part thereof, is transferred by the Government or subdivision or agency to a private owner, the prescription of nonuse shall apply as in the usual case but shall commence only from the date on which the act of acquisition by the private owner is filed for registry.

Act 151 of 1938 is applicable to the state and federal governments, but purports to make only reserved minerals or royalties inprescriptable. The impact of this Act on outstanding rights is unclear. While Act 315 of 1940 expressly covers outstanding and reserved mineral rights or royalties, it applies only to land acquisitions of the United States. This gives rise to the possibility that an arbitrary distinction may exist which would provide grounds for a denial of equal protection of the law. Louisiana R.S. 31:149-152 are intended to address these concerns.

It is the general rule of the Louisiana Courts that laws of prescription, just as statutes of limitation, are retrospective in application. State v. Alden Mills, 202 La. 416, 12 So. 2d 204 (1943); Shreveport Longleaf Lumber Co., Inc. v. Wilson, 195 La. 814, 197 So. 566 (1940). Statutes which either shorten or extend the period of prescription have been held subject to the legislative power so long as the period of time provided by the statute has not elapsed and the prescriptive bar made complete. Campbell v. Holt, 115 U.S. 620, 6 S.Ct. 209, 29 L. Ed. 483 (1885). Therefore, if Act 315 of 1940, which repealed the 1938 Act, is applied retrospectively, it would affect virtually all the conveyances involving these mineral rights. In Whitney National Bank v. Little Creek Oil Co., 212 La. 949, 33 So. 2d 693 (1947), the Louisiana Supreme Court held Act 315 of 1940 was retrospectively applicable.

In the United States v. Nebo Oil Co., Inc., 90 F. Supp. 73 (W.D. LA 1950), the District Court addressed the issue of whether Act 315 of 1940 was retrospectively applicable to acquisitions under the Weeks Act, 16 U.S.C.A. §§ 480, 500, 513, et seq. The court characterized the laws of prescription as remedial and affecting no substantive rights. Therefore, they "...are applicable to all actions instituted after they become effective even though the cause of action arose, or facts giving rise to the cause of action occurred, before the statute was enacted." 90 F. Supp. at 81. As the landowner's expectation that a mineral servitude will lapse within the prescribed period is nothing more than a mere expectancy or hope that the applicable laws of prescription will continue

(3)

without change, the Court found the United States had no vested property rights in the minerals and rejected the United States' contention that application of Act 315 would interfere with the use by the United States of its property and its right of disposal and regulation arising under Article IV, Sec. 3, Cl. 2 of the U. S. Constitution. 90 F. Supp. at 84; see Anadarko Production v. Caddo Parish School Board, 455 So. 2d 699 (La. App. 2d Cir. 1984).

As the United States and the state have "concurrent jurisdiction" over lands acquired for national forest purposes under the Weeks Law, 16 U.S.C. §§480, 500, 513, et seq., 521, 552, 563, Wilson v. Cook, 327 U.S. 474, 66 S. Ct. 663, 90 L. Ed. 793 (1946), the only question remaining for the District Court to decide in Nebo was whether the application of Act No. 315 of 1940 would interfere with the purposes for which the United States purchased the land in question. After discussion of applicable provisions of the Weeks Act (16 U.S.C. §518), and representations made by government officials during the period of acquisition, the Court concluded that Act 315 of 1940 did not interfere with the purposes for which the lands were acquired nor interfere with the obligations of contract. 90 F. Supp. at 92. The judgment was affirmed in United States v. Nebo Oil Co., Inc., 190 F. 2d 1003 (5th Cir. 1950).

The next challenge to Act 315 of 1940 was United States of America v. Leiter Minerals Inc., et al., 204 F. Supp. 560. (1962), which involved the determination of mineral rights to 8,711 acres in Louisiana acquired pursuant to the Migratory Bird Conservation Act. The District Court held that the mineral reservation in the deed to the United States established a servitude for a definite, fixed, and specified term and was not affected by Act 315 of 1940. The servitude expired by its own terms and the mineral rights reverted to the United States. The language creating the reservation provided in essence that the reservation would be extended beyond its initial 10-year period if certain events occurred.

On appeal, the issue was whether the mineral reservation provided for a contractual prescription for the conditioned extinguishment of the mineral servitude which was rendered inoperative by Act 315 of 1940. Leiter Minerals, Inc. v. United States, 329 F. 2d 85 (5th Cir. 1964). The Court of Appeals overturned the District Court's finding that the reservation was for a definite and certain period, and found that the period for which the servitude was established was indefinite and uncertain. 329 F. 2d at 93. The appeals court held that Act 315 of 1940 rendered the contractual prescription inoperative. However, upon being advised the case was settled, the Supreme Court vacated the Court of Appeals judgment in Leiter Minerals and remanded with instructions to dismiss the complaint as moot. 381 U.S. 413 (1965).

(4)

Appx0865

The decisions of Nebo and Leiter, accompanied by increasing interest in mineral development in Louisiana, set the stage for a third challenge to the retroactive application of Act 315 of 1940. The curtain call was answered in the United States v. Little Lake Misere Land Company, Inc., et al., 412 U.S. 580 (1972). The United States acquired two tracts in Louisiana pursuant to the Migratory Bird Conservation Act, 16 U.S.C.A. §715, et seq. One tract was acquired by deed in 1937, the other tract was acquired by condemnation in 1939.

In Little Lake Misere, the Supreme Court first determined whether state law governed the interpretation of a federal land acquisition authorized by the Migratory Bird Conservation Act. The acquisition bears heavily on and arises from a federal regulatory program. 412 U.S. at 592. There were no provisions in the Migratory Bird Conservation Act which provide a guide as to whether to choose state or federal law in interpreting federal land acquisition agreements under the Act. An earlier decision, Leiter Minerals, Inc. v. United States of America, et al., 329 F. 2d 85 (5th Cir. 1964), held that state law governs the interpretation of a federal land acquisition authorized by the Migratory Bird Conservation Act. In Little Lake Misere, the Supreme Court specifically disagreed with this holding and stated that without a provision of the Migratory Bird Conservation Act to guide the Court in choosing state or federal law in interpreting federal land acquisition agreements under the Act, the choice of law task is a federal task for federal courts as defined by Clearfield Trust v. U.S., 318 U.S. 363 (1943). 412 U.S. at 592. "In the absence of an applicable Act of Congress, it is for the federal courts to fashion the governing rule of law according to their own standards." 318 U.S. at 366, 367.

A potential argument is that since the Forest Service tracts were acquired pursuant to the Weeks Act, Little Lake Misere is not controlling as Act 315, which frustrated the purpose of the Migratory Bird Conservation Act, does not frustrate the purpose of the Weeks Act. The Weeks Act does not provide guidance as to whether to choose state or federal law in interpreting the federal land acquisition agreements under the Act. The language in 16 U.S.C. §715(e), providing for acquisition of lands subject to easements and reservations, is almost identical to the language at 16 U.S.C.A. §518, the corresponding provision in the Weeks Act. The Weeks Act is silent as to whether federal or state law is to be applied in interpreting federal land acquisitions under the Act. Land acquisitions under the Weeks Act will arise from and bear heavily on federal regulatory program. Such land acquisition agreements to which the United States is a party are explicitly authorized by the Weeks Act. A strong argument can be made that the choice of law task arising from disputes

(5)

Appx0866

involving federal land acquisitions under the Weeks Act is a federal task for federal courts. <u>Clearfield Trust</u>, <u>supra</u>; <u>Little Lake Misere</u>, <u>supra</u>.

Should the court find that the choice of law task arising from a dispute involving the mineral ownership to these properties does indeed involve a federal task, it is anticipated that the next argument will constitute whether the law to be applied will be state law or federal law. In <u>Little Lake Misere</u> the Supreme Court determined whether the 1937 and 1939 land acquisition agreements in issue should be interpreted according to "borrowed" state law, meaning Act 315 of 1940. The Court stated, "...even assuming in general terms the appropriateness of 'borrowing' state law, specific aberrant or hostile state rules do not provide appropriate standards for federal law." The court found that Act 315, as applied to land acquisitions explicitly authorized by the Migratory Bird Conservation Act, is:

> ...plainly hostile to the interests of the United States. As applied to a consummated land transaction which specifically defined conditions for prolonging the vendors mineral reservation, retroactive application of Act 315 to the United States deprives it of bargained for contractual interests. To permit state abrogation of the explicit terms of a federal land acquisition would deal a serious blow to the congressional scheme contemplated by the Migratory Bird Conservation Act and <u>indeed all other federal land acquisition programs</u>. 412 U.S. at 597. (Emphasis added.)

It is arguable that the contractual certainty the court finds indispensable to federal land acquisitions under the Migratory Bird Conservation Act is equally applicable to the federal land acquisition program authorized by the Weeks Act. Further, Act 315 is hostile to the interests of the United States when applied to land acquisitions under the Weeks Act consumated prior to its enactment which would deprive the United States of bargained for contractual interests. It is important to note that the Fifth Circuit in <u>Leiter</u> and <u>Nebo</u> rejected the Government's contract clause and supremacy clause objections. (Dicta in the <u>Nebo</u> decision indicated that the Court's decision would have been the same if it was a Fish and Wildlife acquisition. 90 F. Supp. at 97) However, the language of the Supreme Court decision in <u>Little Lake Misere</u> erodes the authority of the earlier decisions.

The Supreme Court further stated that "...our conclusion might be influenced if Louisiana's Act 315 of 1940, as applied retroactively, served legitimate and important state interests the fulfillment of which Congress might have contemplated

(6)

12/

through application of state law... And however legitimate the
State's interest in facilitating federal land acquisitions,
that interest has no application to transactions already
completed at the time of enactment of Act 315; the legislature
cannot facilitate transactions already consummated." 412 U.S.
at 599. The United States can contend that Act 315 of 1940,
the corresponding act of 1938, and the new provisions in the
mineral code do not serve any legitimate and important state
interests when applied to the land acquisition between private
or state landowners and the United States which were
consummated prior to the passage of said acts. See North
Dakota v. United States, 460 U.S. 300 (1983).

A party disputing the interests of the United States to the
minerals concerned will rely heavily upon the validity of
United States v. Nebo Oil, 90 F. Supp. 73 (W.D. LA 1950),
aff'd, 190 F. 2d 1003 (5th Cir. 1951). In Nebo Oil, the Fifth
Circuit upheld the application of Act 315 to acquisitions of
the United States similar to those involved in these 264,900
acres. The surface of the property was acquired pursuant to
the Weeks Act by the United States in 1936 for inclusion in the
Kisatchie National Forest. The deed to the United States
referred to outstanding mineral rights. The prior deeds
provided for the lapse of servitude by the 10-year nonuse
provision. After the running of the prescription period, the
United States sought judgment against Nebo Oil Co. declaring
the United States as surface owner to be owners of the
minerals. Nebo defended on the application of Act 315 and the
District Court at page 86 of their opinion stated:

> It thus appears that the acquisition of land subject to
> outstanding mineral reservations, either in the vendor or
> third parties, that was authorized by the Weeks law as
> amended, provided that the Commission and the Secretary of
> Agriculture found that such a reservation of minerals would
> not interfere with the use of the lands for national forest
> purposes. In the present case, therefore, since lands were
> acquired subject to the prior sale of oil, gas, and sulphur
> to a Good Pine Oil Company [Nebo Oils ancestor in title],
> the Commission and the Secretary of Agriculture must
> necessarily have found that the ownership of minerals by
> Good Pine Oil Company would not interfere with the use of
> the land for the purposes for which it was acquired.

The District Court then held that Act 315 of 1940 was
applicable to sales made to the United States prior to, but
within 10 years of, the effective date of Act 315.

This is contrary to the Supreme Court's finding in Little
Lake Misere, where Chief Justice Burger stated, "Since Act 315
is plainly not in accord with the federal program implemented

(7)

Appx0868

by the 1937 and 1939 land acquisition, state law is not a
permissible choice here."  412 U.S. at 604.  It is therefore
arguable that <u>Nebo</u> is no longer valid law in light of <u>Little
Lake Misere</u>.

This contention is further supported by the commentary
following Louisiana R.S. 31:149, the Louisiana Mineral Code
section which is the present version of Act 315 of 1940.  The
comments state as follows:

> Act 315 of 1940, repealing prior legislation on the same
> subject, was held to be retrospectively applicable in
> <u>Whitney National Bank v. Little Creek Oil Co.</u>, 212 La. 949,
> 33 So. 2d 693 (1947).  It was held constitutional in <u>United
> States v. Nebo Oil Co.</u>, 190 F. 2d 1003 (5t Cir. 1951).  The
> retrospective application of the statute has, however, been
> rejected by the United States Supreme Court in the case of
> an acquisition deemed by it to arise from and bear heavily
> on a federal regulatory program.  <u>U.S. v. Little Lake
> Misere Land Co.</u>, 412 U.S. 580 (1973).  The statute was
> described as plainly hostile to the interest of the United
> States, and its future application is cast into deep
> doubt.  The remaining comments in Articles 149-152 are
> based on the assumption of validity and continued
> application of the statute at least to conveyances
> subsequent to 1940.

The Forest Service has reviewed the acquisition records for
the Kisatchie National Forest and determined that 264,900 acres
of land are subject to outstanding or reserved mineral rights,
252,200 acres were acquired prior to the passage of Act 315 of
1940, approximately 12,000 acres with outstanding or reserved
mineral rights were acquired after 1940.  Our office has
reviewed approximately 20 deeds conveying the surface to the
United States where mineral rights are outstanding or
reserved.  The deeds vary in the language which grant the
outstanding or reserved mineral interest, some are for a
specific period of time, some refer to the 10-year prescriptive
period, and some are silent as to when the mineral rights will
revert to the landowner.  In reviewing these deeds, it is
important to note that Louisiana R.S. 31:3 provides that
individuals may renounce or modify what is established in their
favor if such action does not affect the rights of others and
is not contrary to the public good.  We are attaching
representative samples for your examination.

Based on our analysis, we believe it is in the best
interests of the United States to assert interest to the
minerals underlying the lands concerned.  While the arguments
for United States ownership of the minerals are stronger for
those lands acquired prior to the passage of Act 315 of 1940,

12/13/02  FRI 12:08  [TX/R



we feel other grounds exist which support a claim for mineral
ownership of the 12,000 acres acquired after 1940.  In Justice
Renquist's concurrence in the Little Lake Misere case he
indicated that Act 315 of 1940 discriminated against the
interest of the United States stating:

> Implicit in the holdings of a number of our cases dealing
> with state taxation and regulatory measures applied to the
> federal government is that measures must be
> nondiscriminatory.  See, e.g., James v. Dravo Contracting
> Co., 302 U.S. 134 (1937); New York v. United States, 326
> U.S. 572 (1946); RFC v. Beaver County, 328 U.S. 204, 210
> (1946).

> The doctrine of intergovernmental immunity enunciated in
> McCulloch v. Maryland, 4 Wheat 316 (1819), however it may
> have evolved since that decision, requires at least that
> the United States be immune from discriminatory treatment
> which in some manner interferes with the execution of
> federal laws.  If the State of Pennsylvania could not
> impose a nondiscriminatory property tax on the propery
> owned by the United States, United States v. Allegheny
> County, 322 U.S. 174 (1944), a fortiori, the State of
> Louisiana may not enforce Act 315 against the property of
> the United States involved in this case.

It is anticipated that assertion of these mineral interests
will precipitate future litigation; however, due to the
potential value of these minerals as well as the unresolved
questions involving the applicability of Act 315 and other
Louisiana statutes discussed, we feel that the risk involved in
litigation are well worth the potential benefits in the event
of a favorable decision.

We invite your review and comments on this discussion.

Enclosures (Under separate cover)

Sent by telecomm.

IN THE UNITED STATES COURT OF FEDERAL CLAIMS

| | | |
|---|---|---|
| **PETRO-HUNT, L.L.C.** | ) | |
| | ) | |
| **Plaintiff,** | ) | |
| | ) | **No. 00-512-L** |
| **v.** | ) | |
| | ) | **Honorable Francis M. Allegra** |
| **UNITED STATES OF AMERICA,** | ) | |
| | ) | |
| **Defendant** | ) | |

\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*

## SUPPLEMENTAL AND AMENDING AFFIDAVIT
## CONCERNING INTRUSIVE OIL, GAS AND MINERAL LEASES

KNOW ALL MEN BY THESE PRESENTS THAT, before the undersigned Notary

Public, personally came and appeared:

> **DANIEL C. HUGHES,** Attorney at Law, Lafayette, Louisiana,
> whose business address is 126 Heymann Boulevard, Lafayette,
> Louisiana 70503;

after being duly sworn, affiant swears and avers to the following:

I have examined title abstracts provided by Gremillion Abstract Company of

Lafayette, Louisiana and all discovery provided by the United States of America in the

matter of *Petro-Hunt, L.L.C., et al vs. United States of America* in the United States Civil

District Court of the Western District of Louisiana, Shreveport Division, Civil Action No.

CV00-0303 "S".

In connection with Judge Allegra's comments at hearing held on April 9, 2009, I have supplemented and amended my prior Affidavit herein to answer the Judge's queries.

From my review of these records, I determined that the United States of America acquired approximately 185,000 acres of property for forest service purposes in which Bodcaw Lumber Company of Louisiana, Inc. and/or Grant Timber and Manufacturing Company conveyed said lands to the United States of America. When Bodcaw Lumber and Grant Timber conveyed said lands, during the 1930's, to the United States, the transfers and conveyances were subject to the mineral reservations affecting same lands in perpetuity.

Various transfers to Good Pine Oil Company, Inc., of which Petro-Hunt, L.L.C. is a successor in title from OXY USA and Placid Oil Company, as of April 6, 1998, created twenty-one (21) separate mineral servitudes in Natchitoches Parish, fifteen (15) separate mineral servitudes in Grant Parish and sixty (60) mineral servitudes in Winn Parish, for a total of ninety-six (96) separate mineral servitudes (based upon non contiguous lands) totaling approximately 185,000 acres. In order to enumerate the number of servitudes as to contiguous versus non-contiguous lands, I have relied upon Louisiana's Mineral Code (La. R.S. 31:62-66). Article 64 states: "An act creating mineral servitudes on non-contiguous tracts of land creates as many mineral servitudes as there are tracts unless the act provides for more." The Louisiana Supreme Court set the definition of "contiguous" lands in 1923, which remains the definition to this date. In the case of *Lee vs. Giaugue*, 97 So.2d 669 )La. 1923) the court defined contiguous lands as this:

> to constitute a single tract of land, the lands must be so situated
> that one may pass from one point to the other without passing

- 2 -

> over the lands of another. But, as it is impossible to pass through a mere point, two sections (of land) do not constitute a single tract because the Southwest point of one is the Northeast point of the other.

By a (Partial Consent) Judgment in the above referenced civil action of the United States District Court of the Western District of Louisiana, five (5) mineral servitudes comprising a total of 109,844.53 acres were described and had been held by the constant interruption of the prescription of non-use in accordance with the Louisiana Mineral Code. However, no stipulation or determination concerning dates of termination by liberative prescription was made of the remaining ninety-one (91) mineral servitudes, except to determine that such servitudes terminated by non-use because no operations or production occurred for a period of ten (10) years prior to my examination of a Mineral History Report prepared by Lyle Gremillion in November, 2005. Of these five (5) subsisting mineral servitudes, the United States of America has granted ten (10) intrusive leases for oil and gas affecting Servitude No. 2 (containing approximately 33,000 acres) and ten (10) intrusive leases for oil and gas affecting Servitude No. 5 (containing approximately 36,000 acres) as follows:

THE FOLLOWING INTRUSIVE MINERAL LEASES AFFECTED MINERAL SERVITUDE NO. 2:

1.  LAES No. 046315
    Date:         February 1, 1994
    Lessee:       John P. Strang, 35 Sutton Place, New York, New York 10022
    Description:  West half of the Northeast Quarter and the East half of the Northwest Quarter and the South half of the Southeast Quarter of Section 18, Township 13 North, Range 5 West, East of Saline Bayou, Winn Parish, Louisiana, containing 426.74 acres.

- 3 -

2.  LAES No. 046318
    Date:        February 1, 1994
    Recorded:    July 30, 1997 in OGM Book 136 , page 816, Entry No. 167061,
                 records of the Clerk of Court of Winn Parish, Louisiana.*
    Lessee:      John P. Strang, 35 Sutton Place, New York, New York 10022
    Description: The West half of the Southwest Quarter less and except five (5) acres
                 in the Southeast corner and the Northeast Quarter of the Northeast
                 Quarter of the Southeast Quarter of Section 27 of Township 13 North,
                 Range 5 West, Winn Parish, Louisiana, containing 84.75 acres.

    * This lease is the only Instrusive Lease recorded in the public records.

3.  LAES No. 038227
    Date:        August 1, 1983
    Lessee:      Texaco Production, Inc., Post Office Box 457, New Iberia, Louisiana
                 70561
    Description: Section 25 of Township 12 North, Range 5 West, Winn Parish,
                 Louisiana, containing 624.51 acres.

4.  LAES No. 043575
    Date:        September 1, 1991
    Lessee:      Gulf Coast Oil and Gas Company, Post Office Box 30169, Pensacola,
                 Florida 32503

    Description: Tract No. C-107 East of Saline Bayou located in Section 5 of
                 Township 12 North, Range 5 West, Winn Parish, Louisiana, containing
                 224 acres.

5.  LAES No. 047595
    Date:        February 1, 1996
    Lessee:      UMC Petroleum, 1201 Louisiana Street, Houston, Texas 77002
    Description: The West half of the Southeast Quarter of the Northeast Quarter; the
                 Northeast Quarter of the Southwest Quarter of the Northeast Quarter;
                 the South half of the Northwest Quarter of the Northwest Quarter; the
                 Southwest Quarter of the Northwest Quarter; the West half of the
                 Southwest Quarter; the Southeast Quarter of the Southwest Quarter;
                 the Northeast Quarter of the Southeast Quarter; and the South half of
                 the Southeast Quarter of Section 34 of Township 12 North, Range 5
                 West, Winn Parish, Louisiana, containing 330.33 acres.

- 4 -

6.   LAES No. 047978
     Date:        August 9, 1996
     Lessee:      Palmer Petroleum, Inc., 401 Edwards Street, Suite 1400, Shreveport,
                  Louisiana 71101
     Description: The South half of the Southwest Quarter and the Southwest Quarter of
                  the Southeast Quarter of Section 28 of Township 12 North, Range 5
                  West, Winn Parish, Louisiana, containing 158.44 acres.

     Note: This Lease also affects the Northeast Quarter of the Southeast Quarter of
           Section 28, Township 12 North, Range 5 West, which lies outside of
           Servitude No. 2.

7.   LAES No. 048636
     Date:        February 24, 1997
     Lessee:      High Plains Associates, Inc., 1557 Ogden Street #300, Denver,
                  Colorado 80218
     Description: That part of Section 33 of Township 12 North, Range 5 West, lying
                  East of Saline Bayou, Winn Parish, Louisiana, containing
                  approximately 330 acres affecting the servitude.

     Note: This Lease also covers several tracts of land lying in Sections 18, 19, 30, 31,
           32 and 33 of Township 12 North, Range 5 West, Natchitoches Parish,
           Louisiana, which lies West of the boundary of Servitude No. 2.

8.   LAES No. 046310
     Date:        January 26, 1994
     Lessee:      Howell R. Spear, P.O. Box 30169, Pensacola, Florida 32503
     Description: The Northeast Quarter of the Southwest Quarter; the South Half of the
                  Southwest Quarter East of Saline Bayou; and the Southwest Quarter of
                  the Southeast Quarter of Section 7, Township 13 North, Range 5 West,
                  Winn Parish, Louisiana, containing 158.20 acres.

9.   LAES No. 046312
     Date:        January 26, 1994
     Lessee:      Howell R. Spear, P.O. Box 30169, Pensacola, Florida 32503
     Description: The South Half of the Northeast Quarter; the Northeast Quarter of the
                  Northwest Quarter; the South Half of the Northwest Quarter; the North
                  Half of the Southwest Quarter; the Southeast Quarter of the Southwest
                  Quarter; and the Southeast Quarter of Section 14, Township 13 North,
                  Range 5 West, Winn Parish, Louisiana, containing 480.30 acres.

- 5 -

Appx1065

10.  LAES No. 046313
     Date:        January 27, 1994
     Lessee:      Howell R. Spear, P.O. Box 30169, Pensacola, Florida 32503
     Description: The West Half of the Northwest Quarter of Section 15, Township 13
                  North, Range 5 West, Winn Parish, Louisiana, containing 80.06 acres.

     THEREFORE, THESE TEN (10) LEASES AFFECTED 2,897.33 ACRES FROM
THE TOTAL APPROXIMATELY 33,000 ACRE SERVITUDE (NO. 2).


     THE FOLLOWING INTRUSIVE MINERAL LEASES AFFECTED SERVITUDE
NO. 5:

1.   LAES No. 048454
     Date:        January 8, 1997
     Lessee:      First Texas Hydrocarbon Company, 791 Sawdust Road #309, The
                  Woodlands, Texas 77380
     Description: The West half; the Southwest Quarter of the Northeast Quarter; and the
                  Southeast Quarter of the Southeast Quarter of Section 29 of Township
                  10 North, Range 2 West, Grant Parish, Louisiana, containing
                  approximately 400 acres affecting the servitude.

     Note:  This Lease also affects lands located in Sections 20, 21 and 28 and the West
            half of the Southeast Quarter of Section 29, which lie outside the boundaries
            of Servitude No. 5.

2.   LAES No. 047279
     Date:        August 1, 1995
     Lessee:      Justiss Oil Company, Inc., Post Office Box 2990, Jena, Louisiana
                  71342
     Description: The Southeast Quarter of the Southeast Quarter of Section 10 of
                  Township 8 North, Range 2 West, Grant Parish, Louisiana, containing
                  approximately 40 acres affecting the servitude.

     Note:  This Lease also affects lands lying in Sections 4, 9 and other lands located in
            the Southwest Quarter and the South half of the Northeast Quarter of the
            Southeast Quarter of Section 10, but said lands lie outside the boundaries of
            Servitude No. 5.

- 6 -

Appx1066

3.   LAES No. 047294
     Date:          August 1, 1995
     Lessee:        Justiss Oil Company, Inc., Post Office Box 2990, Jena, Louisiana
                    71342
     Description:   The West half of the Northwest Quarter of Section 30 of Township 8
                    North, Range 2 West, Grant Parish, Louisiana, containing
                    approximately 80 acres affecting the servitude.

     <u>Note</u>:  This Lease also affects lands lying in Section 29 and in the East half of the
                    Northwest Quarter of Section 30 of Township 8 North, Range 2 West lying
                    outside the boundaries of Servitude No. 5.


4.   LAES No. 049469
     Date:          May 1, 1998
     Lessee:        Jack McKenzie, 923 S. 13th Street, Oxford, Mississippi 38655
     Description:   Tract C-153 A, lying in Section 30 of Township 8 North, Range 2
                    West, Grant Parish, Louisiana, containing approximately 80 acres.

     <u>Note</u>:  The description of properties leased is difficult to ascertain. However, since
                    the above referenced Lease to Justiss Oil Company covered all of the open
                    acreage in the East half of the Northwest Quarter of Section 30 of Township
                    8 North, Range 2 West, except the Southwest Quarter of the Southwest
                    Quarter, I believe that in all probability this Lease is intrusive upon Servitude
                    No. 5.


5.   LAES No. 049674
     Date:          August 1, 1998
     Lessee:        J. Bradley Jeffreys, 3749 Texas Street, San Diego, California 92104
     Description:   The Southeast Quarter of the Southwest Quarter of Section 11 and the
                    Northwest Quarter of the Northeast Quarter of Section 14 of Township
                    8 North, Range 2 West, Grant Parish, Louisiana, containing
                    approximately 80 acres.

     <u>Note</u>:  This Lease also affects the Southwest Quarter of the Southeast Quarter of
                    Section 11 and the Northeast Quarter of the Northwest Quarter of Section 14
                    of Township 8 North, Range 2 West, which lie outside the boundaries of
                    Servitude No. 5.

- 7 -

6.  LAES No. 050853
    Date:        October 24, 2000
    Lessee:      McGinty-Durham, Inc., Post Office Box 7979, Alexandria, Louisiana
                 71306
    Description: The West half of the Northwest Quarter of Section 17 and the
                 Southeast Quarter of the Northwest Quarter of the Northeast Quarter
                 (less and except 1 acre) of Section 18, Township 8 North, Range 2
                 West, Grant Parish, Louisiana, containing 239 acres.

7.  LAES No. 009684
    Date:        February 1, 1973
    Lessee:      Placid Oil Company, c/o Oxy Petroleum, Post Office Box 300, Room
                 2431, Tulsa, Oklahoma 74102
    Description: The Northeast Quarter of the Southeast Quarter of the Northwest
                 Quarter of Section 22 of Township 9 North, Range 1 West and the
                 Southwest Quarter of the Southwest Quarter of Section 28 of
                 Township 9 North, Range 1 West, Grant Parish, Louisiana, containing
                 approximately 50 acres affecting the servitude.

    Note:  This Lease covered several other Tracts located in Sections 1, 12, 13 and 22
           of Township 9 North, Range 1 West, but I conclude that it has expired.

8.  LAES No. 037729
    Date:        July 1, 1988
    Lessee:      Hogan Exploration, Inc., 221 Wall Street, Columbia, Louisiana 71418
    Description: The Southwest Quarter of the Northwest Quarter of Section 20 of
                 Township 9 North, Range 2 West, Grant Parish, Louisiana, containing
                 approximately 40 acres affecting the servitude.

    Note:  This Lease also affects lands located in Section 18 and 19 of Township 9
           North, Range 2 West, lying outside the boundaries of the Servitude No. 5, but
           I conclude that it has expired.

9.  LAES No. 045714
    Date:        March 11, 1993
    Lessee:      Hogan Energy Corp., 221 Wall Street, Columbia, Louisiana 71418
    Description: The Northwest Quarter of the Southeast Quarter of Section 19,
                 Township 9 North, Range 2 West, Grant Parish, Louisiana, containing
                 40 acres affecting the servitude.

- 8 -

<u>Note</u>: This Lease also affects the Northeast Quarter of the Southeast Quarter of Section 19, Township 9 North, Range 2 West, lying outside the boundaries of Servitude No. 5, but I conclude that it has expired.

10.    LAES No. 047280
      Date:         July 17, 1995
      Lessee:     Justiss Oil Company, Inc., P.O. Box 2990, Jena, Louisiana 71342
      Description: The Southwest Quarter of the Southwest Quarter of Section 11; the South Half of the Northeast Quarter and the Northeast Quarter of the Southeast Quarter of Section 12; 12.41 acres in the Southeast Quarter of the Southeast Quarter North of Fish Creek in Section 13; and the West Half of the Northwest Quarter and part of the South Half in the Southwest Quarter of Section 14, all of Township 8 North, Range 2 West, Grant Parish, Louisiana containing approximately 332.41 acres.

<u>Note</u>: This Lease also affects other lands not affecting the Servitude Tracts.

THEREFORE, THESE TEN (10) LEASES AFFECTED 1,381.41 ACRES FROM THE TOTAL 36,000 ACRE SERVITUDE (NO. 5).

In addition, prior to or at the time of the commencement of the above referenced suit in the United States District Court of the Western District of Louisiana under Civil Action No. CV00-0303 "S', the United States had granted the following intrusive Oil, Gas and Mineral Leases affecting twenty-five (25) of the additional ninety (90) mineral servitudes above referenced, which were not a part of the five (5) contiguous mineral servitudes held by operations and/or production. The following forty-seven (47) intrusive Oil, Gas and Mineral Leases affected 13,399.63 total acres affecting twenty-five (25) servitudes comprising 16,944.76 of the remaining ninety (90) servitudes:

- 9 -

1.    LAES No. 44194

On July 1, 1991, the United States Department of Interior, Bureau of Land Management, granted an Offer to Lease and Lease for Oil and Gas to John P. Strang, affecting the Northeast Quarter of Section 27 of Township 9 North, Range 3 West, affecting 160.64 acres of the Petro-Hunt minerals ( a single servitude).

2.    LAES No. 49126

On July 1, 1997, the United States granted a Lease for Oil and Gas to Oscar C. Forland affecting 19.83 acres located in the West Half of the Southeast Quarter of the Southeast Quarter of Section 3 of Township 9 North, Range 3 West (a single servitude).

On December 1, 1997, the United States of America, through its Department of Interior, Bureau of Land Management, granted forty-five (45) Oil, Gas and Mineral Leases to Snyder Oil Corporation of Fort Worth, Texas, as follows:

1.    LAES No. 49127
      Description:  Northwest Quarter of the Northeast Quarter of Section 7, Township 9 North, Range 3 West, Winn Parish, Louisiana, containing 37.09 acres (comprises 1 sole servitude).

2.    LAES No. 49131
      Description:  All of Section 3 of Township 9 North, Range 5 West, Winn Parish, Louisiana, containing 634.45 acres from a 3,314 acre servitude.

3.    LAES No. 49132
      Description:  West Half of the Northwest Quarter; East Half of the Northeast Quarter and the Southwest Quarter of Section 4, Township 9 North, Range 5 West, Winn Parish, Louisiana, containing 314.78 acres from the same 3,314 acre servitude as that referenced under Lease No. 2 previously.

4.    LAES No. 49133
      Description:  The East Half and the East Half of the Southwest Quarter of Section 5, Township 9 North, Range 5 West, Winn Parish, Louisiana, containing 392.88 acres from the same 3,314 acre servitude as that referenced under Lease Nos. 2 and 3.

- 10 -

Appx1070

5.    LAES No. 49135
      Description: The East Half of Section 8, Township 9 North, Range 5 West, Winn
                   Parish, Louisiana containing 320.44 acres from the same 3,314 acre
                   servitude as that referenced under Lease Nos. 2, 3 and 4.

6.    LAES No. 49136
      Description: All of Section 9 of Township 9 North, Range 5 West, Winn Parish,
                   Louisiana containing 636 acres from the same 3,314 acre servitude as
                   that referenced under Lease Nos. 2, 3, 4 and 5.

7.    LAES No. 49134
      Description: The Northeast Quarter of Section 7, Township 9 North, Range 5 West,
                   Winn Parish, Louisiana containing 151.4 acres (a single servitude).

8.    LAES No. 49137
      Description: The North Half; the Southwest Quarter; and the Southwest Quarter of
                   the Southeast Quarter of Section 11, Township 9 North, Range 5 West,
                   Winn Parish, Louisiana containing 517.07 acres (a single servitude).

9.    LAES No. 49138
      Description: The North Half of the Southwest Quarter and the Southwest Quarter
                   of the Southwest Quarter of Section 16, Township 9 North, Range 5
                   West, Winn Parish, Louisiana, containing 119.40 acres from a 387.25
                   acre servitude.

10.   LAES No. 49140
      Description: West Half of the Northwest Quarter and the West Half of the
                   Northwest Quarter of the Northeast Quarter of the Northwest Quarter
                   and the Southwest Quarter of Section 21, Township 9 North, Range 5
                   West, Winn Parish, Louisiana, containing 248.02 acres from the same
                   387.25 acre servitude referenced under Lease No. 9 above.

11.   LAES No. 49143
      Description: The North Half of the Northwest Quarter of the Northwest Quarter of
                   Section 28, Township 9 North, Range 5 West, Winn Parish, Louisiana,
                   containing 19.85 acres from the same 387.25 acre servitude referred to
                   in Lease Nos. 9 and 10 above.

12.   LAES No. 49139
      Description: The East Half of the Southwest Quarter and the West Half of the
                   Southeast Quarter, Section 20, Township 9 North, Range 5 West, Winn
                   Parish, Louisiana containing 160 acres (a single servitude).

- 11 -

13.  LAES No. 49141
     Description:  South Half of the Northeast Quarter of the Southwest Quarter and the
                   Southeast Quarter of the Southwest Quarter of Section 22, Township
                   9 North, Range 5 West, Winn Parish, Louisiana, containing 59.81
                   acres from a 389.8 acres servitude.

14.  LAES No. 49142
     Description:  The North Half of the North Half , the Southeast Quarter of the
                   Northwest Quarter and the Southeast Quarter of the Northeast Quarter
                   of Section 27, Township 9 North, Range 5 West, Winn Parish,
                   Louisiana, containing 240 acres from the same 389.8 acre servitude
                   referred to in Lease No. 13 above.

15.  LAES No. 49144
     Description:  The North Half of the Southeast Quarter and the Southeast Quarter of
                   the Southeast Quarter of Section 30, Township 9 North, Range 5 West,
                   Winn Parish, Louisiana, containing 116.57 acres (a single servitude).

16.  LAES No. 49145
     Description:  The Northeast Quarter of Section 25 of Township 9 North, Range 6
                   West, Winn Parish, Louisiana, containing 161.23 acres (a single
                   servitude).

17.  LAES No. 49146
     Description:  The Northeast Quarter of the Northeast Quarter of Section 9 and the
                   Northwest Quarter of the Northwest Quarter of Section 10, Township
                   10 North, Range 3 West, Winn Parish, Louisiana, containing 79.64
                   acres (a single servitude).

18.  LAES No. 49147
     Description:  4.27 acres in the South Half of the Northwest Quarter of the Northwest
                   Quarter of Section 6 and all of Section 9 of Township 10 North, Range
                   4 West, Winn Parish, Louisiana, containing 647.95 acres (a single
                   servitude, excluding the 4.27 acre tract).

19.  LAES No. 49148
     Description:  The Northeast Quarter of the Northeast Quarter; the Northwest Quarter
                   of the Northwest Quarter; the South Half of the North Half; and the
                   South Half of Section 11, Township 10 North, Range 4 West, Winn
                   Parish, Louisiana, containing 547.05 acres (a single servitude).

- 12 -

20.  LAES No. 49149
     Description: All of Section 17, Township 10 North, Range 4 West, Winn Parish,
                  Louisiana, containing 636.08 acres, part of a 4,620 acre servitude.

21.  LAES No. 49151
     Description: The Northeast Quarter, the West Half of the Northwest Quarter, the
                  Southeast Quarter of the Northwest Quarter and the South Half of
                  Section 19, Township 10 North, Range 4 West, Winn Parish,
                  Louisiana, containing 592.89 acres, part of a 4,620 acre servitude
                  referred to under Lease No. 20.

22.  LAES No. 49152
     Description: All of Section 20, Township 10 North, Range 4 West, Winn Parish,
                  Louisiana, containing 635.2 acres, part of a 4,620 acre servitude
                  referred to under Lease Nos. 20 and 21.

23.  LAES No. 49153
     Description: The West Half of the Northeast Quarter, the Southeast Quarter of the
                  Northeast Quarter, the West Half and the Northeast Quarter of the
                  Southeast Quarter of Section 21, Township 10 North, Range 4 West,
                  Winn Parish, Louisiana, containing 482.64 acres, part of a 4,620 acre
                  servitude referred to under Lease Nos. 20, 21 and 22.

24.  LAES No. 49155
     Description: Northwest Quarter and the Northeast Quarter of the Southwest Quarter
                  of Section 28, Township 10 North, Range 4 West, Winn Parish,
                  Louisiana, containing 201.04 acres, part of a 4,620 acre servitude
                  referred to under Lease Nos. 20, 21, 22 and 23.

25.  LAES No. 49156
     Description: The North Half and the North Half of the South Half less and except
                  2.02 acres in the Southwest corner of the Northeast Quarter of the
                  Southeast Quarter; and the Southwest Quarter of the Southwest
                  Quarter of Section 30, Township 10 North, Range 4 West, Winn
                  Parish, Louisiana, containing 512.76 acres, part of a 4,620 acre
                  servitude referred to under Lease Nos. 20 through 24.

26.  LAES No. 49167
     Description: The East Half and the Northwest Quarter of the Northwest Quarter of
                  Section 24, Township 10 North, Range 5 West, Winn Parish,
                  Louisiana, containing 355.68 acres, part of 4,620 acre servitude
                  referred to under Lease Nos. 20-25.

- 13 -

27.   LAES No. 49168
      Description:  All of Section 25, Township 10 North, Range 5 West, Winn Parish,
                    Louisiana, containing 630.32 acres, part of 4,620 acre servitude
                    referred to under Lease Nos. 20-26.

28.   LAES No. 49169
      Description:  The South Half of the Northeast Quarter, the North Half of the
                    Southeast Quarter and the Southeast Quarter of the Southeast Quarter
                    of Section 26, Township 10 North, Range 5 West, Winn Parish,
                    Louisiana, containing 198.56 acres, part of 4,620 acre servitude
                    referred to under Lease Nos. 20-27.

29.   LAES No. 49158
      Description:  The Southeast Quarter of the Southwest Quarter and the South Half of
                    the Southeast Quarter, Section 8, Township 10 North, Range 5 West,
                    Winn Parish, Louisiana, containing 117.72 acres (a single servitude).

30.   LAES No. 49159
      Description:  The Southwest Quarter of the Northwest Quarter and the Northwest
                    Quarter of the Southwest Quarter of Section 9, Township 10 North,
                    Range 5 West and one (1) acre in the Northeast Quarter of the
                    Northwest Quarter of the Southeast Quarter of Section 10 of Township
                    10 North, Range 5 West, Winn Parish, Louisiana, containing 81.12
                    acres (a single servitude).

31.   LAES No. 49160
      Description:  The Northwest Quarter of the Southwest Quarter of Section 13,
                    Township 10 North, Range 5 West, Winn Parish, Louisiana (This lease
                    covers additional lands not affecting Petro-Hunt's servitudes),
                    containing 40 acres (a single servitude).

32.   LAES No. 49163
      Description:  The North Half of the Southeast Quarter of Section 19, Township 10
                    North, Range 5 West, Winn Parish, Louisiana, containing 79.42 acres
                    (a single servitude).

33.   LAES No. 49162
      Description:  The South Half of the Southeast Quarter of Section 15, Township 10
                    North, Range 5 West, Winn Parish, Louisiana, containing 79.75 acres,
                    part of approximately 1,080 acre servitude.

- 14 -

34.  LAES No. 49165
     Description:  23.30 acres in Tract C of 7772A in the South Half of the Northeast
                   quarter, the North Half of the Southeast Quarter of the Northeast
                   Quarter, the North Half of the Southwest Quarter, and the Southeast
                   Quarter of Section 22, Township 10 North, Range 5 West, Winn
                   Parish, Louisiana, containing 281.27 acres, part of same approximately
                   1,080 acre servitude referred to under Lease No. 33.

35.  LAES No. 49166
     Description:  All of Section 23, Township 10 North, Range 5 West, less and except
                   16.10 acres in the Northeast Quarter of the Northeast Quarter, west of
                   Couley Creek, Winn Parish, Louisiana, containing 621.54 acres, part
                   of same approximately 1,080 acre servitude referred to under Lease
                   Nos. 33 and 34.

36.  LAES No. 49164
     Description:  The Northeast Quarter of the Southwest Quarter and the Southwest
                   Quarter of the Southwest Quarter of Section 20, Township 10 North,
                   Range 5 West, Winn Parish, Louisiana, containing 79.4 acres
                   (comprising 2 separate servitudes).

37.  LAES No. 49170
     Description:  The Southwest Quarter of Section 28, Township 10 North, Range 5
                   West, Winn Parish, Louisiana, containing 156.93 acres, part of
                   approximately 3,618 acre servitude.

38.  LAES No. 49171
     Description:  The North Half of the Northeast Quarter, the Southwest Quarter of the
                   Northwest Quarter, the Northwest Quarter of the Southwest Quarter,
                   the South Half of the Southwest Quarter and the West Half of the
                   Southeast Quarter of Section 32, Township 10 North, Range 5 West,
                   Winn Parish, Louisiana, containing 315.19 acres, part of approximately
                   3,618 acre servitude referred to under Lease No. 38.

- 15 -

Appx1075

39.  LAES No. 49172
     Description:  The East Half of the East Half, the Northwest Quarter of the Northwest
                   Quarter, the South Half of the Northwest Quarter, the Southwest
                   Quarter of the Southeast Quarter, and the Southwest Quarter less and
                   except 4.92 acres in the Northwest Quarter of the Southwest Quarter,
                   Section 33, Township 10 North, Range 5 West, Winn Parish,
                   Louisiana, 467.76 acres, part of approximately 3,618 acre servitude
                   referred to under Lease Nos. 37 and 38.

40.  LAES No. 49173
     Description:  The Southwest Quarter of the Northeast Quarter, the South Half of the
                   Northwest Quarter, the Southwest Quarter and the West Half of the
                   Southeast Quarter of Section 34, Township 10 North, Range 5 West,
                   Winn Parish, Louisiana, containing 358.11 acres, part of approximately
                   3,618 acre servitude referred to under Lease Nos. 37, 38 and 39.

41.  LAES No. 49174
     Description:  East Half of the Northeast Quarter of Section 35, Township 10 North,
                   Range 5 West, Winn Parish, Louisiana, containing 79.49 acres, part of
                   4,620 acre servitude referred to above.

42.  LAES No. 49175
     Description:  The North Half of Section 36, Township 10 North, Range 5 West,
                   Winn Parish, Louisiana, containing 314.4 acres,  part of 4,620 acre
                   servitude referred to above under Lease No. 41.

43.  LAES No. 49176
     Description:  The Southwest Quarter of the Southwest Quarter of the Southwest
                   Quarter of Section 5; that part of Tract C-107 in the Northeast Quarter
                   and the East Half of the Northwest Quarter South of road in Section 7
                   and that part of Tract C-107 in the West Half of the Northwest Quarter
                   of Section 8 of Township 11 North, Range 3 West, Winn Parish,
                   Louisiana, containing 298.68 acres, part of approximately 340 acre
                   servitude.

44.  LAES No. 49177
     Description:  Southwest Quarter of Section 5 of Township 11 North, Range 4 West,
                   Winn Parish, Louisiana (This lease covers additional land not part of
                   Petro-Hunt's servitudes), containing 160.00 acres (a single servitude).

- 16 -

45.    LAES No. 49178
       Description: The Southeast Quarter of the Southeast Quarter of Section 12,
                    Township 11 North, Range 5 West, Winn Parish, Louisiana, containing
                    39.58 acres (a single servitude).


Also, the Government issued LAES No. 46324 on January 27, 1994 to Howell R.

Spear, P.O. Box 1684, Midland, Texas 79702 for the South Half of the Northeast Quarter

and the Southeast Quarter of Section 24, Township 13 North, Range 7 West, Natchitoches

Parish, Louisiana.  While this Lease does not intrude upon any of the five (5) remaining

servitudes held by operation or production, it does, in fact, intrude upon the acreage which

was *res judicata* in the case of *The United States vs. Nebo Oil Company*, 190 F 2d 1003

(U.S. 5th Cir. 1951) and a part of the ninety-one (91) mineral servitudes referenced above.

This servitude included 800 acres which was a part of a total of 1,120 acres forming one of

the mineral servitudes.

All leases were granted for terms of ten (10) years which have expired by their terms.

There are no other leases which the government has granted which intrude upon the ninety-

six (96) mineral servitudes owned by and claimed by Petro-Hunt, L.L.C., et al or on the five

(5) main servitude tracts referenced herein and retained by Petro-Hunt, L.L.C., et al.

Definition: For purposes of this Affidavit, I have referred to leases for oil or gas

issued by the government as "intrusive".  My use of this term refers to an intrusion upon

Petro-Hunt's title to its mineral rights.

- 17 -

I have relied upon those documents which were provided during discovery in the case

of *Petro-Hunt, L.L.C., et al vs. U.S.A., et al*, United States District Court for the Western

District of Louisiana, Docket No. CV00-0303. I am aware that I have included oil and gas

leases which were not included in a Declaration in this case prepared by Delia K. Jacquette

and that her declaration included oil and gas leases which I have not included. I have no

explanation of such discrepancies. I have relied upon examination of public records and

documents provided by the United States in response to discovery requests.

SWORN TO AND AFFIRMED this ___9th___ day of ___May___, 2009.

_____

**DANIEL C. HUGHES, Affiant**

_____

**NOTARY PUBLIC**

My Commission is for Life

```
MELINDA K. RAMSON
Notary Public
State of Louisiana
NOTARY ID NO. 77270
Lafayette Parish
```

- 18 -

*Sandra*

RECEIVED

FEB 1 8 2000

ROBERT H. SHEMWELL, CLERK
WESTERN DISTRICT OF LOUISIANA
SHREVEPORT, LOUISIANA

U.S. DISTRICT COURT
WESTERN DISTRICT OF LOUISIANA
FILED

FEB 1 8 2000

ROBERT H. SHEMWELL, CLERK
BY _____
DEPUTY

UNITED STATES DISTRICT COURT

WESTERN DISTRICT OF LOUISIANA

PETRO-HUNT, L.L.C.; HUNT            *    CIVIL ACTION
PETROLEUM CORPORATION; AND
KINGFISHER RESOURCES, INC.          *    NO.

VERSUS                              *    **CV00- 0303  S**

                                         SECTION " "
UNITED STATES OF AMERICA             *    JUDGE

AND                                 *    MAGISTRATE  **JUDGE WALTER**

ASPECT RESOURCES, L.L.C.;           *
BAYOU PETROLEUM COMPANY;
CATAWBA ENERGY, INC.; FIRST         *    **MAGISTRATE JUDGE PAYNE**
TEXAS HYDROCARBONS INC.;
OSCAR C. FORLAND, ET UX; GULF       *
COAST OIL & GAS CO.; JUSTISS OIL
COMPANY, INC.; MATRIX ENERGY,       *
INC.; MB EXPLORATION, L.L.C.;
NORTHSTAR ENERGY, L.L.C.;           *
PALMER PETROLEUM, INC.; RICE &
ASSOCIATES, L.L.C.; SNYDER OIL      *
CORPORATION; HOWELL R. SPEAR,
ET UX; JOHN P. STRANG, ET UX;       *
TEXACO EXPLORATION AND
PRODUCTION, INC.; TMR               *
EXPLORATION, INC.; UMC
PETROLEUM CORPORATION; AND,         *
WHELESS TDL EXPLORATION CO.,
L.L.C.

## COMPLAINT

NOW INTO COURT, through undersigned counsel, come Petro-Hunt, L.L.C.; Hunt

Petroleum Corporation; and Kingfisher Resources, Inc. (collectively, the "Plaintiffs"), and,

pursuant to 28 U.S.C. §§ 2201 and 2409a, respectively represent that:



## THE PARTIES

### 1.

Plaintiff Petro-Hunt, L.L.C. is a Delaware limited liability company with its principal place of business in Dallas, Texas.

### 2.

Plaintiff Hunt Petroleum Corporation, sometimes referred to herein by its former name, Louisiana-Hunt Petroleum Corporation, is a Delaware corporation with its principal place of business in Dallas, Texas.

### 3.

Plaintiff Kingfisher Resources, Inc. is a Delaware corporation with its principal place of business in Dallas, Texas.

### 4.

Defendants are the United States of America; Aspect Resources, L.L.C., a limited liability company having its principal place of business in Denver, Colorado; Bayou Petroleum Company, a Louisiana corporation having its principal place of business in Metairie, Louisiana; Catawba Energy, Inc., a Virginia corporation having its principal place of business in Catawba, Virginia; First Texas Hydrocarbons Inc., a Texas corporation having its principal place of business in The Woodlands, Texas; Oscar C. Forland, an individual domiciled in Silverhill, Alabama; Gulf Coast Oil & Gas Co., a Louisiana corporation having its principal place of business in Gibsland, Louisiana; Justiss Oil Company, Inc., a Louisiana corporation having its principal place of business in Jena, Louisiana; Matrix Energy, Inc., a Texas corporation having its principal place of business in Dallas, Texas; MB Exploration, L.L.C., a Delaware limited liability company having its principal place of business in Wilmington, Delaware; Northstar Energy, L.L.C., a

Appx1127

Louisiana limited liability company having its principal place of business in Baton Rouge, Louisiana; Palmer Petroleum, Inc., a Louisiana corporation having its principal place of business in Shreveport, Louisiana; Rice & Associates, L.L.C., a Louisiana limited liability company having its principal place of business in Tallulah, Louisiana; Snyder Oil Corporation, a Delaware corporation having its principal place of business in Forth Worth, Texas; Howell R. Spear, an individual domiciled in Midland, Texas; John P. Strang, an individual domiciled in New York, New York; Texaco Exploration and Production, Inc., a Delaware corporation having its principal place of business in Houston, Texas; TMR Exploration, Inc., a Texas corporation having its principal place of business in Dallas, Texas; UMC Petroleum Corporation, a Texas corporation having its principal place of business in Houston, Texas; and Wheless TDL Exploration Co., L.L.C., a Louisiana limited liability company having its principal place of business in Shreveport, Louisiana.

## CAUSE OF ACTION

5.

This is an action for declaratory judgment pursuant to 28 U.S.C. § 2201 and to quiet title to real estate pursuant to 28 U.S.C. § 2409a. This Court has jurisdiction in this matter pursuant to 28 U.S.C. § 1346(f).

## VENUE

6.

Venue is founded on 28 U.S.C. § 1391(e) in that the property that is the subject of this action is situated in the Western District of Louisiana.

-3-

## BACKGROUND OF CONTROVERSY

7.

Plaintiffs are the owners in indivision and in perpetuity of the exclusive right to explore for and produce all of the oil, gas and other minerals (termed collectively, "Plaintiffs' Mineral Rights") which may be located in, on or under properties located in Grant, Winn, and Natchitoches Parishes, Louisiana, as described in Exhibit "A" of this Complaint. The total acreage affected by the Plaintiffs' Mineral Rights is 180,021.31 acres more or less, and is situated as follows: Grant Parish contains 56,562.86 acres, more or less; Natchitoches Parish contains 25,024.17 acres, more or less; and Winn Parish contains 98,434.28 acres, more or less.

8.

Plaintiffs' Mineral Rights were created as a result of the following conveyances and transactions:

(a)     Sale of Minerals from Bodcaw Lumber Company of Louisiana, Inc. to Good Pine Oil Company, Inc. dated November 12, 1932, recorded in Conveyance Book 168, Folio 419, Entry No. 63721, in the records of Natchitoches Parish;

(b)     Sale of Minerals from Grant Timber & Mfg. Company of La., Inc. to Good Pine Oil Company, Inc., dated November 16, 1932, recorded in Conveyance Book WW, Folio 552, Entry No. 25943, in the records of Grant Parish;

(c)     Sale of Minerals from Grant Timber & Mfg. Company of La., Inc. to Good Pine Oil Company, Inc., dated November 16, 1932, recorded in Conveyance Book 42, Folio 255, Entry No. 25548, in the records of Winn Parish; and

-4-

(d)     Sale of Minerals from Bodcaw Lumber Company of Louisiana, Inc. to Good Pine Oil Company, Inc. dated November 16, 1932, recorded in Conveyance Book 42, Folio 259, Entry No. 25552, in the records of Winn Parish.

(e)     Sale of Minerals from Bodcaw Lumber Company of La., Inc. to Good Pine Oil Company, Inc., dated May 3, 1934, recorded in Conveyance Book 171, Folio 72, Entry No. 65277, in the records of Natchitoches Parish;

(f)     Sale of Minerals from Bodcaw Lumber Company of La., Inc. to Good Pine Oil Company, Inc., dated May 3, 1934, recorded in Conveyance Book 44, Folio 26, Entry No. 26708, in the records of Winn Parish.

9.

The United States of America owns the lands affected by Plaintiffs' Mineral Rights as a result of, *inter alia*, the following conveyances and transactions:

(a)     Sale of lands by Bodcaw Lumber Company of Louisiana, Inc. to the United States of America dated February 11, 1936, recorded in Conveyance Book 173, Folio 400, Entry No. 66862, in the records of Natchitoches Parish; sale made subject to prior sale of minerals noted in Paragraphs 8(a) and 8(e) above;

(b)     Sale of lands by Grant Timber & Manufacturing Company of Louisiana, Inc. to the United States of America, dated November 28, 1934, recorded in Conveyance Book ZZ, Folio 359, Entry No. 27363, in the records of Grant Parish; sale made subject to prior sale of minerals noted in Paragraph 8(b) above.

(c)     Sale of lands by Grant Timber and Manufacturing Company of Louisiana, Inc. to the United States of America, dated March 26, 1935, recorded in Conveyance Book 53,

-5-

Folio 78, Entry No. 27600, in the records of Grant Parish; sale made subject to prior sale of minerals noted in Paragraph 8(b) above;

(d)     Sale of lands by Grant Timber & Manufacturing Company of Louisiana, Inc. to the United States of America, dated November 28, 1934, recorded in Conveyance Book 44, Folio 131, Entry No. 26836, in the records of Winn Parish; sale made subject to prior sale of minerals noted in Paragraph 8(c) above;

(e)     Sale of lands by Bodcaw Lumber Company of Louisiana, Inc. to the United States of America, dated December 20, 1934, recorded in Conveyance Book 44, Folio 160, Entry No. 26887, in the records of Winn Parish; sale made subject to prior sale of minerals noted in Paragraphs 8(d) and 8(f) above;

(f)     Sale of lands by Grant Timber & Manufacturing Company of Louisiana, Inc. to the United States of America, dated March 26, 1935, recorded in Conveyance Book 44, Folio 413, Entry No. 27139, in the records of Winn Parish; sale made subject to prior sale of minerals noted in Paragraph 8(c) above; and

(g)     Sale of lands by Bodcaw Lumber Company of Louisiana, Inc. to the United States of America, dated June 12, 1935, recorded in Conveyance Book 44, Folio 546, Entry No. 27280, in the records of Winn Parish; sale made subject to prior sale of minerals noted in Paragraph 8(d) above.

(h)     Sale of lands by Grant Timber & Manufacturing Company of Louisiana, Inc. to the United States of America, dated March 26, 1935, recorded in Conveyance Book 44, Folio 419, Entry No. 27140, in the records of Winn Parish, Louisiana; sale made subject to prior sale of minerals noted in Paragraph 8(c) above; and

-6-

(i)     Judgment in favor of the United States of America against Bodcaw Lumber Company of Louisiana, Inc., dated January 28, 1937, recorded in Conveyance Book 48, Folio 22, Entry No. 29731, in the records of Winn Parish; judgment made subject to sale of minerals noted in Paragraph 8(d) above.

(j)     Judgment in favor of the United States of America against Bodcaw Lumber Company of Louisiana, Inc., dated January 28, 1937, recorded in Conveyance Book 177, Folio 612, Entry No. 69177, in the records of Natchitoches Parish; judgment made subject to sale of minerals noted in Paragraph 8(e) above.

10.

*United States v. Nebo Oil Co.*, 90 F. Supp. 73 (W.D. La. 1950), *affirmed*, 190 F.2d 1003 (5th Cir. 1951) (the "Nebo Oil Case"), attached as Exhibit B, involved the mineral rights created by the mineral sale described as item (a) of Paragraph 8 above, insofar as those mineral rights affected a portion of the lands conveyed to the United States through the sale described as item (a) of Paragraph 9 above. In the Nebo Oil Case, the United States Court of Appeals for the Fifth Circuit ruled that Act 315 of 1940 of the Louisiana Legislature rendered the mineral rights affected by that mineral sale imprescriptible. The final decree of the District Court (United States District Court, Western District of Louisiana, Shreveport Division, Civil Action No. 2379) in the Nebo Oil Case, attached as Exhibit C to this Complaint, and the Mandate of the United States Court of Appeals for the Fifth Circuit in said case, attached as Exhibit D to this Complaint, are recorded, together with an affidavit setting forth details concerning the ownership of Plaintiffs' Mineral Rights, in Conveyance Book 99, Folio 93, Entry No. 47969, in the records of Grant Parish; Conveyance Book 73, Folio 314, Entry No. 49398, in the records of Winn

-7-

Parish; and Conveyance Book 216, Folio 331, Entry No. 97034, in the records of Natchitoches Parish.

<div align="center">11.</div>

The Plaintiffs' Mineral Rights are owned indivisibly in the following percentages:

> Petro-Hunt, L.L.C. - 64.28572%;
>
> Hunt Petroleum Corporation - 16.80672%; and
>
> Kingfisher Resources, Inc. - 18.90756%

as a result of, *inter alia*, the following conveyances, declarations and transactions:

(a) Conveyance of Minerals from Good Pine Oil Company, Inc. to William C. Brown, et al., dated December 29, 1941, recorded in Conveyance Book 69, Folio 519, Entry No. 35127, in the records of Grant Parish;

(b) Conveyance of Minerals from Good Pine Oil Company, Inc. to William C. Brown, et al., dated December 29, 1941, recorded in Conveyance Book 54, Folio 324, Entry No. 34486, in the records of Winn Parish;

(c) Conveyance of Minerals from Good Pine Oil Company, Inc. to William C. Brown, et al., dated December 29, 1941, recorded in Conveyance Book 188, Folio 547, Entry No. 76585, in the records of Natchitoches Parish;

(d) Conveyance of Minerals from William C. Brown, et al., to Nebo Oil Company, Inc., dated January 20, 1942, recorded in Conveyance Book 71, Folio 181, Entry No. 35377, in the records of Grant Parish;

(e) Conveyance of Minerals from William C. Brown, et al., to Nebo Oil Company, Inc., dated January 20, 1942, recorded in Conveyance Book 71, Folio 195, Entry No. 35378, in the records of Grant Parish;

<div align="center">-8-</div>

(f)       Conveyance of Minerals from William C. Brown, et al., to Nebo Oil Company, Inc., dated January 20, 1942, recorded in Conveyance Book 56, Folio 1, Entry No. 34722, in the records of Winn Parish;

(g)      Conveyance of Minerals from William C. Brown, et al., to Nebo Oil Company, Inc., dated January 20, 1942, recorded in Conveyance Book 56, Folio 18, Entry No. 34723, in the records of Winn Parish;

(h)      Conveyance of Minerals from William C. Brown, et al., to Nebo Oil Company, Inc., dated January 20, 1942, recorded in Conveyance Book 189, Folio 370, Entry No. 76995, in the records of Natchitoches Parish;

(i)       Conveyance of Minerals from William C. Brown, et al., to Nebo Oil Company, Inc., dated January 20, 1942, recorded in Conveyance Book 189, Folio 382, Entry No. 76996, in the records of Natchitoches Parish;

(j)       Acknowledgement by Joe Smith, h/o Anita O'Neal Smith, to Nebo Oil Company, Inc., dated June 19, 1952, recorded in Conveyance Book 101, Folio 3, Entry No. 48538, in the records of Grant Parish; Conveyance Book 74, Folio 51, Entry No. 49817, in the records of Winn Parish; and Conveyance Book 217, Folio 80, Entry No. 97514, in the records of Natchitoches Parish (husband acknowledged in this document that property conveyed in (d), (e), (f), (g), (h) and (i) above was the separate property of his wife);

(k)      Acknowledgement by H. I. Kenney, h/o Grace Wagner Kenney, to Nebo Oil Company, Inc., dated June 18, 1952, recorded in Conveyance Book 101, Folio 5, Entry No. 48539, in the records of Grant Parish; Conveyance Book 74, Folio 52, Entry No. 49818, in the records of Winn Parish; and Conveyance Book 217, Folio 82, Entry No. 97515, in the

-9-

records of Natchitoches Parish (husband acknowledged in this document that property conveyed in (d), (e), (f), (g), (h) and (i) above was the separate property of his wife);

(l) Acknowledgment by S. J. Seeger, h/o Helen B. Seeger, to Nebo Oil Company, Inc., dated July 31, 1944, recorded in Conveyance Book 195, Folio 369, Entry No. 82455, in the records of Grant Parish (husband acknowledged in this document that property conveyed in (h) and (i) above was the property of his wife);

(m) Acknowledgment by Mary Seeger O'Boyle, et al., being the heirs of S. J. Seeger, deceased h/o Helen B. Seeger, to Nebo Oil Company, Inc., dated November 13, 1954, recorded in Conveyance Book 104, F9olio 433, Entry No. 50887, in the records of Grant Parish; and Conveyance Book 235, Folio 717, Entry No. 175422, in the records of Winn Parish (heirs of deceased husband acknowledged in this document that property conveyed in (d), (e), (f) and (g) above was the separate property of his wife)

(n) Certificate of Amendment of Certification of Incorporation (name change) from Nebo Oil Company, Inc. to Bodcaw Company, dated April 4, 1960, recorded in Conveyance Book 119, Folio 39, Entry No. 56054, in the records of Grant Parish; Conveyance Book 87, Folio 221, Entry No. 56325, in the records of Winn Parish; and Conveyance Book 238, Folio 401, Entry No. 111325, in the records of Natchitoches Parish;

(o) Certificate of Agreement of Merger (Bodcaw Company merged into IPB, Inc., and IPB, Inc. changed its name to Bodcaw Company), dated October 10, 1979, recorded in Conveyance Book 226, Folio 84, Entry No. 84739, in the records of Grant Parish; Conveyance Book 143, Folio 608, Entry No. 110749, in the records of Winn Parish;

-10-

and Conveyance Book 356, Folio 491, Entry No. 157257, in the records of Natchitoches Parish; all as further evidenced by (y) below;

(p)     Certificate of Ownership and Merger filed by Bodcaw Company, dated October 10, 1979, recorded in Conveyance Book 226, Folio 85, Entry No. 84740, in the records of Grant Parish; Conveyance Book 143, Folio 609, Entry No. 110750, in the records of Winn Parish; and Conveyance Book 356, Folio 492, Entry No. 157258, in the records of Natchitoches Parish;

(q)     Mineral Deed from Bodcaw Company to Placid Oil Company, dated October 11, 1979, recorded in Conveyance Book 224, Folio 812, Entry No. 84742, in the records of Grant Parish; Conveyance Book 143, Folio 620, Entry No. 110752, in the records of Winn Parish; and Conveyance Book 356, Folio 508, Entry No. 157260, in the records of Natchitoches Parish;

(r)     Assignment, Conveyance and Bill of Sale from Placid Oil Company to Placid International Oil Limited, and in turn from Placid International Oil Limited to Louisiana-Hunt Petroleum Corporation and Rosewood Resources (POC), Inc., dated June 13, 1983, recorded in Conveyance Book 259, Folio 139, Entry No. 93374, in the records of Grant Parish; Conveyance Book 158, Folio 550, Entry No. 122732, in the records of Winn Parish; and Conveyance Book 388, Folio 19, Entry No. 167876, in the records of Natchitoches Parish;

(s)     Certificate of Ownership, Merger Name Change from Rosewood Resources (POC), Inc. to Rosewood Resources, Inc., dated December 31, 1984, recorded in Mortgage Book 134, Folio 880, Entry No. 44105, in the records of Grant Parish; Conveyance Book 172, Folio 553, Entry No. 134394, in the records of Winn Parish; and

-11-

Conveyance Book 420, Folio 49, Entry No. 176881, in the records of Natchitoches Parish;

(t)     Certificate of Merger and Name Change from Louisiana-Hunt Petroleum Corporation to Hunt Petroleum Corporation, dated January 31, 1986, recorded in Conveyance Book 215, Folio 574, Entry No. 64469, in the records of Grant Parish; Conveyance Book 182, Folio 542, Entry No. 141085, in the records of Winn Parish; and Conveyance Book 442, Folio 127, Entry No. 182279, in the records of Natchitoches Parish;

(u)     Assignment and Conveyance from Rosewood Resources, Inc. to Kingfisher Resources, Inc., dated April 24, 1996, recorded in Conveyance Book 338, Folio 395, Entry No. 117748, in the records of Grant Parish; Conveyance Book 217, Folio 757, Entry No. 163185, in the records of Winn Parish; and Oil and Gas Book 296, Folio 836, Entry No. 230814, in the records of Natchitoches Parish; and

(v)     Conveyance and Assumption Agreement from OXY USA Inc. and Placid Oil Company to Petro-Hunt, L.L.C., executed April 6, 1998, recorded in Conveyance Book 348, Folio 191, Entry No. 121619, in the records of Grant Parish; Conveyance Book 227, Folio 85, Entry No. 169509, in the records of Winn Parish; and Conveyance Book 529, Folio 653, Entry No. 209089, in the records of Natchitoches Parish.

<div align="center">12.</div>

The mineral sale involved in the Nebo Oil Case (item (a) of Paragraph 8) is identical in all material respects to the mineral sales described as items (b), (c), (d), (e) and (f) of Paragraph 8, and the sale to the United States of America involved in the Nebo Oil Case (item (a) of

<div align="center">-12-</div>

Paragraph 9) is identical in all material respects to the additional sales to the United States of America identified as items (b), (c), (d), (e), (f), (g) and (h) of Paragraph 9.  Accordingly, all of the lands affected by those sales to the United States of America (including, but without limitation, those portions of the lands affected by the mineral sale described as item (a) of Paragraph 8, which were not specifically described in the complaint in the Nebo Oil Case), are subject to Plaintiffs' Mineral Rights, which are imprescriptible under the facts, analysis, reasoning and decisions rendered in the Nebo Oil Case.

<div align="center">13.</div>

The Plaintiffs' Mineral Rights cover lands now located within the Kisatchie National Forest, which is administered by the Forest Service of the United States Department of Agriculture.  The federal government acquired its surface interest in these lands as a result of the conveyances shown above in Paragraph 9.

<div align="center">14.</div>

Notwithstanding the decisions in the Nebo Oil Case, commencing in 1991, the United States Bureau of Land Management ("BLM") has attempted to grant a number of mineral leases on lands subject to the Plaintiffs' Mineral Rights.  Based on a review of the public records and available BLM documents, Exhibit E lists those lands which are subject to Plaintiffs' Mineral Rights which are either (i) purportedly subject to mineral leases granted by BLM which continue to be in effect, or (ii) purportedly subject to pending offers to lease from BLM (together, the "Disputed Leases").  The defendants listed in Paragraph 4 above, other than the United States of America, are the mineral lessees under the Disputed Leases from the BLM.

<div align="center">-13-</div>

15.

In a series of letters beginning in 1991, Plaintiffs have repeatedly protested the attempted leasing by the BLM of the lands subject to the Plaintiffs' Mineral Rights.

16.

Nevertheless, the BLM has consistently rejected the Plaintiffs' protests and has proceeded to attempt to issue Disputed Leases. The Disputed Leases constitute a cloud and slander on Plaintiffs' title to Plaintiffs' Mineral Rights.

17.

In addition to the facts and legal argument set forth above, all of Plaintiffs' Mineral Rights were rendered imprescriptible by the enactment, *per se*, of Act 315 of 1940, including those mineral rights reserved in items (i) and (j) of Paragraph 9. Additionally, Plaintiffs specifically assert continuing ownership of certain of Plaintiffs' Mineral Rights based on good faith operations for the discovery and production of minerals under the provisions of La. R.S. 31:29.

## RELIEF REQUESTED

18.

As a result of the adverse claims of the United States of America described herein, Plaintiffs are entitled to a declaratory judgment quieting their title to their property pursuant to 28 U.S.C. § 2201 and 28 U.S.C. § 2409a, recognizing and declaring Plaintiffs to be the true and lawful owners, in perpetuity, of the Plaintiffs' Mineral Rights in the proportions outlined in Paragraph 11 above, and for a judgment declaring the Disputed Leases to be null and void.

-14-

Appx1139

19.

In the alternative, and only in the event that this Honorable Court determines that Plaintiffs are not entitled to the relief sought in the preceding paragraph, Plaintiffs allege that the actions of the United States in confiscating their mineral interests amounts to an unconstitutional taking in direct violation of the Fifth Amendment of the United States Constitution, for which Plaintiffs should be compensated.

WHEREFORE, Plaintiffs pray that after due proceedings are held there be a judgment in their favor and against the defendants ordering, adjudging, and decreeing:

1) That they are the owners, in indivision, of exclusive and perpetual mineral rights, covering the right to explore for and produce the minerals in, on or under the properties listed and described in Exhibit A to this Complaint,

2) That the United States of America has no valid mineral interests in the properties described in Exhibit A and that any purported mineral leases affecting said properties previously granted by the United States are null and void, and

3) That the United States of America is permanently enjoined from attempting in any manner to grant mineral leases in, on, or under the properties listed in Exhibit A.

In the alternative, and only in the event that Plaintiffs are not found to be entitled to the declaratory relief sought above, Plaintiffs pray for a money judgment against the United States of America in an amount that will represent just compensation for the unconstitutional taking of the Plaintiffs' Mineral Rights in violation of the Fifth Amendment of the United States Constitution.

-15-

Plaintiffs further pray for such other or further relief as might be necessary or appropriate under the circumstances and for their costs of these proceedings.

OF COUNSEL

R. Fred Hosey
Petro-Hunt, L.L.C.
1601 Elm Street, Suite 3900
Dallas, Texas 75201

Andrew McCulloch
Hunt Petroleum Corporation
3400 Thanksgiving Tower
1601 Elm Street
Dallas, Texas 75201

Gary Taraba
Kingfisher Resources, Inc.
100 Crescent Court, Suite 500
Dallas, Texas 75201

Respectfully submitted,

John M. Wilson, T.A. (Bar #12050)
Craig Wyman (Bar #14908)
J. Patrick Morris (Bar #25187)
LISKOW & LEWIS
One Shell Square
701 Poydras Street, Suite 5000
New Orleans, Louisiana 70139-5099
Telephone: (504)581-7979
Fax: (504)556-4108

Attorneys for Petro-Hunt, L.L.C., Hunt Petroleum Corporation, and Kingfisher Resources, Inc.

-16-

U.S. DISTRICT COURT
WESTERN DISTRICT OF LOUISIANA
FILED

MAY 2 4 2001

ROBERT H. SHEMWELL, CLERK
BY _____
DEPUTY

UNITED STATES DISTRICT COURT

WESTERN DISTRICT OF LOUISIANA

| | | |
|---|---|---|
| PETRO-HUNT, L.L.C.; HUNT PETROLEUM CORPORATION, AND KINGFISHER RESOURCES, INC. | * * | CIVIL ACTION NO. CV00-0303 "S" |
| VERSUS | * | JUDGE WALTER |
| UNITED STATES OF AMERICA | * | MAGISTRATE JUDGE PAYNE |
| AND | * | |
| ASPECT RESOURCES, LLC; BAYOU PETROLEUM COMPANY; CATAWBA ENERGY, INC.; FIRST TEXAS HYDROCARBONS, INC.; OSCAR C. FORLAND; GULF COAST OIL & GAS CO.; JUSTISS OIL COMPANY, INC.; MATRIX ENERGY, INC.; MB EXPLORATION LLC; NORTHSTAR ENERGY, LLC; PALMER PETROLEUM, INC.; RICE & ASSOCIATES, LLC; SNYDER OIL CORPORATION; HOWELL R. SPEAR; JOHN P. STRANG; TEXACO EXPLORATION AND PRODUCTION, INC.; TMR EXPLORATION, INC.; UMC PETROLEUM CORPORATION; AND, WHELESS TDL EXPLORATION CO., LLC | * * * * * * * * | |

* * * * * * * * * * * * * * * * * * * * * * * *

## MEMORANDUM IN SUPPORT OF MOTION FOR SUMMARY JUDGMENT BY PLAINTIFFS AGAINST DEFENDANTS

MAY IT PLEASE THE COURT:

This memorandum is submitted by plaintiffs, Petro-Hunt, L.L.C, Hunt Petroleum Corporation and Kingfisher Resources, Inc. ("Plaintiffs"), in support of their motion for summary judgment.

which is located on the Plaintiffs' mineral servitudes, based on a title opinion prepared by a government attorney named Patrick Murphy.    Plaintiffs requested this title opinion in discovery, and the government initially objected, but has since produced several title opinions, including ones from 1981, 1986 and 1992.  These opinions are collectively attached as Exhibit E.  These opinions discuss the *Nebo* case and the *Little Lake* case, but do not even mention, much less discuss, the *res judicata* effect of the *Nebo* judgment as to the property which is the subject of this suit.    These opinions were apparently relied on by the United States (see government's supplemental response to Plaintiffs' request for documents No. 12, attached as Exhibit F), yet the opinions clearly do not pertain specifically to this property.

Over the years the Plaintiffs or their representatives wrote a number of "objection" letters to the government protesting the issuance of leases, but the government persisted in issuing leases. Finally, in early 2000 Plaintiffs filed this Quiet Title action pursuant to 28 U.S.C. §2409.

In their Quiet Title action the Plaintiffs seek relief in the form of a declaratory judgment that they are the exclusive owners of the mineral servitudes described in the complaint (and as set forth above herein), and the court declare that the United States has no mineral interest in these properties and that the United States be permanently enjoined from trespassing on Plaintiffs' mineral servitudes by issuing mineral leases or otherwise[4].  Plaintiffs request the court confirm their title as found by this same court in *Nebo* 50 years ago.  Since the title opinions produced by the United States do not address the finality and sanctity of the *Nebo* judgment, or *res judicata*, Plaintiffs can only speculate

---

[4] Plaintiffs have an alternative claim for a money judgment in the event Plaintiffs are found to be without title.  The theory for the money judgment is that if Plaintiffs do not have title, there has been a taking of their property.  The United States objected in its answer to jurisdiction under the Quiet Title Act to entertain this alternative claim, and Petro-Hunt has filed an alternative suit in the United States Court of Federal Claims.  Petro-Hunt and the United States stipulated to a stay of that action pending the resolution of this suit.  Hunt Petroleum Corporation and Kingfisher Resources, Inc. plan to intervene and join Petro-Hunt's Court of Federal Claims suit.

Case 100-cv-00303-EWALL Document 19896 *SEALED* 29 Filed 04/23/15 Page 10 of 9

RECEIVED

JUN 2 2 2001

ROBERT H. SHEMWELL, CLERK
WESTERN DISTRICT OF LOUISIANA
SHREVEPORT, LOUISIANA

U.S. DISTRICT COURT
WESTERN DISTRICT OF LOUISIANA
FILED

JUN 2 9 2001

ROBERT H. SHEMWELL, CLERK
BY _____ DEPUTY

## UNITED STATES DISTRICT COURT

## WESTERN DISTRICT OF LOUISIANA

| | | |
|---|---|---|
| PETRO-HUNT, L.L.C.; HUNT PETROLEUM CORPORATION; AND KINGFISHER RESOURCES, INC. | * | CIVIL ACTION |
| | * | NO. CV00-0303 "S" |
| VERSUS | * | JUDGE WALTER |
| UNITED STATES OF AMERICA | * | MAGISTRATE JUDGE PAYNE |
| AND | * | |
| ASPECT RESOURCES, L.L.C.; BAYOU PETROLEUM COMPANY; CATAWBA ENERGY, INC.; FIRST TEXAS HYDROCARBONS INC.; OSCAR C. FORLAND, ET UX; GULF COAST OIL & GAS CO.; JUSTISS OIL COMPANY, INC.; MATRIX ENERGY, INC.; MB EXPLORATION, L.L.C.; NORTHSTAR ENERGY, L.L.C.; PALMER PETROLEUM, INC.; RICE & ASSOCIATES, L.L.C.; SNYDER OIL CORPORATION; HOWELL R. SPEAR, ET UX; JOHN P. STRANG, ET UX; TEXACO EXPLORATION AND PRODUCTION, INC.; TMR EXPLORATION, INC.; UMC PETROLEUM CORPORATION; AND, WHELESS TDL EXPLORATION CO., L.L.C. | * | |

\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*

## FIRST SUPPLEMENTAL AND AMENDED COMPLAINT

The Complaint, as herein supplemented and amended, of Petro-Hunt, L.L.C., Hunt Petroleum Corporation; and Kingfisher Resources, Inc. (collectively, the "Plaintiffs"), in a cause to quiet title to real estate pursuant to 28 U.S.C. §2201 and 28 U.S.C. §2409a, alleges upon information and belief, as follows:

<u>FOR A FIRST CAUSE OF ACTION</u>

I.

Plaintiffs adopt, reiterate, reallege and reaver all of the allegations of the original complaint the same as if copied herein <u>in extenso</u>.

II.

Plaintiffs supplement and amend Paragraph 4 of the original complaint by adding the following three additional defendants.

4.

1.    J. Bradley Jeffreys, an individual domiciled and residing in Dallas, Texas;

2.    Energy Arrow Exploration, L.L.C., a Texas Limited Liability company having its principal place of business in Dallas, Texas; and

3.    Caruthers Producing Co., Inc., a Louisiana corporation having its principal place of business in Shreveport, Louisiana.

Plaintiffs adopt, reiterate and reallege all of the previous allegations of Paragraph 4 of Plaintiffs' original complaint the same as if copied herein <u>in extenso</u>.

III.

Plaintiff supplements and amends Paragraph 14 of the original complaint by supplementing Exhibit E, reference therein, ("Disputed Leases") by adding the following three additional disputed leases to Exhibit E as shown in the attached supplemental Exhibit E.

IV.

Plaintiffs reaver and reallege and incorporate by reference the same is if copied <u>in extenso</u> all other and remaining allegations pled in the original complaint.

-2-

WHEREFORE, Plaintiffs pray that they be permitted to file this first supplemental and amended complaint and that after due proceedings are had there be a judgment in their favor and against the defendants ordering, adjudging and decreeing:

1)    That they are the owners, in division, of exclusive and perpetual mineral rights, covering the right to explore for and produce the minerals in, on or under the properties listed and described in Exhibit A to the original Complaint,

2)    That the United States of America has no valid mineral interests in the properties described in said Exhibit A and that any purported mineral leases affecting said properties previously granted by the United States are null and void, and

3)    That the United States of America is permanently enjoined from attempting in any manner to grant mineral leases in, on, or under the properties listed in said Exhibit A.

In the alternative, and only in the event that Plaintiffs are not found to be entitled to the declaratory relief sought above, Plaintiffs pray for a money judgment against the United States of America in an amount that will represent just compensation for the unconstitutional taking of the Plaintiffs' Mineral Rights in violation of the Fifth Amendment of the United States Constitution.

Plaintiffs further pray for such other and further relief as might be necessary or appropriate under the circumstances and for their costs of these proceedings.

-3-

Respectfully Submitted:

MONTGOMERY, BARNETT, BROWN,
READ, HAMMOND & MINTZ, L.L.P.

BY: _____

J. RALPH WHITE (#13425) (TA)
3200 Energy Centre
1100 Poydras Street
New Orleans, LA. 70163-3200
Telephone:    (504) 585-3200
Fax:             (504) 585-7688

Attorney for Petro-Hunt, L.L.C.

GORDON, ARATA, McCOLLAM,
DUPLANTIS & EAGAN, L.L.C.

BY: _____

JOHN M. McCOLLAM (#117)
MATTHEW J. RANDAZZO, III (# 14340)(TA)
JONAS P. BAKER (#25563)
201 St. Charles Avenue
Suite 4000
New Orleans, LA 70115
Telephone:    (504) 582-1111
Fax:             (504) 582-1121

Attorneys for Hunt Petroleum Corporation and
Kingfisher Resources, Inc.

## CERTIFICATE OF SERVICE

**I HEREBY CERTIFY** that I have on this 20th day of June, 2001, served a copy of the
foregoing pleading on all counsel of record by depositing a copy of same in the United States mail,
properly addressed, and first-class postage prepaid.

_____

H:\bmcdonnell\RALPH\Petro-Hunt BLM\Amended Complaint.wpd

-4-

RECEIVED

NOV 2 1 2005

ROBERT H. SHEMWELL, CLERK
WESTERN DISTRICT OF LOUISIANA
SHREVEPORT, LOUISIANA

UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF LOUISIANA
SHREVEPORT DIVISION

| | |
|---|---|
| PETRO-HUNT, L.L.C., ET AL. | CIVIL ACTION NO. 00-0303 |
| VERSUS | JUDGE DONALD E. WALTER |
| UNITED STATES OF AMERICA, ET AL. | MAGISTRATE JUDGE HAYES |

## O R D E R

Before this Court is plaintiffs' Motion for Trial [Doc. #201]. After reviewing plaintiffs'

motion and the Fifth Circuit's mandate in Petro-Hunt, L.L.C. v. United States, 365 F.3d 385 (5th Cir.

2004), this Court finds that the only issue to be determined is which of the "95 servitudes that were

not at issue in Nebo Oil" have in fact prescribed for nonuse. 365 F.3d at 399.

Accordingly, **IT IS ORDERED** that plaintiffs' Motion for Trial [Doc. #201] be and is hereby

**DENIED.**

**THUS DONE AND SIGNED,** in Shreveport, Louisiana, this 21st day of November, 2005.

DONALD E. WALTER
UNITED STATES DISTRICT JUDGE

IN THE UNITED STATES COURT OF FEDERAL CLAIMS

|  |  |  |
|---|---|---|
| | ) | |
| PETRO-HUNT, L.L.C. | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | Case No. 00-512L |
| v. | ) | Judge Allegra |
| | ) | |
| THE UNITED STATES OF AMERICA | ) | |
| | ) | |
| Defendant. | ) | |
| | ) | |

**MEMORANDUM IN OPPOSITION TO DEFENDANT'S MOTION TO DISMISS AND ALTERNATIVE MOTION FOR SUMMARY JUDGMENT**

J. Ralph White
*Counsel of Record*
WHITE LAW FIRM
650 Poydras Street, Suite 1605
New Orleans, Louisiana 70130
Telephone: (504) 799-2585
Facsimile: (504) 799-2588
E-Mail: jralphwhitepllc@bellsouth.net

*Of Counsel:*

D. Joe Smith
Edmund M. Amorosi
Smith Pachter McWhorter PLC
8000 Towers Crescent Drive, Suite 900
Vienna, Virginia 22182
Telephone: (703) 847-6300
Facsimile: (703) 847-6312
E-Mail: eamorosi@smithpachter.com

Dated: November 14, 2008

IN THE UNITED STATES COURT OF FEDERAL CLAIMS

|  |  |
|---|---|
| PETRO-HUNT, L.L.C. | ) |
| | ) |
| Plaintiff, | ) |
| | ) |
| v. | ) |
| | ) |
| THE UNITED STATES OF AMERICA | ) |
| | ) |
| Defendant. | ) |

Case No. 00-512L
Judge Allegra

## MEMORANDUM IN OPPOSITION TO DEFENDANT'S MOTION TO DISMISS AND ALTERNATIVE MOTION FOR SUMMARY JUDGMENT

### PROLOGUE

Petro-Hunt is entitled to compensation and damages because of two decisions of the U.S. Fifth Circuit of Appeals entered fifty years apart.  The most recent decision holds the United States now owns mineral property for which the Fifth Circuit held in 1951 the United States had paid nothing, and did not buy.

### INTRODUCTION

Plaintiff, Petro-Hunt LLC, through counsel, opposes Defendant's motion to dismiss and alternative motion for summary judgment.  The Plaintiff's predecessors in interest struck a bargain with the United States Government ("Government") in the 1930s whereby they conveyed 180,000 acres of the surface of land, but not the minerals, located in Louisiana to the Government to become part of the Kisatchie National Forest in exchange for payments of an average of $2.19 per acre, with some acreage going for as little as $1.75 per acre.[1]  The understanding of the parties to this conveyance is crucial to understanding the Plaintiff's claims today.  The Fifth Circuit

---

[1]  Transcript of record, *Whitney Nat. Bk. v. Little Creek Oil Co.*, 33 So.2d 693 (La. 1947) (No.38629), p. 24, attached as Ex. A; Transcript of record, *U.S. v. Nebo Oil Co.*, 90 F.Supp. 73 (W.D. La. 1950) (No. 2379), attached as Ex. B.

1

entity.  The United States clearly understood this.  The Fifth Circuit found that the Government

paid no consideration for the valuable mineral interests.  *Id.* ("the price . . . paid . . . did not reflect

the value of any mineral rights.')

Following lengthy litigation dealing with ownership of the mineral servitudes, the issue

was finally settled when the Fifth Circuit did an about face and ruled that Petro-Hunt (and two

other minor successors in interest) was the owner of five of the original mineral servitudes and

the other ninety-one servitudes had prescribed in favor of the United States.  *See* Exhibit A to

Government's Motion to Dismiss, Doc. 53-2.  *Petro-Hunt, LLC v. U.S.*, 2007 WL 715270 (5th

Cir. 2007); *Petro-Hunt, LLC v. U.S.*, 365 F.3d 385 (5th Cir. 2004).  This ruling was final in 2008

when the U.S. Supreme Court denied Petro-Hunt's *writ of certiorari*.  Until the time *certiorari*

was denied, the issue was still unresolved and the case not ripe for adjudication of any claims

which might be asserted in this Court.  It is as a result of the United States' breach of contract and

takings that Petro-Hunt has brought, and now prosecutes, this action, since the Fifth Circuit held

in inconsistent decisions that the Government now owns the subject mineral property that the

same Fifth Circuit previously said it did buy and did not pay for.  Plaintiff now seeks

compensation and damages for this inequitable situation. [3]

### STATEMENT OF FACTS[4]

Although the Government had begun to issue mineral leases on the subject land in the

---

[3]

 This case differs substantially from *Cent. Pines Land Co. v. U.S.*, 274 F.3d 881 (5th Cir.  2001), *cert. denied*, 123 S.Ct. 101 (2002).  That case did not involve a promise by the Government that as a result of federal law, the Louisiana rules of prescription would not apply to a sale of the surface of the land to it.

[4]

 The facts are set forth in plaintiff's Proposed Findings of Uncontested Facts, and its Response to Defendants' Proposed Findings of Fact Pursuant to RCFC 56(h)(2) and Affidavit of Daniel C. Hughes, Esq. in separate documents.

1990s, Petro-Hunt did not acquire an interest in the property until 1998.  Petro-Hunt[5] brought suit under the Quiet Title Act (28 U.S.C. § 2409a) on February 18, 2000, in the Western District of Louisiana, seeking a declaration that it was the owner in perpetuity of the 96 mineral servitudes (the "Quiet Title action").  Petro-Hunt also alleged a Fifth Amendment taking in its Complaint in the Quiet Title Act suit.  The Government objected to the Fifth Amendment taking claim as outside the jurisdiction of the federal district court.

On August 24, 2000, Petro-Hunt also filed a Complaint in this Court alleging facts similar to those alleged in this First Amended Complaint, and arising from the same transactions, acts and occurrences, requesting just compensation under the Fifth Amendment.  This Court ordered a stay of this case on Petro-Hunt's motion pending the outcome of the Quiet Title action to which the Government consented.

The district court entered a Judgment on December 7, 2005 stating that Petro-Hunt is the owner of five mineral servitudes as described in an exhibit attached to the Judgment.  *See* Exhibit A to Government's Motion to Dismiss, Doc. 53-2.  The Judgment specifically directs the Government to cease all leasing activity on the five servitudes and cancels any active leases.  The Judgment also specifically reserves Petro-Hunt's rights to pursue "any and all claims for damages, caused by or as a result of the issuance of all intrusive leases and any other claims they have against the United States of America in the U.S. Court of Federal Claims."  *Id.*

<u>STANDARD OF REVIEW</u>

The Government moves to dismiss Petro-Hunt's First Amended Complaint pursuant to RCFC 12(b)(1), 12(h)(3) and 12(b)(6).  The Government also moves for summary judgment under RCFC 56.  These motions are subject to different standards of review.

---

[5]  Petro-Hunt owns an undivided 64% interest in the minerals.  Its other two co-owners also joined in the Quiet Title suit.

plaintiff knew the Government claimed title to all of the mineral property based on the Louisiana rules of prescription.

## II.  Laches is Not Applicable to Petro-Hunt's Breach of Contract Claims

The Government also alternatively moved to dismiss Petro-Hunt's contract claims, Counts IV, V, VI, and VII, under Rule 12(b)(6) and Rule 56 on the defense of laches.  Since Petro-Hunt's breach of contract claims are timely, the Government's defense of laches is inapplicable.  The Government makes no showing of prejudice, other than speculating that it *might* be prejudiced by the passage of time.  Further, a laches defense is fact based and should not be decided until after discovery.  Finally, the claims relate back to the original filing and thus are timely.

Where claims are not barred by the statute of limitations, a defense of laches should not be sustained absent "extraordinary circumstances."  *Advanced Cardiovascular Sys., Inc., Inc. v. SciMed Life Sys.*, 988 F.2d 1157, 1161 (Fed. Cir. 1993); *Cane Tennessee, Inc. v. U.S.,* 44 Fed. Cl. 785, 795 (1999) (describing the laches defense as requiring a "relatively heavy burden of proof").  Contrary to the Government's assertions, the burden of persuasion is not upon Petro-Hunt, but upon the Government.  *United Enter. & Assocs. v. U.S.,* 70 Fed. Cl. 1, 21 (2006) (burden lies with the defendant to show an "unreasonable" or "inexcusable" delay in filing suit).  Moreover, Petro-Hunt should be allowed discovery before the Court rules on this issue. *Advanced Cardiovascular Sys., Inc., Inc.,* 988 F.2d at 1161.

To prevail on its laches defense, the Government must first show an "unreasonable" or "inexcusable" delay by Petro-Hunt in filing suit, which has in turn caused ˝prejudice or injury to the defendant.˝ *Six v. U.S.*, 71 Fed. Cl. 671, 681 (2006); *United Enter. & Assocs.* 70 Fed. Cl. at 21.  This prejudice must result from the delay, must have actually occurred, and cannot be speculative or anticipated.  *United Enter. & Assocs.* 70 Fed. Cl. at 22-23; *Meyers v. Asics Corp.*,

974 F.2d 1304, 1308 n.1 (Fed. Cir. 1992). "The mere passage of time, without more, does not constitute laches." *Bannum, Inc. v. U.S.*, 60 Fed. Cl. 718, 728 (2004).

The Government *alleges*, but offers no supporting evidence, that "witness memories will have faded, knowledgeable employees *may* have retired or moved, and if an adverse judgment is ultimately rendered, damages *may* have increased or accumulated as a result of Plaintiff's dilatory behavior." Motion to Dismiss at page 15 (emphasis added). No affidavits were attached to the motion, nor was any other evidence introduced. Unverified speculation of prejudice is not enough. *United Enter. & Assocs.* 70 Fed. Cl. at 22-23.

Finally, the Government consented to the stay of this case pending the Quiet Title Act case. The Government's now convenient assertion it would not have consented to the stay had it known of the amendments has a hollow ring, since the action was originally filed as a protective suit, and the amendments were quite foreseeable. The Government was aware of the facts surrounding this case, aware of the *Nebo* decisions, and thus should not have been surprised at Plaintiff's amended complaint.

The claims in Petro-Hunt's amended complaint also are timely under the "relation back" doctrine, which should be liberally applied. *Clipper Exxpress v. Rocky Mountain Motor Tariff Bureau,* 690 F.2d 1240, 1260 n. 29 (9th Cir. 1982); RCFC 15. The main factor in determining whether Rule 15 relation back applies is whether notice was fairly given "by the general fact situation set forth in the original pleading." *Snoqualmie Tribe v. U.S.*, 178 Ct. Cl. 570, 587 (1967). Stated differently, "the key is whether the original complaint put defendant on notice that the type of evidence required for the new, amended claim should be preserved." *Stephenson v. U.S.*, 37 Fed. Cl. 396, 406 (1997). If the defendant had notice to preserve the evidence necessary for defense of the new claim, amendment should be allowed. *Id.*

This Court has previously determined that the assertion of a takings claim is sufficient notice of pendant contract claims, especially where, as here, the Government was aware of all the underlying facts and both causes of action are based on the same set of facts "that have been a part of this proceeding since its inception." *Stockton East Water Dist. v. U.S.*, 62 Fed. Cl. 379, 391-92 (2004), citing *J.L. Simmons Co. v. U.S.,* 188 Ct. Cl. 684, 730 (1969).

The test for determining whether a claim arose out of the "conduct, transaction, or occurrence" underlying the initial pleading is "whether the general fact situation or the aggregate of the operative facts underlying the claim for relief in the first petition gave notice to the Government of the new matter." *Vann v. U.S.*, 190 Ct. Cl. 546, 557 (1970).  *See also Stephenson v. U.S.*, 37 Fed. Cl. 396, 405 (1997).  Where the new claims arise out of same set of facts, the amendment relates back.  RCFC 15(c)(2).  Petro-Hunt alleged a set of operative facts in its initial complaint alleging a takings claim, which was subsequently amended to reflect a breach of contract claim based upon the same operative facts.  The Government's motion on the basis of laches should be denied.

### III.  This Court Has Jurisdiction over Petro-Hunt's Claim for Reformation Because This Claim is Incidental to Petro-Hunt's Claims for Money Damages

The Government has moved to dismiss Count VII (Reformation) under Rule 12(b)(1) on the basis that this Court lacks jurisdiction to consider equitable claims.  However, this Court has jurisdiction to award equitable relief incidental to a claim for money damages.  Since Petro-Hunt's reformation claim is not the primary relief sought and is subordinate to and incidental to its claims for money damages, this Court has jurisdiction.

In *Pauley Petroleum v. U.S.,* 219 Ct. Cl. 24, 40 (1979), the court found jurisdiction to hear claims for rescission of a contract.  The court, having examined the use of equity, stated that the "assumption that we can properly use equitable theories in passing upon suits for monetary

18

Appx2089

> of the lessee to pay rentals stipulated for therein, is in the nature of a slander of title suit, the purpose of which is to remove a cloud from the title to said land, which cloud is in the nature of a trespass and suit is properly brought in the parish where the property is situated.

*Id.* at 838 (La. Ct. App. 1939).  In other words not only is there a cause of action in Louisiana to remove a cloud from the title to a real right, but that cause of action allows the recovery of damages.

Clearly, Petro-Hunt has a cause of action under Louisiana law and as such, Petro-Hunt is entitled to damages from the Government's clouding Petro-Hunt's title.  *See State v. Jefferson Island Salt Mining Co.*, 163 So. 145 (La. 1935) (Louisiana Supreme Court approved damages for trespass in the amount of $1,165,419.54, or the value of the salt removed from the mine); *Rosenthal-Brown Fur Co. v. Jones-Frere Fur Co.*, 110 So. 630 (La. 1926) (Louisiana Supreme Court found that the measure of damages for bad faith trespass was the amount of profit derived from the use of the property, or the gross proceeds from the property minus the expenses).

Similarly here, because the leases issued by the Government on Petro-Hunt's minerals are in the nature of trespass, not only is there a cause of action under Louisiana law, but Petro-Hunt is clearly entitled to money damages as a result of the Government issuing these leases on what, as a matter of public record, were Petro-Hunt's minerals.  The result of the "trespass" is a taking of Petro-Hunt's property.  Use of the property by the Government is a taking without compensation.

<u>CONCLUSION</u>

The Government's Motion should be denied, and Petro-Hunt should be allowed to conduct discovery and this case should proceed to trial on the merits.

Appx2090

Respectfully Submitted,

 /s/ J. Ralph White
J. Ralph White
*Counsel of Record*
WHITE LAW FIRM
650 Poydras Street, Suite 1605
New Orleans, Louisiana 70130
Telephone: 504-799-2585
Facsimile: 504-799-2588
E-Mail: jralphwhitepllc@bellsouth.net

*Of Counsel:*

D. Joe Smith
Edmund M. Amorosi
SMITH PACHTER MCWHORTER PLC
8000 Towers Crescent Drive, Suite 900
Vienna, Virginia 22182
Telephone: 703-847-6300
Facsimile: 703-847-6312
E-Mail: eamorosi@smithpachter.com

Dated: November 14, 2008

41

**IN THE UNITED STATES COURT OF FEDERAL CLAIMS**

_____
)
PETRO-HUNT, L.L.C.,                      )
                                         )
                    Plaintiff,           )
                                         )       No. 00–512 L
                    v.                   )       Judge Allegra
                                         )
UNITED STATES OF AMERICA,                )
                                         )
                    Defendant.           )
_____)

**PLAINTIFF'S MEMORANDUM IN OPPOSITION**
**TO DEFENDANT'S MOTION TO DISMISS**

J. Ralph White
*Counsel of Record*
WHITE LAW FIRM
650 Poydras Street, Suite 1605
New Orleans, Louisiana 70130
Telephone: (540) 799-2585
Facsimile: (540) 799-2588
E-Mail: jralphwhitepllc@bellsouth.net

*Of Counsel:*

Edmund M. Amorosi
SMITH PACHTER MCWHORTER PLC
8000 Towers Crescent Drive, Suite 900
Vienna, Virginia 22182
Telephone: (703) 847-6300
Facsimile: (703) 847-6312
E-Mail: emorosi@smithpachter.com

Dated: July 18, 2011

## **INTRODUCTION**

This is an action for money damages against the United States seeking just compensation for a temporary taking, and a judicial taking of private property by the United States.[1]  The government has asserted 28 U.S.C. § 1500 ("§ 1500") as a jurisdictional bar, alleging that Petro-Hunt's prior Quiet Title Action ("QTA"), in the U.S. District Court for the Western District of Louisiana, pursuant to the Quiet Title Act (28 U.S.C. § 2409a) and the Declaratory Judgment Act (28 U.S.C. § 2201), seeking a declaration that it was the owner of approximately 180,000 mineral acres is the same "claim" that is before this Court and should be dismissed.  Section 1500 does not bar Plaintiff's claim for the following reasons.

First, § 1500 is not applicable to this action as the statute by its express language permits a claim that is not the same or duplicative to proceed.

Second, even if § 1500 applies, the operative facts in the two cases are distinct.  An overlap of common background facts does not serve to bar a claim based on distinct operative facts.[2]  The case prompting the government's motion, *United States v. Tohono O'odham Nation*, 131 S. Ct 1723 (2011) ("*Tohono III*"), is distinguishable as the claims asserted in the two Petro-Hunt cases are not the same and are based on different operative facts.  Moreover, the government's motion is based on *dicta* from *Tohono*.  This Court is not bound to follow *dicta*.  To the extent *Tohono* is read as taking away the "relief" prong of the test to determine if claims are the same, as set out in *Loveladies Harbor, Inc. v United States,* 27 F.3d 1545 (Fed. Cir 1994), that part of the decision is *dicta*.  *See* discussion, *infra* at page 16.

Third, the legislative history of the Quiet Title Act shows a clear intent on the part of

---

[1] This Court dismissed Petro-Hunt's claims for breach of contract and permanent takings as untimely.  *Petro-Hunt, L.L.C. v. United States*, 90 Fed. Cl. 51, 72 (2009).

[2] An overlap of background facts does not render two claims the "same" for purposes of § 1500. *See, e.g.*, *Cooke v. United States*, 77 Fed. Cl. 173, 178 (2007).

1

through use of the property.  The issues ultimately developed and litigated were the *res judicata* effect of the *Nebo Oil* decision and whether Petro-Hunt was the owner of the mineral property following application of the Louisiana law of prescription.  No other facts were necessary or operative to the judgment.  The remedy was declaratory in nature.  No monetary relief was granted.

The United States argues that Petro-Hunt, in the QTA Complaint, made a request in the alternative for just compensation in the event it was found to have not had title to the subject property.  Petro-Hunt's complaint, under the heading "Cause of Action", states "[t]his is an action for declaratory judgment pursuant to 28 U.S.C. §2201 and to quiet title to real estate pursuant to 28 U.S.C. § 2409(a).  This Court has jurisdiction in the matter pursuant to 28 U.S.C. § 1346 (f)."  QTA DI # 1, ¶ 19.  In ¶ 19, Plaintiffs stated:

> "In the alternative, and only in the event this Honorable Court determines that Plaintiffs are not entitled to relief sought in the preceding paragraph, Plaintiffs allege that the actions of the United States in confiscating their mineral interest amount to an unconstitutional taking in direct violation of the Fifth Amendment of the United States Constitution, for which Plaintiffs should be compensated."

In its prayer for relief, Plaintiffs asked that:

> "In the alternative, and only in the event that Plaintiffs are not found to be entitled to declaratory relief sought above, Plaintiff prays for a money judgment against the United States of America in an amount that will represent just compensation for the unconstitutional taking of Plaintiff's mineral rights in violation of the Fifth Amendment of the Constitution of the United States."

It is clear from the context of the pleadings that Plaintiffs were not seeking $10,000. Plaintiffs sought alternative relief contemplated under the Quiet Title Act wherein the plaintiff is entitled to just compensation when the United States elects to retain possession of the property. 28 U.S.C. § 2409a(b).  The United States objected to the District Court's jurisdiction to grant the Fifth Amendment request in the alternative, and the Plaintiffs abandoned same.  The government

14

argues that only operative facts are at play in this exercise, and this is a request for relief, for which there was no jurisdiction and hence a nullity.

**The Temporary Physical Takings Claim**

By contrast, in a takings case, title or ownership is only one element needed to state a claim for a taking, whether it be a regulatory, permanent, temporary, or judicial taking. A party cannot win a takings case if it proves only title or ownership, but does not prove that the United States, in the case of a physical taking, took physical possession of the property.

Prevailing on a takings claim requires three essential elements. First, the party asserting the taking must have a compensable property interest in the property that was allegedly taken. As stated by the Court in its November 9, 2009 Opinion:

> It is, of course, "axiomatic that only persons with a valid property interest at the time of the taking are entitled to compensation." *Bair v. United States*, 515 F.3d 1323, 1327 (Fed. Cir.), *cert. denied*, 129 S. Ct. 763 (2008) (quoting *Wyatt v. United States*, 271 F.3d 1090, 1096 (Fed. Cir. 2001), *cert. denied*, 535 U.S. 1077 (2002)); *see also Maritrans v. United States*, 342 F.3d 1344, 1351 (Fed. Cir. 2003). Accordingly, there is little doubt that to support their temporary takings claims, plaintiff must show that, at the time of the leases in question, it owned the relevant servitudes.

CFC DI # 77. Petro-Hunt established in the QTA that it possessed a present and continuing ownership in Servitudes 1-5.[9]

Second, a party must also prove a physical invasion of a property interest by the government. Ownership, alone, is not sufficient to assert a valid takings claim in this court. A claimant must also show that government action constituted a taking of that interest. Here, the United States appropriated Petro-Hunt's property interest (its "stick" in the "bundle of rights") by issuing mineral leases on Petro-Hunt's mineral estate, not by its assertion of ownership.

---

[9] The Final Judgment entered in December 2005 is proof certain of Petro-Hunt's ownership, and Petro-Hunt avers (and can prove if necessary) that prescription has not run against any of the five servitudes since the Final Judgment was entered.

different forms of relief that Congress has made available exclusively in different courts are not. To the extent the majority is concerned about the burdens of parallel discovery, federal courts have ample tools at their disposal, such as stays, to prevent such burdens.

*Id.*

Justice Ginsburg, in her dissent, pointed out the flaws in the majority's opinion in

*Tohono*. She found that:

> A plaintiff may not, § 1500 instructs, petition both the CFC and a District Court, invoking in each a distinct legal theory appropriate to the forum, but seeking redress for a single injury. When Congress bars a plaintiff from obtaining complete relief in one suit, however, and does not call for an election of remedies, Congress is most sensibly read to have comprehended that the operative facts give rise to two discrete claims.

*Id.* at 1739. The language and intent of 28 U.S.C. § 2409a(a) must be given effect as the more

recent statement of congressional intent, and § 1500 must give way.

**III    Section 1500 Is Unconstitutional, As It Is Arbitrary, Underinclusive, and Lacking a Rational Basis, or a Reasonable Relationship to a Legitimate or Compelling Interest**[14]

Section 1500 arbitrarily and unreasonably allows some claimants to pursue a case in the

Court of Federal Claims, and the same case in another court, depending solely on order of filing.

---

[14] While the *Keene* Court recognized the constitutional authority of congress to limit jurisdiction, it did not consider whether the limits of § 1500, as applied, violated the constitution, but rejected Keene's complaints of hardship as "policy arguments". *Keene*, 508 U.S. at 207. Nor did the Federal Circuit consider any serious argument when it rejected as without merit any claims made by a machinist dismissed from the Navy who prosecuted his takings claim *pro se*. *Agustin v. United States,* 92 F. App'x. 786, 789 (Fed. Cir. 2004) *cert. denied* 543 U.S. 815 (U.S. 2004). In *Davis v. United States,* the Court relied upon *UNR*, without more, for the proposition that § 1500 passes constitutional muster. 30 Fed. Cl. 201, 204-06 (1993). However, the *UNR* Court merely interpreted § 1500. The *only* constitutional discussion in *UNR* concerned a request that the ruling be applied prospectively only. *UNR Indus. v. United States,* 962 F.2d 1013, 1021 (Fed. Cir. 1992) (*en banc*), *aff'd sub nom. Keene Corp. v. United States,* 508 U.S. 200 (1993). The failure of the *UNR* Court to find a legal flaw in the requirement for a plaintiff to "choose the forum best suited to the merits of the claims and the applicable statue of limitations" is not a sufficient basis to conclude that § 1500 passes constitutional muster. The *Davis* Court never conducted a constitutional analysis of § 1500, rather its consideration of the inequities posed by § 1500 involve only discussion of policy issues and not the serious constitutional issues of whether § 1500 is, for example, arbitrary and underinclusive. *Davis,* 30 Fed. Cl. at 206.

*Tecon Eng'rs, Inc. v. United States*, 170 Ct. Cl. 389 (1965).   Consequently, the statute is unconstitutionally underinclusive.  Such a distinction is arbitrary and has no basis at all.

In *Tecon*, the Court of Claims held that § 1500 was inapplicable in situations where a plaintiff first files a claim in the Court of Claims and then files the same claim in a federal District Court.   170 Ct. Cl. at 395, 399 (1965).  The court focused on the language of § 1500 stating that the court will not have jurisdiction if the plaintiff "has pending" in another forum a claim similar to the one brought in the court.  *Id.*  The court construed this language to mean that claims would be barred by § 1500 if they were filed in this Court *after* they were filed in another forum, but that claims would not be barred if they were filed by a plaintiff in this Court *before* they were filed in another court.  *Id.* at 399.

In *UNR Indus.,* the Federal Circuit undertook a "comprehensive effort" to set out the "proper" interpretation of § 1500.  962 F.2d at 1023.  Part of this "effort" involved reviewing and revising the exceptions to the § 1500.  *Id.*  Even though the issue was not before the Federal Circuit (the plaintiffs in *UNR* had filed first in federal District Court), the court decided that *Tecon* was an "aberrational case" and declared it overruled.  *Id.*

The Federal Circuit's invalidation of *Tecon* was effectively reversed by the United States Supreme Court in *Keene Corp.,* 508 U.S. at 216.  In *Keene*, the Supreme Court limited the holding of *UNR* to facts in that case, stating:

> In applying *§ 1500* to the facts of this case, we find it unnecessary to consider, much less repudiate, the 'judicially created exceptions' to *§ 1500* found in *Tecon Engineers…Tecon Engineers* held that a later filed action in another court does not oust the Court of Federal Claims of jurisdiction over an earlier filed complaint; our decision turns on Keene's earlier filed District Court actions, and even Keene now concedes it to be 'unnecessary for the Court to address the *Tecon* question' in ruling on the dismissal of Keene's claims.

28

*Id.* Subsequent decisions of the Federal Circuit have confirmed that *Keene* limited *UNR* and that the interpretation discussed in *Tecon* remains viable law.   In *Lovelacies Harbor*, the Federal Circuit noted that the Supreme Court in *Keene* found it unnecessary to repudiate *Tecon*, stating "[a]s the Supreme Court has reminded us, anything we said in *UNR* regarding the legal import of cases whose factual bases were not properly before us was mere *dictum*, and therefore we will not accord it *stare decisis* effect." 27 F.3d at 1549.

In *Tohono III*, the United States Supreme Court effectively recognized the continued existence of the *Tecon* exception by noting that the Federal Circuit cited *Tecon* as supporting its decision in *Tohono II* but that "the *Tecon* holding [was] not presented in [the *Tohono* cases] because the CFC action here was filed after the District Court suit." 131 S.Ct at 1729-30.

Consequently, *Tecon* still lives, and 28 U.S.C. § 1500 provides the inexplicable dichotomy where a claimant who files a case in the District Court and files the same claim subsequently in the CFC, divests the CFC of jurisdiction.   However, the same claimant, who simply files his case in the CFC first, is then free to proceed with his case in the District Court. Further, as indicated in *Tecon*, there is no legislative history available to explain this dichotomy, and Petro-Hunt has not been able to find any explanation for this arbitrary result.[15]   One class of claimants is allowed to proceed uninhibited in both courts; another class of claimants is denied an opportunity to pursue both of his claims, and is forced to make an election by virtue of the effect of 28 U.S.C. § 1500.  The election is actually made for him, not by him.  Since there does not seem to be any legislative basis for this scenario, and it is, on its face, irrational, it is respectfully suggested that this entire statute is unsupported by any rational basis, and constitutes an irrational legislative scheme.  As such, if §1500 is found to bar Petro-Hunt's CFC claims, it

---

[15] The *Tecon* Court relied on the legislative history of § 1500 in interpreting the statute. *See Tecon*, 170 Ct. Cl at 399 -400.

29

will deprive Petro-Hunt of due process, as enumerated by the Fifth Amendment of the United States Constitution, and just compensation for its property taken by the United States.[16]

Congress clearly has broad power under Article III of the Constitution to determine the jurisdiction of the Federal Courts, other than the Supreme Court.  That power is not without constitutional oversight by the courts.  In *Battaglia v. General Motors*, 169 F.2d 254 (2d Cir. 1948), the Court stated:

> We think, however, that the exercise of the Congress of its control over jurisdiction is subject to compliance with at least the requirements of the Fifth Amendment.  That is to say, while Congress has the undoubted power to give, withhold, and restrict the jurisdiction of courts other than the Supreme Court, it must not so exercise that power as to deprive any person of life, liberty, or property without due process of law or to take private property without just compensation.

169 F.2d at 257; (citing *Graham & Foster v. Goodcell*, 282 U.S. 409, 431 (U.S. 1931); *cf. Brinkerhoff-Faris Trust & Savings Co. v. Hill*, 281 U.S. 673, 682 (U.S. 1930)).  The *Battaglia* Court found that the plaintiffs had not been deprived of any vested rights.  However this, and other cases, demonstrates that there is constitutional oversight by the Courts over Congress' broad power to establish the jurisdiction of lower federal courts.  As with any other act of Congress, legislation pertaining to federal jurisdiction must pass constitutional muster.  *See United States v. Bitty*, 208 U.S. 393, 399-400 (1908) ("What such exceptions and regulations should be it is for Congress, in its wisdom, to establish, having of course due regard for *all* the provisions of the Constitution") (emphasis added); *See generally* J. Nowak & R. Rotunda, *Constitutional Law* § 2.10 (8th ed. 2010).

In *Boumediene v. Bush*, 553 U.S. 723 (2008), the Supreme Court held that Congress could not constitutionally take away the jurisdiction of lower federal courts to hear and rule on

---

[16] The Fifth Amendment provides, in pertinent part, that "[n]o person shall … be deprived of life, liberty, or property, without due process of law; nor shall private property be taken for public use, without just compensation." U.S. Const. amend. V.

petitions for *habeas corpus* filed by prisoners being held in Guantanamo Bay, Cuba, where the subject legislation did not comply with the Suspension Clause.  U.S. Const. art. I. § 9, cl. 2.

In *Plaut v. Spendthrift Farm, Inc.,* 514 U.S. 211 (1995), the Supreme Court struck down as unconstitutional a statute passed by Congress requiring federal courts to reopen cases in which judgments had become final.  The Supreme Court had held that certain cases filed pursuant to the Securities Exchange Act of 1934 were subject to a statute of limitations of one year from the date of discovery of a claim and three years from the violation.  *See Lampf, Pleva, Lipkind, Prupis & Petigrow v. Gilbertson*, 501 U.S. 350 (1991).  The Court made this rule applicable to all cases pending at the time of *Lampf*.  In response, Congress passed Section 27A of the Securities Exchange Act which purported to allow claimants whose cases had been dismissed as untimely under *Lampf* to reopen the cases and avoid the effect of *Lampf*.  The Court held this attempt to require courts to reopen cases where judgments had become final was not constitutional based on separation of power grounds.[17]  Irrational, underinclusive jurisdictional legislation should not be regarded differently from any other, non-jurisdictional legislation from a constitutional standpoint. "Congress surely cannot dilute or abrogate existing constitutional guarantees in the guise of exercising its authority to vest, withhold or restrict the judicial power of inferior courts." *Petersen v. Clark,* 285 F.Supp. 700 (N.D. Cal. 1968).

Section 1500 violates the equal protection principals incorporated in the Fifth Amendment of the United States Constitution.[18]  The analyses applicable to an equal protection

---

[17] The Court did not reach the separate ground of Due Process as unnecessary.

[18] Though there is no equal protection clause in the Fifth Amendment, "[i]t is well settled that the Fifth Amendment's Due Process Clause encompasses equal protection principles." *Mathews v. de Castro*, 429 U.S. 181, 182 n. 1 (1976); *Weinberger v. Salfi*, 422 U.S. 749, 768–770 (1975). The Supreme Court's "approach to Fifth Amendment equal protection claims has always been precisely the same as to equal protection claims under the Fourteenth Amendment." *Weinberger v. Wiesenfeld*, 420 U.S. 636, 637 n2 (1975).

claim are the traditional, "rational basis" analysis, "strict scrutiny" and "intermediate scrutiny."

Strict scrutiny applies if a statute poses a disadvantage to a suspect class or interferes with the exercise of fundamental right. The Fifth Amendment to the Constitution provides an individual right to just compensation for property taken by the government. This is a fundamental, constitutionally guaranteed, right.[19]  *See, e.g., Res. Investments, Inc. v. United States*, 97 Fed. Cl. 545, 559 (2011)[20]. It also denies plaintiffs another fundamental right - access to the courts.[21] To the extent § 1500 impedes or interferes with these rights, it should be reviewed under a standard of strict scrutiny.

In *McCoy v. Union Elevated R. Co.*, 247 U.S. 354 (1918), the court stated "The fundamental right guaranteed by the Fourteenth Amendment is that the owner shall not be deprived of the market value of his property under a rule of law which makes it impossible for him to obtain just compensation." *Id.* at 365.  Under strict scrutiny analysis, a statute will not be

---

[19] "[T]he key to discovering whether [a right] is 'fundamental' is… whether [the] right [is]… explicitly or implicitly guaranteed by the Constitution. *San Antonio Indep. Sch. Dist. v. Rodriguez*, 411 U.S. 1, 33-34 (1973) (citing *Eisenstadt v. Baird*, 405 U.S. 438 (1972); *Dunn v. Blumstein*, 405 U.S. 330 (1972)); *Police Dept. of City of Chicago v. Mosley*, 408 U.S. 92 (1972); *Skinner v. Oklahoma ex rel. Williamson*, 316 U.S. 535 (1942).

[20] In *Res. Investments* the court held:
> Here, the plaintiff seeks to vindicate an equally important right--its constitutional right of private property and the attendant right to just compensation for the alleged taking of that property. *See* U.S. Const. amend. V (providing that "nor shall private property be taken for public use without just compensation"). To be sure, like other rights enumerated in the Bill of Rights, this right has been characterized as "fundamental."

97 Fed. Cl. at 559 (citing *McCoy*, 247 U.S. at 365 (1918)); *Hendler v. United States*, 175 F.3d 1374, 1376 (Fed. Cir. 1999) (referring to the "fundamental Constitutional principle" that "if private property is taken for public use, just compensation must be paid"); *Skip Kirchdorfer, Inc. v. United States*, 6 F.3d 1573, 1578 (Fed. Cir. 1993) (discussing the Fifth Amendment's takings clause, and noting that "James Madison, author of the Bill of Rights, recognized property rights as fundamental to liberty.")

[21] The First Amendment provides, in pertinent part, that "the Congress shall make no law… abridging … the right of the people … to petition the Government for a redress of grievances." U.S. Const. amend. I.

upheld unless the government (either state or federal) can demonstrate that the law has been precisely tailored to serve a compelling government interest. *See, e.g. United States v. Playboy Entm't Group, Inc.,* 529 U.S. 803 (2000).

In *Playboy Entm't*, a cable network sought a declaratory judgment that a portion of a telecommunications act which required cable operators either to scramble sexually explicit channels or limit access to those channels to certain hours, was unconstitutional and an injunction prohibiting the law's enforcement. The Supreme Court affirmed the ruling of a three-judge panel of the District Court, finding that the provision was a content-based restriction on speech that was subject to strict scrutiny, and that it violated the First Amendment's free speech clause.  The Court held:

> Not only does § 505 single out particular programming content for regulation, it also singles out particular programmers. The speech in question was not thought by Congress to be so harmful that all channels were subject to restriction. Instead, the statutory disability applies only to channels "primarily dedicated to sexually-oriented programming." … Laws designed or intended to suppress or restrict the expression of specific speakers contradict basic First Amendment principles.
> …
> [As] content-based speech restriction, it can stand only if it satisfies strict scrutiny. If a statute regulates speech based on its content, it must be narrowly tailored to promote a compelling Government interest. … If a less restrictive alternative would serve the Government's purpose, the legislature must use that alternative. … To do otherwise would be to restrict speech without an adequate justification, a course the First Amendment does not permit.

*Id.* at 812-813 (citing *Reno v. Am. Civil Liberties Union*, 521 U.S. 844, 857, 874 (1997) ("[The CDA's Internet indecency provisions'] burden on adult speech is unacceptable if less restrictive alternatives would be at least as effective in achieving the legitimate purpose that the statute was enacted to serve")); *Sable Communications of Cal., Inc. v. FCC*, 492 U.S. 115, 126 (1989) ("The Government may ... regulate the content of constitutionally protected speech in order to promote a compelling interest if it chooses the least restrictive means to further the articulated interest")'

*see also Willliams v. Rhodes*, 393 U.S. 23 (1968) (Ohio election law which made it nearly impossible for new parties to get on the ballot was invalidated because the interest in promoting two-party system was not a "compelling interest" which justified the burdens created by the law).  Further "[t]he right to petition the government-or to access the courts-is analyzed the same as the right to free speech."  *Borough of Duryea, Pa. v. Guarnieri*, 2011 WL 2437008 at * 6 (U.S. June 20, 2011); *Gunter v. Morrison,* 497 F.3d 868, 872 (8th Cir. 2007) ("[T]he right of access to courts for redress of wrongs is an aspect of the First Amendment right to petition the government."); *Hoffmann v. City of Liberty*, 905 F.2d 229, 233 (8th Cir. 1990) ("we need not determine if (or how) the petition clause is distinct from the speech clause…")

In *Dunn v. Blumstein*, 405 U.S. 330 (1972) a law which required that only the people who, at the time of the next election, will have been residents of the State for a year and residents of the county for three months were allowed to register to vote, was found not to further any compelling state interest and thus violated the equal protection clause of the Fourteenth Amendment.  The Court held:

> In pursuing that important interest, the State cannot choose means that unnecessarily burden or restrict constitutionally protected activity. Statutes affecting constitutional rights must be drawn with "precision"… and must be 'tailored' to serve their legitimate objectives. And if there are other, reasonable ways to achieve those goals with a lesser burden on constitutionally protected activity, a State may not choose the way of greater interference. If it acts at all, it must choose "less drastic means."

*Id*. at 343 (citing *NAACP v. Button*, 371 U.S. 415, 438 (1963) ("Precision of regulation must be the touchstone in an area so closely touching our most precious freedoms"); *United States v. Robel*, 389 U.S. 258, 265 (1967); *Shelton v. Tucker*, 364 U.S. 479, 488 (1960) ("[E]ven though the governmental purpose be legitimate and substantial, that purpose cannot be pursued by

34

means that broadly stifle fundamental personal liberties when the end can be more narrowly achieved.")) (Other citations omitted)

Discrimination against those litigants who file suit in the District Court first can only be allowed if the discrimination substantially relates to an important government objective. What little legislative history that is available sheds no light on this conundrum.[22] Congress could have, and should have, solved the stated problem in a way that did not arbitrarily and randomly discriminate against some litigants. Congress should not be allowed to address a legitimate problem, duplicative litigation, in a statute that arbitrarily eliminates some duplicative litigation, at the expense of those litigants who file their suits in the "wrong order," particularly when the goal of avoiding duplicative litigation can be achieved by the less drastic means already in place, such as *res judicata*, collateral estoppel and staying the litigation in one court pending the outcome of the other case which is being litigated in a different court.

This statute does not survive strict scrutiny, and also does not survive the less onerous, intermediate scrutiny analysis. Intermediate scrutiny analysis applies to statutes that affect "quasi-suspect" classifications. "Between … rational basis review and strict scrutiny lies a level of intermediate scrutiny, which generally has been applied to discriminatory classifications based

---

[22] In *Tecon*, the Court found that:

> The purpose of Section 8 of the Act was explained to the Senate by the author of the bill, Senator Edmunds, as follows (81 Cong. Globe, 40th Cong., 2nd Sess. 2769):
>> 'The object of this amendment is to put to their election that large class of persons having cotton claims particularly, who have sued the Secretary of the Treasury and the other agents of the Government in more than a hundred suits that are now pending, scattered over the country here and there, and who are here at the same time endeavoring to prosecute their claims, and have filed them in the Court of Claims, so that after they put the Government to the expense of beating them once in a court of law they can turn around and try the whole question in the Court of Claims. The object is to put that class of persons to their election either to leave the Court of Claims or to leave the other courts. I am sure everybody will agree to that.'

170 Ct. Cl. At 396.

35

on sex or illegitimacy." *Clark v. Jeter*, 486 U.S. 456, 461 (1988). This test requires invalidating a statute that discriminates based on these classifications unless the government can prove that the statute is substantially related to an important government purpose. *See, e.g., Craig v. Boren*, 429 U.S. 190 (1976) (Court struck down a state statute prohibiting the sale of 3.2% beer to males under the age of 21 and females under the age of 18, finding that the law was not substantially related to the law's objective of traffic safety.)

In *Clark,* the mother of a child born outside of marriage, filed  a child support action. The state trial court entered judgment in favor of the putative father, on the grounds that the statute of limitations had run.  The state supreme court did not allow the appeal.  The United States Supreme Court granted the mother's petition for *certiorari*, and held:

> We are, however, confident that the 6-year statute of limitations is not substantially related to Pennsylvania's interest in avoiding the litigation of stale or fraudulent claims.
> …
> We conclude that the Pennsylvania statute does not withstand heightened scrutiny under the Equal Protection Clause.

486 U.S. 456, 464-465; s*ee also Ramos v. Town of Vernon*, 353 F.3d 171, 186 (2d Cir. 2003) ("Because defendants have failed to demonstrate that Vernon's curfew ordinance is substantially related to an important governmental interest, we hold that it is unconstitutional as applied."); *District of Columbia v. Heller*, 554 U.S. 570 (2008) (Court employed a heightened scrutiny analysis in striking statutes banning handgun possession in a home and requiring that any lawful firearm in the home be rendered inoperable, as being in violation of the Second Amendment.)[23] Clearly, § 1500 does not pass constitutional muster pursuant to intermediate scrutiny analysis.

---

[23] In *Heller*, it is not clear whether the Court employed strict scrutiny or intermediate scrutiny, it is clear, however, that the Court rejected rational basis analysis. *Id*. at 629 n. 27.  The Court found that "Under any of the standards of scrutiny that we have applied to enumerated constitutional rights, banning [firearms] from the home … would fail constitutional muster." *Id*. at 628-629.

36

Government action which is not based upon either suspect or quasi-suspect classifications, and which does not interfere with the exercise of a fundamental right, is subject to the rational basis test.  Under the rational basis test, if the law is not rationally related to a legitimate state interest, it will be struck down.  Here, § 1500, which permits a plaintiff to file two suits based upon the same operative facts, as long as he or she filed in the CFC first, is not rationally related to its alleged objective of avoiding duplicative litigation. Using equal protection analysis, the statute is underinclusive, in an arbitrary way.  *See, e.g., Rubin v. Coors Brewing Company*, 514 U.S. 476, 488-489 (1995).

In *Rubin*, the Court held that a legislative scheme which required labeling of the alcohol content in wine and distilled spirits, but prohibited the labeling of alcohol content in beer, was unconstitutional because it failed to accomplish its legislative purpose of curtailing "strength wars." The Supreme Court found that the subject statute was not constitutional "because of the overall irrationality of the Government's regulatory scheme. *Id*. at 488.

In *United States Dep't of Agriculture v. Moreno*, 413 U.S. 528 (1973), the plaintiffs were individuals who alleged that, although they satisfied the income eligibility requirements for federal food assistance, they were excluded from the food stamp program by a provision in the implementing act, because the people in their households were not all related to each other.  The stated purpose of this provision was to prevent "hippie communes" from participating in the food stamp program.  The plaintiffs were several groups of unrelated people who lived in the same households, who filed a class action seeking declaratory and injunctive relief against the enforcement of the unrelated person provision of the food stamp law.  A three-judge panel of the District Court found that the provision violated the Fifth Amendment, because it created an irrational classification in violation of the equal protection component of the Due Process Clause.

37

The Supreme Court affirmed the ruling of the District Court, holding that the "unrelated person" classification was irrelevant to the stated purpose of the Food Stamp Act, and that it "simply [did] not operate so as rationally to further the prevention of fraud." *Id.* at 537. The Court found that this classification acted to exclude not only those who were likely to abuse the program, but would also exclude many people who needed aid but could not afford to alter their living arrangements to retain their eligibility for food stamps. The Court held:

> [E]ven if we were to accept as rational the Government's wholly unsubstantiated assumptions concerning the differences between 'related' and 'unrelated' households we still could not agree with the Government's conclusion that the denial of essential federal food assistance to all otherwise eligible households containing unrelated members constitutes a rational effort to deal with these concerns.

*Id.* at 535-536; s*ee also Romer v. Evans*, 517 U.S. 620 (1996).

In *Romer*, the Court struck down an amendment to a state constitution which prevented municipalities and counties from taking any legislative, executive, or judicial action to recognize gay and lesbian citizens as a protected class. The purported purpose of this law was to allow other, non-homosexual citizens' freedom of association, and to conserve its resources to fight discrimination against other groups. The Court held that:

> [I]in addition to the … deficiencies … that we have noted, the principles it offends, in another sense, are conventional and venerable; a law must bear a rational relationship to a legitimate governmental purpose, … and Amendment 2 does not.

*Id.* at 635; s*ee also Allegheny Pittsburgh Coal Co. v. County Comm'n*, 488 U.S. 336 (1989) (County tax assessor's  assessment practice which resulted in property being assessed at between 8 to 35 times more than comparable neighboring property which had not been recently sold as violated due process); *Long v. Robinson*, 316 F. Supp. 22, 28 (D. Md. 1970), *aff'd*, 436 F.2d 1116 (4th Cir. 1971) (Maryland statute that set the age for juvenile offenders at age sixteen

within Baltimore, but exempted juveniles until the age of eighteen in the rest of the state was "arbitrary, unreasonably discriminatory, and not related to any legitimate State objective.")

Similarly, here, § 1500, which allows a plaintiff to file suits based on the same operative facts, as long as he or she files in the Court of Federal Claims first is not rationally related to the objective of avoiding duplicative litigation.   As in *Moreno*, providing a cure for a perceived problem some of the time, at the expense of others, is simply not acceptable.   Given the current language of § 1500, it is apparent that without any stated congressional purpose or basis whatsoever, some plaintiffs are allowed to proceed with two cases, and some plaintiffs are not.[24] Petro-Hunt avers that this statute is unconstitutionally and impermissibly underinclusive and irrational, without basis at all, much less substantial bases, and must be declared unconstitutional under the Fifth Amendment to the Constitution.   *See Jay Burns Banking Co. v. Bryan*, 264 U.S. 504, 517 (1924) (statute requiring bread to be within two ounces of its weight right out of the oven after 24 hours was "not necessary for the protection of purchasers against imposition and fraud by short weights, is not calculated to effectuate that purpose, and … are unreasonable and arbitrary, and hence repugnant to the Fourteenth Amendment….")

Just compensation for property taken by the government is a fundamental right which requires that any burden upon it be judged under a strict scrutiny standard, or at least intermediate scrutiny.   However, § 1500 fails under any level of constitutional analysis, even rational basis. Section 1500 is poorly drafted legislation that punishes some citizens and rewards

---

[24] No proper construction of the statute can lead to a conclusion that the statute also applies because of a subsequently filed District Court case.  *See UNR Indus.*, 962 F.2d at 1026 (Plager, J., dissenting); *see also Tecon Eng'rs,* 170 Ct.Cl. 389 (finding that once jurisdiction attached, Congress did not intend that a claimant could oust the Court of Federal Claims of jurisdiction by simply filing another suit in another court).

39

others for no discernable purpose.  Moreover, its stated purpose has been supplanted by modern

notions of *res judicata*.  This statute should be stricken as inimical to the Constitution.

### <u>CONCLUSION</u>

This Court should not dismiss plaintiff's lawsuit.  Plaintiff's Court of Claims lawsuit does

not stem from the same operative facts as its Quiet Title Action.  In addition, the plain language

and the legislative history of the Quiet Title Act clearly allows for both types of lawsuits to

proceed simultaneously. Finally, this court should deny the government's motion to dismiss on

the ground that § 1500 is in violation of the United States Constitution.

Respectfully Submitted,


<u>s/*J. Ralph White*           </u>
J. Ralph White
*Counsel of Record*
WHITE LAW FIRM
650 Poydras Street, Suite 1605
New Orleans, Louisiana 70130
Telephone: (540) 799-2585
Facsimile: (540) 799-2588
E-Mail: <u>jralphwhitepllc@bellsouth.net</u>

*Of Counsel:*

Edmund M. Amorosi
SMITH PACHTER MCWHORTER PLC
8000 Towers Crescent Drive, Suite 900
Vienna, Virginia 22182
Telephone: (703) 847-6300
Facsimile: (703) 847-6312
E-Mail: <u>emorosi@smithpachter.com</u>

40

# Exhibit 2

**Chart Demonstrating the Substantial Factual Overlap Between the DCT and CFC Complaints**

| District Court Complaint | CFC Original Complaint |
|---|---|
| "Plaintiff Petro-Hunt, L.L.C. is a Delaware limited liability company…" ¶ 1. | "Plaintiff, Petro-Hunt L.L.C., a Delaware Limited Liability Company,…" pg. 1 |
| "Plaintiffs are the owners in indivision and in perpetuity of the exclusive right to explore for and produce all of the oil, gas and other minerals (termed collectively, "Plaintiffs' Mineral Rights") which may be located in, on or under properties located in Grant, Winn, and Natchitoches Parishes, Louisiana, as described in Exhibit "A" of this Complaint. The total acreage affected by the Plaintiffs' Mineral Rights is 180,021.31 acres more or less, and is situated as follows: Grant Parish contains 56,562.86 acres, more or less; Natchitoches Parish contains 25,024.17 acres, more or less; and Winn Parish contains 98,434.28 acres, more or less." ¶ 7. | "Plaintiff is the owner of a 64% undivided interest, in perpetuity, of all of the oil, gas and other minerals (termed collectively, "Plaintiff's Mineral Rights") which may be located in, on or under properties located in Grant, Winn, and Natchitoches Parishes, Louisiana, as more particularly described in Exhibit "A", attached to this Complaint. Plaintiff's Mineral Rights include 180,021.31 acres, more or less, situated as follows: Grant Parish: 56,562.86 acres, more or less; Natchitoches Parish: 25,024.17 acres, more or less; and Winn Parish: 98,434.28 acres, more or less." ¶ 2.<br><br>"Plaintiff is the owner in perpetuity of the minerals in, on or under the property described in Exhibit "A" attached herewith." ¶ 7. |
| "Plaintiffs' Mineral Rights were created as a result of the following conveyances and transactions:<br><br>(a) Sale of Minerals from Bodcaw Lumber Company of Louisiana, Inc. to Good Pine Oil Company, Inc. dated November 12, 1932, recorded in Conveyance Book 168, Folio 419, Entry No. 63721, in the records of Natchitoches Parish;<br><br>(b) Sale of Minerals from Grant Timber & Mfg. Company of La., Inc. to Good Pine Oil Company, Inc., dated November 16,1932, recorded in Conveyance Book WW, Folio 552, Entry No. 25943, in the records of Grant Parish; | "Plaintiffs' Mineral Rights were created as a result of the following conveyances and transactions:<br><br>(a) Sale of Minerals from Bodcaw Lumber Company of Louisiana, Inc. to Good Pine Oil Company, Inc. dated November 12, 1932, recorded in Conveyance Book 168, Folio 419, Entry No. 63721, in the records of Natchitoches Parish;<br><br>(b) Sale of Minerals from Grant Timber & Mfg. Company of La., Inc. to Good Pine Oil Company, Inc., dated November 16,1932, recorded in Conveyance Book WW, Folio 552, Entry No. 25943, in the records of Grant Parish; |

Def.'s Ex. 2

| District Court Complaint | CFC Original Complaint |
|---|---|
| (c) Sale of Minerals from Grant Timber &Mfg. Company of La., Inc. to Good Pine Oil Company, Inc., dated November 16, 1932, recorded in Conveyance Book 42, Folio 255, Entry No. 25548, in the records of Winn Parish; and<br><br>(d) Sale of Minerals from Bodcaw Lumber Company of Louisiana, Inc. to Good Pine Oil Company, Inc. dated November 16, 1932, recorded in Conveyance Book 42, Folio 259, Entry No. 25552, in the records of Winn Parish;<br><br>(e) Sale of Minerals from Bodcaw Lumber Company of La., Inc. to Good Pine Oil Company, Inc., dated May 3, 1934, recorded in Conveyance Book 171, Folio 72, Entry No. 65277, in the records of Natchitoches Parish;<br><br>(f) Sale of Minerals from Bodcaw Lumber Company of La., Inc. to Good Pine Oil Company, Inc., dated May 3, 1934, recorded in Conveyance Book 44, Folio 26, Entry No. 26708, in the records of Winn Parish." ¶ 8. | (c) Sale of Minerals from Grant Timber &Mfg. Company of La., Inc. to Good Pine Oil Company, Inc., dated November 16, 1932, recorded in Conveyance Book 42, Folio 255, Entry No. 25548, in the records of Winn Parish; and<br><br>(d) Sale of Minerals from Bodcaw Lumber Company of Louisiana, Inc. to Good Pine Oil Company, Inc. dated November 16, 1932, recorded in Conveyance Book 42, Folio 259, Entry No. 25552, in the records of Winn Parish;<br><br>(e) Sale of Minerals from Bodcaw Lumber Company of La., Inc. to Good Pine Oil Company, Inc., dated May 3, 1934, recorded in Conveyance Book 171, Folio 72, Entry No. 65277, in the records of Natchitoches Parish;<br><br>(f) Sale of Minerals from Bodcaw Lumber Company of La., Inc. to Good Pine Oil Company, Inc., dated May 3, 1934, recorded in Conveyance Book 44, Folio 26, Entry No. 26708, in the records of Winn Parish." ¶ 3. |
| "The United States of America owns the lands affected by Plaintiffs' Mineral Rights as a result of, *inter alia,* the following conveyances and transactions:" ¶ 9. | "The United States of America owns the surface (but not the minerals) of the lands subject to Plaintiffs' Mineral Rights as a result of, *inter alia*, the following conveyance and transactions:" ¶ 4. |

2

Def.'s Ex. 2

| District Court Complaint | CFC Original Complaint |
|---|---|
| "(a) Sale of lands by Bodcaw Lumber Company of Louisiana, Inc. to the United States of America dated February 11, 1936, recorded in Conveyance Book 173, Folio 400, Entry No. 66862, in the records of Natchitoches Parish; sale made subject to prior sale of minerals noted in Paragraphs 8(a) and 8(e) above; | "(a) Sale of lands by Bodcaw Lumber Company of Louisiana, Inc. to the United States of America dated February 11, 1936, recorded in Conveyance Book 173, Folio 400, Entry No. 66862, in the records of Natchitoches Parish; sale made subject to prior sales of minerals noted in Paragraph 3 above; |
| (b) Sale of lands by Grant Timber & Manufacturing Company of Louisiana, Inc. to the United States of America, dated November 28, 1934, recorded in Conveyance Book ZZ, Folio 359, Entry No. 27363, in the records of Grant Parish; sale made subject to prior sale of minerals noted in Paragraph 8(b) above. | (b) Sale of lands by Grant Timber & Manufacturing Company of Louisiana, Inc. to the United States of America, dated November 28, 1934, recorded in Conveyance Book ZZ, Folio 359, Entry No. 27363, in the records of Grant Parish; sale made subject to prior sales of minerals noted in Paragraph 3 above. |
| (c) Sale of lands by Grant Timber and Manufacturing Company of Louisiana, Inc. to the United States of America, dated March 26, 1935, recorded in Conveyance Book 53, Folio 78, Entry No. 27600, in the records of Grant Parish; sale made subject to prior sale of minerals noted in Paragraph 8(b) above; | (c) Sale of lands by Grant Timber and Manufacturing Company of Louisiana, Inc. to the United States of America, dated March 26, 1935, recorded in Conveyance Book 53, Folio 78, Entry No. 27600, in the records of Grant Parish; sale made subject to prior sales of minerals noted in Paragraph 3 above; |
| (d) Sale of lands by Grant Timber & Manufacturing Company of Louisiana, Inc. to the United States of America, dated November 28, 1934, recorded in Conveyance Book 44, Folio 131, Entry No. 26836, in the records of Winn Parish; sale made subject to prior sale of minerals noted in Paragraph 8(c) above; | (d) Sale of lands by Grant Timber & Manufacturing Company of Louisiana, Inc. to the United States of America, dated November 28, 1934, recorded in Conveyance Book 44, Folio 131, Entry No. 26836, in the records of Winn Parish; sale made subject to prior sales of minerals noted in Paragraph 3 above; |
| (e) Sale of lands by Bodcaw Lumber Company of Louisiana, Inc. to the United States of America, dated December 20, 1934, recorded in Conveyance Book 44, Folio 160, Entry No. 26887, in the records of Winn Parish; sale made subject to prior sale of minerals noted in Paragraphs 8(d) and 8(f) above; | (e) Sale of lands by Bodcaw Lumber Company of Louisiana, Inc. to the United States of America, dated December 20, 1934, recorded in Conveyance Book 44, Folio 160, Entry No. 26887, in the records of Winn Parish; sale made subject to prior sales of minerals noted in Paragraph 3 above; |

3

Def.'s Ex. 2

| District Court Complaint | CFC Original Complaint |
|---|---|
| (f) Sale of lands by Grant Timber & Manufacturing Company of Louisiana, Inc. to the United States of America, dated March 26, 1935, recorded in Conveyance Book 44, Folio 413, Entry No. 27139, in the records of Winn Parish; sale made subject to prior sale of minerals noted in Paragraph 8(c) above; and | (f) Sale of lands by Grant Timber & Manufacturing Company of Louisiana, Inc. to the United States of America, dated March 26, 1935, recorded in Conveyance Book 44, Folio 413, Entry No. 27139, in the records of Winn Parish; sale made subject to prior sales of minerals noted in Paragraph 3 above; and |
| (g) Sale of lands by Bodcaw Lumber Company of Louisiana, Inc. to the United States of America, dated June 12, 1935, recorded in Conveyance Book 44, Folio 546, Entry No. 27280, in the records of Winn Parish; sale made subject to prior sale of minerals noted in Paragraph 8(d) above. | (g) Sale of lands by Bodcaw Lumber Company of Louisiana, Inc. to the United States of America, dated June 12, 1935, recorded in Conveyance Book 44, Folio 546, Entry No. 27280, in the records of Winn Parish; sale made subject to prior sales of minerals noted in Paragraph 3 above. |
| (h) Sale of lands by Grant Timber & Manufacturing Company of Louisiana, Inc. to the United States of America, dated March 26, 1935, recorded in Conveyance Book 44, Folio 419, Entry No. 27140, in the records of Winn Parish, Louisiana; sale made subject to prior sale of minerals noted in Paragraph 8(c) above; and | (h) Sale of lands by Grant Timber & Manufacturing Company of Louisiana, Inc. to the United States of America, dated March 26, 1935, recorded in Conveyance Book 44, Folio 419, Entry No. 27140, in the records of Winn Parish, Louisiana; sale made subject to prior sales of minerals noted in Paragraph 3 above; and |
| (i) Judgment in favor of the United States of America against Bodcaw Lumber Company of Louisiana, Inc., dated January 28, 1937, recorded in Conveyance Book 48, Folio 22, Entry No. 29731, in the records of Winn Parish; judgment made subject to sale of minerals noted in Paragraph 8(d) above. | (i) Judgment in favor of the United States of America against Bodcaw Lumber Company of Louisiana, Inc., dated January 28, 1937, recorded in Conveyance Book 48, Folio 22, Entry No. 29731, in the records of Winn Parish; judgment subject to prior sales of minerals noted in Paragraph 3 above. |
| (j) Judgment in favor of the United States of America against Bodcaw Lumber Company of Louisiana, Inc., dated January 28, 1937, recorded in Conveyance Book 177, Folio 612, Entry No. 69177, in the records of Natchitoches Parish; judgment made subject to sale of minerals noted in Paragraph 8(e) above." ¶ 9. | (j) Judgment in favor of the United States of America against Bodcaw Lumber Company of Louisiana, Inc., dated January 28, 1937, recorded in Conveyance Book 177, Folio 612, Entry No. 69177, in the records of Natchitoches Parish; judgment subject to prior sales of minerals noted in Paragraph 3 above." ¶ 4. |

4

Appx2114

Def.'s Ex. 2

| District Court Complaint | CFC Original Complaint |
|---|---|
| "*United States v. Nebo Oil Co.,* 90 F. Supp. 73 (W.D. La. 1950), *affirmed,* 190 F.2d 1003 (5th Cir. 1951) (the "Nebo Oil Case"), attached as Exhibit B, involved the mineral rights created by the mineral sale described as item (a) of Paragraph 8 above, insofar as those mineral rights affected a portion of the lands conveyed to the United States through the sale described as item (a) of Paragraph 9 above. In the Nebo Oil Case, the United States Court of Appeals for the Fifth Circuit ruled that Act 315 of 1940 of the Louisiana Legislature rendered the mineral rights affected by that mineral sale imprescriptible. The final decree of the District Court (United States District Court, Western District of Louisiana, Shreveport Division, Civil Action No. 2379) in the Nebo Oil Case, attached as Exhibit C to this Complaint, and the Mandate of the United States Court of Appeals for the Fifth Circuit in said case, attached as Exhibit D to this Complaint, are recorded, together with an affidavit setting forth details concerning the ownership of Plaintiffs' Mineral Rights, in Conveyance Book 99, Folio 93, Entry No. 47969, in the records of Grant Parish; Conveyance Book 73, Folio 314, Entry No. 49398, in the records of Winn Parish; and Conveyance Book 216, Folio 331, Entry No. 97034, in the records of Natchitoches Parish." ¶ 10. | "Plaintiff, Petro-Hunt, is the successor in interest, with respect to Plaintiff's Mineral Rights, to Nebo Oil Company, Inc.  In United States v. Nebo Oil Co., 90 F.Supp. 73 (W.D.La. 1950), *aff'd*, 190 F.2d 1003 (5th Cir. 1951) (the "Nebo Oil Case"), title to a portion of Plaintiff's Mineral Rights was litigated and Nebo Oil Company was found to be the owner of same in perpetuity. As a result of the doctrines of collateral estoppel, *res judicata*, and issue and claim preclusion, Nebo Oil Company, and hence, Petro-Hunt, L.L.C., as its successor in interest, is the owner in perpetuity of all of the property described above as "Plaintiff's Mineral Rights." See attached Exhibit A.<br><br>    Nebo Oil Company, Inc. placed of record an affidavit wherein it claimed title to all of the property shown in Exhibit A (Plaintiff's Mineral Rights) and said affidavit of ownership can be found in Conveyance Book 99, Folio 93, Entry No. 47969, in the records of Grant Parish; Conveyance Book 73, Folio 314, Entry No. 49398, in the records of Winn Parish; and Conveyance Book 216, Folio 331, Entry No. 97034, in the records of Natchitoches Parish. Grant, Winn and Natchitoches Parishes are all located within the State of Louisiana. Upon information and belief, the United States of America acknowledged and publicly declared in a number of instances that Nebo Oil Company, Inc. and its successors were indeed the owners of Plaintiff's Mineral Rights at all times until some time at or about 1991." ¶ 5. |

Appx2115

Def.'s Ex. 2

| District Court Complaint | CFC Original Complaint |
|---|---|
| "The Plaintiffs' Mineral Rights are owned indivisibly in the following percentages:<br>Petro-Hunt, L.LC. - 64.28572%;<br>Hunt Petroleum Corporation - 16.80672%; and<br>Kingfisher Resources, Inc. - 18.90756%<br>as a result of, *inter alia,* the following conveyances, declarations and transactions: | "Plaintiff's Mineral Rights are owned by plaintiff as a result of, *inter alia*, the following conveyances, declarations and transactions: |
| (a) Conveyance of Minerals from Good Pine Oil Company, Inc. to William C. Brown, et al., dated December 29, 1941, recorded in Conveyance Book 69, Folio 519, Entry No. 35127, in the records of Grant Parish; | (a) Conveyance of Minerals from Good Pine Oil Company, Inc. to William C. Brown, et al., dated December 29, 1941, recorded in Conveyance Book 69, Folio 519, Entry No. 35127, in the records of Grant Parish; |
| (b) Conveyance of Minerals from Good Pine Oil Company, Inc. to William C. Brown, et al., dated December 29, 1941, recorded in Conveyance Book 54, Folio 324, Entry No. 34486, in the records of Winn Parish; | (b) Conveyance of Minerals from Good Pine Oil Company, Inc., to William C. Brown, et al., dated December 29, 1941, recorded in Conveyance Book 54, Folio 324, Entry No. 34486, in the records of Winn Parish; |
| (c) Conveyance of Minerals from Good Pine Oil Company, Inc. to William C. Brown, et al., dated December 29, 1941, recorded in Conveyance Book 188, Folio 547, Entry No. 76585, in the records of Natchitoches Parish; | (c) Conveyance of Minerals from Good Pine Oil Company, Inc. to William C. Brown, et al., dated December 29,1941, recorded in Conveyance Book 188, Folio 547, Entry No. 76585, in the records of Natchitoches Parish; |
| (d) Conveyance of Minerals from William C. Brown, et al., to Nebo Oil Company, Inc., dated January 20, 1942, recorded in Conveyance Book 71, Folio 181, Entry No. 35377, in the records of Grant Parish; | (d) Conveyance of Minerals from William C. Brown, et al., to Nebo Oil Company Inc., dated January 20, 1942, recorded in Conveyance Book 71, Folio 181, Entry No. 35377, in the records of Grant Parish; |
| (e) Conveyance of Minerals from William C. Brown, et al., to Nebo Oil Company, Inc., dated January 20, 1942, recorded in | (e) Conveyance of Minerals from William C. Brown, et al., to Nebo Oil Company, Inc. dated January 20, 1942, recorded in |

6

Def.'s Ex. 2

| District Court Complaint | CFC Original Complaint |
|---|---|
| Conveyance Book 71, Folio 195; Entry No. 35378, in the records of Grant Parish; | Conveyance Book 71, Folio 195, Entry No. 35378, in the records of Grant Parish; |
| (f) Conveyance of Minerals from William C. Brown, et al., to Nebo Oil Company, Inc., dated January 20, 1942, recorded in Conveyance Book 56, Folio 1, Entry No. 34722, in the records of Winn Parish; | (f) Conveyance of Minerals from William C. Brown, et al., to Nebo Oil Company, Inc., dated January 20, 1942, recorded in Conveyance Book 56, Folio 1, Entry No. 34722, in the records of Winn Parish; |
| (g) Conveyance of Minerals from William C. Brown, et al., to Nebo Oil Company, Inc., dated January 20, 1942, recorded in Conveyance Book 56, Folio 18, Entry No. 34723, in the records of Winn Parish; | (g) Conveyance of Minerals from William C. Brown, et al., to Nebo Oil Company, Inc. dated January 20, 1942, recorded in Conveyance Book 56, Folio 18, Entry No. 34723, in the records of Winn Parish; |
| (h) Conveyance of Minerals from William C. Brown, et al., to Nebo Oil Company, Inc., dated January 20, 1942, recorded in Conveyance Book 189, Folio 370, Entry No. 76995, in the records of Natchitoches Parish; | (h) Conveyance of Minerals from William C. Brown, et al., to Nebo Oil Company, Inc., dated January 20, 1942, recorded in Conveyance Book 189, Folio 370, Entry No. 76995, in the records of Natchitoches Parish; |
| (i) Conveyance of Minerals from William C. Brown, et al., to Nebo Oil Company, Inc., dated January 20, 1942, recorded in Conveyance Book 189, Folio 382, Entry No. 76996, in the records of Natchitoches Parish; | (i) Conveyance of Minerals from William C. Brown, et al., to Nebo Oil Company Inc., dated January 20, 1942, recorded in Conveyance Book 189, Folio 382, Entry No. 76996, in the records of Natchitoches Parish; |
| (j) Acknowledgement by Joe Smith, h/o Anita O'Neal Smith, to Nebo Oil Company, Inc., dated June 19, 1952, recorded in Conveyance Book 101, Folio 3, Entry No. 48538, in the records of Grant Parish; Conveyance Book 74, Folio 51, Entry No. 49817, in the records of Winn Parish; and Conveyance Book 217, Folio 80, Entry No. 97514, in the records of Natchitoches Parish (husband acknowledged in this document that property conveyed in (d), ( e), (f), (g), (h) and (i) above was the separate property of | (j) Acknowledgment by Joe Smith, h/o Anita O'Neal Smith, to Nebo Oil Company, Inc., dated June 19, 1952, recorded in Conveyance Book 101, Folio 3, Entry No. 48538, in the records of Grant Parish; Conveyance Book 74, Folio 51, Entry No. 49817, in the records of Winn Parish; and Conveyance Book 217, Folio 80, Entry No. 97514, in the records of Natchitoches Parish (husband acknowledged in this document that property conveyance in (d), (e), (f), (g), (h) and (i) above was the |

7

Def.'s Ex. 2

| District Court Complaint | CFC Original Complaint |
|---|---|
| his wife); | separate property of his wife); |
| (k) Acknowledgement by H.I. Kenney, h/o Grace Wagner Kenney, to Nebo Oil Company, Inc., dated June 18, 1952, recorded in Conveyance Book 101, Folio 5, Entry No. 48539, in the records of Grant Parish; Conveyance Book 74, Folio 52, Entry No. 49818, in the records of Winn Parish; and Conveyance Book 217, Folio 82, Entry No. 97515, in the records of Natchitoches Parish (husband acknowledged in this document that property conveyed in (d), (e), (f), (g), (h) and (i) above was the separate property of his wife); | (k) Acknowledgment by H.I. Kenney, h/o Grace Wagner Kenney, to Nebo Oil Company, Inc., dated June 18, 1952, recorded in Conveyance Book 101, Folio 5, Entry No. 48539, in the records of Grant Parish; Conveyance Book 74, Folio 52, Entry No. 49818, in the records of Winn Parish; and Conveyance Book 217, Folio 82, Entry No. 97515, in the records of Natchitoches Parish (husband acknowledged in this document that property conveyed in (d), (e), (f), (g), (h) and (i) above was the separate property of his wife); |
| (l) Acknowledgment by S. J. Seeger, h/o Helen, B. Seeger, to Nebo Oil Company, Inc., dated July 31, 1944, recorded in Conveyance Book 195, Folio 369, Entry No. 82455, in the records of Grant Parish (husband acknowledged in this document that property conveyed in (h) and (i) above was the property of his wife); | (1) Acknowledgment by S. J. Seeger, h/o Helen B. Seeger, to Nebo Oil Company, Inc., dated July 31, 1944, recorded in Conveyance Book 195, Folio 369, Entry No. 82455, in the records of Grant Parish (husband acknowledged in this document that property conveyed in (h) and (i) above was the property of his wife); |
| (m) Acknowledgment by Mary Seeger O' Boyle, et al., being the heirs of S. J. Seeger, deceased h/o Helen B. Seeger, to Nebo Oil Company, Inc., dated November 13, 1954, recorded in Conveyance Book l04, F9olio 433, Entry No. 50887, in the records of Grant Parish; and Conveyance Boo k 235, Folio 717, Entry No. 175422, in the records of Winn Parish (heirs of deceased husband acknowledged in this document that property conveyed in (d), (e), (f) and (g) above was the separate property of his wife) | (m) Acknowledgment by Mary Seeger O'Boyle, et al., being the heirs of S. J. Seeger, deceased h/o Helen B. Seeger, to Nebo Oil Company, Inc., dated November 13, 1954, recorded in Conveyance Book 104, Folio 433, Entry No. 50887, in the records of Grant Parish; and Conveyance Book 235, Folio 717, Entry No. 175422, in the records of Winn Parish (heirs of deceased husband acknowledged in this document that property conveyed in (d), (e), (f) and (g) above was the separate property of his wife); |
| (n) Certificate of Amendment of Certification of Incorporation (name change) from Nebo Oil Company, Inc. to Bodcaw | (n) Certificate of Amendment of Certification of Incorporation (name change) from Nebo Oil Company, Inc. to Bodcaw |

8

Appx2118

Def.'s Ex. 2

| District Court Complaint | CFC Original Complaint |
|---|---|
| Company, dated April 4, 1960, recorded in Conveyance Book 119, Folio 39, Entry No. 56054, in the records of Grant Parish; Conveyance Book 87, Folio 221, Entry No. 56325, in the records of Winn Parish; and Conveyance Book 238, Folio 401, Entry No. 111325, in the records of Natchitoches Parish; | Company, dated April 4, 1960, recorded in Conveyance Book 119, Folio 39, Entry No. 56054, in the records of Grant Parish; Conveyance Book 87, Folio 221, Entry 56325, in the records of Winn Parish; and Conveyance Book 238, Folio 401, Entry No. 111325, in the records of Natchitoches Parish; |
| (o) Certificate of Agreement of Merger (Bodcaw Company merged into IPB, Inc., and IPB, Inc. changed its name to Bodcaw Company), dated October 10, 1979, recorded in Conveyance Book 226, Folio 84, Entry No. 84739, in the records of Grant Parish; Conveyance Book 143, Folio 608, Entry No. 110749, in the records of Winn Parish; and Conveyance Book 356, Folio 491, Entry No. 157257, in the records of Natchitoches Parish; all as further evidenced by (y) below; | (o) Certificate of Agreement of Merger (Bodcaw Company merged into IPB, Inc., and IPB, Inc. changed its name to Bodcaw Company), dated October 10, 1979, recorded in Conveyance Book 226, Folio 84, Entry 84739, in the records of Grant Parish; Conveyance Book 143, Folio 608, Entry No. 110749, in the records of Winn Parish; and Conveyance Book 356, Folio 491, Entry No. 157257, in the records of Natchitoches Parish; all as further evidenced by (y) below; |
| (p) Certificate of Ownership and Merger filed by Bodcaw Company, dated October 10, 1979, recorded in Conveyance Book 226, Folio 85, Entry No. 84740, in the records of Grant Parish; Conveyance Book 143, Folio 609, Entry No. 110750, in the records of Winn Parish; and Conveyance Book 356, Folio 492, Entry No. 157258, in the records of Natchitoches Parish; | (p) Certificate of Ownership and Merger filed by Bodcaw Company, dated October 10, 1979, recorded in Conveyance Book 226, Folio 85, Entry No. 84740, in the records of Grant Parish; Conveyance Book 143, Folio 609, Entry No. 110750, in the records of Winn Parish; and Conveyance Book 356, Folio 492, Entry No. 1572589 in the records of Natchitoches Parish; |
| (q) Mineral Deed from Bodcaw Company to Placid Oil Company, dated October 11, 1979, recorded in Conveyance Book 224, Folio 812, Entry No. 84742, in the records of Grant Parish; Conveyance Book 143, Folio 620, Entry No. 110752, in the records of Winn Parish; and Conveyance Book 356, Folio 508, Entry No. 157260, in the records of Natchitoches Parish; | (q) Mineral Deed from Bodcaw Company to Placid Oil Company, dated October 11, 1979, recorded in Conveyance Book 224, Folio 812, Entry No. 84742, in the records of Grant Parish; Conveyance Book 143, Folio 620, Entry No. 110752, in the records of Winn Parish; and Conveyance Book 356, Folio 508, Entry No. 157260, in the records of Natchitoches Parish; |
| (r) Assignment, Conveyance and Bill of Sale from Placid Oil Company to Placid International Oil Limited, and in turn from | (r) Assignment, Conveyance and Bill of Sale from Placid Oil Company to Placid International Oil Limited, and in turn from |

9

Def.'s Ex. 2

| District Court Complaint | CFC Original Complaint |
|---|---|
| Placid International Oil Limited to Louisiana-Hunt Petroleum Corporation and Rosewood Resources (POC), Inc., dated June 13, 1983, recorded in Conveyance Book 259, Folio 139, Entry No. 93374, in the records of Grant Parish; Conveyance Book 158, Folio 550, Entry No. 122732, in the records of Winn Parish; and Conveyance Book 388, Folio 19, Entry No. 167876, in the records of Natchitoches Parish; | Placid International Oil Limited to Louisiana-Hunt Petroleum Corporation and Rosewood Resources (POC), Inc., dated June 13, 1983, recorded in Conveyance Book 259, Folio 139, Entry No. 93374, in the records of Grant Parish; Conveyance Book 158, Folio 550, Entry No. 122732, in the records of Winn Parish; and Conveyance Book 388, Folio 19, Entry No. 167876, in the records of Natchitoches Parish; |
| (s) Certificate of Ownership, Merger Name Change from Rosewood Resources (POC), Inc. to Rosewood Resources, Inc., dated December 31, 1984, recorded in Mortgage Book 134, Folio 880, Entry No. 44105, in the records of Grant Parish; Conveyance Book 172, Folio 553, Entry No. 134394, in the records of Winn Parish; and Conveyance Book 420, Folio 49, Entry No. 176881, in the records of Natchitoches Parish; | (s) Certificate of Ownership, Merger Name Change from Rosewood Resources (POC), Inc. to Rosewood Resources, Inc., dated December 31, 1984, recorded in Mortgage Book 134, Folio 880, Entry No. 44105, in the records of Grant Parish; Conveyance Book 172, Folio 553, Entry No. 134394, in the records of Winn Parish; and Conveyance Book 420, Folio 49, Entry No. 176881, in the records of Natchitoches Parish; |
| (t) Certificate of Merger and Name Change from Louisiana-Hunt Petroleum Corporation to Hunt Petroleum Corporation, dated January 31, 1986, recorded in Conveyance Book 215, Folio 574, Entry No. 64469, in the records of Grant Parish; Conveyance Book 182, Folio 542, Entry No. 141085, in the records of Winn Parish; and Conveyance Book 442, Folio 127, Entry No. 182279, in the records of Natchitoches Parish; | (t) Certificate of Merger and Name Change from Louisiana-Hunt Petroleum Corporation to Hunt Petroleum Corporation, dated January 31, 1986, recorded in Conveyance Book 215, Folio 574, Entry 64469, in the records of Grant Parish; Conveyance Book 182, Folio 542, Entry 141085, in the records of Winn Parish and Conveyance Book 442, Folio 127, Entry No. 182279, in the records of Natchitoches Parish; |
| (u) Assignment and Conveyance from Rosewood Resources, Inc. to Kingfisher Resources, Inc., dated April 24, 1996, recorded in Conveyance Book 338, Folio 395, Entry No. 1177448, in the records of Grant Parish; Conveyance Book 217, Folio 757, Entry No. 163185, in the records of Winn Parish; and Oil and Gas Book 296, Folio 836, Entry No. 230814, in the records of Natchitoches Parish; and | (u) Assignment and Conveyance from Rosewood Resources, Inc. to Kingfisher Resources Inc., dated April 24,1996, recorded in Conveyance Book 338, Folio 395, Entry No. 117748, in the records of Grant Parish; Conveyance Book 217, Folio 757, Entry No. 163185, in the records of Winn Parish; and Oil and Gas Book 296, Folio 836, Entry No. 230814, in the records of Natchitoches Parish; and |

10

Def.'s Ex. 2

| District Court Complaint | CFC Original Complaint |
|---|---|
| (v) Conveyance and Assumption Agreement from OXY USA Inc. and Placid Oil Company to Petro-Hunt, L.L.C., executed April 6, 1998, recorded in Conveyance Book 348, Folio 191, Entry No. 121619, in the records of Grant Parish; Conveyance Book 227, Folio 85, Entry No. 169509, in the records of Winn Parish; and Conveyance Book 529, Folio 653, Entry No. 209089, in the records of Natchitoches Parish." ¶ 11. | (v) Conveyance and Assumption Agreement from OXY USA, Inc. and Placid Oil Company to Petro-Hunt, L.L.C., executed April 6, 1998, recorded in Conveyance Book 348, Folio 191, Entry No. 121619, in the records of Grant Parish; Conveyance Book 227, Folio 85, Entry No. 169509, in the records of Winn Parish; and Conveyance Book 529, Folio 653, Entry No. 2090899 in the records of Natchitoches Parish." ¶ 6. |
| "The Plaintiffs' Mineral Rights cover lands now located within the Kisatchie National Forest, which is administered by the Forest Service of the United States Department of Agriculture. The federal government acquired its surface interest in these lands as a result of the conveyances shown above in Paragraph 9." ¶ 13. | "The Plaintiffs' Mineral Rights are located within the Kisatchie National Forest, a National Forest administered by the Forest Service of the United States Department of Agriculture. The federal government acquired its surface interest in these lands as a result of the conveyances shown above in Paragraph 4." ¶ 8. |
| "Notwithstanding the decisions in the Nebo Oil Case, commencing in 1991, the United States Bureau of Land Management ("BLM") has attempted to grant a number of mineral leases on lands subject to the Plaintiffs' Mineral Rights. Based on a review of the public records and available BLM documents, Exhibit E lists those lands which are subject to Plaintiffs' Mineral Rights which are either (i) purportedly subject to mineral leases granted by BLM which continue to be in effect, or (ii) purportedly subject to pending offers to lease from BLM (together, the "Disputed Leases"). The defendants listed in Paragraph 4 above, other than the United States of America, are the mineral lessees under the Disputed Leases from the BLM." ¶ 14. | "On information and belief, the United States Bureau of Land Management began, on or about 1991, to wrongfully grant as Lessor, a series of purported oil and gas leases, as well as entertained offers to grant oil and gas leases, purporting to cover portions of Plaintiff's Mineral Rights." ¶ 9. |
| "In a series of letters beginning in 1991, Plaintiffs have repeatedly protested the attempted leasing by the BLM of the lands subject | "In 1991 and thereafter, plaintiff, or its predecessors and/or co-owners, wrote a series of letters to the United States Department |

11

Appx2121

| District Court Complaint | CFC Original Complaint |
|---|---|
| to the Plaintiffs' Mineral Rights."<br>"Nevertheless, the BLM has consistently rejected the Plaintiffs' protests and has proceeded to attempt to issue Disputed Leases. The Disputed Leases constitute a cloud and slander on Plaintiffs' title to Plaintiffs' Mineral Rights." ¶¶ 15, 16. | of Agriculture protesting the purported leasing by the United States Bureau of Land Management of the land subject to the Plaintiffs' Mineral Rights, but this agency did not acknowledge those letters and would not agree to stop this activity." ¶ 10. |
| "As a result of the adverse claims of the United States of America described herein, Plaintiffs are entitled to a declaratory judgment quieting their title to their property pursuant to 28 U.S.C. § 2201 and 28 U.S.C. § 2409a, recognizing and declaring Plaintiffs to be the true and lawful owners, in perpetuity, of the Plaintiffs' Mineral Rights in the proportions outlined in Paragraph 11 above, and for a judgment declaring the Disputed Leases to be null and void." ¶ 18. | "Consequently, on or about February 18, 2000 plaintiff and plaintiff's co-owners filed suit in the United States District Court for the Western District of Louisiana, Civil Action No. CV00-0303 S, seeking declaratory relief and to remove this cloud on plaintiff's title, caused by the United States of America, pursuant to the Quiet Title Act. 28 U.S.C. §2409(a). Plaintiff also joined as parties defendant the following individuals or entities who had taken purported mineral leases from the USA: … In this suit, (hereinafter "Plaintiff's Louisiana Quiet Title Act Suit"), plaintiffs prayed that they be declared perpetual owners, in indivision, of one hundred (100%) percent of the minerals in, on, under and that may be produced from the property described in Exhibit "A" to this Complaint and that a judgment be entered declaring that the defendants in Plaintiff's Louisiana Quiet Title Act Suit have no estate or interest in and to said minerals in said property adverse to plaintiffs and declaring any mineral leases granted by the United States allegedly applicable to any of the property described in Exhibit "A" to this Complaint to be null and void." ¶ 11. |
| "In the alternative, and only in the event that this Honorable Court determines that Plaintiffs are not entitled to the relief sought in the preceding paragraph, Plaintiffs allege that the actions of the United States in confiscating their mineral interests amounts to an unconstitutional taking in direct violation of the Fifth Amendment | "The present proceeding is brought, in part, in the alternative, and the interests of justice and judicial economy require that it be stayed pending resolution of plaintiff s Louisiana Quiet Title Act Suit. |

12

Appx2122

| District Court Complaint | CFC Original Complaint |
|---|---|
| of the United States Constitution, for which Plaintiffs should be compensated.<br>WHEREFORE, Plaintiffs pray that after due proceedings are held there be a judgment in their favor and against the defendants ordering, adjudging, and decreeing:<br>1) That they are the owners, in indivision, of exclusive and perpetual mineral rights, covering the right to explore for and produce the minerals in, on or under the properties listed and described in Exhibit A to this Complaint,<br>2) That the United States of America has no valid mineral interests in the properties described in Exhibit A and that any purported mineral leases affecting said properties previously granted by the United States are null and void, and<br>3) That the United States of America is permanently enjoined from attempting in any manner to grant mineral leases in, on, or under the properties listed in Exhibit A.<br>In the alternative, and only in the event that Plaintiffs are not found to be entitled to the declaratory relief sought above, Plaintiffs pray for a money judgment against the United States of America in an amount that will represent just compensation for the unconstitutional taking of the Plaintiffs' Mineral Rights in violation of the Fifth Amendment of the United States Constitution." ¶ 19. | WHEREFORE, plaintiff prays that this proceeding be filed but that it be stayed pending resolution of plaintiff's Louisiana Quiet Title Act Suit, and that once the Louisiana Quiet Title Act Suit has reached final judgment, that the stay be lifted, and this matter then proceed to trial and that thereafter judgment be rendered in favor of plaintiff and against the United States in an amount as determined by this Honorable Court to be just compensation for the unconstitutional takings of plaintiff's property in violation of the Fifth Amendment to the United States Constitution.  Plaintiff prays for all other and further relief, whether in law or equity, to which it may be entitled." ¶ 13. |

Appx2123

Def.'s Ex. 2

**IN THE UNITED STATES COURT OF FEDERAL CLAIMS**

| | | |
|---|---|---|
| PETRO-HUNT, L.L.C., | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | Case No. 00-512L |
| v. | ) | Judge Allegra |
| | ) | |
| THE UNITED STATES OF AMERICA, | ) | |
| | ) | |
| Defendant. | ) | |

## MOTION FOR LEAVE TO FILE SUPPLEMENTAL MEMORANDUM  IN OPPOSITION TO MOTION TO DISMISS

Plaintiff, Petro-Hunt, L.L.C. respectfully moves this honorable court for leave to file the attached brief supplemental memorandum in opposition to the government's motion to dismiss this case based on 28 U.S.C. Section 1500. A copy of the proposed Supplemental Memorandum in Opposition to Motion to Dismiss is attached hereto as Exhibit "A"

Petro-Hunt seeks leave of court to address an issue raised by implication in its prior memorandum that is primarily based on authorities already cited to the court.  There are however, several new cases contained in this memorandum.  This supplemental memorandum addresses the issue of the Constitutional right to just compensation as it relates to the doctrine of sovereign immunity, which is a common law doctrine.  Petro-Hunt asserts the Fifth Amendment must be paramount to the sovereign immunity doctrine, and the supplemental memorandum contains a number of cases from this court and the Federal Circuit which have so held.

The Government, in its reply memorandum in support of the motion to dismiss for lack of jurisdiction, relies heavily upon *United States v. Tohono O'odham Nation* 131 S. Ct 1723 (2011)

and quotes from that case stating that the right to access the Court of Federal Claims is a matter of grace.  It is respectfully submitted that that is not correct in a takings case, which *Tohono* does not appear to have been.

The new cases contained in the Supplemental Memorandum are to amplify the issue already raised by the cases in Petro-Hunt's previously filed memorandum, including *Boumedine v. Bush* 553 U.S. 723 (2008); *Plaut v. Spendthrift Farm, Inc.,* 514 U.S. 211 (1995) and *Battaglia v. General Motors*, 169 F.2d 254 (2d Cir. 1948); all of which hold that if Congress cannot take away a Constitutional right then it cannot restrict federal jurisdiction to obtain the benefit of that right. Section 1500 of Title 28 is a serious impingement upon the Fifth Amendment right to just compensation and should be found unconstitutional.

Petro-Hunt respectfully requests leave to file this supplemental memorandum (Exhibit A).

The United States does not consent to the filing of this Supplemental Memorandum in Opposition to Motion to Dismiss.

Respectfully submitted,

<div style="margin-left:40%">

s/*J. Ralph White_____ ____*
J. Ralph White
*Counsel of Record*
WHITE LAW FIRM
650 Poydras Street, Suite 1605
New Orleans, Louisiana 70130
Telephone: (540) 799-2585
Facsimile: (540) 799-2588
E-Mail: jralphwhitepllc@bellsouth.net

*Of Counsel:*

Edmund M. Amorosi
SMITH PACHTER MCWHORTER PLC
8000 Towers Crescent Drive, Suite 900

</div>

2

Vienna, Virginia 22182
Telephone: (703) 847-6300
Facsimile: (703) 847-6312
E-Mail: emorosi@smithpachter.com

## **CERTIFICATE OF ELECTRONIC FILING AND SERVICE**

I hereby certify that on this 24th day of January, 2012, this Plaintiff's *Motion for Leave to File Supplemental Memorandum in Opposition to Motion to Dismiss* was filed electronically. I understand that notice of this filing will be sent to counsel for the Defendant automatically by operation of the Court's electronic filing system. Parties may access this filing through the Court's electronic filing system

s/*J. Ralph White*_____
J. Ralph White

**IN THE UNITED STATES COURT OF FEDERAL CLAIMS**

|   |   |   |
|---|---|---|
| PETRO-HUNT, L.L.C., | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | Case No. 00-512L |
| v. | ) | Judge Allegra |
| | ) | |
| THE UNITED STATES OF AMERICA, | ) | |
| | ) | |
| Defendant. | ) | |

**SUPPLEMENTAL MEMORANDUM  IN OPPOSITION TO MOTION TO DISMISS**

In its Motion to Dismiss the government quoted from the *United States v. Tohono O'odham Nation*, 131 S. Ct 1723, 1731 (2011), wherein the Supreme Court indicated that the right to a remedy in the Court of Claims was "by grace and not by right".  (Doc. 116 p. 19). Petro-Hunt respectfully submits that in a Fifth Amendment case, *Tohono* is inapposite for this proposition  as it is **not** a Fifth Amendment case.  The Fifth Amendment clearly gives the right of just compensation, and that right is meaningless without a remedy.   *Battaglia v. General Motors,* 169 F.2d 254, 257 (2d Cir. 1948), as well as *Boumediene v. Bush,* 553 U.S. 723 (2008) and *Plaut v. Spendthrift Farm, Inc.,* 514 U.S. 211 (1995), hold that if Congress cannot take away a constitutional right, then it cannot restrict federal jurisdiction in such a manner as to deny a litigant the opportunity to obtain that right. *See generally, Jurisdiction–Stripping Reconsidered*, 96 Va.L.Rev. 1043 (2010).

Section 1500 of Title 28 is a severe and unwarranted impingement upon the Fifth Amendment right to just compensation and is invalid under the Constitution as unnecessary to achieve its stated purpose of avoiding duplicative litigation, and unfair because of the class of

**EXHIBIT A**
Appx2127

litigants who are punished by the order of filing rule. *See Tecon Engineers, Inc. v. United States*

170 Ct. Cl. 389 ( 1965).

In *Alder v. United States,* 785 F. 2d. 1004 (Fed. Cir. 1986), the Federal Circuit stated:

> Appellants err in their premise that each taking claim under the Fifth
> Amendment requires a specific waiver of sovereign immunity. The
> Constitution had already achieved that popular right. *Citations omitted.*
> "These [just compensation] Fifth Amendment cases are tied to the language,
> purpose, and self-executing aspects of that constitutional provision…".
> *Citation omitted.* "The form of the remedy did not qualify the right. It rested
> upon the Fifth Amendment. Statutory recognition was not necessary."

*Id.* at 1009

Similarly, this Court's predecessors have addressed the idea that the Fifth Amendment to

the Constitution is paramount to the common law doctrine of sovereign immunity.  In *Hughes*

*Communications Galaxy, Inc. v. United States,* 26 Cl. Ct. 123 (1992), the court stated:

> The taking of property by the sovereign for public use, though
> unquestionably an act of sovereignty, does not, under our Constitution,
> leave the sovereign immune from having to pay compensation for the
> taking. The Fifth Amendment expressly imposes liability."

*Id.* at 145.

In *T.O.F.C., Inc. v. United States* 231 Ct. Cl. 182 (1982) this court stated:

> "We turn now to plaintiff's claim that the acts of defendant constitute a
> taking of plaintiff's property which violates the taking clause of the fifth
> amendment to the Constitution. This claim, in and of itself, raises no
> question as to our jurisdiction since the fifth amendment is an express
> waiver of sovereign immunity."

*Id*. at 393; *see also*, *Edward P. Stahel & Co. v. United States*, 78 Fed. Supp. 800, 111 Ct. Cl. 682

(Ct. Cl. 1948).

Just compensation suits rest upon a specific waiver of sovereign immunity explicitly

granted by the Fifth Amendment to the United States Constitution, which provides that "[n]o

person shall … be deprived of life, liberty, or property, without due process of law; nor shall

private property be taken for public use, without just compensation." *See, e.g. Jacobs v. U.S.*,

290 U.S. 13, 16 (1933).  *Arnberg v. United States*, 757 F.2d 971, 980 n.7 (9th Cir. 1984), *cert. denied*, 475 U.S. 1010 (1986) ("Actions brought under the taking clause of the fifth amendment are, of course, an exception to the rule that sovereign immunity is a bar to damages against the United States for direct constitutional violations.")

Unlike *Petro-Hunt*, *Tohono* was not a takings case.  The *Tohono* Complaint only alleged claims by an Indian tribe for accountings and damages for breaches of fiduciary duty with respect to Indian property and funds.  The *Tohono* Complaint is replete with references to statutes, regulations and executive orders from which it claims the government's fiduciary duties arose but contains no constitutional basis.  For its jurisdiction, *Tohono* relied solely on 28 U.S.C. §§1491 and 1505 (the Indian Tucker Act) and *United States v. Mitchell*, 463 U.S. 206, 103 S. Ct. 2961, 77 L. Ed. 2d 580 (1983).

*Mitchell* held that the United States may be mandated to compensate Indian tribes for monetary damages for breaches of fiduciary responsibilities under statutes and regulations that give the government the full responsibility to manage Indian property and establish a fiduciary relationship, and that the Court of Federal Claims has jurisdiction over claims for such alleged breaches of trusts.  463 U.S. at 228, 103 S. Ct. at 2974.  The *Mitchell* court did not find any constitutional basis for the types of claims raised therein or in *Tohono*.

*Tohono* should be limited to cases whose waiver of sovereign immunity is granted by statute, and may thereby be revoked by statute.  Since the waiver of sovereign immunity in the instant case is granted by the Fifth Amendment of the Constitution, it may not be revoked by statute. Because the *Tohono* case was based upon statutes and regulations, and not upon the Constitution, its jurisdictional and waiver of sovereign immunity analyses could not have encompassed the Constitutional arguments raised in this case.  *Tohono* cannot, therefore, stand as

3

jurisdictional precedent in a takings case whose jurisdiction is granted and waiver of sovereign immunity arises from the Fifth Amendment of the Constitution itself.

Congress may not dispense with just compensation by withholding jurisdiction.   Such an action on the part of Congress is prohibited.  *See* U.S. Const. Amend. I ("Congress shall make no law… abridging … the right of the people … to petition the Government for a redress of grievances").  As found in *Boumediene v. Bush*,  *Plaut v. Spendthrift Farm, Inc.* and  *Battaglia v. General Motors* the withholding of federal jurisdiction for a constitutional right is tantamount to withholding the right.  Therefore, Section 1500 should be stricken as inimical to the Constitution of the United States.

Respectfully submitted

<div style="margin-left:40%">

s/*J. Ralph White*_____

J. Ralph White
*Counsel of Record*
WHITE LAW FIRM
650 Poydras Street, Suite 1605
New Orleans, Louisiana 70130
Telephone: (540) 799-2585
Facsimile: (540) 799-2588
E-Mail: jralphwhitepllc@bellsouth.net

*Of Counsel:*

Edmund M. Amorosi
SMITH PACHTER MCWHORTER PLC
8000 Towers Crescent Drive, Suite 900
Vienna, Virginia 22182
Telephone: (703) 847-6300
Facsimile: (703) 847-6312
E-Mail: emorosi@smithpachter.com

</div>

4

## IN THE UNITED STATES COURT OF FEDERAL CLAIMS

PETRO-HUNT, L.L.C.   )
          )
PLAINTIFF,      )
          )   **CASE NO. 00-512L**
V.         )   **JUDGE ALLEGRA**
          )
THE UNITED STATES OF AMERICA, )
          )
DEFENDANT.     )
          )

## MOTION FOR RECONSIDERATION OF THIS COURT'S ORDER DISMISSING IN PART THE CLAIMS OF PETRO-HUNT, L.L.C. BASED ON AN ALTERNATIVE CLAIM FOR A TAKING IN THE DISTRICT COURT FOR WHICH THE COURT HAD NO JURISDICTION

Now into Court, through undersigned counsel, comes Petro-Hunt, L.L.C. ("Petro-Hunt") who respectfully moves this Honorable Court to reconsider its ruling of May 2, 2012 pursuant to Rule 59 of the Rules of the Court of Federal Claims (RCFC), to the extent this ruling dismissed Petro-Hunt's temporary takings claims. As shown by the attached Memorandum in Support, the Court's determination that Petro-Hunt's temporary takings claims were barred by 28 U.S.C. §1500, is contrary to precedent in the Federal Circuit, which holds that, because the District Court did not have jurisdiction over those claims, they were simply a nullity. *Loveladies Harbor, Inc. v. United States*, 27 F.3d 1545 (1994) (*en banc*).

For this reason, plaintiff respectfully requests this Court to reconsider its ruling and if, in the absence of the claim in the District Court for a Fifth Amendment taking, for which there was no jurisdiction, the Court would have found the quiet title action claim did not preclude jurisdiction in the Court of Federal Claims for the temporary takings claims, then the Court should enter a ruling in accordance with that view.

Respectfully Submitted,

s/*J. Ralph White*

J. Ralph White
*Counsel of Record*
WHITE LAW FIRM
650 Poydras Street, Suite 1605
New Orleans, Louisiana 70130
Telephone: (504) 799-2585
Facsimile: (504) 799-2586
E-Mail: jralphwhitepllc@bellsouth.net

*Of Counsel:*

Edmund M. Amorosi
SMITH PACHTER MCWHORTER PLC
8000 Towers Crescent Drive, Suite 900
Vienna, Virginia 22182
Telephone: (703) 847-6300
Facsimile: (703) 847-6312
E-Mail: eamorosi@smithpachter.com

D. Joe Smith
WILMER CUTLER PICKERING HALE AND DORR, LLP
1875 Pennsylvania Avenue NW
Washington, DC 20006 USA
Telephone: (202) 663-6460
Facsimile: (202) 663-6363
joe.smith@wilmerhale.com

2

Appx2132

IN THE UNITED STATES COURT OF FEDERAL CLAIMS

| | |
|---|---|
| PETRO-HUNT, L.L.C., | ) |
| | ) |
| Plaintiff, | ) |
| | ) |
| v. | ) |
| | ) |
| UNITED STATES OF AMERICA, | ) |
| | ) |
| Defendant. | ) |
| | ) |

No. 00–512 L
Judge Allegra

**MEMORANDUM IN SUPPORT OF MOTION FOR RECONSIDERATION OF THIS COURT'S ORDER DISMISSING IN PART THE CLAIMS OF PETRO-HUNT, L.L.C. BASED ON AN ALTERNATIVE CLAIM FOR A TAKING IN THE DISTRICT COURT FOR WHICH THE DISCTRICT COURT HAD NO JURISDICTION**

J. Ralph White
*Counsel of Record*
WHITE LAW FIRM
650 Poydras Street, Suite 1605
New Orleans, Louisiana 70130
Telephone: (504) 799-2585
Facsimile: (504) 799-2586
E-Mail: jralphwhitepllc@bellsouth.net

*Of Counsel:*

Edmund M. Amorosi
SMITH PACHTER MCWHORTER PLC
8000 Towers Crescent Drive, Suite 900
Vienna, Virginia 22182
Telephone: (703) 847-6300
Facsimile: (703) 847-6312
E-Mail: eamorosi@smithpachter.com

D. Joe Smith
WILMER CUTLER PICKERING HALE AND DORR, LLP
1875 Pennsylvania Avenue NW
Washington, DC 20006 USA
Telephone: (202) 663 6460
Facsimile: (202) 663 6363
joe.smith@wilmerhale.com

Dated: May 29, 2012

i

## INTRODUCTION

Now into Court, through undersigned counsel, comes Petro-Hunt, L.L.C. ("Petro-Hunt") who respectfully moves this Honorable Court to reconsider its ruling of May 2, 2012 pursuant to Rule 59 of the Rules of the Court of Federal Claims ("RCFC"), to the extent this ruling dismissed Petro-Hunt's temporary takings claims. "To prevail on a motion for reconsideration the movant must point to manifest error of law or mistake of fact." *Pac. Gas & Elec. Co., v. United States*, 58 Fed. Cl. 1, 2 (2003), quoting *Franconia Assoc. v. United States*, 44 Fed. Cl. 315, 316 (1999). As shown by the argument below, Petro-Hunt meets this standard.

The Court's determination that Petro-Hunt's temporary takings claims were the same claims as its District Court claims is based on the conclusion that these claims were pending in District Court before Petro-Hunt filed its case in this Court. However, the temporary takings claims were never "pending" in District Court. Because the District Court did not have jurisdiction over those claims, they were simply a nullity. *Loveladies Harbor, Inc. v. United States*, 27 F.3d 1545 (1994) (*en banc*). The Court's determination is contrary to an *en banc* precedent of the Federal Circuit which has not been overturned or modified by the Federal Circuit or by the Supreme Court, and must be reconsidered to correct a manifest error of law.

In its May 2, 2012 opinion, the Court recognized that the pendency of quiet title claims in the District Court did not require dismissal pursuant to 28 U.S.C. § 1500 ("§ 1500"), stating that it had "serious doubts as to whether the pendency of a typical quiet title action in the District Court ought to preclude this court from having jurisdiction over a later filed takings action." *Petro-Hunt, L.L.C. v. United States*, No. 00-512L, 2012 WL 1571004, 5 (Fed. Cl. May 2, 2012).[1]

---

[1] The entire portion of the Court's statement in this regard, which is the subject of this Motion to Reconsider stated as follows:

Given these standards, [the *res judicata* test set forth in *United States v. Tohono* 131 S.Ct. 1723 and *Trusted Integration* and other cases] this court has

1

However, the Court went on to determine that Petro-Hunt's quiet title action was not "typical," apparently because Petro-Hunt had alleged, as an alternative prayer for relief, a Fifth Amendment takings claim in the District Court. The Court then determined that the fact that the District Court lacked jurisdiction to entertain the takings claim was irrelevant to the issue that the claim was pending at the time the Court of Federal Claims case was filed, and found that 28 U.S.C. § 1500 divested the Court of jurisdiction. In doing so, the Court relied on several recent Court of Federal Claims cases as well as the Federal Circuit case of *Trusted Integration, Inc. v. United States,* 659 F.3d 1159 (Fed. Cir. 2011). The court did not discuss or mention the Federal Circuit *en banc* decision in *Loveladies* which has facts very similar to those in this case and is the controlling precedent.

---

serious doubts as to whether the pendancy of a typical quiet title action in the district court ought to preclude this court from having jurisdiction over a later filed takings action [footnote omitted] but, the temporary takings portion of the case *sub judice*, as it turns out, is more straight forward because plaintiff raised a takings claim in its district court complaint that remained pending when plaintiff filed essentially the same takings claim in this court. Indeed, as its original complaint in this court advised, plaintiff filed the instant lawsuit more as a protective matter, in case the district court failed to reward damages. [footnote omitted]. In circumstances like these, § 1500 is undoubtedly triggered, causing this Court to lose jurisdiction over plaintiffs temporary takings claims. *See Pellegrini v. United States,* No. 11-224L, 2012 WL 171912, at 5 (Fed. Cl. Jan. 20, 2012); *Brandt v. United States,* 102 Fed.Cl. 72, 81-82 (2011). It is irrelevant, for this purpose, that the district court lacked jurisdiction over plaintiff's takings claim. *Young v. United States,* 60 Fed. Cl. 418, 424 (2004). Nor is this portion of plaintiff's complaint saved by the fact that plaintiff, in subsequent amendments to its complaint in this court, has refined further the legal theories on which its temporary takings claims are based. *See Keene Corp. v. United States,* 508 U.S. at 212 ("That the two actions were based on different legal theories [does] not matter."); *Trusted Integration,* 659 F.3d. at 1163 (§ 1500 "was enacted to prevent a claimant from seeking recovery in district court and the Court of Claims for the same conduct pleaded under different legal theories"). Those claims still rely upon facts that were operative in the district court action that was pending at the time the case *sub judice* was filed. Hence, § 1500 precludes this court from having jurisdiction over plaintiff's temporary takings claims. [footnote omitted]

2

Appx2135

**Facts Here are Nearly Identical to Facts in *Loveladies***

In *Loveladies,* the plaintiff had pled in Federal District Court a claim under the Clean Water Act, the Federal Water Pollution Control Act, the Administrative Procedure Act as well as the commerce clause and the Fifth Amendment to the Constitution.  The *Loveladies* court held that the takings claim in the District Court had to be ignored and could not be used to trigger dismissal pursuant to § 1500 because the Federal District Court never had jurisdiction over the claim.  In this regard the *Loveladies* court stated as follows:

> The government further argues that the presence of an allegation of a taking in the two complaints means the claims in the district court suit were the same claims as those in the Court of Federal Claims suit, since Loveladies sought in the district court a declaration of taking and thus implicitly the monetary relief that would accompany the declaration.  But the government itself destroyed the core of that argument in its answer to that complaint.  In the district court, the government states as its First Separate Defense: "This Court lacks subject matter jurisdiction over the Complaint's allegations of a taking of property."  The district court agreed with the Government's view that Count I was without legal significance as far as a taking and compensation under the Fifth Amendment were concerned.  While granting judgment in favor of the Government on all other counts, that court dismissed Count I without prejudice to the rights of plaintiffs to pursue the takings allegations in the Court of Federal Claims.  The prayer for a "declaration" of a taking, for which the First Court was the predicate, thus was equally without legal significance.

27 F. 3d at 1553-1554; *See also* 27 F.3d 1554, n. 23[2]

In this case, Petro-Hunt had alleged in the previously filed District Court action, as an alternative claim, a taking in the event the court did not award title to the plaintiffs.  When it amended its complaint, Petro-Hunt eliminated from the counts in the complaint the Fifth Amendment taking, but retained in the prayer for relief, a reference to a Fifth Amendment taking

---

[2] In footnote 23, the *Loveladies en banc* court noted:
> We note in passing that the allegations of a taking, found in both complaints, could be viewed as reflecting the legal theory assumed to underlie the factual allegations.  Since differing legal theories do not define differing claims under § 1500, there seems no logical reason to suppose that overlapping legal theories (*see* dissent, *Op.* at 1559) necessarily define the same claims.

3

in the alternative.  The government in its answer to the District Court complaint filed before the original complaint in this matter, raised the defense of lack of subject matter jurisdiction as to the Fifth Amendment count.  See Exhibit "A", Answer by USA, June 5, 2000, Doc. 17, Third Affirmative Defense, Pg. 5, *Petro-Hunt v. United States,* No. 00-0303, (W.D. La.).  From that point forward, the parties and the District Court simply ignored the taking claim, effectively recognizing that the District Court did not have jurisdiction over the taking claim.

Petro-Hunt never prosecuted the Fifth Amendment taking claim in the District Court. When it filed for summary judgment, it requested and obtained judgment quieting title only on the basis of title considerations.  The Fifth Circuit reversed the original District Court decision and remanded to the District Court to determine which property was owned by the government and which property was owned by Petro-Hunt and its co-owners.  At the conclusion of that determination by the District Court, a judgment was entered on December 7, 2005 delineating which property was owned by which entity.  The judgment also stated that the plaintiffs were reserving any claims that they could bring in the Court of Federal Claims, tacitly recognizing the District Court was without jurisdiction to entertain such claims and that the taking claim was not part of the District Court lawsuit.  See Exhibit "B" Judgment, p. 3, Doc. No. 228, *Petro-Hunt,* No. 00-0303 (W.D. La.).  Had the District Court explicitly ruled on its jurisdiction over the taking claim, the only thing the court could have done was to dismiss the claim, which it impliedly did when it issued its judgment.

### *Loveladies En Banc* Decision is Binding Precedent on This Court

The *Loveladies* decision is an *en banc* decision of the Federal Circuit which is binding on other subsequent Federal Circuit panels and is also binding on this Court.  Since it has never been overruled by another *en banc* decision, *Loveladies* is still *binding* precedent in the Federal Circuit. *See, e.g. Preminger v. Sec'y of Veterans Affairs,* 517 F.3d 1299, 1309 (Fed. Cir. 2008)

("A prior precedential decision on a point of law by a panel of this Court is binding precedent and cannot be overruled or avoided unless or until the Court sits *en banc*"); *Sacco v. Dep't of Justice*, 317 F.3d 1384, 1386 (Fed. Cir. 2003)("A panel of this court is bound by prior precedential decisions unless and until overturned *en banc*"); *Tex. Am. Oil Co. v. U.S. Dep't of Energy*, 44 F.3d 1557, 1561 (Fed.Cir.1995) (*en banc*) ("This court applies the rule that earlier decisions prevail unless overruled by the court *en banc*, or by other controlling authority such as intervening statutory change or Supreme Court decision.").

## Recent Cases have not Overruled Loveladies

The *Loveladies* holding that the filing of a takings claim in a district court does not compel the conclusion that the same claim was pending pursuant to § 1500 remains intact, even after *United States v. Tohono O'odham Nation*, 563 U.S. ——, 131 S.Ct. 1723, 179 L.Ed.2d 723 (2011), and remains binding precedent in the Federal Circuit and on this Court. *Tohono* did not overrule *Loveladies Harbor*. *United Keetoowah Band of Cherokee Indians in Okla. v. United States*, 2012 WL1005907 (Fed. Cir. 2012).

*Tohono*'s effect on *Loveladies* is limited to what it actually decided – that the "relief test" is no longer a consideration in determining whether two cases are the same for purposes of § 1500. *See, e.g. Lumbermens Mut. Cas. Co. v. United States*, 654 F.3d 1305, 1317 (Fed. Cir. 2011), n. 10 ("We have consistently held that panel authority that does not address an issue is not binding as to the unaddressed issue."); *Ark. Game & Fish Com'n v. United States*, 637 F.3d 1366, 1378 (Fed. Cir. 2011); *Sacco v. United States*, 452 F.3d 1305, 1308 (Fed. Cir. 2006) (a prior case was "not binding precedent on [a] point because the court did not address the issue" in that prior case); *Boeing N. Am., Inc. v. Roche*, 298 F.3d 1274, 1282 (Fed. Cir. 2002) ("[W]e are not bound by [a prior opinion] on the issue ... since [that] issue was neither argued nor discussed in our opinion."); *Brecht v. Abrahamson*, 507 U.S. 619, 631, 113 S.Ct. 1710, 123 L.Ed.2d 353 (1993)

(If a decision does not "squarely address[ ] [an] issue," a court remains "free to address the issue on the merits" in a subsequent case). *Tohono*, as a panel decision, could not have overturned the *en banc Loveladies* decision and thus must be read in harmony with *Loveladies* and be limited to what it actually decided.

Until *Loveladies* is overturned by the Federal Circuit, *en banc*, or the Supreme Court, Federal Circuit panels and the Court of Federal Claims are bound by the holding. Therefore, the fact that Petro-Hunt filed an alternative takings claim is irrelevant to the analysis of whether the same claim was "pending" in the District Court and would preclude this Court's jurisdiction under § 1500. The alternative takings claim as stated by the Court in *Loveladies* "is without legal significance" or, stated another way, is a nullity that must be ignored.

Based on the above, the Court should follow its original inclination that the quiet title claim did not cause the Court to lose jurisdiction over the takings claim before it, and it should ignore as a nullity the alternative takings claim which was, without jurisdiction, never pending in the District Court pursuant to *Loveladies*. Thus, the Court should rule as though the alternative takings claim never existed.

Federal Circuit panel decisions subsequent to *Tohono* have not, and in fact could not, overrule the *en banc* decision in *Loveladies* because there has been no decision of the Court, sitting *en banc*, since *Loveladies* to overturn same.

To the extent *Trusted Integration, Inc. v. United States*, 659 F.3d 1159 (Fed.Cir. 2011), contradicts or is not in accordance with the *Loveladies* holding that alleging a claim for which there is no jurisdiction is without legal significance, it is not controlling precedent because it was decided by a panel of the Federal Circuit that was obligated to follow *Loveladies*. Moreover, *Trusted Integration* is in error to the extent that it relied on *Tohono*, because nothing in *Tohono* even remotely reached the conclusion in *Loveladies* regarding claims for which there was no

6

jurisdiction. The *Trusted Integration* panel assumed, with no discussion of the subject, that the claims which were dismissed for lack of jurisdiction were still pending at the time the Court of Federal Claims case was filed. The opinion ignores the *Loveladies* statement that claims for which there is no jurisdiction in the District Court have no legal significance, and it is simply in error.

*United States. v. Cook Cnty., Ill.,* 170 F.3d 1084 (Fed. Cir. 1999)[3], again, not an *en banc* decision, is also inapplicable. In *Cook County,* the Federal District Court transferred two counts from the plaintiff's complaint to the Court of Federal Claims finding that it had no jurisdiction for those counts. What remained pending in the Federal District Court were claims which were "no different in substance from the transferred counts." *See* 170 F.3d 1087. Plaintiff filed its suit in the Court of Federal Claims and the government moved to dismiss on the basis of § 1500. The Court granted the government's motion to dismiss pursuant to § 1500, not because the transferred claims were asking for effectively the same relief as those in the Court of Claims, but because claims remained in the District Court which were essentially the same claims as those being asserted in the Court of Federal Claims after the transfer. Thus, *Cook County* is factually distinguishable from the present case. In the present case, the nullity of the alternative takings claim in the District Court did not leave behind the same claim which was then pending in the Court of Federal Claims. All that was left behind in the District Court was plaintiff's quiet title action claim, over which that Court clearly had jurisdiction.

Nor was *Dico, Inc. v. United States,* 48 F.3d 1199 (Fed. Cir. 1995), mentioned by the government's counsel in oral argument before this court on January 31, 2012, an *en banc* decision of the Federal Circuit. Further, much like the *Cook County* decision, in *Dico* the plaintiff filed for reimbursement of expenses incurred in complying with an order of the

---

[3] This decision was mentioned by the Court during oral argument in this case held on January 31, 2012.

Environmental Protection Agency, pursuant to a provision in the Comprehensive Environmental Response Compensation and Liability Act. ("CERCLA"), 42 U.S.C. § 9606(b).   In the District Court suit, the plaintiff also asked, in the alternative, for relief pursuant to the Fifth Amendment's due process and takings clauses. Dico subsequently filed a claim in the Court of Federal Claims seeking reimbursement of the same expenses, and in fact sought the exact same amount of money in both cases. The government moved to dismiss the Court of Federal Claims action on the basis of § 1500 which the court granted, not based on Dico's alleging the takings claim in the District Court, but based on the fact that the non-takings CERCLA claim was the same claim as that alleged in the Court of Federal Claims. The Court essentially ignored the takings claim that had been filed in the District Court, as *Loveladies* dictates, but noted that Dico was requesting the same monetary relief[4] as it had sought in the District Court.  The District Court had dismissed Dico's claim for relief under the CERCLA statute, but the Eighth Circuit reversed, finding that Dico was entitled to be reimbursed under the statute through a District Court action.  The Federal Circuit noted that the Eighth Circuit did not discuss the Fifth Amendment claim. *See* 48 Fd.3d at 1201, n. 3.

The Federal Circuit found that the relief sought by Dico was the same as that requested in the District Court.  Judge Plager, who wrote the majority opinion in *Dico* and also authored the *en banc* opinion in *Loveladies*, stated that because the plaintiff had asked for the same identical monetary relief in the Court of Federal Claims that he had requested in the District Court, it was unnecessary for the panel in *Dico* to delve into the pleading of a takings claim in the Federal District Court for which there was no jurisdiction.  In this regard the court stated, "[i]n view of our disposition of this matter based on the claims that expressly seek money, we need not concern ourselves further with the consequences under § 1500 of pleadings which seek the same

---

[4] In both cases, Dico was asking for the identical amount of money.

relief but are not well pled." 48 F. 3d at 1204, n. 6. Judge Plager was mindful of the *Loveladies* decision concerning claims for which there was no jurisdiction, but in *Dico* it was not necessary to discuss the claims for which there was no jurisdiction because another claim in the District Court, for which there was jurisdiction, triggered § 1500 anyway. Thus, *Dico* is inapposite.

In *E. Shawnee Tribe of Okla. v. United States*, 582 F.3d 1306 (Fed. Cir. 2009), a panel of the Federal Circuit recognized the conclusion in *Loveladies* that a claim plead in the District Court for which there was no jurisdiction was "without legal significance" in a § 1500 analysis, but found that it was not necessary to reach the issue. Therefore the Court did not discuss this issue. 582 F.3d at 1312, n. 4.[5]

*Pellegrini v. United States*, No. 11-224L, 2012 WL 171912 (Fed. Cl. Jan. 20, 2012); *Brandt v. United States*, 102 Fed. Cl. 72 (2011);[6] and *Young v. United States*, 60 Fed. Cl. 418 (2004) are in error to the extent they contradict the holding in *Loveladies*. Moreover, like District Court cases, Court of Federal Claims cases are not binding on other judges in the Court of Federal Claims. *See American Elec. Power Co., Inc. v. Connecticut*, 131 S.Ct. 2527, 2540 (2011) ("[C]ases decided by the Court of Federal Claims are not binding on this Court.... Moreover, federal district judges, sitting as sole adjudicators, lack authority to render precedential decisions binding other judges, even members of the same court.")

---

[5] Petro-Hunt is aware that the Supreme Court reversed *E. Shawnee*. *E. Shawnee* relied on the Federal Circuit's *Tohono* decision, was decided on the basis of the "same relief" prong from *Loveladies*. There was no discussion in either *Tohono* decision regarding the legal significance of a claim over which the District Court has no jurisdiction. The Supreme Court reversed, *per curiam*, holding "[j]udgment vacated, and case remanded to the United States Court of Appeals for the Federal Circuit for further consideration in light of *United States v. Tohono O'odham Nation*, 563 U.S. ——, 131 S.Ct. 1723, 179 L.Ed.2d 723 (2011)."

[6] The discussion in *Brandt* of the *Loveladies* decision regarding the effect of a claim for which there is no jurisdiction is *dicta*. The *Brandt* Court held that the plaintiff had waived that argument.

**Other Cases Cited in Oral Argument are Not on Point**

*Frantz Equip. Co. v. United States*, 120 Ct. Cl. 312 (1951) is not relevant, as the case was dismissed on statute of limitations grounds, thus any reference to § 1500 is *dicta*. *Commonwealth of Massachusetts v. United States*, 248 F.Supp. 656 (D. Mass. 1966) must also be disregarded as it involved a garden-variety dismissal of a complaint for lack of subject matter jurisdiction, and did not implicate § 1500. *Spodek v. United States*, 44 Fed. Cl. 32 (1999) is not on point as that case turned on the application of the order-of-filing rule established in *Tecon Eng'rs., Inc. v. United States*, 170 Ct. Cl. 389, 399 (1965), *cert. denied*, 382 U.S. 976 (1966), which is not at issue in this case.[7]

**_Loveladies_ Decision is Consonant with Other Decisions**

The *Loveladies* court's finding, *en banc,* that a claim for which there was no jurisdiction was without legal significance and should be ignored, is not an anomalous or unusual finding. Many courts have refused to attach significance to an allegation in a court which lacked jurisdiction to act upon it. For example, in *Christopher Village LP v. United States,* 360 F.3d 1319 (Fed. Cir. 2004), the Federal Circuit held that a decision of the U.S. Fifth Circuit Court of Appeals in a matter where the Fifth Circuit lacked jurisdiction could not be the basis of a finding of *res judicata* barring the claim from being relitigated in the Court of Federal Claims.

In *Schmittling v. Dept. of Army*, 219 F.3d 1332, 1337 (Fed. Cir. 2000), the Court held that the Merit Systems Protection Board's decision on the merits of a petition was a nullity because the Board did not have jurisdiction. *See also Burke v. Utah Transit Auth. & Local 382*, 462 F.3d 1253, 1264 (10th Cir. 2006) ("Filing a timely notice of appeal…transfers the matter from the District Court to the Court of Appeals. The District Court is thus divested of jurisdiction. Any

---

[7] *Frantz, Commonwealth of Massachusetts* and *Spodek* were mentioned during oral argument in this case either by the Court or by counsel for the government.

10

Appx2143

subsequent action by it is null and void.") *See also Kusay v. United States,* 62 F.3d 192 (7th Cir. 1995); *Garcia v. Burlington Northern R. Co.,* 818 F.2d 713 (10th Cir. 1987).

## CONCLUSION

Unless and until the *Loveladies* decision is overturned by the *en banc* Federal Circuit, or by a holding of the Supreme Court, *Loveladies* remains the law. Petro-Hunt has been unable to find any *en banc* decision subsequent to *Loveladies* which overrules the holding of *Loveladies,* that claims for which there is no jurisdictional basis must be ignored in a § 1500 analysis. All the cases discussed above, either do not decide the issue or infringe upon the *en banc* authority and precedent of *Loveladies.* For this reason, plaintiff respectfully requests this Court to reconsider its ruling and if, in the absence of the claim in the District Court for a Fifth Amendment taking, for which there was no jurisdiction, the Court would have found the quiet title action claim did not preclude jurisdiction in the Court of Federal Claims for the temporary takings claims, then the Court should enter a ruling in accordance with that view.

Respectfully Submitted,

s/*J. Ralph White*
J. Ralph White
*Counsel of Record*
WHITE LAW FIRM
650 Poydras Street, Suite 1605
New Orleans, Louisiana 70130
Telephone: (504) 799-2585
Facsimile: (504) 799-2586
E-Mail: jralphwhitepllc@bellsouth.net

*Of Counsel:*

Edmund M. Amorosi
SMITH PACHTER MCWHORTER PLC
8000 Towers Crescent Drive, Suite 900
Vienna, Virginia 22182
Telephone: (703) 847-6300
Facsimile: (703) 847-6312

11

Appx2144

E-Mail: eamorosi@smithpachter.com

D. Joe Smith
WILMER CUTLER PICKERING HALE AND DORR, LLP
1875 Pennsylvania Avenue NW
Washington, DC 20006 USA
Telephone: (202) 663-6460
Facsimile: (202) 663-6363
joe.smith@wilmerhale.com

Electronically Filed on August 26, 2011

## IN THE UNITED STATES COURT OF FEDERAL CLAIMS

| | |
|---|---|
| PETRO-HUNT, L.L.C., | ) |
| | ) |
| Plaintiff, | ) |
| | ) No. 00–512 L |
| v. | ) |
| | ) Honorable Francis M. Allegra |
| UNITED STATES OF AMERICA, | ) |
| | ) |
| Defendant. | ) |

## UNITED STATES' REPLY IN SUPPORT OF ITS
## MOTION TO DISMISS FOR LACK OF SUBJECT MATTER JURISDICTION

i

courts to construe the jurisdictional bar broadly. *Id.* at 1728 (describing the statute as a "robust response" and a "broad prohibition" to duplicative claims); *see also Keene*, 508 U.S. at 213 (recognizing that the language of § 1500 "make[s] it clear that Congress did not intend the statute to be rendered useless by a narrow concept of identity providing a correspondingly liberal opportunity to maintain two suits arising from the same factual foundation").

### B. The Operative Facts in the Two Suits Are Substantially the Same

#### 1. Petro-Hunt Alleged the Same Takings Claim in the DCT Action

The operative facts in the original DCT complaint and the original CFC complaint are substantially the same because Petro-Hunt also alleged a Fifth Amendment takings claim in the district court suit. Def.'s Mot. at 10-13. Petro-Hunt does not contend that the operative facts for this takings claim differed from those alleged in the original CFC complaint. *See* Opp'n at 14-15. Instead, Petro-Hunt argues that the DCT lacked jurisdiction over its takings claim, that it was seeking alternative relief allowed by the QTA, and that it abandoned its DCT takings claim. *See id.* Neither the factual record nor relevant legal principles support these arguments.

Petro-Hunt first argues that the DCT lacked jurisdiction over its Fifth Amendment takings claim. *See id.* However, the DCT complaint did not specify the amount of relief Petro-Hunt sought for the claim, and it is not evident from the complaint that the DCT lacked jurisdiction under 28 U.S.C. § 1346(a). *See Smith v. Orr*, 855 F.2d 1544, 1553 (Fed. Cir. 1988). More important, § 1500 does not turn on the other court's jurisdiction. *See Frantz Equip. Co. v. United States*, 120 Ct. Cl. 312 (1951), *abrogated by E. Shawnee Tribe of Okla. v. United States*, 582 F.3d 1306 (Fed. Cir. 2009), *vacated and remanded* by 131 S. Ct. 2872 (2011).[2] In fact, the Supreme Court and this Court have previously applied § 1500 to a Fifth Amendment takings

---

[2] After the vacatur and remand, the Federal Circuit heard oral argument in *E. Shawnee Tribe of Okla. v. United States* on July 29, 2011.

claim after the related district court action suffered a jurisdictional dismissal. *See Keene*, 508 U.S. at 204; *Vero Technical Support v. United States*, 94 Fed. Cl. 784, 795-96 (2010) (holding that § 1500 applied and granting motion to dismiss under § 1500 where the district court complaint was dismissed for lack of subject matter jurisdiction); *Jachetta v. United States*, 94 Fed. Cl. 277, 282, 284 (2010) (same).

Second, Petro-Hunt contends that the Fifth Amendment takings claim alleged in the DCT was based on the "alternative relief contemplated under the [QTA] wherein the plaintiff is entitled to just compensation when the United States elects to retain possession of the property." Opp'n at 14 (citing 28 U.S.C. § 2409a(b)). The text of Petro-Hunt's complaint shows otherwise. In the DCT complaint, Petro-Hunt requested that the Court declare it the owner of the mineral rights at issue, and sought compensation under the Fifth Amendment if the DCT determined that it were not the owner of the mineral rights and that the United States had unconstitutionally taken those mineral interests. It did not seek just compensation under 28 U.S.C. § 2409a(b) if the DCT declared it the owner of those rights. Indeed, after the United States raised the possibility that the DCT lacked jurisdiction over the claim, Petro-Hunt filed the same Fifth Amendment takings claim in the CFC. *See* Def.'s Mot. at 11-12. Thus, Petro-Hunt's actions and representations to the CFC and the DCT contradict its current characterization of its DCT takings claim. *See id.*

Finally, Petro-Hunt also asserts that it abandoned its takings claim in the DCT. *See* Opp'n at 4, 14. Section 1500 precludes CFC jurisdiction over "any claim for or in respect to which the plaintiff or his assignee *has pending* in any other court." 28 U.S.C. § 1500 (emphasis added). The United States did not move to dismiss the takings claim, the Court did not *sua sponte* dismiss it, and Petro-Hunt did not voluntarily dismiss it. *See* Def.'s Mot. at 3-4. Accordingly, the claim was "pending" in another court for purposes of § 1500 when Petro-Hunt

7

filed its CFC suit in August 2000. *See* Black's Law Dictionary 1169 (8th ed. 2004) (defining "pending" as "[r]emaining undecided" or "awaiting decision"); *cf. Carey v. Saffold*, 536 U.S. 214, 219-20 (2002); *Firebaugh Canal Water Dist. v. United States*, 70 Fed. Cl. 593, 599 (2006). Therefore, when Petro-Hunt filed its takings claim here, it had pending an identical takings claim in DCT, and § 1500 applies.

### 2. The Takings Claim Is Based on Substantially the Same Operative Facts As Those Alleged in the DCT Action

As explained above and more comprehensively in the United States' Motion to Dismiss, § 1500 bars jurisdiction in this Court because the DCT action and the CFC action involved substantially the same operative facts. *See* Def.'s Mot. at 10-13; *see also* Ex. 2 (chart illustrating the similarity between Petro-Hunt's complaints in the DCT and the CFC). Despite the overlapping facts alleged in both complaints, Petro-Hunt argues that the CFC suit involved different operative facts from the DCT action. Opp'n at 12-18. The Court should reject these arguments.

#### a. The Title Inquiry Turns on the Same Facts in Both Courts

When adjudicating a Fifth Amendment takings claim, this Court must first determine whether the plaintiff has a compensable interest in the property at issue. *See, e.g., Air Pegasus of D.C., Inc. v. United States*, 424 F.3d 1206, 1213 (Fed. Cir. 2005). This is, as Petro-Hunt admits, the same inquiry undertaken by a court adjudicating title under the QTA. *Cf. Yaist v. United States*, 656 F.2d 616, 620 (Ct. Cl. 1981) (recognizing that plaintiffs can try title in a suit for just compensation); *Bourgeois v. United States*, 545 F.2d 727, 729 n.1 (Ct. Cl. 1976) (same); *see also* Opp'n at 15 ("Petro-Hunt established in the QTA that it possessed a present and continuing ownership in Servitudes 1-5." (footnote omitted)). The DCT action therefore involved facts related to an issue – the existence of a compensable property interest – that were exactly the

8

application of § 1500, this Court, and its predecessor court, have interpreted the phrase under consideration to mean that the Court "is not denied jurisdiction now, simply because there is a quiet title issue involved in determining entitlement to just compensation *vel non*." *Bourgeois*, 545 F.2d at 729 n.1; *Yaist*, 656 F.2d at 621 (same); *Gila Gin Co. v. United States*, No. 317-80L, 1982 WL 25831 at *1 (Ct. Cl. Sept. 17, 1982) (same); *Oak Forest, Inc. v. United States*, 23 Cl. Ct. 90, 94-96 (1991) (same). In these cases, the United States had argued that a Tucker Act remedy no longer existed when title was in dispute. *See Oak Forest*, 23 Cl. Ct. at 95. These cases simply hold that after enactment of the QTA, this Court still has the ability to resolve title disputes that may arise in the context of a takings claim. These cases do not suggest that Congress' enactment of the QTA intended to obviate application of § 1500.[4]

### III. Section 1500 is Constitutional

Last, Petro-Hunt urges the Court to void § 1500 as unconstitutional because it is unfair, serves no discernable purpose, and should be "stricken as inimical to the Constitution." *Id.* at 40. Since 1868, Congress has restricted this Court's (and its predecessors') jurisdiction, when related

---

[4]   Congress did not explicitly preclude application of § 1500 or explicitly waive sovereign immunity to allow claimants to pursue dual claims in two courts. Even if some legislative history supported Petro-Hunt's argument, which it does not, such evidence could not overcome the lack of such explicit statutory language. *See Nat'l Ass'n of Home Builders*, 551 U.S. at 662 (statutory repeal will not be found "unless the later statute 'expressly contradict[s] the original act'' or unless such a construction 'is absolutely necessary . . . in order that [the] words [of the later statute] shall have any meaning at all.'") (citations omitted). There is no support for Petro-Hunt's suggestion that use a twelve-year limitations period for QTA claims, as opposed to the six-year limitations period for takings claims "clearly indicated" Congress' intent to allow both a QTA action and a Tucker Act suit. Opp'n at 24. The twelve-year statute of limitations was a compromise: "the Department [of Justice] proposed to give up its insistence on 'prospective only' language and to accept an increase in the statute of limitations to twelve years, in exchange for elimination of the grandfather clause." *Block v. N.D. ex rel. Bd. of Univ. & School Lands*, 461 U.S. 273, 284 (1983) (citation omitted). There is no basis to infer that this compromise indicates Congress' intent to eliminate application of Section 1500, and the Court should reject Petro-Hunt's argument.

17

actions are pending elsewhere. *Keene*, 508 U.S. at 212. Congress has repeatedly reenacted the jurisdictional limitation embodied in § 1500, and courts, including the Supreme Court, have applied this jurisdictional limitation on numerous occasions. *Tohono*, 131 S. Ct. at 1728. The Federal Circuit has explicitly held that § 1500 is constitutional, stating that a constitutional challenge to § 1500 is "without merit" because "Congress has the constitutional authority to define the jurisdiction of the lower federal courts" and "Congress has employed its power" to do so in § 1500. *Agustin v. United States*, 92 F. App'x. 786, 789 (Fed. Cir. 2004) (citing *Keene Corp.*, 508 U.S. at 207). This Court, too, has explicitly rejected a constitutional challenge to § 1500 in *Davis v. United States*, 30 Fed. Cl. 201 (1993). In the nearly 150-year history of the limitation contained in § 1500, no court has ever held this jurisdictional limitation constitutionally invalid, and this Court should decline Petro-Hunt's invitation to be the first.

Petro-Hunt bases its argument on an assumption that application of § 1500 under these facts would interfere with Petro-Hunt's "fundamental, constitutionally guaranteed, right" to seek just compensation and deny Petro-Hunt its "fundamental right [to] access to the courts." Opp'n at 32. This is incorrect. First, as this Court explained in *Davis*, § 1500 "does not preclude plaintiff from seeking redress for his alleged damages through the courts, but rather it merely requires plaintiff to consider the operative facts, study the applicable law, and choose the forum in which to pursue his claim based on those facts." *Davis*, 30 Fed. Cl. at 204; *Donnelly*, 28 Fed. Cl. at 64-65 (Congress' considerable discretion to limit the jurisdiction of lower courts is "not implicated by a statute that at most requires an election of forums, even with respect to constitutional claims"). As the *Davis* court noted, the Federal Circuit has consistently found no legal flaw in § 1500: "[W]e see no harm in requiring a party to carefully assess his claims before

18

filing and choose the forum best suited to the merits of the claims and the applicable statute of

limitations." 30 Fed. Cl. at 204 (citing *UNR Indus.*, 962 F.2d at 1021).

Second, Petro-Hunt, like all takings claimants, has no constitutional right of access to this

Court. *See Tohono*, 131 S. Ct. at 1731 ("Although Congress has permitted claims against the

United States for monetary relief in the CFC, that relief is available by grace and not by right.");

*Cary v. Curtis*, 44 U.S. 236, 245 (1845) (noting that authority of "courts created by statute"

depends on the statute); *Rhode Island v. Massachusetts*, 37 U.S. 657, 721 (1838) (Congress

defines scope of lower courts' jurisdiction).[5]

Petro-Hunt's assertion that § 1500 violates the Equal Protection Clause is premised on

the erroneous assumption that *Tecon Eng'rs, Inc. v. United States*, 343 F.2d 943 (Ct. Cl. 1965),

unconstitutionally creates suspect classes and treats such classes differently. However, the

perceived constitutional concern exists only if the Court interprets § 1500 as mandating different

treatment to different classes of litigants. The Court should avoid interpreting § 1500 in a

manner that would raise such constitutional problems, and reject Petro-Hunt's interpretation of

*Tecon. See Clark v. Martinez*, 543 U.S. 371, 380-81 (2005).[6] In addition, Petro-Hunt's Equal

Protection argument fails because no suspect classes exist here. *Cf. Jana-Rock Constr., Inc. v.*

*N.Y. State Dep't of Econ. Dev.*, 438 F.3d 195 (2d Cir. 2006). Section 1500 applies to all citizens

---

[5] The cases on which Petro-Hunt relies are easily distinguishable on this basis. *See Boumediene v. Bush*, 553 U.S. 723 (2008) (holding Military Commissions Act of 2006, 28 U.S.C. § 2241(e) unconstitutional because it deprived federal courts of jurisdiction to entertain the habeas corpus actions in violation of the right to maintain such actions provided by the Constitution); *Plaut v. Spendthrift Farm, Inc.*, 514 U.S. 211 (1995) (invalidating Section 27A(b) of the Securities Exchange Act of 1934, 15 U.S.C. § 78a, *et. seq.*, because it violated the Constitution's separation of powers doctrine by requiring Article III courts to reopen final judgments in private civil actions).

[6] It is the United States' position that *Tecon* is no longer good law and does not apply outside its unique facts. The *Tohono* decision calls into question the continued viability of *Tecon*, stating that the Federal Circuit "was wrong to allow its precedent to suppress the statute's aims." *Tohono*, 131 S. Ct. at 1730.

19

and does not create any classes at all. Even if *Tecon* applies broadly, as Petro-Hunt erroneously supposes, an individual's own decision to pursue a particular litigation strategy cannot result in a constitutional infirmity.

At base, Petro-Hunt's constitutional argument is nothing more than a belief that Congress should have enacted a better law. *See* Opp'n at 39. Such considerations are irrelevant. *Tohono*, 131 S. Ct. at 1731; *Ex parte McCardle*, 74 U.S. 506, 514 (1868) (applying federal statute that withdrew jurisdiction by concluding, "We are not at liberty to inquire into the motives of the legislature. We can only examine into its powers under the Constitution; and the power to make exceptions to the appellate jurisdiction of this lower court is given by express words.").

## CONCLUSION

For the reasons stated above and in the United States' Motion to Dismiss, the claims articulated in Petro-Hunt's DCT action and in its CFC action are based on substantially the same operative facts. Petro-Hunt's decision to pursue both actions deprives this Court of jurisdiction, pursuant to § 1500. The Court lacks jurisdiction over Petro-Hunt's claims and should grant the United States' Motion to Dismiss.

Respectfully submitted this 26th day of August, 2011.

IGNACIA S. MORENO
Assistant Attorney General

s/ William J. Shapiro
WILLIAM J. SHAPIRO
EMILY M. MEEKER
United States Department of Justice
Environment and Natural Resources Division
Natural Resources Section
501 I Street, Suite 9-700
Sacramento, California 95814
(916) 930-2207 (phone)
(916) 930-2210 (fax)
william.shapiro@usdoj.gov

20

```
 1                UNITED STATES COURT OF FEDERAL CLAIMS

 2

 3

 4    PETRO-HUNT, L.L.C.,                    )

 5             Plaintiff,                    ) Case Nos.

 6                  vs.                      ) 00-512L

 7    THE UNITED STATES OF AMERICA,          ) 11-775L

 8             Defendant.                    )

 9

10

11                         Courtroom 7

12             Howard T. Markey National Courts Building

13                    717 Madison Place, N.W.

14                       Washington, D.C.

15                   Tuesday, November 3, 2015

16                         10:30 a.m.

17           Defendant's Motion to Dismiss/Cross Motions for

18                       Summary Judgment

19

20

21             BEFORE: THE HONORABLE MARIAN BLANK HORN

22

23

24

25    Linda D. Metcalf, CER, Digital Reporter
```

Petro-Hunt, LLC v. USA                                      11/3/2015

1    the argument that I made here today in terms of the

2    jurisdiction of a judicial taking applies with equal force to

3    the second filed case, and that case, too, should be

4    dismissed.

5            THE COURT:  Yeah, that's a question I would going

6    to ask Plaintiff's counsel, certainly.  We -- I haven't

7    determined a lot of differences, but -- I don't disagree with

8    you.  But we'll give them a chance to point out why that was

9    done and what the differences, if any, are.

10           MR. SHAPIRO:  Unless the Court has further

11   questions.

12           THE COURT:  Let's turn to Mr. White.

13           MR. SHAPIRO:  Thank you.

14           MR. WHITE:  Thank you, Your Honor.

15           THE COURT:  So, why don't you start with the two

16   cases, are they the same or not?  What was the purpose?

17           MR. WHITE:  The title case is over.  We lost the

18   title case.  This is a different case that --

19           THE COURT:  So, give me --

20           MR. WHITE:  We're not here to ask you to --

21           THE COURT:  -- give me the numbers here and tell

22   me, if you lost it, why wasn't it dismissed?

23           MR. WHITE:  The title case determines title.  We're

24   asking for compensation for a taking.

25           THE COURT:  Well, you have two cases filed right

 1   now.

 2                   MR. WHITE:  Oh, the two cases --

 3                   THE COURT:  That's what I'm talking about.

 4                   MR. WHITE:  That was -- the second case was filed

 5   because of the change in the law with respect to Section

 6   1500.  We were trying to protect that case, which was still

 7   timely, from the taint of 1500 because the other case.

 8   That's why we did that.

 9                   THE COURT:  So, if we --

10                   MR. WHITE:  There --

11                   THE COURT:  -- dismiss based on Judge Allegra's

12   decision, plus a decision in favor of the Government here,

13   should that occur, then both cases go away?

14                   MR. WHITE:  I would think so.  We were trying to

15   protect the judicial takings from the effect of Section 1500.

16                   THE COURT:  Right, no, I understand.

17                   MR. WHITE:  And that's --

18                   THE COURT:  But --

19                   MR. WHITE:  The cases are identical.  If you rule

20   against us on one, I would think that the same would be true

21   for the other.  If you rule in our favor on one, the same

22   would be true for the other.

23                   THE COURT:  So, it would be appropriate, if the

24   Government were to prevail on the judicial takings -- and you

25   already have Judge Allegra's opinion on the other issues --

Petro-Hunt, LLC v. USA                                              11/3/2015

1    then both cases would be subject to dismissal, right or

2    wrong?

3            MR. WHITE:  I think that's -- I think that's

4    correct.  I think one would probably be res judicata as to

5    the other.  The only kink in the works is if 1500 is still a

6    threat to the original case, then I would want to pursue the

7    one that's not affected by 1500.

8            THE COURT:  But if you -- if -- I'm just spitting

9    out a scenario, not having decided the case yet.

10           MR. WHITE:  Sure.

11           THE COURT:  If you have Judge Allegra's opinion on

12   the earlier issue and you get a negative opinion on judicial

13   taking, what I'm trying to get you to tell me is whether both

14   cases should be dismissed at that time, subject to whatever

15   appeal you take, but on either one or both.  In this Court,

16   those two cases would both be over, yes or no?

17           MR. WHITE:  If we were -- if on appeal of Judge

18   Allegra's decision about the first case, as it pertains to

19   1500 --

20           THE COURT:  No, no, no, stop, stop, stop, stop,

21   stop confusing it.  Because what I'm trying to ask you is,

22   Judge Allegra's decision has not been appealed yet.

23           MR. WHITE:  Correct.

24           THE COURT:  So, what I'm asking you is what this

25   trial court should do in the event that the Defendant were to

Petro-Hunt, LLC v. USA                                    11/3/2015

1    succeed on the judicial taking argument and motion to dismiss

2    that they've filed.  So, you have Judge Allegra's decision,

3    subject to appeal -- that hasn't run because there's been no

4    judgment entered -- Judge Allegra's decision, together with a

5    potential negative decision from me on the judicial takings.

6    Do I then dismiss both cases and allow you to do whatever

7    appeal you do on whichever case you do, but step away from it

8    and close the cases in the Court of Federal Claims?

9            MR. WHITE:  Obviously, if you dismiss one for lack

10   of jurisdiction, you would dismiss both for lack of

11   jurisdiction.  If you, so to speak, rule on the merits as to

12   one, I think you would as to the other.  The only reason that

13   we would want to not dismiss the second case would be the

14   threat of an appeal over the Section 1500 issue.  Perhaps we

15   could -- if you entered a -- maybe we should just switch to

16   the new one.  I --

17           THE COURT:  I mean, to me, there's two --

18           MR. WHITE:  You caught me a little bit cold today.

19   I didn't --

20           THE COURT:  Well, you're in charge of your case.

21   This is not a surprising issue.  It's unusual to have two

22   cases.  You filed them both.  I understand why you filed the

23   second one.  But the point being is I'm trying to figure out

24   how we move forward.  So, in the event that the Defendant is

25   successful -- I'll ask the question again.  In the event that

Petro-Hunt, LLC v. USA                                      11/3/2015

```
 1    the Defendant is successful in the motion to dismiss on the
 2    judicial takings case, you now have two decisions on
 3    different aspects of the case, and I think on different
 4    aspects of both cases, that -- that are the same, that have
 5    now been ruled against you -- we're talking hypothetically --
 6    does this Court close out both cases or is anything left?
 7              MR. WHITE:  If you rule against us on jurisdiction
 8    and the cause of action, then I would think you would dismiss
 9    both cases.
10              THE COURT:  Okay.  So, if I embrace Judge Allegra's
11    decision, which I don't see any reason not to do, and I then
12    rule in favor of the Government on their motion to dismiss,
13    hypothetically at this point, then I dismiss both cases?
14              MR. WHITE:  I would think so.
15              THE COURT:  Well, yes or no?  I mean, they're your
16    cases.  What's left?  Tell me why I wouldn't do that.
17              MR. WHITE:  Well, yeah, if you dismiss for either
18    lack of jurisdiction or if you hold there's no cause of
19    action for a judicial taking, yes, you would dismiss both.
20              THE COURT:  Okay.  And that would then allow you,
21    as I would understand it, to appeal either the judicial
22    takings question or the questions that were addressed by
23    Judge Allegra's decision in one of those cases or in both.
24    What would you do at that point?
25              MR. WHITE:  Perhaps both.
```

Petro-Hunt, LLC v. USA                                        11/3/2015

```
 1                THE COURT:  Good luck upstairs then.
 2                MR. WHITE:  I'm still worried about the 1500 on
 3     appeal.  I have to be.
 4                THE COURT:  All right, okay.  So, let's turn back
 5     to why you think -- or turn to, for you, why you think there
 6     is an appropriate judicial takings claim in this Court.
 7                MR. WHITE:  I believe there's a judicial takings
 8     claim in this court because, as Judge Scalia said, there has
 9     been private property that, as the result of a court
10     decision, is now public property and there's been no
11     compensation for it.  That's -- that's, to me, the bright
12     line test that I get from Stop the Beach.  It's a before and
13     after picture.
14                THE COURT:  Okay.  So --
15                MR. WHITE:  And we're not here to argue the --
16     whether the Fifth Circuit was right or whether the Fifth
17     Circuit was wrong.
18                THE COURT:  Well, but you have a decision in the
19     Fifth Circuit that says -- that quieted the title, so to
20     speak, which -- why does that suggest to you that there is a
21     valid taking claim?
22                MR. WHITE:  Because there was an established
23     property right in Petro-Hunt to the imprescriptible mineral
24     servitudes and that right --
25                THE COURT:  But the Fifth Circuit rejected that,
```

# UNITED STATES
# COURT OF FEDERAL CLAIMS

PETRO-HUNT, LLC,           )
                          )
          Plaintiff,      )
                          )
v.                        )   Docket No. 00-512L
                          )
UNITED STATES,            )
                          )
          Defendant.      )

<u>Live Tape</u>

          (The following transcript was transcribed from a
digital recording provided by the United States Court of
Federal Claims to Heritage Reporting Corporation on
February 1, 2012.)

Pages:  1 through 117

Place:  Washington, D.C.

Date:   January 31, 2012

# HERITAGE REPORTING CORPORATION

*Official Reporters*
1220 L Street, N.W., Suite 600
Washington, D.C.  20005-4018
(202) 628-4888
contracts@hrccourtreporters.com

1    MR. SHAPIRO:  Yes.  Your Honor, that reminds

2  me of another issue that they have raised, the Quiet

3  Title Act, which legislatively exempts the application

4  of Section 1500, and if the Court wants a discussion

5  on that, I am prepared to discuss that.

6    THE COURT:  Well, let's just talk about the

7  constitutionality question.

8    MR. SHAPIRO:  So the Plaintiff's argument

9  here, Your Honor, is that Section 1500 applied here

10  would deny the Plaintiffs a fundamental constitutional

11  right, and that it would also violate the Equal

12  Protection clause based in-part on the Tecon decision.

13    Congress has restricted this Court's

14  jurisdiction in a way that would prevent dual claims

15  since 1868, and no court has ever held it to be

16  unconstitutional in the 144 years since it has been on

17  the books.

18    In fact, the Federal Circuit has rejected

19  this argument in the Guston case, which held that the

20  argument that it was unconstitutional was without

21  merit because Congress has the constitutional

22  authority to define the jurisdiction of lower Federal

23  Courts.

24    The idea is repeated in the Tohono case,

25  where the Supreme Court said that Congress might allow

1 claims against the United States for monetary damages,

2 but that relief is available by grace and not by

3 right.

4      It is also in <u>Keene</u>, where the Supreme Court

5 dismissed takings claims, and said that Congress has

6 the constitutional authority to define the

7 jurisdiction of lower Federal Courts.

8      This Court has also considered the

9 constitutionality of Section 1500 in two cases,

10 concluding that it is constitutional, in the <u>Davis</u>

11 case and the <u>Donnelly</u> case.

12      The fundamental flow that we see with the

13 Plaintiff's argument is that Section 1500 does not

14 deny a litigant a right of access to present a takings

15 claim as this argument presupposes.

16      It only denies litigants the opportunity to

17 pursue a takings claim in this Court if the litigant

18 has pending the same claim in a different court, but

19 Petro-Hunt has no constitutional rights to maintain

20 dual claims base don the same operative facts in two

21 different courts, and that is the fundamental flaw.

22      Not only did the <u>Davis</u> court -- that the

23 <u>Davis</u> court in 1993 had explicitly held.  The cases

24 that Petro-Hunt relies upon to support its argument

25 are fundamentally different, and I think show what is

1    really the error in Plaintiff's argument.

2        Just one example. The Plaintiffs rely on

3    the <u>District of Columbia v. Heller</u> case, and that is a

4    Supreme Court decision, which invalidated a handgun

5    ban in the District of Columbia.

6        But the reason that the Supreme Court

7    invalidated that handgun ban is because it first

8    decided that individuals do have an individual

9    fundamental constitutional right to bear arms as

10    protected by the Second Amendment.

11        There is no case that I am aware of that

12    would give Petro-Hunt an individual constitutional

13    right to pursue two different claims in two different

14    courts.

15        The idea that a different rule applies

16    , particular on takings claims, because it is

17    constitutional in nature, is incorrect. Congress has

18    the ability to limit the jurisdiction of this court,

19    and has done so, for example, with a six year statute

20    of limitations, as the Supreme Court held in <u>Block</u>,

21    and the Federal Circuit held in cases like <u>Herr v.</u>

22    <u>United States</u>.

23        A constitutional claim can be time barred

24    just like any other claim can. Nothing in the

25    Constitution requires otherwise. That by anality

1          MR. WHITE:  That's correct.  I am pretty
2     sure that amended complaint was filed after this
3     complaint was filed.  This complaint was filed in
4     August of 2000, I believe.
5          THE COURT:  All right.  So at least in terms
6     of your view as to how to deal with the initial
7     complaint, setting aside for the moment your views
8     about supplemental pleadings, is that the Loveladies
9     Harbor is a point that you think gets around what
10    would otherwise be problems with Keene and some other
11    cases?
12         MR. WHITE:  I think the Loveladies Harbor --
13    it is an en banc Federal Circuit case, and I think it
14    answers the question.  It says that it is without
15    legal significance.  If you ask for relief for which
16    there is no jurisdiction, then there is no legal
17    significance for that.
18         THE COURT:  So your view is that that case
19    basically says to disregard that count?
20         MR. WHITE:  I think that you can disregard
21    that count.  The government has disregarded it for 10
22    years.
23         THE COURT:  So sticking with the original
24    complaints, and by that I am not talking about any of
25    the amendments subsequent to the complaint that was

1   filed by your predecessor later in 2000, after the

2   District Court was filed.  Are there other reasons why

3   you think as to that complaint that 1500 doesn't

4   apply?

5               MR. WHITE:  Are you talking about the

6   amended complaint in the District Court case?

7               THE COURT:  No, I am talking about the

8   original complaint filed in this court either months

9   after the first District Court case was filed.  Are

10  there other reasons why?  You made one argument.

11              MR. WHITE:  That 1500 doesn't apply?

12              THE COURT:  Exactly.

13              MR. WHITE:  Well, at that time, Loveladies

14  was --

15              THE COURT:  Well, that is the argument that

16  I am talking about.  I am asking you about that.

17              MR. WHITE:  Well, Loveladies and Keene both

18  said that if you have different relief, then you don't

19  have a 1500 problem.

20              THE COURT:  Well, I don't think that they

21  meant that in terms of if you ask for A and B in one

22  case, and you ask for A, B, and C in the other case,

23  that that means that the overlap does not cause you a

24  problem.

25              And so it seems to me that the relief that

1  was requested in the District Court action initially,

2  and the relief that was requested in the Court of

3  Federal Claims action initially, was the same was it

4  not?

5         MR. WHITE:  It was the same, but in the

6  District Court, it was an alternative pleading, and I

7  think that makes a difference.  You are entitled to

8  plead alternatively, and I still think it is a

9  nullity.  I thought so at the time.

10        THE COURT:  I know.  You continue to repeat.

11  I am trying to get to -- I understand the first

12  argument.  I am asking if you have other arguments.

13        MR. WHITE:  They both ask for relief for a

14  taking.  I believe that is correct.  But the

15  jurisdiction of the District Court wouldn't allow

16  that.

17        THE COURT:  Well, that is your Loveladies

18  Harbor argument, correct?

19        MR. WHITE:  Correct.

20        THE COURT:  Okay.  And so what I am asking

21  you again is whether there is any other reason why you

22  feel that 1500 does not apply to that initial Court of

23  Federal Claims complaint?

24        MR. WHITE:  Well, now under Tohono, they

25  have thrown out relief.  So I am not sure if relief

1  makes any difference under <u>Tohono</u>.  It is operative

2  facts.  If you can't look at it for one purpose, you

3  should not be able to look at it for the other.

4          THE COURT:  How in your view does the facts

5  in the District Court action compare to those in the

6  action filed here?  Were there significant differences

7  between the two complaints?

8          MR. WHITE:  Yes, there are significant

9  differences.  Can I talk for a minute about the

10  preclusion law that <u>Tohono</u> mentioned?

11          THE COURT:  Sure.  Go ahead.

12          MR. WHITE:  Okay.  The resegment second test

13  is the transaction test, and that is the one that --

14          THE COURT:  We are talking about the res

15  judicata?

16          MR. WHITE:  We are talking about the res

17  judicata.  If you are going to use preclusion law to

18  determine what are the operative facts, then you have

19  to use all of the preclusion law, and the transaction

20  test -- and I will talk about the old law in a minute,

21  but the transaction test says that you look to see if

22  it is the same transaction in the first case that was

23  litigated in the second case, and that is Section 24.

24  And Section 26.1(c) --

25          THE COURT:  You are referring to the

1    restatement, correct?

2            MR. WHITE:  Restatement, the second of

3    Judgments, has an exception to the general rule, and

4    it says that the general rule does not apply if the

5    Plaintiff was unable to rely on a certain theory of

6    the case, or to seek certain remedy, or form of

7    relief, in the first action because of the limitation

8    on the subject matter jurisdiction of the court, or

9    restrictions on the authority to entertain multiple

10   theories or demands, or multiple remedies, or forms of

11   relief in a single action.

12           And the Plaintiff who desires in the second

13   action to rely on that theory, or to seek that remedy,

14   or that form of relief.  That exception is in the

15   second restatement.  It is in the first restatement.

16   It is in Black, and it is even in Wells, the guy that

17   wrote the thing about contracts and acts.

18           THE COURT:  So in your view that exception

19   ought to kick in then in this context?

20           MR. WHITE:  It is our case.  We couldn't get

21   anything in the District Court but title.  We can't

22   get anything in this court but money.

23           THE COURT:  Despite what the pleadings say,

24   and it is sort of in a sense a point that buttresses

25   your argument about Loveladies Harbor, correct?

1      MR. WHITE:  Well, it seems to lead back to

2  where Loveladies Harbor was.  We are talking about

3  theories being tied to the facts.  Let me say this

4  about the facts.

5      If you are going to use conclusion law, then

6  I don't think that you can look just to the complaint.

7   I think that you have got to look at the entire -- to

8  all of the facts, and you might have to have even a

9  factual inquiry.

10      The facts that are different in the title

11  case, or the evidence, and I want to talk about it

12  that way for a minute.  The evidence needed to prove

13  the title case are the traditional land documents,

14  public record documents, deeds, leases, and those

15  documents are used to prove title.

16      The fact that the government had issued

17  leases while it was a catalytic event for filing the

18  title case, the leases themselves, the leases

19  themselves don't prove title.

20      On the other hand, in the Court of Claims

21  case, the leases are the operative facts to prove the

22  taking, and in the District Court case, there is no

23  need to prove value.  In the Court of Claims case, if

24  you don't prove value, you don't get anything.  You

25  don't get any money.

1          THE COURT:  Well, that's true, I guess, if

2     we follow up on your view that the District Court

3     action should be viewed as not containing the just

4     compensation clause because that court lacked

5     jurisdiction over it.

6          But hypothetically speaking that is not the

7     law, and if the just compensation clause in that

8     District Court complaint is relevant for purposes of

9     the analysis, does the point you just made hold true?

10    I mean, is there anything different about the nature

11    of the just compensation clause claim that you made in

12    the District Court, that your predecessor made in the

13    District Court, and that which was raised here eight

14    months later?

15         MR. WHITE:  If you were going to try to

16    prove the takings claim in the District Court, I guess

17    you would use the same evidence that you would use in

18    the Court of Claims, but you would not be allowed to

19    do that.

20         THE COURT:  Because of the point that you

21    are making about jurisdiction?

22         MR. WHITE:  And I don't understand how that

23    is not simply a nullity.  I truly don't know.

24         THE COURT:  Well, is one way to look at this

25    point, I guess, is what, is suggesting that if you

1  don't have jurisdiction that none of the facts are

2  operative?

3        MR. WHITE:  Yes, that if you don't have

4  jurisdiction for a stated claim, it just doesn't mean

5  anything.  I used the word nullity, and in Louisiana

6  law, nullity has a certain legal meaning, and it means

7  that.  It means absolutely nothing, no effect one way

8  or the other.  But that is the way that I read

9  Loveladies.

10        THE COURT:  Go ahead.

11        MR. WHITE:  I think that a proper use of

12  preclusion law would lead you back to these

13  exceptions, and these exceptions have been around for

14  a long time.

15        The concurring opinion by Justice Sotomayor

16  mentions this exception, and says that it undermines

17  Tohono's majority opinion, and --

18        THE COURT:  Of course, that is just an

19  opinion of two of them, and not of the others.

20        MR. WHITE:  That's exactly what it is, but

21  it is there, and I don't see how it can be ignored.

22  The majority didn't talk about it, and the majority

23  didn't reject it.

24        Then you have Trusted Integration that comes

25  along and talks a lot about the old rules of

1  was intended.  It doesn't really prevent welfare

2  fraud, or we see no evidence of it.

3         What is wrong with 1500 -- and it is in the

4  statute itself.  It is not the <u>Tecon</u> interpretation of

5  it.  It is in the statute.  I don't think there is

6  another proper way to read it -- is that it doesn't

7  work to prevent duplicative -- I have trouble with

8  that word -- litigation.  If everybody filed first in

9  this Court --

10        THE COURT:  Were that the standard for its

11  constitutionality, I would rule from the bench that it

12  is unconstitutional, okay?  But the problem is that is

13  not the standard.

14        MR. WHITE:  Well, that is not all there is

15  to it either.  It is also an impingement upon a

16  fundamental -- you know, a constitutional right, two

17  of them, but --

18        THE COURT:  Well, there are, of course, a

19  whole number of cases that deal with questions

20  involving the Congress imposing conditions on people

21  bringing lawsuits, some of which can be considerable,

22  and in none of those situations did the Court conclude

23  that the existence of the condition would be declared

24  unconstitutional because it periodically would trip

25  somebody.

1   to 1500 makes it meaningless.

2           THE COURT:  I understand the point.

3   Anything else?

4           MR. WHITE:  I guess not, Your Honor.

5           THE COURT:  Very good.  Thank you, Mr.

6   White.  Mr. Shapiro.

7           MR. SHAPIRO:  Thank you, Your Honor.

8   Counsel had first started with the idea that the

9   District Court action takings claim should be

10  considered a nullity.  We disagree for several

11  reasons.

12          First of all, it is not clear that the

13  District Court actually lacked jurisdiction over that

14  claim.  District Courts, of course, have jurisdiction

15  over takings claims less than $10 thousand.

16          What the Plaintiff is arguing now that it

17  was, quote, clear from the context of the pleadings

18  that Petro-Hunt was seeking more than $10 thousand.

19  Therefore --

20          THE COURT:  And you don't even agree do you

21  with, and are totally apart, with the basic

22  proposition, do you?  In other words, that we conduct

23  this type of jurisdictional analysis and apply 1500?

24          MR. SHAPIRO:  That's correct.  My point is

25  that it is not clear that the District Court actually

1  lacked jurisdiction, and as the Court says, in fact,

2  Section 1500 does not --

3  THE COURT: Well, under that theory, no

4  court in a small Tucker Act case, at least in theory,

5  lacks jurisdiction, because under jurisprudence, you

6  can wave off your claim above $10 thousand and stay in

7  the District Court.

8  You have to plead less than $10 thousand

9  initially, and it has to be below $10 thousand at that

10 point, and as long as you are willing to limit your

11 damages to $9,999, you can stay in the District Court.

12 So every District Court has essentially

13 jurisdiction over any claim as long as  you are

14 willing to accept that limitation on damages, right?

15 MR. SHAPIRO: That's correct.

16 THE COURT: All right.

17 MR. SHAPIRO: But, of course, the District

18 Court complaint did not mention a dollar amount.

19 THE COURT: Well, what about the basic

20 proposition as to whether Loveladies Harbor actually

21 holds what Mr. White says it does?

22 MR. SHAPIRO: We disagree.  There are

23 several cases, including the Franks Equipment case,

24 which says that Section 1500 does not turn on the

25 District Court's jurisdiction.

1          Even more recently the <u>Trusted Integration</u>

2   case said that Section 1500 is not, quote, conditioned

3   upon the question of whether the District Court had

4   jurisdiction of the claim asserted.

5          In that case, of course, the District Court

6   had actually dismissed certain claims.  That never

7   occurred here before the Plaintiffs filed a Court of

8   Federal Claims action.  But that fact that the

9   District Court had already dismissed for lack of

10  jurisdiction is irrelevant.

11         THE COURT:  Well, if that proposition is

12  correct, wouldn't all the 1631 cases go away?

13         MR. SHAPIRO:  I think that's right.

14         THE COURT:  Because by definition if 1631 is

15  properly invoked, it has got to be because the

16  District Court doesn't have jurisdiction.  So you

17  would never get to a <u>Cook County</u> situation would you?

18         MR. SHAPIRO:  That's right.  The second

19  point -- and one more point about that, Your Honor, is

20  that <u>Deco v. United States</u> says that Section 1500

21  should be a battle of pleadings.  Therefore, what

22  happens after the pleadings are filed really should

23  not matter for Section 1500 purposes.

24         THE COURT:  Mr. Shapiro, I am going to do

25  the same thing with you that I did Mr. White, and so

1    of retroactively acquiring jurisdiction, and

2    definitively held that it cannot be done.

3         And what has to happen is that the CFC suit,

4    quote, must be dismissed and refiled to avoid Section

5    1500, and so for that reason, Your Honor, we request

6    that the Court grant our motion.

7         THE COURT:  Thank you, Mr. Shapiro.  Mr.

8    White, anything else, sir?

9         MR. WHITE:  Just a couple of things.  We

10   cited to the Court the Supreme Court Rockwall case,

11   which is a more recent case than Keene, and Rockwall

12   said that you could determine whether there is

13   jurisdiction from the pretrial order, which supplants

14   the pleadings.

15        And I don't think that -- well, that has

16   always been my understanding of a Federal pretrial

17   order, was that it does supplant the pleadings.  So

18   what is in the pretrial order, and I agree and admit

19   that we don't have one here, but if the pretrial order

20   is going to trump any of the pleadings, then I don't

21   know why a supplemental pleading can't be used to

22   establish jurisdiction.  That is a Supreme Court

23   decision.

24        Your Honor, we had asked for leave to file a

25   supplemental memorandum, and you had said denied

1  without prejudice.  Would you allow us to file that in

2  a post-argument --

3           THE COURT:  Well, I think at this point that

4  I have what I need, and one of the reasons why I was

5  hesitant to do that was to open up briefing here so

6  close to oral argument, because if you got to file a

7  brief, then not surprisingly, Mr. Shapiro might want

8  to file a brief.

9           The reality is that right now I am knee-deep

10  in 1500 cases, which means that over the last two

11  weeks that I have read every 1500 case that has been

12  decided in this court, or the Federal Circuit, or the

13  Supreme Court, for about the last 10 years.

14           So the chances that you are going to cite

15  something to me that really does open up a new avenue

16  here are probably not good.  So I don't want at this

17  point to sort of create work for you, when the reality

18  is that the work is really on my back, in terms of

19  reading all this stuff, which I am in the process of

20  doing.

21           MR. WHITE:  Well, can I just give you this

22  one thought.

23           THE COURT:  Go ahead.

24           MR. WHITE:  And the thought is fairly simple

25  and straightforward, and that is that the right to

1  compensation is constitutional, and sovereign immunity

2  is common law.  It is not constitutional.

3          And the jurisdiction of the -- the gist of

4  Bataglia and the Bush case, and some of the other

5  cases that we cited, is that.  The Congress, while it

6  has great power to set the jurisdiction of the Federal

7  Courts, cannot take away jurisdiction of the Federal

8  Courts to provide a constitutional remedy.

9          THE COURT:  Well, this is an issue with

10 which I am very familiar, because I teach it in my

11 classes at Georgetown.  So I think that I am in a

12 position to be able to assess that issue.

13         MR. WHITE:  Okay.  Thanks, Your Honor.

14         THE COURT:  Anything else, Mr. White?

15         MR. WHITE:  I guess I would just say this.

16 The disparity between the 12 year statute of

17 limitations and the 6 year statute of limitations, I

18 don't think that shows any Congressional intent with

19 respect to the language in the Quiet Title Act.

20         But Congress is charged with the knowledge

21 of existing legislation, and so when it says shall

22 preserve Tucker Act claims, it has got to know that

23 the Tucker Act has a short statute of limitations, at

24 least relatively speaking, and it is quite foreseeable

25 of the need to file Tucker Act claims while District

1    Court claims with Quiet Title actions are pending.

2             So it just further bolsters the idea that

3    the language in that statute has to mean what we say

4    it means.

5             THE COURT:  I will take a close look.

6             MR. WHITE:  Thanks, Your Honor.  Oh, one

7    housekeeping thing on our new lawsuit.  The Clerk gave

8    us the time to respond to the government's motion, but

9    the way that I read your order, that is necessary at

10   this time; is that correct?

11            THE COURT:  I need to go back and look.  I

12   can't say off the top of my head, but I will go take a

13   look and make sure, and if necessary, I will clarify

14   it.

15            MR. WHITE:  I have it here.

16            THE COURT:  Well, I just haven't looked.  So

17   I will go take a look as soon as I get back upstairs.

18    I promise.

19            MR. WHITE:  Thanks, Your Honor.

20            THE COURT:  All right.  Mr. Shapiro,

21   anything on those last points of Mr. White?

22            MR. SHAPIRO:  Just very briefly, Your Honor.

23    With regard to the Rockwall case, that is not a

24   Section 1500 case.  It does not discuss Keene, and it

25   does not discuss Black.

<u>CERTIFICATE</u>

DOCKET NO.:      00-512L

CASE TITLE:      Petro-Hunt, LLC, v. U.S.

HEARING DATE:  January 31, 2012


       I certify that the foregoing is a true and correct transcript made to the best of our ability from a copy of the official electronic digital recording provided by the United States Court of Federal Claims in the above-entitled matter.


Date:  February 1, 2012


<u>Paul S. Intravia</u>

Heritage Reporting Corporation
Suite 600
1220 L Street, N.W.
Washington, D.C.  20005-4018

2007 WL 715270
Only the Westlaw citation is currently available.
This case was not selected for
publication in the Federal Reporter.
Not for Publication in West's Federal Reporter
See Fed. Rule of Appellate Procedure 32.1
generally governing citation of judicial
decisions issued on or after Jan. 1, 2007. See
also Fifth Circuit Rules 28.7, 47.5.3, 47.5.4.
(Find CTA5 Rule 28 and Find CTA5 Rule 47)
United States Court of Appeals,
Fifth Circuit.

PETRO-HUNT, L.L.C.; Hunt
Petroleum Corporation; and Kingfisher
Resources, Inc., Plaintiffs-Appellants,

v.

UNITED STATES of America, Aspect Resources,
L.L.C.; Bayou Petroleum Co.; First Texas
Hydrocarbons, Inc.; Oscar C. Forland; Gulf Coast
Oil & Gas Co.; Justiss Oil Co. Inc.; MB Exploration,
L.L.C; Northstar Energy, L.L.C.; Palmer Petroleum,
Inc.; Howell R. Spear; John P. Strang; Ocean Energy
Resources Inc., formerly known as UMC Petroleum
Corp.; Wheless T.D.L. Exploration Co., L.L.C.;
Devon S.F.S. Operating Inc., formerly known as
Santa Fe Snyder Corp.; J. Bradley Jeffreys; Energy
Arrow Exploration L.L.C., Defendants-Appellees.

No. 06-30095.
|
Decided March 6, 2007.

**Attorneys and Law Firms**

J. Ralph White, Freeland & Freeland, Oxford, MS, W.
Michael Adams, Blanchard, Walker, O'Quin & Roberts,
Shreveport, LA, John Mason McCollam, Matthew
Joseph Randazzo, III, Aimee Williams Hebert, Gordon,
Arata, McCollam, Duplantis & Eagan, New Orleans, LA,
for Plaintiffs-Appellants.

Karen J. King, U.S. Attorney's Office Western District
of Louisiana, Patrick S. Ottinger, Ottinger Hebert,
Lafayette, LA, John Smeltzer, U.S. Department of
Justice Environment & Natural Resources Division,
Washington, DC, Evans Martin McLeod, Phelps Dunbar,
New Orleans, LA, Charles Brownman, Denver, CO,

Edward Nicholas Milam, Urban Libiolics Foundation,
Evanston, IL, R. Joseph Wilson, Gaharan & Wilson, Jena,
LA, Jaren Howard, David L. Smelley, Hargrove Smelley
& Strickland, James Fleet Howell, Shreveport, LA, for
Defendants-Appellees.

Oscar C. Forland, Silverhill, AL, pro se.

Howell R. Spear, Pensacola, FL, pro se.

John P. Strang, New York, NY, pro se.

J. Bradley Jeffreys, San Diego, CA, pro se.

Appeal from the United States District Court for the
Western District of Louisiana.

Before SMITH, BARKSDALE, and DENNIS, Circuit
Judges.

**Opinion**

PER CURIAM: *

\*      Pursuant to 5th Cir. R. 47.5, the court has determined
       that this opinion should not be published and is not
       precedent except under the limited circumstances set
       forth in 5th Cir. R. 47.5.4.

 **\*1** Plaintiffs Petro-Hunt, L.L.C.; Hunt Petroleum Corp.;
and Kingfisher Resources, Inc. (collectively, "Petro-
Hunt") brought this suit in order to quiet title to 95
Louisiana mineral servitudes claimed by the United
States. The servitudes are related to 180,000 acres of
surface land acquired by the United States in the late 1930s
for incorporation into the Kisatchie National Forest. The
case now comes before us on its second appeal. *See
Petro-Hunt, L.L.C. v. United States,* 365 F.3d 385 (5th
Cir.2004). Our prior opinion lays out the extensive factual
and procedural history behind the case. On this appeal,
Petro-Hunt argues that the district court erred on remand
by denying a motion for trial; failing that, Petro-Hunt
argues that the court's prior mandate is clearly erroneous
and should be withdrawn. For the reasons below, we
AFFIRM.

The central issue behind the suit is whether Louisiana Act
315, which passed subsequent to the acquisition at issue
in this case, operates retroactively to render the mineral
servitudes imprescriptible, such that they may never revert
to the United States through non-use. The lands to which
these servitudes relate were acquired by the United States

at the same time as the 800 acres of land and the single mineral servitude at issue in our earlier decision in *United States v. Nebo Oil*, 190 F.2d 1003 (5th Cir.1951). For present purposes, it is enough to note that the earlier Petro-Hunt appeal determined that the *Nebo Oil* decision did not quiet title to anything beyond the 800 acres of land and the single mineral servitude at issue in that case and that therefore *Nebo Oil* did not, through either res judicata or collateral estoppel, bar the present suit. *See Petro-Hunt,* 365 F.3d at 396-97.

Having reached that determination, the panel then looked to the Supreme Court's decision in *United States v. Little Lake Misere Land Co.,* 412 U.S. 580 (1973), and this court's subsequent decision in *Central Pines Land Co. v. United States,* 274 F.3d 881 (5th Cir.2001). Following that precedent, the first *Petro-Hunt* panel determined that federal law governed the choice-of-law decision presented by the facts of this case and that Act 315 could not be used as the federal rule of decision because it is hostile to the federal interest at stake. *Petro-Hunt,* 365 F.3d at 399. Accordingly, the panel found that "the 95 servitudes that were not at issue in *Nebo Oil* are subject to the contractual provisions permitting prescription after ten years' nonuse" and remanded the case "so that the district court can determine which servitudes have in fact prescribed." *Id.*

On remand, Petro-Hunt filed a motion for trial on the question of whether Act 315 was "hostile to the government" and therefore could not be applied to the facts of this case-in other words, whether the 95 servitudes in this case are subject to the rule of prescription. The district court denied the motion for trial, citing the mandate in the first appeal for the proposition that the "only issue to be determined is which of the #95 servitudes that were not at issue in *Nebo Oil* ' have in fact prescribed for nonuse." The parties then stipulated that five of the servitudes-constituting approximately 109,844.5 acres-still exist through use and that the remainder had prescribed. The district court entered final judgment based on this stipulation, granting Petro-Hunt's earlier alternative motion for summary judgment. The judgment declared the five extant servitudes to be in "full force and effect" and declared any leases on lands burdened by those servitudes to be "null and void." On appeal, Petro-Hunt argues that the district court overstepped its bounds by denying the motion for trial; failing that, Petro-Hunt argues that the court's prior mandate is clearly erroneous

and should be withdrawn. We find no merit in either assertion.

**\*2** Petro-Hunt's first argument is that the prior panel's statement regarding the applicability of *Little Lake Misere* and *Central Pines* to the present case constituted dicta, since only the questions of res judicata and collateral estoppel were raised before either the district court or the circuit panel during the first appeal. This court, however, has decided issues "on which the lower court has had no occasion to rule," in situations when "the issue before [the court] is a purely legal one." *Cont'l Sav. Ass'n v. U.S. Fid. & Guar. Co.,* 752 F.2d 1239, 1244 n. 4 (5th Cir.1985). Such rulings are "most efficient to dispose of [an] issue promptly, thus truncating the subsequent development of [a] case." *Id.* Where deciding the issue "require [s] no further factfinding by the district court and ... ha[s] been briefed by the parties in trial briefs included in the record," such action by the court "promotes the finality of litigation, consistent with the goal that "the federal system aims at a single judgment and a single appeal." *Harris v. Sentry Title Co.,* 806 F.2d 1278, 1280 n. 1 (5th Cir.1987) (per curiam) (citing 1B JAMES WM. MOORE ET AL., MOORE'S FEDERAL PRACTICE ¶ 0.404[10] (1984)).

> [T]his Court often addresses issues for the guidance of the parties and the district court on remand. It cannot be said that such considered statements should be dismissed as dictum simply because the Court was not absolutely required to raise and address such an issue. Such statements constitute the "professed deliberate determinations of the [court]" and, when done in this fashion, may not be summarily dismissed as dictum. *See* BLACK'S LAW DICTIONARY 409 (5th ed.1979).

*Harris,* 806 F.2d at 1280 n. 1.

We find that the earlier panel offered just such a deliberate, considered statement in ruling on the choice-of-law issue. The district court could not, therefore, have properly disregarded the panel's explicit directions regarding the scope of the remand and acted properly in limiting its review in accordance with those instructions. *See Briggs v. Penn. R.R. Co.,* 334 U.S. 304 (1948); *Harris,* 806 F.2d at 1280 n. 1.

With regard to Petro-Hunt's second argument-that the prior mandate of this court is clearly erroneous and should be withdrawn-we begin by noting the well-established rule that one panel within this circuit may not overrule

the opinion of another. *Ryals v. Estelle,* 661 F.2d 904 (5th Cir.1981); *United States v. Henry,* 727 F.2d 1373 (5th Cir.1984). Furthermore, the law-of-the-case doctrine forbids us from re-examining issues of law or fact decided in a prior appeal. *See United States v. Becerra,* 155 F.3d 740, 752 (5th Cir.1998). There are three exceptions to this doctrine: we may re-examine an earlier decision only when (1) substantially different evidence is presented; (2) there is a change in controlling legal authority; or (3) "the decision was clearly erroneous and would work a manifest injustice." *Id.; see also White v. Murtha,* 377 F.2d 428 (5th Cir.1967). "Mere doubts or disagreement about the wisdom of a prior disagreement ... will not suffice." *Hopwood v. State of Texas,* 236 F.3d 256, 272 (5th Cir.2000). Petro-Hunt relies on the third of these narrow exceptions, but in support only reasserts the arguments raised before this court during the first appeal. We are not persuaded that the prior panel decision results in such manifest injustice as to warrant the exception, and we therefore decline to apply the exception and revisit the earlier decision.

**\*3** The district court properly limited the scope of its remand in accordance with the earlier panel instructions, and Petro-Hunt has not shown that the earlier decision on appeal is so clearly erroneous as to work a manifest injustice. We therefore AFFIRM the district court's ruling.

**All Citations**

Slip Copy, 2007 WL 715270

---

End of Document

© 2016 Thomson Reuters. No claim to original U.S. Government Works.

 © 2016 Thomson Reuters. No claim to original U.S. Government Works.

## CERTIFICATE OF SERVICE

I hereby certify that on November 7, 2016, the foregoing Reply Brief of

Plaintiff-Appellant was electronically filed with the Clerk of the Court for the

United States Court of Appeals for the Federal Circuit using the appellate CM/ECF

system. All participants in the case are registered CM/ECF users and service will

be accomplished by the appellate CM/ECF system.


November 7, 2016                    /s/ J. Ralph White
                                    J. Ralph White
                                    WHITE ANDREWS &
                                    SHACKELFORD, LLC
                                    650 Poydras Street, Suite 2319
                                    New Orleans, Louisiana 70130
                                    (504) 799-2585
                                    ralph@whiteandrews.com

                                    *Counsel for Petro-Hunt, L.L.C*